UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MCKESSON AUTOMATION, INC. a Delaware Corporation, ) ) ) | |
| Plaintiff, ) | Civ. Action No. 1:06CV00028-SLR/LPS |
| ) | |
| v. ) | |
| ) | |
| TRANSLOGIC CORPORATION a Delaware Corporation, and ) ) ) | PUBLIC VERSION |
| ) | |
| SWISSLOG ITALIA S.P.A. an Italian Corporation, ) ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF CHRISTINA A. ONDRICK, ESQ.

I, CHRISTINA A. ONDRICK, hereby declare, affirm and state the following:

1.    I am an attorney with the law firm of Sutherland Asbill & Brennan LLP in

Washington DC at 1275 Pennsylvania Avenue, NW.

2.    I am submitting this declaration in support of Plaintiff McKesson Automation,

Inc.'s Brief In Opposition To Defendants' Motion To Dismiss Willfulness Allegations and in

support of Plaintiff McKesson Automation, Inc.'s Memorandum In Support Of Its Motion For

Leave To File A Second Amended Complaint.

3.    The facts set forth below are known to me personally and I have first-hand

knowledge of them.

4.    Attached hereto as Exhibit 1 is a true and accurate copy of a document produced

by McKesson bearing bates range M0005045 – M0005046.

7874844.1

5.    Attached hereto as Exhibit 2 is a true and accurate copy of an excerpt from The Neuenschwander Report, ©2001, produced by McKesson and bearing bates range M0000122 – M0000130.

6.    Attached hereto as Exhibit 3 is a true and accurate copy of a document produced by McKesson bearing bates range M0123573 – M0123574.

7.    Attached hereto as Exhibit 4 is a true and accurate copy of U.S. Patent No. 5,468,110

8.    Attached hereto as Exhibit 5 is a true and accurate copy of U.S. Patent No. 5,593,267.

9.    Attached hereto as Exhibit 6 is a true and accurate copy of an excerpt from Top 20 Year-End Best in KLAS, 2006, produced by McKesson and bearing bates range M0243244 – M0243262.

10.    Attached hereto as Exhibit 7 is a true and accurate copy of a document produced by McKesson bearing bates range M0010861 – M0010864.

11.    Attached hereto as Exhibit 8 is a true and accurate copy of a document produced by McKesson bearing bates range T010820 – T010823.

12.    Attached hereto as Exhibit 9 is a true and accurate copy of excerpts from the transcript of the deposition of Sean McDonald, dated August 30, 2007, pp. 255 – 257.

13.    Attached hereto as Exhibit 10 is a true and accurate copy of a document produced by McKesson bearing bates range M0006591 – M0006592.

14.    Attached hereto as Exhibit 11 is a true and accurate copy of excerpts from the transcript of the deposition of Charles Kegley, dated July 26, 2007, pp. 175 – 176.

15. Attached hereto as Exhibit 12 is a true and accurate copy of excerpts from the transcript of the deposition of Maurizio Davolio, dated May 23, 2007, pp. 26-33; 36 – 58; 87; 92-96.

16. Attached hereto as Exhibit 13 is a true and accurate copy of a document produced by Defendant Swisslog Italia, bearing bates range S073794 – S073799.

17. Attached hereto as Exhibit 14 is a true and accurate copy of an email attaching the February 2002 Provvisionato Opinion, produced by Defendant Swisslog Italia, bearing bates range S128314 – S128317.

18. Attached hereto as Exhibit 15 is a true and accurate copy of excerpts from the transcript of the deposition of Andrea Balsamo, dated March 26, 2007, pp. 72 – 73; 99.

19. Attached hereto as Exhibit 16 is a true and accurate copy of excerpts from the transcript of the deposition of Marcello Bergamini, dated May 17, 2007 pp. 11-12, 57-59, 126.

20. Attached hereto as Exhibit 17 is a true and accurate copy of an email attaching the November 2002 Provvisionato Opinion, produced by Defendant Swisslog Italia, bearing bates range S128281 – S128286.

21. Attached hereto as Exhibit 18 is a true and accurate copy of a document produced by Defendant Swisslog Italia, bearing bates range S128265 – S128267.

22. Attached hereto as Exhibit 19 is a true and accurate copy of the January 2006 Provvisionato Opinion, produced by Defendant Translogic, bearing bates range T056855 – T056858.

23. Attached hereto as Exhibit 20 is a true and accurate copy of a document produced by Defendant Swisslog Italia, bearing bates range S047742 – S047762.

24.     Attached hereto as Exhibit 21 is a true and accurate excerpt of a document titled "Functional Specifications – PillPick System" produced by Defendant Translogic, bearing bates range T012575.

25.     Opinion related documents were finally produced by Defendants on March 26, 2007 and May 23, 2007.

26.     McKesson sought to schedule the necessary depositions of Defendants' witnesses upon receipt of the opinions and opinion related documents.

27.     These witnesses include 30(b)(6) deponents from Swisslog Italia and Translogic on topics relating to the Defendants' advice of counsel defense, two Italian opinion writers, and three attorneys from Defendants' trial counsel, Dickstein Shapiro LLP.

28.     McKesson completed the depositions of Defendants' Rule 30(b) witnesses in July of 2007. McKesson also sought to depose Italian opinion counsel that same month.

29.     The deposition did no go forward for a variety of reasons. McKesson repeatedly attempted to reschedule the dates, but was informed that the depositions could not occur until later in the Fall of 2007.

30.     Defendants' attorneys coordinated deposition logistics with Italian opinion counsel. Swisslog never provided another deposition date.

31.     Attached hereto as Exhibit 22 is a true and accurate copy of *Adidas America, Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 508060 (D. Or. Feb. 22, 2008).

32.     Attached hereto as Exhibit 23 is a true and accurate copy of *Energy Trans. Group, Inc., v. William Demant Holding*, C.A. No. 05-422 GMS, 2008 WL 114861 (D. Del. Jan. 7, 2008).

7874844.1

33.    Attached hereto as Exhibit 24 is a true and accurate copy of *F5 Networks, Inc. v.*

*A10 Networks, Inc.*, No. C07-1927, 2008 WL 687114 (W.D. Wash. March 10, 2008).

34.    Attached hereto as Exhibit 25 is a true and accurate copy of *Venetec Inter., Inc. v.*

*Nexus Medical, LLC*, No. 07-57, 2008 WL 821038 (D.Del. March 28, 2008).

I declare under penalty and perjury that the foregoing is true and correct under the laws of

the United States.

Dated:  April 15, 2008

Christina A. Ondrick

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April, 2008, I served by hand delivery and

electronic filing the public version of the DECLARATION OF CHRISTINA A. ONDRICK,

ESQ., using CM/ECF, which will send notification of such filing to the following:

> Julia Heaney, Esquire
> MORRIS, NICHOLS ARSHT & TUNNELL
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899

I also certify that, on this 22nd day of April, 2008, I served the aforementioned document,

by email and First Class Mail to the following participants:

> Lawrence C. Drucker, Esquire
> Alfred R. Fabricant, Esquire
> Richard LaCava, Esquire
> Bryan N. DeMattio, Esquire
> DICKSTEIN SHAPIRO LLP
> 1177 Avenue of the Americas
> New York, NY 10036

> /s/ Dale R. Dubé
> Dale R. Dubé  (I.D. No. 2863)

# EXHIBITS 1-3 and 6-21

# REDACTED IN THEIR ENTIRETY

# EXHIBIT 4



US005468110A

# United States Patent [19]

## McDonald et al.

[11]    **Patent Number:**          **5,468,110**

[45]    **Date of Patent:**          **Nov. 21, 1995**

[54]    **AUTOMATED SYSTEM FOR SELECTING PACKAGES FROM A STORAGE AREA**

[75]    Inventors: **Sean C. McDonald**, Pittsburgh, Pa.;
          **Ellen J. Hertz**, Clemmons, N.C.;
          **James A. Smith**, Allison Park, Pa.;
          **Gregory Toto**, Santa Cruz, Calif.

[73]    Assignee: **Automated Healthcare, Inc.,**
          Pittsburgh, Pa.

[21]    Appl. No.: **295,495**

[22]    Filed:      **Aug. 25, 1994**

### Related U.S. Application Data

[63]    Continuation of Ser. No. 871,832, Apr. 21, 1992, abandoned,
          which is a continuation-in-part of Ser. No. 469,217, Jan. 24,
          1990, abandoned.

[51]    Int. Cl.$^6$ ...................................................... **B65G 1/04**
[52]    **U.S. Cl.** ........................... **414/273**; 364/478; 414/280;
                                          414/268; 414/281; 414/285
[58]    Field of Search ...................................... 235/385, 351;
                        414/266, 267, 268, 269, 270, 273, 274,
                        277, 280, 281, 282, 331, 285; 221/3, 9,
                        15; 364/478, 413.02, 479

[56]                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,802,580 | 4/1974 | Castaldi | 414/280 X |
| 3,986,612 | 10/1976 | Kamm et al. | 209/111.7 |
| 4,546,901 | 10/1985 | Buttarazzi | 414/280 X |
| 4,651,863 | 3/1987 | Reuter et al. | 414/280 X |
| 4,669,047 | 5/1987 | Chucta | 414/331 X |
| 4,687,390 | 7/1987 | Bonneton et al. | 414/282 |
| 4,786,229 | 11/1988 | Henderson | 414/273 X |
| 4,789,295 | 12/1988 | Boucher, Jr. et al. | 414/280 X |
| 4,792,270 | 12/1988 | Yoshida | 414/273 |
| 4,812,629 | 3/1989 | O'Neil et al. | 414/274 X |
| 4,820,109 | 4/1989 | Witt | 414/282 |
| 4,896,024 | 1/1990 | Morello et al. | 414/274 X |
| 5,129,777 | 7/1992 | Pohjonen et al. | 414/280 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2596299 | 10/1987 | France . | |
| 304 | 1/1979 | WIPO | 414/273 |
| 85/00232 | 8/1984 | WIPO . | |

*Primary Examiner*—Frank E. Werner
*Attorney, Agent, or Firm*—Buchanan Ingersoll; Lynn J. Alstadt

[57]                    **ABSTRACT**

A system for filling orders, such as prescriptions for patients, comprising a device for holding packages. Each package has the same type of contents being held in a predetermined location by the holding device. Each package has an identity which defines the contents therein. The holding device has a plurality of predetermined locations corresponding to a plurality of different types of contents. Additionally, the system is comprised of a device for supplying packages to the holding device. Also, there is a device for picking a package from the holding device that is identified in the order for the purpose of restocking the holding device. The picking device is in communication with the holding device and supplying device. In a preferred embodiment, the contents of each package is a single dosage of medicine.

**22 Claims, 19 Drawing Sheets**



**U.S. Patent**     Nov. 21, 1995     Sheet 1 of 19     **5,468,110**



Figure 1



Figure 2



Figure 3



Figure 4



Figure 5



Figure 6



Figure 7



FIGURE 8



FIGURE 9



FIGURE 10



Figure 11



Figure 12



Figure 13



Figure 14



Figure 15



FIGURE 16



FIGURE 17

FIGURE 18

**U.S. Patent**          Nov. 21, 1995          Sheet 19 of 19          **5,468,110**



FIGURE 19

5,468,110

| 1 | 2 |

## AUTOMATED SYSTEM FOR SELECTING PACKAGES FROM A STORAGE AREA

### RELATED APPLICATION

This is a continuation of Ser. No. 07/87/832 filed Apr. 21, 1992, now abandoned which is a continuation-in-part of our U.S. patent application Ser. No. 07/469,217 filed Jan. 24, 1990, now abandoned.

### FIELD OF THE INVENTION

The present invention relates to an automated system for selecting stored articles. More specifically, the present invention relates to an automated system for filling prescriptions and restocking medicines in a pharmacy.

### BACKGROUND OF THE INVENTION

Many industries store products or parts in a storeroom or storage area and repeatedly select some of the stored items to fill orders or for other uses. Such items may range from small electronic components used by a manufacturer of electronic devices to automotive parts, which vary in size, used by service departments of automobile dealerships. Usually one or more people are employed to retrieve the requested items and to restock new and returned items. These individuals may also be required to confirm that the requested items are compatible with one another and with previously supplied items. If the supplied items are to be billed to a customer or charged to particular internal accounts, the list of items is first written by the requestor, and rewritten or entered into a computer database by the storeroom attendant to create an invoice, supply list or other document. In some instances, further generations of the list are made by installers, users or billing clerks. Such methods have built-in opportunities for mistakes every time a list is rewritten and are less efficient than automated systems. Moreover, as labor costs rise and the size of inventory needed to be stored expands, the conventional storeroom and parts department become more and more expensive.

Some businesses have attempted to control costs by limiting inventory through standardization of parts. But such limits are not possible or desirable in some industries, particularly in a hospital pharmacy.

Currently, in large hospital environments, doctors visit patients in nursing units and write out medication orders for each patient. A patient is typically placed on a certain medication which may require multiple doses of medication be administered over a period of a day. Some medications are administered at certain times of the day and possibly at intervals of several hours. Patients may also request certain medications on an elective basis for disorders such as headaches. These requests are included in the doctor's order that is sent from the nursing unit to the central pharmacy of the hospital.

Once an order is received by the pharmacy, it is checked by registered pharmacists and input into the pharmacy information system. These orders reflect not only orders that are added to a particular patient's treatment, but changes in the medication treatment. The pharmacy information system combines this information with the patient's existing medication schedule and develops a patient medication profile. A fill list is generated from that profile. The fill list is a list of all the medications that must be distributed to all patients for the day. This information is sent to the pharmacy printer where a hard copy is generated. Frequently, that hard copy

or a copy thereof is sent to the billing department so that the medication can be charged to the patient or his insurer.

At this point, the drugs for a particular patient are hand-picked by either a pharmacist or a pharmacy technician and placed in the particular patient's designated box. A registered pharmacist must then check the accuracy of the patient order before it leaves the pharmacy. Individual patient boxes are then loaded into a large cassette and delivered to the nursing unit.

Approximately 30% of the drugs dispensed each day are returned to the pharmacy unused. Since each drug is individually packaged, the drugs must be returned to the pharmacy stock. Patients are then credited for unused medication. This return and crediting process is a very time-consuming task and requires significant amount of pharmacy manpower.

In a typical large pharmacy, up to 35 pharmacists and pharmacy technicians are responsible for all aspects of the unit dose dispensing task. Because this process is done manually, a certain amount of error occurs. Studies have estimated that a half-percent error rate is typical in a large hospital. Since a hospital may dispense over 6,000 doses each day, this error rate leads to a significant number of missed or incorrect doses.

Several companies have tried to automate this process through various approaches to the problem. Meditrol utilizes a vending machine approach to dispense the unit dose medications. Each nursing unit must have its own stock of prescription drugs. Nurses key in a patient ID and the drugs for that patient are then dispensed from the vending machine. This system is very expensive because of the necessity of purchasing a machine for each nursing unit. Also, restocking each machine is a very time-consuming task. Implementation of this system requires a complete modification of the current drug dispensing process which many hospitals are reticent to undertake. The system claims no labor-saving advantages from its implementation. This system is covered under U.S. Pat. No. 3,917,045 titled "Drug Dispensing Apparatus" and dated Nov. 11, 1975.

Baxter Travenol offers a dispensing system from Samsung, a Korean company, which dispenses bulk solids into a package which is dispensed to the pharmacist. This system only dispenses the 200 most frequently used solids. A typical hospital pharmacy can contain over 1,500 different medications, many in liquid, syringe or bottle form. These medications cannot be automatically dispensed by this system, but must be manually selected by the pharmacist.

Neither system allows the dispensed medications to be automatically returned to the storage area.

There is a need for an automated system which is able to dispense all dosage forms currently contained in a hospital pharmacy. Medicines should be automatically dispensed by the system per a patient order and placed in individual patient medication boxes for a pharmacist to check. Each drug and each patient box should be individually bar coded so that the accuracy of the dispensing process can be automatically checked by the system. Once drugs are returned to the pharmacy, the system should automatically return each drug to its proper location in inventory and credit the patient's account for the return. One system should also keep a running inventory and notify the user whenever inventory of a particular item drops below a preset level and whether the shelf life of an item has passed. With such a system, a hospital can recognize significant labor savings, as well as savings based on improved accuracy in the dispensing function and better tracking of inventory and expired medications.

3

## SUMMARY OF THE INVENTION

We provide an automated method and apparatus for selecting and restocking stored items, which is particularly useful for filling patient medication orders in a hospital pharmacy. The stored items must be packaged to be held in a storage rack. Preferably, each package contains a bar code corresponding to the package contents. The items are arranged in a main storage rack so that like items are in the same location and a predetermined location is provided for every item.

We prefer to provide a second rack or a designated portion of the main storage rack for receipt of new or returned items to be restocked. Such items can be randomly placed on this supply station for transmittal to their respective predetermined locations on the storage rack.

We also provide a means for picking items from and placing items in the storage rack and the supply station. The picking means preferably is comprised of a gripper assembly mounted on a transport vehicle which moves along a track or other controlled route. The gripper assembly preferably has a movable rod or other carrier for holding selected items, at least one vacuum head and associated controls for gripping and moving selected items. We prefer to provide a bar code reader for reading item packages.

We also prefer to provide a conveyor on which boxes, patient medication trays or drawers can be placed. The conveyor is positioned so that the picking means can place selected items into appropriate containers on the conveyor.

We provide a processing unit with associated memory and data entry peripherals. This computer system receives the list of requested items, directs the picking means, checks the items selected and prepares reports. Data can be entered manually through a keyboard or bar code reader or electronically through an RS 232 port. Reports may be printed, displayed on a console or transmitted to a memory or another computer for later use.

Other details and advantages of our method and apparatus will become apparent from the description of the preferred embodiments shown in the drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings, the preferred embodiments of the invention and preferred methods of practicing the invention are illustrated in which:

FIG. 1 is a schematic representation of our present preferred system.

FIG. 2 is a side view of a present preferred package.

FIG. 3 is a perspective view of one present preferred storage rack.

FIG. 4 is a perspective view of a portion of a second preferred storage rack.

FIG. 5 is a perspective view of a portion of a third preferred storage rack.

FIG. 6 is a schematic representation showing the storage rack, conveyor and movable support structure which holds a gripper assembly.

FIG. 7 is a schematic view of a present preferred gripper assembly.

FIG. 8 is a front view of a present preferred gripper assembly.

FIG. 9 is a side view of the gripper assembly of

FIG. 7 with the storing rod in a raised and extended position.

4

FIG. 10 is a side view of the gripper assembly of FIG. 8 with the storing rod in a lowered and partially retracted position.

FIG. 11 is a diagram showing a preferred vacuum and pressure line for the gripper assembly.

FIG. 12 is a schematic representation of the gripper assembly mounted on a vehicle.

FIG. 13 is a perspective view of a rod with packages thereon connected to a support bar.

FIG. 14 is a schematic representation of a side view of a first rod and a second rod and having packages thereon attached to a portion of the support bar.

FIG. 15 is a schematic overhead view of an alternative system for filling an order.

FIG. 16 is a flowchart of the filling process.

FIG. 17 is a flowchart of the check process.

FIG. 18 is a flowchart of the return process.

FIG. 19 is a flowchart of the restocking process.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings wherein like reference numerals refer to similar or identical parts throughout the several views, and more specifically to FIG. 1 thereof, there is shown a schematic representation of a present preferred system 10 for filling orders, such as prescriptions for patients. The system 10 contains storage racks 12 for handling packages. We prefer to provide at least two storage racks 12 and arrange them parallel to one another. Various storage rack designs can be used and certain present preferred storage racks are shown in FIGS. 3, 4 and 5. In our system, each package preferably contains only one product, although the product may consist of two or more related items, such as nut and bolt. When our system is installed in a hospital pharmacy, each package preferably contains a single dose of medicine.

A present preferred package 14 is illustrated in FIG. 2. Although the package could be a blister card or box, we prefer to use a clear plastic bag having a hole 15 to permit the package to be hung on a rod 30, 48, 65 or 66 shown in FIGS. 3, 6 and 14. Each package preferably has a bar code 16 and a written description 17, which identify the contents of the package. A white area 17a can be created on the clear plastic bag over which the written description 17 can be printed, stamped or even handwritten. The bar code and the written description may include not only the name of the product, but also its quantity, weight, instructions for use and expiration date. We also prefer to position the bar code and label on the package so that there is a large unmarked area 62 through which one can see the contents of the package. FIG. 2 represents a clear plastic bag for a unit dose of medicine. We can use a bag having a perforation line for easy opening or a recloseable bag having an interlocking rib type seal. The perforation line or rib seal is located along line 13. This type of bag is useful in a hospital pharmacy which buys medicines in large or bulk quantities and must repackage the drugs in individual dose packages. Packages 14 can be any desired size. We have used a rectangular package having dimensions indicated by arrows A, B, C and D, wherein A is 3.5 inches, B is 1.0 inch, C is 3.0 inches and D is 0.1875 inches. Alternatively, the package 14 can have A equal 5.0 inches, B equal 1.25 inches, C equal 5.0 inches and D equal 0.1875 inches.

An individual dose of medicine can be manually fed into

5,468,110

5

an automated packaging system **98**, as shown in FIG. 1, which automatically seals the package and prints a bar code and typewritten label directly on the package. In a preferred embodiment, we utilize the H-100™ packaging system as manufactured by Automated packaging Systems of Twinsburg, Ohio. With the addition of the Accu-print™ 100 programmable In-Line Direct Transfer Imprinter, also manufactured by Automated packaging Systems, a bar code can be printed directly on the medicine package.

A storage rack **12**, which may also be used for a supply station, is shown in FIG. 3. This rack is configured to hold packages of the type illustrated in FIG. 2. The rack has a rectangular frame **28**, having an open front and back. Running across the back are a plurality of back rod supports **32** from which the rods **30** extend. The frame **28** with rod supports **32** forms an X, Y coordinate system with each rod **30** and medicine packages **14** therein having a unique X, Y coordinate. Packages are placed in the storage rack so that each product is located at a known X, Y coordinate. Since every product is in a known X, Y location, it is possible to direct an automatic picking means to any product location to select a desired item. The packages are segregated within the storage rack so that all packages in any given location have the same contents.

Although we prefer to use racks in which packages are hung on rods, other types of racks can be used for storage racks and supply stations in our system. In FIG. 4, we show the upper portion of a rack having a rectangular frame **21** with an open front and closed back **23**. Attached to the back **23** are sets of brackets **25** positioned to hold packages **27**. To be held securely in this rack, such packages must be fairly rigid. Blister cards and boxes can be used. If desired, a hole **15** could be provided in the packages to permit them to be carried on a rod.

A top portion of another suitable rack having a rectangular frame **21**, open front and closed back **23** is shown in FIG. 5. This rack has a set of shelves **29**, which may be inclined toward back **23**. A set of dividers **31** separates groups of packages **27**.

The racks of FIGS. 3, 4 and 5 have two important common features. First, the packages are held in locations having known X, Y coordinates. Those coordinates could be single X, Y values as may correspond to the position of the package holes **15** or a group of X, Y values defining an entire package. Second, there is sufficient clearance between packages to allow automated picking means to select, grab and replace individual packages.

Referring now to FIGS. 1 and 6, we provide storage racks **12** on either side of a track **42** over which a vehicle **44** may travel. The vehicle may be column-shaped as in FIG. 6. Many types of drive systems could be used to propel the vehicle. For example, one could provide a motor indicated by block **47** to propel wheels (not shown) at the base of the vehicle. Alternatively, one may use a chain or cable running through the track **42** to pull the vehicle to any desired location. Whatever drive system is used should be capable of moving the vehicle to positions along the track which correspond to the X coordinates of the packages within the rack. Thus, computer **24**, which controls the drive system, can direct the vehicle **44** to a location in front of the package or packages to be selected.

Packages are selected by a picking means **38**, preferably of the type illustrated in FIGS. 7 though 10. The picking means is mounted on column-shaped vehicle **44** in a manner to allow controlled vertical movement along that column. In this manner, the picking means **38** can be positioned at

6

locations along column **44** which correspond to the Y coordinates of packages to be selected. The picking means **38** is controlled by a computer **24**, or local area network of computers, having a database. The database has the order to be filled and a record of the predetermined locations **18** of each different product in the storage rack **12**. The computer **24** guides the picking means **38** based on information contained in the database, such that the picking means **38** picks a package **14** according to the order to be filled. The picking means **38** can also include means, such as a bar code reader **26** as shown in FIG. 7, for determining the identity **16** of a package **14** in the storage rack **12** or in a supply rack **20** and providing its identity **16** to the computer **24**. The computer **24** guides the picking means **38** to select the desired packages and deliver them to a desired location. In the system of FIGS. 1 and 6, the packages are delivered to containers **36** located on conveyor **34**. When the system is installed in a hospital pharmacy, the containers **36** are individual patient boxes in which the patient's medication is delivered from the pharmacy to the appropriate floor or nurses' station. The patient boxes preferably are bar coded with a patient identification code. After a patient's prescription is filled and the patient box **36** has all the medicine packages called for in the prescription, a conveyor belt **34** moves the patient box **36** to a check station **80**. An operator uses the check station bar code reader **82** to scan the bar code label on the filled patient box **36**, see FIG. 15. The patient identification number is taken from the inputted bar code and the prescription of the patient is displayed on the check station screen **84** of the check station console **86** connected to the computer or network of computers **24**. The operator then scans individual medicine package bar codes in the patient box **36**. The identity of the medicine packages **14** in the patient box **36** is automatically checked for correctness with respect to the patient list on the station screen **84**. If the medicine packages **14** in the box **36** are correct, then the patient box is allowed to continue on towards the ultimate destination and the next filled patient box **36** is then checked. If the medicine packages **14** in the patient box **36** are not correct, then it is determined whether the error, whatever that may be, can be corrected. If the correction can be made, then the record on the check station screen **84** is corrected and the procedure for verifying correctness is then repeated. If the problem cannot be corrected, then the patient box **36** can be manually filled or resubmitted to be filled with missing doses by the system and the computer is notified that the patient's prescription has not yet been filled.

In the event that a patient does not take all of the medicine which has been prescribed, unused medicine is returned to the hospital pharmacy in the patient box **36**. Typically, patient boxes are transferred in a carrier which contains several patient boxes. This carrier is received at a return station **92**. The patient box **36** is first removed from the carrier returned from a nursing unit. An operator uses the return station bar code scanner **91** to scan the bar code on the patient box **36**. The nursing unit number and the patient identification number is then parsed from the inputted bar code of the patient box **36**. The database is then accessed and the patient dispensing record is retrieved. On the return screen **94**, there is displayed for a particular patient at the operator console **96**, a list of the medicines ordered and dispensed to the patient. The operator of the return station **92** then scans the identity **16** of the medicine in the patient's box **36** with the return station bar code scanner **91**. The medicine packages **14** that are found thereon are verified as being dispensed to the patients. The expiration date of the medicine in the medicine package **14** is then determined. If

5,468,110

7

the expiration date of a medicine in the medicine package 14 has passed, then the medicine package is discarded. If the expiration date has not passed, then the returned medicine package 14 is placed in the supply rack 20. If there is more medicine to be returned, the process is then repeated. If there is no more medicine in the patient box 36 to return, then the return station console 96 is checked to verify the correctness of the medicine returned. If the screen is correct, then the return record is accepted and the database is updated. If the screen 94 is incorrect, then the screen is corrected to correspond to the returned medicine packages 14 and the patient box 36. In this manner, the system will have developed a record of all medication given to each patient. That record can be transferred to a hospital billing system and used for billing purposes. The data can also be input into an inventory monitoring system and used to generate reports or orders for new supplies.

We prefer to provide supply racks 20 which serve as a holding area for returned and new products. These racks are comparable to storage racks 12 and are accessed by the picking means 38 in the same manner. However, products are randomly placed in the supply racks either manually or by the picking means. The supply racks 20 are shown in FIG. 1 at a position where they are accessible to the picking means. However, we prefer that the supply rack be movable. Then it could be moved to other convenient locations, such as near packaging system 98 for refilling.

When packages 14 are to be restocked onto the storage racks 12, the supply rack 20 is placed in a predetermined position alongside the storage racks 12. By being placed in a predetermined position, the X and Y coordinates at which packages may have been placed in return racks 20 are known to the computer 24. Picking means 38 is then positioned for a given package in the return rack. The bar code reader 26 on the end of picking means 38 then scans the identity 16 of the package 14 that is about to be picked. The process of picking the returned packages 14 is the same as occurs with respect to the process of obtaining packages 14 from the storage rack 12. The only difference is that the order of the packages 14 and their identity as they are picked is saved in the computer 24. When the picking means is then moved to the storage racks 12 the computer knows the identity of the respective medicine package 14 on the picking means 38, which is about to be placed back onto the storage racks 12.

The picking means 38 includes at least one gripper assembly illustrated in FIGS. 7 through 12. As shown in FIG. 12, we prefer to provide a support bracket 41 extending from column 44. This bracket can move along column 44 in a vertical direction. A third actuator 43 is attached to bracket 41. Mounting 39 permits movement along rod 41 and movement at bar 43 in a direction normal to rod 41. A picking means 38, which preferably is the gripper assembly of FIGS. 7 through 10, is mounted to actuator 43 through actuator 45, which permits a 180-degree rotation of the gripper assembly. Actuator 43 permits horizontal movement of picking means 38 in the Z direction.

The gripper assembly is preferably comprised of a housing 49, as shown in FIG. 7 having means for storing medicine packages 14, such as a storing rod 48. Assembly 38 also contains means 50 for obtaining a package 14. The obtaining means 50 is slidingly attached to the housing 49 such that it can move in a Z direction, which is perpendicular to the X, Y directions, to pick a package 14 from a support rod 30 in the storage rack 12 or supply rack 20. Identifying means, for example, the bar code reader 26 shown in FIG. 8, is mounted on housing 49 such that it can identify a package 14 to be picked by the obtaining means 50. The

8

obtaining means 50 preferably includes means for producing a suction, such as a vacuum generator 58 controlled by a vacuum sensor 58a which draws a vacuum through vacuum line 55 and vacuum valve 54. The obtaining means 50 also preferably includes an extension rod 52 in fluidic communication with a pneumatic in/out cylinder 53 and associated valve 59, as shown in FIGS. 8 and 11. The extension rod 52 is slidingly attached with respect to the Y and Z directions to the housing 49. A suction is maintained through the vacuum lines 55 when the vacuum valve 54 is activated to supply air to vacuum generator 48. The obtaining means 50 also can include a suction head 56 connected to the extension rod 52 through which a package is picked with suction. The vacuum sensor 58a will sense when a package is properly positioned on the suction head 56, for example, by detecting air flow therethrough. The suction head 56 and carried package are then moved to the storing means, such as the storing rod 48, to deposit the package thereon. Preferably, the storing means is a storing rod 48 which extends from the housing 49 such that the suction head 56 and the extension rod 52 can deposit a package 14 thereon. The obtaining means 49 is also composed of a cylinder 48A which allows an assembly of both holding rod 48 and pusher plate 57 to move in the Y direction. The holding rod 48 is also attached to a cylinder 48B which allows the storage rod to retract and extend in reference to the obtaining means. The pusher plate 57B is also attached to a cylinder 57A which allows the plate to move in the positive Z direction. This action is necessary to push drugs off of the storage bar 48 during the dump process.

The extension rod 52 can move in the Y and Z directions to place a picked package on the storing rod 48 under the action of up/down cylinder 51 and in/out cylinder 53. Valve 57 activates cylinder 51 to move both the cylinder 53 and the extension rod 52 in the Y direction. Valve 59 activates cylinder 53 to move the extension rod in the Z direction. Valve 54 provides air to the vacuum generator 58 to suction in head 56 sufficient to pick a package from a rod 30 of the support structure 28 and then hold it to the suction head 56. The suction head 56 preferably has two faces 60 and 61 through which suction can be drawn. One face 60 is capable of picking a package from a rod 30 of the storage rack and the other face 61 is capable of picking a package from a storing rod 48 of the picking means 38. As shown in FIG. 2, each package preferably has a face 62. The packages are held by the storing rod 48 and the rods 30 of the support structure 38 such that the face 62 of each package is parallel to the Y axis. The outside face 60 is utilized when a package 14 is being removed from a rod 30 in the supply rack, and the inside face 61 is utilized when a package is being removed from the storing rod 48 of the picking means 38.

In an alternative embodiment, the rods 30 extend from the double rod support bar 64 in sets of two as shown in FIG. 14. A first rod 65 and a second rod 66 of each set point essentially in the Z direction, but approximately 180 degrees apart from each other. This embodiment shown in FIG. 15 includes a first tooling support structure 70, a second tooling support structure 72, a first end of arm tooling 67 and a second end of arm tooling 68 that picks the packages 14. Each tooling support structure has at least one column type vehicle 44 and at least one track 42 to support the column 44. Column 44 moves along the respective tracks 42 to pick a given package 14 from a corresponding support rod 30, or restock a support rod 30 with an associated package 14.

In the operation of the preferred embodiment in a hospital, doctors visit patients in nursing units and write out medication orders for each patient. A patient is typically placed

5,468,110

9

on a certain medication treatment which requires multiple doses of medication over a period of a day. Some medications are administered at certain times of the day and possibly at intervals of several hours. Patients may also request certain medications on an elective basis for disorders such as headaches. These requests are included in the doctor's order that is sent from the nursing unit to the central pharmacy of the hospital. Once an order is received by the pharmacy, it is checked by registered pharmacists and input into the pharmacy information system. These orders reflect not only orders that are added to a particular patient's treatment, but changes in the medication treatment. The pharmacy information system combines this information with the patient's existing medication schedule and develops a patient medication profile. A fill list is generated from that profile. The fill list is a list of all the medications that must be distributed to all patients for the day. This information is sent to the pharmacy printer where a hard copy is generated.

Means for communication between the pharmacy information system and the present system exist by either tapping the serial data print stream of the pharmacy information system or by a direct bi-directional communication link. The relevant information concerning the patient including drug type, dosage and frequency is placed in the database of the system. The database contains information about which drugs are to be dispensed that day to the patient and all drugs that have been dispensed in the past to the patient. Information from the pharmacy information system is received on an ongoing basis throughout the day. New information can be entered into the database at any time. In addition to the fill list, new orders and patient admittance, discharge and transfer information are received and stored.

FIG. 16 is a flowchart with respect to the processing of a patient prescription. A similar method would be followed for retrieving other stored products. The software for processing an order is started as indicated by box 180. Then the steps indicated by boxes 181 thru 202 are followed. Before a box is loaded onto the conveyers, the operator scans the location barcode and the patient barcode on the patient box. The system then checks its database to ensure that that patient is still at that location. If a new patient has been transferred or admitted to that location, the system automatically generates a barcode label with that patient's identification number on it. This label is then manually applied to the patient box and the box is placed on the conveyor. If no patient is registered in the room, the box is placed aside and the operator proceeds with the next patient box to be filled. When the turn comes for the patient box 36 to be filled, it is shuttled into a position on the conveyor 34 such that the gripper assembly 38 can communicate with the box 36 as shown in FIG. 1. A stationary bar code reader 90 reads the bar code on the patient box 36. The patient identification number is then parsed from the bar code input. This causes the fill list for that particular patient to be retrieved from the database as indicated in box 185. The fill list is converted to data consisting of locations and number of picks. At box 187 the data is then downloaded to a robot controller or gantry control program in order for the computer 24 to control the end of arm tooling 38 such that it knows what packages 14 to obtain and place in the patient box 36.

