

**BLANK ROME** LLP
COUNSELORS AT LAW

*Phone:*  *(302) 425-6438*
*Fax:*    *(302) 428-5134*
*Email:*  *Azar@BlankRome.com*

May 22, 2008

**VIA ELECTRONIC FILING & HAND DELIVERY**

The Honorable Leonard P. Stark
United States Magistrate Judge
United States District Court
844 King Street
Wilmington, DE 19801

       Re:   *McKesson Automation, Inc. v. Swisslog Italia S.p.A., et al.,*
            **C.A. No. 06-28 (SLR/LPT)**

Dear Judge Stark:

      This letter responds to Defendants' May 21, 2008 letter (D.I. 300).

      Dr. Book supplemented his report based on newly acquired information to include claims 14-17 of the '110 patent and claim 2 of the '267 patent. These claims all depend from a previously asserted independent claim and include claim terms from other asserted claims. (Copies of claims from the patents are attached as Exh. 1). Each claim is concise and straightforward. They add claim elements such as a container with a label, a label that is a bar code label, a patient prescription box, and a conveyor. The claims were removed from McKesson's original infringement contentions in good faith. Dr. Book timely supplemented his report to include these claims after receiving new information about the accused PillPick System. As such, Dr. Book's supplementation is entirely appropriate, compelled by the discovery rules, and serves the interests of justice.

      Defendants assert that McKesson has "absolutely no justification" for re-asserting infringement of these claims. (May 21, 2008 Ltr. p. 1). This is simply false. Defendant's Rule 30(b)(6) witness for the FillBox testified that the FillBox only operates with the PickRing, not as an alternative to the PickRing. For example, he testified:



May 22, 2008
Page 2

> Q. Why was it that you weren't able to just offer at this point in time, when these potential customers were interested in the fill box solution, the Homerus fill box solution that you had already perfected integrated into the PillPick system?
>
> A. Because the only solution we have is to fill the fill box through the pick ring, and to realize it was necessary to make a design of the solution to do it.
>
> Q. Because of the pick ring aspect of the system?
>
> A. Yeah, the picking is our through-put in any case, in any solution.
>
> Q. I understand.

(Davolio Depo. Tr. 407:14-408:4 attached hereto as Exhibit 2).

McKesson relied on Defendants' Rule 30(b)(6) testimony. Prior testimony regarding the generic operation of FillBox by Messrs. Youtz and Hinnen is not the issue. What is relevant is whether the FillBox constitutes a standalone component that operated without a PickRing or whether the FillBox only operates in conjunction with the PickRing. Defendants' binding corporate testimony required a direct connection. Dr. Stec's April 11, 2008 report unambiguously contradicted the corporate testimony. Around the same time, it became apparent that Defendants may have sold a FillBox without a PickRing to Heartland Hospital, which would be the first FillBox sale in the United States. Dr. Book timely supplemented his report approximately three weeks later on May 2, 2008. Dr. Book's supplementation has absolutely nothing to do with Dr. McCarthy's invalidity report.

Defendants' allegations of prejudice and the need for significant time extensions are belied by the prior discovery conducted by Defendants. Defendants have spent years thoroughly considering their invalidity positions for these claims. Indeed, Defendants' <u>initial</u> Prior Art and Invalidity Statement dated February 28, 2007 detailed several invalidity defenses for these claims. Defendants again presented invalidity defenses for these claims in their April 25, 2007 and September 7, 2007 supplemental disclosures. Defendants continued to raise invalidity assertions against these claims as recently as March 31, 2008 in their supplemental invalidity disclosure filed after the close of fact discovery. Defendants' invalidity contentions for these claims included defenses based on written description, indefiniteness, inventiveness and prior art. Defendants have similarly provided invalidity defenses to these claims in its interrogatory responses over the years.

May 22, 2008
Page 3

  As to any additional claim terms that may require construction, McKesson does not believe these claims contain terms that require construction. Most of the terms in these claims already exist in other asserted claims for which Defendants proposed no construction. McKesson pointed this out in its May 7 letter to Defendants and demonstrated that there was sufficient time in the Scheduling Order to permit Defendants to propose any such construction. (May 7, 2008 Ltr. attached hereto as Exh. 3). Defendants proposed no such construction.

