```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      MCKESSON AUTOMATION, INC.,
 4    a Pennsylvania Corporation,       :    CIVIL ACTION NO.
                                        :
 5              Plaintiff,              :
                                        :
 6          v                           :
                                        :
 7    SWISSLOG HOLDING AG,              :
      SWISSLOG MANAGEMENT AG,           :
 8    TRANSLOGIC CORPORATION, and       :
      SWISSLOG NORTH AMERICA,           :
 9                                      :    06-28 (SLR-LPS)
                Defendants.
10                              - - -

11                       Wilmington, Delaware
                   Friday, May 23, 2008 at 11:00 a.m.
12                       TELEPHONE CONFERENCE

13                              - - -

14    BEFORE:  HONORABLE LEONARD P. STARK, U.S. MAGISTRATE JUDGE

15                              - - -
      APPEARANCES:
16

17              BLANK ROME, LLP
                BY:  CHRISTINE S. AZAR, ESQ.
18
                     and
19
                SUTHERLAND ASBILL & BRENNAN, LLP
20              BY:  BLAIR M. JACOBS, ESQ., and
                     CHRISTINA A. ONDRICK, ESQ.
21                   (Washington, District of Columbia)

22                       Counsel for Plaintiff

23


24
                                 Brian P. Gaffigan
25                               Registered Merit Reporter
```

```
 1   APPEARANCES:  (Continued)

 2

 3
              MORRIS NICHOLS ARSHT & TUNNELL, LLP
 4            BY:  JULIA HEANEY, ESQ.

 5                 and

 6            DICKSTEIN SHAPIRO MORIN & OSHINSKY, LLP
              BY:  ALFRED R. FABRICANT, ESQ.
 7                 (New York, New York)

 8                 Counsel for Defendants

 9

10

11

12

13

14                      - oOo -

15              P R O C E E D I N G S

16         (REPORTER'S NOTE:  The following telephone

17   conference was held in chambers, beginning at 11:00 a.m.)

18         THE COURT:  Good morning.  Are counsel there?

19   Hello?  Anybody there?

20         MR. FABRICANT:  Yes.

21         MS HEANEY:  Good morning.

22         THE COURT:  This is Judge Stark.  Let me know

23   who is on the line, please.

24         MS. HEANEY:  Your Honor, this is Julie Heaney

25   for defendants; and Fred Fabricant is also on.
```

1          THE COURT:  Okay.

2          MR. JACOBS:  Your Honor, on behalf of McKesson

3   Blair Jacobs and Christina Ondrick is also on the line.

4          THE COURT:  Okay.  Good morning to you, all.

5          (The attorneys respond, "good morning.")

6          THE COURT:  So I have received the letters that

7   I had ordered following our hearing the other day.

8          A VOICE:  Joining conference, Christine Azar.

9          MS. AZAR:  Good morning.  This is Christine Azar

10  from Blank Rome.

11         THE COURT:  Okay.  This is Judge Stark.

12         MS. AZAR:  Good morning, Your Honor.

13         THE COURT:  Thanks for joining us.  Are we

14  expecting anybody else?

15         MR. JACOBS:  I think that is all, Your Honor.

16         THE COURT:  Okay.  All right.  So I was just

17  saying I've seen the letters; and in terms of how this

18  dispute will be resolved, I mean it does fall kind of in

19  between the parts of the case that are with Judge Robinson

20  and the parts that are with me since it relates to claim

21  construction which is with Judge Robinson, it relates to

22  scheduling which is with Judge Robinson, but it may have an

23  impact on discovery which is in front of me.  So I'm still

24  not entirely clear on how and when you are going to get a

25  final decision on this dispute, but I want to make sure that

1    I understand the dispute in full and make sure that there is

2    no chance of working out an accommodation.

3           I take it -- well, let me ask you, Mr. Jacobs,

4    when we left the other day, you at least seemed somewhat

5    hopeful there might be some further efforts to try to

6    resolve this dispute.  I take it there were efforts but they

7    failed; is that correct?

