IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

```
MCKESSON AUTOMATION, INC.,        :
                                  :
          Plaintiff,              :
                                  : C.A. No. 06-028 (SLR/LPS)
     v                            :
                                  :
SWISSLOG ITALIA S.P.A. and        :
TRANSLOGIC CORPORATION            :
                                  :
                                  :
          Defendants.             :
```

- - -

Wilmington, Delaware
Tuesday, May 20, 2008 at 11 a.m.

PRETRIAL CONFERENCE

- - -

BEFORE:        LEONARD P. STARK, MAGISTRATE

- - -

APPEARANCES:

BLANK ROME LLP
BY:  CHRISTINE S. AZAR, ESQ.

     and

SUTHERLAND ASBILL & BRENNAN LLP
BY:  BLAIR M. JACOBS, ESQ.,
     CHRISTINA A. ONDRICK, ESQ.

     (Washington, D.C.)

          Counsel for Plaintiff


Ellie Corbett Hannum, Registered Merit Reporter
          www.corbettreporting.com

```
                                                        Page 2

 1   APPEARANCES: (Continued)

 2

             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
 3           BY:  JULIA HEANEY, ESQ.

 4                        and

 5           DICKSTEIN SHAPIRO LLP
             BY:  ALFRED R. FABRICANT, ESQ.
 6           BY:  LAWRENCE C. DRUCKER, ESQ.
             BY:  BRYAN DeMATTEO, ESQ.
 7
                          (New York City, New York)
 8
                          Counsel for the Plaintiffs
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                        - oOo -

 2              P R O C E E D I N G S

 3         (REPORTER'S NOTE:  The following Pretrial

 4   Conference was held in open court, beginning at 11:00

 5   a.m.)

 6              THE COURT:  Good morning.

 7              MR. JACOBS:  Good morning, Your Honor.

 8              MR. FABRICANT:  Good morning, Your

 9   Honor.

10              THE COURT:  Welcome to you all.  This is

11   the time, as you all know, that we have set for oral

12   argument on, I believe, it's four separate motions.  If I

13   am right, Swisslog is the movement on three and McKesson

14   on the other.  But I think it will be easiest for me if I

15   just give you each time to address whatever issues it is

16   that you want to address.

17              And since the primary motion is the

18   motion to dismiss for lack of standing, I want to hear

19   first from Swisslog.  Okay.

20              MR. FABRICANT:  Good morning, Your

21   Honor.

22              THE COURT:  Good morning.

23              MR. FABRICANT:  Your Honor, I am Fred

24   Fabricant from the law firm of Dickstein Shapiro,
```

Page 4

1    representing the defendants in the case.  Our instructor,

2    Brian DeMatteo, also with the law firm of Dickstein

3    Shapiro, and Julie Heaney is our local counsel.

4                      Your Honor, the motion to dismiss for

5    lack of standing started as a motion for lack of standing

6    on its own.  And it started out that way because during

7    the course of reviewing the documents produced by the

8    plaintiff in the spring and summer of 2007, we discovered

9    a file, which was a due diligence file, of the McKesson

10   attorneys that had been used in connection with their

11   acquisition of the AHI Company, which was the original

12   owner of the patents in suit.

13                     And what we found when we reviewed that

14   file was that there had in fact been an assignment, an

15   actual outright assignment, with an assignment document

16   to two separate parties.  And, Your Honor, if I may,

17   because there are some documents I would like to go

18   through today, all of them are exhibits to the papers

19   before the Court, but just for reference sake, to show

20   the Court several of these as we go through.

21                     THE COURT:  That's fine.

22                     MR. FABRICANT:  And this is the

23   assignment document, which is in DeMatteo Moving

24   Declaration Exhibit B.  This is the document which was

Page 5

1    executed by Sean McDonald, the president and founder of

2    AHI, so there is no question he was a person of

3    authority.  And this document conveys to two parties, 100

4    percent of the interest in the then pending patent

5    application and all subsequent rights that might develop

6    as a result of that patent application, including patents

7    that would issue continuations and the like.

8                    THE COURT:  This copy, though, it's only

9    signed by Mr. McDonald, I believe.  Is that typical for

10   an assignment agreement that only the assignor is

11   signing, and have you seen a copy that would be signed by

12   both sides?

13                   MR. FABRICANT:  I don't think it's

14   typical that an assignee signs an assignment document,

15   Your Honor.

16                   THE COURT:  And is that a relevant

17   consideration, since I understood your position to be, at

18   least in part, look at the face of this assignment

19   agreement on its own and separate and independent from

20   the notes and the term sheets and the stock purchase

21   agreement, since this recites consideration and it seems

22   clear and unambiguous, but it is in fact only signed by

23   one side to the transaction.  So I'm not sure that I

24   could consider it in the abstract and not with all the

Page 6

1    other documents.

2                    MR. FABRICANT:  I understand.  I do

3    believe that it is common practice for the assignor to

4    sign an assignment document and for the assignee not to

5    be present as a signatory on an assignment document.

6    That is common in the practice of patent assignments.

7    This document states consideration on its face, having

8    been received and in addition to other stated

9    consideration.  It clearly conveys 100 percent -- not

10   unlike if I transferred my automobile to Mr. Drucker, and

11   I signed the title to Mr. Drucker and I conveyed 100

12   percent of my interest.  Mr. Drucker doesn't sign the

13   form that I convey my interest to him.  It's not even a

14   place for it on the title assignment.

15                   THE COURT:  Let me ask you this:  Would

16   AHI as the assignor have an enforceable right to the one

17   dollar consideration, absent any signature from the

18   assignee?

19                   MR. FABRICANT:  Well, the consideration

20   is stated as having been received, I believe, so I guess

21   they wouldn't.  And I realize this is typical lawyer

22   boilerplate consideration having been received of one

23   dollar, but that's why it's stated as consideration

24   received.

Page 7

1                THE COURT:  So just to put the fine

2    point on it.  Is it your view that this assignment

3    agreement is legally enforceable in and of itself as a

4    separate stand-alone document.

5                MR. FABRICANT:  Yes, it is.  Now, I

6    don't ask the Court obviously to ignore the other

7    documents which have been presented to the Court, but I

8    do believe that we start with the premises that this is a

9    legally enforceable assignment document, and that if

10   other things had not happened here -- some of which are

11   still in dispute, Your Honor.  It is not undisputed

12   whether this loan arrangement that these gentlemen made

13   at the same time as the assignment, whether those loans

14   were ever repaid.  That's an open question.

15                So putting aside those questions, we

16   believe that this is an assignment that stands by itself.

17   It conveyed 100 percent of the rights to this patent

18   application and technology.

19                When we discovered this, Your Honor, we

20   immediately asked the McKesson counsel for any evidence

21   of an assignment back or any proof that, in fact,

22   McKesson is in fact the title holder of the patent.  This

23   started in about July of 2007, promises to provide us

24   with the information; and ultimately, by October of 2007,

Page 8

1    despite our repeated e-mail requests and letters and

2    comments at depositions, nothing was forthcoming.  So we

3    made a motion to dismiss the case for lack of standing,

4    which is a matter of subject matter jurisdiction.  A

5    party to a patent lawsuit does not have ownership rights

6    or sufficient ownership rights, there is a lack of

7    subject matter jurisdiction.  So we believe, as a matter

8    of right, that motion was made and timeliness is not even

9    a factor with respect to that aspect of the motion.

10                Ultimately the counsel for McKesson

11    asked Magistrate Judge Thyne for permission to take the

12    depositions of the two parties represented by these

13    assigness, Mr. Demmler, who was the manager of the

14    Pittsburgh seed fund, and Dr. Heilman, who was a separate

15    individual assignee.  They split it up at 71.4 percent to

16    the fund and 28.6 percent to Dr. Heilman.  And at the

17    time McKesson's counsel urged Magistrate Judge Thyne that

18    it was essential, that they had to take these depositions

19    in order to respond.  The time for such depositions had

20    passed.  We argued that point before Magistrate Judge

21    Thyne, and she allowed them to take those two

22    depositions.

23                What I think is crucial to this motion

24    is that at the depositions they didn't have any of the

Page 9

1   questions which this court, I'm sure, would like to have

2   heard the answer to, like:  Do you have an ownership

3   interest in the patent?  Do you continue to have an

4   ownership interest in the patent?  They didn't ask those

5   questions, Your Honor.  They didn't ask those questions,

6   Your Honor, because in the gap of time between the time

7   he made the motion and the time of those depositions, a

8   gap of several months, the counsel for McKesson prepared

9   draft affidavits for both of those witnesses, Dr. Heilman

10  and Mr. Demmler.

11              And in those draft affidavits, which are

12  part of the record, and I would like to emphasize some

13  points for the Court, they asked these individuals to

14  disavow, in effect, any ownership rights, any continuing

15  claims they might have.  They asked these witnesses to

16  confirm that the loans were repaid.  And the reason why

17  they did this, Your Honor, was because in this district

18  when one reviews the cases which ultimately were

19  submitted to the Court, it can be readily seen that Judge

20  Robinson herself, in 2006, in the Matthews case and other

21  decisions of both the District of Delaware and other

22  courts, that the crucial factor that often comes into

23  play in these standing motions is whether or not this

24  other nonparty disavows any rights, says I will never

Page 10

1   pursue these rights, and in the 2006 case here in the

2   District of Delaware, that's exactly what was the basis

3   for Judge Robinson's decision.  We then find these draft

4   affidavits, which we discovered when we spoke to these

5   witnesses and found out that McKesson's counsel had been

6   in contact and had provided them with draft affidavits.

7   Magistrate Judge Thyne ordered that they produce, and we

8   exchange with each other any communications we have had

9   with these individuals.

10                  THE COURT:  And a suggestion, you

11  proposed draft affidavits as well and the inventors

12  refused to sign yours too; is that correct?

13                  MR. FABRICANT:  Their characterization

14  is false.  We did propose to Mr. Demmler only, not

15  Dr. Heilman, to Mr. Demmler, an affidavit, a proposed

16  affidavit which said only the following -- and I will be

17  happy to submit a copy of it to Your Honor.  It is not

18  part of the papers.  All it said was, which is what this

19  witness told us on the telephone, "I don't remember

20  whether I assigned that.  I don't remember whether the

21  loan was repaid."  That's what it said.  It did not

22  propose any business relationship.  It did not do

23  anything more than that.

24                  However, the affidavits, as I mentioned

Page 11

1   from McKesson's counsel, first Mr. Demmler's proposed

2   after, Exhibit L to Mr. DeMatteo's apply declaration.

3   Here is his draft after; it purports to be on firsthand

4   knowledge of the facts.

5                  On the second page, in paragraph 13 --

6   and this is important, Your Honor -- they used words

7   about how this individual should characterize this

8   transaction.  And they say to secure the repayment of the

9   funds loaned to Automated pursuant to the promissory

10  notes, both the bridge loan and the November loan.  The

11  collateral or security for repayment provided by

12  Automated was an assignment of the technology rights

13  associated with the patent application of January 24,

14  1990."

15                  I focused on that for a moment because

16  that's not the language of the assignment.  The

17  assignment and the original promissory note, which is

18  actually executed by Mr. Demmler, is an assignment of the

19  patent application itself, not an assignment of the

20  technology rights.  Now I will make this point.  When I

21  finish with these affidavits I would like to show Your

22  Honor very important evidence that was produced after

23  this motion was pending.  A box was supposedly found of

24  documents never previously were produced which had

Page 12

1    additional information.  And in that box were draft

2    promissory notes --

3              THE COURT:  Let me just caution you at

4    this point.  I understand you use the word supposedly and

5    you have made certain suggestions that seem to be

6    suggestions of bad faith on the part of your friend on

7    the other side, and unless you really have strong support

8    for that, I rather you stick to the evidence and don't go

9    to "supposedlies."

10             MR. FABRICANT:  Your Honor, I only meant

11   to say documents were produced after the motion was made

12   which were never previously produced.

13             THE COURT:  That's fair.

14             MR. FABRICANT:  Not getting into the

15   reasons why.  I don't know the reasons why.

16             In that box of documents were draft

17   promissory notes for this transaction.  And the draft

18   promissory notes did not refer to an assignment of a

19   patent.  They referred to an assignment of technology --

20   not even an assignment.  They referred to security

21   interests in technology rights.

22             And the language being proposed here,

23   when I show Your Honor those draft notes, is really the

24   language of the draft notes, which were rejected, and not

Page 13

1    the language of the notes which were actually executed by

2    the parties.  That evidence will go if the Court looks at

3    the substance, the merits of the case at all, and

4    McKesson has made a point of the intent of the parties.

5    The intent of the parties clearly here, as the witnesses

6    testified at the deposition, was to grant an assignment.

7    They felt secure with an assignment of the outright

8    patent as opposed to --

9              THE COURT:  Why after, really after June

10   of '90, why is there no evidence of anyone ever acting as

11   if there was an assignment?  That is, in November of '90,

12   you know, they execute the other note and pledge -- I

13   don't know if it's pledge, but they reference assigning

14   those rights again.

15             But on your view of the case, AHI didn't

16   have any rights to assign for the November note.  And

17   then you go forward to 1994, in the Partek transaction,

18   and '96, all the representations made to McKesson.  And

19   17 years or whatever pass and the inventors never

20   actively have any interest.  So explain to me, if I am

21   agree with you up until the moment of June 29th of 1990,

22   why is it not the case that everything that happened

23   after that is totally contradictory to your view of the

24   case?

