IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MCKESSON AUTOMATION, INC.<br>a Delaware Corporation, | )<br>)<br>) |
| Plaintiff, | )<br>) Civil Action No. 1:06CV00028-SLR/LPS |
| v. | )<br>)<br>) |
| TRANSLOGIC CORPORATION<br>a Delaware Corporation, and | )<br>) PUBLIC VERSION<br>) |
| SWISSLOG ITALIA S.P.A.<br>an Italian Corporation, | )<br>)<br>) |
| Defendants. | )<br>) |

## PLAINTIFF MCKESSON AUTOMATION, INC.'S
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

Dale R. Dubé (#2863)
BLANK ROME LLP
1201 N. Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6400
dube@blankrome.com

Blair M. Jacobs
Robert A. Gutkin
Christina A. Ondrick
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 383-0100

Filed Under Seal June 3, 2008                    *Counsel for Plaintiff McKesson Automation, Inc.*
Public Version filed June 11, 2008

## I.    INTRODUCTION

Plaintiff McKesson Automation, Inc. ("McKesson") seeks reconsideration of the Court's May 30, 2008 Report and Recommendation Regarding Defendants' Rule 12(b)(1) Motion to Dismiss (D.I. 310). Reconsideration is necessary to correct a clear error of fact or apprehension and to prevent manifest injustice.

**REDACTED**

Defendants' initial motion to dismiss contended that McKesson lacked standing because it could not produce a formal reassignment. As a result, much of the evidence demonstrating REDACTED was not provided to the Court because it did not pertain to Defendants' argument.

**REDACTED**

Therefore, the Court based its decision regarding REDACTED on an incomplete record. As set forth below, the complete record demonstrates REDACTED

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    Procedural History

Defendants filed their Motion to Dismiss on October 3, 2007, arguing that McKesson lacked standing REDACTED

**REDACTED**

The Court heard oral argument on May 21, 2008 and subsequently issued the ruling

McKesson now seeks to have reconsidered.

**B.      Statement of Facts**



---

[1] Should the Court have any questions regarding the authenticity of any document attached to the Ondrick
Declaration, McKesson stands prepared to submit a declaration from the documents' custodian.

[2] ,

REDACTED

REDACTED

3



# REDACTED

Additional documents of record also confirm that Dr. Heilman was paid in full



---

REDACTED

[4] McKesson will make available at the Court's or Defendants' request the original document

REDACTED

REDACTED

### III.   LEGAL STANDARDS

A motion for reconsideration that challenges the correctness of a previously entered order

is considered the "functional equivalent" of a motion to alter or amend judgment pursuant to

Federal Rule of Civil Procedure 59(e).  *Jones v. Pittsburgh Nat. Corp.*,  899 F.2d 1350, 1352 (3d

Cir. 1990).  The purpose of a motion for reconsideration filed pursuant to Rule 59(e) is "to

correct manifest errors of law or fact or to present newly discovered evidence."  *Max's Seafood

Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  A Court should grant a motion for

---

5                                        REDACTED

6

reconsideration when there is: (1) a change in the controlling law; (2) newly available evidence; or (3) the need to correct a clear error of law or fact and to prevent manifest injustice. *Max's Seafood*, 176 F.3d at 677.[6] The procedural mechanism afforded by motions for reconsideration attempts to balance the interest in finality of judicial decisions with the recognition that courts sometimes err. *Brambles U.S.A., Inc. v. Blocker*, 735 F.Supp. 1239, 1241 (D. Del. 1990). The motion ought to be granted only sparingly; however, it should be granted in circumstances where the court has patently misunderstood a party or made an error not of reasoning but of apprehension. *Id.* Further, "Court[s] will address this issue [on reconsideration] as it bears on the important issue of standing." *Mars, Inc. v. Coin Acceptors, Inc.*, 2006 WL 2927240, at *5 (D.N.J. Aug. 7, 2006) rev'd on other grounds, No. 2007-1409 (Fed. Cir. June 2, 2008).

This standard must be read in conjunction with the Court's independent obligations created by a motion to dismiss challenging standing. As the Court noted in its Report and Recommendation, Courts considering a standing motion are "free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case." *UD Tech. Corp. v. Phenomenex*, 2007 WL 28295, at *2 (D. Del. Jan. 4, 2007). Courts have an "independent obligation" to examine jurisdiction. *Pfizer, Inc. v. Elan Pharmaceutical Research Corp.*, 812 F. Supp. 1352, 1356 (D. Del. 1993). Thus, this Court has an "independent obligation" to consider all of the evidence bearing on the issue of the debt repayment to Dr. Heilman, including the evidence submitted herewith.

---

[6] To the extent the Court concludes that the record presents contradictions of fact or requires witness credibility determinations, the Court should conduct an evidentiary hearing on standing. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254 (1970) (when credibility and veracity are at issue, written submissions are wholly unsatisfactory basis for decision); *Munoz v. Pierce* 711 F.2d 421 (1st Cir. 1983) (court must resolve a genuinely disputed factual issue concerning standing either through pretrial evidentiary hearing or trial itself); *Martin v. Morgan Drive Away*, 665 F.2d 598 (5th Cir. 1982) (vacating district court's order dismissing party for lack of standing without first holding evidentiary hearing when several fact issues were disputed).

**IV.    ARGUMENT**

# REDACTED

McKesson's focus in its opposition to Swisslog's motion to dismiss was based on the

narrow issue that Defendants raised.  Because the Court's Report and Recommendation was

based on a partial record :                     REDACTED

reconsideration is now warranted to prevent mistakes of fact and to prevent manifest injustice.

      REDACTED

                                    Other than a lack of recollection, there is no

evidence that controverts any of these facts.

**V.    CONCLUSION**

      For the reasons above, McKesson respectfully requests that the Court grant its Motion for

Reconsideration                     REDACTED


Dated: June 3, 2008

                            BLANK ROME LLP

                            *Dale R. Dubé*

                            Dale R. Dubé (#2863)
                            1201 N. Market Street
                            Suite 800
                            Wilmington, DE 19801
                            (302) 425-6400
                            dube@blankrome.com

                            Blair M. Jacobs
                            Robert A. Gutkin
                            Christina A. Ondrick
                            SUTHERLAND ASBILL & BRENNAN LLP
                            1275 Pennsylvania Avenue, NW
                            Washington, DC 20004
                            Tel:  (202) 383-0100

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2008, I served by email and electronic filing the

Public Version of PLAINTIFF McKESSON AUTOMATION, INC.'S MEMORANDUM IN SUPPORT

OF ITS MOTION FOR RECONSIDERATION, using CM/ECF, which will send notification of such

filing to the following:

> Julia Heaney, Esquire
> MORRIS, NICHOLS ARSHT & TUNNELL
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899

I also certify that, on this 11th day of June, 2008, I served the aforementioned document, by email

to the following participants:

> Lawrence C. Drucker, Esquire
> Alfred R. Fabricant, Esquire
> Richard LaCava, Esquire
> DICKSTEIN SHAPIRO LLP
> 1177 Avenue of the Americas
> New York, NY 10036

Dale R. Dubé (I.D. No. 2863

# TAB  A



Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
**(Cite as: 2006 WL 2927240 (D.N.J.))**

Page 1

▶

Mars, Inc. v. Coin Acceptors, Inc.
D.N.J.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
MARS, INCORPORATED, et al., Plaintiff and
Counterclaim Defendants,
v.
COIN ACCEPTORS, INC., Defendant and Coun-
terclaim Plaintiff.
**Civil Action No. 90-49 (JCL).**

Aug. 7, 2006.

Lanny Steven Kurzweil, McCarter & English, LLP,
Newark, NJ, for Plaintiff and Counterclaim Defend-
ants.
Elizabeth J. Sher, Pitney, Hardin, Kipp & Szuch,
LLP, Florham Park, NJ, Clyde A. Szuch, Pitney,
Hardin, Kipp & Szuch, Morristown, NJ, for De-
fendant and Counterclaim Plaintiff.

**MEMORANDUM AND ORDER**

LIFLAND, District Judge.
**\*1** This matter comes before the Court upon motion
of Mars, Incorporated ("Mars") to reconsider the
Memorandum and Order of May 19, 2006 denying
Mars' motion to amend the Amended Complaint to
add Mars Electronics International, Inc.
("MEI-US") as a co-Plaintiff, and granting the mo-
tion of Coin Acceptors, Inc. ("Coinco") for partial
summary judgment on Mars' claim for lost profits
damages stemming from the infringement of United
States Patent No. 3,870,137 ("the two frequency
patent" or "the '137 patent") and United States Pat-
ent No. 4,538,719 ("the Gray patent" or "the '719
patent"). In the alternative, Mars renews its motion
to add MEI-US as a co-Plaintiff.