The system is now ready to pick the drugs 188. First, the column-type vehicle 44 goes to the rack where the drug to be selected is stored and stops at the X coordinate of that drug package. The picking means 38 then moves along the column 44 to the Y coordinate of the medicine package to be picked. It is also turned to the proper storage rack 12 which has the desired package 14. These actions may also be

10

performed simultaneously by the system 189.

When the end of gripper assembly 38 is properly positioned, the bar code reader 26 reads 190 the identity 16 on the medicine package 14 in order to confirm that it is the proper medicine package to be picked with respect to the patient's prescription. After such confirmation the suction rod 52 extends in the Z direction by pneumatic cylinder 53 such that the outside suction face 60 contacts the package face 62. Valve 54 activates a suction through the air lines 55 such that a suction drawn through the suction face 60 grabs the medicine package 14 sensor 58a detects when the contact is proper between the suction face 60 and the medicine package 14, as indicated at box 192 of FIG. 16. Then the extension rod 52 retracts from the rod 30 of the support structure 28, pulling the medicine package 14 with it. Once the medicine package 14 is clear of the rod 30, the extension rod 52 positions the medicine package 14 that it has obtained, upon the storing rod 48 as indicated by box 193.

The system now prepares for the next pick. This operation is indicated by box 194 includes several actions. Once the package 14 is on the storage rod 48, the vacuum valve 54 terminates the suction and the medicine package is released from the suction face 60. The vacuum valve 57 then activates the cylinder 51 such that the extension rod 52 (and cylinder 53) are moved in the Y direction so the bottom of the suction head 56 is above the package 14 on the storing rod 48. The extension rod is then moved forward in the Z direction and downward in the Y direction by the respective valves and cylinders to clear the package and position the suction head 56 for the next pick. In an alternative embodiment the storage rod 48 is moved down rather than moving suction head up 56 to provide clearance between them when the suction head moves in a Z direction. The computer 24 then notes that the medicine package 14 with the appropriate medicine has been picked.

The final series of operations indicated by boxes 195 thru 202 involves a comparison of the drug identified by the reader as having been picked with the list of drugs to be selected. If an incorrect drug was selected the gripper assembly moves to a reject area, places the incorrect drug there, removes that drug from the list of items selected and is ready to pick more drugs. If the correct drug was selected the system records that fact and is ready to pick more drugs. The process is repeated for all the medicine identified in the patient's prescription until all of the medicine packages 14 needed have been picked.

The gripper assembly containing all desired packages then positions itself so that it is over the patient box 36. The gripper assembly 38 then positions the outside suction face 60 behind the medicine packages on the storing rod 48 that have been collected. Packages can be dropped into the patient box by retracting rod 48 by actuating cylinder 48A to the position shown in FIG. 10. The storage rod 48 is then moved into the negative Z direction so that the suction face no longer holds the packages in place. The cylinder 48B then causes the storage rod 48 to be retracted which will cause the drugs to be dumped into the box.

Alternatively, the suction head may be stroked forward in the Z direction so that all packages 14 are pushed off the storing rod 48 into the patient box 36. Movement of the suction head is accomplished by the vacuum system. Vacuum valve 57 activates the cylinder 51 to retract in the positive Y direction such that the bottom of the suction head 56 is above the tops of the packages 14 on the storing rod 28. Then vacuum valve 59 activates cylinder 53 to retract the

5,468,110

11                                                    12

extension rod 52 in the negative Z direction such that the outer suction face 60 is behind all of the medicine packages 14 on the storing rod 48. Vacuum valve 57 is then activated such that the suction head 56 is dropped back down in the negative Y direction to be behind the packages 14. Finally, vacuum valve 59 is activated such that the extension rod 52 is extended in the positive Z direction and the front suction face 60 pushes all packages 14 off the storing rod 48 into the patient box 36.

In the event that the wrong medicine package 14 was scanned and is picked, or the medicine has expired, then picking means 38 will have placed those packages in a reject or return area, where the medicine package 14 can be disposed. A pharmacy technician will then manually sort the drugs in the reject area, removing expired drugs and placing the others in the supply rack in order that they might be returned to their correct location in the system. The process is then repeated for the next drug on the prescription list that has not yet been obtained.

The flow chart of FIG. 17 is the process of checking the selected packages which have been placed in a patient box. Such checking is performed at the check station. The process begins by calling up the check program indicated by box 105. The bar code on the patient box is scanned 106 and the patient number portion of the bar code is identified 107. The patient number is displayed 108 on the screen at the check station. Then the packages in the patient box are scanned 109. The identification of the packages is compared with the list of drugs that had been ordered for the patient in a verify step 110. If correct packages are in the box, the checking of the box is complete and the system is ready for the next box 111. If the packages in the box do not match the order the system determines if the problem can be corrected 112. If so, the correction is made 113 and the verify step is repeated. If not, the box is dumped 114 and the order is recorded as not filled or the box is resubmitted and the missing medications are filled by the system. For example, should the system determine that an item is missing it may either create a modified list and send the box on with a modified list or it may instruct the picking means to get the missing item.

The return process is shown in the flow chart of FIG. 18. The process starts 115 by calling up the return program. The patient box containing the returned items must be positioned so that the patient box can be scanned 116 for the patient identification number 117 and the nursing unit from which the box was returned. If the box has come from the proper nursing unit the system retrieves the patient dispensing record 120 and displays that record 121 for the operator. Next the packages are scanned 122. The system preferably verifies 123 that the scanned packages had been sent to the patient making the return. Next the system checks each package 124 to determine if the drug is useful or if it has expired, been recalled or otherwise should not be returned to the supply rack. If no, the package is discarded 125. If yes, the package is returned to the supply rack 126. If more drugs remain in the box the process is repeated 127. If no packages remain, the system may further process the list of returned packages 128 to modify the patient's record, update the system inventory log or display the list of returns for review by the operator.

The process of restocking returned or new packages to the storage rack is diagramed in FIG. 19. These packages are manually placed on a return or supply rack and the program for restocking is called up 130. The program causes the picking means to be positioned 131 so that the gripping assembly can pick packages from the return or supply rack. The bar code on the first package is scanned 132 and the

portion of the scanned bar code which identifies the drug is found 133. The system then checks the database 134 for the location in the storage rack which has been designated for the identified product. The system extends the vacuum head 135 to engage the package. Suction is applied 136 and a suction sensor is checked. This should cause the package to be held by the gripper assembly which fact will be confirmed by the sensor 137. The gripper assembly positions the package 138 on the storage rod 48 in the gripper assembly. Then the suction is released and the gripper assembly is ready to place additional packages on the storage rod. If more packages remain on the return or supply rack 140, the process is repeated until all packages are on the storage rod or the storage rod is full. The gripper assembly is then moved to a position 141 in front of the storage rack to properly place the outermost package on the storage rod. That package is grasped 142 using back suction cups 61 (see FIG. 11). The extension rod 52 is retracted in the negative Z direction such that the inside suction face 61 is in contact with the medicine package 14. The sensing means 58 determines whether proper contact is made. Then the extension rod 52 is moved a predetermined distance in the positive Z direction 143 to place the medicine package over a rod 30 of support structure 28. Vacuum valve 54 is then deactivated 144 to stop suction, allowing the medicine package 14 on the suction face 61 to drop away therefrom. The extension rod 52 then moves in the negative Z direction towards the medicine packages 14 on the storing rod 48 to repeat the process. While it moves back to obtain another medicine package 14, the sensor 58 trips when contact is made. The process can be repeated 141 until there are no more medicine packages 14 on the storing rod 48. The computer 24 knows when to stop returning packages since it knew how many packages had been placed on the storing rod 48.

In the event that all drugs to be returned or restocked at a particular storage location are identical the process is somewhat different. Packages are picked from the supply rack in the method detailed above. The gripper assembly is then moved to a position in front of the storage rack to place the remaining packages on the storage rod. Cylinder 48A causes the assembly of storing rod 48 and pusher plate 57B to move in the negative Z direction. Storage rod 48 is co-linear with a rod 30 of support structure 28. Pusher plate 57B then moves in the positive Z direction pushing all remaining packages on storage rod 48 on to rod 30.

The restocking of the storage racks 12 can be carried out during the evening when packages are not being gathered to fill orders. Alternatively, restocking can be carried out simultaneously with picking if the system 10 has a pair of rods as shown in FIG. 14, a first end of arm tooling 67, second end of arm tooling 68 and a first tooling structure 70 and a second tooling structure 72 is utilized, as shown in FIG. 15. While, for instance, the first end of arm tooling 67 is picking medicine packages 14 to fill a patient's prescription, the second end of arm tooling 68 can be restocking the second side of the storage area 12.

Although the invention has been described in detail in the foregoing embodiments for the purpose of illustration, it is to be understood that such detail is solely for that purpose and that variations can be made therein by those skilled in the art without departing from the spirit and scope of the invention except as it may be described by the following claims.

We claim:

1. A system for selecting and delivering packages to fill orders comprising:

5,468,110

13

a) a storage area comprised of a plurality of storage area locations each location having package holding means sized and configured to hold a plurality of individual packages each individual package having a machine readable label which identifies a type of package, the packages being held in a manner so that each package can be placed into and removed from the storage area locations and so that the machine readable label on at least one package in a storage location can be read without removing the package from the storage location, each location having a distinct x, y coordinate;

b) automated picking means sized and configured to be able to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions, the picking means having a gripper for grasping and moving the packages and having a picking means storage location sized and configured to hold a plurality of packages in a face to face relationship after the plurality of packages have been retrieved from the storage area and prior to delivery of the plurality of packages to a desired destination separate from the picking means;

c) means for moving the automated picking means to selected storage locations;

d) a computer having at least one memory which contains a program for directing the picking means to chosen storage area locations and a database containing at least one x, y coordinate location in the storage area for each package held within the storage area the computer being connected to the automated picking means and the means for moving the automated picking means; and

e) a package reader associated with the picking means and being positioned for reading the machine readable labels on packages located within the storage area, wherein only one type of package is stored in each x, y coordinate location.

2. The system of claim 1 wherein the gripper is a vacuum head.

3. The system of claim 1 also comprising a sensor attached to the picking means for determining when the package is grasped by the gripper.

4. The system of claim 1 wherein the label is a bar code and the reader is a bar code reader.

5. The system of claim 1 wherein the label also contains an expiration date.

6. The system of claim 1 wherein the picking means contains a picking means storage area for holding the plurality of packages selected by the picking means.

7. The system of claim 6 wherein the picking means storage area is comprised of at least one storage rod and holes are provided in the packages to permit the packages to be held on the storage rod.

8. The system of claim 1 also comprising a supply station for receiving new and returned packages, the supply station having a plurality of locations each location having package holding means sized and configured to hold an least one package in a manner so than the package can be placed into

14

and removed from the locations by the automated picking means, each location having a distinct x, y coordinate.

9. The system of claim 8 also comprising means for moving the supply station wherein the supply station is removably positioned adjacent the storage area.

10. The system of claim 1 wherein the package holding means in the storage area is comprised of a plurality of rods and a hole is provided in each package to permit the package to be held on the rods.

11. The system of claim 1 also comprising at least one data transmission port attached to the computer through which a list of packages to be selected can be input and a list of packages selected by the system can be output.

12. The system of claim 1 wherein the memory contains a program for checking comparability of products in packages selected by the picking means with other products listed in the database.

13. The system of claim 1 also comprising a conveyor positioned to receive packages from the picking means.

14. The system of claim 13 also comprising a plurality of containers positioned on the conveyor, the containers being sized and positioned to receive packages from the picking means.

15. The system of claim 14 wherein the containers have machine readable labels.

16. The system of claim 15 wherein the labels are bar codes.

17. The system of claim 14 wherein the labels are bar codes.

18. The system of claim 14 also comprising a check station located adjacent the conveyor, the check station having reading means for reading the machine readable labels.

19. The system of claim 18 wherein the reading means is connected to the computer in a manner to input information from the machine readable labels; the computer having a program for storing the input information in the memory and for comparing the input information to other information contained in the database.

20. A system as described in claim 18 wherein the picking means includes an least one gripper that picks the packages; and a tooling support structure having an least one column to support the tooling and at least one row to support the column such that the tooling means moves along the column as the column moves along the row to pick a given package hanging from a corresponding support rod, said gripper able to turn at least 180° on the column to pick packages Ion either the first or from selected storage locations which locations are positioned opposite and facing one another; and means for moving the column with respect to the row, said moving means controlled by the computer and in communication therewith.

21. The system of claim 1 wherein the packages contain individual doses of medicine.

22. The system of claim 1 also comprising a track over which the picking means travels according to directions supplied by the computer also comprising means for moving the picking means over the track.

*  *  *  *  *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 5,468,110

DATED : November 21, 1995

INVENTOR(S) : SEAN C. McDONALD, ELLEN J. HERTZ, JAMES A. SMITH, GREGORY TOTO

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, line 6, change "07/87/832" to --07/871,832--.

Column 14, lines 47-48, claim 20, delete "[on either the first or".

Signed and Sealed this

Sixteenth Day of April, 1996

*Attest:*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*

# EXHIBIT 5

US005593267A

## United States Patent [19]

### McDonald et al.

[11] **Patent Number:** 5,593,267

[45] **Date of Patent:** Jan. 14, 1997

[54] **AUTOMATED SYSTEM FOR SELECTING AND DELIVERING PACKAGES FROM A STORAGE AREA**

[75] Inventors: **Sean C. McDonald**, Pittsburgh, Pa.; **Ellen J. Hertz**, Clemmons, N.C.; **James A. Smith**, Allison Park, Pa.; **Gregory Toto**, Santa Cruz, Calif.

[73] Assignee: **Automated Healthcare, Inc.**, Pittsburgh, Pa.

[21] Appl. No.: **452,646**

[22] Filed: **May 25, 1995**

#### Related U.S. Application Data

[62] Division of Ser. No. 295,495, Aug. 25, 1994, Pat. No. 5,468,110, which is a continuation of Ser. No. 871,832, Apr. 21, 1992, abandoned, which is a continuation-in-part of Ser. No. 469,217, Jan. 24, 1990, abandoned.

[51] Int. Cl.[6] ............................................... **B65G 1/04**
[52] U.S. Cl. ................................ **414/273; 414/280**
[58] Field of Search ...................................... 235/385, 351;
414/266, 267, 268, 269, 270, 273, 274,
276, 277, 280, 281, 282, 285, 331; 221/3,
5, 9, 15; 364/478, 413.02, 479

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,802,580 | 4/1974 | Castaldi | 414/280 |
| 3,986,612 | 10/1976 | Kamm et al. | 209/111.7 |
| 4,546,901 | 10/1985 | Butarazzi | 414/280 |
| 4,651,863 | 3/1987 | Reuter et al. | 414/280 |
| 4,669,047 | 5/1987 | Chucta | 414/331 |
| 4,678,390 | 7/1987 | Bonneton et al. | 414/282 |
| 4,786,229 | 11/1988 | Henderson | 414/273 |
| 4,789,295 | 12/1988 | Boucher, Jr. et al. | 414/280 |
| 4,792,270 | 12/1988 | Yoshida | 414/273 |
| 4,812,629 | 3/1989 | O'Neil et al. | 414/274 |
| 4,820,109 | 4/1989 | Witt | 414/282 |
| 4,896,024 | 1/1990 | Morello et al. | 414/274 |
| 5,129,777 | 7/1992 | Pohjonen et al. | 414/280 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 304 | 1/1979 | European Pat. Off. | 414/273 |
| 2596299 | 10/1987 | France . | |
| 85/00232 | 8/1984 | WIPO . | |

*Primary Examiner*—Frank E. Werner
*Attorney, Agent, or Firm*—Buchanan Ingersoll, P.C.; Lynn J. Alstadt

[57] **ABSTRACT**

A system for filling orders, such as prescriptions for patients, comprising a device for holding packages. Each package has the same type of contents being held in a predetermined location by the holding device. Each package has an identity which defines the contents therein. The holding device has a plurality of predetermined locations corresponding to a plurality of different types of contents. Additionally, the system is comprised of a device for supplying packages to the holding device. Also, there is a device for picking a package from the holding device that is identified in the order for the purpose of restocking the holding device. The picking device is in communication with the holding device and supplying device. In a preferred embodiment, the contents of each package is a single dosage of medicine.

**11 Claims, 19 Drawing Sheets**





FIGURE 2



Case 1:06-cv-00028-SLR-LPS     Document 280-3     Filed 04/22/2008     Page 34 of 57



FIGURE 3



Figure 4



Figure 5

Case 1:06-cv-00028-SLR-LPS     Document 280-3     Filed 04/22/2008     Page 37 of 57



Figure 6

Case 1:06-cv-00028-SLR-LPS    Document 280-3    Filed 04/22/2008    Page 38 of 57



FIGURE 7

FIGURE 8





FIGURE 9



FIGURE 10



*Figure 11*



Figure 12

**U.S. Patent**     Jan. 14, 1997     Sheet 13 of 19     **5,593,267**



Figure 13




Figure 14



*Figure 15*



FIGURE 16

FIGURE 17



FIGURE 18

**U.S. Patent**    Jan. 14, 1997    Sheet 19 of 19    **5,593,267**



FIGURE 19

1

## AUTOMATED SYSTEM FOR SELECTING AND DELIVERING PACKAGES FROM A STORAGE AREA

Related Application

This application is a division of Ser. No. 08/295,495 filed Aug. 25, 1994, now U.S. Pat. No. 5,468,110 which is a continuation of Ser. No. 07/871,832, filed Apr. 21, 1992, now abandoned which is a continuation-in-part of our U.S. patent application Ser. No. 07/469,217 filed Jan. 24, 1990, now abandoned.

## FIELD OF THE INVENTION

The present invention relates to an automated system for selecting stored articles. More specifically, the present invention relates to an automated system for filling prescriptions and restocking medicines in a pharmacy.

## BACKGROUND OF THE INVENTION

Many industries store products or parts in a storeroom or storage area and repeatedly select some of the stored items to fill orders or for other uses. Such items may range from small electronic components used by a manufacturer of electronic devices to automotive parts, which vary in size, used by service departments of automobile dealerships. Usually one or more people are employed to retrieve the requested items and to restock new and returned items. These individuals may also be required to confirm that the requested items are compatible with one another and with previously supplied items. If the supplied items are to be billed to a customer or charged to particular internal accounts, the list of items is first written by the requester, and rewritten or entered into a computer database by the storeroom attendant to create an invoice, supply list or other document. In some instances, further generations of the list are made by installers, users or billing clerks. Such methods have built-in opportunities for mistakes every time a list is rewritten and are less efficient than automated systems. Moreover, as labor costs rise and the size of inventory needed to be stored expands, the conventional storeroom and parts department become more and more expensive.

Some businesses have attempted to control costs by limiting inventory through standardization of parts. But such limits are not possible or desirable in some industries, particularly in a hospital pharmacy.

currently, in large hospital environments, doctors visit patients in nursing units and write out medication orders for each patient. A patient is typically placed on a certain medication which may require multiple doses of medication be administered over a period of a day. Some medications are administered at certain times of the day and possibly at intervals of several hours. Patients may also request certain medications on an elective basis for disorders such as headaches. These requests are included in the doctor's order that is sent from the nursing unit to the central pharmacy of the hospital.

Once an order is received by the pharmacy, it is checked by registered pharmacists and input into the pharmacy information system. These orders reflect not only orders that are added to a particular patient's treatment, but changes in the medication treatment. The pharmacy information system combines this information with the patient's existing medication schedule and develops a patient medication profile. A fill list is generated from that profile. The fill list is a list of all the medications that must be distributed to all patients for

2

the day. This information is sent to the pharmacy printer where a hard copy is generated. Frequently, that hard copy or a copy thereof is sent to the billing department so that the medication can be charged to the patient or his insurer.

At this point, the drugs for a particular patient are hand-picked by either a pharmacist or a pharmacy technician and placed in the particular patient's designated box. A registered pharmacist must then check the accuracy of the patient order before it leaves the pharmacy. Individual patient boxes are then loaded into a large cassette and delivered to the nursing unit.

Approximately 30% of the drugs dispensed each day are returned to the pharmacy unused. Since each drug is individually packaged, the drugs must be returned to the pharmacy stock. Patients are then credited for unused medication. This return and crediting process is a very time-consuming task and requires significant amount of pharmacy manpower.

In a typical large pharmacy, up to 35 pharmacists and pharmacy technicians are responsible for all aspects of the unit dose dispensing task. Because this process is done manually, a certain amount of error occurs. Studies have estimated that a half-percent error rate is typical in a large hospital. Since a hospital may dispense over 6,000 doses each day, this error rate leads to a significant number of missed or incorrect doses.

Several companies have tried to automate this process through various approaches to the problem. Meditrol utilizes a vending machine approach to dispense the unit dose medications. Each nursing unit must have its own stock of prescription drugs. Nurses key in a patient ID and the drugs for that patient are then dispensed from the vending machine. This system is very expensive because of the necessity of purchasing a machine for each nursing unit. Also, restocking each machine is a very time-consuming task. Implementation of this system requires a complete modification of the current drug dispensing process which many hospitals are reticent to undertake. The system claims no labor-saving advantages from its implementation. This system is covered under U.S. Pat. No. 3,917,045 titled "Drug Dispensing Apparatus" and dated Nov. 11, 1975.

Baxter Travenol offers a dispensing system from Samsung, a Korean company, which dispenses bulk solids into a package which is dispensed to the pharmacist. This system only dispenses the 200 most frequently used solids. A typical hospital pharmacy can contain over 1,500 different medications, many in liquid, syringe or bottle form. These medications cannot be automatically dispensed by this system, but must be manually selected by the pharmacist.

Neither system allows the dispensed medications to be automatically returned to the storage area.

There is a need for an automated system which is able to dispense all dosage forms currently contained in a hospital pharmacy. Medicines should be automatically dispensed by the system per a patient order and placed in individual patient medication boxes for a pharmacist to check. Each drug and each patient box should be individually bar coded so that the accuracy of the dispensing process can be automatically checked by the system. Once drugs are returned to the pharmacy, the system should automatically return each drug to its proper location in inventory and credit the patient's account for the return. One system should also keep a running inventory and notify the user whenever inventory of a particular item drops below a preset level and whether the shelf life of an item has passed. With such a system, a hospital can recognize significant labor savings, as

5,593,267

3

well as savings based on improved accuracy in the dispensing function and better tracking of inventory and expired medications.

## SUMMARY OF THE INVENTION

We provide an automated method and apparatus for selecting and restocking stored items, which is particularly useful for filling patient medication orders in a hospital pharmacy. The stored items must be packaged to be held in a storage rack. Preferably, each package contains a bar code corresponding to the package contents. The items are arranged in a main storage rack so that like items are in the same location and a predetermined location is provided for every item.

We prefer to provide a second rack or a designated portion of the main storage rack for receipt of new or returned items to be restocked. Such items can be randomly placed on this supply station for transmittal to their respective predetermined locations on the storage rack.

We also provide a means for picking items from and placing items in the storage rack and the supply station. The picking means preferably is comprised of a gripper assembly mounted on a transport vehicle which moves along a track or other controlled route. The gripper assembly preferably has a movable rod or other carrier for holding selected items, at least one vacuum head and associated controls for gripping and moving selected items. We prefer to provide a bar code reader for reading item packages.

We also prefer to provide a conveyor on which boxes, patient medication trays or drawers can be placed. The conveyor is positioned so that the picking means can place selected items into appropriate containers on the conveyor.

We provide a processing unit with associated memory and data entry peripherals. This computer system receives the list of requested items, directs the picking means, checks the items selected and prepares reports. Data can be entered manually through a keyboard or bar code reader or electronically through an RS 232 port. Reports may be printed, displayed on a console or transmitted to a memory or another computer for later use.

Other details and advantages of our method and apparatus will become apparent from the description of the preferred embodiments shown in the drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings, the preferred embodiments of the invention and preferred methods of practicing the invention are illustrated in which:

FIG. 1 is a schematic representation of our present preferred system.

FIG. 2 is a side view of a present preferred package.

FIG. 3 is a perspective view of one present preferred storage rack.

FIG. 4 is a perspective view of a portion of a second preferred storage rack.

FIG. 5 is a perspective view of a portion of a third preferred storage rack.

FIG. 6 is a schematic representation showing the storage rack, conveyor and movable support structure which holds a gripper assembly.

FIG. 7 is a schematic view of a present preferred gripper assembly.

4

FIG. 8 is a front view of a present preferred gripper assembly.

FIG. 9 is a side view of the gripper assembly of FIG. 7 with the storing rod in a raised and extended position.

FIG. 10 is a side view of the gripper assembly of FIG. 8 with the storing rod in a lowered and partially retracted position.

FIG. 11 is a diagram showing a preferred vacuum and pressure line for the gripper assembly.

FIG. 12 is a schematic representation of the gripper assembly mounted on a vehicle.

FIG. 13 is a perspective view of a rod with packages thereon connected to a support bar.

FIG. 14 is a schematic representation of a side view of a first rod and a second rod and having packages thereon attached to a portion of the support bar.

FIG. 15 is a schematic overhead view of an alternative system for filling an order.

FIG. 16 is a flowchart of the filling process.

FIG. 17 is a flowchart of the check process.

FIG. 18 is a flowchart of the return process.

FIG. 19 is a flowchart of the restocking process.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings wherein like reference numerals refer to similar or identical parts throughout the several views, and more specifically to FIG. 1 thereof, there is shown a schematic representation of a present preferred system 10 for filling orders, such as prescriptions for patients. The system 10 contains storage racks 12 for handling packages. We prefer to provide at least two storage racks 12 and arrange them parallel to one another. Various storage rack designs can be used and certain present preferred storage racks are shown in FIGS. 3, 4 and 5. In our system, each package preferably contains only one product, although the product may consist of two or more related items, such as nut and bolt. When our system is installed in a hospital pharmacy, each package preferably contains a single dose of medicine.

A present preferred package 14 is illustrated in FIG. 2. Although the package could be a blister card or box, we prefer to use a clear plastic bag having a hole 15 to permit the package to be hung on a rod 30, 48, 65 or 66 shown in FIGS. 3, 6 and 14. Each package preferably has a bar code 16 and a written description 17, which identify the contents of the package. A white area 17a can be created on the clear plastic bag over which the written description 17 can be printed, stamped or even handwritten. The bar code and the written description may include not only the name of the product, but also its quantity, weight, instructions for use and expiration date. We also prefer to position the bar code and label on the package so that there is a large unmarked area 62 through which one can see the contents of the package. FIG. 2 represents a clear plastic bag for a unit dose of medicine. We can use a bag having a perforation line for easy opening or a recloseable bag having an interlocking rib type seal. The perforation line or rib seal is located along line 13. This type of bag is useful in a hospital pharmacy which buys medicines in large or bulk quantities and must repackage the drugs in individual dose packages. Package 14 can be any desired size. We have used a rectangular package having dimensions indicated by arrows A, B, C and D, wherein A is 3.5 inches, B is 1.0 inch, C is 3.0 inches and

5,593,267

5                                                               6

D is 0.1875 inches. Alternatively, the package 14 can have A equal 5.0 inches, B equal 1.25 inches, C equal 5.0 inches and D equal 0.1875 inches.

An individual dose of medicine can be manually fed into an automated packaging system 98, as shown in FIG. 1, which automatically seals the package and prints a bar code and typewritten label directly on the package. In a preferred embodiment, we utilize the H-100™ packaging system as manufactured by Automated Packaging Systems of Twinsburg, Ohio. With the addition of the Accu-Print™ 100 Programmable In-Line Direct Transfer Imprinter, also manufactured by Automated Packaging Systems, a bar code can be printed directly on the medicine package.

A storage rack 12, which may also be used for a supply station, is shown in FIG. 3. This rack is configured to hold packages of the type illustrated in FIG. 2. The rack has a rectangular frame 28, having an open front and back. Running across the back are a plurality of back rod supports 32 from which the rods 30 extend. The frame 28 with rod supports 32 forms an X, Y coordinate system with each rod 30 and medicine packages 14 therein having a unique X, Y coordinate. Packages are placed in the storage rack so that each product is located at a known X, Y coordinate. Since every product is in a known X, Y location, it is possible to direct an automatic picking means to any product location to select a desired item. The packages are segregated within the storage rack so that all packages in any given location have the same contents.

Although we prefer to use racks in which packages are hung on rods, other types of racks can be used for storage racks and supply stations in our system. In FIG. 4, we show the upper portion of a rack having a rectangular frame 21 with an open front and closed back 23. Attached to the back 23 are sets of brackets 25 positioned to hold packages 27. To be held securely in this rack, such packages must be fairly rigid. Blister cards and boxes can be used. If desired, a hole 15 could be provided in the packages to permit them to be carried on a rod.

A top portion of another suitable rack having a rectangular frame 21, open front and closed back 23 is shown in FIG. 5. This rack has a set of shelves 29, which may be inclined toward back 23. A set of dividers 31 separates groups of packages 27.

The racks of FIGS. 3, 4 and 5 have two important common features. First, the packages are held in locations having known X, Y coordinates. Those coordinates could be single X, Y values as may correspond to the position of the package holes 15 or a group of X, Y values defining an entire package. Second, there is sufficient clearance between packages to allow automated picking means to select, grab and replace individual packages.

Referring now to FIGS. 1 and 6, we provide storage racks 12 on either side of a track 42 over which a vehicle 44 may travel. The vehicle may be column-shaped as in FIG. 6. Many types of drive systems could be used to propel the vehicle. For example, one could provide a motor indicated by block 47 to propel wheels (not shown) at the base of the vehicle. Alternatively, one may use a chain or cable running through the track 42 to pull the vehicle to any desired location. Whatever drive system is used should be capable of moving the vehicle to positions along the track which correspond to the X coordinates of the packages within the rack. Thus, computer 24, which controls the drive system, can direct the vehicle 44 to a location in front of the package or packages to be selected.

Packages are selected by a picking means 38, preferably of the type illustrated in FIGS. 7 though 10. The picking

means is mounted on column-shaped vehicle 44 in a manner to allow controlled vertical movement along that column. In this manner, the picking means 38 can be positioned at locations along column 44 which correspond to the Y coordinates of packages to be selected. The picking means 38 is controlled by a computer 24, or local area network of computers, having a database. The database has the order to be filled and a record of the predetermined locations 18 of each different product in the storage rack 12. The computer 24 guides the picking means 38 based on information contained in the database, such that the picking means 38 picks a package 14 according to the order to be filled. The picking means 38 can also include means, such as a bar code reader 26 as shown in FIG. 7, for determining the identity 16 of a package 14 in the storage rack 12 or in a supply rack 20 and providing its identity 16 to the computer 24. The computer 24 guides the picking means 38 to select the desired packages and deliver them to a desired location. In the system of FIGS. 1 and 6, the packages are delivered to containers 36 located on conveyor 34. When the system is installed in a hospital pharmacy, the containers 36 are individual patient boxes in which the patient's medication is delivered from the pharmacy to the appropriate floor or nurses' station. The patient boxes preferably are bar coded with a patient identification code. After a patient's prescription is filled and the patient box 36 has all the medicine packages called for in the prescription, a conveyor belt 34 moves the patient box 36 to a check station 80. An operator uses the check station bar code reader 82 to scan the bar code label on the filled patient box 36, see FIG. 15. The patient identification number is taken from the inputted bar code and the prescription of the patient is displayed on the check station screen 84 of the check station console 86 connected to the computer or network of computers 24. The operator then scans individual medicine package bar codes in the patient box 36. The identity of the medicine packages 14 in the patient box 36 is automatically checked for correctness with respect to the patient list on the station screen 84. If the medicine packages 14 in the box 36 are correct, then the patient box is allowed to continue on towards the ultimate destination and the next filled patient box 36 is then checked. If the medicine packages 14 in the patient box 36 are not correct, then it is determined whether the error, whatever that may be, can be corrected. If the correction can be made, then the record on the check station screen 84 is corrected and the procedure for verifying correctness is then repeated. If the problem cannot be corrected, then the patient box 36 can be manually filled or resubmitted to be filled with missing doses by the system and the computer is notified that the patient's prescription has not yet been filled.

In the event that a patient does not take all of the medicine which has been prescribed, unused medicine is returned to the hospital pharmacy in the patient box 36. Typically, patient boxes are transferred in a carrier which contains several patient boxes. This carrier is received at a return station 92. The patient box 36 is first removed from the carrier returned from a nursing unit. An operator uses the return station bar code scanner 91 to scan the bar code on the patient box 36. The nursing unit number and the patient identification number is then parsed from the inputted bar code of the patient box 36. The database is then accessed and the patient dispensing record is retrieved. On the return screen 94, there is displayed for a particular patient at the operator console 96, a list of the medicines ordered and dispensed to the patient. The operator of the return station 92 then scans the identity 16 of the medicine in the patient's box 36 with the return station bar code scanner 91. The

7

medicine packages 14 that are found thereon are verified as being dispensed to the patients. The expiration date of the medicine in the medicine package 14 is then determined. If the expiration date of a medicine in the medicine package 14 has passed, then the medicine package is discarded. If the expiration date has not passed, then the returned medicine package 14 is placed in the supply rack 20. If there is more medicine to be returned, the process is then repeated. If there is no more medicine in the patient box 36 to return, then the return station console 96 is checked to verify the correctness of the medicine returned. If the screen is correct, then the return record is accepted and the database is updated. If the screen 94 is incorrect, then the screen is corrected to correspond to the returned medicine packages 14 and the patient box 36. In this manner, the system will have developed a record of all medication given to each patient. That record can be transferred to a hospital billing system and used for billing purposes. The data can also be input into an inventory monitoring system and used to generate reports or orders for new supplies.

We prefer to provide supply racks 20 which serve as a holding area for returned and new products. These racks are comparable to storage racks 12 and are accessed by the picking means 38 in the same manner. However, products are randomly placed in the supply racks either manually or by the picking means. The supply racks 20 are shown in FIG. 1 at a position where they are accessible to the picking means. However, we prefer that the supply rack be movable. Then it could be moved to other convenient locations, such as near packaging system 98 for refilling.

When packages 14 are to be restocked onto the storage racks 12, the supply rack 20 is placed in a predetermined position alongside the storage racks 12. By being placed in a predetermined position, the X and Y coordinates at which packages may have been placed in return racks 20 are known to the computer 24. Picking means 38 is then positioned for a given package in the return rack. The bar code reader 26 on the end of picking means 38 then scans the identity 16 of the package 14 that is about to be picked. The process of picking the returned packages 14 is the same as occurs with respect to the process of obtaining packages 14 from the storage rack 12. The only difference is that the order of the packages 14 and their identity as they are picked is saved in the computer 24. When the picking means is then moved to the storage racks 12 the computer knows the identity of the respective medicine package 14 on the picking means 38, which is about to be placed back onto the storage racks 12.

The picking means 38 includes at least one gripper assembly illustrated in FIGS. 7 through 12. As shown in FIG. 12, we prefer to provide a support bracket 41 extending from column 44. This bracket can move along column 44 in a vertical direction. A third actuator 43 is attached to bracket 41. Mounting 39 permits movement along rod 41 and movement at bar 43 in a direction normal to rod 41. A picking means 38, which preferably is the gripper assembly of FIGS. 7 through 10, is mounted to actuator 43 through actuator 45, which permits a 180-degree rotation of the gripper assembly. Actuator 43 permits horizontal movement of picking means 38 in the Z direction.