  Finally, any asserted claim of prejudice rings hollow because McKesson has continually offered to provide Defendants' experts with sufficient time extensions to respond to these claims. McKesson recently offered a three week extension to alleviate whatever concerns Defendants had, but Defendants refused. (May 21 email string attached as Exh. 4).

  McKesson thus respectfully submits that Dr. Book's supplementation of his report to include claims 14-17 of the '110 patent and claim 2 of the '267 patent should be permitted.

               Respectfully submitted,

               Christine S. Azar
               I.D. No. 4170

Enclosures

cc: Dale R. Dubé, Esq.
   Alfred R. Fabricant, Esq.
   Richard LaCava, Esq.
   Larry Drucker, Esq.

**Exhibit 1**

11

extension rod 52 in the negative Z direction such that the outer suction face 60 is behind all of the medicine packages 14 on the storing rod 48. Vacuum valve 57 is then activated such that the suction head 56 is dropped back down in the negative Y direction to be behind the packages 14. Finally, vacuum valve 59 is activated such that the extension rod 52 is extended in the positive Z direction and the front suction face 60 pushes all packages 14 off the storing rod 48 into the patient box 36.

In the event that the wrong medicine package 14 was scanned and is picked, or the medicine has expired, then picking means 38 will have placed those packages in a reject or return area, where the medicine package 14 can be disposed. A pharmacy technician will then manually sort the drugs in the reject area, removing expired drugs and placing the others in the supply rack in order that they might be returned to their correct location in the system. The process is then repeated for the next drug on the prescription list that has not yet been obtained.

The flow chart of FIG. 17 is the process of checking the selected packages which have been placed in a patient box. Such checking is performed at the check station. The process begins by calling up the check program indicated by box 105. The bar code on the patient box is scanned 106 and the patient number portion of the bar code is identified 107. The patient number is displayed 108 on the screen at the check station. Then the packages in the patient box are scanned 109. The identification of the packages is compared with the list of drugs that had been ordered for the patient in a verify step 110. If correct packages are in the box, the checking of the box is complete and the system is ready for the next box 111. If the packages in the box do not match the order the system determines if the problem can be corrected 112. If so, the correction is made 113 and the verify step is repeated. If not, the box is dumped 114 and the order is recorded as not filled or the box is resubmitted and the missing medications are filled by the system. For example, should the system determine that an item is missing it may either create a modified list and send the box on with a modified list or it may instruct the picking means to get the missing item.

The return process is shown in the flow chart of FIG. 18. The process starts 115 by calling up the return program. The patient box containing the returned items must be positioned so that the patient box can be scanned 116 for the patient identification number 117 and the nursing unit from which the box was returned. If the box has come from the proper nursing unit the system retrieves the patient dispensing record 120 and displays that record 121 for the operator. Next the packages are scanned 122. The system preferably verifies 123 that the scanned packages had been sent to the patient making the return. Next the system checks each package 124 to determine if the drug is useful or if it has expired, been recalled or otherwise should not be returned to the supply rack. If no, the package is discarded 125. If yes, the package is returned to the supply rack 126. If more drugs remain in the box the process is repeated 127. If no packages remain, the system may further process the list of returned packages 128 to modify the patient's record, update the system inventory log or display the list of returns for review by the operator.

The process of restocking returned or new packages to the storage rack is diagrammed in FIG. 19. These packages are manually placed on a return or supply rack and the program for restocking is called up 130. The program causes the picking means to be positioned 131 so that the gripping assembly can pick packages from the return or supply rack. The bar code on the first package is scanned 132 and the

12

portion of the scanned bar code which identifies the drug is found 133. The system then checks the database 134 for the location in the storage rack which has been designated for the identified product. The system extends the vacuum head 135 to engage the package. Suction is applied 136 and a suction sensor is checked. This should cause the package to be held by the gripper assembly which fact will be confirmed by the sensor 137. The gripper assembly positions the package 138 on the storing rod 48 in the gripper assembly. Then the suction is released and the gripper assembly is ready to place additional packages on the storage rod. If more packages remain on the return or supply rack 140, the process is repeated until all packages are on the storage rod or the storage rod is full. The gripper assembly is then moved to a position 141 in front of the storage rack to properly place the outermost package on the storage rod. That package is grasped 142 using back suction cups 61 (see FIG. 11). The extension rod 52 is retracted in the negative Z direction such that the inside suction face 61 is in contact with the medicine package 14. The sensing means 58 determines whether proper contact is made. Then the extension rod 52 is moved a predetermined distance in the positive Z direction 143 to place the medicine package over a rod 30 of support structure 28. Vacuum valve 54 is then deactivated 144 to stop suction, allowing the medicine package 14 on the suction face 61 to drop away therefrom. The extension rod 52 then moves in the negative Z direction towards the medicine packages 14 on the storing rod 48 to repeat the process. While it moves back to obtain another medicine package 14, the sensor 58 trips when contact is made. The process can be repeated 141 until there are no more medicine packages 14 on the storing rod 48. The computer 24 knows when to stop returning packages since it knew how many packages had been placed on the storing rod 48.