8           MR. JACOBS:  That is correct, Your Honor.  We

9    have essentially offered to amend the order, scheduling

10   order with regard to these specific allegations and to allow

11   the defendants any time they need to respond, amend expert

12   reports and things of that nature and also, if necessary, to

13   amend deposition dates with regard to these specific

14   allegations.  And we received a response back indicating

15   that, you know, because of the complexity I suppose of the

16   issue, they did not believe that a scheduling amendment

17   would work here.

18           THE COURT:  Okay.

19           MR. FABRICANT:  Your Honor, this is

20   Mr. Fabricant.

21           THE COURT:  Yes.

22           MR. FABRICANT:  I guess the real issue here is

23   that from the day the lawsuit started two or more years

24   ago, the brochures were available on the website which

25   indicated this issue which disclosed that, you know, how

1    these products worked and gave the information that if they

2    believe this was an infringing product to one of their

3    claims, they could have asserted it.  There were numerous

4    depositions, including the two that we've cited in our

5    letter which support that.  There are lots of documents

6    which were produced to the plaintiff at a very early stage

7    which provides this information.  And the additional claims

8    now being asserted, you know, do add a significant amount of

9    work which would need to be done.  If this had happened at

10   an earlier stage of the litigation, I'm sure the Court would

11   have a much easier time allowing that to be added.  But at

12   this stage, in light of the fact that really from the day

13   the case was filed, all this information was available and

14   then was subsequently provided.

15        In fact, during the Youtz deposition, he was the

16   product manager and not only did he provide the testimony

17   that was included in the letter that we submitted the other

18   day, in their letter response, they basically were saying,

19   well, yes, he gave that testimony but it really didn't

20   address the issue of whether it was offered for sale or was

21   a product available at that time.

22        Mr. Youtz further testified specifically in his

23   deposition conducted in May of '08, at Page 246.  He was

24   specifically asked:

25        "Question:  Have you encountered a hospital that

1    has told you that it would be interested in the PillPick

2    system but not the PickRing?

3                And he answered:

4                "Answer:  Yes.

5                "Question:  And in that instance, is that when

6    you offered the FillBox?  Offered it?

7                "Answer:  Yes."

8                So it's not just this recent sale to Heartland.

9    It was the subject of clear testimony dating back as early

10    as May by the product manager himself.

11                THE COURT:  Okay.  Hold on.  Let me stop you

12    there.

13                Mr. Jacobs, let's have you address first the

14    point of you say that I think you initially had some of

15    these terms as your claim construction terms or terms that

16    might be in dispute but then you withdrew them in good faith

17    and now you want to add them back.  Help me understand that

18    sort of history and why the initial withdrawal was in good

19    faith and why now you should be allowed to do it.

20                MR. JACOBS:  That is fine, Your Honor.  And Ms.

21    Ondrick can jump in if I miss something.

22                Essentially, Your Honor, I understand what

23    Mr. Fabricant is saying with regard to the product manager.

24    And we do recall that testimony.  There was a corporate

25    witness who testified on behalf of Translogic/Swisslog who

1    contradicted that testimony.  And after the corporate and

2    30(b)(6) testimony, we decided that we did not have, based

3    on that corporate testimony, any type of good faith basis

4    for keeping these claims in this case any further.

5            After that, subsequent to that, we received the

6    expert report of Mr. Stec.  And he provided additional

7    information kind of corroborating what Mr. Youtz had said

8    but contradictory to what the 30(b)(6) witness had said.

9    And at that point in time we said okay, you know, now, out

10   of an abundance of caution, let's put these back in again

11   because now it appears they have given the information to

12   this expert for him to, with a good faith basis, conclude

13   that these features are there.  And, Your Honor, we're

14   dealing essentially with a modification, a FillBox

15   modification, a conveyer belt essentially at the back end

16   of the product.