Page 14

1                 MR. FABRICANT:  Well, point by point,

2    first of all, the subsequent McKesson transaction, the

3    subsequent security transaction in 1994, I believe it

4    was, the subsequent representations to McKesson at the

5    time of the transaction, as those witnesses testified at

6    the deposition, when they were handed a 100-page

7    transaction document from McKesson, which in the first

8    sentence said, you know, you agree that everything stated

9    within this document is accurate and correct, and

10   supposedly had schedules attached.  First of all the

11   copies produced didn't have the schedule.  We don't know

12   if they ever saw the schedule.  They testified they don't

13   know if they ever saw the schedule.  Even if they had see

14   the schedule, it didn't refer to the patent application

15   that they had an assignment in; it referred to a patent

16   number that had ultimately issued.

17                 So it's pretty clear they would not have

18   known, even if they had read the document that this

19   covered this particular aspect.  With respect to all of

20   the other things, I will put it this way as a result of

21   this lawsuit and as a result of McKesson looking for the

22   assignment back, they stirred up this issue of whether or

23   not there in fact was a proper chain of title and

24   transfer of title.  We can't undo that.  The result of

Page 15

1    this, the result of this is -- even if these individuals

2    from the time of the assignment in 1990 until the fall of

3    2007 were not awakened to the fact that they have legal

4    title to this, to these patents in suit.  As a result of

5    what has happened here they were contacted by McKesson's

6    counsel.  They were asked whether they had the assignment

7    backed up.  They were given a lot of information about

8    this.  They retained counsel.  Their counsel actually

9    contacted our law firm and wanted to know whether there

10   was a business transaction that could be resolved here.

11   I don't know.  Perhaps they made the same kind of

12   advances toward McKesson.  I don't know.

13                  But what's happened here is if there is

14   a party that has legal title, a claim to legal title

15   based upon the transactions, even if they didn't follow

16   it up, over the last however many years, it creates a

17   situation where we now have two parties, two separate

18   groups, a fund with many limited partners, and an

19   individual who is a very sophisticated individual, who

20   may have claims to patents in suit, which they deem as

21   being very valuable.  That wasn't as a result of our

22   doing or our making, that's as a result of --

23                  THE COURT:  Go back to 1990.

24                  MR. FABRICANT:  Yes, Your Honor.

Page 16

1                    THE COURT:  Because I guess I want to

2    hear what do you say about the November 1990 transaction

3    between AHI and the inventors?  I think there was another

4    $50,000 loan.

5                    MR. FABRICANT:  I don't believe that's

6    at all inconsistent with the prior two assignment

7    documents, the prior two notes entered into in June of

8    that year.  And the reason I don't believe it was

9    inconsistent, because that was an additional promissory

10   note which used the same language as the prior notes.

11   If, for example, they wanted to make sure that they still

12   had the assignment, which they already had in their hand,

13   could the words have been different, yes; but if, let's

14   suppose the prior notes had been repaid, but that later

15   note had not been repaid, they wanted to make sure they

16   still had a valid assignment of the patent.  It's

17   possible that only one of three would be paid.  That two

18   of three would be paid.  And I believe it was just, using

19   the same language to make sure it was understood, there

20   was an outright assignment.  The assignment was dated

21   June.  Now they were borrowing another $50,000.  This

22   would have been protected them in the event of default of

23   some but not all of the notes.

24                    I don't believe it's inconsistent that

Page 17

1   the mere fact they took another $50,000 from these

2   parties undid the nature of the assignment which had been

3   granted several months earlier.

4            THE COURT:  So the idea that McKesson

5   raises, which is I need to reject your view of the case

6   because otherwise the November '90 transaction is one in

7   which AHI is purporting to sign something that it had no

8   right to sign.  You say that's not the way to read that

9   November '90 document?

10            MR. FABRICANT:  I think it's clear they

11   had already received the assignment and therefore the

12   words in the 23406 promissory note which said it shall be

13   secured by an assignment.  The assignment had already

14   taken place.  There was nothing else they had to do.

15            THE COURT:  Well, it's a nullity what

16   AHI had represented with respect to the assignment.

17            MR. FABRICANT:  I don't believe it's a

18   nullity.  I believe it was additional words which gave

19   them security in the situation where the first two loans

20   were repaid and they still --

21            THE COURT:  How can they give that

22   security on your view of the case, AHI didn't have any

23   interest whatsoever in the patent, in the things that

24   they assigned on June 29th of 1990.

Page 18

1                      MR. FABRICANT:  I agree that AHI did not

2    have a patent to assign in November of 1990.  It had

3    already been assigned.  I agree with that.  That is our

4    position.

5                      THE COURT:  So how can AHI say, well, if

6    those first two notes are paid off, you can still use the

7    assignment as security in November '90?  I mean, AHI had

8    no ability to control what happened to the assignment, to

9    the patent --

10                     MR. FABRICANT:  There might be an

11   assignment back prior to the date.  There are a number of

12   things that might have happened and I agree that once you

13   assign something it's not the best use of language to not

14   make that a stated point in the third note.  But I don't

15   think it undermines the fact that there was an outright

16   assignment, that they had not been repaid as of the date

17   of November.  There is no question about that.  So that

18   whatever assignment was made, without any dispute, had

19   clearly not been extinguished or undone.  They clearly

20   had made that assignment, there had been no repayment.

21                     THE COURT:  I guess the common sense

22   question, going back to it, is you want to take me

23   through and have me focus on the drafts and everything

24   leading up to the moment on June 29th, 1990, when they

Page 19

1    executed the assignment agreement as well as those notes,

2    to make it clear, in your view, that the intent of the

3    parties was an absolute assignment and not just a

4    security interest.  And yet everything, at least

5    beginning with November 1990, is inconsistent with the

6    parties having such an intent.  And so why doesn't that

7    mean that your argument about what the intent was is

8    actually not persuasive?

9                 MR. FABRICANT:  Well, it starts with the

10   premise, Your Honor, that this court should even be

11   inquiring into the specific intent of the parties,

12   parties not before this court.  It starts with the

13   premise that for this court to look at what was meant by

14   the fact that the two notes which didn't assign the

15   patent and only granted the security interest were

16   rejected days before.  It asks this court to construe

17   that intent.  Then it asks this court to look at what

18   were the reasons for the November language in the note.

19   And then it asks this court to look at whether the loan

20   was repaid, because if the loan wasn't fully repaid, and

21   I mean all three notes repaid, then even the security

22   interests theory wouldn't fly.  Then it asks this court

23   to evaluate the ramifications of the recent Federal

24   Circuit decision, from January 2008, which we cited to

Page 20

1   Your Honor, which that court addresses automatic

2   assignments in that case in the context of an employment

3   agreement but no less applicable in the situation of an

4   automatic assignment back as the McKesson people argued,

5   in which case the Federal Circuit in 2008 stated that you

6   would not gain legal title as a result of a promise to

7   assign in the future an automatic assignment back.

8            The court also went further and said

9   that when it comes to patent assignments, you don't look

10  to state contract law, you look to federal law, which

11  looks to the language of the contract.

12           So when Your Honor starts taking into

13  consideration all of the factors that McKesson has urged

14  in its opposition, what was the intent of the party, form

15  over substance, were the loans repaid, what's the

16  applicant of a self-extinguishing assignment under

17  Pennsylvania state law, in light of the Federal Circuit

18  decision, and keep in mind the No. 1 thing to point out

19  today, which is once all of this became known and the

20  additional documents produced and the draft affidavits

21  were reviewed and the depositions taken, we could see

22  that the seed fund and Dr. Heilman became necessary and

23  indispensable parties in order for the court to resolve

24  this dispute.  How can the court resolve this dispute

Page 21

1    without the parties present.

2             And that's why in reply to all of the

3    factors raised by McKesson -- and all we asked in the

4    initial motion under 12(b)(1) was that they establish

5    they have standing.  They raised in opposition all of

6    this, look at the intent, look at the form, all of these

7    issues, which go to the heart of this court having to

8    make a decision without necessary and indispensable

9    parties present.  So it became a motion to dismiss as

10    well as 12(b)(1) for lack of standing for, under

11    12(b)(7), for lack of necessary and indispensable

12    parties.

13             THE COURT:  Could I simply say, though,

14    without reaching the ownership issue fully stopped, that

15    had they met their burden of proof or production at this

16    procedural moment in the case and, you know, the final

17    determination, if necessary, as to ownership will be at a

18    later point in this case.

19             MR. FABRICANT:  Well, that I think gets

20    to the issue of, if Your Honor were to conclude that, as

21    to whether these parties are necessary and indispensable

22    parties.  How are we going to decide at a later date or

23    at any date prior to trial, or even at trial, the

24    ownership issues without the parties present that have

Page 22

1    the facts, that have the evidence, that have the

2    potential claim, without them present, whatever result

3    this court adjudicates ultimately would then run face on

4    into the risks of Rule 19.  Not only with respect to

5    Swisslog's interests, because obviously we have

6    counterclaims for invalidity of the patent; we have

7    counterclaims for non- infringement of the patent; we

8    have a proposed counterclaims, which we will address with

9    Your Honor, on enforceability of the patent.

10              If there were be an adjudication, it

11   would not be a final adjudication with respect to the

12   patent.  We would have to do it, perhaps, all over again.

13   When it comes to the rights of these individuals in this

14   fund, their rights would be affected.  We've cited to

15   Your Honor decisions that, even though the results of

16   this litigation are not res judicata or in collateral

17   estoppel against those entities or those parties, as a

18   practical matter, as the Gonzales case has said in other

19   courts, their rights have been affected.  It will be a

20   Markman decision that they will not have been

21   participated in.  There may be a practical impact if they

22   have rights to pursue though rights in the future.

23              So we run smack into the fact that they

24   are a necessary party; they are not, we don't believe,

Page 23

1    joinder as feasible, although I don't know plaintiff has

2    tried to join them; that they don't reside in the state

3    of Delaware and they have not done any business here, to

4    our knowledge, so they may not be able to get personal

5    jurisdiction over them, in which this case I think

6    clearly they would be an indispensable party.

7                    THE COURT:  Well, with the Federal

8    Circuit decisions in the Applied Companies, which is a

9    case involving a government contract and looking at

10   whether that was an assignment there or a security

11   interest.  It's cited by McKesson, but I didn't see where

12   you had a response to it.

13                   MR. FABRICANT:  I am trying to recall

14   that case, Your Honor.

15                   THE COURT:  Sure.  There are a lot of

16   cases.

17                   MR. FABRICANT:  A lot of cases.

18                   THE COURT:  It's 144 F.3d 1470 (Fed.

19   Cir. 1998), a decision of the Federal Circuit in the

20   Applied Companies vs. United States.

21                   MR. FABRICANT:  I don't recall it

22   offhand, Your Honor.

23                   THE COURT:  Maybe we will have you back

24   up on rebuttal, if you have anything to say about that.

Page 24

1                    MR. FABRICANT:  What I would like to

2    point out, with respect to the law, is that when Your

3    Honor looks at -- and I thought we had addressed all of

4    the cases cited in their brief.

5                    THE COURT:  You didn't address that one.

6                    MR. FABRICANT:  You may be right, Your

7    Honor.

8                    But basically, when we went through the

9    cases, case by case, I did not find any case that, where

10   the nonparty, who was the subject of this Rule 19 issue,

11   was a prospective assignee of a patent who might have

12   ultimate ownership rights to the patent and where a court

13   refused to join that -- or where a court allowed a case

14   to go forward without the presence as a necessary

15   indispensable party of a patent owner by assignment.

16   Case by case, as I went through the decisions cited by

17   McKesson, there was the Kahn vs. General Motors case,

18   which was a case where --

19                   THE COURT:  You don't need to run

20   through those.

21                   MR. FABRICANT:  Right.  But I went

22   through them and I will address the case, if I can, which

23   Your Honor has raised.  But I didn't find a case where

24   there was an outright assignment where there wasn't some

Page 25

1    other issue of either reacquiring the rights or

2    disavowing the rights or disclaiming the rights or some

3    other factor not applicable to the present case but an

4    outright assignment to a nonparty not subject to joinder

5    in the case.  I didn't see that in the case law.

6                    THE COURT:  What about Section 261

7    relating to the recording of assignments?

8                    MR. FABRICANT:  Yes, Your Honor.

9                    THE COURT:  Explain to me your position

10   on that and why that doesn't win the day for McKesson.

11                   MR. FABRICANT:  Our position is that

12   very simple, which is Section 261 has one big

13   requirement, and that is that you don't have actual

14   notice of the prior assignment.

15                   THE COURT:  And what is the proof here

16   that they had notice of the assignment, specifically the

17   two-page document that you put up earlier?

18                   MR. FABRICANT:  Yes, Your Honor.  This

19   was produced by McKesson out of McKesson's due diligence

20   files involving their acquisition of AHI in 1956.

21                   THE COURT:  So those two pages you put

22   up the assignment of invention that were produced from

23   that folder by McKesson?

24                   MR. FABRICANT:  Yes.  Along with the

Page 26

1    executed promissory notes, along with some of the other

2    documents relevant to this transaction.  It was in a

3    folder marked "McKesson Due Diligence."  So we know that,

4    as a matter of fact, I don't see any way to dispute the

5    fact by McKesson, that they had actual notice of the

6    transaction.

7              And so we believe once you have actual

8    notice, the provisions of 261 do not apply.

9              THE COURT:  And go back to an issue you

10   alluded to of these recent Federal Circuit decisions, I

11   think a couple of them from this year.  Help me out on

12   what is at stake, in your view, as to whether I apply

13   federal or Pennsylvania law?  Is that an issue I need to

14   reach, and if so, why?