For the reasons expressed herein, Mars' motion to
reconsider the denial of its motion to amend is
granted. MEI-US has standing to recover lost
profits or a reasonable royalty during the period in

which MEI-US was the owner of the ' 719 patent,
and Mars does not have standing during that period.
The motion to reconsider summary judgment in fa-
vor of Coinco on the issue of Mars' lost profits is
denied.

**I. STANDARD OF REVIEW**

Relief by way of a motion for reconsideration or
reargument is "an extraordinary remedy" that is to
be granted "very sparingly." *NL Indus. Inc. v. Com-
mercial Union Ins. Co.,* 935 F.Supp. 513, 516
(D.N.J.1996); *Maldonado v. Lucca,* 636 F.Supp.
621, 630 (D.N.J.1986). Local Rule 7.1(i) governing
reconsideration does not contemplate a recapitula-
tion of arguments considered by the court before
rendering its decision. *Bermingham v. Sony Corp.
of Am., Inc.,* 820 F.Supp. 834, 856 (D.N.J.1992),
aff'd, 37 F.3d 1485 (3d Cir.1994); *Carteret Sav.
Bank, F.A. v. Shushan,* 721 F.Supp. 705, 709
(D.N.J.1989). Rather, the rule permits reconsidera-
tion only when "dispositive factual matters or con-
trolling decisions of law" were presented to the
court but were overlooked. *Resorts Int'l v. Great
Bay Hotel and Casino,* 830 F.Supp. 826, 831
(D.N.J.1992); *Khair v. Campbell Soup Co.,* 893
F.Supp. 316, 337 (D.N.J.1995).

Local Rule 7.1(i) requires the moving party to "set[
] forth concisely the matters or controlling de-
cisions which counsel believes the [court] has over-
looked."A motion under Rule 7.1(i) may be granted
if: (1) "an intervening change in the controlling law
has occurred; (2) evidence not previously available
has become available; or (3) it is necessary to cor-
rect a clear error of law or prevent manifest in-
justice."*Database Am., Inc. v. Bellsouth Adver. and
Pub. Co.,* 825 F.Supp. 1216, 1220 (D.N.J.1993);
*see also North River Ins. Co. v. CIGNA Reinsur-
ance Co.,* 52 F.3d 1194, 1218 (3d Cir1995); *S.C. v.
Deptford Township Bd. of Educ.,* 248 F.Supp.2d
368, 380-81 (D.N.J.2003).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
(Cite as: 2006 WL 2927240 (D.N.J.))

Page 2

## II. ANALYSIS

After thoroughly considering all of the arguments and evidence presented by the parties, the Court concluded that Mars' motion to amend was futile because it found that MEI-US was a nonexclusive licensee and therefore lacked standing to sue. As for the lost profits claim, applying the *Panduit* test, the Court concluded that Mars could not show that it had the capability to manufacture or market the coin validation mechanisms at issue, and consequently could not show any lost profits of its own. Although Mars argued that there was an inexorable flow of profits from MEI-US to Mars, in order to demonstrate that MEI-US's lost profits were Mars' lost profits, Mars failed to offer any proof of such a flow of profits. Indeed, after considering the evidence and the testimony related to the financial relationship between the two companies, the Court concluded that the relationship was one where Mars received royalties from MEI-US, which was a nonexclusive licensee. Therefore, as a matter of law, the Court concluded that Mars' claim for lost profits failed.

*2 Now, Mars presents additional evidence, though not necessarily evidence "not previously available," and makes some changes to its previous arguments, which it urges the Court to accept in support of reconsideration. Although the additional evidence does not fall within the boundaries of the Local Rule (i.e., it was previously available), the Court will consider it, in order to prevent manifest injustice. Each issue will be discussed in turn.

### A. Motion to Amend the Complaint to Add MEI-US as a Co-Plaintiff

For MEI-US to join the lawsuit as a co-Plaintiff, MEI-US has to have standing. Standing is a threshold jurisdictional issue. *Fieldturf, Inc. v. Southwest Recreational Indus.*, 357 F.3d 1266, 1268 (Fed.Cir.2004)."To bring an action for patent infringement, a party must be either the patentee, a successor in title to the patentee, or an exclusive li-

censee of the patent at issue."*Id.* (citations omitted). Otherwise, the party lacks standing.

Initially, Mars focused on the consultive aspects of the relationship between itself and MEI-US, arguing that MEI-US was an implied and de facto licensee, which Mars interpreted to be like an exclusive licensee because Mars sought MEI-US's consent before granting licenses to others. The Court rejected this argument, in part because Mars offered no legal support for such a status, and in part due to the evidence that Mars had granted non-exclusive licenses to others. It is the latter aspect of the prior ruling (the other licenses) that the Court addresses now, as well as additional evidence Mars offers which bears on standing.

### 1. *Coin Industries, PLC, and Coin Controls, Inc.*

In 1989, Mars entered into an agreement with Coin Industries, PLC, a corporation of the United Kingdom, and its U.S. subsidiary, Coin Controls, Inc., in which Mars granted "a non-exclusive license ... to make, use and sell coin and token validators using Sentinel Technology" under the '137 patent. (DX-2547.) Mars argues, rightly so, that the Coin Industries agreement did not cover the '719 patent. However, the agreement does show that, as of 1989, Mars was able to grant a nonexclusive license of the '137 patent. Therefore, MEI-US cannot be considered an exclusive licensee of the '137 patent. The '137 patent expired on March 11, 1992.

### 2. *The Anritsu Agreement*

After numerous requests for discovery related to the Anritsu license, Mars finally submitted to Coinco and to the Court what it deemed to be the Anritsu license. By letter to the Court dated April 17, 2006, Mars identified a one-page document entitled "Exhibit B Mars' Patents" as the Anritsu license. The document states in its entirety:

This is an exhibit to the Development and Supply Agreement between Anritsu and *Mars,* and dated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
**(Cite as: 2006 WL 2927240 (D.N.J.))**

on or about November, 1987.

The license to Anritsu under the aforesaid Development and Supply Agreement includes a license under the U.S. Patents 3,918,564 and 3,918,565 for the manufacture of Anritsu Coin Acceptors and under any other present patent right of *Mars* required to manufacture such Anritsu Coin Acceptor.

**\*3** (emphasis added).

At first, Mars argued that this license does not refer to or grant rights under either the '137 or the '719 patents. The '719 patent expired on July 1, 2003. Indeed, on reconsideration Mars again states that the agreement specifically references two patents, and therefore it creates an inference that the parties did not intend to license the '137 or '719 patents. The Court originally rejected this argument based on the deposition testimony of Garo Partoyan, Esq., Mars' General Counsel for Marketing and Technology, and based on the broad language of the grant, which the Court concluded did not support Mars' argument that the license was limited or that it did not include the '137 or the '719 patents.

Now Mars raises for the first time some new issues about the Anritsu license. First, Mars asserts that it was not a party to the Anritsu license. Rather, the license was between Anritsu and MEI-US. Mars also now contends that it was a "transitional sublicense." The Court relied on Exhibit B, which is now PTX-632, which references "Mars" as the licensor. However, the complete Development and Supply Agreement (PTX-631),[FN1] which was not submitted to the Court at the time of the prior motions-only Exhibit B was submitted-but which came into evidence at the trial on damages, clearly indicates that the Agreement was made between Anritsu Corporation and Mars Electronics International, Inc., the entity we know as MEI-US. According to Mars, the license to Anritsu is a sublicense, which, Mars argues, implies that MEI-US was the exclusive licensee. Coinco responds by correctly pointing out that a non-exclusive licensee can sublicense. *See Adelberg Labs., Inc. v. Miles, Inc.,* 921 F.2d

1267, 1272 (Fed.Cir.1990).

> FN1. The Anritsu Development and Supply Agreement is dated April 1, 1990, but Exhibit B to the Agreement bears a date of November 1, 1987. No other agreements, dating from 1987, have been produced by Mars, but the implication is that other agreements, dating from at least 1987, must exist. If this is so, Mars has not produced evidence that the 1990 Agreement is the exact one about which Mr. Partoyan testified. However, if the 1990 Agreement was the one about which Mr. Partoyan testified, Coinco argues that there is nothing in the document to indicate that Mr. Partoyan's testimony was incorrect or mistaken when he testified that the Anritsu license covered the two frequency patents (i.e., the '137) and may have covered the Gray (i.e., the '719).

Adding another twist, Mars now seeks to retract the testimony of Mr. Partoyan as it relates to the subject matter of the Anritsu license. In support of its argument that there is no evidence to indicate that Anritsu coin acceptors used any invention of the '137 or '719 patents, Mars propounds a "correction" to the deposition testimony of Mr. Partoyan (upon which the Court had already relied). Mr. Partoyan testified at his January 24, 2006 deposition as follows:

Q. What was the subject matter of the Anritsu license?

A. I believe it was the two frequency patents, the '137, I can't remember if it was the programmable memory and the Gray-it could have been the Gray patent as well....