The gripper assembly is preferably comprised of a housing 49, as shown in FIG. 7 having means for storing medicine packages 14, such as a storing rod 48. Assembly 38 also contains means 50 for obtaining a package 14. The obtaining means 50 is slidingly attached to the housing 49 such that it can move in a Z direction, which is perpendicular to the X, Y directions, to pick a package 14 from a support rod 30 in the storage rack 12 or supply rack 20. Identifying

8

means, for example, the bar code reader 26 shown in FIG. 8, is mounted on housing 49 such that it can identify a package 14 to be picked by the obtaining means 50. The obtaining means 50 preferably includes means for producing a vacuum, such as a vacuum generator 58 controlled by a vacuum sensor 58a which draws a vacuum through vacuum line 55 and vacuum valve 54. The obtaining means 50 also preferably includes an extension rod 52 in fluidic communication with a pneumatic in/out cylinder 53 and associated valve 59, as shown in FIGS. 8 and 11. The extension rod 52 is slidingly attached with respect to the Y and Z directions to the housing 49. A suction is maintained through the vacuum lines 55 when the vacuum valve 54 is activated to supply air to vacuum generator 48. The obtaining means 50 also can include a suction head 56 connected to the extension rod 52 through which a package is picked with suction. The vacuum sensor 58a will sense when a package is properly positioned on the suction head 56, for example, by detecting air flow therethrough. The suction head 56 and carried package are then moved to the storing means, such as the storing rod 48, to deposit the package thereon. Preferably, the storing means is a storing rod 48 which extends from the housing 49 such that the suction head 56 and the extension rod 52 can deposit a package 14 thereon. The obtaining means 49 is also composed of a cylinder 48A which allows an assembly of both holding rod 48 and pusher plate 57 to move in the Y direction. The holding rod 48 is also attached to a cylinder 48B which allows the storage rod to retract and extend in reference to the obtaining means. The pusher plate 57B is also attached to a cylinder 57A which allows the plate to move in the positive Z direction. This action is necessary to push drugs off of the storage bar 48 during the dump process.

The extension rod 52 can move in the Y and Z directions to place a picked package on the storing rod 48 under the action of up/down cylinder 51 and in/out cylinder 53. Valve 57 activates cylinder 51 to move both the cylinder 53 and the extension rod 52 in the Y direction. Valve 59 activates cylinder 53 to move the extension rod in the Z direction. Valve 54 provides air to the vacuum generator 58 to suction in head 56 sufficient to pick a package from a rod 30 of the support structure 28 and then hold it to the suction head 56. The suction head 56 preferably has two faces 60 and 61 through which suction can be drawn. One face 60 is capable of picking a package from a rod 30 of the storage rack and the other face 61 is capable of picking a package from a storing rod 48 of the picking means 38. As shown in FIG. 2, each package preferably has a face 62. The packages are held by the storing rod 48 and the rods 30 of the support structure 38 such that the face 62 of each package is parallel to the Y axis. The outside face 60 is utilized when a package 14 is being removed from a rod 30 in the supply rack, and the inside face 61 is utilized when a package is being removed from the storing rod 48 of the picking means 38.

In an alternative embodiment, the rods 30 extend from the double rod support bar 64 n sets of two as shown in FIG. 14. A first rod 65 and a second rod 66 of each set point essentially in the Z direction, but approximately 180 degrees apart from each other. This embodiment shown in FIG. 15 includes a first tooling support structure 70, a second tooling support structure 72, a first end of arm tooling 67 and a second end of arm tooling 68 that picks the packages 14. Each tooling support structure has at least one column type vehicle 44 and at least one track 42 to support the column 44. Column 44 moves along the respective tracks 42 to pick a given package 14 from a corresponding support rod 30, or restock a support rod 30 with an associated package 14.

5,593,267

9                                                              10

In the operation of the preferred embodiment in a hospital, doctors visit patients in nursing units and write out medication orders for each patient. A patient is typically placed on a certain medication treatment which requires multiple doses of medication over a period of a day. Some medications are administered at certain times of the day and possibly at intervals of several hours. Patients may also request certain medications on an elective basis for disorders such as headaches. These requests are included in the doctor's order that is sent from the nursing unit to the central pharmacy of the hospital. Once an order is received by the pharmacy, it is checked by registered pharmacists and input into the pharmacy information system. These orders reflect not only orders that are added to a particular patient's treatment, but changes in the medication treatment. The pharmacy information system combines this information with the patient's existing medication schedule and develops a patient medication profile. A fill list is generated from that profile. The fill list is a list of all the medications that must be distributed to all patients for the day. This information is sent to the pharmacy printer where a hard copy is generated.

Means for communication between the pharmacy information system and the present system exist by either tapping the serial data print stream of the pharmacy information system or by a direct bi-directional communication link. The relevant information concerning the patient including drug type, dosage and frequency is placed in the database of the system. The database contains information about which drugs are to be dispensed that day to the patient and all drugs that have been dispensed in the past to the patient. Information from the pharmacy information system is received on an ongoing basis throughout the day. New information can be entered into the database at any time. In addition to the fill list, new orders and patient admittance, discharge and transfer information are received and stored.

FIG. 16 is a flowchart with respect to the processing of a patient prescription. A similar method would be followed for retrieving other stored products. The software for processing an order is started as indicated by box 180. Then the steps indicated by boxes 181 thru 202 are followed. Before a box is loaded onto the conveyors, the operator scans the location barcode and the patient barcode on the patient box. The system then checks its database to ensure that that patient is still at that location. If a new patient has been transferred or admitted to that location, the system automatically generates a barcode label with that patient's identification number on it. This label is then manually applied to the patient box and the box is placed on the conveyor. If no patient is registered in the room, the box is placed aside and the operator proceeds with the next patient box to be filled. When the turn comes for the patient box 36 to be filled, it is shuttled into a position on the conveyor 34 such that the gripper assembly 38 can communicate with the box 36 as shown in FIG. 1. A stationary bar code reader 90 reads the bar code on the patient box 36. The patient identification number is then parsed from the bar code input. This causes the fill list for that particular patient to be retrieved from the database as indicated in box 185. The fill list is converted to data consisting of locations and number of picks as in box 187 the data is then downloaded to a robot controller or gantry control program in order for the computer 24 to control the end of arm tooling 38 such that it knows what packages 14 to obtain and place in the patient box 36.

The system is now ready to pick the drugs 188. First, the column-type vehicle 44 goes to the rack where the drug to be selected is stored and stops at the X coordinate of that drug package. The picking means 38 then moves along the

column 44 to the Y coordinate of the medicine package to be picked. It is also turned to the proper storage rack 12 which has the desired package 14. These actions may also be performed simultaneously by the system 189.

When the end of gripper assembly 38 is properly positioned, the bar code reader 26 reads 190 the identity 16 on the medicine package 14 in order to confirm that it is the proper medicine package to be picked with respect to the patient's prescription. After such confirmation the suction rod 52 extends in the Z direction by pneumatic cylinder 53 such that the outside suction face 60 contacts the package face 62. Valve 54 activates a suction through the air lines 55 such that a suction drawn through the suction face 60 grabs the medicine package 14 sensor 58a detects when the contact is proper between the suction face 60 and the medicine package 14, as indicated at box 192 of FIG. 16. Then the extension rod 52 retracts from the rod 30 of the support structure 28, pulling the medicine package 14 with it. Once the medicine package 14 is clear of the rod 30, the extension rod 52 positions the medicine package 14 that it has obtained, onto the storing rod 48 as indicated by box 193.

The system now prepares for the next pick. This operation is indicated by box 194 includes several actions. Once the package 14 is on the storage rod 48, the vacuum valve 54 terminates the suction and the medicine package is released from the suction face 60. The vacuum valve 57 then activates the cylinder 51 such that the extension rod 52 (and cylinder 53) are moved in the Y direction so the bottom of the suction head 56 is above the package 14 on the storing rod 48. The extension rod is then moved forward in the Z direction and downward in the Y direction by the respective valves and cylinders to clear the package and position the suction head 56 for the next pick. In an alternative embodiment the storage rod 48 is moved down rather than moving suction head up 56 to provide clearance between them when the suction head moves in a Z direction. The computer 24 then notes that the medicine package 14 with the appropriate medicine has been picked.

The final series of operations indicated by boxes 195 thru 202 involves a comparison of the drug identified by the reader as having been picked with the list of drugs to be selected. If an incorrect drug was selected the gripper assembly moves to a reject area, places the incorrect drug there, removes that drug from the list of items selected and is ready to pick more drugs. If the correct drug was selected the system records that fact and is ready to pick more drugs. The process is repeated for all the medicine identified in the patient's prescription until all of the medicine packages 14 needed have been picked.

The gripper assembly containing all desired packages then positions itself so that it is over the patient box 36. The gripper assembly 38 then positions the outside suction face 60 behind the medicine packages on the storing rod 48 that have been collected. Packages can be dropped into the patient box by retracting rod 48 by actuating cylinder 48A to the position shown in FIG. 10. The storage rod 48 is then moved into the negative Z direction so that the suction face no longer holds the packages in place. The cylinder 48B then causes the storage rod 48 to be retracted which will cause the drugs to be dumped into the box.

Alternatively, the suction head may be stroked forward in the Z direction so that all packages 14 are pushed off the storing rod 48 into the patient box 36. Movement of the suction head is accomplished by the vacuum system. Vacuum valve 57 activates the cylinder 51 to retract in the

11

positive Y direction such that the bottom of the suction head 56 is above the tops of the packages 14 on the storing rod 28. Then vacuum valve 59 activates cylinder 53 to retract the extension rod 52 in the negative Z direction such that the outer suction face 60 is behind all of the medicine packages 14 on the storing rod 48. Vacuum valve 57 is then activated such that the suction head 56 is dropped back down in the negative Y direction to be behind the packages 14. Finally, vacuum valve 59 is activated such that the extension rod 52 is extended in the positive Z direction and the front suction face 60 pushes all packages 14 off the storing rod 48 into the patient box 36.

In the event that the wrong medicine package 14 was scanned and is picked, or the medicine has expired, then picking means 38 will have placed those packages in a reject or return area, where the medicine package 14 can be disposed. A pharmacy technician will then manually sort the drugs in the reject area, removing expired drugs and placing the others in the supply rack in order that they might be returned to their correct location in the system. The process is then repeated for the next drug on the prescription list that has not yet been obtained.

The flow chart of FIG. 17 is the process of checking the selected packages which have been placed in a patient box. Such checking is performed at the check station. The process begins by calling up the check program indicated by box 105. The bar code on the patient box is scanned 106 and the patient number portion of the bar code is identified 107. The patient number is displayed 108 on the screen at the check station. Then the packages in the patient box are scanned 109. The identification of the packages is compared with the list of drugs that had been ordered for the patient in a verify step 110. If correct packages are in the box, the checking of the box is complete and the system is ready for the next box 111. If the packages in the box do not match the order the system determines if the problem can be corrected 112. If so, the correction is made 113 and the verify step is repeated. If not, the box is dumped 114 and the order is recorded as not filled or the box is resubmitted and the missing medications are filled by the system. For example, should the system determine that an item is missing it may either create a modified list and send the box on with a modified list or it may instruct the picking means to get the missing item.

The return process is shown in the flow chart of FIG. 18. The process starts 115 by calling up the return program. The patient box containing the returned items must be positioned so that the patient box can be scanned 116 for the patient identification number 117 and the nursing unit from which the box was returned. If the box has come from the proper nursing unit the system retrieves the patient dispensing record 120 and displays that record 121 for the operator. Next the packages are scanned 122. The system preferably verifies 123 that the scanned packages had been sent to the patient making the return. Next the system checks each package 124 to determine if the drug is useful or if it has expired, been recalled or otherwise should not be returned to the supply rack. If no, the package is discarded 125. If yes, the package is returned to the supply rack 126. If more drugs remain in the box the process is repeated 127. If no packages remain, the system may further process the list of returned packages 128 to modify the patient's record, update the system inventory log or display the list of returns for review by the operator.

The process of restocking returned or new packages to the storage rack is diagramed in FIG. 19. These packages are manually placed on a return or supply rack and the program for restocking is called up 130. The program causes the

12

picking means to be positioned 131 so that the gripping assembly can pick packages from the return or supply rack. The bar code on the first package is scanned 132 and the portion of the scanned bar code which identifies the drug is found 133. The system then checks the database 134 for the location in the storage rack which has been designated for the identified product. The system extends the vacuum head 135 to engage the package. Suction is applied 136 and a suction sensor is checked. This should cause the package to be held by the gripper assembly which fact will be confirmed by the sensor 137. The gripper assembly positions the package 138 on the storage rod 48 in the gripper assembly. Then the suction is released and the gripper assembly is ready to place additional packages on the storage rod. If more packages remain on the return or supply rack 140, the process is repeated until all packages are on the storage rod or the storage rod is full. The gripper assembly is then moved to a position 141 in front of the storage rack to properly place the outermost package on the storage rod. That package is grasped 142 using back suction cups 61 (see FIG. 11). The extension rod 52 is retracted in the negative Z direction such that the inside suction face 61 is in contact with the medicine package 14. The sensing means 58 determines whether proper contact is made. Then the extension rod 52 is moved a predetermined distance in the positive Z direction 143 to place the medicine package over a rod 30 of support structure 28. Vacuum valve 54 is then deactivated 144 to stop suction, allowing the medicine package 14 on the suction face 61 to drop away therefrom. The extension rod 52 then moves in the negative Z direction towards the medicine packages 14 on the storing rod 48 to repeat the process. While it moves back to obtain another medicine package 14 the sensor 58 trips when contact is made. The process can be repeated 141 until there are no more medicine packages 14 on the storing rod 48. The computer 24 knows when to stop returning packages since it knew how many packages had been placed on the storing rod 48.

In the event that all drugs to be returned or restocked at a particular storage location are identical the process is some what different. Packages are picked from the supply rack in the method detailed above. The gripper assembly is then moved to a position in front of the storage rack to place the remaining packages on the storage rod. Cylinder 48A causes the assembly of storing rod 48 and pusher plate 57B to move in the negative Z direction. Storage rod 48 is co-linear with a rod 30 of support structure 28. Pusher plate 57B then moves in the positive Z direction pushing all remaining packages on storage rod 48 on to rod 30.

The restocking of the storage racks 12 can be carried out during the evening when packages are not being gathered to fill orders. Alternatively, restocking can be carried out simultaneously with picking if the system 10 has a pair of rods as shown in FIG. 14, a first end of arm tooling 67, second end of arm tooling 68 and a first tooling structure 70 and a second tooling structure 72 is utilized, as shown in FIG. 15. While, for instance, the first end of arm tooling 67 is picking medicine packages 14 to fill a patient's prescription the second end of arm tooling 68 can be restocking the second side of the storage area 12.

Although the invention has been described in detail in the foregoing embodiments for the purpose of illustration, it is to be understood that such detail is solely for that purpose and that variations can be made therein by those skilled in the art without departing from the spirit and scope of the invention except as it may be described by the following claims.

5,593,267

13

We claim:

1. A system for selecting and delivering medicine packages from a holding means to fill orders comprising:

a) holding means comprised of a frame having a plurality of support rods each support rod sized for holding a plurality of medicine packages, each rod associated with a given medicine and holding medicine packages with only the same medicine each support rod having a distinct X, Y coordinate location;

b) means for picking medicine packages from the support rods in accordance with instructions received from a computer, said picking means being able to access the holding means; the picking means capable of holding a plurality of medicine packages which have been picked from the holding means;

c) a computer having a database containing an X, Y coordinate location for all packages in the holding means, the computer able to receive orders for packages and able to direct the means for picking packages; and

d) a supply structure having a plurality of supply support rods which extend from said structure to form an X, Y coordinate system, with each supply support rod and medicine package thereon having a unique X and Y coordinate, said picking means disposed to have access to said structure such that a given medicine package on an associated supply support rod can be picked by the picking means to fill a patient's prescription, or a given medicine package in the supply structure can be picked by the picking means to restock an associated rod in the holding means.

2. A system as described in claim 1 including a conveyor in communication with the picking means; and patient prescription boxes which are moved by the conveyor to the picking means such that the picking means provides the medicine packages it has picked to fill a given prescription to an associated box.

3. A system as described in claim 1 wherein the picking means includes at least one gripper that picks the medicine packages; and a tooling support structure having at least one column supporting the column such that the picking means moves along the column as the column moves along the row to pick a given medicine package hanging from a corresponding support rod, or restock a given medicine package on a corresponding support rod; and means for moving the column with respect to the row, said moving means controlled by the computer.

4. A system as described in claim 3 wherein the picking means is comprised of:

a housing;

means for storing a plurality of medicine packages attached to the housing;

means for obtaining a medicine package, said obtaining means slidingly attached to the housing such that it can move in a Z direction, which is perpendicular to the X and Y directions, to pick a medicine package from a support rod when the housing is adjacent to and aligned

14

with a support rod, and can move in the Z direction to place a picked package on the storing means; and

identifying means attached to the at least one gripper such that it can identify a package to be picked by the obtaining means, each of said packages having an identity disposed on them which can be read by the identifying means.

5. A system described in claim 4 wherein the identity of each package is a bar code, and the identifying means includes a bar code reader disposed on the obtaining means.

6. A system as claimed in claim 1 wherein the support rods extend from back rod supports within the frame in sets of two, with a first rod and a second rod on each set pointing essentially in a Z direction which is perpendicular to the X and Y directions, but approximately 180° apart from each other.

7. A system for selecting and delivering packages from a holding means to fill orders comprising:

a) holding means comprised of a frame having a plurality of support rods for holding packages each support rod having a distinct X, Y coordinate location and holding a plurality of packages, all of those packages on each support rod having similar contents;

b) picking means for picking packages from the support rods in accordance with instructions received from a computer, the picking means being able to access the holding means and having
a housing;
means for storing packages attached to the housing;
means for producing a suction;

a suction rod in fluid connection with the suction producing means, said suction rod slidingly attached with respect to the Y and Z directions to the housing and maintaining a suction therethrough when the suction producing means is activated by which a medicine package is picked with suction; and

means for sensing when a package is properly positioned such that the package rod is then moved to the storing means and deposits the package thereon.

8. A system as described in claim 7 wherein the storing means is a storing rod which extends from the housing such that the suction head and the suction rod can deposit a package thereon.

9. A system as described in claim 8 wherein the tooling includes valves and pneumatic cylinders for moving the suction rod in the Y and Z direction; and a vacuum pump for providing suction to the suction rod and support head sufficient to pick a package from a rod of the support structure and then hold it to the suction head.

10. A system as described in claim 9 wherein the suction head has two faces through which a suction can be drawn, each face capable of picking a package.

11. A system as described in claim 10 wherein the two faces are parallel to each other and are parallel to the x-axis, and wherein each package has a face and the package are held by the storing rod and the rods of the support structure such that the face of each package is parallel to the x-axis.

\* \* \* \* \*

# EXHIBIT 22

## Westlaw.

Slip Copy
Slip Copy, 2008 WL 508060 (D.Or.)
(Cite as: Slip Copy, 2008 WL 508060)

**H**Adidas America, Inc. v. Payless Shoesource, Inc.
D.Or.,2008.

Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
ADIDAS AMERICA, INC. and Adidas-Solomon
AG, Plaintiffs,
v.
PAYLESS SHOESOURCE, INC., Defendant.
**No. CV 01-1655-KI.**

Feb. 22, 2008.

Stephen M. Feldman, Thomas R. Johnson, Perkins
Coie, LLP, Portland, OR, Jerre B. Swann, R. Charles
Henn, Jr., William H. Brewster, Kilpatrick Stockton,
LLP, Atlanta, GA, for Plaintiffs.
Bridget A. Short, William R. Hansen, Lathrop &
Gage L.C., New York, NY, Craig D. Bachman,
Kenneth R. Davis, II, Milo Petranovich, Lane Powell,
PC, William B. Crow, Schwabe Williamson &
Wyatt, PC, Portland, OR, David R. Barnard, Gerald
M. Kraai, R. Cameron Garrison, Travis W.
McCallon, David V. Clark, William A. Rudy,
Lathrop & Gage, LC, Kansas City, MO, Michael G.
Martin, Michael J. Roche, Phillip S. Lorenzo,
Lathrop & Gage, LC, Denver, CO, Stephen J.
Horace, Lathrop & Gage, LC, Boulder, CO, for
Defendant.

### REDACTED OPINION AND ORDER

KING, Judge.

**\*1** adidas-America, Inc. and adidas-Salomon AG
(collectively, "adidas") filed this action against
Payless Shoesource, Inc. ("Payless") for trademark
and trade dress infringement, dilution, and related
federal and state law claims. adidas alleges Payless is
willfully infringing adidas' trademark rights by
marketing and selling footwear bearing confusingly
similar imitations of adidas' Three-Stripe trademark
and Superstar Trade Dress.

Before the court are (1) adidas' motion for partial
summary judgment (doc. 539); (2) Payless' motion to
strike plaintiffs' demand for jury trial (doc. 545); (3)
Payless' motion for summary judgment on adidas'

claim of willfulness (doc. 547); (4) Payless' motion
for summary judgment dismissing adidas' federal and
state dilution claims (doc. 548); (5) Payless' motion
for summary judgment on adidas' claim of trademark
and trade dress infringement (doc. 550); (6) Payless'
motion for summary judgment on affirmative defense
of laches (doc. 551); and Payless' motion (doc. 651)
to strike the Rule 26 reports of Dr. Gerald Ford.

For the reasons set forth below, adidas' Motion for
Partial Summary Judgment (doc. 539) is GRANTED
in part, and DENIED in part; Payless' Motion to
Strike adidas' Demand for Jury Trial (doc. 545) is
DENIED; Payless' Motion for Summary Judgment on
adidas' Claims of Willfulness (doc. 547) is DENIED;
Payless' Motion for Summary Judgment on adidas'
Federal and State Dilution Claims (doc. 548) is
GRANTED in part, and DENIED in part; Payless'
Motion for Summary Judgment on adidas' Trademark
and Trade Dress Infringement Claims (doc. 550) is
DENIED; and Payless' Motion for Summary
Judgment on the Affirmative Defense of Laches (doc.
551) is DENIED; and Payless' Motion (doc. 651) to
Strike Dr. Gerald Ford's Rule 26 Reports is DENIED.

### *I. Background*

The following relevant facts are taken from the
parties' respective concise statements of material fact
and are undisputed.

#### *A. The Parties and Their Products*

adidas manufactures and sells athletic and casual
footwear. As early as 1952, adidas began placing
three parallel bands on athletic shoes, and in 1994,
adidas registered the first of several variations of
Three-Stripe trademark with the U.S. Patent and
Trademark Office. The 1994 Three-Stripe mark
consists of three parallel and equidistant double-
serrated stripes of contrasting color on the side of the
shoe running diagonally from the mid-sole forward to
the shoelaces. In 1999, adidas registered a slight
variation of the Three-Stripe mark, which consists of
three parallel and equidistant straight-edged stripes of
contrasting color running diagonally from the mid-
sole forward to the laces on the side of the shoe.[FN1]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN1. Between 1994 and 2005, adidas
registered at least five separate Three-Stripe
trademarks covering various models of
"athletic footwear." Though adidas' various
trademark registrations are not all identical,
each registration bears three parallel,
equidistant and diagonal stripes from the
sole of the shoe to the laces. For the
purposes of this opinion, the term "Three-
Stripe Mark" encompasses all of adidas'
registered variations of the Three-Stripe
Mark for "athletic footwear."

Among its many different models of shoes, adidas
manufactures and sells the Superstar, Country Ripple,
Tuscany/adi Racer, Pranja, Copa Mundial, Campus,
Samoa, Stan Smith Millennium, and Mei, which are
all at issue in this case. Each of the shoes at issue
here bear variations of the registered Three-Stripe
mark. Some bear three double-serrated stripes, others
bear three straight-edged stripes. For the purpose of
its trademark claims, adidas does not claim
protectable rights in any shoe feature other than its
Three-Stripe Mark.

*2 adidas has used and promoted the Three-Stripe
Mark since 1952, and promotes itself as "The Brand
With Three Stripes." adidas has used the mark in
connection with its frequent sponsorship of
professional sports events and organizations, such as
the World Cup soccer tournament, the Boston
Marathon, the New York Yankees, University of
Notre Dame, the University of California at Los
Angeles, the University of Nebraska, and the
University of Tennessee. adidas also sponsors
numerous professional athletes who wear apparel
bearing the Three-Stripe mark. Since introducing the
Three-Stripe mark, adidas has spent millions of
dollars promoting the mark and products bearing the
mark. In recent years, adidas' annual sales of products
bearing the Three-Stripe mark have totaled in the
billions of dollars globally, and in the hundreds of
millions of dollars within the United States.

adidas also claims protected rights in a Superstar
Trade Dress. adidas first introduced the Superstar
Trade Dress in 1969 and its principle features have
not changed since that time. It consists of: (1) three
parallel stripes (*i.e.,* the Three-Stripe Mark) on the
side of the shoe parallel to equidistant small holes;

(2) a rubber "shell toe"; (3) a particularly flat sole;
and (4) a colored portion on the outer back heel that
identifies the shoes as adidas' brand.

adidas has used and promoted the Superstar Trade
Dress since its introduction in 1969. The general
public, professional and amateur athletes, hip-hop
music artists, and the media commonly associate the
Superstar Trade Dress with adidas. The Superstar
was widely used by professional basketball players in
the 1970s. In the late 1980s, the adidas "shell toe"
reemerged as a fashion shoe, made popular by hip-
hop music artists such as the Beastie Boys and
RunDMC. Since 1999, sales of Superstar shoes have
exceeded $711 million, with more than 5 million pair
sold in the United States in 2001.

adidas has enforced its rights in both the Three-Stripe
mark and the Superstar Trade Dress. Since 1995,
adidas has pursued over 325 infringement matters
involving the Three-Stripe mark in the United States,
filed more than 35 separate lawsuits for infringement
of the Three-Stripe mark, and entered into more than
45 settlement agreements with companies selling
infringing footwear.

Payless is one of the nations' largest retailers of
discount casual and athletic footwear. Payless
operates approximately 4,500 stores in 49 states, and
sells more than 200 million pairs of shoes annually.
Since at least 1994, Payless has marketed and sold
athletic shoes bearing parallel stripes.[FN2] Though
Payless no longer sells footwear bearing three
parallel stripes, Payless does sell several models of
athletic footwear that bear two or four parallel
straight-edged stripes, running diagonally from the
mid-sole forward to the laces. Payless does uses
stripe designs on shoes not to signify source, but as
mere decoration or ornamentation.

FN2. The parties dispute how long Payless
has been selling shoes with stripe designs
like the allegedly infringing shoes at issue.
The parties dispute whether the striped shoes
Payless sold in the 1970s, 1980s, and 1990s
were sufficiently similar to adidas'
trademark, so as to put adidas on notice of
Payless' potentially infringing conduct. The
parties also dispute the number of pairs of
striped shoes sold by Payless during the
1990s, and whether those sales were

significant enough to put adidas on notice of Payless' conduct. Payless maintains that it has been continuously and openly advertising shoes with two and four parallel stripes since at least 1973, and throughout the 1970s, 1980s, and 1990s. adidas contends that Payless did not start selling the allegedly infringing shoes at issue until October 2001, approximately one month prior to adidas' initiation of the present lawsuit.

*3 Payless also sells shoes that have a rubber "shell toe," a flat sole, and a colored portion on the outer back heel. Instead of using three stripes, however, Payless' "shell toe" shoe bears four parallel straight-edge stripes on the side of the shoe, parallel to equidistant small holes. Payless acknowledges that it uses adidas' shoes as "inspirations" for its stripe-shoe designs.

None of Payless' allegedly infringing shoes bear three stripes. Rather, they all bear either two or four parallel stripes running diagonally from the mid-sole to the laces. Payless shoes are sold almost exclusively at Payless retail stores, and adidas shoes are not available at Payless retail stores. Although the parties dispute whether they compete for the same consumers, adidas and Payless do advertise their respective products through at least some of the same media channels.

### B. History of the Dispute

In 1994, adidas filed an action alleging Payless willfully infringed adidas' trademark rights by selling athletic shoes bearing confusingly similar imitations of adidas' Three-Stripe mark.[FN2] Pursuant to a subsequent 1994 Settlement Agreement, Payless agreed not to sell athletic shoes bearing "three substantially straight parallel stripes on the side of the shoe running diagonally from the outsole forward to the lacing area," or "two or four parallel double-serrated stripes of contrasting color running diagonally from the outsole forward to the lacing area." adidas, in turn, agreed to dismiss the action with prejudice, and to release any claims that it "brought or could have brought" based on Payless' use of "two or four parallel double-serrated stripes" on footwear. Payless thereafter ceased selling three-striped shoes, as well as shoes with two or four

double-serrated stripes, but continued to sell shoes with two or four straight-edged stripes.

> FN3. The 1994 New York Action did not include any claims involving the use of either two or four stripes on athletic shoes. All of the claims involved Payless' use of three stripes on footwear.

In November 2001, adidas filed this action, claiming Payless violated the 1994 Settlement Agreement, and alleging some of Payless' two- and four-stripe shoe designs infringed adidas' Three-Stripe mark and Superstar Trade Dress. Payless moved for summary judgment on all of adidas's trademark claims, arguing that the claims were barred by the parties' 1994 Settlement Agreement because the 1994 Settlement Agreement only prohibited Payless from selling shoes with serrated stripes and the shoes at issue had straight-edged stripes. adidas contended Payless' shoes violated the agreement because the shoes were designed to appear to be double-serrated.

On October 8, 2002, Magistrate Judge Jelderks granted Payless' motion for summary judgment based on the 1994 Settlement Agreement, and dismissed all of adidas' trademark infringement claims. Judge Jelderks concluded that the 1994 Settlement Agreement only prohibited Payless from selling shoes with stripes that were "actually 'double-serrated.' " He concluded adidas' trademark infringement claims were barred because the shoes at issue plainly did not have serrated edges. On January 6, 2003, Judge Haggerty adopted Magistrate Judge Jelderks' Findings and Recommendation.

*4 adidas appealed Judge Haggerty's decision to the Ninth Circuit. In June 2004, Judge Redden stayed the case pending the Ninth Circuit's decision on the merits. In January 2006, the Ninth Circuit reversed. In so doing, the court concluded:

A plain reading of the agreement demonstrates that Adidas released only those claims against Payless that Adidas "brought or could have brought" before the dismissal of the action that was the subject of the settlement. The shoe stripe designs at issue in the present dispute, however, were not produced by Payless until after the 1994 agreement was concluded. Adidas could not have brought a claim against shoes not in existence prior to the execution

of the settlement. Therefore, the 1994 settlement agreement does not preclude Adidas's [sic] present Lanham Act claims against Payless.

*adidas America, Inc. v. Payless Shoesource, Inc.,* 166 Fed. Appx. 268, 270-71 (9th Cir.2006).

### C. adidas' Third Amended Complaint

On June 20, 2006, Judge Redden lifted the stay in this case. In August 2006, adidas filed its Third Amended Complaint, adding 231 specific "shoe lots" to the 37 previously at issue.<sup>FN4</sup>Though adidas objects to 268 different "shoe lots" in this case, most of those accused "lots" are essentially variations of nine distinct styles of footwear that adidas claims Payless is infringing: the Superstar, Country Ripple, Tuscany, adi Racer, Pranja, Copa Mundial, Campus, Samoa, Stan Smith Millennium, and Mei. Although some of the accused shoes bear little or no resemblance to any of the above-mentioned shoe styles, they all share one common characteristic: two or four parallel, equidistant stripes running diagonally from the mid-sole forward to the laces. None of the accused shoes bear three stripes.

> FN4. Payless assigns each of its shoe models a different "lot number" for tracking purposes. For example, Payless sells several different models of a shoe called the "4-Stripe," which adidas claims infringes on the adidas Superstar. Payless sells a navy blue 4-Stripe, a light blue 4-Stripe, a black on white 4-Stripe, a white on white 4-Stripe, and so on. Similarly, Payless sells a men's, a women's, and a kid's version of each shoe. Payless assigns each color scheme/style a different "lot number."

adidas alleges Payless' two- and four-stripe footwear infringes adidas' Three-Stripe Mark and its Superstar Trade Dress. adidas asserts eleven claims for relief, including: (1) federal trademark infringement of the Three-Stripe Mark in violation of 15 U.S.C. § 1114 First Claim); (2) federal unfair competition in violation of 15 U.S.C. § 1125(a), as to the Three-Stripe Mark and the Superstar Trade Dress (Second and Third Claims); (3) federal dilution in violation of 15 U.S.C. § 1125(c), as to the Three-Stripe Mark and Superstar Trade Dress (Fourth and Fifth Claims); (4) state trademark dilution and injury to business

reputation in violation of O.R.S. § 647.107, and various other states' laws as to the Three-Stripe Mark and Superstar Trade Dress (Sixth and Seventh Claims); (5) common law infringement and unfair competition as to the Three-Stripe Mark and Superstar Trade Dress (Eighth and Ninth Claims); and (6) unfair and deceptive trade practices as to the Three-Stripe Mark and Superstar Trade Dress (Tenth and Eleventh Claims). adidas seeks injunctive relief, as well as recovery of profits on the basis of unjust enrichment, dilution damages under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)(2), enhancement of damages pursuant to 15 U .S.C. § 1117(a), and attorney's fees and costs.

*5 Payless asserts the affirmative defenses of laches, waiver, estoppel, abandonment, acquiescence, unclean hands, trademark misuse, and contractual estoppel. Payless also asserts the Three-Stripe mark and Superstar Trade Dress are function, and therefore not protectable under the Lanham Act. Payless alleges counterclaims for abandonment and cancellation of the Three-Stripe mark, breach of contract, and unfair competition and deceptive trade practices in violation of O.R. S. § 646.605 *et seq.,* and various other states' laws.

adidas now moves for partial summary judgment as to each of Payless' counterclaims and all but two of Payless' affirmative defenses. Payless moves for partial summary judgment as to adidas' claims of infringement, dilution, and willfulness. In addition, Payless moves for summary judgment on its affirmative defense of laches. Based on its motion for summary judgment on the issue of willfulness, Payless also moves to strike adidas' demand for a jury trial. Finally, Payless moves to strike adidas' expert report and testimony.

### II. Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party must demonstrate an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Celotex,* 477 U.S. at 324. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989).

In evaluating a motion for summary judgment, the court must view all reasonable inferences in favor of the nonmoving party. *Liberty Lobby,* 477 U.S. at 255. Summary judgment is not appropriate where the record would allow a reasonable trier of fact to find for the nonmoving party. *United States v. $69,292.00 in U.S. Currency,* 62 F.3d 1161, 1166 (9th Cir.1995). Conversely, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial.*Celotex,* 477 U.S. at 323. Additionally, "[b]ecause of the intensely factual nature of trademark disputes summary judgment is generally disfavored in the trademark arena."*Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 184 F.3d 1107, 1109 (9th Cir.1999) (citing *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1356 n. 5 (9th Cir.1985)).

### *III. Discussion*

#### *A. Payless' Motion to Strike Dr. Ford's Survey and Testimony*

\*6 Payless seeks an Order striking both the August 22, 2003 Rule 26 report and the March 15, 2007 Supplemental Rule 26 expert report of Dr. Gerald Ford. Payless also seeks an order barring Dr. Ford from testifying at trial. Payless argues Dr. Ford's likelihood of confusion surveys, which focused on adidas' Superstar Trade Dress infringement claims, cannot be used to support adidas' Three-Stripe trademark infringement claims because the accused shoes are "noticeably distinguishable" from one another. Payless further contends that Dr. Ford improperly relied on likelihood of confusion surveys he conducted for adidas in other cases involving potentially infringing third-party uses of two and four-stripe designs. In essence, Payless argues that

because Dr. Ford did not conduct a likelihood of confusion survey for each of the accused shoes lots at issue, his expert reports must be stricken with respect to all of the unreviewed shoes. I disagree.