In the event that all drugs to be returned or restocked at a particular storage location are identical the process is somewhat different. Packages are picked from the supply rack in the method detailed above. The gripper assembly is then moved to a position in front of the storage rack to place the remaining packages on the storage rod. Cylinder 48A causes the assembly of storing rod 48 and pusher plate 57B to move in the negative Z direction. Storage rod 48 is co-linear with a rod 30 of support structure 28. Pusher plate 57B then moves in the positive Z direction pushing all remaining packages on storage rod 48 on to rod 30.

The restocking of the storage racks 12 can be carried out during the evening when packages are not being gathered to fill orders. Alternatively, restocking can be carried out simultaneously with picking if the system 10 has a pair of rods as shown in FIG. 14, a first end of arm tooling 67, second end of arm tooling 68 and a first tooling structure 70 and a second tooling structure 72 is utilized, as shown in FIG. 15. While, for instance, the first end of arm tooling 67 is picking medicine packages 14 to fill a patient's prescription, the second end of arm tooling 68 can be restocking the second side of the storage area 12.

Although the invention has been described in detail in the foregoing embodiments for the purpose of illustration, it is to be understood that such detail is solely for that purpose and that variations can be made therein by those skilled in the art without departing from the spirit and scope of the invention except as it may be described by the following claims.

We claim:

1. A system for selecting and delivering packages to fill orders comprising:

5,468,110

13

a) a storage area comprised of a plurality of storage area locations each location having package holding means sized and configured to hold a plurality of individual packages each individual package having a machine readable label which identifies a type of package, the packages being held in a manner so that each package can be placed into and removed from the storage area locations and so that the machine readable label on at least one package in a storage location can be read without removing the package from the storage location, each location having a distinct x, y coordinate;

b) automated picking means sized and configured to be able to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions, the picking means having a gripper for grasping and moving the packages and having a picking means storage location sized and configured to hold a plurality of packages in a face to face relationship after the plurality of packages have been retrieved from the storage area and prior to delivery of the plurality of packages to a desired destination separate from the picking means;

c) means for moving the automated picking means to selected storage locations;

d) a computer having at least one memory which contains a program for directing the picking means to chosen storage area locations and a database containing at least one x, y coordinate location in the storage area for each package held within the storage area the computer being connected to the automated picking means and the means for moving the automated picking means; and

e) a package reader associated with the picking means and being positioned for reading the machine readable labels on packages located within the storage area, wherein only one type of package is stored in each x, y coordinate location.

2. The system of claim 1 wherein the gripper is a vacuum head.

3. The system of claim 1 also comprising a sensor attached to the picking means for determining when the package is grasped by the gripper.

4. The system of claim 1 wherein the label is a bar code and the reader is a bar code reader.

5. The system of claim 1 wherein the label also contains an expiration date.

6. The system of claim 1 wherein the picking means contains a picking means storage area for holding the plurality of packages selected by the picking means.

7. The system of claim 6 wherein the picking means storage area is comprised of at least one storage rod and holes are provided in the packages to permit the packages to be held on the storage rod.

8. The system of claim 1 also comprising a supply station for receiving new and returned packages, the supply station having a plurality of locations each location having package holding means sized and configured to hold an least one package in a manner so than the package can be placed into

14

and removed from the locations by the automated picking means, each location having a distinct x, y coordinate.

9. The system of claim 8 also comprising means for moving the supply station wherein the supply station is removably positioned adjacent the storage area.

10. The system of claim 1 wherein the package holding means in the storage area is comprised of a plurality of rods and a hole is provided in each package to permit the package to be held on the rods.