17           We have asked the defendants on a couple of

18   different occasions for the factual basis of their claim

19   this would take significant amounts of expert time because,

20   you know, we've all done this many times.  We've been on

21   both of the plaintiff and defendant side.  And from our

22   perspective, we're looking at a fairly quick modification

23   on the invalidity side.  This is not going to take a lot of

24   work.  We thought a couple of weeks easily would address

25   this.  We just don't see it as being a significant amount

1    of time, as they're contending.  We asked a couple times

2    why it would take a significant amount of time and have not

3    received a response to that.

4            THE COURT:  We'll get a response in a second,

5    but first respond to articulate what the prejudice to you is

6    if we don't allow you to add these claims at this point in

7    the case.

8            MR. JACOBS:  The prejudice is that we were

9    relying on the corporate testimony, the 30(b)(6) testimony

10   of their witness when we withdrew.  As soon as we received

11   knowledge that these features were in fact present, we

12   initiated contact with opposing counsel, there was not a

13   significant delay, and asked if we could bring these claims

14   back in again.  They're dependent claims that already

15   relate to independent claims that are in the case.  The

16   prejudice is that we will have no way that we'll be able

17   to assert these claims that we should rightly be able to

18   assert.

19           THE COURT:  Okay.

20           MR. FABRICANT:  Your Honor, if I can address

21   the 30(b)(6) issue for a moment?

22           THE COURT:  Yes, address that, and then

23   articulate for me with specificity your contention that this

24   will throw off every date and, you know, basically "the sky

25   is falling" if we add these claims into the case.

1              MR. FABRICANT:  Yes, Your Honor.  On the

2     30(b)(6) issue, there is a very clear answer, and that is

3     as follows:

4              There are two defendants in the case, Your

5     Honor.  There is Swisslog Italia, the manufacturer in Italy,

6     and there is Translogic, the company in the United States

7     that offers the product for sale.  The Swisslog Italia

8     company has nothing to do with offering the products for

9     sale in the United States, only with selling the product to

10    the American company.

11             The witness which Mr. Jacobs talks about here,

12    Mr. Davolio, was a 30(b)(6) witness only for Swisslog

13    Italia.  He has no relationship with Translogic, the

14    American company.  He had nothing to do with offering

15    products for sale; and he was not designated under 30(b)(6)

16    on the subject of what products are offered for sale in the

17    United States.  Rather, he was offered on the subject of how

18    the system is set up, and how the products work together,

19    not even addressing the issue of what product are offered

20    for sale in the United States -- a subject which was

21    covered not only by the Translogic witnesses, Mr. Youtz

22    and Mr. Hinnen, the sales manager and the product manager,

23    but also by every brochure, by the website, by all of

24    the documents, all the of the things within McKesson's

25    possession literally from the day the case started.

1              THE COURT:  Let me stop you at that point.

2              Mr. Jacobs, what was your response that it was a

3    30(b)(6) for the wrong entity?

4              MR. FABRICANT:  Absolutely, Your Honor.

5    30(b)(6), he was the lead engineer for the entity that

6    made the product.  Mr. Fabricant talked about offered for

7    sale.  Remember that the patent act covers as acts of

8    infringement anything made, used or sold.  And certainly if

9    this product were used in the United States and it did not

10   have the features that were described by this lead engineer,

11   at that point in time, and he is saying it doesn't have

12   these certain features, we have to conclude, based on that

13   testimony, that we cannot maintain those claims in the case

14   because it's not being made, used or sold in the United

15   States.

16             Then we get testimony from somebody else in an

17   expert report subsequent to that indicating, oh, in fact,

18   it is being made, used or sold in the United States.  So

19   we're not just looking at offered for sale.  We were looking

20   at what this individual said, what features were part of

21   the product when it was actually made in Italy and, our

22   understanding is, shipped to the United States for eventual

23   sale.

24             THE COURT:  Let me get some dates here, if

25   either of you have them.  The witnesses that we're

1    discussing are Davolio and Youtz; is that correct?