15             MR. FABRICANT:  Well, the DDB Tech case,

16   from January of 2008, was the case that previously I was

17   referring to about the Federal Circuit.  I think the

18   ramifications of that case is that this entire theory on

19   the merits that McKesson has raised in opposition, that

20   even if there was no assignment back, the assignment back

21   was in effect self-extinguishing because of the security

22   interest under Pennsylvania state law.  I think what the

23   Federal Circuit said in the DDB Tech case was, if you

24   look to federal contract interpretation law, which

Page 27

1   doesn't necessarily take into account the Uniform

2   Commercial Code, and there the court described, looking

3   at the language of the contract, and then they went

4   through that process in that decision where they

5   ultimately remanded to the district court for

6   jurisdictional discovery, which the district judge had

7   not allowed in dismissing the case.  So there was no

8   ultimate resolution, as far as I know as of today, but

9   there was a motion to dismiss based on lack of standing;

10  that was a case dealing with an purported automatic

11  assignment.  The court not only said, we look to the

12  explicit expressed language of the contract, not to state

13  law in patent cases, but also that made an express

14  statement that the promise to assign in the future or the

15  automatic-assignment scenario would not allow legal title

16  to pass.  Even if, even if there was a promise or even if

17  there was to be an automatic assignment, that legal title

18  would not pass.  And that was the import, I think, of

19  that decision to this case.

20              So I would argue, and I think we have

21  stated this in our briefs, that the Pennsylvania

22  provision of the Uniform Commercial Code, as to whether

23  or not this was a security interest rather than an

24  assignment, if it was a security interest, whether it

Page 28

```
 1    would be self-extinguishing not be applicable.
 2                THE COURT:  And what about the Akazawa
 3    case, which I think is an even more recent Federal
 4    Circuit case, in March of this year, which seemed to talk
 5    about state law governing patent ownership over federal?
 6    I'm not entirely clear, but I'm looking for help on that.
 7                MR. FABRICANT:  If I could handle that
 8    on rebuttal, Your Honor.
 9                THE COURT:  Okay.
10                MR. FABRICANT:  I am just unprepared,
11    Your Honor.
12                THE COURT:  Okay.  Why don't -- two
13    things I want to make sure you cover before you sit down.
14    One is are there some new documents that I haven't seen
15    that you wanted to allude to, some recently discovered
16    evidence or something, and also whatever it is you want
17    to tell me about the other motions that we haven't
18    discussed yet.
19                MR. FABRICANT:  Oh, sure.  I don't
20    believe there are any new documents that are not attached
21    as exhibits to either McKesson's briefs or declarations
22    or ours, no additional documents.
23                THE COURT:  Okay.
24                MR. FABRICANT:  I do, as I said, I would
```

Page 29

1   ask the court to look at -- I won't go through them all,

2   but ask the court to look at, if we got into the issue of

3   deciding the merits of this ownership question at all

4   here without these parties present, the draft notes that

5   were rejected, which have very different language which

6   clearly create a security interest and not an assignment

7   of a patent.  And the ramification of that on the

8   evaluation of the intent of the parties.

9                    Also, I would point to the fact, and I

10  think this is crucial to Your Honor's decision if you get

11  past the indispensable party issue and actually looked at

12  the merits of the arguments that McKesson has raised, the

13  documents that were produced after the motion was made

14  that were located by McKesson and produced to us, the

15  witnesses were unable to identify or remember or

16  recollect any of the handwriting on these exhibits.  They

17  were asked that.  They were unable to do that.  There is

18  no evidence before the court as to who placed the

19  handwriting destinations on these documents, so we don't

20  know.

21                    One of the issues Your Honor would have

22  to decide, we believe, if it was to be an evidentiary

23  determination of this issue of ownership, is were the

24  loans ever even repaid in full, because without that even

Page 30

1   a security interest theory doesn't cut it.  So just for a

2   moment, Your Honor, I would show -- and this causes us

3   some concern -- here is the promissory note that was

4   produced after the motion was filed as to the $42,000

5   loan, and you can see that there has been placed on the

6   document the word "void."  And down at the bottom left it

7   says paid 12/27/90, down here.

8               THE COURT:  Is that for Heilman or

9   for PSF?

10              MR. FABRICANT:  The notes apply to both

11  of them, I believe.  This is, I believe, it's both of

12  them.  Oh, no, this is Steven Heilman.  This is Steven

13  Heilman, Your Honor.

14              THE COURT:  Okay.  Just for the record,

15  will you read the Bates number into the record, please.

16              MR. FABRICANT:  Yes.  This is Bates No.

17  M0474909.  And I believe it was DeMatteo Reply

18  Declaration Exhibit M.

19              And then there was another document

20  provided at the same time, after the motion was filed,

21  which was DeMatteo Reply Declaration Exhibit M, but at a

22  different page, M0474912 to 13, and this is the $107,000

23  note.  And this was says "Cancelled, paid in full."  It

24  looks like the same handwriting, but no one has

Page  31

1    identified whose handwriting this is or who made these

2    notations.  And, again, we have what we believe is a

3    disputed issue as to whether there ever was a full

4    repayment of these loans.

5                     And I believe on the lack of standing

6    issue and the indispensable party issue that's all I have

7    for the court at this time.

8                     THE COURT:  Okay.  And on the other

9    motions?

10                    MR. FABRICANT:  Yes, Your Honor.

11                    THE COURT:  Was there anything you

12   wanted to say with respect to them?

13                    MR. FABRICANT:  Yes.  Your Honor, I'm

14   going to address, with the Court's permission, the motion

15   to amend the answers, the answer and counterclaims, and

16   Mr. Drucker will address the other motions.

17                    THE COURT:  That's fine.

18                    MR. FABRICANT:  Your Honor, on the

19   answer, the amendment, the proposed amendment to the

20   answer and counterclaims, the scheduling order had

21   provided a date for motions to amend cut-off of December

22   20, 2006.  As a matter of fact, no documents were

23   produced before that date, no depositions were taken

24   before that date.  The documents were produced from

Page 32

1    McKesson to Swisslog in sort of rolling fashion that

2    began sometime in the spring of 2007, after their

3    deadline had already passed.  The document production

4    continued until -- in fact, one of the largest

5    productions, if not the largest of 250,000 pages,

6    occurred in the fall of 2007, long after this deadline

7    had passed.  And therefore as a result of the timing of

8    the document productions, depositions in this case, by

9    Swisslog of the McKesson witnesses, the 30(b)(6)

10   depositions didn't start until late May of 2007, long

11   after this deadline had passed.  We went into the summer

12   of '07.

13              And the crucial depositions actually, in

14   large part, were taken during the summer of 2007,

15   culminating in the deposition of Sean McDonald, the

16   founder, inventor, a person with duty of candor, the

17   person who founded the company, on August 30, 2007.  So

18   approximately seven days after the deposition of Sean

19   McDonald, we wrote McKesson's counsel and advised them

20   that we would like to make a motion to amend our answer

21   and counterclaims, asking their permission to do so,

22   consent to do so, and they refused to grant that.

23              So we have, obviously, three major

24   factors on a motion to amend, such as this one, undue

Page 33

1   delay, whether the amendment would be futile, and the

2   prejudice to the parties as a result of any amendment.

3                    THE COURT:  Before we get to those, let

4   me just ask you, if I were to grant your motion to

5   dismiss for lack of standing, would your motion then to

6   amend, basically just the counterclaims at that point,

7   would that still be an issue in front of me or would that

8   be mooted?

9                    MR. FABRICANT:  I think the

10  counterclaims, Your Honor, would still be an issue.

11  Although if Your Honor dismissed without prejudice, as

12  Your Honor might be inclined to do, and not knowing who

13  the true owner of the rights might ultimately be found to

14  be, we might not pursue those counterclaims because we

15  might pursue them against the wrong party.

16                   So, as a practical matter, I believe if

17  the case were dismissed without prejudice, probably all

18  of the case would go away until such time as the proper

19  parties stepped forward.

20                   THE COURT:  On the assumption I am not

21  doing that, tell me what I need to know about this

22  motion.

23                   MR. FABRICANT:  Yes.  Undue delay, Your

24  Honor, not only is the window of time relatively short,

Page 34

1    particularly in light of the fact the document production

2    just started in the spring of '07 and depositions

3    throughout, until the end of August of '07, but what the

4    evidence collected during that period related directly to

5    the amendments which we now seek to make at this time.

6              With respect to inequitable conduct for

7    failure to disclose material information to the patent

8    office, in our original answer and counterclaim we

9    reserved the right to add additional affirmative offenses

10   with respect to patent defenses.  We did not, at that

11   time, and I don't think it would have been appropriate to

12   allege inequitable conduct, because inequitable conduct

13   requires a pleading of the nature of a fraud pleading

14   under Rule 9, and therefore we did not have the ability

15   at that time to plead with particularity.

16             We did receive some documents, in the

17   spring and summer of 2007, which suggested that there had

18   been some demonstrations or tests or public displays, but

19   we didn't know who was at them, who attended them, who

20   knew about them, what actually happened at those

21   demonstrations.  We took the deposition in the summer of

22   two people in 2007, the two people who were knowledgeable

23   about what actually happened, Mr. Keyes, who was a

24   cofounder; we took his deposition in the summer of '07,

Page 35

1    and Sean McDonald, whose deposition occurred on August

2    30.  I know we pointed out in our papers, Your Honor,

3    that we've attempted to take Sean McDonald's deposition

4    since early spring.  We wanted him to be early in the

5    process.  I think our first request for him was in March.

6    And for a number of reasons the deposition was postponed

7    and postponed again by the plaintiffs until ultimately we

8    had to subpoena his attendance at a deposition at the end

9    of August.  So it was not through any lack of our desire

10   or intent to take Mr. McDonald's deposition at an earlier

11   date, but it didn't happen.

12                  At that deposition on August 30, just

13   seven days before we raised this issue with McKesson and

14   just a month or so before we made the motion to amend, we

15   discovered all of the particular details and facts as we

16   set forth in our proposed amendment on inequitable

17   conduct, which we believe supports without question an

18   inequitable conduct claim, certainly beyond any question

19   of futility of the event.  We discovered that he had

20   personally performed and put on presentations of a device

21   which we believe teaches each and every element of the

22   claims of the patent more than a year prior to the filing

23   date, which would constitute an on sale bar, which we had

24   already alleged invalidity.

Page 36

1            But what we also discovered because of

2   his duty of candor as an inventor and his knowledge of

3   what had transpired, that comparing what he testified to

4   with the file history, that there had been no disclosure

5   of material facts and events of material prior art.

6   Remember the difference, Your Honor, between inequitable

7   conduct and invalidity is for invalidity based on an on

8   sale bar, you need to be able to establish what was on

9   sale meets each and every element of each and every

10  claim.

11           But for an inequitable conduct claim,

12  you only need to be able to demonstrate that a person

13  with a duty of candor withheld material information to

14  patentability.  It can be something far less than on sale

15  bar if it was material to patentability.  Of course, you

16  have to also establish this was done purposefully, with

17  an intent to deceive the examiner.  And that's why

18  parties don't allege at the early stages of cases,

19  wisely, inequitable conduct until they gather the facts

20  and the evidence.

21           Once we gathered that and concluded that

22  process on August 30, 2007, we immediately notified the

23  other side of our intent to go forward and we made our

24  motion to amend in October.

Page  37

1                    With respect to the antitrust claims,

2    Your Honor, the original answer and counterclaims raised

3    a claim for antitrust violations under the Sherman Act,

4    Section 2, as a result of sham litigation, because at

5    that time all we were able to discern from the complaint

6    and from the lawsuit was that we believed that there was

7    objectively baseless grounds for bringing the action in

8    light of the claim language, the way in which we believe

9    the claim language reads or does not read on the

10   invention, and we didn't believe there was an objective

11   basis for bringing the lawsuit.  So we alleged that kind

12   of sham litigation under Sherman 2, but we did not have

13   the ability to allege any other type of antitrust

14   violations at that time.  We had no documents; we had no

15   fact depositions.

16                    As our papers explain, beginning with

17   the deposition in late May of Mr. Zwolinski, continuing

18   through the summer of '07, and again culminating with

19   Mr. McDonald on August 30th, we discovered that there had

20   been a course of conduct of predatory pricing, of

21   sole-source agreements to protect large segments of the

22   marketplace, of false statements being made about the

23   plaintiff's product, of false and misleading statements

24   being made about, not only the defendant's product but

Page 38

1    the defendant's company and its financial wherewithal,

2    and all of those facts, I believe, are set forth in great

3    detail in our proposed amendment.

4                    And so therefore, based on the facts and

5    evidence collected from May of 2007, which is the

6    earliest possible date we could have discovered any of

7    this, through the summer of 2007, we put together all of

8    the factual allegations which, we believe, without

9    question, supports the Sherman 2 claim based not on sham

10   litigation but on monopolization or attempt to monopolize

11   and the Sherman 1 and Clayton 3 claim, as well as the

12   Delaware state claim which tracks the federal antitrust

13   laws.

14                   So we don't believe the amendments are

15   by any means futile; we don't believe they are subject to

16   a motion to dismiss.  If the Court allowed the amendment

17   to be made, for the reasons I described, and I think the

18   pleadings speak for themselves because they are very

19   detailed in the proposed amendment.  This is not

20   something we could have discovered at an earlier date.

21   And in light of the law with respect to allowing the

22   amendment of pleadings, the liberal track on that, as

23   well as the fact that there is really no prejudice to the

24   parties, which is the third prong, and I will explain

Page 39

1  why.