Mars submitted the Declaration of Autumn J.S. Hwang, Esq., on June 5, 2006 in support of its motion for reconsideration. It contains suggested "corrections" to the deposition testimony of Mr. Partoyan. Significantly, the "correction" sheet is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
(Cite as: 2006 WL 2927240 (D.N.J.))

Page 4

dated May 22, 2006, three days after the date of the May 19th Memorandum and Order denying Mars' motion to amend, suggesting that the "corrected" deposition testimony was in response to the Court's unfavorable decision. Mr. Partoyan now contends that his belief as to the subject matter at the time of his January 2006 deposition was wrong. He seeks to correct his answer to read:

*4 A. It was part of a development and supply agreement between Anritsu and MEI for MEI to make and supply coin validators to Anritsu for its pay telephones. The license allowed Anritsu to use the '564 and '565 patents in a specific coin acceptor during the interim while MEI was making proto-type validators for Anritsu.

(Declaration of Autumn J.S. Hwang, Esq., Ex. 15.)

Coinco responds that the "corrected" testimony contradicts Mr. Partoyan's sworn Rule 30(b)(6) testimony, and that the belated substantive change to this testimony violates Fed.R.Civ.P. 30(e), in that changes to the "form or substance" of a deposition must be requested by the deponent before completion of the deposition and the changes must be submitted within thirty days after being notified that the transcript is available for review. Coinco adds that, as a 30(b)(6) designee, Mr. Partoyan was required to review all corporate documents having a bearing on deposition topics prior to the deposition. Coinco therefore argues that Mars cannot now attempt to change its position on the Anritsu license simply because Mr. Partoyan may have been unprepared to testify about the license. The Court agrees and rejects the change to Mr. Partoyan's testimony.

Finally, Mars argues that the Court overlooked the remainder of the sentence in Exhibit B which states, "and under any other present patent right of Mars *required to manufacture such Anritsu Coin Accept-or.* "In the May 19, 2006 Memorandum, the Court quoted the entire sentence but focused on *"and under any other present patent right ofMars"* as evidence of an intent not to limit the Anritsu license solely to the '564 and '565 patents listed therein, in reliance on Mr. Partoyan's testimony as to the sub-

ject matter of the Anritsu license. Based on that evidence, the Court concluded that Mars failed to prove that the Anritsu license did not include the '137 and '719 patents. Even now, Mars has not provided any sworn testimony that the Anritsu license did not encompass the '137 or '719 patents. In other words, even Mr. Partoyan's "corrected" testimony does not state that the Anritsu license for the Anritsu Coin Acceptor did not include the '137 or '719 patents.

After reviewing the evidence, the Court finds that MEI-US was the party to the Development and Supply Agreement with Anritsu. However, the Court rejects Mars' attempt to restrict the subject matter of the Anritsu license through Mr. Partoyan's deposition "correction." The change is in no way a mere correction; it is untimely pursuant to Fed.R.Civ.P. 30(e); and the Court finds it highly significant that Mars sought this change only after the Memorandum and Order of May 19,2006 had issued. Finally, the Development and Supply Agreement with Anritsu pre-dates the 1996 assignment of rights from Mars to MEI-US (discussed below), and therefore the Court concludes that MEI-US, a licensee itself, was sub-licensing to Anritsu.

### 3. *The 1996 License Agreement and the Agreement Assigning Mars' Rights to MEI-US*

*5 In the brief in support of the motion to amend, Mars argued that it (Mars) was a proper plaintiff because Mars "has held legal title to the '137 and '719 patents at all pertinent times.... Equitable ownership was transferred to MEI-US as of January 1, 1996. * * * As a general rule, the legal title holder is entitled to seek money damages for patent infringement.... Therefore, Mars has standing to seek money damages."(Mem. Supp. at 11-12) (internal citations omitted.) In the reply papers submitted on the motion to amend, Mars stated "MEI became the beneficial owner of the Mars coin mechanism patents, which included the '719 patent. (The '137 patent had expired.) This is another reason why MEI has standing as a party plaintiff."(Reply Mem. at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
(Cite as: 2006 WL 2927240 (D.N.J.))

3.) There was no support for the legal title/equitable title dichotomy advanced by Mars, and the Court did not dwell on it.

Now, Mars focuses again on the assignment of patent rights from Mars to MEIUS that took place as of January 1, 1996. As it did before, Mars asserts that it assigned the beneficial rights in its patents to MEI-US while retaining legal title for itself, but it now argues that MEI-US's beneficial ownership is a form of exclusive license. Coinco responds, rightly, that this is a novel argument that was not raised in the prior motion and is therefore unsuitable for reconsideration. Nonetheless, the Court will address this issue as it bears on the important issue of standing.

As of January 1, 1996 Mars and MEI-UK entered into a "License Agreement." (Declaration of Thomas G. Cornell, Ex. 43; DX-2555.) As of the same date, Mars also entered into an "Agreement" with both MEI-UK and MEI-US, in which Mars "transfer[red] to MEI-US its entire interest in the Covered Intellectual Property that relates to the business of [MEI-US and MEI-UK] (the "Parties")." (Cornell Decl., Ex. 42, DX-2554.) [FN2]

> FN2. There is no question in the Court's mind that such "Covered Intellectual Property" included the '719 patent and, for what it was worth, the expired '137 patent.

In the License Agreement, Mars granted MEI-UK "the non-exclusive right, authority and license to use, make or sell and otherwise exploit any and all of the Covered Intellectual Property."The License Agreement further noted that MEI-UK will "continue to have a non-exclusive right to exploit, in the conduct of its business, the Covered Intellectual Property in any country of the world in exchange for a royalty payable to [Mars]." Thus, in the 1996 License Agreement, Mars clearly conveyed a non-exclusive license to MEI-UK.

The "Agreement," which is what Mars refers to as the Assignment Agreement, also effective January

1, 1996, is critical and states in pertinent part:

Whereas [Mars] currently owns a substantial number of patents and patent applications related to Covered Products manufactured and sold by [MEI-US and MEI-UK (the "Parties") ]

* * *

Whereas, the Parties have been heretofore using and exploiting, in the conduct of their businesses, those letters patent and that Information (the "Covered Intellectual Property"), in exchange for the payment of royalties to [Mars];

*6 Whereas *[Mars] and MEI-UK have entered into an amended royalty agreement* whereby MEI-UK will continue to have a non-exclusive right to exploit, in the conduct of its business, the Covered Intellectual Property in any country in the world, in exchange for a royalty payment to [Mars];

Whereas *[Mars] and MEI-US have agreed to terminate their existing royalty arrangement* and that [Mars] will transfer to MEI-US all of [Mars'] beneficial interest in the Covered Intellectual Property, including the rights to royalties to be received under this amended royalty arrangement with MEI- UK;

* * *

Now Therefore, ... [Mars] hereby transfers to MEI-US its entire interest in the Covered Intellectual Property that relates to the business of the Parties.

The Parties agree that [Mars] shall continue to maintain all existing letters patent and registration of Information, and secure all future letters patent and registrations of Information obtainable due to the ongoing research and development activities of the Parties, in any area of the world in its own name (as an agent or nominee for the Parties) unless to do so would result in a violation of local law or practice, or would cause an enforceable right to no longer be enforceable.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
**(Cite as: 2006 WL 2927240 (D.N.J.))**

Page 6

(emphasis added.)

As noted above, the '137 patent had expired on March 11, 1992 and the '719 patent was to expire on July 1, 2003. The Court must now consider the import of both the License Agreement and, especially, the Agreement transferring Mars' entire interest in at least the '719 patent from Mars to MEI-US.

Responding to Mars' argument that the transfer of the beneficial interest to MEI-US was a form of exclusive license providing MEI-US standing as a beneficial owner, Coinco argues that the transfer could not be an exclusive license because it did not give MEI-US the right to exclude others from making, using or selling the patented inventions.

In the Court's view, the plain language of the January 1, 1996 Agreement resolves the issues. It did not set up a legal title/equitable title dichotomy, nor was it a license. Rather by its explicit terms, it was an assignment of all of Mars' interest in its Covered Intellectual Property, including the '719 patent, to MEI-US. Thus, as of January 1, 1996, Mars assigned to MEI-US its entire interest in at least the '719 patent. As for the Anritsu license, after the assignment, MEI-US became the licensor, rather than sub-licensor, because MEI-US had become the owner of the '719 patent.[FN3]

> FN3. Presumably, the license of the '137 patent to Anritsu became irrelevant when the '137 patent expired in 1992.

Under the January 1, 1996 License Agreement, Mars had granted a nonexclusive license to MEI-UK, but transferred its right to royalties under its "amended royalty arrangement" with MEI-UK to MEI-US by virtue of the Assignment Agreement.