Where actually surveyed products and subsequently accused products share common and prominent features, a trademark infringement plaintiff need not create new likelihood of confusion surveys for each newly accused product. Indeed, Payless concedes that because "[e]ach of [the 37 lots adidas accuses of trade dress infringement] shared *common features* with one another, ... it [was] arguably proper for Dr. Ford to conduct a single survey on a single shoe that contained these *common features.*" Payless Mem. in Supp. Of Motion to Strike, at 7 (emphasis added). Notably, all of Payless' accused shoes, including those which Dr. Ford actually surveyed, share a common and prominent feature *(i.e.,* two- or fourparallel, equidistant and diagonal stripes that allegedly infringe the Three-Stripe Mark). Thus, it was "arguably proper for Dr. Ford to conduct a single survey that contained [those] *common features.*"

Payless' also contends Dr. Ford's report must be stricken because his methodology was flawed. Payless argues Dr. Ford improperly (1) used third-party surveys to assess whether Payless' two- and four-stripe shoes cause consumer confusion, (2) used still photographs as survey stimuli, rather than replicating actual market conditions, (3) failed to isolate adidas' claimed trade dress, and (4) use of leading questions. Dr. Ford conducted eleven different surveys as to the likelihood of post-sale confusion caused by various brands of footwear with two or four parallel, equidistant stripes running diagonally from the mid-sole forward to the laces. All of the surveys were conducted using the same methodology, and *all* of the surveyed shoes share common design features *(i.e.,* two or four parallel, equidistant stripes). Each of Payless' objections go to the weight of Dr. Ford's surveys, rather than their admissibility. *Wendt v. Host Intern., Inc.,* 125 F.3d 806, 814 (9th Cir.1997); *see also Prudential Ins. Co. v. Gibralter Fin. Corp.,* 694 F.2d 1150, 1156 (9th Cir.1982) ("Technical unreliability goes to the weight accorded a survey, not its admissibility."). Accordingly, the motion to strike Dr. Ford's expert reports is denied.

#### *B. Payless' Motion for Partial Summary Judgment*

#### on adidas' Claims of Willfulness

*7 Payless contends that its "good faith"
interpretation of the 1994 Settlement Agreement, in
combination with its reliance on the advice of outside
counsel precludes the finding of any willful
infringement. As such, Payless seeks summary
judgment on all of adidas' damages claims that are
dependent on a finding of willfulness, including
adidas' claims seeking: (1) recovery of profits on the
basis of unjust enrichment; (2) dilution damages
under the Federal Trademark Dilution Act ("FTDA"),
15 U.S.C. § 1125(c)(2) (effective until Oct. 5, 2006);
and (3) enhanced damages pursuant to 15 U.S.C. §
1117(a).

#### 1. Legal Standards

As a general rule, a plaintiff must establish that the
defendant engaged in willful misconduct to obtain
profits under the theory of unjust enrichment.*Lindy*
*Pen Co., Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1405-
06 (9th Cir.1993); *see also Maier Brewing Co. v.*
*Fleischmann Distilling Corp.,* 390 F.2d 117, 123 (9th
Cor.1968) ("[T]he District Court reached the correct
and proper conclusion when, upon finding that
appellants 'knowingly, willfully and deliberately'
infringed the said trade-mark ... it granted appellees
an accounting of appellants' profits.").[FN5] A similar
finding of willful misconduct is required for a
plaintiff to recover enhanced profits and damages
under 15 U.S.C. § 1117, *Nintendo of Am., Inc. v.*
*Dragon Pac. Int'l,* 40 F.3d 1007, 1010 (9th Cir.1994),
or damages for dilution under the FTDA. *See*15
U.S.C. §§ 1125(c)(1) and (2) (Prior to October 6,
2006, where a defendant's "commercial use" of
plaintiff's trademark "causes dilution of the
distinctive quality of [the plaintiff's famous] mark,"
and the defendant "willfully intended to trade on the
owner's reputation or to cause dilution of the famous
mark," the owner of the famous mark "shall ... be
entitled to the remedies set forth in section[ ]
1117(a)....").

> FN5. The Ninth Circuit has suggested that
> willfulness is not always a prerequisite to an
> award of a defendant's profits in a trademark
> infringement action. *See e.g., Adray v. Adry*
> *Mart, Inc.,* 76 F.3d 984, 988 (9th Cir.1995)
> ("An instruction that willful infringement is
> a prerequisite to an award of defendant's

profits may be error in some circumstances
(as when plaintiff seeks the defendant's
profits as a measure of his own damage ...
).") (internal citation omitted); *Java Jazz,*
*Inc. v. Jazzland, Inc.,* 109 Fed. Appx. 159,
162 (9th Cir. Aug 27, 2004) (holding that it
was not error to instruct the jury that
plaintiff was entitled to defendant's profits
resulting from infringement without
referring to willfulness); *Polo Fashions, Inc.*
*v. Dick Bruhn, Inc.,* 793 F.2d 1132, 1134
(9th Cir.1986) (finding that an award of
profits was appropriate without reference to
willfulness). Because Payless' present
motion merely seeks a ruling that it did not
act willfully, I find it unnecessary to address
whether a finding of willfulness is, in fact, a
prerequisite to an award of profits under the
Lanham Act.

"Willful [misconduct] carries a connotation of
deliberate intent to deceive. Courts generally apply
forceful labels such as 'deliberate,' 'false,'
'misleading,' or 'fraudulent' to conduct that meets
this standard."*Lindy Pen,* 982 F.2d at 1406 (citing
*Bangdag, Inc. v. Al Bolser's Tire* Store, Inc., 750 F.2d
903, 918-19 (9th Cir.1984)). The infringement must
be "willfully calculated to exploit the advantage of an
established mark."*Lindy Pen,* 982 F.2d at 1405;*see*
*also Danjaq LLC v. Sony Corp. .,* 263 F.3d 942, 957-
58 (9th Cir.2001) ("[W]illful" means "conduct that
occurs with knowledge that the defendant's conduct
constitutes ... infringement"); *Maier Brewing,* 390
F.2d at 123 (Willfulness where the defendant is
"attempting to gain the value of an established name
of another."); *ALPO Petfoods, Inc. v. Ralston Purina*
*Co.,* 913 F.2d 958, 966 (D.C.Cir.1990) (A finding of
willfulness "require[s] a connection between a
defendant's awareness of its competitors and its
actions at those competitors' expense.")."[T]he
primary consideration is whether the infringer, acting
in good faith and upon due inquiry, had sound reason
to believe that it had the right to act in the manner
that was found to be infringing."*SRI Int'l, Inc. v.*
*Advanced Tech. Labs.,* 127 F.3d 1462, 1464-65
(Fed.Cir.1997). Thus, willful infringement is a
question of fact that turns on the defendant's state of
mind, and "is often accompanied by questions of
intent, belief, and credibility."*Id.* at 1465;*see also*
*Ortho Pharm. Corp. v. Smith,* 959 F.2d 936, 944
(Fed.Cir.1992) ("Whether infringement is 'willful' is
by definition a question of the infringer's intent.").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 7
Slip Copy, 2008 WL 508060 (D.Or.)
(Cite as: Slip Copy, 2008 WL 508060)

## 2. The 1994 Settlement Agreement

*8 In the 1994 Settlement Agreement, adidas agreed to dismiss its claims against Payless and to release any claims that it "brought or could have brought" based on Payless' use of "two or four parallel double-serrated stripes" on footwear. Payless agreed not to sell shoes "bearing two or four parallel double-serrated stripes of contrasting color running diagonally from the outsole to forward to the lacing area."Payless argues that based on its interpretation of the agreement, it reasonably believed it could continue to sell shoes with two and four parallel stripes without infringing adidas' rights, so long as its stripes did not have "double-serrated" edges. Payless argues that its reliance on the 1994 Settlement Agreement necessarily precludes a finding of willful infringement as a matter of law. I disagree

Payless' purported reliance on the 1994 Settlement Agreement does not preclude a finding of willfulness because the agreement did not say that if Payless refrains from using double-serrated stripes, its use of parallel stripes can never violate adidas' trademark rights. As the Ninth Circuit noted, the agreement contains no forward-looking statements that preclude adidas from ever bringing another trademark infringement claim against Payless based on the use of stripes on shoes. The 1994 Settlement Agreement simply prohibited Payless from selling shoes with the specific design features then at issue-namely, double-serrated stripes. It did not authorize Payless to intentionally infringe adidas' Three-Stripe mark so long as Payless avoided using serrated stripes in doing so. In any event, Payless' supposed reliance on its interpretation of the 1994 Settlement Agreement cannot shield it from liability for conduct that continued (and continues to occur) long after the Ninth Circuit expressly rejected that interpretation. A fact-finder could reasonably find that Payless' continued reliance on its flawed interpretation of the 1994 Settlement Agreement was unreasonable.

Finally, adidas submitted circumstantial evidence that tends to undermine Payless' claim that any infringement was, as a matter of law, non-willful. Many of the accused Payless shoes are nearly identical to adidas' shoes, and Payless acknowledges that adidas' shoes were the "inspiration" for the some of the accused shoes. *See* Feldman Decl., Ex. 60

("What are the current inspirations for these styles?... adidas 'clima cool' "); *id.*Ex. 63 ("These new adidas inspired looks are great ... the Adidas [sic] inspired white 4 stripe low is a top seller."). Moreover, Payless employees referred to many of the accused shoes by the name of the corresponding adidas model, or simply as adidas "knock-offs." *Id.* Ex. 44 ("we need more Nike & adidas 'running' knock-offs"); *id.*Ex. 76 ("an adidas look a like 4-stripe"); *id.*Ex. 31 (these orders are for the country ripple jogger"); *id.*Ex. 55 ("samoa has already been purchased"); *id.*Ex. 61 ("on the adidas 4-stripe TAM 16701 the factory has been confirmed as follows...."). This evidence at least raises genuine issues of material fact as to whether Payless attempted to avoid adidas' styles after executing the 1994 Settlement Agreement, or instead continued to manufacture adidas imitations. On this record, a jury could reasonably conclude that Payless did not in fact rely on the 1994 Agreement and that its interpretation of the agreement was both unreasonable and willful. Accordingly, the 1994 Settlement Agreement does not entitle Payless to summary judgment on the issue of willfulness.

## 3. Advice of Counsel

*9 A defendant's reliance on the advice of counsel is relevant to the question of willfulness. *Columbia Picture Television, Inc. v. Krypton Broad. of Birmingham,* 259 F.3d 1186, 1196 (9th Cir.2001). Generally, obtaining the advice of counsel generally negates a finding of willfulness unless the advice is ignored or is found to be incompetent. *Chiron Corp. v. Genentech, Inc.* 268 F.Supp.2d 1117, 1121 (E.D.Cal.2002) (citing *Comark Comm., Inc. v. Harris Corp.,* 156 F.3d 1182, 1191 (Fed.Cir.1998)). Before a court will consider the exculpatory value of an opinion of counsel, however, "the legal advice contained therein must be found on the totality of the circumstances to be competent such that the client was reasonable in relying upon it."*Comark,* 156 F.3d at 1191. If the opinion is not competent, then it is of little value in showing the good faith belief of the infringer. *Id.*

Whether advice is competent, and whether it was reasonable to rely on the advice, depends on several factors, including: (1) the background research performed by the attorney; (2) whether the opinions were written or oral; (3) the objectivity of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opinions; (4) whether the attorneys rendering the opinions were trademark lawyers; (5) whether the opinions were detailed or merely conclusory; and (6) whether material information was withheld from the attorney. *Chiron,* 268 F.Supp.2d at 1121 (citing *Comark,* 156 F.3d at 1191; 7 Chisum, *Chisum on Patents* § 20.03[4][b][v][D], at 20-368 to 20-374 (2002)).[FN6] The advice of counsel "must be thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable."*Ortho Pharm.,* 959 F.2d at 944.

> FN6. Though *Chiron Corp. v. Genentech, Inc.* 268 F.Supp.2d 1117 (E.D.Cal.2002), analyzed the advice of counsel defense in the context of patent infringement, both parties cite to the decision. Given the similarities between trademark law and patent law, the *Chiron* factors are relevant to the advice of counsel defense in the context of trademark infringement. Payless notes the exact language for the first *Chiron* factor is "whether counsel examined the patent file history."*Id.* at 1121.Because there is no "patent file history" in a trademark case, I will consider the background research conducted by Payless' counsel.

It is undisputed that Payless obtained infringement "risk assessments" from outside counsel who specialized in trademark law. There are, however, significant questions as to whether Payless' counsel actually reviewed *each* of the shoes at issue in this case and whether the reviews were conducted *before* the commencement of this lawsuit. For example, Payless acknowledges that it did not obtain any advice as to its allegedly infringing version of the Stan Smith Millennium. As a matter of law, Payless' advice of counsel defense fails as to Payless' allegedly infringing versions of that shoe because a party cannot rely on advice that it did not seek or obtain. Payless' conclusory assertion that its version of the Stan Smith looks nothing like the adidas version does not alter that conclusion.

Furthermore, there are genuine issues of fact as to whether Payless' counsel actually reviewed each of the shoes at issue. Payless has produced "shoe review" documents for only 40 of the 267 shoe lots in dispute. Of the reviewed shoe lots, five were

reviewed only for trade dress concerns, and not trademark concerns. With respect to the unreviewed shoes, it is difficult to see how Payless can rely on advice that it did not actually seek or obtain.

*10 I am not persuaded by Payless' argument that even though it did not conduct actual reviews of each of the accused shoes, all of its shoes were "effectively" reviewed because once a particular design had been approved, the "approval ... carried over to any other proposed shoe that shared the exact same design pattern."Payless Reply, at 19. The problem with this argument is that these so-called "effectively" reviewed shoe lots are *not* exactly the same as the actually reviewed shoe lots. Payless acknowledges that the "effectively" reviewed lots were offered in different colors and materials, and marketed to different customers (*i.e.,* men, women, or children). Furthermore, some of these "effectively" reviewed lots relate back to actual shoe reviews that were conducted *prior* to the Ninth Circuit's rejection of Payless' interpretation of the 1994 Settlement Agreement. Notably, Payless' attorneys did not alter any infringement "risk assessments" after the Ninth Circuit held that nothing in the agreement precluded adidas from bringing suit for infringement based on the use of straight-edge stripes.

In addition, many of the shoe reviews upon which Payless purportedly relied were conducted *after* adidas initiated this lawsuit. Of the shoe reviews submitted by Payless in support of its motion, only four pre-date the filing of this action in 2001. It is difficult to see how Payless could have relied in good faith upon advice that it did not seek or obtain until *after* adidas filed suit for willful infringement. *Cf. Chiron,* 268 F.Supp.2d at 1123, n. 4 (quoting O'Malley, et al., *Federal Jury Practice & Instructions* § 19.08, at 885 (5th ed.2000) (noting that like the advice of counsel defense in the criminal law context, the advice of counsel defense is available in the infringement arena "if, '*before* [acting or failing to act], [the d]efendant, while acting in good faith and for the purpose of securing advice on the lawfulness of [his] possible *future* conduct, sought and obtained the advice of an attorney whom [he] considered to be competent, and made a full and accurate report or disclosure to this attorney of *all* important and material facts of which [he] had knowledge or had the means of knowing, ...") (emphasis and alterations in original). Payless' failure to obtain advice of

counsel *before* engaging in the conduct at issue undermines its contention that it acted in good faith reliance on the advice of its counsel. It also raises the inference that the opinions were designed simply to bolster Payless' advice of counsel defense.

There are also genuine issues of material fact as to whether the advice obtained by Payless was objective, and whether Payless' counsel considered all relevant information in forming their opinions. For example, Payless' counsel made little or no effort to determine whether its use of stripes actually caused consumer confusion, or infringed upon adidas' trademark. There is no evidence that Payless' attorneys considered the fact that Payless' shoes were "inspired" by adidas' shoes-that is, Payless' intent in selling the accused shoes. There is little evidence that Payless' attorneys considered the degree of care exercised by the average purchaser, the relatedness of the parties' goods, the similarity of the marks, or the similarity of the trade or marketing channels of the respective products. In other words, there is little evidence that Payless' attorneys considered any of the likelihood of confusion factors that the Ninth Circuit has expressly instructed courts to consider in evaluating infringement claims. *See Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1404 (9th Cir.1997) ("The eight-factor *Sleekcraft* test is used in the Ninth Circuit to analyze the likelihood of confusion in all trademark infringement cases ....") (emphasis added). As previously noted, Payless' counsel did not alter any of the infringement "risk assessments" after the Ninth Circuit rejected Payless' interpretation of the 1994 Settlement Agreement.

*11 Under these circumstances, a jury could reasonably find that Payless' attorneys lacked important information and rendered judgments about the likelihood of confusion and the risk of infringement without considering all of the facts that should inform such an analysis. Because the opinions were not based on all material information, a jury could also reasonably find that the opinions were not competent, and thus, Payless' reliance on those opinions was unreasonable.<sup>FN7</sup>

> FN7. In an apparent effort to overcome the fact that its counsel did not analyze any of the *Sleekcraft* "likelihood of confusion" factors, Payless asserts that its shoe reviews

were concerned solely with the "risk of drawing an infringement complaint," not with conducting actual infringement analyses. Def.'s Reply, at 5. This argument directly contradicts Payless' memorandum in support of the motion, in which Payless referred to the reviews as infringement analyses. *See* Def.'s Mem. in Support, at 1 (Payless "submitted its proposed shoe designs ... to outside counsel for an infringement analysis"); *id.* at 2 ("detailed analysis designed to ensure that the shoes did not infringe on the rights of adidas"); *id.* at 3 ("XXX XX XXXXXXXX XXXXXX XXXXX    XXXXX    XXXX    XXX XXXXXXXXX XXX XXXXXXXXXX XXXX XXX XXXX XXXXXX XXX XXX XXXXXXXX   XXX   XXXXXX   XX XXXXXX"); *id.* at 12 ("great care to ensure that its designs did not infringe the rights of any other party"). In any event, Payless' distinction undermines its argument. In the trademark context, the advice of counsel defense is concerned with "whether a prudent person had reason to believe that the [trademark] was not infringed," not whether Payless' counsel believed there was a low-to-moderate risk of drawing an infringement complaint. *SRI Int'l,* 127 F.3d at 1465. In other words, whether Payless believed there was a risk of getting sued has little to do with whether its shoes *actually infringed* adidas' mark. Further, the dispute as to how to characterize the reviews highlights the substantial issues of fact regarding the thoroughness and substance of the opinions. In many cases, the advice consists of a single sentence, which makes it difficult to determine the nature of the advice, let alone whether the advice was competent as a matter of law.

Perhaps the most telling characteristic of the opinion letters proffered by Payless, is the conclusory and superficial nature of the opinions themselves. In many cases, the *entire substance* of Payless' counsel's "detailed" advice consists of a single phrase or sentence. *See e.g.,* Horace Decl. Ex. B, p. 1 ("XXX XXX"; regarding Campus); *id.*Ex. C, p. 1 ("XXX XX XX XXXX XXXX XX XXXXXXX XX XX XXXX XX XXX X XXXX XXX XX XXXXXX"; regarding Copa); *id.,* Ex. D, p. 14 ("XXXXXXXX XXXXXX

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

XXXXXXXXXX XXX XX XXXX XXXXX XXX
XXXXX XXX XXXXXXXX XXXXXX XXXXX";
regarding 4-Stripe Country Ripple); *id.,* Ex. J, p. 1
("XXX XXXXXXXX"; regarding men's Tuscany);
*id.,* Ex. K, p. 1 ("XXX XXXXXXXX"; regarding
kids Tuscanny); *id.,* Ex. N, p. 1 ("XXXX XX
XXXXXXX XXXX XXX XXX XXXXXX XXXX
XXXXXXX XXX XX XXXXXXXX XXXX XXX
XXXX XX XX XXXXXXX XXXXXX XXXXXX
XXX XXXXXXX XXXX XXXX XXXXXXXX";
regarding Samoa); *id.,* Ex. Q, p. 1-2 ("XX
XXXXXXXXX XXXXXX XXXXX"; "XXX
XXXXX XXXXX XXXX XXXXX XX
XXXXXXXXX XX XXXXXXXX XXXXXX
XXXXXXXX XXX X XX XXX XXXXXX XXX";
XXX XXXXX XXX XXXX XXXXXXX
XXXXXXX"; regarding four-stripe Superstar)
(emphasis in original).[FN8] These conclusory and
unsupported opinion letters are devoid of any legal or
factual analysis explaining the conclusion reached.

> FN8.  Confidential  attorney-client
> communications have been redacted. The
> non-redacted Opinion and Order has been
> filed under seal.

Notably, Payless neither cites, nor is the court aware
of any case in which a defendant's reliance on the
kind of opinion letters proffered here entitled that
defendant to summary judgment on the issue of
willfulness. In *Chiron Corp. v. Genentech, Inc.,* 268
F.Supp.2d 1117 (E.D.Cal.2002), the primary case
upon which Payless relies, the court *denied* a
defendant's motion for summary judgment on the
advice of counsel defense despite the fact that the
defendant obtained a "fifty-six page letter [that was]
thorough, detailed, cite[d] relevant case law, and was
drafted by patent attorneys."*Chiron,* 268 F.Supp.2d at
1122. The court concluded that factual issues
remained as to the competency of counsel's advice
because the defendant failed to provide counsel with
all material information, and it was unclear whether
the opinions were conveyed orally and whether the
opinions were "conclusory and given without
supporting reasons."*Id.* at 1122-25.In stark contrast to
the thorough and detailed fifty-six page opinion letter
that the court found *insufficient* to preclude
willfulness in *Chiron,* Payless has proffered opinion
letters from counsel that do not even extend to fifty-
six words, fail to cite any relevant legal authority, and
provide no legal or factual analysis.

*\*12* On this record, there are genuine issues of
material fact as to whether the advice of counsel
obtained by Payless was competent as a matter of
law. As such, I conclude that Payless' purported
reliance on such advice is insufficient to defeat
adidas' claim of willfulness as a matter of law. *See
SRI Int'l,* 127 F.3d at 1466 (affirming rejection of
advice of counsel defense because the advice was
"conclusory and woefully incomplete ..., lacking both
legal and factual analysis, ... [and] insufficient to
meet the standard of due care appropriate to serve as
an exculpatory opinion of counsel.") (internal
quotation marks omitted); *Underwater Devices, Inc.
v. Morrison-Knudsen Co.,* 717 F.2d 1380, 1390
(Fed.Cir.1983) (affirming rejection of advice of
counsel defense because opinion memo contained
only "bald, conclusory and unsupported remarks"),
*overruled on other grounds byIn re Seagate Tech.,*
LLC, 497 F.3d 1360 (Fed.Cir.2007); *Bear U.S.A.,
Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.,* 909
F.Supp. 896, 907 (S.D.N.Y.1995) (rejecting advice of
counsel defense because opinion letter could "be
described, at best, as superficial, containing no
analysis explaining the conclusion reached."). Where,
as here, there are disputed issues of material fact and
the analysis turns ultimately on questions of intent,
credibility, and state of mind, summary judgment is
generally inappropriate. *Mendocino Envtl. Ctr. v.
Mendocino County,* 192 F.3d 1283, 1302 (9th
Cir.1999). Thus, Payless' motion for summary
judgment on adidas' claims of willfulness is denied.

### C. Payless' Motion for Partial Summary Judgment on adidas' Claims for Trademark and Trade Dress Infringement

Payless seeks summary judgment on all of adidas'
claims for trademark and trade dress infringement.
Payless argues there is no likelihood of confusion
between its use of two- and four-parallel stripes and
adidas' Three-Stripe trademark.

### 1. Legal Standards

To prevail on a trademark or trade dress infringement
claim under the Lanham Act, a plaintiff must prove
that the alleged infringer used the plaintiff's validly
registered trademark or trade dress "in commerce,"
and that the use is "likely to cause confusion, or to
cause mistake, or to deceive consumers" as to the

source of the product. *Reno Air Racing Ass'n, Inc. v. McCord,* 452 F.3d 1126, 1134 (9th Cir.2006); *Karl Storz Endoscopy-Am., Inc. v. Surgical Tech., Inc.,* 285 F.3d 848, 853-54 (9th Cir.2002).[FN9] In the Ninth Circuit, neither an intent to confuse, nor actual confusion are required elements of a trademark infringement claim. *Coca-Cola Co. v. Overland, Inc.,* 692 F.2d 1250, 1256 n. 16 (9th Cir.1982); *Brookfield Comm., Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1050 (9th Cir.1999). Instead, the central inquiry is whether a "reasonably prudent customer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the two marks" because of the similarities between the two marks *Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir.1998); *see also Academy of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1456 (9th Cir.1991) (Likelihood of confusion exists "whenever consumers are likely to assume that a mark is associated with another source" because of the similarities between the two marks). Likelihood of confusion is considered by examining the "total effect of the defendant's product and package on the eye and mind of an ordinary purchaser."*First Brand Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383-84 (9th Cir.1987).

> FN9.15 U.S.C. § 1114 provides in relevant part: (1) Any person who shall, without the consent of the registrant-
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ...
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

**\*13** In the Ninth Circuit, courts examine the following eight factors in evaluating the likelihood of confusion: (1) the similarity of the marks; (2) the relatedness of the parties' goods; (3) the similarity of trade or marketing channels; (4) the strength of the plaintiff's marks; (5) defendant's intent; (6) evidence

of actual confusion; (7) the degree of care exercised by the average purchaser; and (8) the likelihood of expansion into other markets.*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir.1979).

Regardless of the type of alleged confusion at issue-point-of-sale, initial interest, or post-sale confusion-the court's likelihood of confusion analysis should be guided by an evaluation of the so-called *Sleekcraft* factors.*Interstellar,* 304 F.3d at 942 ("To evaluate the likelihood of confusion, including initial interest confusion, the so-called *Sleekcraft* factors provide non-exhaustive guidance."); *Academy of Motion Picture Arts & Scis.,* 944 F.2d at 1446 (stating in the post-sale confusion context, "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks"); *see also Dr. Seuss,* 109 F.3d at 1404 ("The eight-factor *Sleekcraft* test is used in the Ninth Circuit to analyze the likelihood of confusion question in *all* trademark infringement cases.") (emphasis added); *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP,* 423 F.3d 539, 550 n. 15 (6th Cir.2004) ("evidence of initial-interest confusion comes into the eight-factor [likelihood of confusion] test as a substitute for evidence of actual confusion"). The eight-factor *Sleekcraft* test is not a rigid one, however, and "[o]ther variables may come into play depending on the particular facts presented."*Sleekcraft,* 599 F.2d at 348 n. 11;*see also Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1141 (9th Cir.2002) (Likelihood of confusion is not determined by mechanically counting the number of factors that weigh in favor of each party, or by giving the same weight to a particular factor in each case). Additionally, "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena."*Interstellar,* 184 F.3d at 1109 (citation omitted).

**2. Analysis of the Sleekcraft Factors**

*a. Similarity of the Marks*

"The first *Sleekcraft* factor-the similarity of the marks-has always been considered a critical question in the likelihood-of-confusion analysis."*GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000)."[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion."*Id.* at 1206.In the similarity analysis: "(1)

Marks should be considered in their entirety and as they appear in the marketplace; (2) Similarity is best adjudged by appearance, sound, and meaning; and (3) Similarities weigh more heavily than differences."*Entrepreneur Media,* 279 F.3d at 1144. "[S]imilarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features."*Exxon Corp. v. Texas Motor Exch., Inc.,* 628 F.2d 500, 505 (5th Cir.1980).

*14 Here, the similarities between Payless' stripe designs and adidas' Three-Stripe Mark are unmistakable. Like adidas' Three-Stripe Mark, Payless' stripes contrast with the background color of the shoe, and run parallel, at the same angle, from the mid-sole of the shoe diagonally forward to the laces."Considered in their entirety and as they appear in the marketplace," the stripe designs on Payless' athletic and casual shoes are similar to adidas' Three-Stripe Mark. *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1392 (9th Cir.1993).

With respect to Payless' allegedly infringing imitation of adidas' Superstar Trade Dress, the similarities are even more striking. Like the adidas' Superstar, Payless' shoe prominently displays parallel, equidistant stripes, running parallel to small equidistant holes on the sides of the shoes. Both versions of the Superstar have a rubber "shell toe" design, a particularly flat sole, and a similarly shaped heel patch. Notably, Payless' rubber "shell toe" designs-the overall shape, raised lines fanning out (like a sea shell), even the tiny "x's" embossed between the ridges of the toe-are almost indistinguishable from the adidas' "shell toe."

As even Payless repeatedly points out, the only readily discernable difference between Payless' use of stripes and adidas' Three-Stripe Mark is that Payless' shoes display two or four stripes, not three. Payless' argument is that because "two or four stripes do not equal three stripes," there can be no actionable similarity between its use of two and four stripe designs and adidas' Three-Stripe Mark. I disagree.

Payless cannot avoid liability for infringement merely by adding (or subtracting) an identical, parallel stripe to adidas' Three-Stripe Mark."[W]hat is critical is the *overall* appearance of the mark as used in the marketplace, not a deconstructionist view

of the different components of the marks."*Playmakers, LLC v. ESPN, Inc.,* 297 F.Supp.2d 1277, 1283 (W.D.Wash.2003), *aff'd,* 376 F.3d 894 (9th Cir.2004) (emphasis in original). As one court aptly noted, "few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts."*Baker v. Master Printers Union,* 34 F.Supp. 808, 811 (D.N.J.1940). Here, although there may be minor differences between Payless' use of stripes and adidas' Three-Stripe mark, "the *overall impression* created by the marks is essentially the same, [and thus] it is very probable that the marks are confusingly similar."4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:22 (4th ed.2007) (emphasis added); *see also GoTo.com, Inc. v. Walt Disney* Co., 202 F.3d 1199, 1206 (9th Cir.2000) (finding actionable similarity despite use of different colors in logo); *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988) (actionable similarity between "Century Investments & Realty" and "Century 21"); *Saks & Co. v. Hill,* 843 F.Supp. 620, 622 (S.D.Cal.1993) ("Saks Thrift Avenue" likely to be confused with Saks Fifth Avenue"); *Nabisco Brands, Inc. v. Kaye,* 760 F.Supp. 25, 27 (D.Conn.1991) ( "A2" steak sauce likely to be confused with "A1" steak sauce).

*15 Furthermore, courts have considered and rejected Payless' "two or four does not equal three" mathematical argument in related cases related involving the likelihood of similarity between adidas' Three-Stripe Mark and two- and four-stripe shoes:

> From the mathematical premise that three does not equal four, defendants argue that, as a matter of law, the use of a four stripe design on the side of a casual shoe cannot be confusingly similar to adidas' Three Stripe Mark. Defendants posit that to find otherwise would grant adidas a monopoly over the use of stripes as decorations on the sides of all sports shoes.

> This argument is not well taken. Although three stripes obviously do not equal four stripes, the issue is not simply the number of stripes. Instead, the issue is whether the total effect of the allegedly infringing design is likely to cause confusion in the

minds of an ordinary purchaser. While there can be no debate that defendants' four stripe mark has one stripe more than adidas' Three Stripe Mark, so too there can be no debate that many of the other features of the stripes displayed on defendants' [shoes] are strikingly similar-if not identical-to the features of the Three Stripe Mark displayed on [adidas'] Superstar IIK and Campus II models.... The stripes are equal in size, are placed equidistant at a similar or identical angle, are in substantially the same location between the sole and the reinforced area which supports the shoelace holes (with the necessary adjustment to accommodate four rather than three stripes), are displayed in colors which contrast with the background color of the shoes, and have serrated edges. Thus, this court cannot simply count the number of stripes and determine as a matter of law that four stripes are not confusingly similar to three stripes.

adidas-Salomon AG v. Target Corp., 228 F.Supp.2d 1192, 1211 (D.Or.2002); see also ACI Int'l, Inc. v. adidas-Solomon AG, 359 F.Supp.2d 918, 922 (C.D.Cal.2005) ("The Court expressly rejects [defendant's] argument that confusion cannot occur because its shoe has two stripes instead of three...."). Given these previous rulings and the clear similarities between the parties' respective stripe designs, I conclude that, as a matter of law, there is an actionable similarity between Payless' use of two or four stripes and the Three-Stripe Mark.

*b. Relatedness or Proximity of the Parties' Goods*

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods."Brookfield, 174 F.3d at 1055;see also E & J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir.1992) ("Where goods are related or complementary, the danger of consumer confusion is heightened."). In determining whether the product is likely to confuse, "less similarity between the marks will suffice when the goods are complementary, or the goods are similar in use and function."Sleekcraft, 599 F.2d at 350 (citations omitted). Related goods are those "which would be reasonably thought by the buying public to come from the same source if sold under the same mark."Id. at 348 n. 10 (citation omitted).

*16 Here, the parties' products are essentially identical in use and function. Both parties sell athletic and casual footwear. Aside from arguable differences in quality, the parties' products are "reasonably interchangeable by buyers for the same purposes," and thus competitive. McCarthy § 24.23. Where goods are directly competitive, "the degree of similarity of the marks needed to cause likely confusion is less than in the case of dissimilar goods...."Id. § 24.22. Given the substantial similarity of the marks at issue, see supra Section III.C.2.a, I find that this Sleekcraft factor weighs heavily in favor of finding a likelihood of confusion. See adidas v. Target, 228 F.Supp.2d at 1212-13 (denying defendant's motion for summary judgment on infringement claims, and noting "[t]his factor favors adidas since defendants are using a four stripe design on a nearly identical product of athletic shoes"); see also Brookfield, 174 F.3d at 1056 ("In light of the virtual identity of the marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").

*c. Similarity of Trade or Marketing Channels*

A consideration of how and to whom the respective goods of the parties are sold is relevant to the issue of likelihood of confusion. McCarthy § 24:51."Convergent marketing channels increase the likelihood of confusion."Sleekcraft, 599 F.2d at 353. In addition, when the "general class" of purchasers of the parties' respective products is the same, confusion is more likely. Id. On the other hand, significant differences in the price of the products, or the type of stores (e.g., discount or specialty) at which the respective products are sold may decrease the likelihood of confusion. L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1134 (Fed.Cir.1993).

Although adidas' and Payless' shoes are generally sold through different retail outlets and at different prices, adidas has submitted evidence that the parties' marketing channels are similar, and that the parties compete for at least some of the same customers. In fact, Payless' counsel conceded that the parties' markets "certainly overlap." Knops Dep. 103:14-104:1. adidas and Payless place advertisements for their respective products in the same magazines, and on the same Internet websites. Feldman Decl. Exs. 35-36, 92-94. Further, at least some of the Payless shoes at issue were actually sold in stores where

adidas' shoes were also sold. *Id.* Ex. 34, 37. Though not identical, there is evidence the parties' marketing channels partially overlap.

Even if the Payless and adidas' marketing channels were completely incongruous (which they are not), this factor would not necessarily favor Payless because channels of trade are largely irrelevant in determining the likelihood of *post*-sale confusion. Indeed, factors such as channels of trade are "directed to *pre*-sale confusion," and are "immaterial to ... whether actionable confusion is likely to occur *after* the marked product has entered the public arena."*Payless v. Reebok,* 998 F.2d 985, 989-90 (Fed.Cir.1993) (emphasis in original). This is because "post-sale observers may be unaware that Payless and [adidas] shoes are sold in different stores or at different prices, yet their confusion may be detrimental to [adidas]."*Id.* at 990.Given the similarity of the parties' respective products and adidas' credible evidence of the overlap of marketing channels, I find this factor favors adidas.