11. The system of claim 1 also comprising at least one data transmission port attached to the computer through which a list of packages to be selected can be input and a list of packages selected by the system can be output.

12. The system of claim 1 wherein the memory contains a program for checking comparability of products in packages selected by the picking means with other products listed in the database.

13. The system of claim 1 also comprising a conveyor positioned to receive packages from the picking means.

14. The system of claim 13 also comprising a plurality of containers positioned on the conveyor, the containers being sized and positioned to receive packages from the picking means.

15. The system of claim 14 wherein the containers have machine readable labels.

16. The system of claim 15 wherein the labels are bar codes.

17. The system of claim 14 wherein the labels are bar codes.

18. The system of claim 14 also comprising a check station located adjacent the conveyor, the check station having reading means for reading the machine readable labels.

19. The system of claim 18 wherein the reading means is connected to the computer in a manner to input information from the machine readable labels; the computer having a program for storing the input information in the memory and for comparing the input information to other information contained in the database.

20. A system as described in claim 18 wherein the picking means includes an least one gripper that picks the packages; and a tooling support structure having an least one column to support the tooling and at least one row to support the column such that the tooling means moves along the column as the column moves along the row to pick a given package hanging from a corresponding support rod, said gripper able to turn at least 180° on the column to pick packages Ion either the first or from selected storage locations which locations are positioned opposite and facing one another; and means for moving the column with respect to the row, said moving means controlled by the computer and in communication therewith.

21. The system of claim 1 wherein the packages contain individual doses of medicine.

22. The system of claim 1 also comprising a track over which the picking means travels according to directions supplied by the computer also comprising means for moving the picking means over the track.

* * * * *

5,593,267

13

We claim:

1. A system for selecting and delivering medicine packages from a holding means to fill orders comprising:
   a) holding means comprised of a frame having a plurality of support rods each support rod sized for holding a plurality of medicine packages, each rod associated with a given medicine and holding medicine packages with only the same medicine each support rod having a distinct X, Y coordinate location;
   b) means for picking medicine packages from the support rods in accordance with instructions received from a computer, said picking means being able to access the holding means; the picking means capable of holding a plurality of medicine packages which have been picked from the holding means;
   c) a computer having a database containing an X, Y coordinate location for all packages in the holding means, the computer able to receive orders for packages and able to direct the means for picking packages; and
   d) a supply structure having a plurality of supply support rods which extend from said structure to form an X, Y coordinate system, with each supply support rod and medicine package thereon having a unique X and Y coordinate, said picking means disposed to have access to said structure such that a given medicine package on an associated supply support rod can be picked by the picking means to fill a patient's prescription, or a given medicine package in the supply structure can be picked by the picking means to restock an associated rod in the holding means.

2. A system as described in claim 1 including a conveyor in communication with the picking means; and patient prescription boxes which are moved by the conveyor to the picking means such that the picking means provides the medicine packages it has picked to fill a given prescription to an associated box.

3. A system as described in claim 1 wherein the picking means includes at least one gripper that picks the medicine packages; and a tooling support structure having at least one column supporting the column such that the picking means moves along the column as the column moves along the row to pick a given medicine package hanging from a corresponding support rod, or restock a given medicine package on a corresponding support rod; and means for moving the column with respect to the row, said moving means controlled by the computer.

4. A system as described in claim 3 wherein the picking means is comprised of:
   a housing;
   means for storing a plurality of medicine packages attached to the housing;
   means for obtaining a medicine package, said obtaining means slidingly attached to the housing such that it can move in a Z direction, which is perpendicular to the X and Y directions, to pick a medicine package from a support rod when the housing is adjacent to and aligned

14

with a support rod, and can move in the Z direction to place a picked package on the storing means; and
   identifying means attached to the at least one gripper such that it can identify a package to be picked by the obtaining means, each of said packages having an identity disposed on them which can be read by the identifying means.

5. A system described in claim 4 wherein the identity of each package is a bar code, and the identifying means includes a bar code reader disposed on the obtaining means.

6. A system as claimed in claim 1 wherein the support rods extend from back rod supports within the frame in sets of two, with a first rod and a second rod on each set pointing essentially in a Z direction which is perpendicular to the X and Y directions, but approximately 180° apart from each other.