2              MR. FABRICANT:  And Hinnen.

3              MR. JACOBS:  Yes, and Mr. Hinnen.

4              MR. FABRICANT:  And I think I should point out,

5    Your Honor, what we're referring to here as the new evidence

6    which gave this change to the McKesson company was two lines

7    in the Stec report -- which is the damages expert, not the

8    technical expert -- the damages expert who, in reference in

9    the historical portion of his report, referenced a brochure

10   on the website of Translogic.

11             THE COURT:  Okay.  Here is what I want to know.

12   Davolio, that was the 30(b)(6) witness for Swisslog Italia;

13   is that correct?

14             MR. FABRICANT:  Yes, Your Honor.

15             THE COURT:  That's the one, Mr. Jacobs, you are

16   saying you relied on in withdrawing your claims; is that

17   correct?

18             MR. JACOBS:  That is correct, Your Honor.

19             THE COURT:  Do we know what the date of Mr. or

20   Ms. Davolio's testimony is?

21             MS. ONDRICK:  I can give you that information,

22   Your Honor.  Mr. Davolio's deposition was May 23rd and 24th

23   of 2007.

24             THE COURT:  Okay.  Was that Ms. Ondrick?

25             MS. ONDRICK:  Yes, this is Ms. Ondrick.

```
 1                    THE COURT:  Okay.  Thank you.
 2                    And now Youtz.  Again, what kind of witness was
 3        and is he?
 4                    MR. FABRICANT:  Yes.  Mr. Youtz was the product
 5        manager for the very product in question from Translogic in
 6        the United States; and we believe his deposition was taken
 7        actually within a short number of weeks after Davolio.  It
 8        was in June.  We believe it was in June of 2007.
 9                    MS. ONDRICK:  Actually, that was --
10                    MR. FABRICANT:  Or May.  I'm sorry.
11                    MS. ONDRICK:  That's correct, Your Honor.
12        May 3rd.
13                    MR. FABRICANT:  May 3rd.  So it was before
14        Davolio.  Right.
15                    MS. ONDRICK:  It was before Davolio.  And it
16        was an individual witness's testimony, it wasn't 30(b)(6)
17        testimony.
18                    THE COURT:  Right.  And who is Hinnen?
19                    MR. FABRICANT:  Hinnen was the sales manager for
20        the product in the United States.
21                    MR. JACOBS:  And that was well before the
22        Davolio deposition.  Do we have that date, Christina?
23                    MS. ONDRICK:  Yes.  That was November 8th and
24        9th of 2006.
25                    MR. FABRICANT:  So, Your Honor, it's clear then
```

1    that two of the depositions that we're talking about of the

2    Translogic entity that actually makes, that uses and sells

3    this product in the U.S. have made clear by those people who

4    were the most familiar with the product that it was being

5    offered for sale in the U.S., and that if they had a claim

6    of infringement they could assert it.

7              MR. JACOBS:  And, Your Honor, you see the

8    contradiction that we have.  The guy who makes it said it

9    didn't have these features, and he said it after.

10             THE COURT:  But let me ask you --

11             MS. ONDRICK:  Your Honor, just so it's very

12   clear, it's that product -- a product of the type we are now

13   alleging infringes -- the way Mr. Davolio's deposition

14   testimony reads out is that that product doesn't exist.  So

15   I don't understand how they could offer a product that he

16   said doesn't exist.

17             MR. FABRICANT:  Your Honor, there is one other

18   thing I would like to add.  Mr. Davolio also at his

19   deposition testified that he was -- that the pillbox product

20   was designed and developed without his participation.  That

21   it happened after he had become only a consultant to the

22   company and that he only had a high level of understanding

23   of what its functionality was.

24             THE COURT:  And Mr. Jacobs or Ms. Ondrick,

25   the claim terms that you want to add in, were they all

1  originally at issue?  And, if so, on what date did you

2  withdraw them from being at issue?