2            Prejudice to the parties -- obviously,

3  there would be a significant prejudice to defendants if

4  they are not allowed to urge inequitable conduct and the

5  antitrust claims in light of the evidence which has been

6  collected, but really nothing has been added to the

7  lawsuit which will delay the case, delay the trial, cause

8  any real need for anyone to have discovery in this case.

9  These issues were all on the table in the original

10 pleadings, although in a slightly different manner.  On

11 sale bar, as part of invalidity, was already alleged.  So

12 the only thing that changed was Mr. McDonald and

13 Mr. Keyes' knowledge and familiarity with what happened

14 as persons of duty of candor, which we needed to meet the

15 final prong of intent to deceive.

16            With respect to the antitrust claims, we

17 needed to gather the evidence and take the depositions of

18 these individuals.  Nothing has changed.  We had an

19 antitrust claim.  They knew we had an antitrust claim.

20 We were already into that whole body of law and the only

21 thing now is that there is some additional factual

22 allegations which underlie the antitrust claim.

23            Your Honor, we did nothing during this

24 process to hold back the case.  And, in fact, we had our

Page 40

1    -- we presumed, for purposes of discovery and expert

2    reports, that Your Honor would ultimately or this court

3    would ultimately allow us to amend and, therefore, we

4    conducted the discovery which we felt was necessary

5    anticipating that possibility.  We had our expert even

6    include that in his expert report.

7                    THE COURT:  I have got all of that.

8    Just very briefly, if you want to add the affirmative

9    defense of lack of standing, if the motion to dismiss for

10   lack of standing is denied, what impact would it have on

11   the case if we allow you to add that as an affirmative

12   defense going forward in the case?

13                   MR. FABRICANT:  Your Honor, we did ask

14   for that relief, I believe, as a matter of law.  Because

15   it involves subject matter jurisdictions, we are entitled

16   as a matter of law to challenge standing if it affects

17   subject matter jurisdiction.  So I would submit that we

18   are entitled to that, notwithstanding the need to amend.

19   I believe it would remain an issue in the case, unless

20   this court is prepared to grant, in effect, what would be

21   summary judgment on the standing issue at this point on

22   this record, in which case there would be adjudication.

23   If the court is not prepared to do that, then we would

24   ask that this amendment be permitted so that we could

Page 41

1   pursue that through trial.

2              THE COURT:  All right.  Let me hear from

3   Mr. Drucker briefly on the remaining motion.

4              MR. FABRICANT:  Yes, sir.

5              MR. DRUCKER:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. FABRICANT:  The issue on the motion

8   to dismiss the willfulness claim really arises out of the

9   change of law after Seagate.

10             Just to recap the sequence of events

11  here.  McKesson filed its original complaint in January

12  2006.  They amended in July 2006 -- that was a

13  substitution of parties.  The allegation of willfulness

14  remained the same.  It was just a bare-bones allegation

15  that defendants sold the accused products with full

16  knowledge of McKesson's patent rights.

17             THE COURT:  Prior to Seagate, would that

18  have been enough to establish willfulness?

19             MR. FABRICANT:  Well, it would have been

20  enough to allege willfulness in the complaint, but the

21  issue is really slightly different.  We think it still

22  won't have been enough because it doesn't satisfy the

23  duty of good faith.  That existed before Seagate.  That's

24  a simple matter of law, Ledmen in Rule 8.  They have an

Page 42

1   obligation to show that, at least that they have some

2   basis for saying that we have that knowledge.  Discovery

3   proceeded.  In February 2007, we decided to elect to rely

4   on the advice of counsel defense, that was a date that

5   had been set by the Court in the scheduling order.

6                Beginning the following week, we

7   produced the remaining documents supporting those

8   opinions.  And, I think, by May of 2007, everything had

9   been produced relating to the opinions of counsel.

10                In August 2007, the Federal Circuit

11   decided Seagate.  And shortly after we contacted

12   McKesson's counsel and we said, what's the basis for the

13   allegation of willfulness?  It seems the bar has been

14   raised.  Now it's an objective standard.  You have to

15   have acts of objective recklessness in light of knowledge

16   of the patents.  Where is the proof?

17                And we were getting toward the end of

18   discovery at that point also.  We still had no basis from

19   McKesson as to what the claim of willfulness was based

20   on.

21                Finally, after exchanging correspondence

22   for the following months on that question, we moved to

23   dismiss.

24                And the question is really coming down

Page 43

1  to, did they have equitable faith basis?  What was it?

2                    The response to the motion, McKesson

3  said, well, we can't answer until we have taken the

4  depositions of the Italian attorneys who rendered

5  opinions in this case.  And just to recap what happened

6  with respect to those opinions, in 2002, when Swisslog

7  was designing its system, they contacted an Italian law

8  firm, Provissionato & Company.  They received an opinion

9  that would help guide them, help guide them around

10  possible infringement.  The opinion consisted of a survey

11  of what the relevant patents were in the field and gave

12  them, just highlighted the major issues that they needed

13  to focus on to avoid infringement when they were

14  finishing up the design of their product.

15                    In November 2002, they asked for a final

16  opinion and the Italian attorneys provided that.  They

17  gave them a final opinion confirming their earlier one

18  that the patents weren't infringed if they followed

19  certain steps, and that was before they even entered the

20  U.S. market.

21                    In 2003, Swisslog entered the U.S.

22  market and started to make sales here.

23                    In 2002, it's covered in the briefing so

24  I will raise it with Your Honor, the parties actually had

Page 44

1    negotiations, there had been several meetings.  There was

2    discussion about whether Swisslog would act as a sales

3    agent, and whether McKesson would enter into an agreement

4    to market the Matoped (sic) product.

5              As part of that, there were meetings

6    between executives of the two companies.  McKesson was

7    given access to technical information.  The senior

8    engineers at McKesson, Mr. Wangoo (sic) and Mr. Spano,

9    the software developer, were told about the Swisslog

10   product.  And apparently no mention was ever made of

11   patents.  And the reason this is relevant to this motion

12   is because in response to our motion, it seems that the

13   only information McKesson is able to come forward with to

14   show that they had a good-faith basis at the outset of

15   the suit is based on the disclosures that were made well

16   after the suit was filed.

17             THE COURT:  But I have to, in a motion

18   to dismiss, take their allegations as true.

19             MR. DRUCKER:  That's fine, you can do

20   that.  It changes nothing with respect to what they knew

21   at the time they filed suit, and that's expressly what

22   Seagate requires.

23             THE COURT:  Well, if Seagate goes to

24   proof, it doesn't go to pleadings, and you have

Page 45

1  acknowledged that, I believe, in your filings.

2              MR. DRUCKER:  Correct.  This is not a

3  matter of what's pled.

4              THE COURT:  So the problem I am having

5  is what the procedural basis for me to look behind the

6  pleadings to figure out what they knew and then make a

7  decision, I guess, as to whether it was reasonable based

8  on what they knew at the time of the suit.  How is any of

9  that relevant to a motion to dismiss analysis?

10             MR. DRUCKER:  Well, we believe it comes

11 down to the good-faith basis of filing the suit in the

12 first place.  It comes down to Rule 11, it comes down

13 to --

14             THE COURT:  Then you are just bringing

15 just an exception motion?

16             MR. DRUCKER:  Well, it's actually a

17 motion to dismiss, because -- well, Seagate says when a

18 compliant is filed the patentee must have a good-faith

19 basis for alleging willful infringement.  It says so a

20 willfulness claim asserted in the original complaint --

21             THE COURT:  Seagate doesn't say if the

22 defendant thinks the plaintiff doesn't have that, file a

23 motion to dismiss.

24             MR. DRUCKER:  No, it doesn't say that

Page 46

1    expressly.  In fact, we are not aware of any cases either

2    way on this point.  Seagate is a relatively new decision,

3    as the Court knows.  I don't believe the issue has been

4    addressed before, not in any reported decision, but it

5    seems at some point McKesson has to show the basis.  And

6    what they have done -- and this ties into the motion to

7    amend.  They have come forward now with a proposed second

8    amended complaint, and the entire basis for the

9    allegations of willfulness are information that they've

10   obtained in the course of discovery from us relating to

11   those opinions of counsel.  If we had never chosen, if

12   defendants had never chosen to rely on the advice of

13   counsel defense, McKesson right now would have absolutely

14   no basis for their allegation of willful infringement.

15              THE COURT:  Okay.

16              MR. DRUCKER:  So it's being used against

17   us, to our prejudice.

18              THE COURT:  Okay.  I understand.  I have

19   heard enough on those two motions and we will give

20   Mr. Fabricant a chance for brief rebuttal but not until

21   after we give McKesson a chance to tell me whatever they

22   want to tell me on all four motions.

23              MR. JACOBS:  Good morning, Your Honor.

24   Blair Jacobs on behalf of McKesson; Christina Ondrick is

Page 47

1   with me; Christine Azar from Blank Rome here in

2   Wilmington; and Jill Dessalines, from McKesson, is also

3   present.

4                    Your Honor, what I would like to do is I

5   would like to direct some comments to some questions that

6   the Court asked Mr. Fabricant during his presentation,

7   then I have some additional points that I want to bring

8   up and demonstrate that weren't raised during that

9   discussion.  And then I would like to conclude by

10  demonstrating and showing how the loans were fully repaid

11  and the evidence that's in the record that demonstrates

12  that.

13                   THE COURT:  It's also likely I will have

14  some other questions for you, but go ahead.

15                   MR. JACOBS:  And respond to all of your

16  questions as well.

17                   THE COURT:  That was implied.

18                   MR. JACOBS:  Let me start out by, if I

19  could, by dealing with the state of the law.  And I would

20  ask the Court to take it in this progression.

21                   In 1996, the Federal Circuit, in a case

22  called Minco, Inc. vs. Combustion Engineering, stated

23  that "construction of assignment agreements are a matter

24  of state law."  It's a quote from the case, that

Page 48

1    statement has stood.  It has not been overturned to this

2    date.

3                    THE COURT:  Federal Circuit?

4                    MR. JACOBS:  Federal Circuit case.

5                    In February, we have the DDB

6    Technologies case.  Now, that was a question of whether

7    the creation of an automatic assignment or an obligation

8    to assign in the future.  So the court was looking at a

9    specific assignment; was it assignment in the future or

10   was it an automatic assignment vesting as of right now?

11   And so that is something that is entwined with patent

12   law, because it relates at some level to interpretation

13   of patent rights.  And Judge Newman sat on that case, if

14   you look at the opinion; she also filed a dissent

15   disagreeing with certain aspects of that case.

16                   Then Akazawa, a month later, comes forth

17   and it says that state law, not federal law, governs

18   patent ownership.  And as part of that, and we believe

19   the part that is really important to the resolution of

20   this case, the Federal Circuit says a change in ownership

21   can occur by operation of state law.  So if there was an

22   assignment, and if the assignment could be extinguished

23   because it was in effect a security interest, that would

24   be something that would be governed by Hill (sic).

Page 49

1   That's why we have focused so much on intent.  Actually,

2   UCC, Provision 9 of the UCC, which is adopted in

3   Pennsylvania, there is a U.S. provision that's very, very

4   similar with regard to security interests.  We haven't

5   found a lot of case law where it's been interpreted via

6   federal law.  Pennsylvania has a lot more guidance with

7   regard to why intent is important with regard to that

8   issue.

9                   THE COURT:  So, in your view, though, do

10  I need to resolve whether it's federal or state law OR do

11  I analyze the issues the same way either way?

12                  MR. JACOBS:  I think either way you

13  analyze the issues based on the intent of the parties,

14  what the parties intended.  Did they intend absolute

15  assignment, divestiture of all of their rights -- that's

16  the simple test for was an assignment required -- or did

17  they intend something that was to serve as short-term

18  security?

19                  Now, one thing that's interesting, Your

20  Honor, is that we have had three papers that have been

21  filed by the defendants since this motion was originally

22  filed, and we filed our opposition.  And with our

23  opposition we filed a declaration of Sean McDonald.  Sean

24  McDonald was the founder of AHI.  He sat in on the

Page 50

1    transactions.  He has recollection of what actually

2    occurred and why it occurred.  And he states in

3    paragraphs 22 and 23 of that declaration, Your Honor,

4    that he understood that the notes and the assignment,

5    which he signed on behalf of AHI, were to simply provide

6    collateral in the case the loans were not paid off.  He

7    also states in paragraph 23 that, of course, start-up

8    company, his intent was to obtain funding.  His intent

9    was to use the patent application as collateral.  It was

10   not to provide -- this goes to was it intent.  An intent

11   to assign has to be a complete divestiture of rights.  He

12   says my intent was not to do that, it would have made no

13   sense to provide permanent assignment of rights to the

14   property.  And if you think about the context of how this

15   arose, it's a start-up company.  That's all they had at

16   this point in time.

17             THE COURT:  That maybe what makes sense,

18   but when he signed, the one thing he signed was the

19   assignment of invention document which on its face makes

20   no reference to notes, no reference to collateral, no

21   reference to security interests.  It is, on its face, it

22   seems to me, a clear and unambiguous assignment.  So how

23   does that fit into your argument?

24             MR. JACOBS:  Sure, Your Honor.  This is

Page 51

1    the language in the promissory note that creates the

2    obligation to provide the assignment, the document that

3    you are referring to.  Okay?  And it says, in this

4    document, "this note will be secured by an assignment of

5    application for patent for the technology rights."  So it

6    does not say, Your Honor, we are assigning the rights, as

7    part of this transaction, to this patent application to

8    the investors; it says this note will be secured by an

9    assignment.