Therefore, as of January 1, 1996, Mars lost standing; it owned no relevant patent rights.

The Court agrees with Coinco's position that when Mars terminated the license from Mars to MEI-US (see Agreement, *supra* at 12-13, where they

"agreed to terminate their existing royalty arrangement") and replaced that non-exclusive license with the assignment of Mars' "entire interest" to MEI-US, Mars failed to reserve any rights, including the right to exclude others and to enforce patents.[FN4]Thus, Coinco argues, and the Court agrees, that Mars lost standing to sue on the merits on January 1, 1996. See *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.,* 402 F.3d 1198 (Fed.Cir.2005).

> FN4. There is nothing in the language of the Agreement that suggests that Mars retained *any* rights, except the right to "maintain all existing letters patent and registration of Information, and secure all future letters patent and registrations of Information obtainable due to the ongoing research and development activities of the Parties, in any area of the world in its own name (as an agent or nominee for the Parties)." These rights are not relevant to this dispute.

*7 In *Schreiber Foods,* the plaintiff owned two patents, and filed suit against defendants alleging infringement. While the case was being litigated, Schreiber Foods assigned one of the patents, the '860 patent, including all of the claims and causes of action thereunder, to its subsidiary, Schreiber Technologies. However, Schreiber Foods failed to inform the defendants and the court of the assignment and Schreiber Technologies was not joined as a party to the lawsuit. *Id.* at 1200.After the trial and verdict, but while the defendants' motion for judgment as a matter of law was pending, Schreiber Foods reacquired the '860 patent.

Discussing whether the district court lacked jurisdiction to adjudicate the case because the loss of standing by Schreiber Foods created a mootness problem, the Federal Circuit concluded that a judgment could be rendered void if the deficiency in standing is not corrected. *Id.* at 1203.But, such a loss of standing in these circumstances can be cured, as long as the plaintiff regains standing be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fore judgment is entered. *Id.* at 1204 (citing *Caterpillar, Inc. v. Lewis,* 519 U.S. 61 (1996); *Insituform Technologies, Inc. v. Cat Contracting, Inc.,* 385 F.3d 1360 (Fed.Cir.2004)).

Ultimately, the court found that "Schreiber reacquired its stake in the litigation by reacquiring the '860 patent (and causes of action thereunder) before the entry of judgment. The jurisdictional defect that had existed was cured before the entry of judgment and thus the judgment was not void."*Id.* at 1204.However, the Federal Circuit upheld the district court's decision to vacate judgment under Federal Rule of Civil Procedure 60(b)(2) and (3). The court remanded for a new trial, because it agreed with the district court that Schreiber Foods' misrepresentations of ownership of the '860 patent and its counsel's failure to advise the court of the potential jurisdictional defect merited a new trial.

Mars relies on the 1996 Agreement to insist that MEI-US has standing to join as co-Plaintiff. As far as the Court knows, the 1996 Agreement is still in force and it does cover the '719 patent .<sup>FN5</sup>But, Mars granted to MEI-US "its *entire interest* in the Covered Intellectual Property. The only reasonable conclusion to draw from the plain language of the Agreement is that Mars granted all of its rights, including the right to exclude and the right to enforce the '719 patent, to MEI-US. It is also reasonable to conclude that the Agreement is still in force. Therefore, it appears that Mars lost its standing in 1996 to sue on at least the '719 patent and, as far as the Court is aware, has not cured that "jurisdictional" defect.

> FN5. The conclusion that the Agreement is still in force is based on Mars' statement that "[w]e anticipate that, in the very near future, MEI will assign all of its pertinent rights back to Mars, as part of or in preparation for the sale of MEI by Mars."(Br. Supp. at 11 n. 6.)

Finally, Mars argues that *Kalman v. The Berlyn*

*Corp.,* 914 F.2d 1473 (Fed.Cir.1991), stands for the proposition that non-patent owners have standing to join as co-plaintiffs with the patentee. In *Kalman,* the patent holder, Dr. Kalman, sought to amend his complaint to add as a plaintiff a corporation in which he was a 50% owner. The corporation, Process Developments Ltd ("PDL"), was formed by Dr. Kalman and his brother to manufacture and market the patented product, a filtration device. At a certain point in time, Dr. Kalman was approached by The Berlyn Corporation for a license to manufacture the filtration device, but Dr. Kalman refused to grant any licenses. The Berlyn Corporation later began to sell a filtration device similar to Dr. Kalman's patented product and Dr. Kalman brought an infringement action against The Berlyn Corporation. Ultimately, the court concluded that The Berlyn Corporation's product infringed Dr. Kalman's patent. Thereafter, in an effort to obtain the full amount of PDL's lost profits as damages, Dr. Kalman sought to add PDL as a plaintiff.

*8 The district court denied the motion to amend. On appeal, reversing that decision, the Federal Circuit held that PDL had standing to join as a co-Plaintiff because it found that "Berlyn considered Dr. Kalman and PDL to be a single entity for purposes of damages, and that Berlyn was not harmed by a lack of discovery of PDL's business practices."*Kalman,* 914 F.2d at 1480. In reliance on there being a clearly defined "nexus between the sole licensee and the patentee," the court held that the "sole licensee must be recognized as the real party in interest."*Id.* at 1482.

This "single entity" theory was advanced by plaintiffs in the later case of *Poly-America, L.P. v. GSE Lining Technology, Inc.,* 383 F.3d 1303 (Fed.Cir.2004), although not on a motion to amend. In arguing for lost profits damages, Poly-America claimed that it "operates together with Poly-Flex as a single economic unit for the purposes of production, marketing, and sales of the patented liner. It claim[ed] that the two corporations share a unity of interest that justifies treating them as a single eco-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
(Cite as: 2006 WL 2927240 (D.N.J.))

nomic unit for lost profits."*Id.* at 1310.In reaching its decision that Poly-America could not sue for Poly-Flex's lost profits, but could recover for any of its own lost profits, if there were any, the Federal Circuit rejected the single economic entity theory. "Even though Poly-America and Poly-Flex seem to share interests as two entities collaborating in the manufacture and sale of textured landfill liners, that relationship by itself is not sufficient to permit Poly-America to claim Poly-Flex's lost profits from Poly-Flex's lost sales."*Id.* at 1311.Rather the court focused on the fact that the two companies were separate corporate entities and must bear the burden of that corporate structure even if they also had a common parent corporation.

It appears that Federal Circuit jurisprudence now rejects the "single economic entity" theory in this context. Accordingly, *Kalman* does not help Mars' position that Mars is entitled to share in MEI's lost profits, or that a non-exclusive licensee, like MEI-US, has standing to sue.

In summary, prior to January 1, 1996, Mars was entitled to recover either lost profits or reasonable royalties, depending on the law. At summary judgment on this issue, the Court held that, under *Panduit,* Mars could not prove its own lost profits. Therefore, Mars was only entitled to a reasonable royalty. On reconsideration, after considering Mars' arguments, the Court concludes that Mars has failed to present any compelling reason for any change to this decision. (Reconsideration of the lost profits aspect of the present case is discussed below.) Thus, Mars is only entitled to a reasonable royalty as damages for Coinco's infringement of the '719 patent through the end of 1995, or until expiration in 1992 as to the '137 patent.

As of January 1, 1996, Mars sold the '719 patent to MEI-US who is not a plaintiff in this action. Mars divested its ownership of the '719 patent and therefore has no standing to recover any monetary damages after January 1, 1996. However, Mars' lack of standing does not void proceedings for 1990-1995. The 1996-present lack of standing can be cured by

the "imminent" transfer back to Mars of the rights to the '137 and '719 patents before final judgment. *See Schreiber Foods,* 402 F.3d at 1204.

**\*9** The transferee of Mars' entire interest in the patents, MEI-US, could recover for its lost profits if it were a plaintiff, but it isn't. The motion to amend to make it a plaintiff was denied because of futility, the Court ruling that MEI-US was a non-exclusive licensee. However, it now appears that after January 1, 1996, MEI-US was no longer a licensee, because it became the owner of at least the '719 patent. The assignment gives MEI-US standing (as the owner of the patent) as of January 1, 1996. Thus, upon reconsideration, the motion to amend is granted to prevent manifest injustice, and MEI-US is not barred from seeking lost profits after it became the owner. Mars' creative attempt to cast the assignment, and its legal effect, as a shared property interest (legal title/equitable title) is rejected.

MEI-US's joinder reflects "successive standing," which is the equivalent of Mars and MEI-US being co-Plaintiffs, but for different and not overlapping periods. The summary judgment decision is derivative of the motion to amend. The result is that Mars is entitled to receive a reasonable royalty until December 31, 1995. From January 1, 1996, MEI-US can claim its lost profits. Because evidence of MEI-US's lost profits after January 1, 1996 was not presented to the Court during the damages trial, additional evidence on this issue will be received. The Court will initiate a telephone conference to schedule this.