*d. Strength of the Mark*

**\*17** The scope of protection afforded a trademark "depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones."*Entrepreneur Media,* 279 F.3d at 1141;*see also GoTo.com,* 202 F.3d at 1207 ("The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws."). The strength of the trademark is evaluated in terms of its conceptual strength and commercial strength. *GoTo.com,* 202 F.3d at 1207.

With respect to conceptual strength, marks are generally classified by their placement on a continuum of increasing distinctiveness: generic, descriptive, suggestive, and fanciful or arbitrary. *E. & J. Gallo,* 967 F.2d at 1291. Suggestive, fanciful, and arbitrary marks are deemed inherently distinctive and entitled to the most protection because their intrinsic nature serves to identify a particular source of a product. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).[FN10] In contrast, "generic" marks-or, names that refer to an entire class of products-are the weakest and receive no trademark protection. *Id.* A "descriptive" (*e.g.,* one that describes the quality or

features of a product) mark may be entitled to protection only if it has acquired distinctiveness through secondary meaning. *Two Pesos,* 505 U.S. at 769. Secondary meaning is the consumer's association of the mark with a particular source. *E. & J. Gallo,* 967 F.2d at 1291. In other words, to be entitled to trademark protection, the owner of a merely descriptive trademark must show that buyers identify that mark with a single commercial source. *McCarthy* § 15:1.

> FN10. A fanciful mark is "a coined word or phrase, such as Kodak, invented solely to function as a trademark."*Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1390 (9th Cir.1993). An arbitrary mark is a common word that is "non-descriptive of any quality of the goods or services."*Id.*"A suggestive mark is one for which a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, ... the mark does not describe the product's features but suggests them."*Entrepreneur Media,* 279 F.3d at 1142 (citation omitted).

With respect to conceptual strength, this court found in a related case that the adidas Three-Stripe Mark was "arbitrary because three stripes do not define, describe or suggest the various products that bear them."*adidas v. Target,* No. 01-1582-RE, slip op. at 13 (D.Or. Jan. 29, 2003). Though the spectrum of distinctiveness does not easily translate into the world of shapes and images, *McCarthy* §§ 8:13, 11:2, I agree with this court's previous conclusion that the Three-Stripe Mark is strong and entitled to protection. Indeed, Payless' own attorneys have acknowledged as much. Knops Dep. at 132:20 to 133:12 ("Q: Did you believe the adidas three-stripe mark was in fact a strong mark? A: Yes.").

Even if the Three-Stripe Mark is not inherently distinctive, a fact-finder could reasonably conclude that adidas' Three-Stripe Mark and Superstar Trade Dress have acquired distinctiveness through secondary meaning. adidas owns a valid and incontestable registration for the Three-Stripe Mark, which serves as conclusive proof that the mark has secondary meaning. *Entrepreneur Media,* 279 F.3d at 1142 n. 3. adidas has also submitted evidence that it has expended hundreds of millions of dollars in

promoting the sale of its goods bearing both the Three-Stripe Mark and Superstar Trade Dress. Pierpoint Decl. ¶ 20. The Three-Stripe Mark has been used in connection with numerous high-profile sports events, organizations, and athletes. Pierpoint Decl. ¶¶ 21-23, 29. adidas' substantial advertising and promotional efforts are significant evidence of the strength of its mark. *See Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir.1996) (affirming trial court's finding of secondary meaning based on "significant" advertising); *Guess?, Inc. v. Tres Hermanos*, 993 F.Supp. 1277, 1280 (C.D.Cal.1997) ("Strength of mark is demonstrated by extensive advertising ...."). adidas submitted evidence of billions of dollars in sales of products bearing the Three-Stripe Mark and Superstar Trade Dress, which is also significant evidence of secondary meaning. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir.1985); *see also Century 21 Real Estate*, 846 F.2d at 1179 ("Evidence of strength of [plaintiff's] mark includes ... sales in excess of one billion dollars."). In addition, adidas' extensive evidence of unsolicited media attention supports a finding of secondary meaning. *See Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350-51 (9th Cir.1980) (evidence of extensive media coverage supported district court's determination that the mark had acquired national recognition). Given the previous court findings on this issue and the significant evidence that adidas' Three-Stripe Mark and Superstar Trade Dress have acquired secondary meaning, this factor weighs in favor of adidas.

*e. Defendant's Intent*

**\*18** Though a showing of "intent to confuse consumers is not required for a finding of trademark infringement,"*Brookfield*, 174 F.3d at 1059, adidas has submitted sufficient evidence of Payless' intent to imitate the Three-Stripe Mark to create a genuine issue of material fact as to likelihood of confusion. *See Academy of Motion Picture Arts & Scis.*, 944 F.2d at 1456 ("When one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived."); *Official Airline Guides, Inc.*, 6 F.3d at 1394 ("When an alleged infringer knowingly adopts a mark similar to another's courts will presume an intent to deceive the public.").

Here, there is no dispute that Payless was aware of the Three-Stripe Mark when it began selling the accused footwear. Horace Decl. Ex. A; Silverman Dep. 63:9-65:1; Prokop Dep. 29:14-31:7, 87:9-89:3. Payless also acknowledges monitoring the trademark portfolios and enforcement activities of branded footwear companies, including adidas. Knops Dep. at 119:16-25, 174:14-175:17, 182:6-184:23. This is credible and admissible evidence of Payless' knowledge of adidas' Three-Stripe Mark and its enforcement efforts.

In addition, there is substantial circumstantial and direct evidence that Payless intentionally copied adidas' mark. For example, Payless' employees repeatedly referred to their shoes by the name of the corresponding adidas model (such as the Country Ripple or Samoa), or simply as "adidas" shoes. *See* Feldman Decl., Ex. 23 ("Mark has the 2G [which is an adidas model] coming"); *id.*Ex. 26 ("2 versions of the 4 stripe Oxford (Adidas) [sic]"); *id.*Ex. 31 ("these orders are for the country ripple jogger"); *id.*Ex. 55 ("samoa has already been purchased"); *id.*Ex. 61 ("on the adidas 4-Stripe TAM 16701 the factory has confirmed as follows: Mens 60m pairs 11/30-12/7 Boys 90m pairs 11/30-12/7"). Payless buyers also acknowledge "knocking off" or "interpreting" adidas styles. *Id.*, Ex. 44 ("we need more Nike & adidas 'running' knock-offs"); *id.*Ex. 76 ("an adidas look a like 4-stripe"); *id.*Ex. 30 ("Adidas [sic] inspired 4-stripe look a top seller"); *id.*Ex. 59 ("we did a good job of ... interpreting adidas this Spring"); *id.*Ex. 60 ("What are the current inspirations for these styles?... adidas 'clima cool.' ").

Given the substantial similarity of the parties' respective products, the evidence of Payless' knowing imitation of adidas' mark raises substantial issues of material fact as to Payless' intent. Furthermore, as discussed *supra* Section III.B.3, there are substantial issues of material fact as to whether advice of counsel obtained by Payless was competent and whether Payless' purported reliance on such advice was reasonable. As such, the court cannot conclude that any infringement was non-willful as a matter of law. This factor weighs against granting summary judgment in Payless' favor on the issue of infringement.

*f. Actual Confusion*

**\*19** As an initial matter, adidas acknowledges that there is no likelihood of consumer confusion at the point-of-sale. Rather, adidas' infringement claims are based on the likelihood of initial-interest and post-sale confusion. Payless argues that both of those theories fail in this context. I disagree.

Contrary to the court needing to "buy into" adidas' initial interest and post-sale confusion theories, *see* Payless Mem. in Supp. of Summ. J., at 3, "[t]he Ninth Circuit has explicitly recognized that the use of another's trademark in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may still be an infringement.' " *adidas v. Target,* 228 F.Supp.2d at 1211 (quoting *Dr. Seuss,* 109 F.3d at 1405). Similarly, "the law in the Ninth Circuit is clear that 'post-purchase confusion,' *i.e.,* confusion on the part of someone other than the purchaser who, for example, simply sees the item after its has been purchased can establish the required likelihood of confusion under the Lanham Aet." *Karl Storz,* 285 F.3d at 854.

Moreover, this court has specifically endorsed the use of both initial-interest and post-sale confusion in *factually identical* cases involving two-and four-stripe footwear that allegedly infringed adidas' Three-Stripe Mark. *adidas v. Target,* 228 F.Supp.2d at 1211;*ACI v. adidas,* 359 F.Supp.2d at 921. I agree with the rationale and conclusions in those cases. Initial-interest and post-sale confusion are well established forms of confusion in this context, and adidas' failure to allege point-of-sale confusion is of no consequence. *See ACI v. adidas,* 359 F.Supp.2d at 921 ("Post-sale eonfusion ... may be no less injurious to the trademark owner's reputation than confusion on the part of the purchaser at the time of sale.") (quoting *Karl Storz,* 285 F.3d at 854)); *Brookfield,* 174 F.3d at 1062 (finding initial-interest confusion in the absence of point-of-sale confusion); *Levi Strauss,* 632 F.2d at 822 (rejecting defendant's attempt to limit the confusion analysis to point-of-sale circumstances); *see also Academy of Motion Picture Arts & Scis.,* 944 F.2d at 1455;*Payless v. Reebok,* 998 F.2d at 989-90 (both reversing trial court for failure to consider post-sale confusion).

adidas has submitted credible evidence of actual harm resulting from the alleged initial-interest and post-sale confusion) to create a genuine issue of material fact as to the likelihood of confusion. Payless directly benefits from initial interest confusion by receiving unearned consumer interest. Pham Decl., Ex. 1 ¶¶ 88, 90; *cf. Dr. Seuss,*1090 F.3d at 1405 (Initial interest confusion allows the infringer to improperly benefit from the goodwill that has developed in the mark). In addition, consumers are likely to impute to Payless many of the positive traits associated with the adidas brand due to years of extensive advertising of the Three-Stripe Mark. *Id.* ¶ 96.Payless also receives sales from buyers aiming to acquire the prestige of the adidas brand at a cheaper price. This is credible evidence of harm flowing from consumer confusion. *McCarthy* § 23:7; *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,* 219 F.3d 104, 108 (2d Cir.2000) ("[P]ost-sale confusion can occur when a manufacturer of knoekoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product.").

**\*20** Furthermore, adidas has submitted evidence that Payless' stripe designs negatively impact consumer perceptions of the adidas brand as a source of quality footwear. Joachimsthaler Decl., Ex. 1 ¶ 112. adidas' expert, Dr. Joachimsthaler noted that "the presence of the knockoff Payless shoes in the mass market may cause adidas to appear overexposed and thereby lose its premium perception...."*Id.,* Ex. 1 ¶ 105. Indeed, consumers who view Payless' shoes in the post-sale context "may attribute any perceived inferior quality of Payless shoes to [adidas]."*Payless v. Reebok,* 998 F.2d at 989. Here, there is evidence that Payless shoes are actually inferior to adidas' shoes in quality. Teston Dep. at 163:20-23, 165:22-24. Perhaps more importantly, there is evidence that consumers actually perceive Payless' shoes to be of inferior quality. Joachimsthaler Decl., Ex. 1 ¶ 101; Feldman Decl. Ex. 49 at 18 ("[M]any [consumers] commented that the overall quality of the shoes wasn't great."). Indeed, Payless is aware of the perception among consumers that its shoes are low quality. Wells Dep. at 85:2-8, 141:22-143:8. This is credible evidence of harm to adidas because "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."*El Greco Leather Prods. Co., Inc. v. Shoe World, Inc. .,* 806 F.2d 392, 395 (2d Cir.1986). Finally, there is evidence that Payless' shoes are

likely to have a negative effect on adidas' customer loyalty. Joachimsthaler Decl., Ex. 1 ¶¶ 106-08. In sum, adidas has submitted sufficient evidence of actual harm to create a genuine issue of material fact as to initial-interest and post-sale confusion.

Finally, adidas has also submitted evidence of actual confusion in the form of survey evidence, which shows that two and four stripe footwear creates a likelihood of confusion among consumers "who within the next six months were likely to purchase a pair of athletic shoes."Ford Decl. ¶ 16. Each of the surveys were performed using the same methodology, and a substantial portion of *prospective* purchasers (41%) *actually believed* that Payless' four-stripe shoe was made or authorized by adidas. Ford. Decl. ¶¶ 19, 24. Such a finding is sufficient to support a finding of actual confusion. *Thane Int'l,* 305 F.3d at 903 (finding more than 25% consumer confusion sufficient); *Exxon Corp.,* 628 F.2d at 507 (15% confusion sufficient); *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 279 (7th Cir.1976) (15%); *Re/Max Int'l Inc. v. Help-U-Sel Inc.,* 20 U.S.P.Q.2d 1945, 1946-47 (C.D.Cal.1991) (trade dress infringement survey showing 28% affiliation response "constitutes strong evidence" of likelihood of confusion); *Mut. of Omaha Ins., Co. v. Novak,* 836 F.2d 397, 400-01 (8th Cir.1987) (10-12% confusion entitled to "significant weight"). Contrary to Payless' argument, consumer surveys have generally been accepted as proxies for actual confusion. *McCarthy* § 32:184 ("Several courts ... have put survey evidence under the heading of 'actual confusion.' "). As discussed *supra,* Section III.A, Payless' objection to Dr. Ford's survey methodology go to the weight of the evidence, rather than its admissibility.

**\*21** Given adidas' showing of actual consumer confusion, and the evidence of harm to adidas resulting from initial-interest and post-sale confusion, I find there are significant issues of material fact as to actual confusion. Accordingly, this factor weighs against granting Payless summary judgment on the issue of infringement.

*g. Degree of Care Exercised by the Average Purchaser*

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."*Sleekcraft,* 599

F.2d at 353. Where goods are expensive, or purchased after careful consideration, it is less likely that a reasonably prudent buyer would be confused as to the source of the goods. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 489 (1st Cir.1981); *see also Sleekcraft,* 599 F.2d at 353 ("[W]hen the goods are expensive the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."); *McCarthy* § 23:96 ("The reasonably prudent buyer is assumed to take more .care in purchasing 'expensive' items which he buys infrequently, than in buying everyday, relatively inexpensive items.").

Courts have found that purchasers of "relatively inexpensive athletic and sportswear" are "not likely to exercise a great deal of care in distinguishing between trademarks when purchasing the goods. *M'Otto Enters., Inc. v. Redsand, Inc.,* 831 F.Supp. 1491, 1502 (W.D.Wash.1993); *see also Gucci Am., Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1066 (S.D.N.Y.1991) ("[T]he court has no reason to conclude that the buyer of casual sportswear represent a particularly sophisticated group of customers."). Moreover, Payless' counsel acknowledges that Payless' consumers are "not particularly sophisticated." Knops Dep. at 104:6-16. Relatively unsophisticated value-conscious customers are more likely to be attracted to, and confused by imitations of adidas' Three-Stripe Mark. This factor tips in favor of adidas.

*h. Likelihood of Expansion into Other Markets*

The parties agree that this factor is not relevant in this ease.

**3. Conclusion**

Having considered the *Sleekcraft* factors, I find adidas has produced substantial evidence of the likelihood of confusion between the Three-Stripe Mark and Payless' use of two or four stripes on footwear. There are significant issues of material fact as to several of the *Sleekcraft* confusion factors. Many of these issues will turn on questions of credibility and intent. As such, Payless' motion for summary judgment on adidas' infringement claims is denied.

## D. Payless' Motion for Partial Summary Judgment Dismissing Plaintiffs' Federal and State Dilution Claims

### 1. Federal Dilution Standards

The point of federal dilution law is to protect the owner's investment in his mark. *Nissan Motor Co. v. Nissan Computer Corp.,* 378 F.3d 1002, 1012 (9th Cir.2004)."Dilution ... is 'the lessening of the capacity of a famous mark to identify and distinguish goods or services' of the owner of the famous mark such that the strong identification value of the owner's trademark whittles away or is gradually attenuated as a result of its use by another."*Horphag Research Ltd. v. Garcia,* 475 F.3d 1029, 1035 (9th Cir.2007) (quoting 15 U.S.C. § 1127). It is a cause of action "invented and reserved for a select class of marks-those marks with such powerful consumer associations that even non-competing uses can impinge on their value."*Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 875 (9th Cir.1999) (citation omitted). For this reason, the FTDA applies "only to those marks which are both truly distinctive and famous, and therefore most likely to be adversely affected by dilution."*Id.* at 876.

**\*22** Prior to October 6, 2006, the Federal Trademark Dilution Act ("FTDA") entitled the owner of a famous mark to injunctive relief where "another person's commercial use ... of a mark or trade name ...*causes* dilution of the distinctive quality of the mark."15 U.S.C. § 1125(c)(1) (effective until October 5, 2006) (emphasis added). The statute further provided that the owner of a famous mark "shall be entitled only to injunctive relief ... unless the person against whom the injunction is sought wilfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the [monetary] remedies set forth in section[ ] 1117(a)...."*Id.* § 1125(c)(2) (effective until October 5, 2006). The FTDA "unambiguously require [d] a showing of actual dilution, rather than a likelihood of dilution."*Moseley v. v. Secret Catalogue, Inc.,* 537 U.S. 418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). Thus, to obtain money damages for dilution under the FTDA, a plaintiff must show: (1) its mark is famous; (2) the defendant is making commercial use of the famous mark; (3) the defendant's use began after the plaintiff's mark

became famous; (4) the defendant's use *actually diluted* the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services; and (5) the defendant willfully intended to trade on the trademark owner's reputation or to cause dilution. 15 U .S.C. § 1125; *Horphag Research,* 475 F.3d at 1036 (citing *Moseley,* 537 U.S. at 433);*Avrey Dennison,* 189 F.3d at 873-74. In addition, "the mark used by the alleged diluter must be identical, or nearly identical, to the protected mark."*Thane Int'l., Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 905 (9th Cir.2002).

On October 6, 2006, Congress enacted the Trademark Dilution Revision Act of 2006 ("TDRA"), which amended the FTDA.[FN11]Under the TDRA, "the owner of a famous mark ... shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is *likely to cause dilution* by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."15 U.S.C. § 1125(c)(1) (emphasis added). Thus, the TDRA replaced the FTDA's "actual dilution" standard with a "likelihood of dilution" standard. The TDRA did not, however, eliminate the requirement that the alleged diluter's mark be identical, nearly identical, or substantially similar. *Century 21 Real Estate, LLC v. Century Ins. Group,* No. 03-0053-PHX-SMM, 2007 WL 484555, at \*14 (D.Ariz. Feb.9, 2007).

> FN11. Specific changes to federal dilution law under the TDRA include: (1) the establishment of a "likelihood of dilution" standard for dilution claims, rather than an "actual dilution" standard; (2) a provision that non-inherently distinctive marks may qualify for protection; (3) a reconfiguration of the factors used to determine whether a mark is famous for dilution purposes, including a rejection of dilution claims based on "niche" fame; and (4) the specification of separate and explicit causes of action for dilution by blurring and dilution by tarnishment; and (5) an expanded set of exclusions. *See*15 U.S.C. § 1125(c).

With respect to adidas' federal dilution claims, the parties agree that (1) the TDRA's relaxed "likelihood

of dilution" standard applies retroactively to adidas'
claims for injunctive relief, while (2) the FTDA
governs adidas' claims for monetary damages
because Payless' allegedly unlawful actions began
before the enactment of the TDRA. *See*15 U.S.C. §
1125(c)(5) ("The owner of the famous mark shall
also be entitled to [monetary damages] ... [if] the
mark or trade name that is likely to cause dilution ...
was *first used* in commerce by the [defendant] *after
October 6, 2006*.") (emphasis added); *see also
Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477
F.3d 765, 766 (2d Cir.2007) (applying the TDRA's
"likelihood of dilution" standard retroactively to the
plaintiff's claims for injunctive relief); *Malletier v.
Dooney & Bourke, Inc.*, No. 04 Civ. 2990(SAS),
2007 WL 1222589, at *3 (S.D.N.Y. April 24, 2007)
("The second sentence of subsection 1125(c)(5),
entitling owners of famous marks to dilution
damages, contains an unambiguous date restriction
that authorizes the application of the "likelihood of
dilution" standard as a basis for recovering damages
to civil actions where the diluting mark or trade name
was first introduced in commerce after *October 6,
2006*.") (emphasis in original); *Dan-Foam and
Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, No.
06 Civ. 6350(SAS), 2007 WL 1346609, at *7
(S.D.N.Y. May 4, 2007) ("[T]he TDRA's relaxed
likelihood of dilution standard applies only to pre-
October 6, 2006 claims seeking prospective relief,
actual dilution under *Moseley* still applies when a
pre-October 6, 2006 claimant seeks monetary
relief.").

## 2. Payless Challenges

**\*23** Payless argues that adidas has failed to establish
that (1) Payless' use of two and four stripe designs
has caused *actual* dilution of the Three-Stripe mark,
and (2) Payless wilfully intended to trade on adidas'
reputation, each of which is required to recover
monetary damages under FTDA. In addition, Payless
contends adidas cannot demonstrate any likelihood of
dilution under the TDRA. Finally, Payless argues that
adidas' claims under both the FTDA and TDRA must
be dismissed because adidas has failed to
demonstrate that (1) Payless' designs are identical or
nearly identical to adidas' trademark, and (2) the
Three-Stripe Mark is "widely recognized by the
consuming public."I disagree.

*a. Famousness of the Mark*

To prevail on its dilution claims under either the
FTDA or the TDRA, adidas must establish that the
Three-Stripe mark is "famous." 15 U.S.C. § 1125;
*see also Avery Dennison*, 189 F.3d at 876 ("[T]he
[FTDA] ... appl[ies] only to those marks which are
both truly distinctive *and* famous, and therefore most
likely to be adversely affected by dilution.") (internal
quotations omitted; emphasis in original). Under the
FTDA, fame is interpreted very narrowly.*Thane Int'l.*,
305 F.3d at 907. Similarly, the TDRA specifically
requires that the mark be "widely recognized by the
general consuming public of the United States as a
designation of source of the goods or services of the
mark's owner."15 U.S.C. § 1125(c)(2)(A). Thus, to
demonstrate "famousness" under either the FTDA or
the TDRA, adidas must show that the mark is "truly
prominent and renowned." *Avery Dennison*, 189 F.3d
at 875. In addition to proving the mark is famous,
adidas must also establish that Payless' commercial
use of the Three-Stripe Mark began after the mark
became famous. *Horphag Research*, 475 F.3d at
1036.

The FTDA and the TDRA each outline several non-
exclusive factors the court may consider in
determining whether a mark is famous. Under the
TDRA, "the court may consider all relevant factors,"
including: (1) "[t]he duration, extent, and geographic
reach of advertising and publicity of the mark,
whether advertised or publicized by the owner or
third parties"; (2) "[t]he amount, volume, and
geographic extent of sales of goods or services
offered under the mark"; (3) "[t]he extent of actual
recognition of the mark"; and (4) whether the mark is
registered. 15 U.S.C. § 1125(c)(2)(A). The FTDA
outlines a similar set of factors, "such as, but not
limited to":

(A) the degree of inherent or acquired
distinctiveness of the mark;

(B) the duration and extent of use of the mark in
connection with the goods or services with which
the mark is used;

(C) the duration and extent of advertising and
publicity of the mark;

(D) the geographical extent of the trading area in
which the mark is used;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

**\*24** (G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered ... on the principal register.

15 U.S.C. § 1125(c)(1)(A)-(H) (effective until Oct. 5, 2006).

Under either set of factors, the record supports a finding that adidas' Three-Stripe Mark is famous, and has been famous since as early as 1970. Indeed, this court has already recognized as much in two separate, but factually identical cases. *adidas-See America, Inc. v. KMart Corp.,* No. CV-05-120-ST, 2006 WL 2044857, at \*12 (D.Or. June 15, 2006) ("[B]y the early 1970s, the Three-Stripe Mark and the Superstar shoe were well-known and famous"); *adidas v. Target,* 228 F.Supp.2d at 1216 (finding adidas' extensive use of the Three Stripe Mark in connection with its athletic footwear since 1952, its "huge" expenditures in advertising, promoting and developing its brand identity, and its wide recognition in the athletic apparel industry to be sufficient evidence to withstand summary judgment on the issue of fame). After careful review of the record, I agree with this court's previous findings on the issue of fame. FN12

> FN12. Given the extensive evidence adidas submitted as to each of the statutory "fame" factors, its failure to conduct a fame survey is not dispositive. *Cf. Google Inc. v. Am. Blind & Wallpaper,* No. C 03-5340 JFR, 2007 WL 1159950, at \*11 (N.D.Cal. Apr.18, 2007) (unpublished decision) (failure to conduct survey was not dispositive on the question of fame where plaintiff submitted evidence of fame in the form of declarations, trademark registration, and extensive sales and advertising); *see also 800-JR Cigar, Inc.*

*v. Goto.com,* 437 F.Supp.2d 273, 294 (D.N.J.2006) (finding mark famous based on trademark registration, sales, and third-party recognition without requiring fame survey).

*b. Identity of the Marks*

For a dilution claim to succeed under either the FTDA or the TDRA, "the mark used by the alleged diluter must be identical, or nearly identical, to the protected mark."*Thane Int'l.,* 305 F.3d at 905;*see also Century 21 Real Estate,* 2007 WL 484555, at \*14 ("Although the TDRA no longer requires actual dilution, the new law does not eliminate the requirement that the mark used by the alleged diluter be identical, nearly identical, or substantially similar to the protected mark.")."For marks to be nearly identical to one another, they must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same."*Thane Int'l,* 305 F.3d at 906 (internal quotations omitted). In the dilution context, the "similarity of the marks" test is more stringent than in the infringement context. *Id.* at 905.

In determining whether Payless' designs are identical or nearly identical to adidas' marks, the Ninth Circuit's discussion of identity in *Thane International, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 905-07 (9th Cir.2002), is instructive. In that case, a bicycle manufacturer alleged that an exercise machine manufacturer's use of the name "OrbiTrek" diluted the "TREK" trademark. In discussing whether the marks were "identical or nearly identical," the Ninth Circuit noted that to state a claim for dilution, the plaintiff "must show that ... 'the defendant is making commercial use of *the* mark....' " *Id.* at 905 (quoting *Avery Dennison,* 189 F.3d at 874) (emphasis in original). The Ninth Circuit explained that "a dilution claim alleges a form of appropriation," which "implies the adoption of the mark itself." *Id.* at 906.Although the "OrbiTrek" and "TREK" marks were not identical, a fact-finder could reasonably conclude that the marks were nearly identical because the "OrbiTrek mark contain[ed] the entire TREK mark." *Id.* at 907.That the OrbiTrek mark added four letters to the word TREK did not entitle the alleged diluter to summary judgment on the issue of identity because "[a] reasonable trier of fact could determine that [the OrbiTrek manufacturer] 'use [d]' the TREK mark by incorporating the *same* word into its own

mark as a separate, visually identifiable element, and that a significant segment of the consuming public would likely focus on that element as an identifier essentially the same as the TREK mark." *Id.* at 907 (emphasis added).

**\*25** Although Payless' four-stripe designs are not identical to adidas' Three-Stripe Mark, a reasonable fact-finder could conclude that the marks are "nearly identical" or "essentially the same." Like the nearly identical OrbiTrek and TREK marks in *Thane International,* Payless' four-stripe design actually contains the *entire* Three-Stripe Mark and simply adds another identical, parallel stripe. If Payless were to remove the fourth stripe, its stripe design would be virtually indistinguishable from adidas' mark in angularity, placement, size, and equidistance. Payless cannot appropriate the Three-Stripe Mark and avoid liability for dilution simply by adding or subtracting a single, identical stripe. *See Thane Int'l.,* 305 F.3d at 907 (TREK and OrbiTrek are similar enough to present a jury question as to whether they are nearly identical); *see also Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 466 n. 4 (7th Cir.2000) (HERBROZAC sufficiently similar to PROZAC to prove dilution). As in *Thane International,* a reasonable trier of fact could determine that Payless "used" or "appropriated" adidas' Three-Stripe Mark and "incorporat[ed] the *same* [symbol] into its own mark as a separate, visually identifiable element, and that a significant segment of the consuming public would likely focus on that element as an identifier essentially the same as the [adidas] mark."*Id.* (emphasis added).

Furthermore, adidas has submitted evidence that a "substantial segment of the consuming public" actually believes that Payless' four-stripe designs are "essentially the same" as adidas' Three-Stripe Mark. Forty-one percent of respondents in one survey saw a four-stripe design and believed it was adidas' mark. Ford Decl. ¶¶ 2, 20, 24-25, 30-31, 41, 45-46, 50, 53, 57-58. In addition, adidas' expert stated Payless' two-and four-stripe shoes "feature a number of design elements that call to mind various classic adidas shoes ... includ[ing] the angularity, positioning, parallel, and equidistant nature of the stripes on a number of Payless models that mimic adidas' iconic Three-Stripe symbol, the perforations alongside the stripes on specific Payless models that imitate their original adidas counterparts, and specific design

elements of the adidas models ... such as the shell toe, flat sole, and heel patch of the adidas Superstar model."Joachimsthaler Decl., Ex. 1 ¶ 78. The distinct similarities between the parties stripe designs will cause consumers to make a mental association between the two products. Pham Decl., Ex. 1 ¶¶ 67-78, 87-100; *see also McCarthy § 24:117* ("The more similar the marks, the more likely it is that the required public 'association' is proven," and consequently, the more likely dilution by blurring may be proven.). As this court has noted in substantially similar factual circumstances, such survey evidence and expert opinion may be "open to attack, [but] it is at least sufficient to create a genuine issue of material fact to preclude summary judgment [on the issue of identity]."*adidas v. KMart,* 2006 WL 2044857, at \* 12-13;*see also ACI v. adidas,* 359 F.Supp.2d at 923 ("adidas has submitted sufficient evidence to support the requisite elements that the two-stripe design is identical or nearly identical to its Mark.").

**\*26** Whether the marks at issue are nearly identical is a context-specific and fact-intensive inquiry. *Savin Corp. v. Savin Group,* 391 F.3d 439, 453 (2d Cir.2004). Given the similarity of Payless' stripe designs and adidas' Three-Stripe Mark, and adidas' evidence that consumers actually view the marks as "essentially the same," a fact-finder could reasonably conclude that Payless' stripe designs and adidas' Three-Stripe Mark are, in fact, nearly identical. As such, summary judgment is not appropriate on the issue of identity.

*c. Actual Dilution*

As noted, because Payless' allegedly unlawful actions began before the effective date of the TDRA, adidas must show that Payless' alleged use of stripes actually dilutes the adidas' Three-Stripe Mark to recover money damages under the FTDA. *Starbucks,* 477 F.3d at 766;*Dan-Foam,* 2007 WL 1346609, at \*7.

Dilution is the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception."*Moseley,* 537 U.S. at 433 (citing 15 U.S .C. § 1117). Actual dilution occurs "by either a blurring of the mark's identification or a

tarnishment of the positive associations the mark has come to convey."*See Moseley,* 537 U.S. at 433 (The purpose of the FTDA "is to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it."). Actual dilution "does not mean that the consequences of dilution, such as an actual loss of sales or profits, must also be proved."*Id.* (emphasis added). In *Moseley,* the Supreme Court noted, "[i]t may well be ... that direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can be reliably proved through circumstantial evidence-the obvious case is one where the junior and senior marks are identical."*Id.* On the other hand, "where the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution."*Id.*

Payless argues that adidas cannot demonstrate actual dilution under the FTDA because the opinion testimony and circumstantial evidence adidas relies on as proof of dilution is insufficient as a matter of law. I disagree. In a factually identical case involving alleged dilution of the Three-Stripe Mark, Magistrate Judge Stewart considered and rejected the exact argument Payless now proffers:

> Defendants assert adidas cannot demonstrate actual dilution. In response, adidas has submitted an expert opinion identifying numerous ways in which defendants' continued sale of two and four stripe footwear dilutes the distinctiveness of the Three-Stripe Mark by:

> (1) reducing brand equity within the footwear market; (2) negatively affecting the strength of the mark in the minds of consumers; (3) eviscerating the perception of the mark as signifying quality and a premium product; and (4) impacting consumer loyalty associated with the mark. Joachimsthaler Report, ...; see also Pham report,.... This evidence is sufficient to create a genuine issue of material fact both as to actual dilution under the FTDA, ... and as to the likelihood of dilution....

*27adidas v. KMart,* 2006 WL 2044857, at *12. Here, adidas relies on the *same* evidence that this court previously found sufficient to withstand summary judgment on the issue of actual dilution, and Payless makes no attempt to distinguish the facts

of this case from *adidas v. KMart.* Accordingly, I find no compelling reason to depart from Magistrate Judge Stewart's analysis and conclusion that such evidence is sufficient to create an issue of fact as to actual dilution under the FTDA.

Given Judge Stewart's previous rulings on this exact issue and the substantial similarity between the marks at issue, I find adidas has submitted sufficient evidence to create a genuine issue of material fact as to actual dilution under the FTDA. Because adidas has proffered sufficient evidence to demonstrate actual dilution, it has necessarily satisfied the lesser standard of likelihood of dilution under the TDRA.

*d. Willful Intent*

To recover monetary damages for dilution under the FTDA, a plaintiff must show that the defendant "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark."*See* 15 U.S.C. § 1125(c)(2) (The owner of a famous mark "shall be entitled only to injunctive relief ... unless the [defendant] willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the [monetary] remedies set forth in section[ ] 1117(a)....") (effective until October 5, 2006).

As discussed at length *supra,* Sections III.B and III.C.2.e, adidas has submitted sufficient direct and circumstantial evidence to raise genuine issues of material fact as to Payless' intent in using two- or four-parallel, equidistant stripes running diagonally from the mid-sole forward to the laces. Based on that evidence, a fact-finder could reasonably conclude that Payless did, in fact, intend to "trade on [adidas'] reputation" by creating an association between its footwear and adidas' Three-Stripe Mark. 15 U .S.C. § 1125(c).

### 3. Oregon State Law Dilution

adidas has also asserted a claim under Oregon's anti-dilution statute, Or.Rev.Stat. § 647.107. Oregon's dilution statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a [registered]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mark ... or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Or.Rev.Stat. § 647.104.<u>FN13</u>Payless, however, argues that adidas' state law trade dress dilution claims are preempted by federal patent law. Payless contends the Oregon dilution law substantially interferes with federal patent law because it effectively extends "patent-like protection" to an unpatented, yet patentable product design (*i.e.,* the Superstar Trade Dress). I agree.

> FN13. adidas alleges dilution of the Superstar Trade Dress under the anti-dilution laws of 36 states. The parties agree that each of the state dilution laws are substantively identical to Oregon's anti-dilution law.

**\*28** In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), the Supreme Court held that "state regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws."*Id.* at 154.In so holding, the Court explained:

The federal patent system ... embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years. '[The inventor] may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the community, the patent is granted. An exclusive enjoyment is guaranteed him for seventeen years, but upon expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use.'

The attractiveness of such a bargain, and its effectiveness in inducing creative effort and disclosure of the results of that effort, depend almost entirely on a backdrop of free competition in the exploitation of unpatented designs and innovations. The novelty and nonobviousness requirements of patentability embody a congressional understanding, implicit in the Patent Clause itself, that free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception. Moreover, the ultimate goal of the patent system is to bring new designs and technologies into the public domain through disclosure. State law protection for techniques and designs whose disclosure has already been induced by market rewards may conflict with the very purpose of the patent laws by decreasing the range of ideas available as the building blocks of further innovation. The offer of federal protection from competitive exploitation of intellectual property would be rendered meaningless in a world where substantially similar state law protections were readily available. To a limited extent, the federal patent laws must determine not only what is protected, but also what is free for all to use.