7. A system for selecting and delivering packages from a holding means to fill orders comprising:
   a) holding means comprised of a frame having a plurality of support rods for holding packages each support rod having a distinct X, Y coordinate location and holding a plurality of packages, all of those packages on each support rod having similar contents;
   b) picking means for picking packages from the support rods in accordance with instructions received from a computer, the picking means being able to access the holding means and having
      a housing;
      means for storing packages attached to the housing;
      means for producing a suction;
      a suction rod in fluid connection with the suction producing means, said suction rod slidingly attached with respect to the Y and Z directions to the housing and maintaining a suction therethrough when the suction producing means is activated by which a medicine package is picked with suction; and
      means for sensing when a package is properly positioned such that the package rod is then moved to the storing means and deposits the package thereon.

8. A system as described in claim 7 wherein the storing means is a storing rod which extends from the housing such that the suction head and the suction rod can deposit a package thereon.

9. A system as described in claim 8 wherein the tooling includes valves and pneumatic cylinders for moving the suction rod in the Y and Z direction; and a vacuum pump for providing suction to the suction rod and support head sufficient to pick a package from a rod of the support structure and then hold it to the suction head.

10. A system as described in claim 9 wherein the suction head has two faces through which a suction can be drawn, each face capable of picking a package.

11. A system as described in claim 10 wherein the two faces are parallel to each other and are parallel to the x-axis, and wherein each package has a face and the package are held by the storing rod and the rods of the support structure such that the face of each package is parallel to the x-axis.

* * * * *

**Exhibit 2**

Confidential - Attorneys Eyes Only

Page 279

```
IN THE UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF DELAWARE


MCKESSON AUTOMATION, INC.,    )
a Delaware Corporation,       )
                              ) Civil Action No.
          Plaintiff,          ) 1:06 CV 00028-KAJ
                              )
     vs.                      )
                              )
TRANSLOGIC CORPORATION, a     )
Delaware Corporation, and     )
SWISSLOG ITALIA, S.p.A., an   )
Italian Corporation,          )
                              )
          Defendants.         )
------------------------------)


     * CONFIDENTIAL - ATTORNEYS' EYES ONLY *

                    VOLUME II


       CONTINUED VIDEOTAPED DEPOSITION OF

               MAURIZIO DAVOLIO

              New York, New York

            Thursday, May 24, 2007



Reported by:

KRISTIN KOCH, RPR, RMR, CRR, CLR

JOB NO. 10991
```

1    Davolio - Confidential - Attorneys' Eyes Only
2    Homerus to PillPick will be expecting fill
3    box." Is that because they would have been
4    using something similar to the fill box with
5    the Homerus system?
6            MR. LaCAVA: Objection. Calls for
7        speculation.
8            MR. JACOBS: You can answer.
9        A.   The Homerus system -- in the Homerus
10   system the only way is the fill box and he said
11   that he doesn't know, but he can assume that
12   this client could be interested to have the
13   same solution.
14       Q.   Why was it that you weren't able to
15   just offer at this point in time, when these
16   potential customers were interested in the fill
17   box solution, the Homerus fill box solution
18   that you had already perfected integrated into
19   the PillPick system?
20       A.   Because the only solution we have is
21   to fill the fill box through the pick ring, and
22   to realize it was necessary to make a design of
23   the solution to do it.
24       Q.   Because of the pick ring aspect of
25   the system?

Confidential - Attorneys Eyes Only

Page 408

1   Davolio - Confidential - Attorneys' Eyes Only
2        A.    Yeah, the picking is our through-put
3   in any case, in any solution.
4        Q.    I understand.
5              (Davolio Exhibit 39, e-mail dated
6         December 2, 2004, Bates stamped S 022884
7         and S 022885, marked for identification.)
8        Q.    I just have a few questions on
9   Exhibit 39, which is a chain of e-mails bearing
10  Bates numbers S 022884 through S 022885.  It
11  says:  "Marcello, as we discussed, CGA built
12  the fill box for at least six applications for
13  the Homerus system sold by Pyxis."  And then it
14  says:  "Please collect all documentation
15  available and bring an accurate estimate of
16  costing and the time it will take to deliver
17  the first unit," in the message from Mr. Kegley
18  to Mr. Bergamini.
19             Did Mr. Bergamini approach you at
20  any point in time after November 29th of 2004
21  and ask for your assistance in gathering any
22  documentation that might relate to the fill box
23  that was used in the different applications for
24  the Homerus system?
25             MR. LaCAVA:  Objection to form.