3         MS. ONDRICK:  Yes, Your Honor.  This is

4  Christina Ondrick.  They were originally at issue, and we

5  asserted them when --

6         MR. JACOBS:  When did we withdraw them,

7  Christina?

8         MS. ONDRICK:  We withdrew them on January 31st,

9  2008, at the close of fact discovery.

10         THE COURT:  And why did it take from the

11  May 2007 deposition of Davolio until January of '08 to

12  withdraw them?

13         MS. ONDRICK:  Your Honor, we were assessing all

14  of our contentions at that time, and we wanted to supplement

15  what we had to make sure it was accurate and accurately

16  reflected what was there.  And we did that at the close of

17  discovery so we weren't proceeding in the case with, you

18  know, assertions that we shouldn't be raising.

19         THE COURT:  And was there any back and forth

20  or, you know, is there any record of any communications

21  between the parties about the situation that the plaintiffs

22  evidently found yourselves in, which was arguably there was

23  a basis for keeping these claims at issue based on the Youtz

24  and Hinnen testimony but that seemed contradicted by the

25  Davolio testimony.  And so I guess my question is did you

1     just unilaterally decide to rely on Davolio despite the

2     contradiction or inconsistency or was there any discussion

3     or back and forth about the bind that you may have been in?

4              MS. ONDRICK:  No, Your Honor.  We did not go

5     back and forth with them.  We did not see this as

6     contradictory or a bind at the time the information we had

7     looked at led us to believe that it was not being offered

8     for sale in the particular configuration that we now

9     understand to be offered for sale.

10             THE COURT:  Help me understand how you reached

11    that conclusion if, just three weeks earlier, you had the

12    Youtz testimony, the product manager for the company in the

13    United States distributing the product, which I'm being

14    told, at least, was evidence that the product was being

15    distributed.

16             MS. ONDRICK:  Well, the product wasn't being

17    distributed and it had never been sold in the United States.

18    It was our understanding that the only configuration that

19    they could have offered was the configuration where it was

20    inline in the system after the PickRing, not in a situation

21    where it existed without the PickRing.  And it seemed to

22    us -- and this is sort of I think speculation -- but at

23    that point, this product is so close in this alternative

24    configuration for infringement, it has become clear that

25    that, you know, is really why I think they're making this

1    argument for refusing to provide us with any kind of

2    deadline to extend discovery.

3              THE COURT:  Well, let me turn to that.

4    Mr. Fabricant.

5              MR. FABRICANT:  Yes.

6              THE COURT:  I had cut you off earlier, but

7    explain to me or persuade me that, whether it's fair or not

8    on its own face, to let them have these terms at this point,

9    I want to focus now on what impact would it have on the

10   schedule if I did allow them to add it back.  So articulate

11   that for me.  Specifically, which dates would have to be

12   changed, and how much, and why?

13             MR. FABRICANT:  Well, Your Honor, what it

14   involves from a work standpoint is having -- first of

15   all, doing additional searches of the prior art to try to

16   determine whether there is prior art that reads on the

17   additional claims which are now being asserted with respect

18   to this configuration.  It was withdrawn and was not

19   something which we focused on as a result of having been

20   withdrawn.

21             We would need to obviously to consult with

22   the expert witness who was testifying on the subject of

23   invalidity so that that witness could evaluate the prior

24   art, the relevant art and amend and modify their expert

25   report on the subject of these additional claims.

1          We would also need to evaluate the infringement

2     aspect of the non-infringement of the additional claims.  We

3     would have to work with the expert, obviously, to have the

4     expert consider and evaluate the non-infringement position

5     of the additional claims.

6          And then, of course, once we made those

7     modifications and amendments, the McKesson expert no doubt

8     would have to respond to the additional changes and

9     modifications made by our experts.

10          THE COURT:  But it would only affect expert

11     discovery; right?  There wouldn't be reopening fact

12     discovery since these claims were at issue until the last

13     day of fact discovery; correct?