10                   THE COURT:  But what about the two-page

11   assignment of invention document?  Let's start there.

12                   MR. JACOBS:  That was part of the

13   totality of the circumstance, all of the documents --

14                   THE COURT:  Do you have any argument

15   that if I find that I can look at it or you can look at

16   it separately, the assignment of invention document, just

17   those two pages, do you have any argument that there is

18   any ambiguity in those two pages that what was created

19   here was an absolute assignment?

20                   MR. JACOBS:  Well, other than the fact

21   that it was not signed by the assignee, and it is typical

22   when you have an assignment that it would be signed by an

23   assignor and an assignee.  Other than that, looking at

24   the language of the document, it looks like a standard

Page 52

1    assignment.  There is no question.  It looks like a

2    standard assignment of rights.  But that's not what the

3    law calls for.  The law calls for construing all of the

4    documents together in determining what the intent of the

5    parties actually was.

6                        And when you do that, Your Honor, you

7    see that the very document that created the need for that

8    assignment, the promissory notes, were cancelled, marked

9    "null and void," 'paid in full,' as soon as the loans

10   were paid up.  When that happens, pursuant to case law,

11   we are done.  There is no right that exists any longer.

12   And that goes, Your Honor, to the case that you raised

13   earlier, that Mr. Fabricant will have a chance to address

14   on rebuttal, the Applied Companies case.  In that case

15   the Federal Circuit looked at similar situations when the

16   payment of a debt released the assignment and essentially

17   held that it mooted the intended terms -- there was a

18   set-off provision that was being disputed in that case.

19                        So this is not something that is novel.

20   It is very consistent when you apply the laws of logic to

21   these issues that if you have an interest, a security

22   that's being secured by something, if that's paid off

23   completely, you don't need the collateral anymore.  The

24   collateral goes back to whoever the original owner was.

Page 53

1                    THE COURT:  If that was so clear the

2      intent, then why does the assignment of invention not

3      make any reference to security to collateral to debt to

4      notes?

5                    MR. JACOBS:  The assignment document --

6      unfortunately, nobody remembers that, Your Honor.  It was

7      17 years ago.  Nobody recalls why -- you know, these

8      individuals were being represented by counsel.  We have

9      talked to the individuals who were involved.  They say it

10     was a long time ago.  We don't recall exactly why things

11     were done by the lawyers the way they were done.  All we

12     have is the documents as they exist together.

13                    But when you look at the dates of them,

14     it's very likely that what happened was you have that

15     assignment provision in the promissory note, and so the

16     lawyer is representing the investor, the lawyer probably

17     said get me an assignment.  I need the assignment.  We

18     negotiated for an assignment of this patent application.

19     Get me the assignment that's called for by the promissory

20     note.  But the two have to be construed together because

21     you have to look at what the parties intended here.

22     That's what controls the ultimate outcome.

23                    Now, there was some discussion about the

24     investors -- and in the deposition of the investors we

Page 54

1    didn't ask them:  Do you have ownership rights? and

2    things of that nature because they were really, really

3    clear.  We asked them whether they thought they had an

4    interest, things of that nature.  They said, Our lawyers

5    would construe all these documents; our lawyers would

6    tell us what we had here.  We don't know what we had.  We

7    are not going to get into issues of law.  And question

8    after question after question that was the position they

9    took.  So we were not going to ask them legal questions,

10   that made no sense whatsoever.

11              There is a lot of discussion today with

12   regard to disavow.  And that really goes to this new Rule

13   19(a) issue that has come up subsequent to the original

14   12(b)(1) motion that was brought.  And, Your Honor, just

15   really quick with regard to 19(a), that requires a

16   two-prong test.  And it strikes us that the first prong

17   of that test is that if the court were to determine that

18   an absent party is absolutely necessary for adjudication

19   of the issues in a case.

20              Now, there's a two-prong test that comes

21   along with determining whether a party is absolutely

22   necessary.  The first one is complete relief cannot be

23   accorded among the parties.  The second is the absent

24   party claims an interest in the subject matter and their

Page 55

1    absence will be prejudiced in some way by not being

2    present.  Here the absence of the investors does not

3    affect or impact the Court's ability to afford relief

4    between McKesson and defendants unless there is some type

5    of determination that the investors have some type of

6    ownership interest.  At this point in time, they are not

7    necessary parties.  At this point in time, they have no

8    interest whatsoever.  If the Court is to find that they

9    have an interest, that the assignment grants them some

10   type of right, at that point in time, we may need to deal

11   with, Does McKesson have any rights; does McKesson not

12   have rights; is there a joinder issue here; do they want

13   to intervene?

14            They have not sought to intervene to

15   this point in time.  Yet they have been aware of this.

16   Your Honor, they had said in their deposition we don't

17   know one way or another whether we have any interest in

18   this.  We are waiting for the court to tell us that

19   basically.  It's a legal issue.  They don't have any

20   understanding one way or another whether they have

21   interest.

22            THE COURT:  As things stand now, aren't

23   the defendants potentially subject to an infringement

24   lawsuit from the investors?  And presumably if their

Page 56

1    lawyer wakes up tomorrow and says, why don't you go ahead

2    and file suit for infringement, the defendants --

3                    MR. JACOBS:  They are not, Your Honor --

4    first of all, I would like to point out that the Third

5    Circuit has held that the risk of multiple litigation is

6    irrelevant in a Rule 19(a) analysis, and that's the Field

7    vs. --

8                    THE COURT:  But in the patent law

9    context, isn't that really one of the main principals

10   underlying the whole issue of patent standards --

11                   MR. JACOBS:  It would have to be

12   determined in some way that they had an interest before

13   there could be a risk of duplicative litigation or

14   multiple litigation.  If the Court, as I believe the

15   Court should, if the Court looks at what is before the

16   Court, the standing motion, and if the Court decides and

17   determines the ownership issue -- and it's the ownership

18   issue that underlies the standing issue.  At that point

19   in time either the investors will have an interest or

20   they will not have an interest.

21                   It's our opinion, looking at all of

22   these documents, looking at the fact that the loans were

23   completely paid off, as was intended, looking at the fact

24   that the parties have all operated for 17 years --

Page 57

1            THE COURT:  It's your position they

2    don't have any interest.  I understand what to do if I

3    find that.  If I find that they do have an interest, then

4    I have to dismiss this case for lack of standing and let

5    you work it out as whether you can come back.  Isn't that

6    right?

7            MR. JACOBS:  I would say that's correct,

8    Your Honor.  If you find that they have any interest,

9    absolutely, there would be a lack of standing at least

10   until the issues were worked out.  There is no question

11   about that.

12           THE COURT:  What about the middle

13   ground?  What if I just really can't tell?  At that

14   point, don't I have to rely on the fact that the burden

15   is on you and dismiss without prejudice saying they

16   failed to meet their burden of showing they are the sole

17   and exclusive owner of these patent rights?

18           MR. JACOBS:  That's another interesting

19   question, because with regard to the 12(b)(1) motion, the

20   burden is on McKesson.  And so certainly with regard to

21   standing and ownership, the burden is on McKesson to come

22   forward, as we believe we have with the documents and the

23   declaration of Mr. McDonald, demonstrating what the

24   intent of the parties actually was here.

Page 58

1                    However, it seems that the defendants

2    are now arguing a Rule 19(a) argument more than a

3    12(b)(1), and if that's the case, Your Honor, then they

4    have the burden.  They have the burden to come forth and

5    to demonstrate that the party is necessary and that the

6    parties are indispensable.  And indispensable, Your

7    Honor, gives you some additional flexibility because, No.

8    1, one of the questions that comes up all the time is are

9    the interests of the parties that are missing adequately

10   represented?  This is the second prong of the test.  And

11   beyond that, if they are, the Court can still determine

12   in equity and in good conscience that the action could

13   proceed without the parties.

14                    So there is a number of steps that have

15   to be gone through with regard to this Rule 19(a) motion.

16   And the Rule 19 motion, the burden falls on the defendant

17   to demonstrate that we have a necessary party, that they

18   are indispensable, that there are no reasons, from an

19   equitable standpoint, after we have gone through more

20   than two years of discovery and we are ready for trial in

21   March and these parties have been aware for a long time

22   of the fact that they could intervene, if they wanted to

23   intervene.  Yet they have taken no overt step.  They have

24   indicated in no way that they he believe they have an

Page 59

1    interest.

2              So our view with regard to the disavow

3    argument, Your Honor, is that they have nothing to

4    disavow.  They don't know whether they have an interest

5    or not.  So, of course, they can't disavow anything.  You

6    can only disavow an interest that they are aware of

7    having.

8              I want to address, if I can, Your Honor,

9    one of your arguments that was made with regard to -- and

10   this ought to be quick -- with regard to some factual

11   disputes with regard to whether the notes were paid in

12   full.  We believe that -- there is no evidence that the

13   documents were tampered with, that somebody wrote "void"

14   or "cancelled."  But there is also a letter, and for the

15   record, the Bates number on this is M0474908.  And this

16   is a January 3rd, 1991 letter, and you will see it's from

17   David Cohen. He represented the investors.  He was the

18   investors' attorney.  You will see it's to a Mark

19   Baseman.  He was representing AHI and Sean McDonald at

20   the time.  And as you will see, in the second paragraph

21   of this letter, Your Honor, it indicates, "the notes were

22   satisfied at the closing of the financing held last

23   Thursday, and you are authorized to mark the notes

24   cancelled and paid in full."

Page 60

1              And, Your Honor, I would note for the

2    record that documents --

3              THE COURT:  Hold on.  Let me.  I'm

4    sorry.  That seemed to be referencing, at least the typed

5    portion, only the two notes relate to PSF.  I see the

6    handwriting at the bottom stated David Cohen gave

7    PSF/Heilman's attorney, forwarding all three promissory

8    notes.  Explain that to me.  I may be misreading the text

9    but it looks like that's what it says.

10             MR. JACOBS:  I was going to point out to

11   the Court, Your Honor, that the documents that were

12   attached to that letter which bears Bates numbers we

13   submitted to the Court M0474909 to M0474913 showed that

14   they, in fact, were the three notes, all of the notes

15   that are involved here, and that they are all marked

16   void; they are all marked cancelled.

17             So it seems that since these documents

18   were maintained and kept together and that they are

19   referenced within that the ones that are marked "void,

20   cancelled, paid in full" are, in fact, the notes that are

21   described in this record.

22             THE COURT:  Is there anything in the

23   record and I suppose in depositions about the handwriting

24   on the bottom of that page?

Page 61

1                    MR. JACOBS:  That's our law firm's

2      internal note.  That's about what it has to do with, Your

3      Honor.

4                    THE COURT:  Got you.  Okay.

5                    MR. JACOBS:  Just a couple of other

6      points.

7                    The Court inquired about the November

8      1990 assignment, and we believe that is a very relevant

9      factor to consider beyond the other issues that have been

10     considered with regard to the intent of the parties.  It

11     makes perfect sense that the Court could not have used

12     the same patent application as an absolute assignment in

13     November of 1990 if the patent application had in fact

14     absolutely been assigned in June of 1990 because those

15     rights would already be fully possessed by the investors

16     at that point in time.  So it would have made absolutely

17     no sense to do it.

18                   What this shows instead, Your Honor, is

19     that basically there is language in these documents to

20     create some type of short-term protective interests for

21     the parties who were involved.  This was a bridge loan.

22     It was known to be a short-term loan.  It was done for a

23     start-up company in order to obtain some short-term

24     financing.  They knew more financing was coming down the

Page 62

1   road.  And the intent of everybody involved was for the
2   patent rights to vest back to the start-up company after
3   the loans were repaid.  The two investors, Your Honor,
4   served on the board of directors of AHI until it was
5   acquired in 1996 by McKesson.  It was in their interests,
6   as serving on the board, for the patents to be part of
7   AHI's property portfolio.  AHI was going out and starting
8   to sell products.  They were making representations.  You
9   know, they had to have this protection of their product
10  to compete in the marketplace.
11              THE COURT:  Going back to November 1990,
12  why should I not then conclude that AHI made a mistake?
13  That is, if they didn't have any legal ability to assign
14  the rights again in November of '90 because they had
15  already done it in June of '90, but either nobody cared
16  or nobody noticed or everybody made a mistake.  But
17  people do make mistakes.  So what do you have that rules
18  out the possibility or makes it less likely that the
19  document that is under agreement meant what it meant in
20  November of 1990 and people acted in a mistaken way
21  thereafter?
22              MR. JACOBS:  Absolutely.  The totality
23  of the circumstances, starting with the fact that we do
24  have the declaration of Sean McDonald telling us exactly

Page 63

1    what was intended by all of these documents and what was

2    going on during this time period.  There is nothing in

3    the record that points in any way to this being an

4    absolute assignment of rights.  There is a lot of

5    circumstantial evidence; the conduct of the parties, all

6    of the documents when you read them all together; the

7    declaration of McDonald; the fact that this same interest

8    was used in 1994, again, as a security interest in the

9    Partek transaction.  The totality of the circumstance,

10   Your Honor, is very, very consistent with the conclusion

11   that, sure, they were just granting a security interest

12   in June of 1990.  They knew it was going to be paid off

13   and terminated very, very shortly.  So they just did the

14   same exact thing in November.  It made sense.  They used

15   the same clause.  They just went ahead and granted

16   another security interest in the patent application,

17   because the understanding was, Your Honor, that all of

18   these notes would be paid off when a subsequent round of

19   funding was provided, which is what happened, basically.