The "imminent" reacquisition of patent rights by Mars is merely a transfer of assets. Mars cannot recover its own lost profits-the Court has already concluded that it has none. However, Mars may be able to recover MEI-US's lost profits (which MEI-US proves) if it acquires MEI-US's rights to them in the "imminent" transaction. Mars can recover a reasonably royalty until December 31, 1995.

B. Reconsideration of Grant of Partial Summary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
**(Cite as: 2006 WL 2927240 (D.N.J.))**

Page 9

Judgment

Turning to the issues presented in the lost profits summary judgment motion, Mars argues that the Court overlooked the significance of the consolidated accounts of Mars and MEI-US, which, according to Mars, is *prima facie* evidence that the profits and losses of MEI-US were recognized by (flow through to) Mars and MEIUS's lost profits became lost profits of Mars. As noted above, the Court carefully considered the relationship between Mars and MEI-US before rejecting Mars' "flow through" argument. As part of its analysis of the lost profits claim, the Court examined the Declaration of Thomas Cornell, which discussed the "consolidated accounts" as well as his later deposition testimony, related to MEI-US's royalty payments to Mars. Significantly, Mr. Cornell did not testify to an automatic flow of profits up the corporate ladder, and if there had been such a flow, Mars should have presented evidence of it. The Court has given this argument its full attention and Mars does not point to any new evidence previously unavailable to support reconsideration.

Second, Mars argues that the Court overlooked the disposition in *Poly-America, L.P. v. GSE Lining Technology, Inc.,* 383 F.3d 1303 (Fed.Cir.2004). Having rejected the idea that Poly-America, the patent owner, was entitled to claim the lost profits of Poly-Flex, licensee and sister corporation to Poly-America, the Federal Circuit remanded for a determination of whether Poly-America lost profits in its own right due to defendant's infringement. Mars suggests that, on reconsideration, the Court should consider whether any lost profits were incurred by Mars because of the existence of the consolidated accounts, which Mars argues demonstrates a greater symbiosis between the two companies than existed in *Poly-America.*

**\*10** Mars admitted that it did not have the capability to manufacture the patented product and has not presented any evidence previously unavailable to demonstrate the contrary. *Poly-America* instructs that lost profits could be awarded to the patent

owner only if the patent owner actually lost profits in its own right. An ability to manufacture the patented product is the touchstone of a lost profits analysis, and the Court has thoroughly considered this issue in connection with the relationship between Mars and MEI-US. Mere disagreement with the Court's prior ruling is not sufficient to meet the stringent standard for reconsideration.

Third, Mars contends that the Court overlooked *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549 (Fed.Cir.1984) and *Bio-Rad Labs v. Nicolet Instrument Corp.,* 739 F.2d 604 (Fed.Cir.1984), previously cited in Mars' papers. Mars suggests they support its argument that it could rely on the manufacturing capabilities of MEI-US to meet the *Panduit* test. In *Gyromat,* the evidence demonstrated that Gyromat produced 160 machines, 40 percent of the number of machines sold by Champion, during the period of infringement. Additionally, the evidence showed that "not only could Gyromat itself have handled the increased production, but that substantial portions of the work could have been subcontracted without serious adverse effect on Gyromat's over-all profit margin."*Gyromat,* 735 F.2d at 554.

There is no evidence here that Mars itself made any of the coin mechanisms-rather, Mars admitted that it could not manufacture the patented product. The issue of whether Mars could have subcontracted the production to MEI-US is reached in *Gyromat* only as additional support for the determination that Gyromat could have met the demands of the marketplace. Primarily the *Gyromat* court focused on the ability of Gyromat itself to produce the patented product, as this Court does here. Finally, Mars' reliance on *Bio-Rad, supra,* does not further this analysis, because BioRad held an exclusive license in the patent at issue and established all of the *Panduit* factors, unlike Mars which could not establish that it had the capability to manufacture or market the patented product.

Accordingly, **IT IS** on this 7th day of August 2006

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927240 (D.N.J.)
**(Cite as: 2006 WL 2927240 (D.N.J.))**

**ORDERED** that the motion for reconsideration of the denial of the motion to amend to add MEI-US as a co-Plaintiff is granted; and it is further

**ORDERED** that upon proper evidentiary support Mars Electronics International, Inc. (MEI-US) can recover its lost profits as the owner of the '719 patent from January 1, 1996 until expiration; and it is further

**ORDERED** that Mars Incorporated can recover a reasonable royalty as damages for infringement of the '137 patent until expiration; and it is further **ORDERED** that Mars Incorporated can recover a reasonable royalty as damages for infringement of the '719 patent until December 31, 1995; and it is further

***11 ORDERED** that Mars Incorporated has no standing to recover any damages for any period after December 31, 1995 unless and until Mars Incorporated reacquires ownership of the '719 patent.

D.N.J.,2006.
Mars, Inc. v. Coin Acceptors, Inc.
Slip Copy, 2006 WL 2927240 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **TAB  B**



Slip Copy

Slip Copy, 2007 WL 28295 (D.Del.)

**(Cite as: 2007 WL 28295 (D.Del.))**

Page 1

**C**

UD Technology Corp. v. Phenomenex, Inc.

D.Del.,2007.

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

UD TECHNOLOGY CORPORATION, Plaintiff,

v.

PHENOMENEX, INC., Defendant.

**C.A. No. 05-842-GMS.**

Jan. 4, 2007.

Michael P. Kelly, McCarter & English, LLP, Wilmington, DE, for Plaintiff.

John W. Shaw, Young, Conaway, Stargatt & Taylor, Chad Michael Shandler, Richards, Layton & Finger, Wilmington, DE, for Defendant.

### *MEMORANDUM*

GREGORY M. SLEET, United States District Judge.

### I. INTRODUCTION

*1 The plaintiff, UD Technology Corporation ("UDTC"), filed the above captioned suit, against Defendants Phenomenex, Inc. ("Phenomenex") and Research Corporation Technologies ("RCT"), alleging patent infringement, breach of contract, violation of the covenant of good faith and fair dealing, misappropriation of trade secrets, violation of the Uniform Deceptive Trade Practices Act, unjust enrichment, and conversion. On July 21, 2006, UDTC filed a stipulation of dismissal, dismissing RCT from the case, with prejudice. (D.I.37.) Presently before the court is Phenomenex's motion to dismiss UDTC's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), and UDTC's motion to amend its complaint. For the reasons set forth below, the court will (1) grant-in-part and deny-in-part Phenomenex's motion to dismiss and (2) grant-in-part and deny-in-part UDTC's motion to amend.

### II. BACKGROUND

In March of 1990, the University of Delaware (the "University") entered into a contract with RCT for "Disclosure, Evaluation and Commercialization of Inventions" (the "DECI"). (D.I.26, Ex. A.) In the DECI contract, the University granted RCT certain rights to market and promote the University's proprietary technologies. *Id.*

In or around 1991, Drs. Mary Wirth and Hafeez O. Fatunmbi were working in the Department of Chemistry and Biochemistry at the University on the study of surface chemistries relating to substrates such as silica beads used in chromatographic processes. (D.I.1, Compl.¶¶ 12, 14.) This work culminated in an application for a patent. (D.I.1, Compl.¶¶ 14-15.) On June 17, 1992, RCT filed U.S. Patent Application No. 900,215 (the "Application") to protect Drs. Wirth and Fatunmbi's research. *Id* .

In August 1992, RCT and Phenomenex entered into the "Materials Treatment Agreement," which allowed Phenomenex to submit certain materials for treatment according to the technology in the Application, and an opportunity to use the treated materials for noncommercial research purposes. (D.I.26, Ex. B.) According to the Materials Treatment Agreement, Drs. Wirth and Fatunmbi (the "Inventors") had assigned the Application to RCT. *Id.*

In March 1993, RCT and Phenomenex entered into the "Evaluation License Agreement," in which RCT granted Phenomenex a license to make and use products, and to practice processes, using the technology in the Application, for evaluation of the "invention" described in the Application. (D.I.26, Ex. C.)

During RCT's ownership of the Application and claimed technology, U.S. Patent No. 5,599,625 ("the '625 patent"), entitled "Products Having Multiple-Substituted Polysiloxane Monolayer," issued

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

to Drs. Wirth and Fatunmbi (the "Inventors"), on February 4, 1997. (D.I.1, Compl.¶ 27.) On August 10, 2001, RCT assigned to the University its "entire right, title and interest" in the ' 625 patent. (D.I.26, Ex. E.) This assignment was pursuant to an "Agreement to Assign" between RCT and the University, effective July 24, 2001. *Id.*

**\*2** Plaintiff UDTC owns and manages intellectual property developed through the University's scientific research and doctorate programs. (D.I.1, Compl.¶ 1.)