*Id.* at 150-51 (citations omitted; emphasis added). In *Bonito Boats,* the Court concluded that a state statute, which prohibited using any direct molding process to duplicate a boat hull, granted boat manufacturers "patent-like protection for ideas deemed unprotected under the present federal scheme," and therefore conflicted with, and was preempted by federal patent law. *Id.* at 168.The state law "substantially restricted the public's ability to exploit an unpatented design in general circulation, raising the specter of state-created monopolies in a host of useful shapes and processes for which patent protection has been denied or is otherwise unobtainable."*Id.* at 167.

The Court did not, however, prohibit all state regulation of potentially patentable designs. States "may protect businesses in the use of their trademarks, labels, or distinctive trade dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods."*Id.* at 154.Similarly, a state may protect trade secrets, or forbid industrial espionage without conflicting with federal patent law. *Id.* at 155.The Court indicated that limited state regulations of patentable designs may be permissible if the regulations are "not aimed exclusively at the promotion of the invention itself and ... limited to those necessary to promote goals outside the contemplation of the federal patent scheme ."*Id.* at 166.

**\*29** Relying *Bonito Boats,* federal courts have held that state anti-dilution statutes are preempted by federal patent law where the state law effectively prohibits the copying of a patentable, yet unpatented product design, without any requirement of consumer confusion. *Escada AG v. The Limited, Inc.,* 810 F.Supp. 571, 574 (S.D.N.Y.1993); *Eastern Am. Trio Prods., Inc. v. Tang Electronic Corp.,* 97 F.Supp.2d 395, 424 n. 199 (S.D.N.Y.2000). In both *Escada* and *Eastern,* the court determined that New York's anti-dilution law, which is substantively identical to the Oregon anti-dilution law, was preempted by federal patent law because the plaintiff sought to use the statute to "enjoin defendants from making, using or selling [product] designs which allegedly mimic[ked]" the plaintiff's unpatented trade dress. "Were the statute to be so applied, a would-be inventor ... would not have to meet the rigorous standards for obtaining a patent and his right to exclude copiers would not be confined to a design patent's 14 year limit."*Escada,* 810 F.Supp. at 574;*see also Eastern,* 97 F.Supp.2d 424 n. 199.Since the New York dilution law did not require a finding of consumer confusion, the New York anti-dilution law went beyond the limited state regulation allowed by *Bonito Boats.*

Like the preempted state anti-dilution law at issue in *Escada* and *Eastern,* Oregon's dilution law would interfere with federal patent law by allowing adidas to forever exclude others from making and selling an unpatented product design without requiring adidas to meet the rigorous standards for obtaining a federal patent. In effect, the Oregon anti-dilution statute would provide perpetual "patent-like protection for an intellectual creation that would otherwise remain unprotected as a matter of law."*Bonito Boats,* 489 U.S. at 168. Notably, the Oregon anti-dilution is substantively indistinguishable from the New York anti-dilution law in *Escada* and *Eastern.*[FN14]Like the plaintiff in *Escada* and *Eastern,* adidas seeks to prohibit Payless from imitating a patentable design under a state law that does not require a finding of consumer confusion. Thus, as applied to potentially patentable trade dress designs, the state anti-dilution statutes upon which adidas relies go beyond the limited state regulation allowed by *Bonito Boats.*"When the subject matter is potentially patentable the state interest in protecting the manufacturer from dilution must yield to the national interest in uniform patent law."*Id.* at 154.As such, adidas' state law dilution claims are preempted by

federal patent law, and Payless' motion for summary judgment dismissing adidas' Seventh Claim is granted.

> FN14. adidas actually asserts a state law dilution claim under the same New York anti-dilution state at issue in both *Escada* and *Eastern.*

### *E. Payless' Affirmative Defenses and Counterclaims*

Both parties move for summary judgment on Payless' affirmative defense of laches. In addition, adidas seeks summary judgment as to Payless' Second (waiver and equitable estoppel), Third (contractual estoppel), Fourth (acquiescence), Fifth (lack of distinctiveness), Sixth (functional), Seventh (unclean hands), Eighth (antitrust), Tenth (abandonment), Eleventh (failure to perform), Twelfth (loss of secondary meaning), Thirteenth (generic) and Fourteenth (stripe depletion) Affirmative Defenses, as well as all four of Payless' Counterclaims (breach of contract, state unfair competition and deceptive trade practices, and abandonment of trademark). Because many of Payless' affirmative defenses and counterclaims raise closely related legal issues and rely on similar factual bases, the parties do not separately address each claim. Accordingly, I will follow suit and group the defenses and counterclaims against which adidas moves into sections based on common factual and legal arguments.

### 1. Laches

**\*30** Laches is a valid defense to Lanham Act claims for both monetary damages and injunctive relief. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n,* 465 F.3d 1102, 1108 (9th Cir.2006); *see also Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 840 (9th Cir.2002) ("As long as the defendant would 'be prejudiced by a prospective injunction,' a court may apply laches."). The defense is premised on the maxim that "one who seeks the help of a court of equity must not sleep on his rights."*Jarrow Formulas,* 304 F.3d at 835. It is a disfavored defense in trademark cases, *E. & J. Gallo Winery v. Pasatiempos Gallo, S.A .,* 905 F.Supp. 1403, 1414 (E.D.Cal.1994), and available "only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time."*Brookfield,* 174 F.3d 1061

(9th Cir.1999). To prevail on a laches defense, a defendant must prove: (1) the claimant unreasonably delayed in filing suit; and (2) as a result of the delay, the defendant suffered prejudice. *Danjaq,* 263 F.3d at 955.

*a. Unreasonable Delay*

"A determination of whether a party exercised unreasonable delay in filing suit consists of two steps."*Jarrow Formulas,* 304 F.3d at 838. First, the court must assess the length of delay, which is measured from the time plaintiff knew, or in the exercise of reasonable diligence, should have known about its potential cause of action. *Id.* Second, the court must consider whether plaintiff's delay was reasonable in light of the time allotted by the analogous state law limitations period. *Id.* at 838-39.Here, adidas' claims are governed by Oregon's two-year statute of limitations for fraud claims, Or.Rev.Stat. § 12.110. *See Johannsen v. Brown,* 797 F.Supp. 835, 839-40 (D.Or.1992) (citing *Unlimited Screw Prods., Inc. v. Malm,* 781 F.Supp. 1121, 1125 (E.D.Va.1991)) ("The majority of federal courts to have considered this issue have concluded that claims brought under section 43(a) of the Lanham Act are most comparable to claims brought for fraud.").[FN15] If adidas filed within the analogous two-year state law limitations period for fraud, there is a strong presumption against finding unreasonable delay; if adidas filed outside that period, the presumption is reversed. *Jarrow Formulas,* 304 F.3d at 837-38.

> FN15. adidas neither cites, nor is the court aware of any authority to support its argument that Oregon's ten-year statute of "ultimate repose" should govern its claims.

In determining the start date of the laches period-that is, the date plaintiff knew or should have known of defendant's potentially infringing conduct-the court must "focus on the conduct upon which the claimant bases its infringement claim."*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n,* 311 F.Supp.2d 1023, 1032 (D.Or.2004), *aff'd*465 F.3d 1102 (9th Cir.2006); *see also Danjaq,* 263 F.3d at 955 ("[T]he relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct."). To prove that a plaintiff knew or should have known of the defendant's allegedly wrongful activity, the defendant

must "make a showing that it would have been inconceivable that [the plaintiff] would have been unaware" of those activities. *Official Airline Guides, Inc. v. Churchfield Publications, Inc.,* 756 F.Supp. 1393, 1404 (D.Or.1990).

**\*31** Here, adidas alleges Payless' use of two and four parallel stripes on footwear infringes adidas' Three-Stripe mark for athletic and casual footwear (*i.e.,* three, parallel, and equidistant stripes running diagonally from the mid-sole of the shoe forward to the shoelaces). adidas also alleges Payless is infringing its Superstar Trade Dress, which consists of the Three-Stripe mark, a rubber "shell toe," a particularly flat sole, and a colored portion on the outer back heel. Thus, the question becomes whether it would have been "inconceivable" that adidas was unaware of Payless' potentially infringing imitations of adidas' Three-Stripe Mark and Superstar Trade Dress prior to November 1999 (*i.e.,* outside the analogous two-year limitations period for fraud).

On this record, there are disputed issues of fact as to when adidas knew or reasonably should have known of Payless' potentially infringing use of two- or four-parallel stripes. adidas contends that it did not have actual knowledge that Payless was selling the footwear at issue until October 2001-approximately one month prior to adidas' initiation of this lawsuit. adidas argues that the earliest it *could* have known of Payless' allegedly infringing conduct was 1998, when Payless started selling the specific shoes at issue. But the focus of laches is the defendant's allegedly infringing "course of conduct," not the specific products that the plaintiff chooses to isolate for the purposes of litigation. *See Danjaq,* 263 F.3d 953-54 (noting that it would be "incongruous" to allow plaintiff's infringement claim to proceed with respect to the re-release of a DVD despite dismissing "the same claim regarding the original work" on laches grounds). Moreover, as noted in *adidas America v. Kmart Corp.,* 2006 WL 2044857, at \*7, "adidas'[ ] aggressive policing of its Three-Stripe Mark also casts doubt on adidas'[ ] professed ignorance of defendant's sales of two and four stripe shoes in the 1970s, 1980s, and 1990s." In light of the fact that Payless is one of the nations' largest retailers of discount athletic and casual footwear, "it is difficult to reconcile [adidas'] own emphasis on its aggressive policing of its trademarks with its simultaneous claims of ignorance" of Payless' sale of two- and four

striped footwear.*McDonald's Corp. v. Druck & Gerner, DDS, P.C.,* 814 F.Supp. 1127, 1137 (N.D.N.Y.1993).

On the other hand, I am not persuaded by Payless' argument that there is no genuine issue of fact that adidas should have known of Payless' use of stripes in the 1970s, 80s, or 90s. As adidas points out, many of the striped shoes Payless sold during that period are substantially different in appearance than the shoes at issue in this case. Some of those shoes bear nonparallel stripes. Others have horizontal stripes bisecting the two- or four-parallel stripes. Still others have velcro straps or cartoon designs obscuring the stripes. adidas does not challenge the use of two or four stripes in the abstract, but the use of two- or four-stripe designs that are *confusingly similar* to the Three-Stripe Mark or Superstar Trade Dress. In other words, "the issue is not simply the number of stripes. Instead, the issue is whether the total effect of the allegedly infringing design is likely to cause confusion in the minds of an ordinary person."*adidas v. Target,* 228 F.Supp.2d at 1211;*see also Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 462 (4th Cir.1996) (A trademark owner need not sue "until the likelihood of confusion looms large."); *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.,* 314 F.3d 62, 70 (2d Cir.2002) ("[A] plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known ... that [it] had a provable infringement claim....").

*32 There are also genuine issues of fact as to whether Payless' sales and advertisement of two- and four-stripe footwear during the 1970s, 1980s, and 1990s were so "pervasive, open, and notorious" that adidas should have known it had a potential infringement claim. *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 (Fed.Cir.1996). Payless has submitted no evidence of any *actual* sales of shoes bearing two or four stripes for any year prior to 1994. The evidence Payless' submitted of sales between 1995 and 1999 consists solely of lists of lot numbers without any images of the shoes, and thus it is unclear whether those sales are even relevant (*i.e.,* how many stripes were on those shoes, or the location, shape, or direction of the stripes). Further, Payless' evidence of T.V. ads and newspaper inserts from that period depict shoes with stripe-like features together with several other shoe styles, making it

difficult to pick out the striped shoes in question. Finally, there is no evidence of the scope of distribution of those ads, making it difficult to determine when the ads ran, what markets they ran in, or how often they ran. Thus, I cannot conclude as a matter of law that adidas should have been aware Payless' activities.

I am also not persuaded by Payless' argument that the laches period began no later than 1994, when Payless' informed adidas that it was selling shoes with four double-serrated stripes. As discussed above, adidas filed suit against Payless in 1994 when it learned that Payless was selling footwear with three parallel double-serrated stripes. Although none of the accused shoes in the 1994 case had two- or four-parallel stripes, Payless' counsel advised adidas during the course of the parties' negotiations that it was selling shoes with four double-serrated stripes that were similar to the accused shoes in that case. *See* Garrison Decl., Ex. B. The parties then specifically negotiated and agreed to limit Payless' ability to sell shoes with two-, three-, or four-parallel double-serrated stripes. *See* Feldman Ex. C (Agreement) The *inclusion* of two- and four-stripe shoes in the final 1994 Settlement Agreement indicates that adidas *objected* to Payless' use of potentially infringing two- or four-parallel stripes. That cannot reasonably be characterized as evidence that adidas was "sleep[ing] on [its] rights." *Jarrow Formulas,* 304 F.3d at 835. In any event, the parties conducted no discovery in the 1994 case, so adidas had no reason to believe that Payless was selling "other" potentially infringing shoes, or that the settlement agreement would not be sufficient to protect its rights.

Finally, neither adidas' 1997 cease-and-desist letter regarding "athletic slides" (i.e., flip-flops), nor its possession of a Payless "Eagle ProWings" shoe with four stripes establishes, as a matter of law, that adidas knew of Payless' potentially infringing conduct in 1997. As discussed above, in determining the length of delay for the purposes of laches, the court must "focus on the conduct upon which the claimant bases its infringement claim."*Tillamook Country Smoker,* 311 F.Supp.2d at 1032. Here, adidas has alleged infringement of the Three-Stripe Mark as applied to *athletic or casual footwear.* adidas has not accused *any* "slides" in this case. The cease-and-desist letter regarding Payless' "slides" does not prove adidas knew or should have known of Payless' sale of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

potentially infringing athletic and casual footwear. With respect to the Payless four-stripe "Eagle ProWings," the issue is "not simply the number of stripes. Instead, the issue is whether the total effect of the allegedly infringing design is likely to cause confusion in the minds of an ordinary purchaser."*adidas v. Target,* 228 F.Supp.2d at 1211. Like many of Payless' other striped shoes from the 1970s, 80s, and 90s, the "Eagle ProWings" is different in appearance than any of the accused footwear in this case. None of the accused shoes have a prominent black "wave" that cuts across the shoe and though the stripe design. Moreover, the stripes on the side of the "Eagle ProWings" do not appear to be parallel or equidistant. In other words, there are issues of fact as to whether the "Eagle ProWings" was sufficiently similar to adidas' mark, sueh that adidas should have known it had a potential infringement claim.

**\*33** Accordingly, 1 find that there are genuine issues of material fact as to whether adidas knew or should have known of Payless' potentially infringing course of conduct prior to November 1999 (*i .e.,* within Oregon's analogous two year limitations period for fraud claims). As such, 1 cannot conclude that adidas' delay in bringing suit was either reasonable or unreasonable, as a matter of law. Thus, Payless' motion for summary judgment on the issue of laches must be denied.

*b. Prejudice*

Even though there are genuine issues of fact as to whether adidas' delay in filing suit was unreasonable, 1 conclude that adidas is entitled to summary judgment on Payless' laches defense because Payless cannot demonstrate that it suffered prejudice as a result of adidas' delay.

"Material prejudice to adverse parties resulting from the plaintiff's delay is essential to the laches defense."*A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1033 (9th Cir.1992); *Miller see also v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 999 (9th Cir.2006) ("In addition to establishing that Plaintiffs' delay in filing suit was unreasonable, [the defendant] must demonstrate that it has been prejudiced by the delay."). Indeed, "[l]aches is not a doctrine concerned solely with timing. Rather, it is primarily concerned with prejudice."*In Re Beaty,* 306

F.3d 914, 924 (9th Cir.2002). There are "two chief forms of prejudice in the laches context-evidentiary and expectations-based."*Danjag,* 263 F.3d at 955.

### i. Evidentiary Prejudice

"Evidentiary prejudice includes such things as lost, stale, or degraded evidenee, or witnesses whose memories have faded or who have died."*Id.* Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts."*A.C. Aukerman,* 960 F.2d at 1033. A defendant must identify key witnesses or evidence whose "absence has resulted in the [defendant's] inability to present a full and fair defense on the merits."*Freeman v. Gerber Prods. Co.,* 466 F.Supp.2d 1242, 1246 (D.Kan.2006).

Here, Payless has failed to identify any *specific* missing evidence or witness, whose "absence has resulted in [Payless'] inability to present a full and fair defense *on the merits.*" *Gerber Prods. Co.,* 466 F.Supp.2d at 1246 (emphasis added). Though Payless asserts that it has lost evidence of shoe sales, designs, and advertisements from the 1970s, 80s, and early 90s, that evidence is of little value in determining whether the specific shoes at issue (none of which were sold before 1998) infringe adidas' mark. ln other words, Payless' allegedly missing evidence is not relevant to the merits of adidas' claims, and thus its absence does not "undermin[e] the court's ability to judge the facts" of adidas' claims. *A.C. Aukerman,* 960 F.2d at 1033.

**\*34** Furthermore, Payless' "[c]onclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient" to establish evidentiary prejudice. *See Meyers v. Asics Corp.,* 974 F.2d 1304, 1308 (Fed.Cir.1992); *Bayer AG v. Sony Elecs., Inc.,* 229 F.Supp.2d 332, 367-68 (D.Del.2002) (both rejecting claims of evidentiary prejudice because defendant failed to demonstrate the absence of specific witnesses or documents and why that evidence was important to the case). To prove evidentiary prejudice, Payless must do more than speculate as to evidence that might have been available had adidas sued at an earlier date.

## ii. Expectations-Based Prejudice

A defendant may establish expectations-based prejudice "by showing that during plaintiff's delay, it invested money to expand its business or entered into business transactions based on [its] presumed rights."*Miller,* 454 F.3d at 999 (9th Cir.2006). The courts that have found expectation-based prejudice, however, have done so only where the defendant was using the infringing word or design *as a trademark,* and thus had built up goodwill in the mark as a designation of source. *See Tillamook Country Smoker,* 311 F.Supp.2d at 1039 (finding expectation-based prejudice where defendant "actually spent money promoting its *brand name,*" thereby "occasioning substantial goodwill for [it]") (emphasis added); *Jarrow Formulas,* 304 F.3d at 839 ("If [plaintiff] had filed sooner, [defendant] could have invested its resources in shaping an *alternative identity...* in the minds of the public.") (emphasis added); *Grupo Gigante SA De CV v. Dallo & Co., Inc.,* 391 F.3d 1088, 1105 (9th Cir.2004) ("[A] defendant can make the required showing of prejudice by proving that it has continued to *build a valuable business around its trademark* during the time that the plaintiff delayed the exercise of its legal rights."); *see also Bridgestone/Firestone Research, Inc. v. Automotive Club De L'Ouest De La France,* 245 F.3d 1359, 1363 (Fed.Cir.2001) ("Economic prejudice arises from *investment in and development of the trademark,* and the continued commercial use and *economic promotion of a mark* over a prolonged period ....") (emphasis added); *McCarthy* § 31:12 ("Laches is a good defense if plaintiff's long failure to exercise its legal rights has caused defendant to rely to his detriment by *building up a valuable business around its trademark.*") (emphasis added). This is because laches is premised, in part, on the notion that it would be inequitable to allow a dilatory plaintiff to divest a defendant of its trade name, and the goodwill it has built around that name, thereby requiring the defendant to "recast" its entire business identity and "re-educate" its consumers. *See Landers, Frary, & Clark v. Universal Cooler Corp.,* 85 F.2d 46, 49 (2d Cir.1936) (J. Hand); *Tillamook Country Smoker,* 311 F.Supp.2d at 1038. It would be difficult to even "estimate what the losses" would be from such a "dislocation" of the defendant's business identity. *Landers,* 85 F.2d at 49. Thus, the cases make clear that expectation-based prejudice is not simply a matter of expending resources promoting a potentially infringing design. *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir.1965). If so, "relief would have to be denied in practically every case of delay."*Id.* Instead, the defendant must show that the expenditures were made promoting the design as its trademark, or as part of its business identity.*Jarrow Formulas,* 304 F.3d at 839.

**\*35** Here, Payless' investment in marketing and selling the allegedly infringing two- and four-stripe shoes at issue cannot serve as a basis for expectations-based prejudice because Payless acknowledges that it uses stripes merely for decoration and *not* as a trademark, or indicator of source. Austin Dep., at 121:6-10; Bone Dep., at 124:24-125:4; *see also* Payless Mem. in Supp. of Mot. for Summ. J. on Pls.' Trademark and Trade Dress Infringement Claims, at 20 ("Payless ... uses two and four stripes on shoes not to signify source, but as mere decoration or ornamentation."). Payless has proffered no evidence that it has built up any goodwill, or association in the minds of consumers between its business and its use of stripes on shoes. Indeed, Payless acknowledges that it has not built its business identity around the use of two- or four-stripes on shoes. As such, Payless' entire business would *not* have to be "recast," nor would its market need to be "re-educated" if it were divested of the ability to use of two- or four-parallel, equidistant stripes, running diagonally from the mid-sole to the laces of its shoes. Indeed, Payless' damages experts acknowledged that if Payless were unable to sell the allegedly infringing striped shoes at issue, it could easily and without expense fill its stores with non-infringing shoes. Horace Dep. (vol.2), at 60:8-11. Payless' economic investment in the use of ornamental or decorative stripe designs, which are not intended to signify source, cannot constitute expectations-based prejudice.

Finally, Payless' potential liability for damages attributable to a finding of liability for infringement cannot constitute economic prejudice for the purposes of laches. *A.C. Aukerman Co.,* 960 F.2d 1020, 1033. Such a rule would result in material prejudice in every infringement action. *Id.; see also Leatherman Tool Group, Inc. v. Alltrade, Inc.,* No. 98-423-KI, 1999 WL 37827 (D.Or. Apr. 26, 1999) (finding damages for liability for infringement

insufficient to show expectations-based prejudice).

Because Payless cannot demonstrate any legally cognizable prejudice as a result of adidas' alleged delay in bringing suit, Payless' laches defense fails as a matter of law. adidas is entitled to summary judgment as to Payless' laches claim.

**2. Waiver**

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."*United States v. King Features Entm't, Inc.,* 843 F.2d 394, 399 (9th Cir.1988)."Although mere silence can be a basis for a claim of estoppel when a legal duty to speak exists, waiver must be manifested in an unequivocal manner"*Duncan v. Office Depot,* 973 F.Supp. 1171, 1177 (D.Or.1997); *see also United States v. Amwest Surety Ins. Co.,* 54 F.3d 601, 602-03 (9th Cir.1995) (quoting *Groves v. Prickett,* 420 F.2d 1119, 1125 (9th Cir.1970) ("An implied waiver of rights will be found where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved.").

**\*36** Here, Payless has failed to proffer any evidence of a "clear, decisive and unequivocal" intent by adidas to relinquish any of its trademark or trade dress rights. adidas' "failure to act, without more, is insufficient evidence of [its] intent to waive its right to claim infringement."*Novell, Inc. v. Weird Stuff, Inc.,* No. C92-20467, 0094 WL 16458729, at \*12-13 (N.D.Cal. Aug.2, 1993). The undisputed facts show that adidas has enforced its rights against Payless and others. adidas' failure to prevent *all* third parties from selling *any* two- and four-striped shoes is not sufficient to prove adidas' express and affirmative intent to relinquish its rights. *See Novell,* 0094 WL 16458729, at \*13 ("[E]ven if [plaintiff] failed to take preventative measures to stop [defendant's] infringement-related activities, failure to act, without more is insufficient evidence of the trademark owner's intent to waive its right to claim infringement.").

Finally, Payless neither cites, nor is the court aware of any authority to support the proposition that adidas waived its trademark rights against Payless simply by agreeing not to sue K-Swiss, or its licensees for using four stripes on shoes. *See* Garrison Decl., Ex. O

(adidas-KSwiss agreement) "[T]rademark agreements are favored in the law as a means by which parties agree to market products in a way that reduces the likelihood of consumer confusion and avoids time-consuming litigation."*Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 60 (2d Cir.1997). That adidas and K-Swiss agreed not to sue each other for using four stripes on shoes is not sufficient to establish a triable issue of fact on the defense of waiver. Thus, Payless' waiver defense fails as a matter of law.

**3. Estoppel**

"Unlike waiver, estoppel focuses not on a party's intent, but rather on the effects of his conduct on another. Estoppel arises only when a party's conduct misleads another to believe that a right will not be enforced and causes him to act to his detriment in reliance upon this belief."*Novell,* 0094 WL 16458729, at \* 13 (citing *Saverslak v. Davis-Cleaver Produce Co.,* 606 F.2d 208, 213 (7th Cir.1979). To prevail on its equitable estoppel defense, Payless must prove: (1) adidas knew Payless was selling potentially infringing two- and four-stripe footwear; (2) adidas' actions or failure to act led Payless to reasonably believe that adidas did not intend to enforce its trademark right against Payless; (3) Payless did not know that adidas actually objected to the sale of its potentially infringing footwear; and (4) due to its reliance on adidas' actions, Payless will be materially prejudiced if adidas is allowed to proceed with its claim. *Lehman v. United States,* 154 F.3d 1010, 1016 (9th Cir.1998); *A.C. Aukerman Co.,* 960 at 1028."Where any one of the elements of equitable estoppel is absent, the claim must fail."*Am. Casualty Co. v. Baker,* 22 F.3d 880, 892 (9th Cir.1994).

**\*37** As discussed *supra,* Section III.E. 1.b, Payless cannot demonstrate that it suffered any legally cognizable prejudice as a result of adidas' inaction. In addition, Payless proffers no evidence that adidas' failure to act *caused* Payless to sell potentially infringing footwear. In other words, there is no evidence that Payless actually relied on adidas' alleged inaction. Because Payless cannot prove each element of equitable estoppel, the defense must fail.

**4. Acquiescence**

"Estoppel by acquiescence includes the two elements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of laches-(1) plaintiff's unreasonable and inexcusable delay, (2) inducing the belief that it has abandoned its claim against the infringer-and adds (3) affirmative conduct inducing the belief that it has abandoned its claim against the alleged infringer, and (4) detrimental reliance by infringer."*E & J Gallo Winery,* 905 F.Supp. at 1414. "The distinguishing feature of the acquiescence defense is the element of *active* or *explicit* consent to the use of an allegedly infringing mark."*SunAmerica Corp. v. Sun Life Assur. Co. of Canada,*77 F.3d 1324, 1344 (11th Cir.1996) (emphasis in original).

Payless' acquiescence defense fails as a matter of law because Payless has failed to demonstrate any detrimental reliance resulting from adidas' alleged delay in filing suit. *Novell, Inc.,* 0094 WL 16458729, at *13. In any event, Payless has failed to proffer any evidence of "affirmative conduct" or "active encouragement" by adidas, which would induce Payless to believe that it had abandoned its claim. *McCarthy* § 31:42. The only conduct Payless alleges in support of its acquiescence defense is adidas' *objection* to the sale of four-stripe slides in 1997, and adidas alleged failure to "follow-up" on its 1997 cease and desist letter. But adidas' failure to follow-up is not sufficient to support a finding of estoppel by acquiescence. *See Plasticolor Molded Prods. .. v. Ford Motor Co.,* 698 F.Supp. 199, 202-203 (C.D.Cal.1998) ("[M]ore than merely passive consent is required; the trademark owner must have, by affirmative word or deed, conveyed its implied consent."). Likewise, adidas' trademark agreement with K-Swiss is not evidence that adidas "affirmatively" acted to abandon its claim *against Payless.* Thus, the defense fails.

## 5.   Abandonment-Related   Defenses   and Counterclaims

Payless' Fourth Counterclaim alleges "adidas has abandoned any claim of exclusive right to use the Three-Stripe Mark," and seeks an order cancelling adidas' various Three-Stripe Mark registrations. Payless Answer, ¶¶ 42, 44. Payless' Tenth Affirmative Defense alleges adidas has "abandoned any claims that [its] rights are infringed by the manufacturing, use or sale of footwear bearing less ... or more than three stripes, and have abandoned any claims that its rights are infringed by use of ... elements of the alleged Superstar trade dress."Payless

Answer, at 9-10. Payless' Twelfth and Thirteenth Affirmative Defenses allege the Three-Stripe Mark and the Superstar Trade Dress have "lost any alleged secondary meaning," and have become "generic." *Id.* at 10.Each of these defenses appears to be premised on the theory that by adidas has abandoned or weakened the Three-Stripe Mark and Superstar Trade Dress by allowing numerous third parties to use two-and for-stripe designs.

*38 In cases like this, where a defendant is not claiming non-use of the trademark, "a mark shall be deemed 'abandoned' ... when any course of conduct of the owner, including acts of omission as well as commission causes the *mark* to become ... generic ..., or otherwise to lose its significance as a mark."15 U.S.C. § 1127 (emphasis added). In reviewing allegations that a plaintiff has abandoned a trademark by failing to enforce it, the Ninth Circuit has held that the mere existence of third-party infringers is irrelevant. *See Eclipse Assocs. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1119 (9th Cir.1990) ("Evidence of other potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law."). Though a plaintiff's failure to sue potentially infringing third parties may be relevant to the *strength of the mark,*"[a]bandonment ... requires proof that the mark has lost all significance as an indication of origin. That is, the mark is completely without signs of life."*McCarthy* § 17:17 (emphasis in original); *see also Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.,* 270 F.3d 298, 310 (6th Cir.2001) ("[A]bandonment occurs 'only when all rights of protection are extinguished.'") (citation omitted)."Abandonment of a trademark, being in the nature of a forfeiture, must be strictly proved."*Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp.,* 694 F.2d 1150, 1156 (9th Cir.1982).

adidas argues that Payless cannot prove abandonment because there is "no basis" in the record to conclude that either the "Three-Stripe Mark or Superstar Trade Dress ha[ve] lost *all* significance as an indicator of source." adidas' Mem. in Supp. of Mot. for Summ. J., at 33 (emphasis in original). By failing to respond to adidas' legal abandonment argument, Payless effectively concedes that adidas' has *not* abandoned its rights in the Three-Stripe Mark or its Superstar Trade Dress. *See* Defs.' Opp. to Pls.' Mot. for Partial Summ. J., at 41 ("Adidas [sic] mischaracterizes the

nature of Payless' [defenses] as alleging that Adidas [sic] has abandoned all rights in its three-stripe mark or alleged Superstar Trade Dress .... that is not at all what Payless has alleged."); *see also Nevada Shell Dealers Ass'n v. Shell Oil Co.,* 725 F.Supp. 1104, 1109 (D.Nev.1989) (finding that party opposing summary judgment implicitly conceded an issue by failing to respond to movant's argument). Instead, Payless now argues that its Tenth and Twelfth Affirmative Defenses and its Fourth Counterclaim actually allege adidas has "abandoned ... and weakened/diluted its ability to enforce the Three-Stripe Mark *against shoes with two and four stripes* " by permitting numerous third parties to use two and four stripes on footwear. Defs.' Opp., at 41-42 (emphasis in original).

Payless' attempt to recast its counterclaim and affirmative defenses as claims alleging abandonment of the ability to enforce its mark against shoes two and four stripes is unavailing. The language of Payless' Answer makes clear that despite its present argument to the contrary, Payless was, in fact, claiming that adidas had abandoned the Three-Stripe Mark under 15 U.S.C. § 1127. Indeed, the Fourth Counterclaim is entitled "Declaration of Abandonment and Cancellation of Plaintiff's Three Stripe Mark Registrations," and Payless cites to the section of the Lanham Act that defines abandonment, 15 U.S.C. § 1127. *See* Answer, at pp. 16-18.In the counterclaim, Payless alleges "adidas has abandoned any claim of exclusive right to use the Three-Stripe Mark," that "adidas has caused the Three Stripe Mark to lose its significance as a trademark and to become abandoned by operation of law," and that adidas' "marks were abandoned due to its course of conduct."*Id.* ¶ 42-47.Payless even requests that the court cancel each of adidas' "now abandoned Three Stripe Mark" registrations because they "rel[y] on the abandoned Three Stripe Mark."*Id.* ¶ 44.Moreover, Payless' Rule 30(b)(6) witness testified that this counterclaim was alleging that adidas' "conduct has affected an abandonment of the mark."Horace Dep., at 58:9-59:22. Similarly, Payless' Tenth and Twelfth Affirmative Defenses allege that adidas "abandoned" its claims and that the Three-Stripe Mark and Superstar Trade Dress have "lost their ability to identify a single source, and lost any alleged secondary meaning," or have become "generic." All of these allegations plainly mirror the language of a legal abandonment claim under 15 U.S.C. § 1127. Given that Payless now admits adidas has *not*

abandoned its Three-Stripe Mark and its Superstar Trade Dress, adidas is entitled to summary judgment as to Payless' Fourth Counterclaim, and its Tenth, Twelfth, and Thirteenth Affirmative Defenses.

**\*39** In any event, Payless claim that adidas has abandoned its ability to enforce its mark against two or four stripes by permitting third parties to use those designs is not a cognizable defense or counterclaim. Under 15 U.S.C. § 1127, "a mark shall be deemed 'abandoned' ... when any course of conduct of the *owner,* including acts of omission as well as commission causes the *mark* to become ... generic ..., or otherwise to lose its significance as a mark."The plain language of the statute makes clear that legal abandonment involves the abandonment of the *owner's mark.* adidas does not claim to own a two- or four-stripe mark, and therefore cannot abandon those marks under the statute. Payless' abandonment claim is, in substance, simply a restatement of Payless' affirmative defenses of laches, waiver, estoppel, and acquiescence. To the extent that Payless alleges adidas' rights have been *weakened* or diluted by third-party uses (but not to the point of losing all trademark significance), this is not an affirmative defense, but rather a part of the likelihood of confusion analysis. As Professor McCarthy notes:

> What is the significance ... an alleged failure to prosecute? If the argument is couched in terms of alleged 'abandonment,' it is far from the mark. Such an argument is no more persuasive than that of a drunken driver who pleads to be let off because there are 'lots of other drunk drivers on the road-why pick on me?'This is not a 'defense,' nor should it be. Rather it appears that the only relevancy of failure to prosecute others is as to the possible impact such failure may have on the strength of the plaintiff's mark. It is possible that plaintiff's mark has been 'weakened' by widespread use in the market and that such use resulted from plaintiff's failure to sue infringers.

*McCarthy* § 17:17 (citations omitted). Here, third-party uses of two- or four-stripe designs is relevant to the strength of the mark, not abandonment. Similarly, Payless' "genericness" defense relates solely to the strength of the Three-Stripe Mark under the likelihood of confusion analysis. Accordingly, adidas is entitled to summary judgment as to Payless' Fourth Counterclaim and its Tenth, Twelfth, and Thirteenth

Affirmative Defenses.

### 6. Payless' Antitrust Misuse/Unclean Hands Defense

Payless' Seventh (Unclean Hands) and Eighth (Trademark Misuse/Antitrust) Affirmative Defenses, and its Second and Third (Unfair Competition and Deceptive Trade Practices) Counterclaims all rely on the same set of factual and legal arguments [FN16]—that is, adidas is an active participant in an anti-competitive conspiracy to restrain trade in violation of Section 1 of the Sherman Act.[FN17]Though its Answer to adidas' Third Amended Complaint is devoid of any mention of "Section 1," "conspiracy," or "agreement," Payless now asserts that in 2007, adidas and K-Swiss, Inc. agreed to "refrain from selling their products to value-based retailers, like Payless," and to "assist one another ... in the enforcement of their respective rights against third parties that use designs consisting of four parallel or nearly parallel stripes...." Def.'s Opp., at 6, 7. Payless maintains that the 2007 Agreement constitutes a *per se* illegal antitrust conspiracy to divide-up the stripe-shoe market, and a group boycott designed to eliminate competition. I disagree.