**Exhibit 3**



**Sutherland**
**▪ Asbill &  ▪**
**Brennan** LLP
ATTORNEYS AT LAW

1275 Pennsylvania Ave., NW
Washington, DC 20004-2415
tel 202.383.0100
fax 202.637.3593
www.sablaw.com

CHRISTINA A. ONDRICK
DIRECT LINE: 202.383.0819
E-mail: christina.ondrick@sablaw.com

May 7, 2008

VIA E-MAIL

Bryan N. DeMatteo, Esq.
Dickstein Shapiro LLP
1177 Avenue of the Americas
New York, NY 10036-2714

    Re:   *McKesson Automation, Inc. v. Translogic Corporation et al.*
           CA No. 06-028 (MPT)

Dear Bryan:

I write in response to your May 5, 2008 letter.

Your allegation that the inclusion of claims 14 – 17 of the '110 patent and claim 2 of the '267 creates surprise or prejudice to Swisslog is without merit. Swisslog has been aware of McKesson's infringement allegations concerning these claims for at least two years. McKesson outlined Swisslog's infringement of these claims in McKesson's <u>initial</u> Disclosure of Asserted Claims and Preliminary Infringement Contentions dated December 22, 2006. McKesson again outlined Defendants' infringement of these claims in its April 25, 2007 supplemental disclosure. These infringement allegations remained in the case as of January 2008.

Your assertion that Swisslog will require "considerable time to update their interrogatory responses, revise their invalidity contentions and determine whether there are now additional terms that require claim construction" is wholly without basis. Swisslog has spent years thoroughly considering their invalidity positions for these claims. Indeed, Swisslog's <u>initial</u> Prior Art and Invalidity Statement dated February 28, 2007 detailed several invalidity defenses for these claims. Swisslog again presented invalidity defenses for these claims in its April 25, 2007 and September 7, 2007 supplemental disclosures. Swisslog continued to raise invalidity assertions against these claims as recent as five weeks ago in its March 31, 2008 supplemental invalidity disclosure. Defendants' invalidity contentions for these claims included defenses based on written description, indefiniteness, inventiveness and prior art. Swisslog has similarly provided invalidity defenses to these claims in its interrogatory responses over the years.

Bryan N. DeMatteo
May 7, 2008
Page 2

As to any additional claim terms that may require construction, McKesson does not believe these claims contain terms that require construction. Most of the terms in these claims already exist in other asserted claims for which Swisslog proposed no construction. In any event, there is sufficient time in the Scheduling Order to permit Swisslog to propose any such construction.

Dr. Book is obligated to supplement his report if he receives new information and reserved the right to do so. Dr. Book received new information contained in the expert report of Jeffery A. Stec, Ph.D. and also received new information regarding Swisslog's recent PillPick System sale to Heartland. Thus, Dr. Book's supplementation is entirely appropriate and compelled by the discovery rules. Dr. Book's supplementation has absolutely nothing to do with Dr. McCarthy's invalidity report.

McKesson offered to extend expert discovery to the extent Swisslog needs additional time. McKesson's offer is no different than Swisslog's similar offer based on Swisslog's recent supplementation of Dr. Stec's report. Further, Swisslog must remember that McKesson has not objected to the supplementation of Dr. Stec's report. We further point out that McKesson has not objected to either of Swisslog's expert reports, both of which raised new facts and new arguments, which were not provided by Swisslog during fact discovery. McKesson recognizes that this information, like any fact information from Dr. Book's supplemental report, will properly be the subject of expert discovery.

Please feel free to call me if you wish to discuss this matter further.

Sincerely,

*Christina Ondrick*

Christina A. Ondrick

**Exhibit 4**

## Viguie, Mary

**From:** Drucker, Lawrence [DruckerL@dicksteinshapiro.com]
**Sent:** Wednesday, May 21, 2008 3:41 PM
**To:** Ondrick, Christina; Jacobs, Blair; Fabricant, Alfred; DeMatteo, Bryan; LaCava, Richard
**Cc:** Forte, Karen; JHeaney@MNAT.com
**Subject:** Re: McKesson v. Swisslog

In light if the late date, the disruption to the schedule, and the fact that all of the purportedly new information leading Dr. Book to amend his report was well known to McKesson long ago, I propose that you withdraw the amended report entirely.