14          MR. FABRICANT:  That's correct.  We would have,

15     certainly, no intention of reopening fact discovery on that

16     point.

17          MR. JACOBS:  Nor would McKesson.

18          THE COURT:  Right.  Mr. Fabricant, why isn't an

19     extra three-weeks-or-so about the magnitude of time that

20     might need to be added to the expert process?

21          MR. FABRICANT:  Well, if there had to be

22     additional time, I think, you know, perhaps 30 days would

23     be appropriate.  I mean, first of all, searching for prior

24     art, meeting with the expert.  Our expert on this subject

25     is in California.  You know, he is a professor in college.

1   We have to get time when he is available.  So I mean it's

2   not always easy to work within a short period of time.

3            I think also the prejudice should be viewed in

4   light of the fact -- the comment that was made about this

5   product being offered for sale.  The testimony is without

6   question clear that the product was offered for sale, was

7   in our brochures, was on our website.  Mr. Youtz testified

8   to that.  This was obviously a very considered analysis that

9   McKesson did from the spring of 2007 until January '08,

10   after which they made an intelligent decision based on all

11   the deposition transcripts, all the documents, that there

12   was no basis for asserting these claims.

13            Now we're being put in the position -- and I

14   think this is part of the prejudice -- even if we're allowed

15   an additional period of time, we're now being put in the

16   position as a result of their about-face, after having

17   months and months to consider this, of having to address

18   these additional -- you know, this is five additional

19   claims in a patent lawsuit, which will make the case more

20   complicated, will make the trial longer, will make the cost

21   greater, will take more of the Court's time at trial, will

22   make Markman more complex, will make the Markman briefs

23   longer.  I mean it adds to the complexity and the cost and

24   burden of the case.

25            THE COURT:  Mr. Jacobs or Ms. --

```
1              MR. FABRICANT:  And, Your Honor, I'm sorry.  One
2    other thing, which I think is perhaps the most important
3    from our standpoint.  I think it's unfair to allow a
4    plaintiff to wait until it has our expert report on
5    invalidity, have it for a month, for a solid month, to have
6    an opportunity to evaluate our expert report on invalidity
7    and to see the strengths of our invalidity arguments on the
8    asserted claims and then, one month after having the benefit
9    of that report and analysis and having the opportunity to
10   meet with their own expert, to discuss it, to say:  You know
11   something?  We think we'd better add some additional claims
12   here.  Perhaps we have some problems.
13              To now go back and redesign the case around our
14   expert report on invalidity, I don't think that is what the
15   rules were meant to provide, nor the scheduling order meant
16   to provide; to allow one party an unfair advantage to view
17   the other side's expert report on invalidity and then being
18   given an additional opportunity to change its entire case.
19   And I think perhaps that is our strongest argument.
20              THE COURT:  Thank you.  And I did want to turn
21   to that.  Mr. Jacobs or Ms. Ondrick, it seems to me if fact
22   discovery was closed on January 31st, 2008, whatever you
23   learned in the expert report, it's not in the nature of
24   factual evidence, it's an expert opinion.  So help me
25   understand not just the arguable unfairness as Mr. Fabricant
```

1    points out but how can you in fact learn something factual

2    about this case from an expert that you shouldn't have

3    been able to figure out on your own based on the factual

4    record that was established during fact discovery.

5                MR. JACOBS:  I'll handle that, Christina.

6                Your Honor, what happened was Mr. Stec met with

7    individuals relating to specific configurations that were

8    being offered by Translogic.  So he was provided, and he

9    represents in his report that he was provided, certain

10   factual information that allowed him to draw his conclusion.

11   This is one of those conclusions that he indicates was

12   based on factual information that was provided to him.

13   This information regarding this particular configuration

14   is also contradictory to the last piece of information that

15   we had on the record from Mr. Davolio relating to this.