20   They were paid off with stock and cash in the late

21   December time period, which led to that letter in January

22   that we have now showed the Court.

23                  So, Your Honor, the intent of the

24   parties is a fundamental import here.  It cannot be

Page 64

1  ignored.  In order to accept the argument that the

2  defendants are making, the intent of the party has to be

3  ignored, and that is just inconsistent with the law.

4            THE COURT:  Help me out.  Because if I

5  agree that it all makes sense and everyone acted in the

6  way consistent with your interpretation, why isn't that

7  nullifying this two-page assignment of invention which

8  even you can see only its face is clear and unambiguous.

9  What is it that allows me to do anything here other than

10 just look at the two pages signed by Sean McDonald.

11 Maybe he didn't understand what he was doing, maybe he

12 didn't intend to do it, but seems a clear, unambiguous

13 assignment, doesn't reference anything else, you can see

14 there is no evidence of physical delivery.  It's a

15 reassignment.  So why would that not be the be all and

16 end all of this case and everything else is irrelevant?

17            MR. JACOBS:  Your Honor, the reason that

18 it is not the be all and end all is that Pennsylvania

19 law, federal law, all law that we are aware of that

20 relates to the interpretation of provisions in contracts

21 or in agreements require that the provision be considered

22 within the context of the four corners of the documents,

23 all of the documents that relate to the transaction.

24 That document is part, within the four corners of all of

Page 65

1    the documents.

2                    THE COURT:  I don't know that until I

3    look to the other documents.  I mean, if I just found the

4    assignment of invention laying on the security, I would

5    then get a clear and unambiguous assignment.  So what is

6    it?  I think the law is -- you don't get to intent until

7    you find there is some reason to do that.

8                    MR. JACOBS:  Right.

9                    THE COURT:  If what you are looking at

10   is clear and unambiguous, why would you even want to do

11   that?

12                   MR. JACOBS:  The other documents tell us

13   that the assignment was created only because of the --

14   it's a security interest.  It was to secure something.

15   So it's not like this wasn't referenced anywhere else.

16   It's not like this comes in a vacuum.

17                   THE COURT:  I understand it's elsewhere.

18   Tell me, if you can, what case or what provision of

19   Pennsylvania or federal saw that says I need to look to

20   those other documents, I can't just --

21                   MR. JACOBS:  The Sanford case, which is

22   198 Fed 3rd 421, is the primary case that we cited that

23   when documents reference each other that reading them

24   together is required.

Page 66

1                  THE COURT:  That all the documents

2      relied on reference to one another or is it analogous to

3      here where I have the assignment that doesn't reference

4      anything, and granted I do have other documents --

5                  MR. JACOBS:  It's analogous to here

6      where not every document references each other, but

7      certainly all of the documents are referenced at one

8      point in time to a document that ties them together

9      somehow.  And when that is the case, then we have to look

10     at all of the documents and we have to construe all of

11     the documents through the lens of what was the intent of

12     the parties.  Did the parties intend a security or did

13     the parties intend an absolute assignment?  If that's the

14     test, if that's where we end up, Your Honor, the evidence

15     is overwhelmingly compelling in the corner of the parties

16     intended this to be a security.

17                  Now, with regard to Rule 19, really

18     quickly, in order to get to that, to the necessary party

19     aspect of that argument, the Court is going to have to

20     construe the documents.  The Court is going to have to

21     make the determination as to whether there is any type of

22     interest.  If the Court makes the determination that they

23     have an interest, as we've mentioned, that removes the

24     need to move further into the Rule 19(a), the Court can

Page 67

1    dismiss based on standing.  If the Court, however,

2    concludes, no, they don't have -- because of the intent

3    of the parties, they do not have an interest, the

4    interest vested back to AHI, then they are not a

5    necessary party.  So Rule 19 really is not, we don't need

6    to go down the Rule 19 path.  Because either way,

7    whichever decision, with regard to necessary party, that

8    the Court arrives at, we don't need to proceed further.

9                THE COURT:  And in that third middle

10   ground -- we didn't really finish that conversation -- if

11   I just can't tell because it's 17 years later, one

12   document, as you can see is clear and unambiguous, but

13   the other documents, let's say I agree with you and say

14   they are ambiguous, so I just can't tell.  With the

15   burden on you in that context, do you agree that means I

16   have to dismiss?

17               MR. JACOBS:  No, I do not, Your Honor.

18   And that is because 12(b)(1), if that's what we are going

19   to interpret this under, establishes an intentionally low

20   threshold with regard to satisfying a burden.  And if we

21   are going to apply 12(b)(1), the Court has said time and

22   time again that it's a relatively light standard and

23   dismissal should only be granted, and is only appropriate

24   where a claim is so insubstantial, implausible foreclosed

Page 68

1    by prior decisions of this court or otherwise completely

2    devoid of merit as to not involve a federal controversy.

3                    Under the middle ground scenario that

4    you are describing, there would still be a lot of

5    evidence -- if you look at the declaration of McDonald

6    and the totality of the circumstances surrounding these

7    transactions -- but the parties intended this to be a

8    security interest.

9                    THE COURT:  If I look at it that way,

10   what happens next?  I dismiss the -- I deny the motion,

11   but I say I don't know who owns this.  Procedurally, what

12   happens to this case?

13                   MR. JACOBS:  It would then be a question

14   for the jury, Your Honor.  There would be factual

15   disputes; there would be factual issues.

16                   THE COURT:  So the whole assignment of

17   the security interest question would then go to the jury?

18                   MR. JACOBS:  If the facts are so tied to

19   the issue that the Court cannot decide the facts based on

20   everything that the Court has in front of it and assuming

21   that the burden has not been met with regard to 12(b)(1),

22   that defendants have not satisfied that, then it would be

23   a question that would be appropriate for the jury.

24                   You know, Your Honor, we have put forth

Page 69

1    as much as exists in a 17-year-old record to demonstrate

2    what the intent of the parties actually was here.  We did

3    go out and find those documents showing that they were

4    paid in full.  We have done everything that we could

5    possibly do to put this together to show that this was

6    intended to be a short-term security interest and, in

7    fact, that the parties operated that way 17 years after

8    the close of the loans in January.  Under those

9    circumstances, there is nothing indicating that this was

10   anything other than a short-term interest.

11            Looking at that document by itself, in a

12   vacuum, is inappropriate, because it's referenced by

13   other documents.  It has no meaning outside of the

14   promissory notes that created it.  It's a security

15   interest in the assignment.

16            If you look at the term sheet which came

17   before that, there was a change.  It said, We want a

18   security interest in technology rights.  That was then

19   changed to security interests in the assignment of the

20   patent application.  So there are a number of documents,

21   Your Honor, that tie all of these things together.

22            And for that reason, we would ask the

23   Court to look at the intent of the parties, to look at

24   all of the documents, to construe the documents to

Page 70

1    determine that this was intended to be a short-term

2    security interest and to therefore deny the 12(b)(1)

3    motion, and as a result of denying the 12(b)(1) motion

4    based on ownership to deny the Rule 19 motion for lack of

5    necessary party.

6              Subject to any further questions that

7    the Court has...

8              THE COURT:  No.  We explored that area,

9    but address the other three motions that are in front of

10   me if there is anything you want to add to the briefing.

11             MR. JACOBS:  I will address, with the

12   Court's permission, the amendment issue and then I will

13   allow Ms. Ondrick to address the Seagate issues.

14             THE COURT:  Fine.

15             MR. JACOBS:  Thank you, Your Honor.

16             Very quickly, Your Honor, with regard to

17   the amendment, we would focus on prejudice to the

18   opposing party in our discussion of that amendment.

19   Discovery is closed, Your Honor.  We are dealing with

20   proposed new claims or causes of action.  These new

21   claims and causes of action will significantly increase

22   the discovery, and there will be further delay that will

23   be required.  I have a list here of some additional

24   discovery that will be necessary.

Page 71

1           THE COURT:  You don't have to --

2           MR. JACOBS:  With regard to the new

3   antitrust allegations, there are Section 2 and Section 3

4   Sherman Act allegations.  Looking at the proposed amended

5   complaint, it appears that there would be some necessary

6   discovery with regard to Swisslog's management of what

7   they believe the relevant market to be, industry

8   practices, their own sales conduct, because they are

9   alleging inappropriate sales conduct.  If they are

10  engaging in the same exact sales activity, there is going

11  to be an argument here, of course, that these are

12  standard business practices; that is something that we

13  would have to look at.

14           There are third-party pricing policies

15  that we would have to look at.  They do some work for a

16  predecessor machine, a Homaris machine.  You know, how

17  was the pricing established with regard to that?  What

18  kind of discounts did you give, under what circumstances?

19  We haven't done any of that discovery yet.

20           The impact.  There is a $10 million

21  claim attached to these new Sherman Act allegations.

22  They allege, in the complaint, one lost sale.  Well, we

23  know that one lost sale is nowhere near $10 million, so

24  what else are we talking about with regard to -- are we

Page 72

1    talking about damage in the marketing place; are we

2    talking about pricing issues; is it on a per unit?  But

3    we have to go through and ask their folks all of these

4    questions.

5              They talk about exclusion of third

6    parties from the marketplace.  We are going to have to go

7    and check and see if third parties have, in fact, been

8    excluded by this behavior.  On the other hand, they make

9    the allegation that this is a very, very limited market,

10   so we need to get to the bottom of what do they mean by

11   exclusion of other parties in the marketplace.  There are

12   some allegations, Your Honor, about an interface; the

13   interface is not provided by the plaintiff in this case,

14   McKesson Automation.  It is provided by another McKesson

15   entity.  And there are claims that this has caused

16   problems with third parties.  So we will need to talk to

17   those third parties and see whether, in fact, this has

18   caused the problems that are being alleged now.

19              They allege in paragraph 49 of their

20   proposed amended complaint that customers have repeatedly

21   requested this interface capability.  We are not aware of

22   that.  We are going to have to go out and take discovery

23   on whether, in fact, this has occurred.  There are

24   questions about the financial viability of the

Page 73

1    defendants.  They allege that false statements were made.

2    Well, were, in fact, they having financial problems?  We

3    need to get to the bottom of all of that to see whether

4    these were, in fact, misrepresentations or not.  There

5    will be more deposition discovery necessary on their

6    product, Your Honor, because they say that McKesson, in

7    sales presentations, has misrepresented the mechanical

8    complexity of, and reliability, of their product.  In the

9    first run-through discovery, because they are not alleged

10   to -- we didn't get into those types of issues,

11   mechanical, complexity, that didn't go to the claims.  We

12   didn't get into reliability.  Those are issues that we

13   would have to take up again -- maintenance requirements.

14                   And then finally, Your Honor, with

15   regard to this first set, which I generally describe as

16   the antitrust allegations, the series of claims that

17   relate, I think, to those charges, there are these

18   general purchasing organizations that are out there where

19   you will go and you will say, I want to work with your

20   general purchasing organization, and if you get that

21   contract, you get preferred pricing and you provide it to

22   multiple hospitals.  They have alleged, in this new set

23   of allegations, that that has been done to exclude them

24   from competing and other third-party competitors from

Page 74

1    competing in the marketplace.  It's not our understanding

2    of these GPO contracts, but certainly we would need to go

3    and talk to the folks who provided the GPO contracts to

4    get a feeling for whether this is truly a sole-source

5    commitment or can you still sell to other parties despite

6    the fact that you are giving preferred pricing?  Those

7    are the types of things we haven't provided discovery on.

8                    THE COURT:  What if I granted leave to

9    amend to add the antitrust claims and then stayed those

10   claims, are you prejudiced by that?

11                   MR. JACOBS:  No.  Under the

12   circumstances, given where we are, how far along we are

13   in the discovery of this case, that would not be

14   prejudicial, because the other antitrust claims will

15   ultimately be resolved at one point in time, either

16   during pretrial proceedings or later, and we could take

17   this up separately.  It would be like dismissing and

18   saying you could file this in a separate jurisdiction if

19   you want to; it would have the same exact impact.  That

20   would balance the prejudices, in my mind, a little bit

21   more, Your Honor, because versus all of this discovery

22   and delaying trial dates and things of that nature, they

23   would still have all of their rights.  Their rights would

24   still be preserved.

Page 75

1                    THE COURT:  What about the inequitable

2   conduct?

3                    MR. JACOBS:  Inequitable conduct, just

4   very, have shortly on that, Your Honor.

5                    There is some additional discovery that

6   would be required with regard to that.  There are four

7   inventors here.  The defendants noticed the deposition of

8   all four inventors, and they withdrew three of those

9   notices after they had filed the four notices.  So we

10  have three inventors who signed declarations to the

11  patent office as well.  They have not been deposed.  And

12  then, Your Honor, there were a number of companies that

13  were purportedly involved in the demonstrations.  These

14  prior demonstrations that we obviously will contend were

15  basically just showing them preliminary things, weren't

16  in fact offers for sale.  And they will probably contend

17  they were offers for sale.  They had noticed depositions

18  of a number of those companies during the process of

19  discovery as well, and they withdrew them.

20                   And so, you know, when they notice

21  depositions and withdraw them, it's our understanding

22  that we are not going to obtain evidence from those

23  parties.  And then to come after that and to try to amend

24  the complaint to add these charges, where now we need to

1    talk to these prior companies that were talked to, we may

2    need to go and find out what the other inventors know.

3    Again, it's prejudicial in that it delays, it causes

4    problems.  If the Court were to allow some additional

5    time for discovery, it may be something that we could get

6    done and still allow the amendments to take place, but

7    there is additional work that needs to be done and it

8    would be prejudicial.