## III. STANDARDS OF REVIEW

### A. Rule 12(b)(1) Standard

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of a plaintiff's complaint. A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction can take two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of subject matter jurisdiction in fact (factual attack).*Mortensen v. First Federal Savings and Loan,* 549 F.2d 884, 891 (3d Cir.1977). When reviewing a facial attack, the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. *Id.*

When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case. *Mortensen,* 549 F.2d at 891. Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. *Id.* The plaintiff bears the burden to prove that jurisdiction does in fact exist. *Id.* However, the plaintiff's burden is relatively light, since "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so in-

substantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.' " *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987)*(quoting Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666 (1974)).

### B. Rule 12(b)(6) Standard

In ruling on a motion to dismiss for failure to state a claim, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v.. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*See Graves,* 117 F.3d at 726;*Nami,* 82 F.3d at 65 (both *citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

### C. Motion to Amend Standard

Leave to amend a pleading should be "freely given when justice so requires."Fed.R.Civ.P. 15(a). The court has discretion to deny leave to amend when there exists undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997).

### IV. DISCUSSION

**\*3** "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."*In Re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D.Pa.1993), *aff'd*39 F.3d 61 (3d Cir.1994). Therefore, the court will first turn its attention to the 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

## A. Patent Infringement (Count I)

UDTC first contends that Phenomenex has infringed and continues to infringe one or more claims of the '625 patent by its offer of sale and sale of certain Phenomenex products, including products marketed under the name Jupiter. (D.I.1, Compl.¶ 28.) Phenomenex argues that UDTC lacks standing to assert a claim for patent infringement arising prior to 2001 because UDTC does not allege that UDTC was transferred the right to sue for past infringement, and its right to sue for post-2001 patent infringement is insufficiently pled.

Standing to sue for infringement has traditionally been confined to those with an ownership interest in the patent at the time of the infringement.*Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579 (Fed.Cir.1991) ( "The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement."). Where a plaintiff, who is not the inventor, seeks to sue for infringement, both past and present, the plaintiff must have obtained an assignment of the patent, coupled with an assignment of a right of action for past infringements. *Id.* The latter assignment must be express, and cannot be inferred from an assignment of the patent itself. *Id. (citing Moore v. Marsh,* 74 U.S. (7 Wall.) 515, 522 (1868)). Applying these principles to the facts alleged in UDTC's complaint and the contracts available for the court's review, the court concludes that UDTC does not demonstrate standing to sue for any period of infringement of the ' 625 patent.

UDTC's complaint alleges two assignments from

the University to UDTC (D.I.1, Compl.¶ 8), but does not identify any time frame or relate such assignments chronologically with an alleged assignment from RCT to the University on July 24, 2001 (D.I.1, Compl.¶ 30). UDTC cites to RCT's Answer to UDTC's original complaint as support for its claim that RCT assigned its rights to the '625 patent and all related contractual interests to the University. (D.I. 26 at 11, Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss.) UDTC not only argues that RCT admits UDTC's allegation of a complete transfer of rights, but UDTC also points out that RCT asserts no rights under the '625 patent in this action. *Id.* Nevertheless, RCT's Answer to UDTC's complaint bears no weight or relevance as to the propriety and sufficiency of UDTC's complaint against Phenomenex.

**\*4** Even if RCT's Answer was arguably relevant to the issue of the sufficiency of UDTC's complaint, the substance of the cited portion of RCT's Answer does not help UDTC. Indeed, it does nothing more than admit the averments of paragraph 30 of the Complaint. Paragraph 30 alleges that, pursuant to a July 24, 2001 Agreement to Assign, RCT assigned all of its right, title, and interest in and to the '625 Patent and the inventions described therein to the University on August 10, 2001. This "admission" does not address the issue of whether UDTC has the right to sue for past infringement. Likewise, it offers no insight into the question of when or by what instrument UDTC was assigned all of the University's "past, present and/or future right, title and interest in and to the technology and any agreements, causes of action and/or third party beneficiary rights associated with the '625 Patent to UDTC."(D.I .1, Compl.¶ 8.)

### 1. Right to Sue for Past Infringement, Prior to August 10, 2001

In its opposition brief, UDTC cites to *Minco, Inc. v. Combustion Engineering, Inc.*[FN2] for the proposition that "the intent of the parties control."(D.I. 26 at 12, Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

This assertion, however, misconstrues the holding in *Minco.*The Federal Circuit did indeed affirm the trial court's decision that the plaintiff could recover damages for infringement occurring before the date of the assignment to the plaintiff, but the Federal Circuit did so by analyzing whether *"the assignment agreement manifests an intent"* to transfer the right to sue for prior infringement. *Minco,* 95 F.3d at 1117 (emphasis added). In other words, in *Minco,* the Court of Appeals found clear intent from the words of the assignment itself. *Id.* ("The express reference to past infringement in the MAC assignment expanded the scope of the term 'right, title, and interest' to encompass the right to sue for prior infringement.").

FN2.95 F.3d 1109, 117 (Fed.Cir.1996).

*Chisum* has aptly summarized a long line of Supreme Court and Federal Circuit cases as holding that if ownership of the patent is transferred, the transferor retains the right to sue for pre-transfer infringements unless that right is expressly relinquished in the transfer. CHISUM § 21.03[2][g][I]. In spite of this well-settled federal law, UDTC urges the court to apply Delaware and Arizona state law regarding the interpretation of contract language to "fix the scope and breadth of [the] assignment ."(D.I. 26 at 12.) Determining whether the right to sue for prior infringement has been transferred turns on the proper construction of the assignment agreements, which is a matter of state contract law. *Minco,* 95 F.3d at 1117. The Delaware and Arizona cases to which UDTC directs the court's attention, however, concern contracts with ambiguous terms. None of these cases permit resort to extrinsic evidence for unambiguous contract language, as in the case here. Further, the court has not found any Arizona or Delaware case law that sanctions the contract interpretation UDTC asks the court to adopt under the facts of this case.

**\*5** Moreover, the agreements that the court has in its possession and to which the court must confine its analysis, in the absence of any other evidence from UDTC, do not manifest any intent to confer a

right to sue for past infringement. In the absence of an express provision to sue for past damages, as is the case here, the court cannot confer standing on UDTC to pursue damages for alleged patent infringement that occurred before it was assigned the ' 625 patent.

Additionally, UDTC directs the court's attention to the litigation conduct of RCT as a reason to infer a provision not expressed in the assignment. Specifically, UDTC suggests that because RCT did not file a cross-claim, counter-claim, or otherwise assert an affirmative defense, the totality of circumstances indicates that RCT conveyed to the University any rights it had to sue for past infringement. (D.I. 26 at 13.) Simply put, the conduct of third-party RCT in litigation is not evidence from which the court can now conclude that UDTC was assigned a right to sue for past infringement.

The court therefore rejects UDTC's contention that it has sufficiently alleged a right to sue for past infringement. Moreover, the court is left wondering whether UDTC indeed possesses the right to sue for patent infringement alleged to have occurred during any period.

*2. Right to Sue for Infringement After August 10, 2001 Assignment*

The court notes that UDTC does not even attach as an exhibit to its complaint, responsive briefs, or amended complaint, the instrument that purportedly conferred to UDTC the rights to bring this lawsuit. The party asserting the existence of subject matter jurisdiction bears the burden of proof when contesting a Rule 12(b)(1) motion. *See, e.g. Mortensen,* 549 F.2d at 891 n. 16 (3d Cir.1977). Here, UDTC states that "[a]t such time as it becomes necessary (because it is not now in the context of a motion to dismiss), UDTC will adequately evidence the assignment from the University to UDTC."(D.I. 26 at 9.) Unfortunately, for UDTC, as the saying goes, there is no time like the present. More specifically, the necessary time was immediately after subject

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
**(Cite as: 2007 WL 28295 (D.Del.))**

Page 5

matter jurisdiction was challenged, i.e. when UDTC filed its opposition to Phenomenex's motion to dismiss. *See Cedars-Sinai Medical Center v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir.1993) ("Once challenged, allegations alone are insufficient to meet the complainant's burden [to support its contention regarding the court's jurisdiction].").