> FN16. Payless acknowledges that "both the unclean hands and antitrust defenses essentially comprise the same set of facts and arguments."Def.'s Opp.to Pls.' Mot. for Partial Summ. J., at 1; *see also* Def.'s Opp., at 8 (Payless' Second and Third Counterclaims are "premised upon the same facts underlying Payless' unclean hands and trademark misuse/antitrust defenses.").

> FN17. Payless concedes that it has no defense or claim under section 2 of the Sherman Act. *See* Def.'s Opp., at 2 (adidas' arguments that (1) Payless' failed to identify a relevant antitrust market and (2) trademark enforcement efforts are immune from antitrust scrutiny are "based on [adidas'] erroneous assumption that Payless' allegations fall within Section 2 of the Sherman Act.").

*a. Legal Standards*

**\*40** Use of a trademark in violation of the antitrust laws may be a valid basis for an antitrust/unclean hands defense to trademark infringement.[FN18]*See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 298 F.Supp. 1309, 1314 (D.C.N.Y.1969) ("[A] court, in the exercise of its equity powers, may deny enforcement of a trademark on the part of one who has used that trademark in violation of the antitrust laws."); *McCarthy* § 31:91. Nevertheless, the defense is very narrow, *Estee Lauder, Inc. v. Fragrance Counter, Inc.,* 189 F.R.D. 269, 272 (S.D.N.Y.1999), and "in almost every reported instance where the antitrust misuse of a trademark has been raised as a defense, it has been rejected."*See Carl Zeiss,* 298 F.Supp. at 1314 (citing cases rejecting antitrust misuse-unclean hands defense because defendant failed to establish that the trademark "was itself being used as the prime and effective instrument to effectuate antitrust activity.").

> FN18. Payless proffers no evidence that would support a traditional unclean hands affirmative defense, which generally requires a defendant to "show that plaintiff used the trademark to deceive consumers,"*Japan Telecom, Inc. v. Japan Telecom Am. Inc.,* 287 F.3d 866, 870 (9th Cir.2002). To the extent that Payless' unclean hands/trademark misuse-antitrust defenses are premised upon adidas' aggressive trademark enforcement efforts, those claims are barred under the *Noerr-Pennington* doctrine. *See rof'* l *Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (Under the *Noerr-Pennington* doctrine, "[t]hose who petition government for redress are generally immune form antitrust liability."); *Sosa v. DIRECT TV, Inc.,* 437 F.3d 923, 936-38 (9th Cir.2006) (extending *Noerr-Pennington* immunity to litigation-related activities prior to formal commencement of litigation).

*b. Payless Failed to Plead a Sherman Act Section 1 Defense*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce."15 U.S.C. § 1. The Supreme Court has explained that for pleadings to be sufficient to state a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 1 claim under the Sherman Act, a claimant must go beyond conclusory and formulaic statements and must allege "enough factual matter (taken as true) to suggest that an agreement was made."*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007); *see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 508 (9th Cir.1989) (To state a claim under section 1 of the Sherman Act, the claimant "must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail."). Though Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," a claimant's pleadings must "possess enough heft to 'show that the pleader is entitled to relief.' " *Twombly,* 127 S.Ct. at 1966. In other words, the pleadings must set forth enough facts to suggest that "the agreement necessary to make out a Section 1 claim" was is in fact made. *Id.* It is well-established that counterclaims "must be pleaded as fully and distinctly and with the same substantial requisites as an original cause of action." *Mut. Life Assur. Co. v. Leimer,* D.C., 3 F.R.D. 145 (D.Mo.1942); Fed.R.Civ.P. 8(a).

Here, Payless' failed to properly plead a Section 1 conspiracy claim. Payless' pleadings bear no mention of any "conspiracy," "contract," "agreement," or a restraint on trade. *See* Def.'s Answer, at 9, 14-16. In fact, Payless' pleadings more closely resemble a Section 2 attempted monopoly claim than a Section 1 conspiracy claim. *See id.* at 9 (attempting to misuse their trademark "to acquire a monopoly") (Eighth Defense); *id.* at 14 (adidas is "misusing its trademark registrations to impermissibly claim the exclusive right to a variety of" stripes on footwear) (Second Counterclaim); *id.* at 15 ("filing frivolous and meritless lawsuits ... threatening to take legal action against competitors"). Payless' first mention of any agreement or conspiracy to restrain trade occurs in its memorandum in opposition. Indeed, Payless' Rule 30(b)(6) witness for these defenses and counterclaims failed to identify any facts to support a Section 1 claim and confirmed that its antitrust misuse-unclean hands defense was premised on adidas' aggressive enforcement efforts. Horace Dep. at 50:13-58:8; 78:24-82:23. Even if I were persuaded by Payless' attempt to read "conspiracy" into its Rule 30(b)(6) witness' testimony (which I am not), that testimony cannot overcome Payless' failure to allege any agreement in restraint of trade. Payless' pleadings do not sufficiently state a claim for a violation of Section 1 of the Sherman Act because they are devoid of any mention of an agreement or conspiracy to restrain trade. As such, Payless' 7th and 8th Affirmative Defenses (unclean hands and trademark misuse/antitrust), and Payless' Second and Third Counterclaims (unfair competition and deceptive trade practices) fail.

*c. Payless Cannot Prove a Sherman Act Section 1 Defense*

**\*41** Even if Payless' pleadings were sufficient to properly allege a Section 1 conspiracy claim, Payless has failed to present sufficient evidence to support such a claim. Payless has presented no evidence to suggest that adidas trademark "was itself being used as the prime and effective instrument to effectuate the antitrust activity."*Carl Zeiss,* 298 F.Supp. at 1314. Instead, Payless argues adidas unlawfully conspired with K-Swiss to refrain from selling their respective products at value-based retail outlets like Payless ShoeSource, and to assist one another in the enforcement of their respective rights. As several courts have recognized, such conduct, even if it pertains to products bearing trademarks, cannot be all that is required to establish the antitrust misuse defense. *See e.g., Carl Zeiss,* 298 F.Supp. at 1314-15 (defendant's allegations of a group boycott and a conspiracy to control prices is insufficient to establish antitrust misuse-unclean hands defense); *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.,* No. 99-C-1174, 2001 WL 747422, at \*4-5 (N.D.Ill.2001) (defendant's allegation that plaintiff conspired with others to refuse to sell its trademarked products to defendant was insufficient to support the antitrust misuse-unclean hands defense). If such conduct were sufficient to establish an antitrust misuse-unclean hands defense, "any antitrust violation in the distribution of ... merchandise would result in forfeiture of the trademark."*Carl Zeiss,* 289 F.Supp. at 1315. Thus, "it is not enough merely to prove that merchandise bearing a trademark ... has been used in furtherance of antitrust violations."*Id.* Rather, the party invoking the defense must also establish "that the mark itself has been the basic and fundamental vehicle required and used to accomplish the violation."*Id.* Here, Payless' contention that adidas and K-Swiss have engaged in a conspiracy to refuse to sell their products at Payless retail stores and to assist one another in enforcing their rights is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insufficient to establish support the antitrust misuse-unclean hands defense. *Cf. R.J. Reynolds,* 2001 WL 747422, at \*5.

Further, Payless' conclusory assertions that adidas' agreement with K-Swiss constitutes an unlawful effort to "divide-up the stripe-shoe market" and a group boycott are insufficient to establish a *per se* violation of Section 1 of the Sherman Act. The *per se* analysis applies to practices that are presumptively illegal, such as: (1) horizontal and vertical price-fixing; (2) horizontal market division; (3) group boycotts and refusals to deal; and (4) certain tie-in sales. *Cascade Cabinet Co. v. Western Cabinet & Millwork Inc.,* 710 F.2d 1366, 1370 (9th Cir.1983). Courts will not apply the *per se* analysis unless the agreement at issue "facially appears to be one that would always or almost always tend to restrict competition."*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of University of Oklahoma,* 468 U.S. 85, 104, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

\*42 Payless presents no evidence to support the existence of a so-called "stripe-shoe market," or to show that adidas attempted to exclude or boycott any competitor. To the contrary, the agreement reflects adidas' and K-Swiss' legitimate efforts to protect their respective marks and avoid consumer confusion. By Payless' own account, K-Swiss agreed to refrain from using four-stripe designs to avoid consumer confusion, and assist each other in enforcing their respective rights. Such agreements "are favored in the law as a means by which parties agree to market products in a way that reduces the likelihood of consumer confusion and avoids time-consuming litigation."*Clorox,* 117 F.3d at 60. That adidas and K-Swiss agreed not to sell their respective products at Payless retail outlets is insufficient to establish a group boycott. *See Mutual Fund Investors, Inc. v. Putnam Management Co., Inc.,* 553 F.2d 620, (9th Cir.1977) ("[A] corporation has the right to deal with whom it pleases and to select its customers, provided there is no effect which contravenes the antitrust laws.").

Payless has also failed to establish a violation of the Section 1 under the "rule of reason." To establish a Section 1 violation under the "rule of reason," a claimant must prove: (1) an agreement, among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain

competition; and (3) which actually causes injury to competition within a field of commerce in which the claimant is engaged. *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.,* 833 F.2d 208, 211 (9th Cir.1987). Payless' Section 1 claim fails on several grounds. First, Payless points to no evidence that the agreement between adidas and K-Swiss was motivated by a desire to curtail competition. Payless' conclusory assertions that adidas and K-Swiss entered the agreement to divide a market or boycott a competitor are insufficient to raise a genuine issue of fact. *Cf. Mysushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("metaphysical doubt as to the material facts" is insufficient to raise a genuine issue of fact). Further, Payless proffers no evidence to suggest that the agreement at issue actually "results in an unreasonable restraint" on competition. *Cal. Packing Corp. v. Sun-Maid Raisin Growers,* 165 F.Supp. 245, 250-52 (S.D.Cal.1958). Agreements that restrict a competitor's ability to use a particular mark cannot have any meaningful exclusionary or anticompetitive effect because the competitor remains free to sell its goods using a different mark. *Clorox,* 117 F.3d at 56. Furthermore, "because the antitrust laws exist to protect competition, not competitors, ... it is difficult to show that an unfavorable trademark agreement raises antitrust concerns."*Id.* at 57.

Payless has neither pleaded nor proved an antitrust misuse-unclean hands defense under Section 1 of the Sherman Act. Because Payless concedes that its Seventh and Eighth Affirmative Defenses and its Second and Third Counterclaims are all premised upon the same factual bases and legal arguments, adidas is entitled to summary judgment on each of those affirmative defenses and counterclaims.

### 7. Contractual Estoppel and Breach of Contract

\*43 Payless' Third and Eleventh Affirmative Defenses (contractual estoppel) and its First Counterclaim (breach of contract) are premised on the notion that adidas' claims are barred by its failure to perform its contractual obligations under the parties' 1994 Settlement Agreement.

#### a. Breach of Contract

In its First Counterclaim, Payless alleges that the 1994 Agreement included "specific non-infringement

design standards" which allowed Payless to sell shoes bearing two and four stripes with straight edges. Payless Answer, at ¶¶ 8, 12. Pursuant to the agreement, adidas agreed "not to take legal action against Payless based solely on the use of stripes on Payless footwear that comply with [those] design standards."*Id.* at ¶ 12.Payless contends it has fully complied with the design standards set out in the agreement, and therefore adidas breached the agreement by filing this infringement action based on Payless' use of such design standards. *See Id.* ¶¶ 15-16.

The Ninth Circuit has expressly rejected Payless' assertion that adidas' trademark claims violate the design standards implicit in the 1994 Settlement Agreement. Under Oregon law, the interpretation of an unambiguous contract is a question of law for the court. *Rolfe v. N.W. Cattle & Re., Inc.,* 260 Or. 590, 491 P.2d 195, 200 (Or.1971) ("[I]f the provisions of a contract are clear and unambiguous it is the function of the court to interpret the contract and declare its legal effect...."). Here, the Ninth Circuit concluded that the parties' 1994 Settlement Agreement was unambiguous, and as a matter of law, the agreement did not preclude adidas from asserting Lanham Act claims based on Payless' sale of two- or four-stripe shoes with straight edges:

A *plain reading* of the agreement demonstrates that [a]didas released only those claims against Payless that [a]didas "brought or could have brought" before the dismissal of the action that was the subject of the settlement. The shoe stripe designs at issue in the present dispute, however, were not produced by Payless until after the 1994 agreement was concluded. [a]didas could not have brought a claim against shoes not in existence prior to the execution of the settlement.... Therefore, *the 1994 settlement agreement does not preclude [a]didas' present Lanham Act claims against Payless.*

*adidas v. Payless,* 166 Fed. Appx. at 271 (citation omitted; emphasis added). To the extent that Payless' First Counterclaim and its Third and Eleventh Affirmative Defenses are premised on the notion that adidas' claims are precluded by the "design standards" provisions of the 1994 Settlement Agreement, adidas is entitled to summary judgment.

*b. Contractual Estoppel*

As an alternative basis for its Third and Eleventh Affirmative Defenses and its First Counterclaim, Payless argues adidas violated paragraph 4 of the 1994 Settlement Agreement. Payless Answer, at ¶ 17. That provision provides: "Adidas agrees that the Payless obligations set forth in Paragraphs 1, 2, and 3 shall remain in effect so long as Adidas diligently and aggressively acts enforce similar restrictions against other retailers in the United States."Payless Answer, at ¶ 10; Feldman Decl., Ex. C (Agreement ¶ 4) The "restrictions" referenced in that prohibition are the prohibitions on the sale of athletic shoes bearing "three substantially straight parallel stripes" or "two or four parallel double-serrated stripes of contrasting color."Feldman Decl., Ex. C (Agreement ¶¶ 2-3).

\*44 Here, Payless has failed to identify a single instance in which adidas failed to object to a third-party's sale of athletic shoes bearing *three substantially straight parallel stripes,* or two or four parallel *double-serrated* stripes. Moreover, Payless does not dispute adidas' contention that it has enforced its Three-Stripe Mark against dozens of third parties selling shoes with serrated-and straight-edge stripes. Thus, adidas is entitled to summary judgment on Payless' First Counterclaim and its Third and Eleventh Affirmative Defenses.[FN19]

> FN19. Even if adidas had not complied with paragraph 4 of the Agreement, it would not give rise to a contractual estoppel defense or allow Payless to sell athletic shoes bearing potentially infringing two- or four straight-edge stripes. By the agreement's express terms, the only effect of adidas' failure to enforce those restrictions would be that the contractual provision prohibiting Payless' from selling shoes with "three substantially straight parallel stripes" or "two or four parallel double-serrated stripes of contrasting color" would no longer "remain in effect." See Feldman Decl. Ex. C (Agreement ¶ 4).

**8. Stripe Depletion/Aesthetic Functionality**

adidas moves for summary judgment on Payless' Fourteenth Affirmative Defense, which asserts that adidas "cannot be allowed to deplete a common, generic design feature by claiming the exclusive use

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of stripes on apparel, shoes, and sports equipment."Def.'s Answer, at 10. Though the defense bears no mention of the concept of functionality, Payless now argues that the use of stripes on shoes is "aesthetically functional." Payless contends adidas' attempt to control two- and four-parallel stripe designs on shoes "would put competitors at a significant nonreputation-related disadvantage" by "limit[ing] the range of adequate stripe designs" available for use on footwear. *See* Payless Opp. at 45-48. Assuming, *arguendo,* that Payless did not waive an "aesthetic functionality" defense, I find the doctrine inapplicable here.

"Under the doctrine of 'aesthetic functionality,' many visually attractive and aesthetically pleasing designs are categorized as 'functional' and hence free for all to copy and imitate."*McCarthy § 7:79.* In the Ninth Circuit, however, the doctrine has been limited, if not rejected, in favor of the "utilitarian functionality" test discussed *infra. First Brands,* 809 F.2d at 1382 n. 3;*see also Clicks Billiards, Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1260 (9th Cir.2001) (Aesthetic functionality is "internally inconsistent and at odds with the commonly accepted view that functionality denotes utility."); *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 773 (9th Cir.1981) (rejecting the notion that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of the product."); *Gucci Timepieces Am., Inc. v. Yidah Watch Co.,* 47 U.S.P.Q.2d 1938, 1941 C.D. Cal.1998) ("[T]he aesthetic functionality test is essentially defunct in this circuit."); *see also McCarthy § 7:81* (" 'Aesthetic functionality' is an oxymoron. Ornamental aesthetic designs are the antithesis of utilitarian designs.").

To the extent that the aesthetic functionality defense still survives, it has been "limited to product features that serve an aesthetic purpose *wholly independent of any source-identifying function.*" *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1073 (9th Cir.2006) (emphasis added). Thus, the aesthetic functionality defense is inapplicable where, as here, adidas seeks to prevent Payless from using a confusingly similar imitation of a trademark that is a distinctive indicator of source. *See Int'l Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir.1980) (aesthetic functionality does not apply where there is a likelihood of confusion as to

the source of the goods) (citation omitted); *Vuitton,* 644 F.2d at 776 (rejecting the claim that Louis Vuitton trademarked purse was functional where the mark had acquired secondary meaning); *Dr. Ing H.C.F. Porche AG v. Universal Brass,* 1995 WL 420816, at *4 (W.D.Wash.1995) ("[T]he aesthetic appeal of the mark cannot be allowed to overtake the primary function of the mark as a designation of origin or sponsorship."). Thus, adidas is entitled to summary judgment as to Payless' aesthetic functionality defense.

### 9. Protectability of adidas' Superstar Trade Dress

**\*45** As noted, adidas claims protected rights in a Superstar Trade Dress, which consists of: (1) three parallel stripes (*i.e.,* the Three-Stripe Mark) on the side of the shoe parallel to equidistant small holes; (2) a rubber "shell toe"; (3) a particularly flat sole; and (4) a colored portion on the outer back heel that identifies the shoes as adidas' brand. Amended Complaint ¶ 22. Payless' Fifth and Sixth Affirmative Defenses allege that adidas has no valid trade dress in the Superstar product design because it lacks distinctiveness and is functional.[FN20]

> FN20. These affirmative defenses reference several other adidas shoe styles, for which adidas does not claim any trade dress rights. As such, the court's discussion is limited to the Superstar Trade Dress.

#### a. Functionality

"Trade dress protection extends only to design features that are nonfunctional."*Clicks Billiards,* 251 F.3d at 1258. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."*Qualitex Co. v. Jacobhson Products. Co., Inc.,* 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

In general terms, "[a] product feature is functional and cannot serve as a trademark if the product feature is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, nonreputation-related disadvantage."*Id.* at 165.In the Ninth Circuit, courts consider four

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

factors in determining whether a claimed trade dress is functional: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture."*Clicks Billiards,* 251 F.3d at 1260 (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1006 (9th Cir.1998)).

"[I]n evaluating functionality as well as the other elements of a trade dress claim, it is crucial that [the court] focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."*Clicks Billiards,* 251 F.3d at 1259;*see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842 (9th Cir.1987) ("We examine trade dress as a whole to determine its functionality.")."[T]hat individual elements of the trade tress may be functional does not necessarily mean the trade dress as a whole is functional."*adidas v. Target,* 228 F.Supp.2d at 1195. Rather, "functional elements that are separately unprotectable can be protected together as part of a trade dress."*Fuddruckers,* 826 F.2d at 842. In other words, the question here is not whether the individual elements of adidas' claimed Superstar Trade Dress are functional, but whether all of the elements of the Superstar Trade Dress taken together are functional. *Id.* at 842;*see also adidas v.Target,* 228 F.Supp.2d at 1203 ("All the elements of adidas' alleged trade dress must stand or fall together.").

**\*46** Though adidas acknowledges that some of the individual elements of the Superstar Trade Dress may have been intended to be functional in 1969 (when adidas introduced the shoes), Payless proffers no evidence that any of the Superstar Trade Dress elements have been functional during any part of the relevant period of alleged infringement (*i.e.,* 2001 to the present, when all of the shoes at issue were manufactured or sold). Contrary to Payless' argument, there is authority for the proposition that product features once deemed wholly functional can be transformed over time to non-functional, source-indicating features. *See adidas v. Target,* 228 F.Supp.2d at 1205 ("functionality is a fact-specific status that may change over time. 'Even though a configuration has been held functional, its status may later change to become non-functional.'" (quoting

*McCarthy* § 7:63)); *see also In re Zippo Mfg. Co.,* 50 U.S.P.Q.2d 1852, 1999 WL 398181, at \*4-5 (TTAB, Mar. 23, 1999) (reversing denial of registration for a lighter, and noting changed circumstances since a previous denial of registration on the basis of functioanlity); *In re Honeywell, Inc.,* 1988 WL 252417, \*6 (TTAB, Aug. 16, 1988). In a case *factually identical* to this one, the court concluded:

> adidas has proffered evidence that the flat sole of the Original Superstar was considered optimal for a performance basketball shoe in 1969, when adidas introduced the Original Superstar, but that it is considered optimal no longer. adidas has also introduced evidence that the rubber toe of the Original Superstar shoe adds neither durability nor performance to the shoes, but is purely ornamental and actually increases the production cost, Judge Stewart concluded from this evidence that adidas had established the nonfunctionality of the Original Superstar trade dress. I agree with that conclusion.

*adidas v. Target,* 228 F.Supp.2d at 1194-95 (J. Redden).

As adidas points out, the issue before the court is not whether the Superstar Trade Dress was designed to be functional in 1969. Rather, the issue is whether the Superstar Trade Dress was functional at the time Payless allegedly infringed adidas' rights (*i.e.,* between 2001 and the present). Other than its unsupported assertions, Payless has failed to proffer any evidence that the elements of the Superstar Trade Dress-individually or collectively-are "essential" to the use or purpose of the shoes, or "affects" their cost or quality. In fact, Payless' own witnesses have conceded that neither the stripes, the stylized "shell toe," nor the heel patch of the Superstar Trade Dress are functional. Austin Dep., at 121:6-10 (no function to Payless stripes; they are "just for look"); Waugh Dep., at 114:25-115:18 (stripe designs relate to "aesthetics" not "functionality"); Nutt Dep., at 194:17-33 ("Q:Athletic shoes today don't have rubber toe caps to serve a functional purpose, do they? A: No, that what I just said, in 2007 the Superstar whilst I can say has some functional elements, they relate more to the elements in the '60s than today. Today it is just a fashion statement."); Austin Dep., at 121:11-17 (conceding heel patch serves no function on shoe). adidas has also submitted evidence, which Payless does not rebut, that indicates the flat heel on the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Superstar decreases performance by modern footwear standards, and that the stripes and colored heel patch increase the cost of manufacturing the shoes. Jury Decl. ¶¶ 9, 11, 16. Though the rubberized toe of the Superstar might make the shoe more durable, there is no evidence that the stylized "shell toe" serves any utilitarian purpose. In any event, Payless submits no evidence that the combination of unique and stylized Superstar Trade Dress elements, taken as a whole, serve any utilitarian purpose.

**\*47** In light of adidas' uncontroverted evidence, Payless' expert witness testimony, and the court's rulings in factually identical circumstances, I conclude that there are no genuine issues of material fact as to whether the elements of the Superstar Trade Dress-collectively or individually-have been functional during any part of the relevant period of alleged infringement (*i.e.,* 2001 to the present). Accordingly, adidas is entitled to summary judgment on the issue of functionality (Sixth Affirmative Defense).

*b. Distinctiveness*

Nothing in the Lanham Act explicitly requires a producer to show that its trade dress is distinctive, but " 'courts have universally imposed that requirement, since without distinctiveness the trade dress would not cause confusion ... as to the origin, sponsorship, or approval of [the] goods'...."*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (citation omitted; alteration in original). As here, where a plaintiff infringement of unregistered trade dress under Lanham Act, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning."*Id.* at 216.The trade dress of a product has secondary meaning when "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself."*Id.* at 211;*see also Fuddruckers,* 826 F.2d at 843 ("The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source."). Secondary meaning is a question of fact. *First Brands,* 809 F.2d at 1383.

Although adidas has presented significant circumstantial evidence of sales, advertising, product placement, and unsolicited media attention given the

Superstar Trade Dress, there are genuine issues of material fact as to whether the Superstar Trade Dress has acquired secondary meaning. As Payless points out, "evidence of extensive advertising or other promotional efforts [does] not necessarily indicate that prospective buyers would associate the trade dress with a particular source."*First Brands,* 809 F.2d at 1383. Similarly, evidence of extensive sales or product popularity is not necessarily indicative of secondary meaning. Such evidence can be attributed to "dozens of factors, only one of which may be the drawing power of the trademark."*McCarthy* § 15:47. Finally, Payless points out that much of adidas' evidence of secondary meaning comes from the declaration of one of adidas' own employees. *See generally* Pierpont Decl. Aside from the hearsay and authentication problems associated with such evidence, the Ninth Circuit has held that "evidence of secondary meaning from a partial source possesses very limited probative value ... because '[t]rademark law is skeptical of the ability of an associate of the trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark.'"*Filipino Yellow Pages, Inc. v. Asian Journal Pubs., Inc.,* 198 F.3d 1143, 1152 (9th Cir.1999). The resolution of the issue of secondary meaning will involve factual determinations based of the credibility and the weight of the evidence. As such, summary judgment is not appropriate at this stage of the proceedings. The court's decision in *adidas v. Target,* 228 F.Supp.2d 1192 (D.Or.2002), does not dictate otherwise. There, the court denied *defendant's* motion for summary judgment on the issue of distinctiveness, concluding that there were issues of facts as to whether the Superstar Trade Dress had acquired secondary meaning. The same issues of fact are present here. Accordingly, adidas motion for summary judgment as to Payless' Fifth Affirmative Defense is denied.

*F. Payless' Motion to Strike adidas' Demand for Jury Trial*

**\*48** The Seventh Amendment provides that "in Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...."U.S. Const. amend. VII. Though the Seventh Amendment preserves inviolate the right to a trial by jury of all legal claims (*e.g.,* money damages), it is clear that there is no right to a jury trial in a trademark infringement action where *only*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

equitable claims (*e.g .,* injunctive relief) remain. Fed.R.Civ.P. 38(a); *Danjaq,* 263 F.3d at 962. Where both legal and equitable issues are presented in a single case, however, "only under the most imperative circumstances ... can the right to a jury trial of legal issues be lost through prior determination of equitable claims ."*Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510-11, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). The right to a jury trial "must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims."*Danjaq,* 263 F.3d at 962 (quoting *Ross v. Bernhard,* 396 U.S. 531, 537-38, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)). In other words, any legal claim-that is, any claim for monetary damages-entitles a party to a jury trial.

Payless argues adidas has no legal claims for relief because: (1) adidas has no evidence that Payless' alleged infringement caused any actual injury; (2) adidas cannot demonstrate Payless caused any actual dilution or that Payless willfully intended to trade on adidas' reputation, both of which are required to obtain dilution damages; and (3) adidas' remaining claims for relief-injunction and an accounting of Payless' profits-are purely equitable. As such, Payless argues adidas is not entitled to a jury trial. I disagree.

Contrary to Payless' contention, adidas has presented sufficient evidence to raise genuine issues of material fact as to its actual damages for both dilution and trademark infringement. As discussed *supra* Section III.D.2, adidas has submitted evidence sufficient to allow a fact-finder to reasonably conclude that Payless both willfully intended to trade on adidas' reputation, and actually diluted adidas' Three-Stripe Mark. Further, adidas has submitted credible evidence in the form of consumer surveys and expert opinion, which indicates that Payless' alleged infringement has caused actual injury. *See Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1146 (9th Cir.1997) (finding expert opinion report and consumer surveys to be "adequate evidence for a reasonable jury to conclude that Plaintiffs suffered actual injury ..."); *see also Brunswick Corp. v. Sprint Reel Co.,* 832 F.2d 513, 525 (10th Cir.1987) (actual consumer confusion entitling a plaintiff to monetary damages may be demonstrated through consumer surveys). In sum, adidas has submitted sufficient evidence to raise genuine issues of material fact as to damages for both actual dilution and trademark

infringement. As such, adidas is entitled to a jury trial as to those legal claims.

**\*49** In any event, the Supreme Court has held that a claim for an accounting of profits in a trademark infringement action is a legal claim for relief, and thus gives rise to a right to a trial by jury. *Dairy Queen v. Wood,* 369 U.S. 469, 477-78, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). In *Dairy Queen,* the plaintiff alleged breach of a trademark licensing agreement and trademark infringement, and sought an injunction and an accounting of profits. *Id.* at 475.The Court held that plaintiff's claim for monetary relief in the form of an accounting of profits was "unquestionably legal" under either basis of liability:

> [a]s an action on a debt allegedly due under a contract, it would be difficult to conceive of an action of a more traditionally legal character. And as an action for damages based upon a charge of trademark infringement, it would be no less subject to cognizanee by a court of law.

*Id.* at 477-78 (footnotes omitted). After *Dairy Queen,* it is clear that a claim for an accounting of profits is treated as the equivalent of a claim for damages for jury trial purposes. *McCarthy § 32:124; see also Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174-75 (9th Cir.1977) (holding that plaintiffs had a right to a trial by jury of its claim for an accounting of profits in an infringement action). Though a minority of courts have limited *Dairy Queen* to claims involving breach of contract, *see McCarthy § 32:124* (citing cases), that interpretation is inconsistent with the plain language of *Dairy Queen,* which called plaintiff's claim "wholly legal," whether construed as a complaint for breach of contract or trademark infringement. *Dairy Queen,* 369 U.S. at 477;*Lee Pharmaceuticals v. Mishler,* 526 F.2d 1115, 1116-17 (2d Cir.1975). Accordingly, adidas' is entitled to a jury trial on its request for an accounting of profits. Payless' motion to strike adidas' demand for a jury trial is denied.

### *IV. Conclusion*

For the reasons stated above, adidas' Motion for Partial Summary Judgment (doc. 539) is GRANTED in part, and DENIED in part; Payless' Motion to Strike adidas' Demand for Jury Trial (doc. 545) is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 508060 (D.Or.)
**(Cite as: Slip Copy, 2008 WL 508060)**

Page 40

DENIED; Payless' Motion for Summary Judgment on
adidas' Claims of Willfulness (doc. 547) is DENIED;
Payless' Motion for Summary Judgment on adidas'
Federal and State Dilution Claims (doc. 548) is
GRANTED in part, and DENIED in part; Payless'
Motion for Summary Judgment on adidas' Trademark
and Trade Dress Infringement Claims (doc. 550) is
DENIED; and Payless' Motion for Summary
Judgment on the Affirmative Defense of Laches (doc.
551) is DENIED; and Payless' Motion (doc. 651) to
Strike Dr. Gerald Ford's Rule 26 Reports is DENIED.

IT IS SO ORDERED.

D.Or.,2008.
Adidas America, Inc. v. Payless Shoesource, Inc.
Slip Copy, 2008 WL 508060 (D.Or.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 23

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2008 WL 114861 (D.Del.)
(Cite as: Slip Copy, 2008 WL 114861)

**H**Energy Transp. Group, Inc. v. William Demant
Holding AS
D.Del.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ENERGY TRANSPORTATION GROUP, INC.,
Plaintiff,
v.
WILLIAM DEMANT HOLDING A/S et al.,
Defendants.
**C.A. No. 05-422 GMS.**

Jan. 7, 2008.

Edmond D. Johnson, Pepper Hamilton LLP, Thomas
Henry Kovach, Parkowski, Guerke & Swayze, P.A.,
Wilmington, DE, for Plaintiff.
Mary B. Graham, James Walter Parrett, Jr., Donald
E. Reid, Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, DE, for Defendants.

***ORDER***

GREGORY M. SLEET, Chief District Judge.
**\*1** WHEREAS, on January 3, 2008, the court held a
pretrial conference in the above-captioned action;

WHEREAS, the defendants raised an issue with
respect to the type of willfulness evidence that the
jury may consider and, more specifically, whether the
jury may consider the fact that they have not obtained
advice of counsel;

WHEREAS, the defendants assert that the Federal
Circuit's recent opinion in *In re Seagate Technology,
LLC,* 497 F.3d 1360 (Fed.Cir .2007), effected a
change in the law such that failure to obtain advice of
counsel cannot be considered by the jury;

WHEREAS, the plaintiff contends that the *Seagate*
opinion effected no such change in the law;

WHEREAS, after having considered the parties'
arguments and relevant law, the court concludes that,
while the *Seagate* opinion does effect a change in the
standard for willfulness, from the lower duty of care

standard to that of objective recklessness,[FN1] it does
not inform the totality of circumstances analysis for
the objective recklessness standard as the defendants
suggest; and

> FN1.*In re Seagate, LLC,* 497 F.3d 1360,
> 1371 (Fed.Cir.2007).

WHEREAS, the court further concludes that nothing
in *Seagate* forbids a jury to consider whether a
defendant obtained advice of counsel as part of the
totality of the circumstances in determining
willfulness;

IT IS HEREBY ORDERED that:

1. The defendants' request to preclude evidence
regarding their failure to obtain advice of counsel is
DENIED.

D.Del.,2008.
Energy Transp. Group, Inc. v. William Demant
Holding AS
Slip Copy, 2008 WL 114861 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 24

Westlaw.

Slip Copy
Slip Copy, 2008 WL 687114 (W.D.Wash.)
**(Cite as: Slip Copy, 2008 WL 687114)**

Page 1

F5 Networks, Inc. v. A10 Networks, Inc.
W.D.Wash.,2008.
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.
F5 NETWORKS, INC., Plaintiff,
v.
A10 NETWORKS, INC., Defendant.
**No. C07-1927RSL.**

March 10, 2008.

Ramsey M. Al-Salam, Ryan Mcbrayer, Perkins Coie, Seattle, WA, for Plaintiff.
Bryan J. Sinclair, Karineh Khachatourian, Buchanan Ingersoll & Rooney PC, Redwood Shores, CA, Miles Aaron Yanick, Stephen C. Willey, Savitt & Bruce LLP, Seattle, WA, for Defendant.

ORDER GRANTING MOTION TO STRIKE
PORTIONS OF THE COMPLAINT

ROBERT S. LASNIK, District Judge.

## I. INTRODUCTION

*1 This matter comes before the Court on a motion filed by defendant A10 Networks, Inc. ("A10") for an order, pursuant to Federal Rule of Civil Procedure 12(f), striking the request for treble damages and the allegation of willfulness in the complaint filed by plaintiff F5 Networks, Inc. ("F5"). A10 contends that the complaint does not actually allege any willful conduct by A10. In the alternative, A10 moves for an order pursuant to Rule 12(e) for a more definite statement of the factual basis for plaintiff's request for treble damages and allegation of willful infringement.

For the reasons set forth below, the Court grants defendant's motion.[FN1]

> FN1. Because the Court finds that this matter can be decided on the parties' memoranda, declarations, and exhibits, defendant's request for oral argument is

denied.

## II. DISCUSSION

This is an action for patent infringement under 35 U.S.C. § 271 *et seq.* F5 is the owner of United States Patent No. 6,473,802 ("the '802 patent") entitled, "Method and System for Storing Load Balancing Information with an HTTP Cookie."F5 alleges that A10 has infringed the patent.

In a patent infringement case, "[u]pon a finding of willful infringement, a district court may, at its discretion, grant up to treble damages."*Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1274 (Fed.Cir.1999)."To willfully infringe a patent, the patent must exist and one must have knowledge of it."*State Indus., Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236 (Fed.Cir.1985).