Separate and apart from this, if you would like more time for the rebuttal reports and expert discovery, we will certainly be amenable to granting an extension along the lines you proposed.

Larry

----- Original Message -----
From: Ondrick, Christina <Christina.Ondrick@sutherland.com>
To: Drucker, Lawrence; DeMatteo, Bryan; Fabricant, Alfred; LaCava, Richard
Cc: Jacobs, Blair <Blair.Jacobs@sutherland.com>; Forte, Karen
Sent: Wed May 21 15:14:06 2008
Subject: RE: McKesson v. Swisslog

Larry,

What schedule do you propose?

Christina

---

From: Drucker, Lawrence [mailto:DruckerL@dicksteinshapiro.com]
Sent: Wednesday, May 21, 2008 3:13 PM
To: Ondrick, Christina; DeMatteo, Bryan; Fabricant, Alfred; LaCava, Richard
Cc: Jacobs, Blair; Forte, Karen
Subject: Re: McKesson v. Swisslog


Christina:

That proposal is not acceptable to defendants. The additional allegations of infringement are substantial and cannot be addressed in any meaninfgul way under the schedule you propose.

Larry

----- Original Message -----
From: Ondrick, Christina <Christina.Ondrick@sutherland.com>
To: DeMatteo, Bryan; Fabricant, Alfred; Drucker, Lawrence; LaCava, Richard
Cc: Jacobs, Blair <Blair.Jacobs@sutherland.com>
Sent: Wed May 21 14:50:03 2008
Subject: McKesson v. Swisslog

Hi Fred,

In an attempt to resolve your concerns about the supplementation of Dr. Book's report, we propose the following:

5/22/2008

(1) extending Swisslog's due date for expert rebuttal reports, and any amendment/supplementation of existing reports, addressing claims 14-17 of '110 patent and claim 2 of '267 patent to June 9
(2) extending expert deposition discovery to July 9

We hope that this will resolve your concerns. Please let us know if you are agreeable. We are willing to consider any proposals you may have.

Regards,
Christina


Christina A. Ondrick, Esq.

SUTHERLAND

1275 Pennsylvania Ave., N.W.
Washington, D.C. 20004


Direct: (202) 383-0819
Fax: (202) 637-3593


christina.ondrick@sutherland.com



Please note our new Web address is www.sutherland.com. Accordingly, all e-mail addresses should be adjusted to replace @sablaw.com with @sutherland.com.

CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any transaction, arrangement, or other matter.

The information contained in this message from SUTHERLAND and any attachments are confidential and intended only for the named recipient(s). If you have received this message in error, you are prohibited from copying, distributing or using the information. Please contact the sender immediately by return email and delete the original message.

---

This e-mail message and any attached files are confidential
and are intended solely for the use of the addressee(s)
named above. This communication may contain material
protected by attorney-client, work product, or other
privileges. If you are not the intended recipient or person
responsible for delivering this confidential communication
to the intended recipient, you have received this
communication in error, and any review, use, dissemination,
forwarding, printing, copying, or other distribution of
this e-mail message and any attached files is strictly
prohibited. Dickstein Shapiro reserves the right to monitor
any communication that is created, received, or sent on its
network. If you have received this confidential
communication in error, please notify the sender


5/22/2008

immediately by reply e-mail message and permanently delete
the original message.

To reply to our email administrator directly, send an email
to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com
=================================================================

------------------------------------------------------------
This e-mail message and any attached files are confidential
and are intended solely for the use of the addressee(s)
named above. This communication may contain material
protected by attorney-client, work product, or other
privileges. If you are not the intended recipient or person
responsible for delivering this confidential communication
to the intended recipient, you have received this
communication in error, and any review, use, dissemination,
forwarding, printing, copying, or other distribution of
this e-mail message and any attached files is strictly
prohibited. Dickstein Shapiro reserves the right to monitor
any communication that is created, received, or sent on its
network.  If you have received this confidential
communication in error, please notify the sender
immediately by reply e-mail message and permanently delete
the original message.

To reply to our email administrator directly, send an email
to postmaster@dicksteinshapiro.com

Dickstein Shapiro LLP
http://www.DicksteinShapiro.com
=================================================================

5/22/2008