16               So at that point in time, we needed to

17   reevaluate the factual nature of whether this configuration

18   was being offered.  And if it is being offered, Your Honor,

19   then we have a good faith basis for bringing these claims

20   into the case.

21               And so, you know, oftentimes experts would

22   speak to people and are provided information, see documents

23   perhaps that haven't even been provided during the course

24   of discovery.  They then testify based on that factual

25   information, and that factual information is something that

1    you can then examine and have your experts look further at.

2    This has nothing to do with their invalidity contentions.

3           We had our expert look at this factual statement

4    in light of the fact that it changed our knowledge of the

5    configuration that was being offered based on the testimony

6    of Mr. Davolio, the corporate testimony.  He looked at it

7    and said you can assert infringement of these claims based

8    on this factual information.

9           And with regard to the invalidity contentions,

10   remember, Your Honor, these claims were in the case and the

11   defendants had already filed invalidity contentions in the

12   case on a couple of different occasions and so certainly

13   they have already done a prior art since they've already

14   looked at this.  This is already out there.  We didn't

15   withdraw this until the end of fact discovery.

16           THE COURT:  Right.  Well, the last thing I need

17   to hear from both sides is tell me, there was some allusion

18   to kind of the urgency of this issue.  I want to understand

19   what dates are we pressing up against right now?  That is,

20   say, in the next two weeks to 30 days?  Mr. Fabricant.

21           MR. FABRICANT:  Yes, Your Honor.  Well, the

22   first dates that come up are the dates for our rebuttal

23   report to the expert report submitted by McKesson on

24   infringement, so we have to address non-infringement, and

25   that I believe is May 28th?

x

1          MR. JACOBS:  Yes.

2          MR. FABRICANT:  But that right now is May 28th,

3     Your Honor.

4          And then, of course, we would have to modify the

5     invalidity report.  And those dates are the dates by which

6     the dates for the Markman briefs and summary judgment briefs

7     have been set.  So that when the dates were set by Judge

8     Robinson for when the claim construction briefs and summary

9     judgment briefs would be due, it was based on when these

10    reports would be finished and also when the depositions of

11    the experts, based on those report dates, would be

12    concluded.

13         I believe right now the schedule provides

14    that the dates for the conclusion of the expert depositions

15    is at the end of June.  So it obviously has a ripple effect

16    on the dates for the expert reports, the dates for the

17    conclusion of the expert depositions, and then the dates

18    for the submission of the opening briefs on summary judgment

19    and Markman.

20         THE COURT:  And I believe that briefing date is

21    September 10th.  Does that look right to you?

22         MR. JACOBS:  That is right, Your Honor.  We

23    built in a pretty big gap there.  We actually negotiated

24    with the defendants a schedule and we built in a pretty big

25    gap in case there were any necessary changes during the

1    summer time frame, and based upon the representation of both

2    parties that there was some vacations going on in the summer

3    as well.  So there is plenty of time in there to add a

4    little bit of additional time and to cure any potential

5    prejudice that might be here and to still keep things at the

6    tail end on track.

7             THE COURT:  Is it only defendants that have a

8    report due on May 28th?

9             MR. JACOBS:  That is everybody that is doing a

10   rebuttal to an issue which they did not bear the burden

11   originally, Your Honor.

12            THE COURT:  Okay.

13            MR. JACOBS:  But we had agreed, Your Honor, that

14   we certainly did not expect them to respond or address these

15   contentions in that, you know, May 28th rebuttal and that we

16   would give them additional time to supplement.  If the Court

17   decided that these claims were permitted to come into the

18   case, certainly, we would give them additional time to allow

19   their experts to address that.

20            THE COURT:  Okay.  Mr. Fabricant.

21            MR. FABRICANT:  Yes.  Could I?

22            THE COURT:  Yes.

23            MR. FABRICANT:  I'm sorry.  Could I add one

24   thing to the record, Your Honor?  I have the document in

25   front of me now, so one sentence that I would like to read

1    into the record?