9              THE COURT:  Okay.  Thank you.

10             MR. JACOBS:  Thank you, Your Honor.

11             Real quick, Your Honor, with regard to

12   Section 261, if the Court does find that there is

13   something ambiguous in the assignment agreement, then

14   McKesson, when they had this in their due diligence file,

15   would have had no actual notice; it would have been

16   ambiguous.  They won't have known the meaning of what it

17   was they were looking at if it was an ambiguous document.

18             So the actual notice issue can be

19   handled two ways, as we argued it in our brief, if you

20   look in a due diligence file in 1996 and you see -- okay,

21   there is an assignment here, but you also have related

22   documents that you pulled together and you say, oh, that

23   was extinguished when they repaid this loan back in 1990,

24   does that put you on actual notice that there is an issue

Page  77

1    of this nature?  We don't think so.  We think it's a

2    reasonable conclusion.

3                    THE COURT:  It goes back to the question

4    I asked you about mistake.  I mean, if your client made a

5    mistake in '96, you know, why should anybody else bear

6    the burden of that?  They had the documents.  They made a

7    decision, either consciously or without adequately

8    investigating that it was extinguished.  If I find that

9    it wasn't extinguished, I don't see how you are helped.

10                    MR. JACOBS:  If the documents were

11    ambiguous, however, perhaps there wouldn't be actual

12    notice because they wouldn't be able to interpret the

13    meaning one way or another.

14                    THE COURT:  Well, they were on notice of

15    the documents.  Their legal impact nobody knew, for sure.

16    But I appreciate your bringing up 261, because I do have

17    one other question about that.

18                    261 doesn't in any way give AHI more

19    ability to assign something that it didn't have.  The

20    point is, if I find that they assigned it away in June

21    '90 and you never got it back, 261 can't help you.

22                    MR. JACOBS:  It doesn't revive a right

23    in any way.  It goes more to notice and whether you were

24    on notice at the time that the future transaction took

Page 78

1  place.

2              THE COURT:  All right.  I appreciate

3  that.  Thank you.

4              MR. JACOBS:  Thank you, Your Honor.

5              MS. ONDRICK:  Good afternoon, Your

6  Honor.

7              THE COURT:  Good afternoon.

8              MS. ONDRICK:  I'm going to briefly

9  address the two Seagate-related motions.  I am going to

10  start with defendants here today have admitted that Rule

11  8 still applies to willful infringement allegations.

12  They have also now, as I understand it, they've admitted

13  that our initial pleadings, back in January of 2006, met

14  the Rule 8 pleading requirement under Underwater Devices

15  at the time.  They don't contest that.  The case law is

16  very consistent that McKesson's allegation was

17  sufficient.

18              When the law changed, after Seagate, the

19  pleading requirement didn't change.  Seagate didn't talk

20  about pleading requirements.  It didn't talk about notice

21  of pleading.  It didn't talk about Rule 11.  The law did

22  change, though; and McKesson's allegation is still

23  sufficient under Seagate.  Seagate talked about proof and

24  evidentiary burdens.

Page 79

1                    McKesson very specifically alleged that

2      defendants had knowledge of the patent, and that their

3      acts were deliberate.  That is enough under the old

4      standard or the new standard, even if there is one.  I

5      contend there is no difference in standards, but if you

6      were to look at McKesson's pleadings and apply it to

7      Seagate, which has the two-part test that would be, first

8      prong would be this objectively -- the objective inquiry.

9      And so under an objective inquiry, it would be

10     objectively reckless for a business to have knowledge of

11     a patent, to have knowledge of what their device does and

12     to have deliberately infringed that patent.  That is

13     sufficient.

14                    Then also, under the subjective column,

15     we alleged they specifically had knowledge.  Therefore,

16     we have also met the subjective prong under Seagate.

17                    Our pleading stands under both

18     requirements.  There has been one case, since Seagate, to

19     specifically decide this issue, the F5 Networks case.

20     The F5 Networks case specifically held Rule 8 still

21     applies.  Notice pleading is all that's required, and an

22     allegation that alleges notice of the patent is

23     sufficient and is proper for a willful infringement

24     allegation.

Page 80

1                        THE COURT:  Let's say I agree with you.

2      Do you have a preference as to whether I deny their

3      motion to dismiss the willfulness allegations or grant

4      your motion to leave so that the expanded allegations of

5      willfulness become the complaint?

6                        MS. ONDRICK:  It would be our preference

7      to deny the motion.  We only filed the amendment as a

8      precautionary motion in light of all the issues they had

9      raised.

10                        THE COURT:  And what practical

11     difference would it make which way I went on that if I

12     agreed with you?

13                        MS. ONDRICK:  I don't think it

14     effectively makes any practical difference.  Our

15     allegation is still there, it still survives, and it's

16     still before the court.  The real issue of their motion

17     goes to summary judgment, which is going to be decided

18     down the road, and that's where all of the arguments that

19     they are raising are proper.  And all their arguments on

20     Rule 11 have nothing to do with what is in the pleadings.

21                        Their argument is we can't figure out

22     what plaintiff knew to make this allegation.  There is

23     privileged information there.  There is information where

24     they have never served a discovery request.  They never

Page 81

1   served an interrogatory to find out what facts we had at

2   the time.  They have never kind of handled this issue.

3   So what they are talking about in Rule 11, they are just

4   speculating because they don't know what we knew.

5                    There are lots of things that courts

6   look at when determining if there is a good-faith basis

7   for bringing a claim.  There are numerous, numerous

8   factors.  One that is frequently looked at is the

9   similarity between the patent claims and the accused

10  device.  That often is one factor that is enough.  There

11  are many other factors that are involved in looking at

12  it.  Those factors include how long this patent has been

13  around.  This patent was issued in the mid 1990s.  It's

14  not like this patent was issued the day before this

15  lawsuit was filed.  The patents have been touted, the

16  product is well-known.  All those things get factored

17  into this inquiry.

18                    THE COURT:  All right.  Thank you very

19  much.

20                    Mr. Fabricant, it won't be a full hour,

21  but a few minutes to address a few points.

22                    MR. FABRICANT:  Thank you, Your Honor.

23                    Your Honor, I think many of the things

24  that Mr. Jacobs said to Your Honor, to the Court, both in

Page 82

1    the briefs and on oral argument, really support and

2    emphasize the reason why it's inappropriate for this

3    court, on either a standing motion or even a motion with

4    respect to indispensable parties, to adjudicate, to reach

5    a decision as to whether or not this was an assignment,

6    an outright assignment or security interest which somehow

7    was self-extinguished.  When the Court looks at the cases

8    where this has come up, either in the standing context or

9    in the indispensable party context, you don't find the

10   courts deciding the issue and then after they decide that

11   McKesson has the rights, not the investors, I now find

12   that the investors were indispensable parties; what the

13   courts do is they reach the conclusion that there is a

14   general issue as to whether or not this party that's not

15   present before the court has an interest, not adjudicate

16   that fact, but reach the conclusion that there is a

17   genuine possible claim out there.

18              The words of Rule 19(a) themselves talk

19   about a party not joined that has a claim, and that's

20   been construed to mean either they have asserted it or

21   they may have it.  So Rule 19 is directly related to just

22   the question of whether this Court should proceed to

23   adjudicate without the presence of those parties who have

24   knowledge of the facts and would be necessary for the

Page 83

1    jury or the Court to ultimately reach that conclusion.

2                 THE COURT:  So if I analyze it under

3    Rule 19 and say with that particular issue therefore they

4    are indispensable parties, what do I do then?  Do I

5    dismiss or do I give them a chance to see if they could

6    join those parties?

7                 MR. JACOBS:  Well, I will answer.  I

8    think the standing issue falls for the same reason.  They

9    do have a burden of proving that they have substantial,

10   all of the substantial rights of this patent.  I think on

11   the standing issue it's subject matter jurisdiction, the

12   Court, if it agrees with our position, has to dismiss.

13                On the indispensable party issue, yes, I

14   think the Court could allow them an opportunity to join

15   what is a necessary and indispensable party, but if

16   joinder is not feasible and if this Court can't get

17   personal jurisdiction over those parties, then at that

18   point I think the Court would be left with no choice but

19   to dismiss.

20                Now, dismissal without prejudice, as

21   egregious as that might sound in the context of a

22   two-year old battle, Your Honor, I think the Court has to

23   weigh the ultimate prejudice to plaintiff, on the one

24   hand that brought this lawsuit with this open issue, and

Page 84

1    the prejudice to the defendants, on the other hand, if

2    the case proceeds to trial, millions of dollars more

3    expended, possible risk of injunctive relief.  We have an

4    ongoing business that our client has that's at jeopardy

5    here.  The risk of the defendant, if the defendant

6    litigates this and ultimately cannot have a final

7    resolution of patent invalidity, cannot have a final

8    resolution of noninfringement, cannot have a final

9    resolution of unenforceability, has spent all of its time

10   and effort and money only to have some parties in

11   Pennsylvania, who were not of our making, mistake or

12   otherwise, sitting with an outright assignment document,

13   which they could now use with lawyers to pursue our

14   client.  So those are the relevant issues of prejudice

15   which this Court has to take into consideration, both

16   under the standing motion as well as under the

17   indispensable party motion.

18                    And I thought one of the most compelling

19   pieces of evidence that Mr. Jacobs put up on the screen,

20   Your Honor, was that letter that Your Honor paid

21   attention to with respect to the notes being repaid.  And

22   what I think is crucial with respect to that letter, as

23   Your Honor pointed out, it refers to only two of the

24   three notes.  First of all, the letter hasn't been

Page 85

1    authenticated.  They never chose to take the deposition

2    of Mr. Cohen.  The letter only refers to two of the

3    notes, not the third.  The letter which purports --

4    although it says no enclosures; right on the face of the

5    letter it says no enclosures.  The letter purports to

6    refer to two of the three notes.  And then Mr. Jacobs

7    testified, well, there are notes attached to the letter

8    and they are marked cancelled and void, but the letter

9    itself purports to state to the reader you are authorized

10   to mark them cancelled.  So how are notes already marked

11   cancelled or void attached to a letter that says you are

12   authorized to mark them cancelled.

13                    Issues are being raised.  And the reason

14   I focus on that, there is no evidence about the third

15   note.  Let assume that's an authentic letter; let's

16   assume two of the three notes were repaid; let's assume

17   there is a genuine dispute as to the third note.  Under

18   the assignment document, which is before the Court, not

19   only would Mr. Heilman but the seed fund would also, the

20   seed fund whose two notes were supposedly repaid, they

21   would still have their interests under the assignment

22   document because they have an outright assignment, and

23   there is nothing in that assignment document, as this

24   Court has noted, which cross-references anything.  There

Page 86

1   is nothing in the assignment document that says if a note

2   which AHI has given to Dr. Heilman has been repaid but

3   the other notes haven't been repaid, then Dr. Heilman has

4   to reassign but the seed fund doesn't.  There is nothing

5   in that assignment document which considers the

6   possibility of repayment of the notes, reassignment under

7   any circumstances.  We have to take that document on its

8   face, and on its face those individuals own 100 percent

9   of the rights to this patent and are free today to pursue

10  my client's for patent infringement.

11          And I think the mere fact that there is

12  a genuine, legitimate dispute as to this that needs to be

13  adjudicated by a court as to clear title, quiet title,

14  before my client is subjected to the financial and other

15  economic burden of having to defend a patent infringement

16  lawsuit that could ruin it's business against a party who

17  doesn't even and may not even be ultimately determined to

18  be defensible.

19          THE COURT:  What do you say about the

20  burden on a motion to dismiss on standing that Mr. Jacobs

21  referenced?

22          MR. FABRICANT:  I read that case.  The

23  case says that.  It's still the burden.  I don't know how

24  you get beyond the burden of proof being more likely than

Page 87

1    not.  I mean, they have got to have the burden of

2    persuading this Court that in likelihood, it's more

3    likely that they own these claims than not.  And that

4    only gets us then to, if Your Honor is satisfied that

5    they have met that burden.  And I think there are some

6    very serious issues raised by the documents which have

7    been located and presented to this court.  But if Your

8    Honor gets by that burden, then I think we do have the

9    very serious consideration how we proceed to litigate

10   that issue if in this court without those parties.

11               And when Mr. Jacobs read from Rule 19,

12   he left out several of the provisions.  It's certainly a

13   prong of 19(a), whether complete relief can be afforded

14   the parties before this court.  It cannot be under

15   19(a)(1), because we can't litigate completely our claims

16   of invalidity and noninfringement, enforceability even

17   without looking to the absent parties.  And then as far

18   as on indispensable party, the law is clear, by all of

19   the courts that I have read, where you have a party who

20   may have a claim of ownership, they are an indispensable

21   party in a patent infringement lawsuit, because

22   substantial, all the rights have to be before the Court.

23               THE COURT:  How about anything on the

24   Applied Case from the Federal Circuit?

Page 88

1                    MR. FABRICANT:  I did not see a

2    reference to it in our brief, and I apologize for that.

3    My recollection of reading that case, and what the

4    plaintiff's comment on that case was in their brief, is

5    that, first, it would not even apply to a situation where

6    there was an issue as to whether there was an outstanding

7    payment because it addressed an issue where the terms of

8    the document were rendered moot as a result of the

9    payment.  It wouldn't apply to that.

10                   Then second, I remember, I could not

11   tell in my recollection of reading that case that we were

12   dealing with the same kind of instruments here:  an

13   independent assignment, standing on its own, without

14   cross-references to set-off agreements and other

15   conditions which might, under certain circumstances as

16   was applicable in that case, render that document moot,

17   not the same contractual situation as is present before

18   this court, even if payment was resolved, which we don't

19   believe it has been.