In Phenomenex's Opening Brief in Support of its Motion to Dismiss, Phenomenex states that "UDTC's claims are insufficient as pled and must be dismissed, insofar as UDTC has failed to state claims upon which relief can be granted and improperly alleged subject matter jurisdiction for its claim of patent infringement."(D.I. 23 at 1, Def.'s Br. ISO Mot. to Dismiss.) In apparent deference to UDTC's conclusory allegation that the University assigned its rights in the '625 patent to UDTC, Phenomenex appears to retreat from its initial argument as to UDTC's lack of standing to pursue post-2001 patent infringement. *See* Def.'s Reply Br. ISO Mot. to Dismiss (D.I. 32 at 2). The court will not, however, cover Phenomenex's withdrawal. *See Mennen Co. v. Atlantic Mt. Ins. Co.,* 147 F.3d 287 (3d Cir.1998) ("A party may not confer or defeat jurisdiction by mere pleading. Subject matter jurisdiction depends upon facts, and *when any question arises as to the existence of jurisdiction, a federal court is obligated to make an independent determination of those facts.").*

*6 Phenomenex has raised a colorable question as to whether this court has jurisdiction to hear UDTC's pre-2001 patent infringement claims. The court agrees with Phenomenex that UDTC cannot pursue its claim for past infringement of the '625 patent before this forum. Fulfilling its obligation to make an independent determination, the court also finds proof of subject-matter jurisdiction lacking for UDTC's post-2001 patent infringement claims. The court will, however, give UDTC another opportunity to demonstrate that it has the right to pursue post-2001 infringement claims, as set forth in the accompanying order.

**B. Contract Claims (Counts II-V)**[FN3]

> FN3. Counts IX-X were also contract-related counts against RCT. Since RCT has been dismissed from this action, the court will not address counts IX-X, as they are moot.

*1. Breach of Contract*

UDTC alleges that Phenomenex has breached the Materials Agreement between RCT and Phenomenex and the Evaluation License Agreement between the same parties. Neither UDTC or the University of Delaware contend they were parties to either contract. Phenomenex argues that UDTC has not pled facts sufficient to confer standing to assert claims for breaches of the Materials Treatment and Evaluation License Agreements. The court agrees.

A fundamental principle of contract law provides that only those entities that are parties to a contract or conferred rights to or under a contract have standing to enforce it. *See Insituform of North America, Inc. v. Chandler,* 534 A.2d 257 (Del. Ch.1987) ("Analysis of the standing issue begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party.").*See generally* 2 *Williston on Contracts* § 356 (1959); 4 *Corbin on Contracts* §§ 772, 774 (1951). The developed law has characterized persons who, while not being parties to a contract, nonetheless benefit from its performance in one of three ways: as donee beneficiaries, as creditor beneficiaries, or as incidental beneficiaries. Restatement of Contracts § 133 (1932); *see generally Restatement of Contracts (Second)* § 302 (1979). Where a contract only incidentally or remotely benefits a third party, but is not expressly made for the benefit of the party, that party cannot recover thereon. *Fobes v. Blue Cross and Blue Shield of Arizona, Inc.,* 861 P.2d 692, 696 (Ariz.Ct.App.1993); *see also German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230 (1912) ("Before a stranger can avail himself of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
**(Cite as: 2007 WL 28295 (D.Del.))**

Page 6

exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit.").

As a threshold matter, the court finds the factual allegations in the complaint facially deficient. *See*Fed.R.Civ.P. 8(a) and 9(f).Rule 8(a) requires a claimant to set forth (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim *showing that the pleader is entitled to relief*, and (3) a demand for judgment for the relief the pleader seeks. Rule 9(f) states: "For the purpose of testing the sufficiency of a pleading, *averments of time and place are material* and shall be considered like all other averments of material matter."FN4

> FN4."Whether or not statements in a pleading of time and place are required is determined by the substantive nature of the suit ... A specific statement of time has been required in numerous types of cases. For example, in pleading claims based on a written contract or promissory note, it usually is necessary to allege the time it was signed ... because this helps identify the document that is the subject matter of the dispute."5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1309 (2d ed.1995).

**\*7** Notably, UDTC's complaint fails to specifically allege that it possesses rights to enforce the Materials Treatment and Evaluation License Agreements. The closest averment the court can find within the complaint is the conclusory allegation of paragraph 8, which alleges two unidentified assignments from the University to UDTC. (D .I.1, Compl.¶ 8.) As noted above, however, neither the University nor UDTC are parties to the agreements UDTC is attempting to enforce. Additionally, the alleged assignments of paragraph 8 of the complaint provide

no temporal context. That is, the averment does not identify either contract by name or time frame, nor does it relate either assignment contextually and chronologically with an alleged assignment from RCT to the University on August 10, 2001. *See* Compl. ¶ 30. (D.I.1.) Moreover, the alleged assignment from RCT to the University averred in paragraph 30, does not confer an assignment of contractual rights, only prospective ownership rights to the '625 patent. *Id.*

In response to Phenomenex's challenge to UDTC's standing, UDTC states that it has alleged "rights to pursue its claims as (i) a party (either as a principal to its agent RCT or directly), (ii) as a disclosed and intended third party beneficiary thereto, and (iii) as previously stated, via total assignment of rights. (D.I.1-Compl.¶¶ 7-8)." (D.I. 26 at 13-14). First, the only contracts the court has in its possession clearly show that UDTC was not a party. Phenomenex correctly points out that UDTC did not plead agency and cannot defeat a motion to dismiss by now advancing the theory that RCT, originally a defendant in this action, was an agent for UDTC.

Second, UDTC did not plead that it was an intended third party beneficiary and the Materials Treatment and Evaluation License Agreements don't disclose it as such.FN5Furthermore, the Evaluation License Agreement contains the following language: *"No Third-Party Beneficiaries.*None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any third party."While not as explicit as the Evaluation License Agreement, the Materials Treatment Agreement contains no mention of UDTC and only passively refers to the University of Delaware in further identifying the Inventors of what has become the '625 patent. *See* D.I. 26, Ex. B ("Drs. M.J. Wirth and H.O. Fatunmbi ("INVENTORS") of the University of Delaware have invented a Multiple-Substituted Polysiloxane Monolayer ('INVENTION') as described in U.S. Patent Application No. 900,215, filed 06/17/92 ('APPLICATION')."). This passing reference gives no indication that the University was an intended

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

third party beneficiary. Furthermore, the Materials Treatment Agreement itself states that the Inventors assigned the technology at issue to RCT.

> FN5. The court need not engage the purely academic exercise of determining whether, under Arizona or Delaware law, UDTC qualifies as an intended third party beneficiary as it fails to plead third-party beneficiary status.

Finally, UDTC offers no support for its allegation that RCT assigned any contractual rights to the University. Given Phenomenex's subject-matter jurisdictional challenge, UDTC must first establish that RCT assigned both agreements to the University, before it can rely on an alleged assignment of those rights from the University to UDTC. Instead, UDTC alleged that RCT retained contractual rights to "police and monitor all third party use of the Licensed Technology."(D.I.1, Compl.¶ 34.) This allegation formed part of the basis for UDTC's now-dismissed suit against RCT. At the time of the complaint, UDTC claimed that RCT was still responsible for monitoring the Licensed Technology. (D.I.1, Compl.¶ 33) ("Pursuant to the Marketing Agreement, RCT was *and is* responsible for monitoring the Licensed Technology...."). These allegations, which find support in the Marketing Agreement, the July 2001 Agreement to Assign, and the accompanying August 2001 Deed of Assignment, contradict UDTC's argument that it can pursue its contract claims pursuant to "total assignment" of rights. For these reasons, UDTC's breach of contract claims must be dismissed.

### 2. Breach of the Covenant of Good Faith & Fair Dealing

**\*8** The court agrees with Phenomenex's contention that UDTC does not have standing to pursue an alleged breach of the covenant of good faith and fair dealing,. *See Leal v. Allstate Ins. Co.,* 17 P.3d 95, 99 (Ariz.Ct.App.2000) ( "Courts imply a covenant of good faith and fair dealing in every contract. The

duty to act in good faith arises by virtue of a contractual relationship. Thus, a third-party claimant, a stranger to the contract, cannot sue the insurer for tortious breach of the duty of good faith."); *Superior Vision Servs. v. Reliastar Life Ins. Co.,* 2006 Del. Ch. LEXIS 160 (Del. Ch., Aug. 25, 2006, Decided) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare."). The court can find no grounds upon which to impose a duty of good faith and fair dealing flowing from Phenomenex to UDTC. In the absence of any evidence demonstrating an assignment of contractual rights to UDTC,[FN6] the court concludes that UDTC's contract-related claims must be dismissed.

> FN6. The court acknowledges that Phenomenex has set forth additional grounds for the dismissal of UDTC's contract claims, however, the court has concluded that UDTC lacks standing and therefore, the court will not reach the merits of Phenomenex's additional arguments.

### 3. Misappropriation of Trade Secrets

In Counts IV and V of its complaint, UDTC alleges that Phenomenex willfully misappropriated the University's trade secrets, in violation of Ariz.Rev.Stat. Sec. 44 and 6 Del. C. Sec.2001. According to paragraphs 60 and 68 of its complaint, UDTC predicates its claims of trade secret misappropriation on an agreement between Phenomenex and RCT that allegedly required Phenomenex to keep the University's secrets. (D.I.1, Compl.¶¶ 60, 68.) Where the duty to keep a divulged trade secret arises from a contract, it follows that only those parties to the contract have standing to pursue a claim of trade secret misappropriation based on a breach of that contract. For the reasons previously stated, the court concludes that UDTC does not have standing to pursue contract-based claims against Phenomenex. Therefore, UDTC's trade secret misappropriation claim must be dismissed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
(Cite as: 2007 WL 28295 (D.Del.))