Federal Rule of Civil Procedure 12(f) provides, "The Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."An allegation of willful infringement is not subject to a heightened pleading standard but must meet the requirements of Rule 8. *See, e.g., In re Seagate Tech., LLC,* 497 F.3d 1360 (Fed.Cir.2007).

The complaint alleges, "On information and belief, A10 has performed such acts of infringement in a willful and deliberate manner, insofar as it has committed such acts with knowledge of F5's '802 patent."Complaint at ¶ 11. F5 argues, citing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that it is only required to provide notice of the nature of the claim. However, the Supreme Court has recently clarified that a "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."*Bell Atlantic Corp. v. Twombly,* -- - U.S. ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007)."Factual allegations must be enough to raise a right to relief above the speculative level."*Id.* at 1965.Regarding willful infringement, the Supreme Court has required "a pleading equivalent to 'with a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00028-SLR-LPS    Document 280-4    Filed 04/22/2008    Page 46 of 57

Slip Copy
Slip Copy, 2008 WL 687114 (W.D.Wash.)
(Cite as: Slip Copy, 2008 WL 687114)

Page 2

knowledge of the patent and of his infringement."'*Sentry Prot. Prods., Inc. v. Hero Prods., Inc.,* 400 F.3d 910, 918 (Fed.Cir.2005) (quoting *Dunlap v. Schofield,* 152 U.S. 244, 248, 14 S.Ct. 576, 38 L.Ed. 426 (1894)).

In this case, the complaint does not contain any facts to support a claim of willful infringement or to put A10 on notice of the grounds on which that claim rests. Despite F5's assertion to the contrary, the complaint does not allege prior knowledge of the patent. Asserting that A10 willfully infringed "insofar"-or to the extent-that it had knowledge of the patent is not the same as actually alleging that A10 had knowledge of the patent. The former is a legal tautology while the latter is a factual allegation. F5 could have amended its complaint <sup>FN2</sup> after receiving A10's motion but chose not to do so.

> FN2. Amending the language would have been a simple matter. For example, it would be sufficient to allege willful infringement "because" (rather than "insofar as") A10 had prior knowledge.

**\*2** F5 also contends that "A10 has not alleged or provided any evidence that it did not know of the '802 Patent prior to the filing of the suit."F5's Opposition at p. 2. F5 is required to meet its pleading burden. A10 is not required to disprove the allegations at the pleading stage.

## III. CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendant's motion (Dkt. # 13) and strikes the allegation of willfulness and request for treble damages without prejudice. F5 may move to file an amended complaint to reassert those allegations if and when appropriate.

W.D.Wash.,2008.
F5 Networks, Inc. v. A10 Networks, Inc.
Slip Copy, 2008 WL 687114 (W.D.Wash.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 25

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
(Cite as: --- F.Supp.2d ----, 2008 WL 821038)

Venetec Inter., Inc. v. Nexus Medical, LLC
D.Del.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
VENETEC INTERNATIONAL, INC., Plaintiff,
v.
NEXUS MEDICAL, LLC, Defendant.
No. 07-57-MPT.

March 28, 2008.

**Background:** Patent owner brought infringement
action against competitor. Competitor counterclaimed
alleging inequitable conduct. Owner brought motion
for judgment on the pleadings as to competitor's
counterclaim. Competitor brought motion to amend
its answer and counterclaims by augmenting its
inequitable conduct defense and to add seven new
false marking claims.

**Holdings:** The District Court, Mary Pat Thynge,
United States Magistrate Judge, held that:
(1) competitor sufficiently stated that patent owner
violated duty of candor and good faith to Patent and
Trademark Office (PTO), and
(2) purported diligence that competitor exercised
after deadline for amending pleadings could not be
credited on its motion to amend its pleadings to add
false marking claim.

Owner's motion denied. Competitor's motion granted
in part and denied in part.

**[1] Federal Civil Procedure 170A** 🔑0

170A Federal Civil Procedure
Generally, judgment on the pleadings is appropriate
when there are no material issues of fact, which
requires the moving party to show that it is entitled to
judgment as a matter of law; the court does not
consider matters outside the pleadings, and it must
accept the non-moving party's allegations as true,
drawing all reasonable factual inferences in the non-
movant's favor. Fed.Rules Civ.Proc.Rule 12(c), 28
U.S.C.App.(2000).

**[2] Federal Civil Procedure 170A** 🔑0

170A Federal Civil Procedure
It is within the discretion of the court to determine
the appropriateness of a proposed amendment and to
deny the amendment when considering the factors of
undue delay, bad faith on the part of the party seeking
the amendment, undue prejudice to the opposing
party, or futility of the amendment. Fed.Rules
Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑0

170A Federal Civil Procedure
Generally, delay alone is not sufficient to justify
denial of leave to amend; the more dispositive factor
in determining whether leave should be granted is
prejudice      to      the      non-movant.      Fed.Rules
Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A** 🔑0

170A Federal Civil Procedure
Leave to amend is particularly warranted when
pleadings lack the requisite factual specificity for a
particular cause of action. Fed.Rules Civ.Proc.Rule
15(a), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A** 🔑0

170A Federal Civil Procedure
A scheduling order may be modified only for good
cause and by the consent of the judge; the good cause
element requires the movant to demonstrate that,
despite diligence, the proposed claims could not have
been reasonably sought in a timely manner.
Fed.Rules Civ.Proc.Rule 16(b), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A** 🔑0

170A Federal Civil Procedure
Motions to amend which, in effect, operate to change
the scheduling order are controlled by the rule
governing      scheduling      orders.      Fed.Rules
Civ.Proc.Rules 15(a), 16(b), 28 U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
Page 2
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 821038)**

**[7] Federal Civil Procedure 170A** ☜0

170A Federal Civil Procedure
The good cause standard under the rule governing scheduling orders hinges on diligence of the movant and not on prejudice to the non-moving party. Fed.Rules Civ.Proc.Rule 16(b), 28 U.S.C.A.

**[8] Patents 291** ☜0

291 Patents
Because the patent application process is ex parte, patent applicants and their counsel, or those involved in the preparation and prosecution of patent applications, owe a duty of candor and good faith to the Patent and Trademark Office (PTO), and the breach of that duty may render a patent unenforceable for inequitable conduct. 37 C.F.R. § 1.56.

**[9] Patents 291** ☜0

291 Patents
To prove unenforceability of a patent by inequitable conduct, the alleged infringer must provide clear and convincing evidence of (1) affirmative misrepresentations of a material fact, the failure to disclose material information, or submission of false material information and (2) an intent to deceive. 37 C.F.R. § 1.56.

**[10] Patents 291** ☜0

291 Patents
When analyzing whether inequitable conduct occurred, the court balances the levels of materiality and intent to deceive the Patent and Trademark Office (PTO). 37 C.F.R. § 1.56.

**[11] Patents 291** ☜0

291 Patents
The elements of inequitable conduct must be pleaded with particularity because inequitable conduct is a claim sounding in fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; 37 C.F.R. § 1.56.

**[12] Patents 291** ☜0

291 Patents
Inequitable conduct allegations in a patent case remain subject to the liberal pleading standard, which requires only a short and plain statement of a claim or defense, the purpose of which is to place the opposition on notice of the misconduct charged; therefore, pleadings that disclose the name of the allegedly withheld relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of rule that governs the pleading fraud with particularity. Fed.Rules Civ.Proc.Rules 8, 9(b), 28 U.S.C.A.; 37 C.F.R. § 1.56.

**[13] Patents 291** ☜0

291 Patents
Competitor sufficiently stated that patent owner violated duty of candor and good faith to Patent and Trademark Office (PTO) on allegations, among other things, that owner intentionally and with intent to deceive did not timely notify PTO of present litigation and did not submit invalidity contentions and subsequently its interrogatory responses relating to those contentions with regard to patent that had not issued but subsequently did issue even though present litigation initially involved patents that had same subject matter as pending application and those patents related to and had identical disclosures as pending application. Fed.Rules Civ.Proc.Rules 8, 9(b), 28 U.S.C.A.; 37 C.F.R. § 1.56.

**[14] Patents 291** ☜0

291 Patents
On a claim of inequitable conduct, direct evidence of intent to deceive the Patent and Trademark Office (PTO) is rarely available, but may be inferred from the surrounding circumstances. 37 C.F.R. § 1.56.

**[15] Patents 291** ☜0

291 Patents
The duty to disclose material information to the Patent and Trademark Office (PTO) is not limited to prior art. 37 C.F.R. § 1.56.

**[16] Patents 291** ☜0

291 Patents
The duty to disclose relevant information to the

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
(Cite as: --- F.Supp.2d ----, 2008 WL 821038)

Patent and Trademark Office (PTO) regarding litigation includes defenses raised against the validity or unenforceability of the patent, which may be found in the pleadings, admissions and discovery. 37 C.F.R. § 1.56.

**[17] Patents 291 ☜0**

291 Patents
Purported diligence that competitor exercised after deadline for amending pleadings could not be credited on its motion to amend its pleadings to add false marking claim that was filed in response to patent owner's filing of amended complaint two days before deadline, where competitor had agreed to deadline, it could have exercised earnest and conscientious activity to determine appropriateness of false marking claim before owner filed amended complaint, and it never notified court of need to modify deadline before its passing. Fed.Rules Civ.Proc.Rules 15(a), 16(b)(4), 28 U.S.C.A.

**Patents 291 ☜328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases

**Patents 291 ☜328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases
4,193,174,    4,224,937,    4,250,880,    4,397,647, 4,517,971. Cited as Prior Art.

6,213,979, 6,447,485, 6,929,625, 7,247,150. Cited.

Jack B. Blumenfeld, Maryellen Noreika, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, for Plaintiff.
Mary Matterer, Richard K. Herrmann, Morris James LLP, Wilmington, DE, for Defendant.

*MEMORANDUM ORDER*

MARY PAT THYNGE, United States Magistrate Judge.

**INTRODUCTION**

*1 This patent matter was initiated on January 29, 2007 in which Venetec International, Inc. ("Venetec") alleges that Nexus Medical, LCC's ("Nexus") product, "The Bone," infringes U.S. Patent Nos. 6,213,979 (the "'979 patent") and 6,447,485 (the "485 patent").[FN1] Venetec moved for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ .P.") 12(c) to dismiss Nexus' counterclaim of inequitable conduct. In its opposition brief and through a separate motion, Nexus moved to amend its answer and counterclaim under Fed.R.Civ.P. 15(a) and 16(b). In its motion, Nexus moves to add false marking claims against Venetec, to further expand upon its inequitable conduct claim and to plead an additional basis for inequitable conduct due to Venetec's alleged fraudulent withholding notice of the existence of the present litigation from the United States Patent and Trademark Office ("PTO"). Because the motions are interrelated, this Memorandum Order addresses both motions.

**FACTS**

The three patents asserted in this litigation are related in that the '150 patent is a continuation of U.S. Patent No. 6,929,625, which is a continuation of the '485 patent, which is a divisional of the '979 patent. According to the record, during the prosecution of the '150 patent, on October 20, 2005 and November 21, 2006, Venetec disclosed to the PTO certain prior art references which Nexus alleges invalidates all three patents-in-dispute.[FN2]

As noted herein, the present action was instituted on January 27, 2007 which just asserted infringement of the '979 and '485 patents since the '150 patent had not yet issued. Prosecution of the '150 patent continued during the pendency of the action. On February 7, 2007, Venetec had an interview with the Examiner of the '150 patent application, during which amendments to the claims were discussed. In March 2007, the PTO forwarded a Notice of Allowability which advised Venetec that the '150 patent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 821038)**

application would be allowed over the prior art of record and that the patent would issue. Venetec paid the issue fee in March 2007.[FN3]On April 27, 2007, the court entered a scheduling order which required that amendments to the pleadings be completed by September 7, 2007. On May 30, 2007, Nexus responded to Venetec's first written discovery requests, alleging that the '979 and '485 patents are invalid based upon the six prior art references noted herein.[FN4]On June 20, 2007, Venetec disclosed to the PTO the invalidity contentions and claim charts of Nexus for the '979 and '485 patents that were part of the discovery responses. Since those materials were not submitted to the PTO until after the patent issue fee was paid, Nexus' contentions were not considered by the PTO during the prosecution of the '150 patent.[FN5]All six prior art references, however, were cited to and before the PTO during the prosecution of the '150 patent.[FN6]On June 25, 2007, Nexus filed an *inter parties* reexamination request of the '485 patent.

**\*2** The '150 patent issued on July 24, 2007, and the following day Venetec moved for leave to file its first supplemental complaint which added claims of infringement under that patent against Nexus. Venetec's request was granted. Nexus filed its answer and counterclaims on August 8, 2007, which included allegations of inequitable conduct of the '150 patent. Venetec filed an answer to Nexus' counterclaims on August 28, 2007. In its answer, Venetec did not assert the failure to state a claim for relief.

On September 5, 2007, Venetec filed a second supplemental complaint against Nexus which added the false marking claims.[FN7]In the parties' joint status report to the court filed on September 6, 2007, Nexus asked for an extension in the discovery cut-off. There was no mention of the deadline for amending the pleadings. A status teleconference was held with the court on September 11, 2007.[FN8]On September 19, 2007, Nexus filed an answer and counterclaim to the second amended complaint, alleging that because Venetec failed to withdraw its patent application for the '150 patent to allow the PTO to re-consider the six prior art references, and consider Nexus' invalidity contentions and its '485 patent reexamination proceeding, such conduct evidences bad faith with an intent to deceive the Patent Office.[FN9]On September 27, 2007, Venetec filed an answer to Nexus' counterclaim alleging for the first time that Nexus failed to state a claim for relief with

respect to the inequitable conduct claim.[FN10]Venetec filed its motion for partial judgment on the pleadings on September 28, 2007. Nexus' motion for leave to amend followed on November 8, 2007, shortly after briefing on Venetec's motion was completed on October 25, 2007.

## APPLICABLE LAW

### Rule 12(c)

[1] Generally, judgment on the pleadings under Fed.R.Civ.P. 12(c) is appropriate when there are no material issues of fact, which requires the moving party to show that it is entitled to judgment as a matter of law.[FN11] The court does not consider matters outside the pleadings, and it must accept the non-moving party's allegations as true, drawing all reasonable factual inferences in the non-movant's favor.[FN12]The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference.[FN13]

### Rules 15(a) and 16(b)

[2] Under Fed.R.Civ.P. 15(a), leave to amend pleadings is "freely given when justice so requires."[FN14]In its analysis under Rule 15(a), it is within the discretion of the court to determine the appropriateness of the proposed amendment and to deny the amendment when considering the factors of undue delay, bad faith on the part of the party seeking the amendment, undue prejudice to the opposing party or futility of the amendment.[FN15]

[3][4] Generally, "[d]elay alone is not sufficient to justify denial of leave to amend."[FN16] The more dispositive factor in determining whether leave should be granted is prejudice to the non-movant.[FN17]"Moreover, leave to amend is particularly warranted when pleadings lack the requisite factual specificity for a particular cause of action."[FN18]

**\*3**[5][6][7] Balanced with Rule 15(a) is Rule 16(b) which governs modifications to the court's scheduling order. Under Rule 16(b), a more stringent standard is applied which requires that a scheduling order only be modified for good cause and by the consent of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judge. This jurisdiction recognizes that motions to amend which, in effect, operate to change the scheduling order are controlled by 16(b).[FN19] The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner.[FN20]Unlike Rule 15(a), the good cause standard under Rule 16(b) hinges on diligence of the movant and not on prejudice to the non-moving party.[FN21]

### Rules 8 and 9(b) and Standard for Inequitable Conduct

[8][9][10] Because the patent application process is *ex parte,* patent applicants and their counsel, or those involved in the preparation and prosecution of patent applications, owe a duty of candor and good faith to the PTO. The breach of that duty may render a patent unenforceable for inequitable conduct.[FN22]To *prove* unenforceability by inequitable conduct, "the alleged infringer must provide clear and convincing evidence of (1) affirmative misrepresentations of a material fact, the failure to disclose material information, or submission of false material information and (2) an intent to deceive."[FN23]In analyzing whether inequitable conduct occurred, the court balances the levels of materiality and intent.

[11] Because inequitable conduct is a claim sounding in fraud, Rule 9(b) applies which requires the elements of inequitable conduct to be pled with particularity.[FN24]

[12] Inequitable conduct allegations, however, "remain subject to the liberal pleading standard of Rule 8, which requires only a 'short and plain' statement of a claim or defense," the purpose of which is to place the opposition on notice of the misconduct charged.[FN25]Therefore, " 'pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b).' " [FN26]

### DISCUSSION

The parties cross-referenced their respective arguments in the briefing on the two motions. In fact, their positions noted in a brief in support of one motion considerably overlap and are very similar to their arguments contained in the other motion.[FN27]As

a result, the court views the two motions on similar, if not the same, subject matters, as one continuous discussion-two bites of the same apple. Therefore, the court will address the motions together as a whole.

### Nexus' Motion to Amend

Although Nexus' motion to amend its answer and counterclaims by augmenting its inequitable conduct defense and to add seven new false marking claims against certain lines of Venetec's products was filed after briefing on Venetec's motion for partial judgment on the pleadings on Nexus' original counterclaim of inequitable conduct of the '150 patent, the court will address these *two* issues first .[FN28]The court analyzes the issues in light of the pertinent federal civil rules contained herein, specifically Rules 8, 9(b), 15(a) and 16(b).

### Proposed Amendment on Inequitable Conduct

*4[13] Venetec argues that to meet the requirements of Rule 9(b), Nexus must plead with particularity how the withheld information is material to the prosecution of the patent and also must identify with particularity facts establishing the deliberate intent to mislead the PTO. In this jurisdiction, the standard for Rule 9(b), in light of Rule 8, is not as severe or as specific as Venetec suggests. As noted previously herein, to meet the requirements of Rule 9(b), Nexus need only disclose the relevant material information and the acts of the alleged fraud to apprise Venetec of " 'what is being alleged in a manner sufficient to permit responsive pleadings.' " [FN29]

Nexus' proposed counterclaim on inequitable conduct discloses at least that much. In paragraphs 23 through 64 of the proposed amendments to the unenforceability counterclaim, Nexus alleges that Venetec intentionally and with the intent to deceive failed to cite for consideration the request for reexamination of the '485 patent; failed to timely notify the PTO of the present litigation and submit material information, that is, Nexus' invalidity contentions and subsequently its interrogatory responses relating to those contentions; and did not withdraw the '150 patent from issuance. It further alleges that Venetec was aware of its obligations to advise the PTO of material information during the prosecution of the patent, which Nexus contends includes information regarding the present action.

Case 1:06-cv-00028-SLR-LPS   Document 280-4   Filed 04/22/2008   Page 53 of 57

Nexus alleges that Venetec was clearly aware that the aforementioned information was material under 37 CFR 1.56 (also known as Rule 56). Nexus also emphasizes in its argument the requirements under the Manual of Patent Examining Procedure ("MPEP") section 2001.06(c). Although "it is certainly true that allegations of 'date, place or time' satisfy the pleading requirements, nothing in [Rule 9] requires them."[FN30]Therefore, Nexus proposed amendment suffices to place Venetec on notice of the misconduct with which it is charged.

Regarding Venetec's argument that the amendment is futile, a review of the applicable law on inequitable conduct and the application of that law to the contentions is required.

[14][15][16] A patent applicant has the duty to disclose material information to the PTO, which arises under the general duty of candor, good faith, and honesty as embodied in 37 CFR § 1.56(a). Under § 1.56(a), "applicants have a duty to disclose to the PTO information of which they are aware which is material to the examination of the application."[FN31]Breach of the disclosure duty alone is not enough to render the patent unenforceable; inequitable conduct must exist. Inequitable conduct is the failure to disclose material information with an intent to deceive or mislead the PTO.[FN32]Direct evidence of intent is rarely available, but may be inferred from the surrounding circumstances.[FN33]Moreover, the duty to disclose is not limited to prior art. Under Rule 56, any *material information* must be disclosed.[FN34]Rule 56 is not the exclusive section pertinent to materiality of information. Pursuant to MPEP 2001.06(c),[FN35]"where the subject matter for which a patent is being sought is ... involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the Patent and Trademark Office...." Relevant information regarding litigation includes defenses raised against the validity or unenforceability of the patent, which may be found in the pleadings, admissions and discovery.[FN36]Such information is material "because it signals to the examiner that other material information relevant to patentability may become available through litigation proceedings."[FN37]Clearly, inequitable conduct is material to patentability, and at a minimum the PTO should be advised of the "existence and/or nature of

any allegations relating to validity and/or ... 'inequitable conduct' relating to the original patent, and the nature of the litigation materials relating to these issues."[FN38]Since the "PTO obviously considers such information material," there is no basis for this court to assume otherwise.[FN39]

*5 It is undisputed that the present litigation initially involved patents having the same subject matter as the application under examination that lead to the '150 patent. It is not refuted that, initially, litigation involved two patents related to and having identical disclosures as the '150 patent application It is undisputed that Venetec did not advised the PTO of Nexus' reexamination proceedings of the '485 patent. Although Venetec did eventually advise the PTO of the present litigation, it did so in June 2007, approximately five months after this action was instituted and over three months after the issue fee was paid. Venetec was clearly aware that its June 2007 IDS would not be considered by the PTO from the notice of non-compliant information disclosure statement dated June 25, 2007. In that form notice, the PTO suggested for Venetec to consider filing a petition to withdraw the application from issue to have the IDS considered. Therefore, there is sufficient support for the amendment of unenforceability of the '150 patent.

Venetec contends that the absence of case law mandating that it withdraw the ' 150 patent application from issue makes Nexus' proposed amendment futile, relying on *Kimberly-Clark Foundation v. P & G Distributing Co., Inc.*[FN40] In that case, the Federal Circuit reviewed a finding by the lower court of no inequitable conduct after discovery and motion practice had been completed, evidence had been presented to the court on the issue and a final judgment entered based upon findings of fact and conclusions of law. The Federal Circuit reviewed the evidence before the district court under an abuse of discretion standard to determine whether there was an intent to deceive and found none. Unlike *Kimberly-Clark,* the present matter is not at that advanced stage.

Further, Nexus initially raised inequitable conduct of the '150 patent in August 2007. Its proposed amendment adds flesh to those allegations. As a result, Nexus' motion to amend its unenforceability defense is granted.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
(Cite as: --- F.Supp.2d ----, 2008 WL 821038)

*Proposed Amendment on False Marking*

[17] A thornier issue relates to Nexus' attempt to amend its answer and counterclaim to add seven new false marking claims after the due date in the Scheduling Order for amendment of the pleadings-a due date chosen and proposed by the parties and subsequently ordered by the court. Nexus' motion, in essence, is requesting that the Scheduling Order be modified. As contained in Rule 16(b)(4), "a schedule may be modified *only* for good cause and with the judge's consent."[FN41]Venetec maintains that Nexus has unduly delayed in bringing its false marking counterclaims and has failed to establish its diligence in seeking to add such claims. Nexus argues that since it is attempting to add the claims within ten months of the filing of the lawsuit, such conduct proves its diligence and the cases relied upon by Venetec are distinguishable. Nexus also notes that it sought leave to amend only eight weeks after September 7, 2007, the deadline for amendments to pleadings.

*6 Nexus relies on the declaration of Jennifer C. Bailey to show its good faith and diligence.[FN42]Therein is noted the litany of Nexus' efforts in researching and investigating false marking claims against Venetec and preparing the motion for leave to amend which began on *September 5, 2007,* apparently in response to Venetec's filing of its second supplemental complaint, which alleged false marking claims for the first time against Nexus. Obviously, since Venetec filed its second supplemental complaint on September 5, 2007, two days before the deadline, it began its research and investigation of those claims before the eve of the amendment to the pleadings cut-off date. The declaration shows that Nexus took various measures *at that time* to ascertain whether it could bring valid false marking claims against Venetec. Those efforts include that Nexus researched the false marking case law and reviewed Venetec's products by examining Venetec's website for product pictures and brochures. When the website information was inadequate, Nexus obtained certain Venetec products, specifically eight available specimens, and compared the claims of the fourteen separate patents listed on each to those products. After completing that analysis of Venetec's products and their corresponding markings, Nexus prepared its proposed amended answer and

counterclaims to Venetec's second supplemental complaint. Nexus accomplished its research, investigation and analysis and preparation of the proposed amendment within sixty-three days. Although the court is impressed with Nexus' efforts, sorely lacking in any of its submissions on the issue is the earnest or conscientious activity, if any, by Nexus to determine the appropriateness of a false marking claim *before* September 5, 2007.

Nexus complains that Venetec added its false marking claims (to which Nexus stipulated) at nearly the last minute, and therefore, it should be allowed to add similar claims after the due date. What Nexus is requesting is relief from a due date to which it agreed and for which it never notified the court of a need to modify before its passing.[FN43]Moreover, it is the responsibility of each party to determine what claims are appropriate to bring in a timely fashion. Nexus purported diligence came too late, and its motion to amend to add the false marking claims is denied.[FN44]

**Venetec's Motion for Partial Judgment on the Pleadings**

The court's focus on Venetec's motion for partial judgment on the pleadings is accepting Nexus' allegations as true and drawing all reasonable factual inferences in its favor, there are no material issues of fact and Venetec is entitled to judgment as a matter of law. At the present stage of the litigation, the court cannot reach that conclusion. Venetec asks the court to evaluate its conduct during the prosecution of the '150 patent and to determine as a matter of law that its conduct was not deceitful. The facts, however, which demonstrate that the proposed amendment is not futile, also show that Nexus' counterclaim on unenforceability is viable. The allegations, which this court has to accept as true, assert that Venetec failed to timely notify to PTO of the present litigation and submit material information of this litigation with the intent to deceive. Nexus also alleges that Venetec never cited for consideration the request for reexamination of the '485 patent and that Venetec could have, but did not withdraw the '150 patent from issuance to allow the PTO to consider the additional material information. Nexus maintains that Venetec's delayed action and inaction was done, not only with the knowledge of its obligations under 35 CFR § 1.56 and MPEP 2001.06(c), but also with an understanding that the PTO would not consider the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
(Cite as: --- F.Supp.2d ----, 2008 WL 821038)

IDS filed in June 2007 in light of the status of the '150 patent application. Further, due to the present status of this matter, the court finds the *Kimberly-Clark* case distinguishable as previously discussed herein. Despite Nexus' anemic presentation of its unenforceability counterclaim of inequitable conduct, the facts alleged and the obligations under Rule 56 and MPEP 2001.06 suffice to state a disputed claim and to deny Venetec's motion for partial judgment on the pleadings.

*7 Therefore, consistent with the findings contained herein,

IT IS ORDERED and ADJUDGED that:

1. Venetec's motion for partial judgment on the pleadings (D.I.94) is DENIED.

2. Nexus' motion for leave to amend its answer and counterclaim to the second supplemental complaint and counterclaim (D.I.105) is GRANTED in part and DENIED in part.

3. Nexus shall file an amended answer and counterclaims to the second supplemental complaint and counterclaim on or before **April 10, 2008.**

> FN1. After its issuance on July 24, 2007, Venetec moved to add a claim for infringement of U.S. Patent No. 7,247,150 (the "'150 patent"), a continuation in part of the '979 and '485 patents.

> FN2. Those six prior art references disclosed are WO 96/10435 to Beirman ("Beirman"), U.S. Patent No. 4,193,174 to Stephens ("Stephens"); U.S. Patent No. 4,224,937 to Gordon; U.S. Patent No 4,250,880 to Gordon; U.S. Patent No. 4,397,647 to Gordon ("Gordon I, II, and III" respectively); and U.S. Patent No. 4,517,971 to Sorbonne ("Sorbonne").

> FN3. Venetec claims that the PTO issued the Notice of Allowability on March 2, 2007; Nexus claims this did not occur until March 16, the day after the date on which it appears that Venetec paid the issue fee, which is also the same date of Venetec's letter notifying

the PTO that it was no longer entitled to status as a small entity. It appears that March 15 is the date when corrections were made on the amount of the issue fee due (from $700.00 to $1,400.00 and the total fees due from $1,000.00 to $1,700.00).

> FN4. The Beirman, Stephens, Gordon I, II and II references were also disclosed during the prosecution of the '979 and '485 patents. Only the Sorbonne reference was not disclosed prior to the issuance of those two patents. Although Nexus alleges in its interrogatory response that the asserted claims are invalid based on the six prior art referenees, Venetec claims that Nexus only relies on the Beirman and Sorbonne references as allegedly invalidating in its answers to interrogatories.. Nexus does not refute that representation.

> FN5. The PTO advised in the Notice of Non-Compliant Information Disclosure Statement that because the IDS was filed after the issue fee was paid, it failed to meet the requirements of 37 CFR 1.97(d), and would not be considered. *See* D.I. 91, Ex. B.

> FN6. Nexus' interrogatory responses allege invalidity of the '485 and 979 patents based on the prior art references contained in n. 3. The Sorbonne reference was identified on a separate Information Disclosure Statement ("IDS"), also known as PTO Form 1449, to the Examiner in relation to the '150 patent application in November 2006 and is noted by the Examiner as considered dated March 2, 2007.

> FN7. No motion or briefing was required since the parties stipulated to that amendment.

> FN8. Although the scheduling order was discussed during the teleconference, there was no concern raised about the amendment to the pleadings cut-off date.

> FN9. Nexus' inequitable conduct defense focuses on Venetec's failure to timely notify the PTO of the existence of this lawsuit and

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
(Cite as: --- F.Supp.2d ----, 2008 WL 821038)

Nexus' contentions of invalidity and its failure to advise of the '485 patent reexamination proceeding. Nexus maintains that such conduct, combined with mysteriously quick payment of the issue fee before the Notice of Allowability, shows that Venetec was aware that the PTO would not consider the IDS unless the application for the '150 patent was withdrawn from issue-facts which evidence intent to deceive.

FN10. According to Nexus, its unenforeability counterclaim in response to the second amended complaint remained as previously alleged. Nexus also notes that Venetec added the failure to state a claim defense after the amendment to the pleadings cut-off date passed without first seeking leave of the court.

FN11.*Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir .2005)*; *Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.,* 931 F.2d 1002, 1005 (3d Cir.1991).

FN12.*Mele v. Fed. Reserve Bank,* 359 F.3d 251, 257 (3d Cir.2004); *Inst. for Sci. Info., Inc.,* 931 F.2d at 1005;*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,* 164 F.3d 186, 189 (3d Cir.1998).

FN13. Wright and Miller, *5C Fed. Prac. & Proc. Civ.3d* § 1367 (1990).

FN14.*Foman v. Davis,* 371 U.S. 179, 182 (1962).

FN15.*Id.;Arthur v. Maersk, Inc.,* 434 F.3d 196, 203 (3d Cir.2006); *see also Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984); *Massarsky v. General Motors Corp.,* 706 F.2d 111 (3d Cir.1983).

FN16.*Arthur,* 434 F.3d at 204 (wherein the Third Circuit noted that "only one appellate court ... has approved ... denial of leave to amend based on a delay of less than one year").

FN17.*Id.*

FN18.*France Telecom S.A. v. Novell, Inc.,* 2002 WL 31355255, at*1 (D.Del. Oct. 17, 2002) (noting that amendments to the pleadings benefit the parties by providing notice of the nature and grounds of a defense and narrowing discovery).

FN19.*E. Minerals & Chems. Co. v.Mahan,* 225 F.3d 330, 340 & n. 18 (3d Cir.2000).

FN20.*See Samick Music Corp. v. Delaware Music Indus., Inc.,* C.A. 91-23-CMW 1992 U.S. Dist. LEXIS 2464, at *18-20 (D. Del Feb. 12, 1992).

FN21.*Slip Track Sys., Inc. v. Metal-Lire, Inc.,* 304 F.3d 1256, 1270 (Fed.Cir.2002).

FN22.*M. Eagles Tool Warehouse, Inc. v. Fisher Tolling Co.,* 439 F.3d 1335, 1339 (Fed.Cir.2006); 37 CFR § 1.56.

FN23.*Impax Labs., Inc. v. Aventis Pharms., Inc.,* 488 F.3d 1366, 1374 (Fed.Cir.2006).

FN24.*Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 552 (Fed.Cir.1990) (" 'Materiality does not presume intent, which is a separate and essential component of inequitable conduct.' " (quoting *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1557 (Fed.Cir.1988)).

FN25.*McKesson Information Solutions, LLC v. The Trizetto Group, Inc.,* 2005 WL 914776, at *3 (D.Del. Apr.20, 2005); *TruePosition, Inc. v. Allen Telecom, Inc.,* 2003 WL 151227, at *5 (D.Del. Jan.21, 2003).

FN26.*France Telecom S.A. v. Novell, Inc.,* 2002 WL 31355255, at *3 (D.Del. Oct.17, 2002) (quoting *EMC Corp. v. Storage Tech. Corp. .,* 921 F.Supp. 1261, 1263 (D.Del.1996)).

FN27. There is considerable overlap between the motion for partial judgment on

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 821038)**

the pleadings and the motion to amend regarding the claim of inequitable conduct of the '150 patent with the parties' referencing their positions in the second motion to their arguments in the first motion. Moreover, in the closing section in its answering brief to Venetec's motion, Nexus requests leave to amend its inequitable conduct counterclaim and outlines what it intends to charge in its proposed amended inequitable conduct claim. Although Venetec did not respond to "this unalleged and new argument," it provided a footnote as to why the proposed, yet unfiled motion, for leave to amend was meritless and subsequently fully briefed the issue in response to Nexus' motion.

FN28. Nexus' motion to amend includes both the changes to the inequitable conduct defense and the additional new counterclaims; however, the court views those two parts of the proposed amendment differently.

FN29.*France Telecom,* 2002 WL 3135525, at *3 (quoting *5 Wright & Miller § 1296 (1990)*); *see also McKesson,* 2005 WL 914776, at *3.

FN30.*Seville Industrial Machinery v. Southwest Machinery,* 742 F.2d 786, 791 (3d Cir.1984).

FN31.*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed.Cir.1997).

FN32.*J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1559-60 (Fed.Cir.1984).

FN33.*Id.* at 1560.

FN34.*Critikon,* 120 F.3d 1258.

FN35.MPEP 2001.06(c) is not binding law, but a "useful tool to inform the Court of the USPO's official interpretation of C.F.R. 1.56(b)" regarding what type of information is material. *Boehringer Ingelheim Vetmedia,*

*Inc. v. Schering-Plough Corp.,* 68 F.Supp.2d 508, 548 (D.N.J.1999).

FN36.*Nilssen v. Osram Sylvania, Inc.,* 504 F.3d 1223, 1234 (Fed.Cir.2008).

FN37.*Id.*

FN38.MPEP 2001.06(c) (1994) (regarding a reissue application).

FN39.*Nilssen,* 504 F.3d 1234.

FN40.973 F.2d 911 (Fed.Cir.1992). Venetec also argues that case in support of its motion for partial judgment on the pleadings.

FN41.Rule 16(b)(4) (emphasis added). Since the parties' briefing, "the language of Rule 16 was amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent through the rules."The changes were stylistic only. *Advisory Committee Notes* 2007.

FN42. D.I. 107.

FN43. As noted previously herein, there was no mention of any concern with the amendment to the pleadings' cut-off date in the status report to the court. Nexus addressed the cut-off date for discovery *due to* Venetec's new false marking claims in that report and during the teleconference on September 11, 2007.

FN44. Since it took Nexus about two months to complete its investigation and research after the deadline while also addressing Venetec's motion for partial judgment on the pleadings, it had sufficient time to do the same before the cut-off date.

D.Del.,2008.
Venetec Inter., Inc. v. Nexus Medical, LLC
--- F.Supp.2d ----, 2008 WL 821038 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.