2              THE COURT:  Go ahead.

3              MR. FABRICANT:  And that is from the Stec report

4    that created this entire issue.  That is our damages expert

5    report.  There was actually one sentence in his very lengthy

6    report which had anything to do with this issue, and it read

7    as follows:

8              The FillBox component is used to load unit doses

9    without the PickRing into patient specific compartments or

10   dedicated ward and pharmaceutical bins, footnote 40.

11             And footnote 40 reads:  A reference to Swisslog

12   Healthcare Solutions automated drug management system

13   brochure at Page 9.

14             That is the entire reference in the Stec report

15   to the entire issue referencing not conversations with

16   people, not interviews with witnesses but a brochure that

17   was on the website from Day One of the lawsuit.

18             THE COURT:  And, Mr. Jacobs, do you find more

19   in the Stec report than what Mr. Fabricant is saying?

20             MR. JACOBS:  Well, I wonder why that report was

21   not produced during the course of discovery, Your Honor, if

22   it was on the website.  Usually these types of facts are

23   provided via discovery in the case.  Certainly, if you look

24   at the Stec report, there are many, many references, Your

25   Honor, to his conclusions being based on a number of

1    conversations.

2            Now, I would agree with Mr. Fabricant that I

3    don't believe that that particular sentence was tied in the

4    report to a discussion.  But if you look at the report

5    globally, he talks about all of the discussions he had

6    with a number of people to derive and come up with the

7    opinions and the conclusions that he represents in the

8    report.

9            THE COURT:  Okay.  Thank you.

10           MS. ONDRICK:  And, Your Honor, I don't believe

11   that that particular document that he is even referencing

12   makes the statement that it's an alternative to the

13   PickRing.

14           THE COURT:  Okay.  Thank you.  I have enough on

15   all of that at this point.

16           Here is what we're going to do.  We're going to

17   continue the schedule as it is so whatever rebuttal reports

18   that you were all working on for May 28th, those are still

19   due on May 28th.

20           If we decide to allow McKesson to add the

21   additional claims, then obviously you will hear that from

22   us.  And I will understand that we'll need to do some kind

23   of modification, it's unclear yet as to how extensive but

24   some modification to permit some type of supplemental expert

25   reports which may have some impact on the termination of

1    expert discovery.

2              In no event, however, will any of this have any

3    effect on the trial date.  The trial date is going to stay

4    what it is.  So continue as you were.  I'm going to take

5    this issue under advisement; and you will hear from us in

6    short order.

7              MR. JACOBS:  Thank you, Your Honor.

8              MR. FABRICANT:  Thank you.  Your Honor, may I

9    just raise a different issue for one second?

10             THE COURT:  Yes.

11             MR. FABRICANT:  We received a letter last

12   evening actually after our day was over for me which added

13   some additional cases and addressed the motions we had the

14   other day before Your Honor.

15             THE COURT:  Yes, I saw that.  Did you want to

16   respond to that?

17             MR. FABRICANT:  Well, I don't believe the cases

18   change what was stated at the oral argument with respect to

19   the issue of what you do when you look at a document which

20   makes no reference whatsoever within its four corners to

21   other documents in a situation.  I would ask the Court if

22   the Court would like to give us until Tuesday to send in a

23   letter in response, if Your Honor wants a response.

24             THE COURT:  I'll leave it up to you, but you

25   have until the end of the day Tuesday, but you have got to

1    keep it to two pages, just as the folks on the other end

2    did; okay?

3                    MR. FABRICANT:  Thank you, Your Honor.

4                    THE COURT:  Okay.  In the meantime, everyone

5    have a good weekend.

6                    MR. JACOBS:  You do the same, Your Honor.  Thank

7    you.

8                    THE COURT:  Thank you, all.  Good-bye.

9                    MS. ONDRICK:  Thank you, Your Honor.

10                    (Telephone conference ends at 11:38 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25