20                   THE COURT:  And how about the Akazawa

21   case, in March of 2008, the opinion on state law versus

22   federal law, the Federal Circuit, I just want to give you

23   a chance if you have anything.

24                   MR. FABRICANT:  I think Mr. Jacobs

1    correctly stated the law, as I understand it, that the

2    Federal Circuit has really not been inconsistent in these

3    rulings, that the February decision in DDT, I think it

4    was, dealt with a self-executing assignment or a promise

5    to assign in the future as opposed to other assignment

6    questions that might come about.  And I think that's the

7    slight difference between the two cases, that we have got

8    a self-executing assignment, as was the case in the DDT

9    case.  You wouldn't necessarily look to state law to

10   construe it; in fact, they said you wouldn't look to

11   state law.  And in other assignment situations, and I

12   think Mr. Jacobs correctly stated the law, you can and

13   should look to state law.

14            THE COURT:  Two quick questions with

15   respect to the other motion; I don't know if you want to

16   address them, either you or Mr. Drucker.  Basically, do

17   you agree that some, at least, of the discovery that he

18   outlined would be necessary if we allowed the amendment?

19   That's for you.

20            And then what is your view on if I give

21   you leave to amend with respect to the antitrust claims

22   but I stay those claims, what is your position on that?

23            MR. FABRICANT:  Your Honor, obviously,

24   when any attorney defends a motion to amend a pleading,

Page 90

1   one of our obligations is to build the prejudice side and

2   urge additional discovery being necessary.  I don't

3   believe in this case it seriously is necessary.  And the

4   reason I believe that's so is after we made our motion to

5   this court, on the motion to amend, they took additional

6   depositions of our business people on the antitrust

7   issues; Mr. Patrician's deposition on the market share,

8   on the marketing activities, on all of the things that

9   Mr. Jacobs went through.  They took Mr. Ellis'

10  deposition, Mr. Patrician's deposition; they asked the

11  president of the company, marketing and antitrust

12  questions.  They had an ample opportunity to ask those

13  questions, and they did.  So I don't really believe that

14  they are going to redepose those people and ask

15  additional questions on the same subject.

16              Next I would urge that at the time we

17  first advised them of our intent to make the motion and

18  we made the motion, discovery was opened in this case,

19  fact discovery, until January 31, 2008, Your Honor.  They

20  never raised with the Court, other than to reserve their

21  rights on the various scheduling orders, which they did.

22  They never raised with the Court, you know, we need to

23  take this discovery within the cut-off period.

24              Your Honor, again prejudice to the

Page 91

1    parties.  Swisslog and Translogic should not be

2    prejudiced by the unfortunate situation in this district

3    that we did not have a district judge for well over a

4    year, and this issue sat -- and I'm not blaming anyone

5    because I realize this court has been overburdened as a

6    result of the lack of a district court judge.  We are

7    dealing with a very short period of time from the time we

8    got the documents and the depositions and the request to

9    amend.

10                THE COURT:  And what about staying the

11    antitrust, would that prejudice you?

12                MR. FABRICANT:  That's a result which is

13    not particularly attractive to the defendants.  This is a

14    very long and expensive experience and burden for the

15    defendants.  We will be trying the antitrust claim under

16    Sherman 2, which we raised in the original answer and

17    counterclaim.  We have all of these patent issues.  To

18    require a separate trial on a later date on related

19    antitrust issues, which cover much of the same ground,

20    much of the same relevant market.

21                THE COURT:  But they aren't all

22    antitrust issues.

23                MR. FABRICANT:  Then I think it's

24    prejudicial to the defendants to not be able to at the

Page 92

1  same time trial to be able to tell the complete story to

2  this jury.  I think it's prejudicial.  It's better,

3  obviously, than not having those claims at all because we

4  believe they are viable claims; we believe the evidence

5  is serious.  We would prefer, and we think it's

6  prejudicial not to allow the jury to consider those

7  factors with the others.

8            THE COURT:  Mr. Drucker, may have a note

9  for you, and then you will be done.

10            MR. DRUCKER:  Just quickly to address

11  Ms. Ondrick's arguments.  Basically, they are looking at

12  the pleading requirement just to say if you say that the

13  other side had knowledge of the patents, that's all you

14  need to do.  Those are the magic words.  You utter those

15  words, and you are fine.

16            We say there is an additional obligation

17  as to Rule 11 that still is not being addressed here.

18  There has to be some basis of saying that there was

19  knowledge of patents at the time the complaint was filed.

20  If they are only looking at conduct that came afterward,

21  if they are only look at things they learned about during

22  the course of discovery, they are admitting that they had

23  no knowledge at the time that the complaint was filed or

24  when it was amended for the first time that our client

Page 93

1    had any knowledge of the patents.  You would expect to

2    see something.  There was no mention in the course of

3    dealings in 2002 when the parties were negotiating, when

4    they were exchanging information, there was no mention of

5    the patents then.  Their papers in opposition to the

6    motion are silent about that.

7                    So if you allow them to just utter the

8    magic words, the defendants had knowledge of the patent

9    in suit and was selling the accused products, and that

10   satisfies their burden then it eviscerates Rule 11, if

11   they can just get around it by saying that and there is

12   nothing further to support it.

13                   THE COURT:  Thank you for that.

14                   MR. FABRICANT:  Your Honor, I don't know

15   what other questions you may have.  There is one other

16   issue unrelated to today's motion that at the appropriate

17   time we would like to bring to your attention.

18                   THE COURT:  I don't have any other

19   questions on the motions we talked about.

20                   MR. JACOBS:  Your Honor, if I could, I

21   just have 20 seconds.  I promise.

22                   THE COURT:  With respect to these

23   motions?

24                   MR. JACOBS:  With respect to these

Page 94

1   issues.

2                    THE COURT:  Okay.

3                    MR. JACOBS:  I just wanted to bring to

4   the Court's attention, this is paragraph 21 of the

5   McDonald declaration, and he says there:  "In addition,

6   to signing two of the promissory notes and the term sheet

7   on June 29th, I signed an assignment as part of the loan

8   transaction."

9                    So McDonald ties together into the loan

10  transaction all of the documents, including the

11  assignment.  So I just wanted to -- I was stretching my

12  memory to figure out where we had that, and that's where

13  it was.

14                   THE COURT:  Thank you.

15                   MR. FABRICANT:  If I could comment on

16  that, Your Honor.

17                   THE COURT:  I don't need any comment on

18  that.  I understand where that fits in, but your other

19  issue.

20                   MR. FABRICANT:  Yes.  The other issue

21  is, and I don't know whether this is an issue which we

22  should properly bring to Your Honor's attention or if

23  Judge Robinson should resolve this.

24                   Recently within the last week or ten

Page 95

1    days, after the time for identifying the asserted claims

2    passed, after the time for identifying the disputed claim

3    terms passed, and after the time when our initial expert

4    reports were exchanged, including our expert report on

5    invalidity, which identifies prior art, addressing the

6    claims being asserted, the plaintiff chose to assert

7    additional claims of the patents, not previously asserted

8    after this schedule went forward new claims, for which we

9    did not agree, or proposed disputed claim language nor

10   claims for which our expert was able to address or did

11   address prior art, because those were not claims being

12   asserted.

13           So we are now confronted with, in the

14   middle of our expert schedule, new claims being asserted,

15   our expert not having addressed it in his initial report,

16   creating a ramification of, perhaps, a schedule delay

17   because we now need -- if they are allowed to do this, we

18   need to go out there and search for prior art, have our

19   expert address the prior art, have them address the

20   noninfringement position, which we haven't previously

21   addressed.  And it is a serious change, at this late

22   date, on the patent side of the case, to change the

23   asserted claims at this state without asking us to do so,

24   without the Court's permission.

Page 96

1                   THE COURT:  If I am not mistaken, I

2    think the reference to me carves out claim construction

3    and Judge Robinson has claim construction -- help me out.

4                   MR. JACOBS:  That's correct.

5                   MR. FABRICANT:  That's correct.  But it

6    doesn't exactly deal -- I guess it begins being a

7    procedural issue because, putting aside the fact if they

8    are allowed to add the claim, obviously we have to

9    propose claim construction and we will get to the point

10   of the expert.  But it does involve procedure, because

11   does our expert now have to consider these claims?  Does

12   our expert now have to proffer prior art?  Should we

13   consider in our expert report, which is due in another

14   week on noninfringement.

15                   So we are left really objecting to but

16   not knowing exactly what to do.

17                   THE COURT:  Let me hear what Mr. Jacob's

18   view on how I should handle that, if in fact, I should

19   handle it.

20                   MR. JACOBS:  Your Honor, if the Court is

21   inclined to handle it, we have agreed to grant additional

22   time to the extent additional time is necessary.  This

23   came about as a result of some information that was

24   provided in one of their initial expert reports.  So

Page 97

1   until we had that information, we were not prepared to

2   assert these additional claims.  They are dependent

3   claims.  So they depend upon independent claims that were

4   already asserted.  To the extent that it does require

5   additional time or an amendment of expert reports, we are

6   certainly willing to work with the defendants, as we have

7   done all along, to make sure that everybody can get done

8   what they need to get done in an appropriate time period

9   here.

10          And at the same time, they have

11  supplemented one of their expert reports and added some

12  additional claims after their initial first round of

13  expert reports came in and we agreed to allow them to do

14  that, even though it obligated us to do some additional

15  stuff with our expert as well.  My view, is this

16  something that, given the time period we have, we can

17  work out and we certainly can bring it in.  It's three

18  dependent claims, certainly something that shouldn't take

19  a lot of time, but we will work with them to the extent

20  it causes any undue problems for them.

21          THE COURT:  Here is what we are going to

22  do.  I am going to tentatively view this as a

23  discovery-type issue that would be referred to me and

24  would be governed by my standard procedure is that we

Page 98

1    would schedule a telephone conference.  And a couple of

2    days before I would get a three-page letter from the

3    party that is complaining, and the next day a three-page

4    letter from the other side.  And so I can set a schedule

5    now for letters, but let me just, before I buy that

6    litigation for myself, did I understand from Mr. Jacobs

7    that maybe if I had left you all on your own for a few

8    more days maybe you could work this out without me having

9    to get involved?  Do you think you have an issue and are

10   at an impasse that's just not going to get resolved

11   without some judicial involvement?

12            MR. FABRICANT:  Your Honor, I would

13   prefer if Your Honor set the schedule.  It is a relevant

14   change.  Although it involves only three new claims, it's

15   a significant addition at this point.

16            I would also ask for some direction on,

17   I don't know whether Your Honor would have an opportunity

18   to resolve this, but the only immediate impact that is

19   that both sides have expert rebuttal reports due on, I

20   believe, the 28th of May, and it would be very difficult,

21   in light of this latest development, for our expert to

22   address those three additional claims in the report due

23   in a short time.

24            THE COURT:  Scheduling, I'm almost

Page 99

1    certain, is in front of Judge Robinson.  I think you

2    folks met with her.

3                    MR. JACOBS:  We will work with her.

4                    THE COURT:  This is what we will do.

5    That I will look for a three-page letter from Swisslog by

6    the end of day tomorrow on this issue, a three-page

7    letter from McKesson by the end of the day Thursday on

8    this matter.  And we will, I will go back and look at my

9    calendar, but sometime Friday we will try to put this on

10   for a call.  However, be on notice that if after

11   reviewing your letters I determine or Judge Robinson

12   determines it's not an issue for me, then we will let the

13   parties know that you are not having a call with me on

14   Friday, and there will be some other mechanism for

15   resolving the issue.

16                    MR. JACOBS:  And in the meantime, Your

17   Honor, we will try to reach out and negotiate and maybe

18   we can obviate the need for the letters.

19                    THE COURT:  If you can resolve it,

20   that's great.  Don't leave the courtroom; I will send my

21   deputy back in with a tentative time for a Friday

22   telephone conference.  But if I don't get letters

23   tomorrow and Thursday, there won't be a teleconference

24   and even if I get letters and it's not my issue, we will

Page 100

1    let you know.

2                    MR. FABRICANT:  Your Honor, if it is

3    your issue, I would just let you know that we have a

4    conflict from about noon until three o'clock on Friday.

5                    THE COURT:  We will go and take a look

6    at it whether we have time in the morning.  Okay.

7                    Anything further?

8                    MR. JACOBS:  No, Your Honor.

9                    MR. FABRICANT:  No, Your Honor.

10                   (The hearing adjourned at 1:10 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 101

1                        C E R T I F I C A T E

2

3    STATE OF DELAWARE:

4    NEW CASTLE COUNTY:

5         I, Ellen Corbett Hannum, a Notary Public within and

6    for the County and State aforesaid, do hereby certify

7    that the foregoing oral argument was taken before me,

8    pursuant to notice, at the time and place indicated; that

9    the statements of participants was correctly recorded in

10   machine shorthand by me and thereafter transcribed under

11   my supervision with computer-aided transcription; that

12   the transcript is a true record of the statements given

13   by the participants; and that I am neither of counsel nor

14   kin to any party in said action, nor interested in the

15   outcome thereof.

16        WITNESS my hand and official seal this 27th day of

17   May A.D. 2008.

18                  *Ellen Corbett Hannum*

19                  Ellen Corbett Hannum, RMR, CMR.
                    Notary Public - Reporter
20                  Delaware Certified Shorthand Reporter
                    Certification No. 118-RPR, Expires 1/31/11

21

22

23

24