Page 8

## C. Claims for Violation of the Uniform Deceptive Trade Practices, Unjust Enrichment, and Conversion (Count VI-VIII)

In Count VI of its complaint, UDTC alleges that Phenomenex engaged in conduct designed "to deceive the public to whom Phenomenex markets such that it represents expertise, experience and product design *that are the result of secret misappropriation of the Licensed Technology and the '625 Patent.*"(D.I.1, Compl.¶ 73) (Emphasis added). In Count VII, UDTC alleges that Phenomenex benefited from "Phenomenex's unauthorized use of the Licensed Technology and '625 Patent."(D.I.1, Compl.¶ 79.) UDTC's allegations of trade secret misappropriation preempt its claims of deceptive trade practices and unjust enrichment. This is so because the latter claims are based expressly upon the alleged misappropriation of trade secrets. The misappropriation is alleged to stem from Phenomenex's alleged use of and benefit from the University's confidential information. *See On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH,* 386 F.3d 1122, 1146 (Fed.Cir.2004); *Ethypharm S.A. v. Bentley Pharm., Inc.,* 388 F.Supp.2d 426, 433 (D.Del.2005) (granting motion to dismiss fraud and unjust enrichment claims as preempted). Since no additional facts, independent of those alleged in support of its trade secret misappropriation claim, have been averred to support these claims, UDTC's deceptive trade practice and unjust enrichment claims are therefore dismissed, as preempted.

*9 The eighth count of the complaint alleges conversion. (D.I.1, Compl.¶ 82.) The extent to which UDTC's conversion action is predicated only on the same facts upon which it bases its deceptive trade practice and unjust enrichment claims, the conversion claim is clearly preempted. *Ethypharm,* 388 F.Supp.2d at 433.

It is conceivable that UDTC also presents a claim for conversion of tangible property in addition to its claim of conversion of intellectual property. In its complaint, UDTC refers to "other property" (D.I.1, Compl.¶ 82) ("Phenomenex, by exercising control

and dominion over the Licensed Technologies and the '625 Patent and *other property* in an unauthorized manner, systematically and secretly deprived UDTC of its interest in its intellectual property.") (emphasis added). UDTC later defines Licensed Technology to include "other technology, including any trade secrets and/or know how associated therewith, that is encompassed by any of the Marketing Agreement, the Materials Agreement and the Evaluation Agreement, including Licensed products and Licensed Processes as defined in those Agreements."(D.I.1, Compl. ¶ 35.) In its opposition brief, however, UDTC resolves any ambiguity in its conversion claim by stating what it believes to be the elements of its conversion claim: "(i) UDTC has a *property interest in the confidential information, trade secrets and patents;* (ii) that UDTC had right to prevent others from using such information, trade secrets and patents; and (iii) that UDTC has sustained damages. *See Facciolo Constr. Co. v. Bank of Del.,* 514 A.2d 413 (Del.1986); *Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203 (Del. Ch.1988)." (D.I. 26 at 32.) Aside from the fact that UDTC cites the *Facciolo* and *Goodrich* cases, which involve tangible property and do not discuss the interplay between conversion and claims concerning intellectual property, UDTC's listing of the necessary elements of its conversion claim makes no mention of tangible property. Where UDTC makes no claim of conversion of tangible property, the court sees no obligation to preserve this otherwise potentially viable, albeit narrow, subset of its conversion claim.

For at least these reasons, Count VIII of UDTC's complaint for conversion must be dismissed.

## D. Claims for Relief (Count XI-XII)

In Counts XI and XII of its complaint, UDTC does not state a claim for relief, but rather incorporates the allegations of its previous ten claims, and requests additional remedies. In Count XI, UDTC demands that "Phenomenex provide to it an accounting of all past, present and future uses of the Li-

Slip Copy
Slip Copy, 2007 WL 28295 (D.Del.)
**(Cite as: 2007 WL 28295 (D.Del.))**

Page 9

censed Technology and the '625 Patent and account for all revenues, benefits or otherwise accrued from such use."(D.I. 1, Compl. at 24.) In Count XII, UDTC asks the court to impose a constructive trust for the benefit of UDTC "in an amount to be determined at the time of trial."(D.I. 1, Compl. at 26.) As these counts do not allege any different claims for which relief can be granted, other than claims previously alleged, the court will treat these counts as an additional prayer for relief. Counts XI and XII are therefore dismissed.

### E. Motion to Amend

**\*10** Recognizing that motions to amend shall be granted freely, the court views this motion differently than the typical motion to amend. First, in its terse motion, UDTC states that the reasons for its motion are "in the interest of judicial economy" in light of the fact that the "dismissal [of RCT] made extraneous certain allegations of the Complaint."(D.I. 38, Pl.'s Mot. to Amend at 1.) In its reply brief, UDTC states that its motion to amend the complaint was an effort "to simplify the pleadings for the Court."(D.I. 43, Pl.'s Reply Br. at 1.) The court finds these stated reasons curious in light of UDTC's letter of July 21, 2006 (D.I.39), and the actual proposed amendments to the complaint, which also attempt to bolster the standing deficiencies.[FN7]UDTC's July 21st letter states that the motion to amend and presumably, the proposed amendments, "reflect[s] that UDTC no longer seeks to prosecute such claims [against RCT]."*Id.*While UDTC's proposed amendments do eliminate Counts IX-X against RCT, they also remove contextual background necessary for the standing analysis of the remaining counts, found in paragraphs 16-17 and 33-34 of the original complaint.

> FN7. The court is also in receipt of UDTC's May 15, 2006 letter (D.I .36), in which UDTC makes reference to a "Clarification" that would be presented to the court, rendering moot RCT's Motion to Dismiss. According to UDTC, the

"Clarification" would be a stipulation that would restate prior assignments and "for the avoidance of any further doubt, assign any such right, title and interest as RCT still may have to UDTC)." To date, the court has not received the aforementioned "Clarification." Even if the court was in receipt of such a "Clarification," the court is not inclined to accept assignments that post-date the civil action upon which the lawsuit relies. "As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day."*Gaia Technologies, Inc. v. Reconversion Technologies, Inc.,* 93 F.3d 774, 780 (Fed.Cir.1996), *as amended on rehearing,*104 F.3d 1296 (Fed.Cir.1996).

Further, UDTC's proposed amendments add substance to the complaint, which would only serve to bolster arguments made in its Opposition to Phenomenex's Motion to Dismiss. For example, UDTC seeks to change paragraph 7 of the original complaint to add that RCT acted "on behalf of" the University instead of "agreed with the" University to market intellectual property. This change would appear to lend support to the later-argued, but not alternatively pled, position that RCT acted as an agent for the University. UDTC also seeks to add a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

new paragraph asserting that "At all times relevant, University was the owner of the intellectual property at issue herein, including the right to sue for past, present and future infringement, and to pursue contract damages pursuant to the contracts identified herein, between RCT and Phenomenex."(D.I.38, Ex. B.)

Even if the court were to allow these substantive amendments, the amendments would be futile, in that Phenomenex has asserted factual challenges to subject matter jurisdiction and UDTC's standing. UDTC's proposed additions are nothing more than conclusory and bald assertions, which the court is not obliged to credit. *See United States v. Vespe,* 868 F.2d 1328, 1340 (3d Cir.1989) (stating conclusory statements need not be credited).

Insofar as UDTC's amended complaint seeks to make substantive changes that either remove necessary context or add further conclusory allegations regarding ownership or standing, and such amendments do not change the outcome of Phenomenex's motion to dismiss, those amendments are denied. The court will permit UDTC to amend its complaint to remove Counts IX-X.

### *ORDER*

IT IS HEREBY ORDERED that:

1. Phenomenex's Motion to Dismiss (D.I.22) is GRANTED IN PART and DENIED IN PART.

**\*11** (a) UDTC's claim for patent infringement alleged to have occurred prior to August 10, 2001, is dismissed.

(b) UDTC's claim for patent infringement alleged to have occurred after August 10, 2001, is conditionally dismissed. The court will grant UDTC leave to provide a more definite statement, including evidence of an assignment from the University of Delaware to UDTC for alleged patent infringement occurring after August 10, 2001, within 30 days of this Order.

(c) Counts II-XII are dismissed.

2. UDTC's Motion to Amend (D.I.38) is GRANTED IN PART and DENIED IN PART.

D.Del.,2007.
UD Technology Corp. v. Phenomenex, Inc.
Slip Copy, 2007 WL 28295 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.