IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MCKESSON AUTOMATION, INC., ) | **PUBLIC VERSION** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 06-028 (SLR-LPS) |
| ) | |
| SWISSLOG ITALIA S.P.A. and ) | Confidential Version Filed: June 20, 2008 |
| TRANSLOGIC CORPORATION, ) | Public Version Filed: June 10, 2008 |
| Defendants. ) | |

**DECLARATION OF BRYAN N. DEMATTEO IN OPPOSITION TO
MCKESSON'S MOTION FOR RECONSIDERATION**

I, Bryan N. DeMatteo, declare as follows:

1.      I am associated with the law firm Dickstein Shapiro LLP, counsel of record for

Defendants Swisslog Italia S.p.A and Translogic Corporation (collectively "Defendants").   I

make this declaration in support of Defendants' Opposition to McKesson Automation, Inc.'s

Motion for Reconsideration (Re: D.I. 310).

2.      Attached as Exhibit A is a true and correct copy of the Assignment of Invention

dated June 29, 1990, bearing bates numbers M0143293 – M0143294.

3.      Attached as Exhibit B is a true and correct copy of a letter dated June 24, 1992 to

the Commissioner of Patents from Lynn J. Alstadt, enclosing an original assignment document,

bearing bates numbers M0125290 – M0125294.

4.      Attached as Exhibit C is a true and correct copy of a post-it note dated June 27,

1990 authored by Frank Demmler, and forwarding draft promissory notes to Sean McDonald,

bearing bates numbers M0474917 – M0474919.

5.      Attached as Exhibit D is a true and correct copy of a letter from David Cohen to Mark I. Baseman, dated January 3, 1991, forwarding voided Promissory Notes, bearing bates numbers M0474908 – M0474913.

6.      Attached as Exhibit E is a true and correct copy of excerpts from the transcript of the deposition of Frank Demmler, taken January 17, 2008.

7.      Attached as Exhibit F is a true and correct copy of excerpts from the transcript of the deposition of Marlin Stephen Heilman, taken January 17, 2008.

8.      Attached as Exhibit G is a true and correct copy of excerpts from the transcript of the deposition of Sean McDonald, taken August 30, 2007.

9.      Attached as Exhibit H is a true and correct copy of a bill for professional services rendered by Cohen & Grigsby, dated July 19, 1990, bearing bates numbers M0477006 – M0477013.

10.     Attached as Exhibit I is a true and correct copy of a excerpts of a due diligence file which includes a Stock Purchase Agreement, Promissory Notes and an Assignment of Invention, bearing bates numbers M0143186; M0143189; M0143288 – M0143294; M0143797.

11.     Attached as Exhibit J is a true and correct copy of unsigned declarations of L. Frank Demmler and M. Stephan Heilman, bearing bates numbers M0480865 – M0480867 and M0480935 – M0480937.

12.     Attached as Exhibit K is a true and correct copy of the transcript of the telephone conference held before the Honorable Mary Pat Thynge on October 24, 2007.

13.     Attached as Exhibit L is a true and correct copy of the transcript of the pretrial conference held before the Honorable Leonard P. Stark on May 20, 2008.

14.     Attached as Exhibit M is a true and correct copy of a letter dated May 22, 2008 from opposing counsel to the Honorable Leonard P. Stark.

15.     Attached as Exhibit N is a true and correct copy of cancelled Promissory Notes, bearing bates numbers M0474909 – M0474913.


I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.  This declaration is executed this 20th day of June, 2008.


_____/s/ Bryan N. DeMatteo_____
Bryan N. DeMatteo

2377257

314964

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on July 10, 2008 I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Dale R. Dubé, Esquire
Blank Rome LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on July 10, 2008 upon the following individuals in the manner indicated

**<u>BY E-MAIL</u>**

Dale R. Dubé, Esquire
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE  19801

Blair M. Jacobs, Esquire
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC  20004

*/s/ Julia Heaney (#3052)*
_____
Julia Heaney (#3052)
jheaney@mnat.com

# EXHIBIT A

## FULLY REDACTED

# EXHIBIT B

40-581-D



# Buchanan Ingersoll
### PROFESSIONAL CORPORATION
### ATTORNEYS

June 24, 1992

58th FLOOR • 600 GRANT STREET
PITTSBURGH, PA 15219
412-562-8800
TELEX 866514 (ISPC PGH)
TELECOPIER 412-562-1041

Hon. Commissioner of Patents
and Trademarks
Washington, D. C. 20231

Re: **United States patent application of
Sean C. McDonald et al. for AN AUTOMATED
SYSTEM FOR SELECTING AND DELIVERING PACKAGES
FROM A STORAGE AREA, Serial No. 871,832
Filed April 2, 1992 - Our Ref. 920015**

Dear Sir:

Enclosed herewith for recording in the above-identified patent application is an original assignment document from Sean C. McDonald, Ellen J. Hertz, James A. Smith and Gregory Toto to AUTOMATED HEALTHCARE, INC., a Pennsylvania corporation.

Enclosed is a check for $40.00 to cover the cost of the recordation fee.

Upon completion of the recordation process, please return the recorded document to the address shown above.

Respectfully submitted,

Lynn J. Alstadt
Registration No. 29,362

LJA/vjs

Enclosure

REEL 6177

FRAME 0500

91630853

100 FW 07/02/92 07871832                    1 581        40.00 CK

M0125290

A S S I G N M E N T

WHEREAS, We, Sean C. McDonald, Ellen J. Hertz, James A. Smith and Gregory Toto, respectively residing at Pittsburgh, Allegheny County, Pennsylvania; Clemmons, Forsyth County, North Carolina; Allision Park, Allegheny County, Pennsylvania and Santa Cruz, Santa Cruz County, California, have invented certain new and useful improvements in AN AUTOMATED SYSTEM FOR SELECTING AND DELIVERING PACKAGES FROM A STORAGE AREA, a continuation-in-part of Serial No. 07/469,217, filed January 24, 1990, for which we have on April 21, 1992, filed an application for United States Letters Patent, which application bears Serial No. 07/871,832;

AND WHEREAS, Automated Healthcare, Inc. a Pennsylvania corporation having a place of business at 261 Kappa Drive, Pittsburgh, Pennsylvania 15238, hereinafter called the "assignee", is desirous of acquiring the entire right, title and interest in and to said application and the inventions and improvements therein disclosed;

NOW, THEREFORE, in consideration of One ($1.00) Dollar and other good and valuable consideration paid to us by said assignee, receipt whereof we acknowledge, we do hereby assign, sell, transfer, and set over unto said assignee the entire right, title, and interest in and to said application and the inventions and improvements therein disclosed for the United States and all

REEL 6177 FRAME 0501

M0125291

generally do all other and further lawful acts, deemed necessary or expedient by said assignee or by counsel for said assignee, to assist or enable said assignee to obtain and enforce full benefits from the rights and interests herein assigned. This assignment shall be binding upon our heirs, executors, administrators, and/or assigns, and shall inure to the benefit of the successors, and/or assigns, as the case may be, of said assignee.

EXECUTED:

_June 19_, 1992              _Sean McDonald_ (SEAL)
                             Sean C. McDonald

_June 8_, 1992               _Ellen J. Hertz_ (SEAL)
                             Ellen J. Hertz

_June 14_, 1992              _James A. Smith_ (SEAL)
                             James A. Smith

_June 18_, 1992             _Gregory Toto_ (SEAL)
                             Gregory Toto

State of                         ss:
County of

    Before me, a Notary Public in and for the said County and State, personally appeared SEAN C. McDONALD who acknowledged that he is one of the persons who executed the foregoing assignment and acknowledged it to be his free and voluntary act and deed.

    Witness my hand and notarial seal this _19_ day of _June_, 1992.

_Michael Toto_
Notary Public

(NOTARIAL SEAL)

REEL 6177 FRAME 0503

- 3 -

M0125292

State of North Carolina :
                           : ss:
County of Forsyth :

     Before me, a Notary Public in and for the said County and

State, personally appeared ELLEN J. HERTZ who acknowledged that she is

one of the persons who executed the foregoing assignment and

acknowledged it to be her free and voluntary act and deed.

     Witness my hand and notarial seal this __8__ day of

_____, 1992.



(NOTARIAL SEAL)
                                       Notary Public

State of _____ :
                           : ss:
County of _____ :

     Before me, a Notary Public in and for the said County and

State, personally appeared JAMES A. SMITH who acknowledged that he is

one of the persons who executed the foregoing assignment and

acknowledged it to be his free and voluntary act and deed.

     Witness my hand and notarial seal this _19_ day of

JUNE , 1992.

                                     Notary Public

(NOTARIAL SEAL)

— 4 —

M0125293

State of ___California___ :
                              : ss:
County of ___Santa Cruz___ :

RECORDED
PATENT & TRADEMARK OFFICE

JUN 26 92

Before me, a Notary Public in and for the said County and State, personally appeared GREGORY TOTO who acknowledged that he is one of the persons who executed the foregoing assignment and acknowledged it to be his free and voluntary act and deed.

Witness my hand and notarial seal this ___18th___ day of ___June___, 1992.

_____
Notary Public

(NOTARIAL SEAL)



OFFICIAL SEAL
S T POLLASTRINI
Notary Public-California
SANTA CRUZ COUNTY
My Commission Expires
May 27, 1996

REEL 6177

FRAME 0505

- 5 -

M0125294

# EXHIBIT C

## FULLY REDACTED

# EXHIBIT D

## FULLY REDACTED

# EXHIBIT E

## FULLY REDACTED

# EXHIBIT F

## FULLY REDACTED

# EXHIBIT G

## FULLY REDACTED

# EXHIBIT H

## FULLY REDACTED

# EXHIBIT I

## FULLY REDACTED

# EXHIBIT J

## FULLY REDACTED

# EXHIBIT K

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                   - - -

    MCKESSON AUTOMATION, INC.,
4   a Pennsylvania Corporation,        :    CIVIL ACTION
                                        :
5              Plaintiff,               :
                                        :
6        v                              :
                                        :
7   SWISSLOG HOLDING AG,                :
    SWISSLOG MANAGEMENT AG,             :
8   TRANSLOGIC CORPORATION, and         :
    SWISSLOG NORTH AMERICA,             :
9                                       :    NO. 06-28 (***)
              Defendants.
10                                  - - -

11                         Wilmington, Delaware
                    Wednesday, October 24, 2007 at 5:03 p.m.
12                         TELEPHONE CONFERENCE

13                                  - - -

14  BEFORE:   HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE

15                                  - - -

    APPEARANCES:
16

17              BLANK ROME, LLP
                BY:  DALE R. DUBE, ESQ.
18
                    and
19
                SUTHERLAND ASBILL & BRENNAN, LLP
20              BY:  BLAIR M. JACOBS, ESQ., and
                    KATHERINE LAHNSTEIN-BERTOCCI, ESQ.
21                  (Washington, District of Columbia)

22                   Counsel for Plaintiff

23

24
                                Brian P. Gaffigan
25                              Registered Merit Reporter

SHEET 2

2

APPEARANCES: (Continued)

MORRIS NICHOLS ARSHT & TUNNELL, LLP
BY: JULIA HEANEY, ESQ.

and

DICKSTEIN SHAPIRO MORIN & OSHINSKY, LLP
BY: ALFRED R. FABRICANT, ESQ.
(New York, New York)

Counsel for Defendants

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE: The following telephone
conference was held in chambers, beginning at 5:03 p.m.)

THE COURT: Good afternoon, this is Judge
Thynge.

MS. DUBE: Good afternoon, Your Honor. This is
Dale Dube of Blank Rome for McKesson Automation. Also on
the line for McKesson is lead counsel Blair Jacobs and
Katherine Lahnstein-Bertocci of Sutherland Asbill's
Washington, DC office.

THE COURT: I'm sorry. The last name, Bertocci?

MS. DUBE: Yes, her new name is Katherine
Lahnstein-Bertocci.

THE COURT: Okay. Now I understand. I kept

3

looking at the list. I only have a Katherine Lahnstein.
Congratulations, Katherine!

MS. LAHNSTEIN-BERTOCCI: Thank you.

MS. HEANEY: Your Honor, this is Julie Heaney
for defendants; and on the line I have Fred Fabricant.

THE COURT: Good afternoon to you, too.

MR. FABRICANT: Good afternoon, Your Honor.

THE COURT: I understand that there is a bit of
a dispute arising on the issue as to whether there should be
an extension allowed for McKesson to take some additional
discovery on the issue of the motion to dismiss. This is
McKesson's motion, I believe, so I'll allow McKesson to
start off and then Swisslog will be allowed to respond.

Before we do get started on this, has there been
contact between the parties and Judge Stark in this case
about mediation?

MR. JACOBS: There has, Your Honor. There is a
currently scheduled date of November 20th.

THE COURT: All right. Thank you. Who just
said that?

MR. JACOBS: That was Mr. Jacobs.

THE COURT: All right. Mr. Jacobs, then I guess
you go forward.

MR. JACOBS: Yes, Your Honor. As we indicated
in our paper, we are only seeking a slight additional

4

period of time here. We have noticed the depositions of
two individuals that we believe have information that
is extremely important to understand the circumstances
surrounding the assignment at issue; and we noticed them,
those depositions to occur on October 29th, which was the
earliest we were able to notice them.

Originally, the defendants had noticed these
individuals and we had relied upon the fact that they were
going to proceed with the depositions of these individuals.
We've then produced some documents demonstrating that the
loans at issue that created the assignment essentially had
been paid in full and found out shortly after that that the
defendants were not going to proceed with depositions of
these individuals that have knowledge of the facts
surrounding the assignments.

The assignments took place 16 years ago, Your
Honor, so we're trying to recreate some facts that took
place a long, long time ago. Until this point, about six
weeks ago when this was brought to our attention, all we
knew was that everything at the Patent Office indicated
that McKesson was the rightful owner of these patents.
The individuals who had been involved from McKesson's end
with the assignment believed that McKesson and Automation
Healthcare were the appropriate and proper owners of the
patents in suit. So everything that we had seen indicated

5

that McKesson was the lawful owner of these patents.

When the issue was brought to our attention
about six weeks ago, we did start investigating. We did dig
up some additional documents we have produced on the issue
and now we just need a little bit of additional time to wrap
up the depositions of these individuals; and we're gathering
one or two declarations showing that people who were
involved with the circumstances clearly understood that no
formal reassignment in writing was necessary because the
assignment was extinguished when the promissory note was
extinguished.

One final fact, Your Honor. Mr. Heilman, one
of the individuals who we're seeking to depose, was on the
board of directors of the company that executed the assign-
ment, Automated Healthcare, and he authorized assignment
of the same technology and the same patents four years
subsequent to the assignment at issue here in 1994 while he
was still on the board of directors at Automated Healthcare.
We believe that that is just a clear indication that he
understood that the patents in fact were the property of
Automated Healthcare. We have no way of bringing that
evidence in to dispute this issue and to show the circum-
stances surrounding the acquisition of this property unless
we have a brief opportunity to talk to Mr. Heilman, and we
only need a short period of time after those depositions

**6**

1  to bring our opposition to the court, just a few days.
2  Five-six days, we can get everything together and bring it
3  to the court.
4          So under the circumstances, Your Honor, we don't
5  think that there is any evidence that we've acted in bad
6  faith.  We have moved diligently since the issue was brought
7  to our attention.
8          And, secondly, on the issue of prejudice, the
9  only thing that is brought up in the letter put forth here
10 by the defendants is essentially that it would allow the
11 case to carry on for a short additional period of time,
12 assuming that their position here was correct.  In contrast
13 to that, there would be great prejudice in responding with
14 regard to the motion if we were not allowed just a brief
15 additional period of time to gather facts that are necessary
16 to fully apprise the court with regard to the circumstances
17 surrounding this transaction.
18         THE COURT:  If the court grants your request,
19 Mr. Jacobs, will the two depositions go forward on October
20 29th?  And implied by that question is the following:  Are
21 the witnesses available at that time?  And is opposing
22 counsel available?
23         MR. JACOBS:  Your Honor, I have left three
24 messages, the last one yesterday afternoon at approximately
25 4:00 p.m. with an individual by the name of Mr. Cohen who is

**7**

1  the intermediary.  He is a lawyer who is the intermediary
2  for both of the individuals who we seek to depose, and I
3  asked him precisely that question.  I also told him that we
4  had availability on the 30th, on the 1st of November and
5  the 2nd of November to accommodate their schedules.  That
6  was the third message I have left for him, one voice mail
7  message and two written messages.  I have not heard back
8  from him.  I was assuming perhaps he had heard that the
9  defendants were looking to prevent these depositions from
10 going forward and so he has not responded to me.  It is on
11 my list this evening to follow-up with him once again.
12         THE COURT:  And where are these individuals?
13         MR. JACOBS:  They're both in Pittsburgh, Your
14 Honor, and we could do them both in one day back to back,
15 and that is what I told Mr. Cohen.
16         THE COURT:  Okay.  Thank you.
17         MR. FABRICANT:  Your Honor, this is Fred
18 Fabricant for the defendants.
19         THE COURT:  You may proceed.
20         MR. FABRICANT:  Yes.  I'd like to start with a
21 legal premise and then address the factual scenario that has
22 developed over the last several months since August 22.  The
23 most important matter which I think is controlling here is
24 that this is a standing-to-sue issue under Article III and
25 that in order to have the right to bring this action, we

**8**

1  believe that the rights have to be owned by McKesson.
2          We also believe, just as a primary issue
3  here, that regardless of depositions or anything else
4  that the plaintiff has brought to the court's attention,
5  this court doesn't have jurisdiction, respectfully, to
6  decide who owns the rights as between McKesson, on the one
7  hand, and the Pittsburgh rights holders, who are a group of
8  both individuals and entities, on the other hand because
9  ultimately it would be a denial of due process of law unless
10 they are willing to submit themselves to this jurisdiction
11 and be part of this action for the court to decide who owns
12 the rights.  What Mr. Jacobs ultimately will have to do
13 here we believe is litigate this issue of rights ownership
14 under Pennsylvania law, and we don't think that is the
15 proper position of this court in a patent infringement
16 suit where my client, two years ago, was sued for patent
17 infringement where the primary consideration that plaintiff
18 and his counsel had to make is do they have the rights and
19 do they have the standing to sue.  So we think ultimately
20 here we're leading down to a path to dismiss regardless of
21 what these two deponents might say.
22         Now, with that introduction, Your Honor, I
23 would add some very important facts.  I first personally
24 brought the issue of rights ownerships to Mr. Blair Jacobs'
25 attention on August 22 at the deposition of Mr. Tease, who

**9**

1  is one of the founders of the company.  He was not able to
2  identify whether or not AHI, and subsequently McKesson,
3  was the owner of the right affirmatively.  We took the
4  deposition of the 30(b)(6) witnesses who were identified as
5  the persons with knowledge of patent title and ownership.
6  There was no McKesson witness, including the 30(b)(6)
7  witnesses, who were able to testify that in fact McKesson
8  has those rights, that there ever was an assignment back.
9          That's two months ago, Your Honor.  From the
10 time we first put Mr. Jacobs on notice, we wrote to him at
11 least four times and received no substantive response other
12 than the fact that he was looking into it.
13         We finally came to the October 10 deadline for
14 the noticing of depositions in this case applicable to
15 both parties.  McKesson chose not to notice depositions of
16 any of these prospective rights holders in Pittsburgh,
17 Pennsylvania.  Remembering that these rights holders are
18 all in Pittsburgh, Pennsylvania, we don't believe they're
19 subject to personal jurisdiction in the District of
20 Delaware, and it was only a week after our motion was made
21 to dismiss that McKesson first decided that they wanted to
22 take the depositions of these rights holders.
23         Now, we, on October 10, did notice the
24 depositions of two of these or three of these rights holders
25 and we only did it for one reason.  We didn't know what the

**10**

1  response to the motion to dismiss would be and we wanted to
2  preserve our right to take their deposition if something
3  came in, but we had no direct intention to take it and
4  later abandoned our intention to take those depositions.
5       We don't believe this crucial issue that
6  Mr. Jacobs has brought to the court's attention, whether or
7  not the loan was repaid, is dispositive of the issue of the
8  rights.  In fact, for purposes of this discussion today,
9  Your Honor, we could assume that the loans were repaid.
10  We still have an assignment, an absolute assignment under
11  Pennsylvania law.  That assignment in the assignment
12  documents states that they own 100 percent of the rights.
13  The contract which was signed contemplated an assignment
14  back, a written assignment back which never took place.
15  There may be some contract disputes now between McKesson
16  on the one hand and the rights holders on the other hand.
17       Now to address the real serious legal issues
18  here.  The public policy behind the standing law is that
19  there not be a threat of multiple litigation; that
20  defendants, including my clients, not be subjected to
21  lawsuits from numerous parties.  As a matter of fact,
22  I've been advised by the rights holders counsel Mr. Cohen
23  who called me that the McKesson counsel have submitted
24  declarations to him and to his clients for them to sign
25  and they have refused to sign them.  So we have a clear

**11**

1  dispute here as to ownership of these rights, we have a
2  clear dispute as to whether or not there are multiple
3  parties who claim to own these rights, and this is not
4  the case nor the time to litigate those rights under
5  Pennsylvania contract law.
6       I would also bring to the court's attention
7  that there are several decisions, including a decision from
8  the Federal Circuit which is very close, very analogous to
9  the present situation.  It's the Arachnid case from 1991.
10  It came out of the District Court of Pennsylvania.  It's a
11  decision by the Federal Circuit.  And in that case, it held
12  specifically that a promise to assign in the future unless
13  it takes place is merely a contract right and does not vest
14  legal title if the assignment actually never took place.
15  And in that case, the Federal Circuit actually reversed the
16  District Court which had deemed the plaintiff the owner as
17  a result of that promise and the Fed Circuit reversed.
18       So we believe there are legal issues here.  We
19  believe that this can't be litigated in the District of
20  Delaware to take rights away from the Pennsylvania
21  investors.
22       And now, coming down to Your Honor's role here
23  as United States Magistrate on the discovery issues, I
24  think the reason the depositions shouldn't go forward very
25  simply is with all of that background, McKesson chose not

**12**

1  to notice their depositions prior to the October 10 cutoff,
2  chose not to notice them until after our motion to dismiss,
3  Your Honor, only last week produced a box of documents from
4  dated back in 1994, none of which are an assignment back to
5  the rights holders in Pennsylvania, from them to McKesson.
6  And then this box of documents, which should have been
7  produced a year ago, mysteriously disappeared, and now what
8  we're told are probative documents on that issue but not
9  dispositive are now produced for the first time.
10       We're not happy or comfortable with the way
11  this is going forward.  Our client has spent millions of
12  dollars to defend an action which we believe ultimately has
13  to be dismissed, and to allow McKesson now, long after the
14  cutoff, long after the issue was first brought to Mr. Jacobs
15  attention in August, to now take yet additional further
16  depositions which will take us nowhere as a matter of law is
17  just not equitable or fair.  And that's our position, Your
18  Honor.
19       THE COURT:  All right.  Thank you.
20       Mr. Jacobs.
21       MR. JACOBS:  Well, Your Honor, first of all,
22  we're more than comfortable that Delaware courts can
23  construe Pennsylvania law.  It's a very, very simple
24  securities issue that has been construed in the past on
25  numerous occasions.  As a matter of fact, there are several

**13**

1  Pennsylvania cases that decide this issue of law with regard
2  to extinguishment of rights, dead on the mark.
3       We have not come across any case, Your Honor,
4  in the history of jurisprudence that has required a written
5  assignment back where an assignment is extinguished as
6  part of a security interest, so a lot of the legal argument
7  that Mr. Fabricant is making is a legal argument that will
8  ultimately be decided by the court with regard to the stand-
9  ing issue.  We are more than comfortable that the Delaware
10  court can do this in looking at the facts surrounding the
11  motion to dismiss.
12       The one point that I would like to raise is
13  that whenever we're looking at the interpretation of written
14  documents, one of the key points of assessing the under-
15  standing of those words is the understanding of the parties
16  who were involved in the transaction.  Your Honor, we moved
17  forward immediately after finding out that the defendants
18  were not going to depose these individuals.  We were going
19  to just cross-depose them when they deposed them, when
20  they served their notices on October 10th.  As soon as we
21  found out that they weren't going to move forward with their
22  depositions, we noticed them immediately because all we
23  want to do is to have the facts come out so the court can
24  look at the circumstances surrounding the transaction
25  because the law in every jurisdiction is eminently clear

14

1   that in understanding the words in written documents and
2   what happens as a result of those words, the circumstances
3   surrounding it and the understanding of the parties who were
4   involved is a key consideration.  And we're only asking for
5   a reasonable amount of time to move forward, to gather those
6   facts.
7          If, in fact, the defendants want to raise this
8   issue of whether the Delaware court can interpret the
9   Pennsylvania law under these circumstances, they can do so
10  in their reply brief to the motion to dismiss.  I could just
11  say quickly that's the first time I've heard of the issue
12  but it sounds like they're trying to raise the interest
13  of a third-party who is not involved in this litigation.
14  Clearly, with regard to McKesson and the defendants who
15  are involved, this court has jurisdiction to decide these
16  issues but I have to hear more from Mr. Fabricant later
17  with regard to where he is going on that one.
18         As things stand right now, this court is
19  perfectly situated to resolve the standing issue.  All we
20  need to do is to gather a few additional facts and to bring
21  them forward.  When I look at their papers and when I hear
22  Mr. Fabricant's argument, it just seems to me as if he is
23  just trying, for one reason or another, to deny us the
24  opportunity to gather facts that relate directly to the
25  circumstances that shows what happens in this transaction

15

1   that took place 16 years ago.  That is all we want to do.
2   And we're looking in a very focused, efficient, limited way
3   of making that happen.
4          For that reason, Your Honor, we would just
5   request that you grant us the short period of extension that
6   we have requested.  You know, we're perfectly comfortable
7   we'll have everything and that by November 9th our papers
8   will be in, and they can file their reply brief, and then we
9   can sort out at that point in time who would be appropriate
10  to hear this issue and to decide on this issue.
11         THE COURT:  Well, I have got a couple questions.
12  These witnesses that you want to depose are located in
13  Pittsburgh?
14         MR. JACOBS:  Yes, Your Honor.
15         THE COURT:  Does this court even have
16  jurisdiction over them to require them to be deposed?
17         MR. JACOBS:  We have noticed their deposition
18  based on the authority of the court in the Western District
19  of Pennsylvania, Your Honor.
20         THE COURT:  Okay.
21         MR. JACOBS:  So the subpoenas have been served
22  and issued and they understand they are bound by those
23  subpoenas.
24         THE COURT:  All right.  So you basically filed a
25  miscellaneous action out there?

16

1          MR. JACOBS:  Yes, Your Honor.
2          MR. FABRICANT:  Did you file an action?
3          MR. JACOBS:  We did not file an action, Your
4   Honor.  We served the subpoenas through that court.  We
5   could file an action but our understanding and our past
6   practice has been to serve the subpoenas through the court.
7   The action arises if they move to quash or if they seek a
8   protective order.
9          THE COURT:  That's true.  That's true.  That is
10  one aspect of it.  And then you can get a miscellaneous.
11  You can go through that court out there to find out whether
12  or not the depositions are going to go forward.
13         MR. JACOBS:  Exactly.
14         MR. FABRICANT:  Your Honor?  I'm sorry.
15         MR. JACOBS:  We have not heard, Your Honor,
16  that they will not go forward.  As a matter of fact, the
17  declarations that were served to us, when we learned that
18  those declarations were not going to be signed, we tried
19  to take the easy route to begin with.  We indicated, okay,
20  we'll have to move forward with depositions and we'll get
21  the facts that way.  We never heard anything that, oh, no,
22  no, we're going to oppose depositions.  Our understanding is
23  these gentlemen have a strong interest in having the truth
24  and the facts come out here.
25         MR. FABRICANT:  Your Honor, it's not the

17

1   question of where they're located for deposition purposes.
2   Obviously, anyone can serve a deposition.
3          THE COURT:  Sure.
4          MR. FABRICANT:  But they're not parties in this
5   action.  There is obviously a dispute here as to ownership.
6   They're not willing to sign the declarations that McKesson
7   proffered to them.  Their counsel told me they're not
8   willing to sign those declarations.  There is a dispute now
9   as to ownership.
10         THE COURT:  Well, I don't know whether there
11  is a dispute as to ownership, and that is one thing the
12  depositions may tell us.
13         MR. JACOBS:  Your Honor, this is Mr. Jacobs.  I
14  can tell you we've spoken with Mr. Heilman, and there is not
15  a dispute regarding this.
16         THE COURT:  Well, this is what I'm looking at.
17  We know that the declarations were not signed.  The request
18  is being made to take the depositions of these two
19  individuals.  It could be, and Fred could be right on this,
20  that in the end these two depositions may not help your case
21  one iota because you may find out that there is a dispute.
22  And if that is the case, and that is a point that Fred has
23  got an argument on the reply and it's got to be addressed
24  because they are not parties to this litigation and now
25  you could end up having a litigation between McKesson and

**18**

1   another set of individuals, investors who may be claiming
2   that they have an interest or title or ownership of the
3   patent. But I'm going to allow the depositions to go
4   forward. I want to know immediately, and I do mean
5   immediately, if there is going to be any problem with the
6   depositions being completed around October 29th to November
7   2nd time frame.
8           MR. FABRICANT: Your Honor, can I speak to that
9   for a second?
10          THE COURT: Yes.
11          MR. FABRICANT: I've had a business trip planned
12  for months to Japan, which I leave on October 27th, which is
13  Saturday, and I won't be back in the office in New York
14  until November 12th.
15          THE COURT: Well, was it your intent to stop
16  everything in this case while you are gone?
17          MR. FABRICANT: Well, there is not anything
18  other than some depositions which are taking place this
19  week here in New York. I don't believe there is anything
20  scheduled during that period, and these depositions of these
21  Pittsburgh individuals are very important, and I did intend
22  to personally attend them. So I would ask if Your Honor is
23  going to allow these two depositions to take place, that
24  take place some time after November 12th.
25          MR. JACOBS: Well, Fred, we have depositions

**19**

1   in Pittsburgh currently scheduled for the 7th and the 9th.
2   Maybe you weren't going to attend those. Look, if we want
3   to go after the 12th and if Fred wants to be there, we're
4   not going to oppose that. We're not looking to create any
5   problems here. We're just looking to get a brief,
6   reasonable period of time to get these facts and to file a
7   response.
8           MR. FABRICANT: And with respect to the 7th and
9   the 9th, I intend to take those personally and I had not
10  even seen those dates yet. I think you communicated them
11  to --
12          (Unidentified Speaker): You were served the
13  alternative dates yesterday, Fred.
14          MR. JACOBS: Well, Fred, you and I will
15  follow-up separately on that issue.
16          THE COURT: Thank you. I don't want to get
17  involved in that tete-a-tete right now.
18          MR. JACOBS: We'll follow up.
19          THE COURT: A couple things need to be done. I
20  think it needs to be confirmed as to the availability of the
21  witnesses and what date the deposition is going to be taken,
22  and I strongly recommend it gets done in the November time
23  frame. That is, I would hate to see these depositions go
24  into December.
25          Once the depositions are taken, you will have

**20**

1   a week, that is, five working days in which to file your
2   response.
3           MR. JACOBS: That is acceptable, Your Honor.
4   That's fine.
5           THE COURT: And defendant, or I should say
6   Swisslog, will have the right to file its answering brief
7   consistent with the local court rules thereafter and its
8   reply brief.
9           MR. FABRICANT: Yes, Your Honor.
10          THE COURT: If there is going to be a problem
11  that this is going to be delayed longer, I need to know
12  that.
13          I also think that in light of this, the parties
14  may want to reexamine the scheduling order that is in this
15  case. The last scheduling order I believe that I'm aware of
16  was the one that was issued -- let me get the date. There
17  might be another one since then because it indicated to me a
18  fourth scheduling order was issued in this case. Yes, that
19  was October 1st.
20          MS. HEANEY: Your Honor, it was September 28th.
21          THE COURT: Yes. Well, I think I signed it
22  October 1st, Julie. And the question I have is this
23  obviously is going to affect potentially claim construction.
24  I don't know if it's going to affect claim construction
25  issue identification and whether, in light of this motion,

**21**

1   the parties are looking to have claim construction and
2   joint claim construction information exchanged along with
3   the briefs and case dispositive motions moving forward.
4           MR. JACOBS: The parties will sit down and
5   discuss that, Your Honor. We should be able to work that
6   out.
7           THE COURT: And there should be another
8   discussion, and that is whether the parties desire to have
9   a Magistrate Judge decide the issue of, whether it's myself
10  or Judge Stark, but to have -- I guess not Judge Stark
11  because he is going to be doing the mediation -- to have a
12  Magistrate Judge, which leaves me, decide whether you have
13  that desire to have the judge decide the motion to dismiss.
14  You can choose just to have a Magistrate Judge decide
15  certain case dispositive motions without consenting to that
16  Magistrate Judge's jurisdiction for trial. I can't
17  guarantee you how soon it would be addressed.
18          MR. JACOBS: Your Honor, just from a procedural
19  standpoint, under the court's local rules, would that be a
20  recommendation or can a Magistrate Judge decide dispositive
21  issues that are Article III issues under the court's local
22  rules?
23          THE COURT: If you read 28 U.S.C., Section
24  636 -- and the local rules do not supersede that -- if the
25  parties consent to a Magistrate Judge's jurisdiction for

22

1  whatever purpose, the Magistrate Judge then stands in the
2  position of the District Court Judge for that purpose. And
3  28 U.S.C., Section 626 outlines a lot of that, along with
4  the Federal Rules of Civil Procedure under Rule 72, I
5  believe. And I don't believe our local rules obviously
6  would conflict with those provisions. So in short, yes, we
7  can serve in that capacity.
8         MR. JACOBS: Okay.
9         THE COURT: We do it all the time. I think,
10  Julie, there was a case in which your office consented to
11  my jurisdiction on the issue of, claim construction was one
12  particular point that came from an appeal, after appellate
13  review, and it came back. This was after Judge McKelvie
14  left. The parties consented to my jurisdiction to issue
15  that claim construction on that particular claim term and
16  decide summary judgment motion on infringement so that
17  enabled the parties to go back up to the Fed Circuit
18  immediately or soon thereafter to have it decided whether
19  my claim construction on that particular term was correct.
20         So the parties can consent. If you give
21  consent, wherever you give the consent to, to the extent you
22  give the consent, that is how much you are bound and you
23  don't go through the report and recommendations situation.
24         MR. JACOBS: Okay.
25         MR. FABRICANT: Your Honor, we do have one

23

1  further request in connection with this ruling allowing
2  these two depositions to go forward.
3         THE COURT: Yes, sir.
4         MR. FABRICANT: We would ask, since there has
5  been communications with these investors, rights holders
6  from the McKesson side, there have been declarations
7  exchanged or proffered, there have been e-mails or
8  communications, we believe we would be entitled to discovery
9  in advance of their depositions to gather whatever commun-
10  ications have taken place because those may be documents or
11  information that affect the testimony of those witnesses.
12         MR. JACOBS: We don't have any problem with
13  that.
14         THE COURT: Then fine, get it exchanged. If you
15  have no problem with it, get it exchanged as soon as
16  possible.
17         MR. JACOBS: We'll do that.
18         MR. FABRICANT: Thank you, Your Honor.
19         THE COURT: Thank you, counsel. I probably
20  will not be issuing a separate order but will rely upon the
21  discussion we had here today. My ruling is contained in
22  the transcript.
23         MR. JACOBS: One point of clarification, Your
24  Honor. If we're going to produce information that we've
25  exchanged with the investors, it has come to our understand-

24

1  ing that the defendants have tried to purchase the rights
2  that these individuals do not have and so we're going to
3  want to take discovery with regard to that. We believe that
4  if there has been anything in writing exchanged from counsel
5  for the defendants with Mr. Heilman, Mr. Demmler, anybody at
6  PSF, that we should certainly be entitled to that as well.
7  Is that okay, Your Honor?
8         THE COURT: What is your position?
9         MR. FABRICANT: Your Honor, we've made no type
10  of written e-mail or other type of writing, offered to
11  purchase anything from them.
12         THE COURT: But that doesn't answer the
13  question.
14         MR. JACOBS: Yes. If it's oral, we want
15  discovery into it. That's my point.
16         MR. FABRICANT: Well, then we'll have to take
17  each other's depositions, I guess.
18         MR. JACOBS: No, no. Of the individuals, Fred.
19  We can just ask the individuals what is said to them.
20         MR. FABRICANT: Yes. At a deposition,
21  obviously we'll all be free to ask the individuals about any
22  communications they had.
23         MR. JACOBS: That's fine.
24         THE COURT: That's fine. Well, first of all,
25  they're not subject to privilege anyhow because as far as I

25

1  know, neither one of you are representing those individuals.
2         MR. FABRICANT: That is correct.
3         THE COURT: In fact, you pointed out to me there
4  is a Mr. Cohen representing them.
5         MR. FABRICANT: That's correct.
6         MR. JACOBS: That's correct.
7         THE COURT: That's the only place where I could
8  see attorney-client privilege arising, and the privilege
9  rests with the individual, but I don't think there is any
10  work product privilege if you disclosed it to a third-party.
11         MR. JACOBS: Agreed, Your Honor.
12         THE COURT: All right. That's fine. Is there
13  anything else before we get off the line? You might as well
14  take your last crack.
15         MR. JACOBS: That's all, Your Honor.
16         THE COURT: Okay. Thank you, counsel.
17         MR. FABRICANT: Thank you, Your Honor.
18         THE COURT: Good-bye now.
19         (The attorneys respond, "Thank you, Your
20  Honor.")
21         (Telephone conference ends at 5:33 p.m.)
22
23
24
25

**0**

06-28 [1] - 1:9

**1**

10 [3] - 9:13, 9:23, 12:1
100 [1] - 10:12
10th [1] - 13:20
12th [3] - 18:14, 18:24, 19:3
16 [2] - 4:16, 15:1
1991 [1] - 11:9
1994 [2] - 5:17, 12:4
1st [3] - 7:4, 20:19, 20:22

**2**

2007 [1] - 1:11
20th [1] - 3:18
22 [2] - 7:22, 8:25
24 [1] - 1:11
27th [1] - 18:12
28 [2] - 21:23, 22:3
28th [1] - 20:20
29th [3] - 4:5, 6:20, 18:6
2nd [2] - 7:5, 18:7

**3**

30(b)(6 [2] - 9:4, 9:6
30th [1] - 7:4

**4**

4:00 [1] - 6:25

**5**

5:03 [2] - 1:11, 2:14
5:33 [1] - 25:21

**6**

626 [1] - 22:3
636 [1] - 21:24

**7**

72 [1] - 22:4
7th [2] - 19:1, 19:8

**9**

9th [3] - 15:7, 19:1, 19:9

**A**

abandoned [1] - 10:4
able [4] - 4:6, 9:1, 9:7, 21:5
absolute [1] - 10:10
acceptable [1] - 20:3
accommodate [1] - 7:5
acquisition [1] - 5:23
acted [1] - 6:5
action [9] - 7:25, 8:11, 12:12, 15:25, 16:2, 16:3, 16:5, 16:7, 17:5
ACTION [1] - 1:4
add [1] - 8:23
additional [8] - 3:10, 3:25, 5:4, 5:5, 6:11, 6:15, 12:15, 14:20
address [2] - 7:21, 10:17
addressed [2] - 17:23, 21:17
advance [1] - 23:9
advised [1] - 10:22
affect [3] - 20:23, 20:24, 23:11
affirmatively [1] - 9:3
afternoon [5] - 2:15, 2:17, 3:6, 3:7, 6:24
AG [2] - 1:7, 1:7
ago [8] - 4:16, 4:18, 4:19, 5:3, 8:16, 9:9, 12:7, 15:1
Agreed [1] - 25:11
AHI [1] - 9:2
ALFRED [1] - 2:6
allow [5] - 3:12, 6:10, 12:13, 18:3, 18:23
allowed [3] - 3:10, 3:13, 6:14
allowing [1] - 23:1
alternative [1] - 19:13
AMERICA [1] - 1:8
amount [1] - 14:5
analogous [1] - 11:8
AND [1] - 1:2
answer [1] - 24:12
answering [1] - 20:6
anyhow [1] - 24:25
appeal [1] - 22:12
APPEARANCES [2] -

1:15, 2:1
appellate [1] - 22:12
applicable [1] - 9:14
apprise [1] - 6:16
appropriate [2] - 4:24, 15:9
Arachnid [1] - 11:9
argument [4] - 13:6, 13:7, 14:22, 17:23
arises [1] - 16:7
arising [2] - 3:9, 25:8
ARSHT [1] - 2:3
Article [2] - 7:24, 21:21
ASBILL [1] - 1:19
Asbill's [1] - 2:20
aspect [1] - 16:10
assessing [1] - 13:14
assign [2] - 5:14, 11:12
assignment [17] - 4:4, 4:11, 4:23, 5:10, 5:15, 5:17, 9:8, 10:10, 10:11, 10:13, 10:14, 11:14, 12:4, 13:5
assignments [2] - 4:15, 4:16
assume [1] - 10:9
assuming [2] - 6:12, 7:8
attend [2] - 18:22, 19:2
attention [8] - 4:19, 5:2, 6:7, 8:4, 8:25, 10:6, 11:6, 12:15
attorney [1] - 25:8
attorney-client [1] - 25:8
attorneys [1] - 25:19
August [3] - 7:22, 8:25, 12:15
authority [1] - 15:18
authorized [1] - 5:15
Automated [3] - 5:15, 5:18, 5:21
AUTOMATION [1] - 1:3
Automation [2] - 2:18, 4:23
availability [2] - 7:4, 19:20
available [2] - 6:21, 6:22
aware [1] - 20:15

**B**

background [1] -

11:25
bad [1] - 6:5
based [1] - 15:18
BEFORE [1] - 1:14
begin [1] - 16:19
beginning [1] - 2:14
behind [1] - 10:18
BERTOCCI [2] - 1:20, 3:3
Bertocci [3] - 2:20, 2:22, 2:24
between [4] - 3:15, 8:6, 10:15, 17:25
bit [2] - 3:8, 5:5
BLAIR [1] - 1:20
Blair [2] - 2:19, 8:24
BLANK [1] - 1:17
Blank [1] - 2:18
board [2] - 5:14, 5:18
bound [2] - 15:22, 22:22
box [2] - 12:3, 12:6
BRENNAN [1] - 1:19
Brian [1] - 1:24
brief [7] - 5:24, 6:14, 14:10, 15:8, 19:5, 20:6, 20:8
briefs [1] - 21:3
bring [6] - 6:1, 6:2, 7:25, 11:6, 14:20
bringing [1] - 5:21
brought [8] - 4:19, 5:2, 6:6, 6:9, 8:4, 8:24, 10:6, 12:14
business [1] - 18:11
BY [4] - 1:17, 1:20, 2:4, 2:6
bye [1] - 25:18

**C**

capacity [1] - 22:7
carry [1] - 6:11
case [16] - 3:15, 6:11, 9:14, 11:4, 11:9, 11:11, 11:15, 13:3, 17:20, 17:22, 18:16, 20:15, 20:18, 21:3, 21:15, 22:10
cases [1] - 13:1
certain [1] - 21:15
certainly [1] - 24:6
chambers [1] - 2:14
choose [1] - 21:14
chose [3] - 9:15, 11:25, 12:2
Circuit [5] - 11:8, 11:11, 11:15, 11:17, 22:17

circum [1] - 5:22
circumstances [8] - 4:3, 5:8, 6:4, 6:16, 13:24, 14:2, 14:9, 14:25
Civil [1] - 22:4
CIVIL [1] - 1:4
claim [4] - 11:3, 20:23, 20:24, 21:1, 21:2, 22:11, 22:15, 22:19
claiming [1] - 18:1
clarification [1] - 23:23
clear [4] - 5:19, 10:25, 11:2, 13:25
clearly [1] - 5:8
Clearly [1] - 14:14
client [8] - 8:16, 12:11, 25:8
clients [2] - 10:20, 10:24
close [1] - 11:8
Cohen [4] - 6:25, 7:15, 10:22, 25:4
Columbia [1] - 1:21
comfortable [4] - 12:10, 12:22, 13:9, 15:6
coming [1] - 11:22
commun [1] - 23:9
communicated [1] - 19:10
communications [3] - 23:5, 23:8, 24:22
company [2] - 5:14, 9:1
completed [1] - 18:6
CONFERENCE [1] - 1:12
conference [2] - 2:14, 25:21
confirmed [1] - 19:20
conflict [1] - 22:6
Congratulations [1] - 3:2
connection [1] - 23:1
consent [5] - 21:25, 22:20, 22:21, 22:22
consented [2] - 22:10, 22:14
consenting [1] - 21:15
consideration [2] - 8:17, 14:4
consistent [1] - 20:7
construction [7] - 20:23, 20:24, 21:1, 21:2, 22:11, 22:15, 22:19
construe [1] - 12:23
construed [1] - 12:24

contact [1] - 3:15
contained [1] - 23:21
contemplated [1] - 10:13
Continued [1] - 2:1
contract [4] - 10:13, 10:15, 11:5, 11:13
contrast [1] - 6:12
controlling [1] - 7:23
Corporation [1] - 1:4
CORPORATION [1] - 1:8
correct [5] - 6:12, 22:19, 25:2, 25:5, 25:6
Counsel [2] - 1:22, 2:8
counsel [9] - 2:19, 6:22, 8:18, 10:22, 10:23, 17:7, 23:19, 24:4, 25:16
couple [2] - 15:11, 19:19
COURT [42] - 1:1, 2:15, 2:22, 2:25, 3:6, 3:8, 3:19, 3:22, 6:18, 7:12, 7:16, 7:19, 12:19, 15:11, 15:15, 15:20, 15:24, 16:9, 17:3, 17:10, 17:16, 18:10, 18:15, 19:16, 19:19, 20:5, 20:10, 20:21, 21:7, 21:23, 22:9, 23:3, 23:14, 23:19, 24:8, 24:12, 24:24, 25:3, 25:7, 25:12, 25:16, 25:18
court [19] - 6:1, 6:3, 6:16, 6:18, 8:5, 8:11, 8:15, 13:8, 13:10, 13:23, 14:8, 14:15, 14:18, 15:15, 15:18, 16:4, 16:6, 16:11, 20:7
Court [3] - 11:10, 11:16, 22:2
court's [5] - 8:4, 10:6, 11:6, 21:19, 21:21
courts [1] - 12:22
crack [1] - 25:14
create [1] - 19:4
created [1] - 4:11
cross [1] - 13:19
cross-depose [1] - 13:19
crucial [1] - 10:5
cutoff [2] - 12:1, 12:14

**D**

Dale [1] - 2:18
DALE [1] - 1:17
date [3] - 3:18, 19:21, 20:16
dated [1] - 12:4
dates [2] - 19:10, 19:13
days [3] - 6:1, 6:2, 20:1
DC [1] - 2:21
dead [1] - 13:2
deadline [1] - 9:13
December [1] - 19:24
decide [11] - 8:6, 8:11, 13:1, 14:15, 15:10, 21:9, 21:12, 21:13, 21:14, 21:20, 22:16
decided [3] - 9:21, 13:8, 22:18
decision [2] - 11:7, 11:11
decisions [1] - 11:7
declarations [8] - 5:7, 10:24, 16:17, 16:18, 17:6, 17:8, 17:17, 23:6
deemed [1] - 11:16
defend [1] - 12:12
defendant [1] - 20:5
defendants [2] - 3:5, 4:7, 4:13, 6:10, 7:9, 7:18, 10:20, 13:17, 14:7, 14:14, 24:1, 24:5
Defendants [2] - 1:9, 2:8
DELAWARE [1] - 1:2
Delaware [6] - 1:11, 9:20, 11:20, 12:22, 13:9, 14:8
delayed [1] - 20:11
Demmler [1] - 24:5
demonstrating [1] - 4:10
denial [1] - 8:9
deny [1] - 14:23
deponents [1] - 8:21
depose [5] - 5:13, 7:2, 13:18, 13:19, 15:12
deposed [2] - 13:19, 15:16
deposition [8] - 8:25, 9:4, 10:2, 15:17, 17:1, 17:2, 19:21, 24:20
depositions [35] - 4:1, 4:5, 4:9, 4:13, 5:6,

5:25, 6:19, 7:9, 8:3, 9:14, 9:15, 9:22, 9:24, 10:4, 11:24, 12:1, 12:16, 13:22, 16:12, 16:20, 16:22, 17:12, 17:18, 17:20, 18:3, 18:6, 18:18, 18:20, 18:23, 18:25, 19:23, 19:25, 23:2, 23:9, 24:17
desire [2] - 21:8, 21:13
developed [1] - 7:22
DICKSTEIN [1] - 2:6
dig [1] - 5:3
diligently [1] - 6:6
direct [1] - 10:3
directly [1] - 14:24
directors [2] - 5:14, 5:18
disappeared [1] - 12:7
disclosed [1] - 25:10
discovery [5] - 3:11, 11:23, 23:8, 24:3, 24:15
discuss [1] - 21:5
discussion [3] - 10:8, 21:8, 23:21
dismiss [7] - 3:11, 9:21, 10:1, 12:2, 13:11, 14:10, 21:13
dismissal [1] - 8:20
dismissed [1] - 12:13
dispositive [5] - 10:7, 12:9, 21:3, 21:15, 21:20
dispute [9] - 3:9, 5:22, 11:1, 11:2, 17:5, 17:8, 17:11, 17:15, 17:21
disputes [1] - 10:15
DISTRICT [2] - 1:1, 1:2
District [7] - 1:21, 9:19, 11:10, 11:16, 11:19, 15:18, 22:2
documents [9] - 4:10, 5:4, 10:12, 12:3, 12:6, 12:8, 13:14, 14:1, 23:10
dollars [1] - 12:12
done [2] - 19:19, 19:22
down [3] - 8:20, 11:22, 21:4
Dube [1] - 2:18
DUBE [3] - 1:17, 2:17, 2:23
due [1] - 8:9
during [1] - 18:20

**E**

e-mail [1] - 24:10
e-mails [1] - 23:7
earliest [1] - 4:6
easy [1] - 16:19
efficient [1] - 15:2
eminently [1] - 13:25
enabled [1] - 22:17
end [3] - 4:22, 17:20, 17:25
ends [1] - 25:21
entities [1] - 8:8
entitled [2] - 23:8, 24:6
equitable [1] - 12:17
ESQ [5] - 1:17, 1:20, 1:20, 2:4, 2:6
essentially [2] - 4:11, 6:10
evening [1] - 7:11
evidence [2] - 5:22, 6:5
Exactly [1] - 16:13
exchanged [6] - 21:2, 23:7, 23:14, 23:15, 23:25, 24:4
executed [1] - 5:14
extension [2] - 3:10, 15:5
extent [1] - 22:21
extinguished [3] - 5:10, 5:11, 13:5
extinguishment [1] - 13:2
extremely [1] - 4:3

**F**

FABRICANT [22] - 2:6, 3:7, 7:17, 7:20, 16:2, 16:14, 16:25, 17:4, 18:8, 18:11, 18:17, 19:8, 20:9, 22:25, 23:4, 23:18, 24:9, 24:16, 24:20, 25:2, 25:5, 25:17
Fabricant [4] - 3:5, 7:18, 13:7, 14:16
Fabricant's [1] - 14:22
fact [11] - 4:8, 5:12, 5:20, 9:7, 9:12, 10:8, 10:21, 12:25, 14:7, 16:16, 25:3
facts [12] - 4:14, 4:17, 6:15, 8:23, 13:10, 13:23, 14:6, 14:20, 14:24, 16:21, 16:24,

19:6
factual [1] - 7:21
fair [1] - 12:17
faith [1] - 6:6
far [1] - 24:25
Fed [2] - 11:17, 22:17
Federal [4] - 11:8, 11:11, 11:15, 22:4
few [2] - 6:1, 14:20
file [7] - 15:8, 16:2, 16:3, 16:5, 19:6, 20:1, 20:6
filed [1] - 15:24
final [1] - 5:12
finally [1] - 9:13
fine [5] - 20:4, 23:14, 24:23, 24:24, 25:12
first [8] - 8:23, 9:10, 9:21, 12:9, 12:14, 12:21, 14:11, 24:24
Five [1] - 6:2
five [1] - 20:1
Five-six [1] - 6:2
focused [1] - 15:2
follow [3] - 7:11, 19:15, 19:18
follow-up [2] - 7:11, 19:15
following [2] - 2:13, 6:20
FOR [1] - 1:2
formal [1] - 5:9
forth [1] - 6:9
forward [15] - 3:23, 6:19, 7:10, 11:24, 12:11, 13:17, 13:21, 14:5, 14:21, 16:12, 16:16, 16:20, 18:4, 21:3, 23:2
founders [1] - 9:1
four [2] - 5:16, 9:11
fourth [1] - 20:18
frame [2] - 18:7, 19:23
Fred [9] - 3:5, 7:17, 17:19, 17:22, 18:25, 19:3, 19:13, 19:14, 24:18
free [1] - 24:21
full [1] - 4:12
fully [1] - 6:16
future [1] - 11:12

**G**

Gaffigan [1] - 1:24
gather [5] - 6:15, 14:5, 14:20, 14:24, 23:9
gathering [1] - 5:6
gentlemen [1] - 16:23

Good-bye [1] - 25:18
grant [1] - 15:5
grants [1] - 6:18
great [1] - 6:13
group [1] - 8:7
guarantee [1] - 21:17
guess [3] - 3:22,
21:10, 24:17

## H

hand [4] - 8:7, 8:8,
10:16
happy [1] - 12:10
hate [1] - 19:23
Healthcare [4] - 4:24,
5:15, 5:18, 5:21
HEANEY [3] - 2:4, 3:4,
20:20
Heaney [1] - 3:4
hear [3] - 14:16,
14:21, 15:10
heard [5] - 7:7, 7:8,
14:11, 16:15, 16:21
Heilman [4] - 5:12,
5:24, 17:14, 24:5
held [2] - 2:14, 11:11
help [1] - 17:20
history [1] - 13:4
holders [9] - 8:7, 9:16,
9:17, 9:22, 9:24,
10:16, 10:22, 12:5,
23:5
HOLDING [1] - 1:7
Honor [44] - 2:17, 3:4,
3:7, 3:17, 3:24, 4:17,
5:12, 6:4, 6:23, 7:14,
7:17, 8:22, 9:9, 10:9,
12:3, 12:18, 12:21,
13:3, 13:16, 15:4,
15:14, 15:19, 16:1,
16:4, 16:14, 16:15,
16:25, 17:13, 18:8,
18:22, 20:3, 20:9,
20:20, 21:5, 21:18,
22:25, 23:18, 23:24,
24:7, 24:9, 25:11,
25:15, 25:17, 25:20
Honor's [1] - 11:22
HONORABLE [1] -
1:14

## I

ications [1] - 23:10
identification [1] -
20:25
identified [1] - 9:4
identify [1] - 9:2

III [2] - 7:24, 21:21
immediately [5] -
13:17, 13:22, 18:4,
18:5, 22:18
implied [1] - 6:20
important [4] - 4:3,
7:23, 8:23, 18:21
IN [2] - 1:1, 1:2
INC [1] - 1:3
including [3] - 9:6,
10:20, 11:7
indicated [5] - 3:24,
4:20, 4:25, 16:19,
20:17
indication [1] - 5:19
individual [2] - 6:25,
25:9
individuals [19] - 4:2,
4:8, 4:9, 4:14, 4:22,
5:6, 5:13, 7:2, 7:12,
8:8, 13:18, 17:19,
18:1, 18:21, 24:2,
24:18, 24:19, 24:21,
25:1
information [4] - 4:2,
21:2, 23:11, 23:24
infringement [3] -
8:15, 8:17, 22:16
ing [2] - 13:9, 24:1
intend [2] - 18:21,
19:9
intent [1] - 18:15
intention [2] - 10:3,
10:4
interest [4] - 13:6,
14:12, 16:23, 18:2
intermediary [2] - 7:1
interpret [1] - 14:8
interpretation [1] -
13:13
introduction [1] - 8:22
investigating [1] - 5:3
investors [4] - 11:21,
18:1, 23:5, 23:25
involved [7] - 4:22,
5:8, 13:16, 14:4,
14:13, 14:15, 19:17
iota [1] - 17:21
issue [31] - 3:9, 3:11,
4:4, 4:11, 5:2, 5:4,
5:17, 5:22, 6:6, 6:8,
7:24, 8:2, 8:13, 8:24,
10:5, 10:7, 12:8,
12:14, 12:24, 13:1,
13:9, 14:8, 14:11,
14:19, 15:10, 19:15,
20:25, 21:9, 22:11,
22:14
issued [3] - 15:22,
20:16, 20:18

issues [6] - 10:17,
11:18, 11:23, 14:16,
21:21
issuing [1] - 23:20

## J

Jacobs [10] - 2:19,
3:21, 3:22, 6:19,
8:12, 9:10, 10:6,
12:14, 12:20, 17:13
JACOBS [32] - 1:20,
3:17, 3:21, 3:24,
6:23, 7:13, 12:21,
15:14, 15:17, 15:21,
16:1, 16:3, 16:13,
16:15, 17:13, 18:25,
19:14, 19:18, 20:3,
21:4, 21:18, 22:8,
22:24, 23:12, 23:17,
23:23, 24:14, 24:18,
24:23, 25:6, 25:11,
25:15
Jacobs' [1] - 8:24
Japan [1] - 18:12
joint [1] - 21:2
Judge [11] - 2:15,
3:15, 21:9, 21:10,
21:12, 21:14, 21:20,
22:1, 22:2, 22:13
judge [1] - 21:13
JUDGE [1] - 1:14
Judge's [2] - 21:16,
21:25
judgment [1] - 22:16
JULIA [1] - 2:4
Julie [3] - 3:4, 20:22,
22:10
jurisdiction [10] - 8:5,
8:10, 9:19, 13:25,
14:15, 15:16, 21:16,
21:25, 22:11, 22:14
jurisprudence [1] -
13:4

## K

KATHERINE [1] - 1:20
Katherine [4] - 2:20,
2:23, 3:1, 3:2
kept [1] - 2:25
key [2] - 13:14, 14:4
knowledge [2] - 4:14,
9:5

## L

LAHNSTEIN [2] - 1:20,

3:3
Lahnstein [3] - 2:20,
2:24, 3:1
LAHNSTEIN-
BERTOCCI [2] -
1:20, 3:3
Lahnstein-Bertocci
[2] - 2:20, 2:24
last [6] - 2:22, 6:24,
7:22, 12:3, 20:15,
25:14
law [10] - 8:9, 8:14,
10:11, 10:18, 11:5,
12:16, 12:23, 13:1,
13:25, 14:9
lawful [1] - 5:1
lawsuits [1] - 10:21
lawyer [1] - 7:1
lead [1] - 2:19
leading [1] - 8:20
learned [1] - 16:17
least [1] - 9:11
leave [1] - 18:12
leaves [1] - 21:12
left [3] - 6:23, 7:6,
22:14
legal [6] - 7:21, 10:17,
11:14, 11:18, 13:6,
13:7
letter [1] - 6:9
light [2] - 20:13, 20:25
limited [1] - 15:2
line [3] - 2:19, 3:5,
25:13
list [2] - 3:1, 7:11
litigate [2] - 8:13, 11:4
litigated [1] - 11:19
litigation [4] - 10:19,
14:13, 17:24, 17:25
LLP [4] - 1:17, 1:19,
2:3, 2:6
loan [1] - 10:7
loans [2] - 4:11, 10:9
local [3] - 20:7, 21:19,
21:21, 21:24, 22:5
located [2] - 15:12,
17:1
look [2] - 13:24, 14:21
Look [1] - 19:2
looking [10] - 3:1, 7:9,
9:12, 13:10, 13:13,
15:2, 17:16, 19:4,
19:5, 21:1

## M

MAGISTRATE [1] -
1:14
Magistrate [8] - 11:23,

21:9, 21:12, 21:14,
21:16, 21:20, 21:25,
22:1
mail [2] - 7:6, 24:10
mails [1] - 23:7
MANAGEMENT [1] -
1:7
mark [1] - 13:2
MARY [1] - 1:14
matter [5] - 7:23,
10:21, 12:16, 12:25,
16:16
McKelvie [1] - 22:13
McKesson [23] - 2:18,
2:19, 3:10, 3:12,
4:21, 4:23, 5:1, 8:1,
8:6, 9:2, 9:6, 9:7,
9:15, 9:21, 10:15,
10:23, 11:25, 12:5,
12:13, 14:14, 17:6,
17:25, 23:6
MCKESSON [1] - 1:3
McKesson's [2] -
3:12, 4:22
mean [1] - 18:4
mediation [2] - 3:16,
21:11
ment [1] - 5:15
merely [1] - 11:13
Merit [1] - 1:25
message [2] - 7:6, 7:7
messages [2] - 6:24,
7:7
might [3] - 8:21,
20:17, 25:13
millions [1] - 12:11
miscellaneous [2] -
15:25, 16:10
months [3] - 7:22, 9:9,
18:12
MORIN [1] - 2:6
MORRIS [1] - 2:3
most [1] - 7:23
motion [11] - 3:11,
3:12, 6:14, 9:20,
10:1, 12:2, 13:11,
14:10, 20:25, 21:13,
22:16
motions [2] - 21:3,
21:15
move [4] - 13:21, 14:5,
16:7, 16:20
moved [2] - 6:6, 13:16
moving [1] - 21:3
MR [52] - 3:7, 3:17,
3:21, 3:24, 6:23,
7:13, 7:17, 7:20,
12:21, 15:14, 15:17,
15:21, 16:1, 16:2,
16:3, 16:13, 16:14,

16:15, 16:25, 17:4,
17:13, 18:8, 18:11,
18:17, 18:25, 19:8,
19:14, 19:18, 20:3,
20:9, 21:4, 21:18,
22:8, 22:24, 22:25,
23:4, 23:12, 23:17,
23:18, 23:23, 24:9,
24:14, 24:16, 24:18,
24:20, 24:23, 25:2,
25:5, 25:6, 25:11,
25:15, 25:17
**MS** [5] - 2:17, 2:23,
3:3, 3:4, 20:20
**multiple** [2] - 10:19,
11:2
**mysteriously** [1] -
12:7

## N

**name** [3] - 2:22, 2:23,
6:25
**necessary** [2] - 5:9,
6:15
**need** [5] - 5:5, 5:25,
14:20, 19:19, 20:11
**needs** [1] - 19:20
**never** [3] - 10:14,
11:14, 16:21
**New** [4] - 2:7, 18:13,
18:19
**new** [1] - 2:23
**NICHOLS** [1] - 2:3
**NO** [1] - 1:9
**none** [1] - 12:4
**NORTH** [1] - 1:8
**note** [1] - 5:10
**NOTE** [1] - 2:13
**notice** [6] - 4:6, 9:10,
9:15, 9:23, 12:1,
12:2
**noticed** [5] - 4:1, 4:4,
4:7, 13:22, 15:17
**notices** [1] - 13:20
**noticing** [1] - 9:14
**November** [8] - 3:18,
7:4, 7:5, 15:7, 18:6,
18:14, 18:24, 19:22
**nowhere** [1] - 12:16
**numerous** [2] - 10:21,
12:25

## O

**Obviously** [1] - 17:2
**obviously** [4] - 17:5,
20:23, 22:5, 24:21
**occasions** [1] - 12:25

**occur** [1] - 4:5
**October** [11] - 1:11,
4:5, 6:19, 9:13, 9:23,
12:1, 13:20, 18:6,
18:12, 20:19, 20:22
**OF** [1] - 1:2
**offered** [1] - 24:10
**Office** [1] - 4:20
**office** [3] - 2:21,
18:13, 22:10
**Once** [1] - 19:25
**once** [1] - 7:11
**one** [21] - 5:7, 5:12,
6:24, 7:6, 7:14, 8:6,
9:1, 9:25, 10:16,
13:12, 13:14, 14:17,
14:23, 16:10, 17:11,
17:21, 20:16, 20:17,
22:11, 22:25, 25:1
**One** [2] - 5:12, 23:23
**oOo** [2] - 2:11
**opportunity** [2] - 5:24,
14:24
**oppose** [2] - 16:22,
19:4
**opposing** [1] - 6:21
**opposition** [1] - 6:1
**oral** [1] - 24:14
**order** [5] - 7:25, 16:8,
20:14, 20:15, 20:18,
23:20
**Originally** [1] - 4:7
**OSHINSKY** [1] - 2:6
**outlines** [1] - 22:3
**own** [2] - 10:12, 11:3
**owned** [1] - 8:1
**owner** [4] - 4:21, 5:1,
9:3, 11:16
**owners** [1] - 4:24
**ownership** [7] - 8:13,
9:5, 11:1, 17:5, 17:9,
17:11, 18:2
**ownerships** [1] - 8:24
**owns** [2] - 8:6, 8:11

## P

**p.m** [4] - 1:11, 2:14,
6:25, 25:21
**paid** [1] - 4:12
**paper** [1] - 3:25
**papers** [2] - 14:21,
15:7
**part** [2] - 8:11, 13:6
**particular** [3] - 22:12,
22:15, 22:19
**parties** [16] - 3:15,
9:15, 10:21, 11:3,
13:15, 14:3, 17:4,

17:24, 20:13, 21:1,
21:4, 21:8, 21:25,
22:14, 22:17, 22:20
**party** [2] - 14:13,
25:10
**past** [2] - 12:24, 16:5
**PAT** [1] - 1:14
**patent** [4] - 8:15, 8:16,
9:5, 18:3
**Patent** [1] - 4:20
**patents** [5] - 4:21,
4:25, 5:1, 5:16, 5:20
**path** [1] - 8:20
**Pennsylvania** [13] -
1:4, 8:14, 9:17, 9:18,
10:11, 11:5, 11:10,
11:20, 12:5, 12:23,
13:1, 14:9, 15:19
**people** [1] - 5:7
**percent** [1] - 10:12
**perfectly** [2] - 14:19,
15:6
**perhaps** [1] - 7:8
**period** [7] - 4:1, 5:25,
6:11, 6:15, 15:5,
18:20, 19:6
**personal** [1] - 9:19
**personally** [3] - 8:23,
18:22, 19:9
**persons** [1] - 9:5
**Pittsburgh** [7] - 7:13,
8:7, 9:16, 9:18,
15:13, 18:21, 19:1
**place** [11] - 4:16, 4:18,
10:14, 11:13, 11:14,
15:1, 18:18, 18:23,
18:24, 23:10, 25:7
**plaintiff** [3] - 8:4, 8:17,
11:16
**Plaintiff** [2] - 1:5, 1:22
**planned** [1] - 18:11
**point** [7] - 4:18, 13:12,
15:9, 17:22, 22:12,
23:23, 24:15
**pointed** [1] - 25:3
**points** [1] - 13:14
**policy** [1] - 10:18
**position** [5] - 6:12,
8:15, 12:17, 22:2,
24:8
**possible** [1] - 23:16
**potentially** [1] - 20:23
**practice** [1] - 16:6
**precisely** [1] - 7:3
**prejudice** [2] - 6:8,
6:13
**premise** [1] - 7:21
**present** [1] - 11:9
**preserve** [1] - 10:2
**prevent** [1] - 7:9

**primary** [2] - 8:2, 8:17
**privilege** [4] - 24:25,
25:8, 25:10
**probative** [1] - 12:8
**problem** [4] - 18:5,
20:10, 23:12, 23:15
**problems** [1] - 19:5
**procedural** [1] - 21:18
**Procedure** [1] - 22:4
**proceed** [3] - 4:9,
4:13, 7:19
**process** [1] - 8:9
**produce** [1] - 23:24
**produced** [5] - 4:10,
5:4, 12:3, 12:7, 12:9
**product** [1] - 25:10
**proffered** [2] - 17:7,
23:7
**promise** [2] - 11:12,
11:17
**promissory** [1] - 5:10
**proper** [2] - 4:24, 8:15
**property** [2] - 5:20,
5:23
**prospective** [1] - 9:16
**protective** [1] - 16:8
**provisions** [1] - 22:6
**PSF** [1] - 24:6
**public** [1] - 10:18
**purchase** [2] - 24:1,
24:11
**purpose** [2] - 22:1,
22:2
**purposes** [2] - 10:8,
17:1
**put** [2] - 6:9, 9:10

## Q

**quash** [1] - 16:7
**questions** [1] - 15:11
**quickly** [1] - 14:11

## R

**raise** [3] - 13:12, 14:7,
14:12
**read** [1] - 21:23
**real** [1] - 10:17
**reason** [4] - 9:25,
11:24, 14:23, 15:4
**reasonable** [2] - 14:5,
19:6
**reassignment** [1] - 5:9
**received** [1] - 9:11
**recommend** [1] -
19:22
**recommendation** [1] -

**21:20
**recommendations** [1]
- 22:23
**recreate** [1] - 4:17
**reexamine** [1] - 20:14
**refused** [1] - 10:25
**regard** [7] - 6:14, 6:16,
13:1, 13:8, 14:14,
14:17, 24:3
**regarding** [1] - 17:15
**regardless** [2] - 8:3,
8:20
**Registered** [1] - 1:25
**relate** [1] - 14:24
**relied** [1] - 4:8
**rely** [1] - 23:20
**Remembering** [1] -
9:17
**repaid** [2] - 10:7, 10:9
**reply** [4] - 14:10, 15:8,
17:23, 20:8
**report** [1] - 22:23
**Reporter** [1] - 1:25
**REPORTER'S** [1] -
2:13
**representing** [2] -
25:1, 25:4
**request** [4] - 6:18,
15:5, 17:17, 23:1
**requested** [1] - 15:6
**require** [1] - 15:16
**required** [1] - 13:4
**resolve** [1] - 14:19
**respect** [1] - 19:8
**respectfully** [1] - 8:5
**respond** [2] - 3:13,
25:19
**responded** [1] - 7:10
**responding** [1] - 6:13
**response** [4] - 9:11,
10:1, 19:7, 20:2
**rests** [1] - 25:9
**result** [2] - 11:17, 14:2
**reversed** [2] - 11:15,
11:17
**review** [1] - 22:13
**rightful** [1] - 4:21
**rights** [24] - 8:1, 8:6,
8:7, 8:12, 8:13, 8:18,
8:24, 9:8, 9:16, 9:17,
9:22, 9:24, 10:8,
10:12, 10:16, 10:22,
11:1, 11:3, 11:4,
11:20, 12:5, 13:2,
23:5, 24:1
**role** [1] - 11:22
**Rome** [1] - 2:18
**ROME** [1] - 1:17
**route** [1] - 16:19
**Rule** [1] - 22:4

rules [5] - 20:7, 21:19, 21:22, 21:24, 22:5
Rules [1] - 22:4
ruling [2] - 23:1, 23:21

**S**

Saturday [1] - 18:13
scenario [1] - 7:21
scheduled [3] - 3:18, 18:20, 19:1
schedules [1] - 7:5
scheduling [3] - 20:14, 20:15, 20:18
second [1] - 18:9
secondly [1] - 6:8
Section [2] - 21:23, 22:3
securities [1] - 12:24
security [1] - 13:6
see [2] - 19:23, 25:8
seek [2] - 7:2, 16:7
seeking [2] - 3:25, 5:13
separate [1] - 23:20
separately [1] - 19:15
September [1] - 20:20
serious [1] - 10:17
serve [3] - 16:6, 17:2, 22:7
served [5] - 13:20, 15:21, 16:4, 16:17, 19:12
set [1] - 18:1
several [3] - 7:22, 11:7, 12:25
SHAPIRO [1] - 2:6
short [4] - 5:25, 6:11, 15:5, 22:6
shortly [1] - 4:12
show [1] - 5:22
showing [1] - 5:7
shows [1] - 14:25
side [1] - 23:6
sign [4] - 10:24, 10:25, 17:6, 17:8
signed [4] - 10:13, 16:18, 17:17, 20:21
simple [1] - 12:23
simply [1] - 11:25
sit [1] - 21:4
situated [1] - 14:19
situation [2] - 11:9, 22:23
six [3] - 4:18, 5:3, 6:2
slight [1] - 3:25
soon [4] - 13:20, 21:17, 22:18, 23:15
sorry [2] - 2:22, 16:14

sort [1] - 15:9
sounds [1] - 14:12
Speaker [1] - 19:12
specifically [1] - 11:12
spent [1] - 12:11
spoken [1] - 17:14
stances [1] - 5:23
stand [2] - 13:8, 14:18
standing [5] - 7:24, 8:19, 10:18, 13:15, 14:19
standing-to-sue [1] - 7:24
standpoint [1] - 21:19
stands [1] - 22:1
Stark [3] - 3:15, 21:10
start [3] - 3:13, 5:3, 7:20
started [1] - 3:14
STATES [1] - 1:1
states [1] - 10:12
States [1] - 11:23
still [2] - 5:18, 10:10
stop [1] - 18:15
strong [1] - 16:23
strongly [1] - 19:22
subject [2] - 9:19, 24:25
subjected [1] - 10:20
submit [1] - 8:10
submitted [1] - 10:23
subpoenas [4] - 15:21, 15:23, 16:4, 16:6
subsequent [1] - 5:17
subsequently [1] - 9:2
substantive [1] - 9:11
sue [2] - 7:24, 8:19
sued [1] - 8:16
suit [2] - 4:25, 8:16
summary [1] - 22:16
supersede [1] - 21:24
surrounding [7] - 4:4, 4:15, 5:23, 6:17, 13:10, 13:24, 14:3
Sutherland [1] - 2:20
SUTHERLAND [1] - 1:19
Swisslog [2] - 3:13, 20:6
SWISSLOG [3] - 1:7, 1:7, 1:8

**T**

Tease [1] - 8:25
technology [1] - 5:16
Telephone [1] - 25:21
TELEPHONE [1] -

1:12
telephone [1] - 2:13
term [2] - 22:15, 22:19
testify [1] - 9:7
testimony [1] - 23:11
tete [1] - 19:17
tete-a-tete [1] - 19:17
THE [43] - 1:1, 1:2, 2:15, 2:22, 2:25, 3:6, 3:8, 3:19, 3:22, 6:18, 7:12, 7:16, 7:19, 12:19, 15:11, 15:15, 15:20, 15:24, 16:9, 17:3, 17:10, 17:16, 18:10, 18:15, 19:16, 19:19, 20:5, 20:10, 20:21, 21:7, 21:23, 22:9, 23:3, 23:14, 23:19, 24:8, 24:12, 24:24, 25:3, 25:7, 25:12, 25:16, 25:18
themselves [1] - 8:10
thereafter [2] - 20:7, 22:18
third [3] - 7:6, 14:13, 25:10
third-party [2] - 14:13, 25:10
threat [1] - 10:19
three [2] - 6:23, 9:24
THYNGE [1] - 1:14
Thynge [1] - 2:16
title [3] - 9:5, 11:14, 18:2
today [2] - 10:8, 23:21
together [1] - 6:2
took [6] - 4:16, 4:17, 9:3, 10:14, 11:14, 15:1
transaction [4] - 6:17, 13:16, 13:24, 14:25
transcript [2] - 23:22
TRANSLOGIC [1] - 1:8
trial [1] - 21:16
tried [2] - 16:18, 24:1
trip [1] - 18:11
true [2] - 16:9
truth [1] - 16:23
trying [3] - 4:17, 14:12, 14:23
TUNNELL [1] - 2:3
two [12] - 4:2, 5:7, 6:19, 7:7, 8:16, 8:21, 9:9, 9:24, 17:18, 17:20, 18:23, 23:2
type [2] - 24:9, 24:10

**U**

U.S [1] - 1:14
U.S.C [2] - 21:23, 22:3
ultimately [5] - 8:9, 8:12, 8:19, 12:12, 13:8
under [10] - 6:4, 7:24, 8:14, 10:10, 11:4, 13:14, 14:9, 21:19, 21:21, 22:4
understood [2] - 5:8, 5:20
Unidentified [1] - 19:12
United [1] - 11:23
UNITED [1] - 1:1
unless [3] - 5:23, 8:9, 11:12
up [8] - 5:4, 5:6, 6:9, 7:11, 17:25, 19:15, 19:18, 22:17

**V**

vest [1] - 11:13
voice [1] - 7:6

**W**

wants [1] - 19:3
Washington [2] - 1:21, 2:21
Wednesday [1] - 1:11
week [4] - 9:20, 12:3, 18:19, 20:1
weeks [2] - 4:19, 5:3
Western [1] - 15:18
willing [3] - 8:10, 17:6, 17:8
Wilmington [1] - 1:11
witness [1] - 9:6
witnesses [6] - 6:21, 9:4, 9:7, 15:12, 19:21, 23:11
words [2] - 13:15, 14:1, 14:2
wrap [1] - 5:5
writing [3] - 5:9, 24:4, 24:10
written [6] - 7:7, 10:14, 13:4, 13:13, 14:1, 24:10
wrote [1] - 9:10

**Y**

year [1] - 12:7
years [4] - 4:16, 5:16, 8:16, 15:1
yesterday [2] - 6:24, 19:13
York [4] - 2:7, 18:13, 18:19

# EXHIBIT L

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF DELAWARE
 3                          - - -
 4   MCKESSON AUTOMATION, INC.,   :
                                  :
 5          Plaintiff,            :
                                  : C.A. No. 06-028 (SLR/LPS)
 6      v                         :
                                  :
 7   SWISSLOG ITALIA S.P.A. and   :
     TRANSLOGIC CORPORATION       :
 8                                :
                                  :
 9          Defendants.           :
10                          - - -
11                     Wilmington, Delaware
                 Tuesday, May 20, 2008 at 11 a.m.
12
                       PRETRIAL CONFERENCE
13
                            - - -
14
     BEFORE:        LEONARD P. STARK, MAGISTRATE
15
                            - - -
16   APPEARANCES:
17          BLANK ROME LLP
            BY:  CHRISTINE S. AZAR, ESQ.
18
                 and
19
            SUTHERLAND ASBILL & BRENNAN LLP
20          BY:  BLAIR M. JACOBS, ESQ.,
                 CHRISTINA A. ONDRICK, ESQ.
21
                 (Washington, D.C.)
22
                       Counsel for Plaintiff
23
24   Ellie Corbett Hannum, Registered Merit Reporter
              www.corbettreporting.com
```

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                    719b3435-759f-41f0-994c-79a533b967e9

Page 2

1  APPEARANCES: (Continued)
2
3      MORRIS, NICHOLS, ARSHT & TUNNELL LLP
       BY:  JULIA HEANEY, ESQ.
4          and
5      DICKSTEIN SHAPIRO LLP
       BY:  ALFRED R. FABRICANT, ESQ.
6      BY:  LAWRENCE C. DRUCKER, ESQ.
       BY:  BRYAN DeMATTEO, ESQ.
7
8          (New York City, New York)

       Counsel for the Plaintiffs
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1                  - oOo -
2          P R O C E E D I N G S
3      (REPORTER'S NOTE:  The following Pretrial
4  Conference was held in open court, beginning at 11:00
5  a.m.)
6          THE COURT:  Good morning.
7          MR. JACOBS:  Good morning, Your Honor.
8          MR. FABRICANT:  Good morning, Your
9  Honor.
10         THE COURT:  Welcome to you all.  This is
11 the time, as you all know, that we have set for oral
12 argument on, I believe, it's four separate motions.  If I
13 am right, Swisslog is the movement on three and McKesson
14 on the other.  But I think it will be easiest for me if I
15 just give you each time to address whatever issues it is
16 that you want to address.
17         And since the primary motion is the
18 motion to dismiss for lack of standing, I want to hear
19 first from Swisslog.  Okay.
20         MR. FABRICANT:  Good morning, Your
21 Honor.
22         THE COURT:  Good morning.
23         MR. FABRICANT:  Your Honor, I am Fred
24 Fabricant from the law firm of Dickstein Shapiro,

Page 4

1  representing the defendants in the case.  Our instructor,
2  Brian DeMatteo, also with the law firm of Dickstein
3  Shapiro, and Julie Heaney is our local counsel.
4          Your Honor, the motion to dismiss for
5  lack of standing started as a motion for lack of standing
6  on its own.  And it started out that way because during
7  the course of reviewing the documents produced by the
8  plaintiff in the spring and summer of 2007, we discovered
9  a file, which was a due diligence file, of the McKesson
10 attorneys that had been used in connection with their
11 acquisition of the AHI Company, which was the original
12 owner of the patents in suit.
13         And what we found when we reviewed that
14 file was that there had in fact been an assignment, an
15 actual outright assignment, with an assignment document
16 to two separate parties.  And, Your Honor, if I may,
17 because there are some documents I would like to go
18 through today, all of them are exhibits to the papers
19 before the Court, but just for reference sake, to show
20 the Court several of these as we go through.
21         THE COURT:  That's fine.
22         MR. FABRICANT:  And this is the
23 assignment document, which is in DeMatteo Moving
24 Declaration Exhibit B.  This is the document which was

Page 5

1  executed by Sean McDonald, the president and founder of
2  AHI, so there is no question he was a person of
3  authority.  And this document conveys to two parties, 100
4  percent of the interest in the then pending patent
5  application and all subsequent rights that might develop
6  as a result of that patent application, including patents
7  that would issue continuations and the like.
8          THE COURT:  This copy, though, it's only
9  signed by Mr. McDonald, I believe.  Is that typical for
10 an assignment agreement that only the assignor is
11 signing, and have you seen a copy that would be signed by
12 both sides?
13         MR. FABRICANT:  I don't think it's
14 typical that an assignee signs an assignment document,
15 Your Honor.
16         THE COURT:  And is that a relevant
17 consideration, since I understood your position to be, at
18 least in part, look at the face of this assignment
19 agreement on its own and separate and independent from
20 the notes and the term sheets and the stock purchase
21 agreement, since this recites consideration and it seems
22 clear and unambiguous, but it is in fact only signed by
23 one side to the transaction.  So I'm not sure that I
24 could consider it in the abstract and not with all the

www.corbettreporting.com

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                719b3435-759f-41f0-994c-79a533b967e9

Page 6

1  other documents.
2         MR. FABRICANT:  I understand.  I do
3  believe that it is common practice for the assignor to
4  sign an assignment document and for the assignee not to
5  be present as a signatory on an assignment document.
6  That is common in the practice of patent assignments.
7  This document states consideration on its face, having
8  been received and in addition to other stated
9  consideration.  It clearly conveys 100 percent -- not
10  unlike if I transferred my automobile to Mr. Drucker, and
11  I signed the title to Mr. Drucker and I conveyed 100
12  percent of my interest.  Mr. Drucker doesn't sign the
13  form that I convey my interest to him.  It's not even a
14  place for it on the title assignment.
15        THE COURT:  Let me ask you this:  Would
16  AHI be the assignor have an enforceable right to the one
17  dollar consideration, absent any signature from the
18  assignee?
19        MR. FABRICANT:  Well, the consideration
20  is stated as having been received, I believe, so I guess
21  they wouldn't.  And I realize this is typical lawyer
22  boilerplate consideration having been received of one
23  dollar, but that's why it's stated as consideration
24  received.

Page 7

1         THE COURT:  So just to put the fine
2  point on it.  Is it your view that this assignment
3  agreement is legally enforceable in and of itself as a
4  separate stand-alone document.
5         MR. FABRICANT:  Yes, it is.  Now, I
6  don't ask the Court obviously to ignore the other
7  documents which have been presented to the Court, but I
8  do believe that we start with the premises that this is a
9  legally enforceable assignment document, and that if
10  other things had not happened here -- some of which are
11  still in dispute, Your Honor.  It is not undisputed
12  whether this loan arrangement that these gentlemen made
13  at the same time as the assignment, whether those loans
14  were ever repaid.  That's an open question.
15        So putting aside those questions, we
16  believe that this is an assignment that stands by itself.
17  It conveyed 100 percent of the rights to this patent
18  application and technology.
19        When we discovered this, Your Honor, we
20  immediately asked the McKesson counsel for any evidence
21  of an assignment back or any proof that, in fact,
22  McKesson is in fact the title holder of the patent.  This
23  started in about July of 2007, promises to provide us
24  with the information; and ultimately, by October of 2007,

Page 8

1  despite our repeated e-mail requests and letters and
2  comments at depositions, nothing was forthcoming.  So we
3  made a motion to dismiss the case for lack of standing,
4  which is a matter of subject matter jurisdiction.  A
5  party to a patent lawsuit does not have ownership rights
6  or sufficient ownership rights, there is a lack of
7  subject matter jurisdiction.  So we believe, as a matter
8  of right, that motion was made and timeliness is not even
9  a factor with respect to that aspect of the motion.
10        Ultimately the counsel for McKesson
11  asked Magistrate Judge Thyne for permission to take the
12  depositions of the two parties represented by these
13  assignees, Mr. Demmler, who was the manager of the
14  Pittsburgh seed fund, and Dr. Heilman, who was a separate
15  individual assignee.  They split it up at 71.4 percent to
16  the fund and 28.6 percent to Dr. Heilman.  And at the
17  time McKesson's counsel urged Magistrate Judge Thyne that
18  it was essential, that they had to take these depositions
19  in order to respond.  The time for such depositions had
20  passed.  We argued that point before Magistrate Judge
21  Thyne, and she allowed them to take those two
22  depositions.
23        What I think is crucial to this motion
24  is that at the depositions they didn't have any of the

Page 9

1  questions which this court, I'm sure, would like to have
2  heard the answer to, like:  Do you have an ownership
3  interest in the patent?  Do you continue to have an
4  ownership interest in the patent?  They didn't ask those
5  questions, Your Honor.  They didn't ask those questions,
6  Your Honor, because in the gap of time between the time
7  he made the motion and the time of those depositions, a
8  gap of several months, the counsel for McKesson prepared
9  draft affidavits for both of those witnesses, Dr. Heilman
10  and Mr. Demmler.
11        And in those draft affidavits, which are
12  part of the record, and I would like to emphasize some
13  points for the Court, they asked these individuals to
14  disavow, in effect, any ownership rights, any continuing
15  claims they might have.  They asked these witnesses to
16  confirm that the loans were repaid.  And the reason why
17  they did this, Your Honor, was because in this district
18  when one reviews the cases which ultimately were
19  submitted to the Court, it can be readily seen that Judge
20  Robinson herself, in 2006, in the Matthews case and other
21  decisions of both the District of Delaware and other
22  courts, that the crucial factor that often comes into
23  play in these standing motions is whether or not this
24  other nonparty disavows any rights, says I will never

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                    719b3435-759f-41f0-994c-79a533b967e9

Page 10

1  pursue these rights, and in the 2006 case here in the
2  District of Delaware, that's exactly what was the basis
3  for Judge Robinson's decision.  We then find these draft
4  affidavits, which we discovered when we spoke to these
5  witnesses and found out that McKesson's counsel had been
6  in contact and had provided them with draft affidavits.
7  Magistrate Judge Thyne ordered that they produce, and we
8  exchange with each other any communications we have had
9  with these individuals.
10        THE COURT:  And a suggestion, you
11  proposed draft affidavits as well and the inventors
12  refused to sign yours too; is that correct?
13        MR. FABRICANT:  Their characterization
14  is false.  We did propose to Mr. Demmler only, not
15  Dr. Heilman, to Mr. Demmler, an affidavit, a proposed
16  affidavit which said only the following -- and I will be
17  happy to submit a copy of it to Your Honor.  It is not
18  part of the papers.  All it said was, which is what this
19  witness told us on the telephone, "I don't remember
20  whether I assigned that.  I don't remember whether the
21  loan was repaid."  That's what it said.  It did not
22  propose any business relationship.  It did not do
23  anything more than that.
24        However, the affidavits, as I mentioned

Page 11

1  from McKesson's counsel, first Mr. Demmler's proposed
2  after, Exhibit L to Mr. DeMatteo's apply declaration.
3  Here is his draft after; it purports to be on firsthand
4  knowledge of the facts.
5        On the second page, in paragraph 13 --
6  and this is important, Your Honor -- they used words
7  about how this individual should characterize this
8  transaction.  And they say to secure the repayment of the
9  funds loaned to Automated pursuant to the promissory
10  notes, both the bridge loan and the November loan.  The
11  collateral or security for repayment provided by
12  Automated was an assignment of the technology rights
13  associated with the patent application of January 24,
14  1990."
15        I focused on that for a moment because
16  that's not the language of the assignment.  The
17  assignment and the original promissory note, which is
18  actually executed by Mr. Demmler, is an assignment of the
19  patent application itself, not an assignment of the
20  technology rights.  Now I will make this point.  When I
21  finish with these affidavits I would like to show Your
22  Honor very important evidence that was produced after
23  this motion was pending.  A box was supposedly found of
24  documents never previously were produced which had

Page 12

1  additional information.  And in that box were draft
2  promissory notes --
3        THE COURT:  Let me just caution you at
4  this point.  I understand you use the word supposedly and
5  you have made certain suggestions that seem to be
6  suggestions of bad faith on the part of your friend on
7  the other side, and unless you really have strong support
8  for that, I rather you stick to the evidence and don't go
9  to "supposedlies."
10        MR. FABRICANT:  Your Honor, I only meant
11  to say documents were produced after the motion was made
12  which were never previously produced.
13        THE COURT:  That's fair.
14        MR. FABRICANT:  Not getting into the
15  reasons why.  I don't know the reasons why.
16        In that box of documents were draft
17  promissory notes for this transaction.  And the draft
18  promissory notes did not refer to an assignment of a
19  patent.  They referred to an assignment of technology --
20  not even an assignment.  They referred to security
21  interests in technology rights.
22        And the language being proposed here,
23  when I show Your Honor those draft notes, is really the
24  language of the draft notes, which were rejected, and not

Page 13

1  the language of the notes which were actually executed by
2  the parties.  That evidence will go if the Court looks at
3  the substance, the merits of the case at all, and
4  McKesson has made a point of the intent of the parties.
5  The intent of the parties clearly here, as the witnesses
6  testified at the deposition, was to grant an assignment.
7  They felt secure with an assignment of the outright
8  patent as opposed to --
9        THE COURT:  Why after, really after June
10  of '90, why is there no evidence of anyone ever acting as
11  if there was an assignment?  That is, in November of '90,
12  you know, they execute the other note and pledge -- I
13  don't know if it's pledge, but they reference assigning
14  those rights again.
15        But on your view of the case, AHI didn't
16  have any rights to assign for the November note.  And
17  then you go forward to 1994, in the Partek transaction,
18  and '96, all the representations made to McKesson.  And
19  17 years or whatever pass and the inventors never
20  actively have any interest.  So explain to me, if I am
21  agree with you up until the moment of June 29th of 1990,
22  why is it not the case that everything that happened
23  after that is totally contradictory to your view of the
24  case?

4 (Pages 10 to 13)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                                                719b3435-759f-41f0-994c-79a533b967e9

Page 14

1        MR. FABRICANT:  Well, point by point,
2   first of all, the subsequent McKesson transaction, the
3   subsequent security transaction in 1994, I believe it
4   was, the subsequent representations to McKesson at the
5   time of the transaction, as those witnesses testified at
6   the deposition, when they were handed a 100-page
7   transaction document from McKesson, which in the first
8   sentence said, you know, you agree that everything stated
9   within this document is accurate and correct, and
10  supposedly had schedules attached.  First of all the
11  copies produced didn't have the schedule.  We don't know
12  if they ever saw the schedule.  They testified they don't
13  know if they ever saw the schedule.  Even if they had see
14  the schedule, it didn't refer to the patent application
15  that they had an assignment in; it referred to a patent
16  number that had ultimately issued.
17        So it's pretty clear they would not have
18  known, even if they had read the document that this
19  covered this particular aspect.  With respect to all of
20  the other things, I will put it this way as a result of
21  this lawsuit and as a result of McKesson looking for the
22  assignment back, they stirred up this issue of whether or
23  not there in fact was a proper chain of title and
24  transfer of title.  We can't undo that.  The result of

Page 15

1   this, the result of this is -- even if these individuals
2   from the time of the assignment in 1990 until the fall of
3   2007 were not awakened to the fact that they have legal
4   title to this, to these patents in suit.  As a result of
5   what has happened here they were contacted by McKesson's
6   counsel.  They were asked whether they had the assignment
7   backed up.  They were given a lot of information about
8   this.  They retained counsel.  Their counsel actually
9   contacted our law firm and wanted to know whether there
10  was a business transaction that could be resolved here.
11  I don't know.  Perhaps they made the same kind of
12  advances toward McKesson.  I don't know.
13        But what's happened here is if there is
14  a party that has legal title, a claim to legal title
15  based upon the transactions, even if they didn't follow
16  it up, over the last however many years, it creates a
17  situation where we now have two parties, two separate
18  groups, a fund with many limited partners, and an
19  individual who is a very sophisticated individual, who
20  may have claims to patents in suit, which they deem as
21  being very valuable.  That wasn't as a result of our
22  doing or our making, that's as a result of --
23        THE COURT:  Go back to 1990.
24        MR. FABRICANT:  Yes, Your Honor.

Page 16

1        THE COURT:  Because I guess I want to
2   hear what do you say about the November 1990 transaction
3   between AHI and the inventors?  I think there was another
4   $50,000 loan.
5        MR. FABRICANT:  I don't believe that's
6   at all inconsistent with the prior two assignment
7   documents, the prior two notes entered into in June of
8   that year.  And the reason I don't believe it was
9   inconsistent, because that was an additional promissory
10  note which used the same language as the prior notes.
11  If, for example, they wanted to make sure that they still
12  had the assignment, which they already had in their hand,
13  could the words have been different, yes; but if, let's
14  suppose the prior notes had been repaid, but that later
15  note had not been repaid, they wanted to make sure they
16  still had a valid assignment of the patent.  It's
17  possible that only one of three would be paid.  That two
18  of three would be paid.  And I believe it was just, using
19  the same language to make sure it was understood, there
20  was an outright assignment.  The assignment was dated
21  June.  Now they were borrowing another $50,000.  This
22  would have been protected them in the event of default of
23  some but not all of the notes.
24        I don't believe it's inconsistent that

Page 17

1   the mere fact they took another $50,000 from these
2   parties undid the nature of the assignment which had been
3   granted several months earlier.
4        THE COURT:  So the idea that McKesson
5   raises, which is I need to reject your view of the case
6   because otherwise the November '90 transaction is one in
7   which AHI is purporting to sign something that it had no
8   right to sign.  You say that's not the way to read that
9   November '90 document?
10        MR. FABRICANT:  I think it's clear they
11  had already received the assignment and therefore the
12  words in the 23406 promissory note which said it shall be
13  secured by an assignment.  The assignment had already
14  taken place.  There was nothing else they had to do.
15        THE COURT:  Well, it's a nullity what
16  AHI had represented with respect to the assignment.
17        MR. FABRICANT:  I don't believe it's a
18  nullity.  I believe it was additional words which gave
19  them security in the situation where the first two loans
20  were repaid and they still --
21        THE COURT:  How can they give that
22  security on your view of the case, AHI didn't have any
23  interest whatsoever in the patent, in the things that
24  they assigned on June 29th of 1990.

www.corbettreporting.com

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                    719b3435-759f-41f0-994c-79a533b967e9

Page 18

1      MR. FABRICANT:  I agree that AHI did not
2  have a patent to assign in November of 1990.  It had
3  already been assigned.  I agree with that.  That is our
4  position.
5      THE COURT:  So how can AHI say, well, if
6  those first two notes are paid off, you can still use the
7  assignment as security in November '90?  I mean, AHI had
8  no ability to control what happened to the assignment, to
9  the patent --
10     MR. FABRICANT:  There might be an
11 assignment back prior to the date.  There are a number of
12 things that might have happened and I agree that once you
13 assign something it's not the best use of language to not
14 make that a stated point in the third note.  But I don't
15 think it undermines the fact that there was an outright
16 assignment, that they had not been repaid as of the date
17 of November.  There is no question about that.  So that
18 whatever assignment was made, without any dispute, had
19 clearly not been extinguished or undone.  They clearly
20 had made that assignment, there had been no repayment.
21     THE COURT:  I guess the common sense
22 question, going back to it, is you want to take me
23 through and have me focus on the drafts and everything
24 leading up to the moment on June 29th, 1990, when they

Page 19

1  executed the assignment agreement as well as those notes,
2  to make it clear, in your view, that the intent of the
3  parties was an absolute assignment and not just a
4  security interest.  And yet everything, at least
5  beginning with November 1990, is inconsistent with the
6  parties having such an intent.  And so why doesn't that
7  mean that your argument about what the intent was is
8  actually not persuasive?
9      MR. FABRICANT:  Well, it starts with the
10 premise, Your Honor, that this court should even be
11 inquiring into the specific intent of the parties,
12 parties not before this court.  It starts with the
13 premise that for this court to look at what was meant by
14 the fact that the two notes which didn't assign the
15 patent and only granted the security interest were
16 rejected days before.  It asks this court to construe
17 that intent.  Then it asks this court to look at what
18 were the reasons for the November language in the note.
19 And then it asks this court to look at whether the loan
20 was repaid, because if the loan wasn't fully repaid, and
21 I mean all three notes repaid, then even the security
22 interests theory wouldn't fly.  Then it asks this court
23 to evaluate the ramifications of the recent Federal
24 Circuit decision, from January 2008, which we cited to

Page 20

1  Your Honor, which that court addresses automatic
2  assignments in that case in the context of an employment
3  agreement but no less applicable in the situation of an
4  automatic assignment back as the McKesson people argued,
5  in which case the Federal Circuit in 2008 stated that you
6  would not gain legal title as a result of a promise to
7  assign in the future an automatic assignment back.
8      The court also went further and said
9  that when it comes to patent assignments, you don't look
10 to state contract law, you look to federal law, which
11 looks to the language of the contract.
12     So when Your Honor starts taking into
13 consideration all of the factors that McKesson has urged
14 in its opposition, what was the intent of the party, form
15 over substance, were the loans repaid, what's the
16 applicant of a self-extinguishing assignment under
17 Pennsylvania state law, in light of the Federal Circuit
18 decision, and keep in mind the No. 1 thing to point out
19 today, which is once all of this became known and the
20 additional documents produced and the draft affidavits
21 were reviewed and the depositions taken, we could see
22 that the seed fund and Dr. Heilman became necessary and
23 indispensable parties in order for the court to resolve
24 this dispute.  How can the court resolve this dispute

Page 21

1  without the parties present.
2      And that's why in reply to all of the
3  factors raised by McKesson -- and all we asked in the
4  initial motion under 12(b)(1) was that they establish
5  they have standing.  They raised in opposition all of
6  this, look at the intent, look at the form, all of these
7  issues, which go to the heart of this court having to
8  make a decision without necessary and indispensable
9  parties present.  So it became a motion to dismiss as
10 well as 12(b)(1) for lack of standing for, under
11 12(b)(7), for lack of necessary and indispensable
12 parties.
13     THE COURT:  Could I simply say, though,
14 without reaching the ownership issue fully stopped, that
15 had they met their burden of proof or production at this
16 procedural moment in the case and, you know, the final
17 determination, if necessary, as to ownership will be at a
18 later point in this case.
19     MR. FABRICANT:  Well, that I think gets
20 to the issue of, if Your Honor to conclude that, as
21 to whether these parties are necessary and indispensable
22 parties.  How are we going to decide at a later date or
23 at any date prior to trial, or even at trial, the
24 ownership issues without the parties present that have

Page 22

1  the facts, that have the evidence, that have the
2  potential claim, without them present, whatever result
3  this court adjudicates ultimately would then run face on
4  into the risks of Rule 19.  Not only with respect to
5  Swisslog's interests, because obviously we have
6  counterclaims for invalidity of the patent; we have
7  counterclaims for non- infringement of the patent; we
8  have a proposed counterclaims, which we will address with
9  Your Honor, on enforceability of the patent.
10       If there were be an adjudication, it
11  would not be a final adjudication with respect to the
12  patent.  We would have to do it, perhaps, all over again.
13  When it comes to the rights of these individuals in this
14  fund, their rights would be affected.  We've cited to
15  Your Honor decisions that, even though the results of
16  this litigation are not res judicata or in collateral
17  estoppel against those entities or those parties, as a
18  practical matter, as the Gonzales case has said in other
19  courts, their rights have been affected.  It will be a
20  Markman decision that they will not have been
21  participated in.  There may be a practical impact if they
22  have rights to pursue though rights in the future.
23       So we run smack into the fact that they
24  are a necessary party; they are not, we don't believe,

Page 23

1  joinder as feasible, although I don't know plaintiff has
2  tried to join them; that they don't reside in the state
3  of Delaware and they have not done any business here, to
4  our knowledge, so they may not be able to get personal
5  jurisdiction over them, in which case I think
6  clearly they would be an indispensable party.
7       THE COURT:  Well, with the Federal
8  Circuit decisions in the Applied Companies, which is a
9  case involving a government contract and looking at
10  whether that was an assignment there or a security
11  interest.  It's cited by McKesson, but I didn't see where
12  you had a response to it.
13       MR. FABRICANT:  I am trying to recall
14  that case, Your Honor.
15       THE COURT:  Sure.  There are a lot of
16  cases.
17       MR. FABRICANT:  A lot of cases.
18       THE COURT:  It's 144 F.3d 1470 (Fed.
19  Cir. 1998), a decision of the Federal Circuit in the
20  Applied Companies vs. United States.
21       MR. FABRICANT:  I don't recall it
22  offhand, Your Honor.
23       THE COURT:  Maybe we will have you back
24  up on rebuttal, if you have anything to say about that.

Page 24

1       MR. FABRICANT:  What I would like to
2  point out, with respect to the law, is that when Your
3  Honor looks at -- and I thought we had addressed all of
4  the cases cited in their brief.
5       THE COURT:  You didn't address that one.
6       MR. FABRICANT:  You may be right, Your
7  Honor.
8       But basically, when we went through the
9  cases, case by case, I did not find any case that, where
10  the nonparty, who was the subject of this Rule 19 issue,
11  was a prospective assignee of a patent who might have
12  ultimate ownership rights to the patent and where a court
13  refused to join that -- or where a court allowed a case
14  to go forward without the presence as a necessary
15  indispensable party of a patent owner by assignment.
16  Case by case, as I went through the decisions cited by
17  McKesson, there was the Kahn vs. General Motors case,
18  which was a case where --
19       THE COURT:  You don't need to run
20  through those.
21       MR. FABRICANT:  Right.  But I went
22  through them and I will address the case, if I can, which
23  Your Honor has raised.  But I didn't find a case where
24  there was an outright assignment where there wasn't some

Page 25

1  other issue of either reacquiring the rights or
2  disavowing the rights or disclaiming the rights or some
3  other factor not applicable to the present case but an
4  outright assignment to a nonparty not subject to joinder
5  in the case.  I didn't see that in the case law.
6       THE COURT:  What about Section 261
7  relating to the recording of assignments?
8       MR. FABRICANT:  Yes, Your Honor.
9       THE COURT:  Explain to me your position
10  on that and why that doesn't win the day for McKesson.
11       MR. FABRICANT:  Our position is that
12  very simple, which is Section 261 has one big
13  requirement, and that is that you don't have actual
14  notice of the prior assignment.
15       THE COURT:  And what is the proof here
16  that they had notice of the assignment, specifically the
17  two-page document that you put up earlier?
18       MR. FABRICANT:  Yes, Your Honor.  This
19  was produced by McKesson out of McKesson's due diligence
20  files involving their acquisition of AHI in 1956.
21       THE COURT:  So those two pages you put
22  up the assignment of invention that were produced from
23  that folder by McKesson?
24       MR. FABRICANT:  Yes.  Along with the

7 (Pages 22 to 25)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                          719b3435-759f-41f0-994c-79a533b967e9

Page 26

1 executed promissory notes, along with some of the other
2 documents relevant to this transaction. It was in a
3 folder marked "McKesson Due Diligence." So we know that,
4 as a matter of fact, I don't see any way to dispute the
5 fact by McKesson, that they had actual notice of the
6 transaction.
7        And so we believe once you have actual
8 notice, the provisions of 261 do not apply.
9        THE COURT: And go back to an issue you
10 alluded to of these recent Federal Circuit decisions, I
11 think a couple of them from this year. Help me out on
12 what is at stake, in your view, as to whether I apply
13 federal or Pennsylvania law? Is that an issue I need to
14 reach, and if so, why?
15        MR. FABRICANT: Well, the DDB Tech case,
16 from January of 2008, was the case that previously I was
17 referring to about the Federal Circuit. I think the
18 ramifications of that case is that this entire theory on
19 the merits that McKesson has raised in opposition, that
20 even if there was no assignment back, the assignment back
21 was in effect self-extinguishing because of the security
22 interest under Pennsylvania state law. I think what the
23 Federal Circuit said in the DDB Tech case was, if you
24 look to federal contract interpretation law, which

Page 27

1 doesn't necessarily take into account the Uniform
2 Commercial Code, and then there the court described, looking
3 at the language of the contract, and then they went
4 through that process in that decision where they
5 ultimately remanded to the district court for
6 jurisdictional discovery, which the district judge had
7 not allowed in dismissing the case. So there was no
8 ultimate resolution, as far as I know as of today, but
9 there was a motion to dismiss based on lack of standing;
10 that was a case dealing with an purported automatic
11 assignment. The court not only said, we look to the
12 explicit expressed language of the contract, not to state
13 law in patent cases, but also that made an express
14 statement that the promise to assign in the future or the
15 automatic-assignment scenario would not allow legal title
16 to pass. Even if, even if there was a promise or even if
17 there was to be an automatic assignment, that legal title
18 would not pass. And that was the import, I think, of
19 that decision to this case.
20        So I would argue, and I think we have
21 stated this in our briefs, that the Pennsylvania
22 provision of the Uniform Commercial Code, as to whether
23 or not this was a security interest rather than an
24 assignment, if it was a security interest, whether it

Page 28

1 would be self-extinguishing not be applicable.
2        THE COURT: And what about the Akazawa
3 case, which I think is an even more recent Federal
4 Circuit case, in March of this year, which seemed to talk
5 about state law governing patent ownership over federal?
6 I'm not entirely clear, but I'm looking for help on that.
7        MR. FABRICANT: If I could handle that
8 on rebuttal, Your Honor.
9        THE COURT: Okay.
10        MR. FABRICANT: I am just unprepared,
11 Your Honor.
12        THE COURT: Okay. Why don't -- two
13 things I want to make sure you cover before you sit down.
14 One is are there some new documents that I haven't seen
15 that you wanted to allude to, some recently discovered
16 evidence or something, and also whatever it is you want
17 to tell me about the other motions that we haven't
18 discussed yet.
19        MR. FABRICANT: Oh, sure. I don't
20 believe there are any new documents that are not attached
21 as exhibits to either McKesson's briefs or declarations
22 or ours, no additional documents.
23        THE COURT: Okay.
24        MR. FABRICANT: I do, as I said, I would

Page 29

1 ask the court to look at -- I won't go through them all,
2 but ask the court to look at, if we got into the issue of
3 deciding the merits of this ownership question at all
4 here without these parties present, the draft notes that
5 were rejected, which have very different language which
6 clearly create a security interest and not an assignment
7 of a patent. And the ramification of that on the
8 evaluation of the intent of the parties.
9        Also, I would point to the fact, and I
10 think this is crucial to Your Honor's decision if you get
11 past the indispensable party issue and actually looked at
12 the merits of the arguments that McKesson has raised, the
13 documents that were produced after the motion was made
14 that were located by McKesson and produced to us, the
15 witnesses were unable to identify or remember or
16 recollect any of the handwriting on these exhibits. They
17 were asked that. They were unable to do that. There is
18 no evidence before the court as to who placed the
19 handwriting destinations on these documents, so we don't
20 know.
21        One of the issues Your Honor would have
22 to decide, we believe, if it was to be an evidentiary
23 determination of this issue of ownership, is were the
24 loans ever even repaid in full, because without that even

8 (Pages 26 to 29)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                    719b3435-759f-41f0-994c-79a533b967e9

Page 30

1 a security interest theory doesn't cut it. So just for a
2 moment, Your Honor, I would show -- and this causes us
3 some concern -- here is the promissory note that was
4 produced after the motion was filed as to the $42,000
5 loan, and you can see that there has been placed on the
6 document the word "void." And down at the bottom left it
7 says paid 12/27/90, down here.
8        THE COURT: Is that for Heilman or
9 for PSF?
10       MR. FABRICANT: The notes apply to both
11 of them, I believe. This is, I believe, it's both of
12 them. Oh, no, this is Steven Heilman. This is Steven
13 Heilman, Your Honor.
14       THE COURT: Okay. Just for the record,
15 will you read the Bates number into the record, please.
16       MR. FABRICANT: Yes. This is Bates No.
17 M0474909. And I believe it was DeMatteo Reply
18 Declaration Exhibit M.
19       And then there was another document
20 provided at the same time, after the motion was filed,
21 which was DeMatteo Reply Declaration Exhibit M, but at a
22 different page, M0474912 to 13, and this is the $107,000
23 note. And this was says "Cancelled, paid in full." It
24 looks like the same handwriting, but no one has

Page 31

1 identified whose handwriting this is or who made these
2 notations. And, again, we have what we believe is a
3 disputed issue as to whether there ever was a full
4 repayment of these loans.
5        And I believe on the lack of standing
6 issue and the indispensable party issue that's all I have
7 for the court at this time.
8        THE COURT: Okay. And on the other
9 motions?
10       MR. FABRICANT: Yes, Your Honor.
11       THE COURT: Was there anything you
12 wanted to say with respect to them?
13       MR. FABRICANT: Yes. Your Honor, I'm
14 going to address, with the Court's permission, the motion
15 to amend the answers, the answer and counterclaims, and
16 Mr. Drucker will address the other motions.
17       THE COURT: That's fine.
18       MR. FABRICANT: Your Honor, on the
19 answer, the amendment, the proposed amendment to the
20 answer and counterclaims, the scheduling order had
21 provided a date for motions to amend cut-off of December
22 20, 2006. As a matter of fact, no documents were
23 produced before that date, no depositions were taken
24 before that date. The documents were produced from

Page 32

1 McKesson to Swisslog in sort of rolling fashion that
2 began sometime in the spring of 2007, after their
3 deadline had already passed. The document production
4 continued until -- in fact, one of the largest
5 productions, if not the largest of 250,000 pages,
6 occurred in the fall of 2007, long after this deadline
7 had passed. And therefore as a result of the timing of
8 the document productions, depositions in this case, by
9 Swisslog of the McKesson witnesses, the 30(b)(6)
10 depositions didn't start until late May of 2007, long
11 after this deadline had passed. We went into the summer
12 of '07.
13       And the crucial depositions actually, in
14 large part, were taken during the summer of 2007,
15 culminating in the deposition of Sean McDonald, the
16 founder, inventor, a person with duty of candor, the
17 person who founded the company, on August 30, 2007. So
18 approximately seven days after the deposition of Sean
19 McDonald, we wrote McKesson's counsel and advised them
20 that we would like to make a motion to amend our answer
21 and counterclaims, asking their permission to do so,
22 consent to do so, and they refused to grant that.
23       So we have, obviously, three major
24 factors on a motion to amend, such as this one, undue

Page 33

1 delay, whether the amendment would be futile, and the
2 prejudice to the parties as a result of any amendment.
3        THE COURT: Before we get to those, let
4 me just ask you, if I were to grant your motion to
5 dismiss for lack of standing, would your motion then to
6 amend, basically just the counterclaims at that point,
7 would that still be an issue in front of me or would that
8 be mooted?
9        MR. FABRICANT: I think the
10 counterclaims, Your Honor, would still be an issue.
11 Although if Your Honor dismissed without prejudice, as
12 Your Honor might be inclined to do, and not knowing who
13 the true owner of the rights might ultimately be found to
14 be, we might not pursue those counterclaims because we
15 might pursue them against the wrong party.
16       So, as a practical matter, I believe if
17 the case were dismissed without prejudice, probably all
18 of the case would go away until such time as the proper
19 parties stepped forward.
20       THE COURT: On the assumption I am not
21 doing that, tell me what I need to know about this
22 motion.
23       MR. FABRICANT: Yes. Undue delay, Your
24 Honor, not only is the window of time relatively short,

9 (Pages 30 to 33)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                    719b3435-759f-41f0-994c-79a533b967e9

Page 34

1  particularly in light of the fact the document production
2  just started in the spring of '07 and depositions
3  throughout, until the end of August of '07, but what the
4  evidence collected during that period related directly to
5  the amendments which we now seek to make at this time.
6        With respect to inequitable conduct for
7  failure to disclose material information to the patent
8  office, in our original answer and counterclaim we
9  reserved the right to add additional affirmative offenses
10  with respect to patent defenses.  We did not, at that
11  time, and I don't think it would have been appropriate to
12  allege inequitable conduct, because inequitable conduct
13  requires a pleading of the nature of a fraud pleading
14  under Rule 9, and therefore we did not have the ability
15  at that time to plead with particularity.
16        We did receive some documents, in the
17  spring and summer of 2007, which suggested that there had
18  been some demonstrations or tests or public displays, but
19  we didn't know who was at them, who attended them, who
20  knew about them, what actually happened at those
21  demonstrations.  We took the deposition in the summer of
22  two people in 2007, the two people who were knowledgeable
23  about what actually happened, Mr. Keyes, who was a
24  cofounder; we took his deposition in the summer of '07,

Page 35

1  and Sean McDonald, whose deposition occurred on August
2  30.  I know we pointed out in our papers, Your Honor,
3  that we've attempted to take Sean McDonald's deposition
4  since early spring.  We wanted him to be early in the
5  process.  I think our first request for him was in March.
6  And for a number of reasons the deposition was postponed
7  and postponed again by the plaintiffs until ultimately we
8  had to subpoena his attendance at a deposition at the end
9  of August.  So it was not through any lack of our desire
10  or intent to take Mr. McDonald's deposition at an earlier
11  date, but it didn't happen.
12        At that deposition on August 30, just
13  seven days before we raised this issue with McKesson and
14  just a month or so before we made the motion to amend, we
15  discovered all of the particular details and facts as we
16  set forth in our proposed amendment on inequitable
17  conduct, which we believe supports without question an
18  inequitable conduct claim, certainly beyond any question
19  of futility of the event.  We discovered that he had
20  personally performed and put on presentations of a device
21  which we believe teaches each and every element of the
22  claims of the patent more than a year prior to the filing
23  date, which would constitute an on sale bar, which we had
24  already alleged invalidity.

Page 36

1        But what we also discovered because of
2  his duty of candor as an inventor and his knowledge of
3  what had transpired, that comparing what he testified to
4  with the file history, that there had been no disclosure
5  of material facts and events of material prior art.
6  Remember the difference, Your Honor, between inequitable
7  conduct and invalidity is for invalidity based on an on
8  sale bar, you need to be able to establish what was on
9  sale meets each and every element of each and every
10  claim.
11        But for an inequitable conduct claim,
12  you only need to be able to demonstrate that a person
13  with a duty of candor withheld material information to
14  patentability.  It can be something far less than on sale
15  bar if it was material to patentability.  Of course, you
16  have to also establish this was done purposefully, with
17  an intent to deceive the examiner.  And that's why
18  parties don't allege at the early stages of cases,
19  wisely, inequitable conduct until they gather the facts
20  and the evidence.
21        Once we gathered that and concluded that
22  process on August 30, 2007, we immediately notified the
23  other side of our intent to go forward and we made our
24  motion to amend in October.

Page 37

1        With respect to the antitrust claims,
2  Your Honor, the original answer and counterclaims raised
3  a claim for antitrust violations under the Sherman Act,
4  Section 2, as a result of sham litigation, because at
5  that time all we were able to discern from the complaint
6  and from the lawsuit was that we believed that there was
7  objectively baseless grounds for bringing the action in
8  light of the claim language, the way in which we believe
9  the claim language reads or does not read on the
10  invention, and we didn't believe there was an objective
11  basis for bringing the lawsuit.  So we alleged that kind
12  of sham litigation under Sherman 2, but we did not have
13  the ability to allege any other type of antitrust
14  violations at that time.  We had no documents; we had no
15  fact depositions.
16        As our papers explain, beginning with
17  the deposition in late May of Mr. Zwolinski, continuing
18  through the summer of '07, and again culminating with
19  Mr. McDonald on August 30th, we discovered that there had
20  been a course of conduct of predatory pricing, of
21  sole-source agreements to protect large segments of the
22  marketplace, of false statements being made about the
23  plaintiff's product, of false and misleading statements
24  being made about, not only the defendant's product but

10 (Pages 34 to 37)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                719b3435-759f-41f0-994c-79a533b967e9

Page 38

1  the defendant's company and its financial wherewithal,
2  and all of those facts, I believe, are set forth in great
3  detail in our proposed amendment.
4        And so therefore, based on the facts and
5  evidence collected from May of 2007, which is the
6  earliest possible date we could have discovered any of
7  this, through the summer of 2007, we put together all of
8  the factual allegations which, we believe, without
9  question, supports the Sherman 2 claim based not on sham
10  litigation but on monopolization or attempt to monopolize
11  and the Sherman 1 and Clayton 3 claim, as well as the
12  Delaware state claim which tracks the federal antitrust
13  laws.
14        So we don't believe the amendments are
15  by any means futile; we don't believe they are subject to
16  a motion to dismiss. If the Court allowed the amendment
17  to be made, for the reasons I described, and I think the
18  pleadings speak for themselves because they are very
19  detailed in the proposed amendment. This is not
20  something we could have discovered at an earlier date.
21  And in light of the law with respect to allowing the
22  amendment of pleadings, the liberal track on that, as
23  well as the fact that there is really no prejudice to the
24  parties, which is the third prong, and I will explain

Page 39

1  why.
2        Prejudice to the parties -- obviously,
3  there would be a significant prejudice to defendants if
4  they are not allowed to urge inequitable conduct and the
5  antitrust claims in light of the evidence which has been
6  collected, but really nothing has been added to the
7  lawsuit which will delay the case, delay the trial, cause
8  any real need for anyone to have discovery in this case.
9  These issues were all on the table in the original
10  pleadings, although in a slightly different manner. On
11  sale bar, as part of invalidity, was already alleged. So
12  the only thing that changed was Mr. McDonald and
13  Mr. Keyes' knowledge and familiarity with what happened
14  as persons of duty of candor, which we needed to meet the
15  final prong of intent to deceive.
16        With respect to the antitrust claims, we
17  needed to gather the evidence and take the depositions of
18  these individuals. Nothing has changed. We had an
19  antitrust claim. They knew we had an antitrust claim.
20  We were already into that whole body of law and the only
21  thing now is that there is some additional factual
22  allegations which underlie the antitrust claim.
23        Your Honor, we did nothing during this
24  process to hold back the case. And, in fact, we had our

Page 40

1  -- we presumed, for purposes of discovery and expert
2  reports, that Your Honor would ultimately or this court
3  would ultimately allow us to amend and, therefore, we
4  conducted the discovery which we felt was necessary
5  anticipating that possibility. We had our expert even
6  include that in his expert report.
7        THE COURT: I have got all of that.
8  Just very briefly, if you want to add the affirmative
9  defense of lack of standing, if the motion to dismiss for
10  lack of standing is denied, what impact would it have on
11  the case if we allow you to add that as an affirmative
12  defense going forward in the case?
13        MR. FABRICANT: Your Honor, we did ask
14  for that relief, I believe, as a matter of law. Because
15  it involves subject matter jurisdictions, we are entitled
16  as a matter of law to challenge standing if it affects
17  subject matter jurisdiction. So I would submit that we
18  are entitled to that, notwithstanding the need to amend.
19  I believe it would remain an issue in the case, unless
20  this court is prepared to grant, in effect, what would be
21  summary judgment on the standing issue at this point on
22  this record, in which case there would be adjudication.
23  If the court is not prepared to do that, then we would
24  ask that this amendment be permitted so that we could

Page 41

1  pursue that through trial.
2        THE COURT: All right. Let me hear from
3  Mr. Drucker briefly on the remaining motion.
4        MR. FABRICANT: Yes, sir.
5        MR. DRUCKER: Good morning, Your Honor.
6        THE COURT: Good morning.
7        MR. FABRICANT: The issue on the motion
8  to dismiss the willfulness claim really arises out of the
9  change of law after Seagate.
10        Just to recap the sequence of events
11  here. McKesson filed its original complaint in January
12  2006. They amended in July 2006 -- that was a
13  substitution of parties. The allegation of willfulness
14  remained the same. It was just a bare-bones allegation
15  that defendants sold the accused products with full
16  knowledge of McKesson's patent rights.
17        THE COURT: Prior to Seagate, would that
18  have been enough to establish willfulness?
19        MR. FABRICANT: Well, it would have been
20  enough to allege willfulness in the complaint, but the
21  issue is really slightly different. We think it still
22  won't have been enough because it doesn't satisfy the
23  duty of good faith. That existed before Seagate. That's
24  a simple matter of law, Ledmen in Rule 8. They have an

11 (Pages 38 to 41)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                    719b3435-759f-41f0-994c-79a533b967e9

1  obligation to show that, at least that they have some
2  basis for saying that we have that knowledge. Discovery
3  proceeded. In February 2007, we decided to elect to rely
4  on the advice of counsel defense, that was a date that
5  had been set by the Court in the scheduling order.
6         Beginning the following week, we
7  produced the remaining documents supporting those
8  opinions. And, I think, by May of 2007, everything had
9  been produced relating to the opinions of counsel.
10        In August 2007, the Federal Circuit
11  decided Seagate. And shortly after we contacted
12  McKesson's counsel and we said, what's the basis for the
13  allegation of willfulness? It seems the bar has been
14  raised. Now it's an objective standard. You have to
15  have acts of objective recklessness in light of knowledge
16  of the patents. Where is the proof?
17        And we were getting toward the end of
18  discovery at that point also. We still had no basis from
19  McKesson as to what the claim of willfulness was based
20  on.
21        Finally, after exchanging correspondence
22  for the following months on that question, we moved to
23  dismiss.
24        And the question is really coming down

1  to, did they have equitable faith basis? What was it?
2         The response to the motion, McKesson
3  said, well, we can't answer until we have taken the
4  depositions of the Italian attorneys who rendered
5  opinions in this case. And just to recap what happened
6  with respect to those opinions, in 2002, when Swisslog
7  was designing its system, they contacted an Italian law
8  firm, Provissionato & Company. They received an opinion
9  that would help guide them, help guide them around
10  possible infringement. The opinion consisted of a survey
11  of what the relevant patents were in the field and gave
12  them, just highlighted the major issues that they needed
13  to focus on to avoid infringement when they were
14  finishing up the design of their product.
15        In November 2002, they asked for a final
16  opinion and the Italian attorneys provided that. They
17  gave them a final opinion confirming their earlier one
18  that the patents weren't infringed if they followed
19  certain steps, and that was before they even entered the
20  U.S. market.
21        In 2003, Swisslog entered the U.S.
22  market and started to make sales here.
23        In 2002, it's covered in the briefing so
24  I will raise it with Your Honor, the parties actually had

1  negotiations, there had been several meetings. There was
2  discussion about whether Swisslog would act as a sales
3  agent, and whether McKesson would enter into an agreement
4  to market the Matoped (sic) product.
5         As part of that, there were meetings
6  between executives of the two companies. McKesson was
7  given access to technical information. The senior
8  engineers at McKesson, Mr. Wangoo (sic) and Mr. Spano,
9  the software developer, were told about the Swisslog
10  product. And apparently no mention was ever made of
11  patents. And the reason this is relevant to this motion
12  is because in response to our motion, it seems that the
13  only information McKesson is able to come forward with to
14  show that they had a good-faith basis at the outset of
15  the suit is based on the disclosures that were made well
16  after the suit was filed.
17        THE COURT: But I have to, in a motion
18  to dismiss, take their allegations as true.
19        MR. DRUCKER: That's fine, you can do
20  that. It changes nothing with respect to what they knew
21  at the time they filed suit, and that's expressly what
22  Seagate requires.
23        THE COURT: Well, if Seagate goes to
24  proof, it doesn't go to pleadings, and you have

1  acknowledged that, I believe, in your filings.
2         MR. DRUCKER: Correct. This is not a
3  matter of what's pled.
4         THE COURT: So the problem I am having
5  is what the procedural basis for me to look behind the
6  pleadings to figure out what they knew and then make a
7  decision, I guess, as to whether it was reasonable based
8  on what they knew at the time of the suit. How is any of
9  that relevant to a motion to dismiss analysis?
10        MR. DRUCKER: Well, we believe it comes
11  down to the good-faith basis of filing the suit in the
12  first place. It comes down to Rule 11, it comes down
13  to --
14        THE COURT: Then you are just bringing
15  just an exception motion?
16        MR. DRUCKER: Well, it's actually a
17  motion to dismiss, because -- well, Seagate says when a
18  compliant is filed the patentee must have a good-faith
19  basis for alleging willful infringement. It says so a
20  willfulness claim asserted in the original complaint --
21        THE COURT: Seagate doesn't say if the
22  defendant thinks the plaintiff doesn't have that, file a
23  motion to dismiss.
24        MR. DRUCKER: No, it doesn't say that

Page 46

1   expressly.  In fact, we are not aware of any cases either
2   way on this point.  Seagate is a relatively new decision,
3   as the Court knows.  I don't believe the issue has been
4   addressed before, not in any reported decision, but it
5   seems at some point McKesson has to show the basis.  And
6   what they have done -- and this ties into the motion to
7   amend.  They have come forward now with a proposed second
8   amended complaint, and the entire basis for the
9   allegations of willfulness are information that they've
10  obtained in the course of discovery from us relating to
11  those opinions of counsel.  If we had never chosen, if
12  defendants had never chosen to rely on the advice of
13  counsel defense, McKesson right now would have absolutely
14  no basis for their allegation of willful infringement.
15          THE COURT:  Okay.
16          MR. DRUCKER:  So it's being used against
17  us, to our prejudice.
18          THE COURT:  Okay.  I understand.  I have
19  heard enough on those two motions and we will give
20  Mr. Fabricant a chance for brief rebuttal but not until
21  after we give McKesson a chance to tell me whatever they
22  want to tell me on all four motions.
23          MR. JACOBS:  Good morning, Your Honor.
24  Blair Jacobs on behalf of McKesson; Christina Ondrick is

Page 47

1   with me; Christine Azar from Blank Rome here in
2   Wilmington; and Jill Dessalines, from McKesson, is also
3   present.
4           Your Honor, what I would like to do is I
5   would like to direct some comments to some questions that
6   the Court asked Mr. Fabricant during his presentation,
7   then I have some additional points that I want to bring
8   up and demonstrate that weren't raised during that
9   discussion.  And then I would like to conclude by
10  demonstrating and showing how the loans were fully repaid
11  and the evidence that's in the record that demonstrates
12  that.
13          THE COURT:  It's also likely I will have
14  some other questions for you, but go ahead.
15          MR. JACOBS:  And respond to all of your
16  questions as well.
17          THE COURT:  That was implied.
18          MR. JACOBS:  Let me start out by, if I
19  could, by dealing with the state of the law.  And I would
20  ask the Court to take it in this progression.
21          In 1996, the Federal Circuit, in a case
22  called Minco, Inc. vs. Combustion Engineering, stated
23  that "construction of assignment agreements are a matter
24  of state law."  It's a quote from the case, that

Page 48

1   statement has stood.  It has not been overturned to this
2   date.
3           THE COURT:  Federal Circuit?
4           MR. JACOBS:  Federal Circuit case.
5           In February, we have the DDB
6   Technologies case.  Now, that was a question of whether
7   the creation of an automatic assignment or an obligation
8   to assign in the future.  So the court was looking at a
9   specific assignment; was it assignment in the future or
10  was it an automatic assignment vesting as of right now?
11  And so that is something that is entwined with patent
12  law, because it relates at some level to interpretation
13  of patent rights.  And Judge Newman sat on that case, if
14  you look at the opinion; she also filed a dissent
15  disagreeing with certain aspects of that case.
16          Then Akazawa, a month later, comes forth
17  and it says that state law, not federal law, governs
18  patent ownership.  And as part of that, and we believe
19  the part that is really important to the resolution of
20  this case, the Federal Circuit says a change in ownership
21  can occur by operation of state law.  So if there was an
22  assignment, and if the assignment could be extinguished
23  because it was in effect a security interest, that would
24  be something that would be governed by Hill (sic).

Page 49

1   That's why we have focused so much on intent.  Actually,
2   UCC, Provision 9 of the UCC, which is adopted in
3   Pennsylvania, there is a U.S. provision that's very, very
4   similar with regard to security interests.  We haven't
5   found a lot of case law where it's been interpreted via
6   federal law.  Pennsylvania has a lot more guidance with
7   regard to why intent is important with regard to that
8   issue.
9           THE COURT:  So, in your view, though, do
10  I need to resolve whether it's federal or state law OR do
11  I analyze the issues the same way either way?
12          MR. JACOBS:  I think either way you
13  analyze the issues based on the intent of the parties,
14  what the parties intended.  Did they intend absolute
15  assignment, divestiture of all of their rights -- that's
16  the simple test for was an assignment required -- or did
17  they intend something that was to serve as short-term
18  security?
19          Now, one thing that's interesting, Your
20  Honor, is that we have had three papers that have been
21  filed by the defendants since this motion was originally
22  filed, and we filed our opposition.  And with our
23  opposition we filed a declaration of Sean McDonald.  Sean
24  McDonald was the founder of AHI.  He sat in on the

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                    719b3435-759f-41f0-994c-79a533b967e9

Page 50

1  transactions. He has recollection of what actually
2  occurred and why it occurred. And he states in
3  paragraphs 22 and 23 of that declaration, Your Honor,
4  that he understood that the notes and the assignment,
5  which he signed on behalf of AHI, were to simply provide
6  collateral in the case the loans were not paid off. He
7  also states in paragraph 23 that, of course, start-up
8  company, his intent was to obtain funding. His intent
9  was to use the patent application as collateral. It was
10 not to provide -- this goes to was it intent. An intent
11 to assign has to be a complete divestiture of rights. He
12 says my intent was not to do that, it would have made no
13 sense to provide permanent assignment of rights to the
14 property. And if you think about the context of how this
15 arose, it's a start-up company. That's all they had at
16 this point in time.
17        THE COURT: That maybe what makes sense,
18 but when he signed, the one thing he signed was the
19 assignment of invention document which on its face makes
20 no reference to notes, no reference to collateral, no
21 reference to security interests. It is, on its face, it
22 seems to me, a clear and unambiguous assignment. So how
23 does that fit into your argument?
24        MR. JACOBS: Sure, Your Honor. This is

Page 51

1  the language in the promissory note that creates the
2  obligation to provide the assignment, the document that
3  you are referring to. Okay? And it says, in this
4  document, "this note will be secured by an assignment of
5  application for patent for the technology rights." So it
6  does not say, Your Honor, we are assigning the rights, as
7  part of this transaction, to this patent application to
8  the investors; it says this note will be secured by an
9  assignment.
10        THE COURT: But what about the two-page
11 assignment of invention document? Let's start there.
12        MR. JACOBS: That was part of the
13 totality of the circumstance, all of the documents --
14        THE COURT: Do you have any argument
15 that if I find that I can look at it or you can look at
16 it separately, the assignment of invention document, just
17 those two pages, do you have any argument that there is
18 any ambiguity in those two pages that what was created
19 here was an absolute assignment?
20        MR. JACOBS: Well, other than the fact
21 that it was not signed by the assignee, and it is typical
22 when you have an assignment that it would be signed by an
23 assignor and an assignee. Other than that, looking at
24 the language of the document, it looks like a standard

Page 52

1  assignment. There is no question. It looks like a
2  standard assignment of rights. But that's not what the
3  law calls for. The law calls for construing all of the
4  documents together in determining what the intent of the
5  parties actually was.
6        And when you do that, Your Honor, you
7  see that the very document that created the need for that
8  assignment, the promissory notes, were cancelled, marked
9  "null and void," 'paid in full,' as soon as the loans
10 were paid up. When that happens, pursuant to case law,
11 we are done. There is no right that exists any longer.
12 And that goes, Your Honor, to the case that you raised
13 earlier, that Mr. Fabricant will have a chance to address
14 on rebuttal, the Applied Companies case. In that case
15 the Federal Circuit looked at similar situations when the
16 payment of a debt released the assignment and essentially
17 held that it mooted the intended terms -- there was a
18 set-off provision that was being disputed in that case.
19        So this is not something that is novel.
20 It is very consistent when you apply the laws of logic to
21 these issues that if you have an interest, a security
22 that's being secured by something, if that's paid off
23 completely, you don't need the collateral anymore. The
24 collateral goes back to whoever the original owner was.

Page 53

1        THE COURT: If that was so clear the
2  intent, then why does the assignment of invention not
3  make any reference to security to collateral to debt to
4  notes?
5        MR. JACOBS: The assignment document --
6  unfortunately, nobody remembers that, Your Honor. It was
7  17 years ago. Nobody recalls why -- you know, these
8  individuals were being represented by counsel. We have
9  talked to the individuals who were involved. They say it
10 was a long time ago. We don't recall exactly why things
11 were done by the lawyers the way they were done. All we
12 have is the documents as they exist together.
13        But when you look at the dates of them,
14 it's very likely that what happened was you have that
15 assignment provision in the promissory note, and so the
16 lawyer is representing the investor, the lawyer probably
17 said get me an assignment. I need the assignment. We
18 negotiated for an assignment of this patent application.
19 Get me the assignment that's called for by the promissory
20 note. But the two have to be construed together because
21 you have to look at what the parties intended here.
22 That's what controls the ultimate outcome.
23        Now, there was some discussion about the
24 investors -- and in the deposition of the investors we

14 (Pages 50 to 53)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)          719b3435-759f-41f0-994c-79a533b967e9

Page 54

1  didn't ask them: Do you have ownership rights? and
2  things of that nature because they were really, really
3  clear. We asked them whether they thought they had an
4  interest, things of that nature. They said, Our lawyers
5  would construe all these documents; our lawyers would
6  tell us what we had here. We don't know what we had. We
7  are not going to get into issues of law. And question
8  after question after question that was the position they
9  took. So we were not going to ask them legal questions,
10  that made no sense whatsoever.
11       There is a lot of discussion today with
12  regard to disavow. And that really goes to this new Rule
13  19(a) issue that has come up subsequent to the original
14  12(b)(1) motion that was brought. And, Your Honor, just
15  really quick with regard to 19(a), that requires a
16  two-prong test. And it strikes us that the first prong
17  of that test is that if the court were to determine that
18  an absent party is absolutely necessary for adjudication
19  of the issues in a case.
20       Now, there's a two-prong test that comes
21  along with determining whether a party is absolutely
22  necessary. The first one is complete relief cannot be
23  accorded among the parties. The second is the absent
24  party claims an interest in the subject matter and their

Page 55

1  absence will be prejudiced in some way by not being
2  present. Here the absence of the investors does not
3  affect or impact the Court's ability to afford relief
4  between McKesson and defendants unless there is some type
5  of determination that the investors have some type of
6  ownership interest. At this point in time, they are not
7  necessary parties. At this point in time, they have no
8  interest whatsoever. If the Court is to find that they
9  have an interest, that the assignment grants them some
10  type of right, at that point in time, we may need to deal
11  with, Does McKesson have any rights; does McKesson not
12  have rights; is there a joinder issue here; do they want
13  to intervene?
14       They have not sought to intervene to
15  this point in time. Yet they have been aware of this.
16  Your Honor, they had said in their deposition we don't
17  know one way or another whether we have any interest in
18  this. We are waiting for the court to tell us that
19  basically. It's a legal issue. They don't have any
20  understanding one way or another whether they have
21  interest.
22       THE COURT: As things stand now, aren't
23  the defendants potentially subject to an infringement
24  lawsuit from the investors? And presumably if their

Page 56

1  lawyer wakes up tomorrow and says, why don't you go ahead
2  and file suit for infringement, the defendants --
3       MR. JACOBS: They are not, Your Honor --
4  first of all, I would like to point out that the Third
5  Circuit has held that the risk of multiple litigation is
6  irrelevant in a Rule 19(a) analysis, and that's the Field
7  vs. --
8       THE COURT: But in the patent law
9  context, isn't that really one of the main principals
10  underlying the whole issue of patent standards --
11       MR. JACOBS: It would have to be
12  determined in some way that they had an interest before
13  there could be a risk of duplicative litigation or
14  multiple litigation. If the Court, as I believe the
15  Court should, if the Court looks at what is before the
16  Court, the standing motion, and if the Court decides and
17  determines the ownership issue -- and it's the ownership
18  issue that underlies the standing issue. At that point
19  in time either the investors will have an interest or
20  they will not have an interest.
21       It's our opinion, looking at all of
22  these documents, looking at the fact that the loans were
23  completely paid off, as was intended, looking at the fact
24  that the parties have all operated for 17 years --

Page 57

1       THE COURT: It's your position they
2  don't have any interest. I understand what to do if I
3  find that. If I find that they do have an interest, then
4  I have to dismiss this case for lack of standing and let
5  you work it out as whether you can come back. Isn't that
6  right?
7       MR. JACOBS: I would say that's correct,
8  Your Honor. If you find that they have any interest,
9  absolutely, there would be a lack of standing at least
10  until the issues were worked out. There is no question
11  about that.
12       THE COURT: What about the middle
13  ground? What if I just really can't tell? At that
14  point, don't I have to rely on the fact that the burden
15  is on you and dismiss without prejudice saying they
16  failed to meet their burden of showing they are the sole
17  and exclusive owner of these patent rights?
18       MR. JACOBS: That's another interesting
19  question, because with regard to the 12(b)(1) motion, the
20  burden is on McKesson. And so certainly with regard to
21  standing and ownership, the burden is on McKesson to come
22  forward, as we believe we have with the documents and the
23  declaration of Mr. McDonald, demonstrating what the
24  intent of the parties actually was here.

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                    719b3435-759f-41f0-994c-79a533b967e9

Page 58

1    However, it seems that the defendants
2  are now arguing a Rule 19(a) argument more than a
3  12(b)(1), and if that's the case, Your Honor, then they
4  have the burden.  They have the burden to come forth and
5  to demonstrate that the party is necessary and that the
6  parties are indispensable.  And indispensable, Your
7  Honor, gives you some additional flexibility because, No.
8  1, one of the questions that comes up all the time is are
9  the interests of the parties that are missing adequately
10  represented?  This is the second prong of the test.  And
11  beyond that, if they are, the Court can still determine
12  in equity and in good conscience that the action could
13  proceed without the parties.
14    So there is a number of steps that have
15  to be gone through with regard to this Rule 19(a) motion.
16  And the Rule 19 motion, the burden falls on the defendant
17  to demonstrate that we have a necessary party, that they
18  are indispensable, that there are no reasons, from an
19  equitable standpoint, after we have gone through more
20  than two years of discovery and we are ready for trial in
21  March and these parties have been aware for a long time
22  of the fact that they could intervene, if they wanted to
23  intervene.  Yet they have taken no overt step.  They have
24  indicated in no way that they they believe they have an

Page 59

1  interest.
2    So our view with regard to the disavow
3  argument, Your Honor, is that they have nothing to
4  disavow.  They don't know whether they have an interest
5  or not.  So, of course, they can't disavow anything.  You
6  can only disavow an interest that you are aware of
7  having.
8    I want to address, if I can, Your Honor,
9  one of your arguments that was made with regard to -- and
10  this ought to be quick -- with regard to some factual
11  disputes with regard to whether the notes were paid in
12  full.  We believe that -- there is no evidence that the
13  documents were tampered with, that somebody wrote "void"
14  or "cancelled."  But there is also a letter, and for the
15  record, the Bates number on this is M0474908.  And this
16  is a January 3rd, 1991 letter, and you will see it's from
17  David Cohen.  He represented the investors.  He was the
18  investors' attorney.  You will see it's to a Mark
19  Baseman.  He was representing AHI and Sean McDonald at
20  the time.  And as you will see, in the second paragraph
21  of this letter, Your Honor, it indicates, "the notes were
22  satisfied at the closing of the financing held last
23  Thursday, and you are authorized to mark the notes
24  cancelled and paid in full."

Page 60

1    And, Your Honor, I would note for the
2  record that documents --
3    THE COURT:  Hold on.  Let me.  I'm
4  sorry.  That seemed to be referencing, at least the typed
5  portion, only the two notes relate to PSF.  I see the
6  handwriting at the bottom stated David Cohen gave
7  PSF/Heilman's attorney, forwarding all three promissory
8  notes.  Explain that to me.  I may be misreading the text
9  but it looks like that's what it says.
10    MR. JACOBS:  I was going to point out to
11  the Court, Your Honor, that the documents that were
12  attached to that letter which bears Bates numbers we
13  submitted to the Court M0474909 to M0474913 showed that
14  they, in fact, were the three notes, all of the notes
15  that are involved here, and that they are all marked
16  void; they are all marked cancelled.
17    So it seems that since these documents
18  were maintained and kept together and that they are
19  referenced within that the ones that are marked "void,
20  cancelled, paid in full" are, in fact, the notes that are
21  described in this record.
22    THE COURT:  Is there anything in the
23  record and I suppose in depositions about the handwriting
24  on the bottom of that page?

Page 61

1    MR. JACOBS:  That's our law firm's
2  internal note.  That's about what it has to do with, Your
3  Honor.
4    THE COURT:  Got you.  Okay.
5    MR. JACOBS:  Just a couple of other
6  points.
7    The Court inquired about the November
8  1990 assignment, and we believe that is a very relevant
9  factor to consider beyond the other issues that have been
10  considered with regard to the intent of the parties.  It
11  makes perfect sense that the Court could not have used
12  the same patent application as an absolute assignment in
13  November of 1990 if the patent application in fact
14  absolutely been assigned in June of 1990 because those
15  rights would already be fully possessed by the investors
16  at that point in time.  So it would have made absolutely
17  no sense to do it.
18    What this shows instead, Your Honor, is
19  that basically there is language in these documents to
20  create some type of short-term protective interests for
21  the parties who were involved.  This was a bridge loan.
22  It was known to be a short-term loan.  It was done for a
23  start-up company in order to obtain some short-term
24  financing.  They knew more financing was coming down the

16 (Pages 58 to 61)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                          719b3435-759f-41f0-994c-79a533b967e9

Page 62

1   road.  And the intent of everybody involved was for the
2   patent rights to vest back to the start-up company after
3   the loans were repaid.  The two investors, Your Honor,
4   served on the board of directors of AHI until it was
5   acquired in 1996 by McKesson.  It was in their interests,
6   as serving on the board, for the patents to be part of
7   AHI's property portfolio.  AHI was going out and starting
8   to sell products.  They were making representations.  You
9   know, they had to have this protection of their product
10  to compete in the marketplace.
11          THE COURT:  Going back to November 1990,
12  why should I not then conclude that AHI made a mistake?
13  That is, if they didn't have any legal ability to assign
14  the rights again in November of '90 because they had
15  already done it in June of '90, but either nobody cared
16  or nobody noticed or everybody made a mistake.  But
17  people do make mistakes.  So what do you have that rules
18  out the possibility or makes it less likely that the
19  document that is under agreement meant what it meant in
20  November of 1990 and people acted in a mistaken way
21  thereafter?
22          MR. JACOBS:  Absolutely.  The totality
23  of the circumstances, starting with the fact that we do
24  have the declaration of Sean McDonald telling us exactly

Page 63

1   what was intended by all of these documents and what was
2   going on during this time period.  There is nothing in
3   the record that points in any way to this being an
4   absolute assignment of rights.  There is a lot of
5   circumstantial evidence; the conduct of the parties, all
6   of the documents when you read them all together; the
7   declaration of McDonald; the fact that this same interest
8   was used in 1994, again, as a security interest in the
9   Partek transaction.  The totality of the circumstance,
10  Your Honor, is very, very consistent with the conclusion
11  that, sure, they were just granting a security interest
12  in June of 1990.  They knew it was going to be paid off
13  and terminated very, very shortly.  So they just did the
14  same exact thing in November.  It made sense.  They used
15  the same clause.  They just went ahead and granted
16  another security interest in the patent application,
17  because the understanding was, Your Honor, that all of
18  these notes would be paid off when a subsequent round of
19  funding was provided, which is what happened, basically.
20  They were paid off with stock and cash in the late
21  December time period, which led to that letter in January
22  that we have now showed the Court.
23          So, Your Honor, the intent of the
24  parties is a fundamental import here.  It cannot be

Page 64

1   ignored.  In order to accept the argument that the
2   defendants are making, the intent of the party has to be
3   ignored, and that is just inconsistent with the law.
4           THE COURT:  Help me out.  Because if I
5   agree that it all makes sense and everyone acted in the
6   way consistent with your interpretation, why isn't that
7   nullifying this two-page assignment of invention which
8   even you can see only its face is clear and unambiguous.
9   What is it that allows me to do anything here other than
10  just look at the two pages signed by Sean McDonald.
11  Maybe he didn't understand what he was doing, maybe he
12  didn't intend to do it, but seems a clear, unambiguous
13  assignment, doesn't reference anything else, you can see
14  there is no evidence of physical delivery.  It's a
15  reassignment.  So why would that not be the be all and
16  end all of this case and everything else is irrelevant?
17          MR. JACOBS:  Your Honor, the reason that
18  it is not the be all and end all is that Pennsylvania
19  law, federal law, all law that we are aware of that
20  relates to the interpretation of provisions in contracts
21  or in agreements require that the provision be considered
22  within the context of the four corners of the documents,
23  all of the documents that relate to the transaction.
24  That document is part, within the four corners of all of

Page 65

1   the documents.
2           THE COURT:  I don't know that until I
3   look to the other documents.  I mean, if I just found the
4   assignment of invention laying on the security, I would
5   then get a clear and unambiguous assignment.  So what is
6   it?  I think the law is -- you don't get to intent until
7   you find there is some reason to do that.
8           MR. JACOBS:  Right.
9           THE COURT:  If what you are looking at
10  is clear and unambiguous, why would you even want to do
11  that?
12          MR. JACOBS:  The other documents tell us
13  that the assignment was created only because of the --
14  it's a security interest.  It was to secure something.
15  So it's not like this wasn't referenced anywhere else.
16  It's not like this comes in a vacuum.
17          THE COURT:  I understand it's elsewhere.
18  Tell me, if you can, what case or what provision of
19  Pennsylvania or federal saw that says I need to look to
20  those other documents, I can't just --
21          MR. JACOBS:  The Sanford case, which is
22  198 Fed 3rd 421, is the primary case that we cited that
23  when documents reference each other that reading them
24  together is required.

17 (Pages 62 to 65)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                                                719b3435-759f-41f0-994c-79a533b967e9

Page 66

1    THE COURT: That all the documents
2 relied on reference to one another or is it analogous to
3 here where I have the assignment that doesn't reference
4 anything, and granted I do have other documents --
5    MR. JACOBS: It's analogous to here
6 where not every document references each other, but
7 certainly all of the documents are referenced at one
8 point in time to a document that ties them together
9 somehow. And when that is the case, then we have to look
10 at all of the documents and we have to construe all of
11 the documents through the lens of what was the intent of
12 the parties. Did the parties intend a security or did
13 the parties intend an absolute assignment? If that's the
14 test, if that's where we end up, Your Honor, the evidence
15 is overwhelmingly compelling in the corner of the parties
16 intended this to be a security.
17    Now, with regard to Rule 19, really
18 quickly, in order to get to that, to the necessary party
19 aspect of that argument, the Court is going to have to
20 construe the documents. The Court is going to have to
21 make the determination as to whether there is any type of
22 interest. If the Court makes the determination that they
23 have an interest, as we've mentioned, that removes the
24 need to move further into the Rule 19(a), the Court can

Page 67

1 dismiss based on standing. If the Court, however,
2 concludes, no, they don't have -- because of the intent
3 of the parties, they do not have an interest, the
4 interest vested back to AHI, then they are not a
5 necessary party. So Rule 19 really is not, we don't need
6 to go down the Rule 19 path. Because either way,
7 whichever decision, with regard to necessary party, that
8 the Court arrives at, we don't need to proceed further.
9    THE COURT: And in that third middle
10 ground -- we didn't really finish that conversation -- if
11 I just can't tell because it's 17 years later, one
12 document, as you can see is clear and unambiguous, but
13 the other documents, let's say I agree with you and say
14 they are ambiguous, so I just can't tell. With the
15 burden on you in that context, do you agree that means I
16 have to dismiss?
17    MR. JACOBS: No, I do not, Your Honor.
18 And that is because 12(b)(1), if that's what we are going
19 to interpret this under, establishes an intentionally low
20 threshold with regard to satisfying a burden. And if we
21 are going to apply 12(b)(1), the Court has said time and
22 time again that it's a relatively light standard and
23 dismissal should only be granted, and is only appropriate
24 where a claim is so insubstantial, implausible foreclosed

Page 68

1 by prior decisions of this court or otherwise completely
2 devoid of merit as to not involve a federal controversy.
3    Under the middle ground scenario that
4 you are describing, there would still be a lot of
5 evidence -- if you look at the declaration of McDonald
6 and the totality of the circumstances surrounding these
7 transactions -- but the parties intended this to be a
8 security interest.
9    THE COURT: If I look at it that way,
10 what happens next? I dismiss the -- I deny the motion,
11 but I say I don't know who owns this. Procedurally, what
12 happens to this case?
13    MR. JACOBS: It would then be a question
14 for the jury, Your Honor. There would be factual
15 disputes; there would be factual issues.
16    THE COURT: So the whole assignment of
17 the security interest question would then go to the jury?
18    MR. JACOBS: If the facts are so tied to
19 the issue that the Court cannot decide the facts based on
20 everything that the Court has in front of it and assuming
21 that the burden has not been met with regard to 12(b)(1),
22 that defendants have not satisfied that, then it would be
23 a question that would be appropriate for the jury.
24    You know, Your Honor, we have put forth

Page 69

1 as much as exists in a 17-year-old record to demonstrate
2 what the intent of the parties actually was here. We did
3 go out and find those documents showing that they were
4 paid in full. We have done everything that we could
5 possibly do to put this together to show that this was
6 intended to be a short-term security interest and, in
7 fact, that the parties operated that way 17 years after
8 the close of the loans in January. Under those
9 circumstances, there is nothing indicating that this was
10 anything other than a short-term interest.
11    Looking at that document by itself, in a
12 vacuum, is inappropriate, because it's referenced by
13 other documents. It has no meaning outside of the
14 promissory notes that created it. It's a security
15 interest in the assignment.
16    If you look at the term sheet which came
17 before that, there was a change. It said, We want a
18 security interest in technology rights. That was then
19 changed to security interests in the assignment of the
20 patent application. So there are a number of documents,
21 Your Honor, that tie all of these things together.
22    And for that reason, we would ask the
23 Court to look at the intent of the parties, to look at
24 all of the documents, to construe the documents to

18 (Pages 66 to 69)

Page 70

1  determine that this was intended to be a short-term
2  security interest and to therefore deny the 12(b)(1)
3  motion, and as a result of denying the 12(b)(1) motion
4  based on ownership to deny the Rule 19 motion for lack of
5  necessary party.
6           Subject to any further questions that
7  the Court has...
8           THE COURT:  No.  We explored that area,
9  but address the other three motions that are in front of
10  me if there is anything you want to add to the briefing.
11          MR. JACOBS:  I will address, with the
12  Court's permission, the amendment issue and then I will
13  allow Ms. Ondrick to address the Seagate issues.
14          THE COURT:  Fine.
15          MR. JACOBS:  Thank you, Your Honor.
16          Very quickly, Your Honor, with regard to
17  the amendment, we would focus on prejudice to the
18  opposing party in our discussion of that amendment.
19  Discovery is closed, Your Honor.  We are dealing with
20  proposed new claims or causes of action.  These new
21  claims and causes of action will significantly increase
22  the discovery, and there will be further delay that will
23  be required.  I have a list here of some additional
24  discovery that will be necessary.

Page 71

1           THE COURT:  You don't have to --
2           MR. JACOBS:  With regard to the new
3  antitrust allegations, there are Section 2 and Section 3
4  Sherman Act allegations.  Looking at the proposed amended
5  complaint, it appears that there would be some necessary
6  discovery with regard to Swisslog's management of what
7  they believe the relevant market to be, industry
8  practices, their own sales conduct, because they are
9  alleging inappropriate sales conduct.  If they are
10  engaging in the same exact sales activity, there is going
11  to be an argument here, of course, that these are
12  standard business practices; that is something that we
13  would have to look at.
14          There are third-party pricing policies
15  that we would have to look at.  They do some work for a
16  predecessor machine, a Homaris machine.  You know, how
17  was the pricing established with regard to that?  What
18  kind of discounts did you give, under what circumstances?
19  We haven't done any of that discovery yet.
20          The impact.  There is a $10 million
21  claim attached to these new Sherman Act allegations.
22  They allege, in the complaint, one lost sale.  Well, we
23  know that one lost sale is nowhere near $10 million, so
24  what else are we talking about with regard to -- are we

Page 72

1  talking about damage in the marketing place; are we
2  talking about pricing issues; is it on a per unit?  But
3  we have to go through and ask their folks all of these
4  questions.
5           They talk about exclusion of third
6  parties from the marketplace.  We are going to have to go
7  and check and see if third parties have, in fact, been
8  excluded by this behavior.  On the other hand, they make
9  the allegation that this is a very, very limited market,
10  so we need to get to the bottom of what do they mean by
11  exclusion of other parties in the marketplace.  There are
12  some allegations, Your Honor, about an interface; the
13  interface is not provided by the plaintiff in this case,
14  McKesson Automation.  It is provided by another McKesson
15  entity.  And there are claims that this has caused
16  problems with third parties.  So we will need to talk to
17  those third parties and see whether, in fact, this has
18  caused the problems that are being alleged now.
19          They allege in paragraph 49 of their
20  proposed amended complaint that customers have repeatedly
21  requested this interface capability.  We are not aware of
22  that.  We are going to have to go out and take discovery
23  on whether, in fact, this has occurred.  There are
24  questions about the financial viability of the

Page 73

1  defendants.  They allege that false statements were made.
2  Well, were, in fact, they having financial problems?  We
3  need to get to the bottom of all of that to see whether
4  these were, in fact, misrepresentations or not.  There
5  will be more deposition discovery necessary on their
6  product, Your Honor, because they say that McKesson, in
7  sales presentations, has misrepresented the mechanical
8  complexity of, and reliability, of their product.  In the
9  first run-through discovery, because they are not alleged
10  to -- we didn't get into those types of issues,
11  mechanical, complexity, that didn't go to the claims.  We
12  didn't get into reliability.  Those are issues that we
13  would have to take up again -- maintenance requirements.
14          And then finally, Your Honor, with
15  regard to this first set, which I generally describe as
16  the antitrust allegations, the series of claims that
17  relate, I think, to those charges, there are these
18  general purchasing organizations that are out there where
19  you will go and you will say, I want to work with your
20  general purchasing organization, and if you get that
21  contract, you get preferred pricing and you provide it to
22  multiple hospitals.  They have alleged, in this new set
23  of allegations, that that has been done to exclude them
24  from competing and other third-party competitors from

19 (Pages 70 to 73)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                    719b3435-759f-41f0-994c-79a533b967e9

Page 74

1  competing in the marketplace. It's not our understanding
2  of these GPO contracts, but certainly we would need to go
3  and talk to the folks who provided the GPO contracts to
4  get a feeling for whether this is truly a sole-source
5  commitment or can you still sell to other parties despite
6  the fact that you are giving preferred pricing? Those
7  are the types of things we haven't provided discovery on.
8          THE COURT: What if I granted leave to
9  amend to add the antitrust claims and then stayed those
10  claims, are you prejudiced by that?
11          MR. JACOBS: No. Under the
12  circumstances, given where we are, how far along we are
13  in the discovery of this case, that would not be
14  prejudicial, because the other antitrust claims will
15  ultimately be resolved at one point in time, either
16  during pretrial proceedings or later, and we could take
17  this up separately. It would be like dismissing and
18  saying you could file this in a separate jurisdiction if
19  you want to; it would have the same exact impact. That
20  would balance the prejudices, in my mind, a little bit
21  more, Your Honor, because versus all of this discovery
22  and delaying trial dates and things of that nature, they
23  would still have all of their rights. Their rights would
24  still be preserved.

Page 75

1          THE COURT: What about the inequitable
2  conduct?
3          MR. JACOBS: Inequitable conduct, just
4  very, have shortly on that, Your Honor.
5          There is some additional discovery that
6  would be required with regard to that. There are four
7  inventors here. The defendants noticed the deposition of
8  all four inventors, and they withdrew three of those
9  notices after they had filed the four notices. So we
10  have three inventors who signed declarations to the
11  patent office as well. They have not been deposed. And
12  then, Your Honor, there were a number of companies that
13  were purportedly involved in the demonstrations. These
14  prior demonstrations that we obviously will contend were
15  basically just showing them preliminary things, weren't
16  in fact offers for sale. And they will probably contend
17  they were offers for sale. They had noticed depositions
18  of a number of those companies during the process of
19  discovery as well, and they withdrew them.
20          And so, you know, when they notice
21  depositions and withdraw them, it's our understanding
22  that we are not going to obtain evidence from those
23  parties. And then to come after that and to try to amend
24  the complaint to add these charges, where now we need to

Page 76

1  talk to these prior companies that were talked to, we may
2  need to go and find out what the other inventors know.
3  Again, it's prejudicial in that it delays, it causes
4  problems. If the Court were to allow some additional
5  time for discovery, it may be something that we could get
6  done and still allow the amendments to take place, but
7  there is additional work that needs to be done and it
8  would be prejudicial.
9          THE COURT: Okay. Thank you.
10          MR. JACOBS: Thank you, Your Honor.
11          Real quick, Your Honor, with regard to
12  Section 261, if the Court does find that there is
13  something ambiguous in the assignment agreement, then
14  McKesson, when they had this in their due diligence file,
15  would have had no actual notice; it would have been
16  ambiguous. They won't have known the meaning of what it
17  was they were looking at if it was an ambiguous document.
18          So the actual notice issue can be
19  handled two ways, as we argued it in our brief, if you
20  look in a due diligence file in 1996 and you see -- okay,
21  there is an assignment here, but you also have related
22  documents that you pulled together and you say, oh, that
23  was extinguished when they repaid this loan back in 1990,
24  does that put you on actual notice that there is an issue

Page 77

1  of this nature? We don't think so. We think it's a
2  reasonable conclusion.
3          THE COURT: It goes back to the question
4  I asked you about mistake. I mean, if your client made a
5  mistake in '96, you know, why should anybody else bear
6  the burden of that? They had the documents. They made a
7  decision, either consciously or without adequately
8  investigating that it was extinguished. If I find that
9  it wasn't extinguished, I don't see how you are helped.
10          MR. JACOBS: If the documents were
11  ambiguous, however, perhaps there wouldn't be actual
12  notice because they wouldn't be able to interpret the
13  meaning one way or another.
14          THE COURT: Well, they were on notice of
15  the documents. Their legal impact nobody knew, for sure.
16  But I appreciate your bringing up 261, because I do have
17  one other question about that.
18          261 doesn't in any way give AHI more
19  ability to assign something that it didn't have. The
20  point is, if I find that they assigned it away in June
21  '90 and you never got it back, 261 can't help you.
22          MR. JACOBS: It doesn't revive a right
23  in any way. It goes more to notice and whether you were
24  on notice at the time that the future transaction took

Page 78

1  place.
2          THE COURT:  All right.  I appreciate
3  that.  Thank you.
4          MR. JACOBS:  Thank you, Your Honor.
5          MS. ONDRICK:  Good afternoon, Your
6  Honor.
7          THE COURT:  Good afternoon.
8          MS. ONDRICK:  I'm going to briefly
9  address the two Seagate-related motions.  I am going to
10  start with defendants here today have admitted that Rule
11  8 still applies to willful infringement allegations.
12  They have also now, as I understand it, they've admitted
13  that our initial pleadings, back in January of 2006, met
14  the Rule 8 pleading requirement under Underwater Devices
15  at the time.  They don't contest that.  The case law is
16  very consistent that McKesson's allegation was
17  sufficient.
18          When the law changed, after Seagate, the
19  pleading requirement didn't change.  Seagate didn't talk
20  about pleading requirements.  It didn't talk about notice
21  of pleading.  It didn't talk about Rule 11.  The law did
22  change, though; and McKesson's allegation is still
23  sufficient under Seagate.  Seagate talked about proof and
24  evidentiary burdens.

Page 79

1          McKesson very specifically alleged that
2  defendants had knowledge of the patent, and that their
3  acts were deliberate.  That is enough under the old
4  standard or the new standard, even if there is one.  I
5  contend there is no difference in standards, but if you
6  were to look at McKesson's pleadings and apply it to
7  Seagate, which has the two-part test that would be, first
8  prong would be this objectively -- the objective inquiry.
9  And so under an objective inquiry, it would be
10  objectively reckless for a business to have knowledge of
11  a patent, to have knowledge of what their device does and
12  to have deliberately infringed that patent.  That is
13  sufficient.
14          Then also, under the subjective column,
15  we alleged they specifically had knowledge.  Therefore,
16  we have also met the subjective prong under Seagate.
17          Our pleading stands under both
18  requirements.  There has been one case, since Seagate, to
19  specifically decide this issue, the F5 Networks case.
20  The F5 Networks case specifically held Rule 8 still
21  applies.  Notice pleading is all that's required, and an
22  allegation that alleges notice of the patent is
23  sufficient and is proper for a willful infringement
24  allegation.

Page 80

1          THE COURT:  Let's say I agree with you.
2  Do you have a preference as to whether I deny their
3  motion to dismiss the willfulness allegations or grant
4  your motion to leave so that the expanded allegations of
5  willfulness become the complaint?
6          MS. ONDRICK:  It would be our preference
7  to deny the motion.  We only filed the amendment as a
8  precautionary motion in light of all the issues they had
9  raised.
10          THE COURT:  And what practical
11  difference would it make which way I went on that if I
12  agreed with you?
13          MS. ONDRICK:  I don't think it
14  effectively makes any practical difference.  Our
15  allegation is still there, it still survives, and it's
16  still before the court.  The real issue of their motion
17  goes to summary judgment, which is going to be decided
18  down the road, and that's where all of the arguments that
19  they are raising are proper.  And all their arguments on
20  Rule 11 have nothing to do with what is in the pleadings.
21          Their argument is we can't figure out
22  what plaintiff knew to make this allegation.  There is
23  privileged information there.  There is information where
24  they have never served a discovery request.  They never

Page 81

1  served an interrogatory to find out what facts we had at
2  the time.  They have never kind of handled this issue.
3  So what they are talking about in Rule 11, they are just
4  speculating because they don't know what we knew.
5          There are lots of things that courts
6  look at when determining if there is a good-faith basis
7  for bringing a claim.  There are numerous, numerous
8  factors.  One that is frequently looked at is the
9  similarity between the patent claims and the accused
10  device.  That often is one factor that is enough.  There
11  are many other factors that are involved in looking at
12  it.  Those factors include how long this patent has been
13  around.  This patent was issued in the mid 1990s.  It's
14  not like this patent was issued the day before this
15  lawsuit was filed.  The patents have been touted, the
16  product is well-known.  All those things get factored
17  into this inquiry.
18          THE COURT:  All right.  Thank you very
19  much.
20          Mr. Fabricant, it won't be a full hour,
21  but a few minutes to address a few points.
22          MR. FABRICANT:  Thank you, Your Honor.
23          Your Honor, I think many of the things
24  that Mr. Jacobs said to Your Honor, to the Court, both in

21 (Pages 78 to 81)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                   719b3435-759f-41f0-994c-79a533b967e9

Page 82

1  the briefs and on oral argument, really support and
2  emphasize the reason why it's inappropriate for this
3  court, on either a standing motion or even a motion with
4  respect to indispensable parties, to adjudicate, to reach
5  a decision as to whether or not this was an assignment,
6  an outright assignment or security interest which somehow
7  was self-extinguished. When the Court looks at the cases
8  where this has come up, either in the standing context or
9  in the indispensable party context, you don't find the
10 courts deciding the issue and then after they decide that
11 McKesson has the rights, not the investors, I now find
12 that the investors were indispensable parties; what the
13 courts do is they reach the conclusion that there is a
14 general issue as to whether or not this party that's not
15 present before the court has an interest, not adjudicate
16 that fact, but reach the conclusion that there is a
17 genuine possible claim out there.
18        The words of Rule 19(a) themselves talk
19 about a party not joined that has a claim, and that's
20 been construed to mean either they have asserted it or
21 they may have it. So Rule 19 is directly related to just
22 the question of whether this Court should proceed to
23 adjudicate without the presence of those parties who have
24 knowledge of the facts and would be necessary for the

Page 83

1  jury or the Court to ultimately reach that conclusion.
2        THE COURT: So if I analyze it under
3  Rule 19 and say with that particular issue therefore they
4  are indispensable parties, what do I do then? Do I
5  dismiss or do I give them a chance to see if they could
6  join those parties?
7        MR. JACOBS: Well, I will answer. I
8  think the standing issue falls for the same reason. They
9  do have a burden of proving that they have substantial,
10 all of the substantial rights of this patent. I think on
11 the standing issue it's subject matter jurisdiction, the
12 Court, if it agrees with our position, has to dismiss.
13        On the indispensable party issue, yes, I
14 think the Court could allow them an opportunity to join
15 what is a necessary and indispensable party, but if
16 joinder is not feasible and if this Court can't get
17 personal jurisdiction over those parties, then at that
18 point I think the Court would be left with no choice but
19 to dismiss.
20        Now, dismissal without prejudice, as
21 egregious as that might sound in the context of a
22 two-year old battle, Your Honor, I think the Court has to
23 weigh the ultimate prejudice to plaintiff, on the one
24 hand that brought this lawsuit with this open issue, and

Page 84

1  the prejudice to the defendants, on the other hand, if
2  the case proceeds to trial, millions of dollars more
3  expended, possible risk of injunctive relief. We have an
4  ongoing business that our client has that's at jeopardy
5  here. The risk of the defendant, if the defendant
6  litigates this and ultimately cannot have a final
7  resolution of patent invalidity, cannot have a final
8  resolution of noninfringement, cannot have a final
9  resolution of unenforceability, has spent all of its time
10 and effort and money only to have some parties in
11 Pennsylvania, who were not of our making, mistake or
12 otherwise, sitting with an outright assignment document,
13 which they could now use with lawyers to pursue our
14 client. So those are the relevant issues of prejudice
15 which this Court has to take into consideration, both
16 under the standing motion as well as under the
17 indispensable party motion.
18        And I thought one of the most compelling
19 pieces of evidence that Mr. Jacobs put up on the screen,
20 Your Honor, was that letter that Your Honor paid
21 attention to with respect to the notes being repaid. And
22 what I think is crucial with respect to that letter, as
23 Your Honor pointed out, it refers to only two of the
24 three notes. First of all, the letter hasn't been

Page 85

1  authenticated. They never chose to take the deposition
2  of Mr. Cohen. The letter only refers to two of the
3  notes, not the third. The letter which purports --
4  although it says no enclosures; right on the face of the
5  letter it says no enclosures. The letter purports to
6  refer to two of the three notes. And then Mr. Jacobs
7  testified, well, there are notes attached to the letter
8  and they are marked cancelled and void, but the letter
9  itself purports to state to the reader you are authorized
10 to mark them cancelled. So how are notes already marked
11 cancelled or void attached to a letter that says you are
12 authorized to mark them cancelled.
13        Issues are being raised. And the reason
14 I focus on that, there is no evidence about the third
15 note. Let assume that's an authentic letter; let's
16 assume two of the three notes were repaid; let's assume
17 there is a genuine dispute as to the third note. Under
18 the assignment document, which is before the Court, not
19 only would Mr. Heilman but the seed fund would also, the
20 seed fund whose two notes were supposedly repaid, they
21 would still have their interests under the assignment
22 document because they have an outright assignment, and
23 there is nothing in that assignment document, as this
24 Court has noted, which cross-references anything. There

22 (Pages 82 to 85)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                    719b3435-759f-41f0-994c-79a533b967e9

Page 86

1  is nothing in the assignment document that says if a note
2  which AHI has given to Dr. Heilman has been repaid but
3  the other notes haven't been repaid, then Dr. Heilman has
4  to reassign but the seed fund doesn't.  There is nothing
5  in that assignment document which considers the
6  possibility of repayment of the notes, reassignment under
7  any circumstances.  We have to take that document on its
8  face, and on its face those individuals own 100 percent
9  of the rights to this patent and are free today to pursue
10  my client's for patent infringement.
11          And I think the mere fact that there is
12  a genuine, legitimate dispute as to this that needs to be
13  adjudicated by a court as to clear title, quiet title,
14  before my client is subjected to the financial and other
15  economic burden of having to defend a patent infringement
16  lawsuit that could ruin it's business against a party who
17  doesn't even and may not even be ultimately determined to
18  be defensible.
19          THE COURT:  What do you say about the
20  burden on a motion to dismiss on standing that Mr. Jacobs
21  referenced?
22          MR. FABRICANT:  I read that case.  The
23  case says that.  It's still the burden.  I don't know how
24  you get beyond the burden of proof being more likely than

Page 87

1  not.  I mean, they have got to have the burden of
2  persuading this Court that in likelihood, it's more
3  likely that they own these claims than not.  And that
4  only gets us then to, if Your Honor is satisfied that
5  they have met that burden.  And I think there are some
6  very serious issues raised by the documents which have
7  been located and presented to this court.  But if Your
8  Honor gets by that burden, then I think we do have the
9  very serious consideration how we proceed to litigate
10  that issue if in this court without those parties.
11          And when Mr. Jacobs read from Rule 19,
12  he left out several of the provisions.  It's certainly a
13  prong of 19(a), whether complete relief can be afforded
14  the parties before this court.  It cannot be under
15  19(a)(1), because we can't litigate completely our claims
16  of invalidity and noninfringement, enforceability even
17  without looking to the absent parties.  And then as far
18  as on indispensable party, the law is clear, by all of
19  the courts that I have read, where you have a party who
20  may have a claim of ownership, they are an indispensable
21  party in a patent infringement lawsuit, because
22  substantial, all the rights have to be before the Court.
23          THE COURT:  How about anything on the
24  Applied Case from the Federal Circuit?

Page 88

1          MR. FABRICANT:  I did not see a
2  reference to it in our brief, and I apologize for that.
3  My recollection of reading that case, and what the
4  plaintiff's comment on that case was in their brief, is
5  that, first, it would not even apply to a situation where
6  there was an issue as to whether there was an outstanding
7  payment because it addressed an issue where the terms of
8  the document were rendered moot as a result of the
9  payment.  It wouldn't apply to that.
10          Then second, I remember, I could not
11  tell in my recollection of reading that case that we were
12  dealing with the same kind of instruments here:  an
13  independent assignment, standing on its own, without
14  cross-references to set-off agreements and other
15  conditions which might, under certain circumstances as
16  was applicable in that case, render that document moot,
17  not the same contractual situation as is present before
18  this court, even if payment was resolved, which we don't
19  believe it has been.
20          THE COURT:  And how about the Akazawa
21  case, in March of 2008, the opinion on state law versus
22  federal law, the Federal Circuit, I just want to give you
23  a chance if you have anything.
24          MR. FABRICANT:  I think Mr. Jacobs

Page 89

1  correctly stated the law, as I understand it, that the
2  Federal Circuit has really not been inconsistent in these
3  rulings, that the February decision in DDT, I think it
4  was, dealt with a self-executing assignment or a promise
5  to assign in the future as opposed to other assignment
6  questions that might come about.  And I think that's the
7  slight difference between the two cases, that we have got
8  a self-executing assignment, as was the case in the DDT
9  case.  You wouldn't necessarily look to state law to
10  construe it; in fact, they said you wouldn't look to
11  state law.  And in other assignment situations, and I
12  think Mr. Jacobs correctly stated the law, you can and
13  should look to state law.
14          THE COURT:  Two quick questions with
15  respect to the other motion; I don't know if you want to
16  address them, either you or Mr. Drucker.  Basically, do
17  you agree that some, at least, of the discovery that he
18  outlined would be necessary if we allowed the amendment?
19  That's for you.
20          And then what is your view on if I give
21  you leave to amend with respect to the antitrust claims
22  but I stay those claims, what is your position on that?
23          MR. FABRICANT:  Your Honor, obviously,
24  when any attorney defends a motion to amend a pleading,

23 (Pages 86 to 89)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                                                 719b3435-759f-41f0-994c-79a533b967e9

Page 90

1  one of our obligations is to build the prejudice side and
2  urge additional discovery being necessary.  I don't
3  believe in this case it seriously is necessary.  And the
4  reason I believe that's so is after we made our motion to
5  this court, on the motion to amend, they took additional
6  depositions of our business people on the antitrust
7  issues; Mr. Patrician's deposition on the market share,
8  on the marketing activities, on all of the things that
9  Mr. Jacobs went through.  They took Mr. Ellis'
10  deposition, Mr. Patrician's deposition; they asked the
11  president of the company, marketing and antitrust
12  questions.  They had an ample opportunity to ask those
13  questions, and they did.  So I don't really believe that
14  they are going to redepose those people and ask
15  additional questions on the same subject.
16          Next I would urge that at the time we
17  first advised them of our intent to make the motion and
18  we made the motion, discovery was opened in this case,
19  fact discovery, until January 31, 2008, Your Honor.  They
20  never raised with the Court, other than to reserve their
21  rights on the various scheduling orders, which they did.
22  They never raised with the Court, you know, we need to
23  take this discovery within the cut-off period.
24          Your Honor, again prejudice to the

Page 91

1  parties.  Swisslog and Translogic should not be
2  prejudiced by the unfortunate situation in this district
3  that we did not have a district judge for well over a
4  year, and this issue sat -- and I'm not blaming anyone
5  because I realize this court has been overburdened as a
6  result of the lack of a district court judge.  We are
7  dealing with a very short period of time from the time we
8  got the documents and the depositions and the request to
9  amend.
10          THE COURT:  And what about staying the
11  antitrust, would that prejudice you?
12          MR. FABRICANT:  That's a result which is
13  not particularly attractive to the defendants.  This is a
14  very long and expensive experience and burden for the
15  defendants.  We will be trying the antitrust claim under
16  Sherman 2, which we have in the original answer and
17  counterclaim.  We have all of these patent issues.  To
18  require a separate trial on a later date on related
19  antitrust issues, which cover much of the same ground,
20  much of the same relevant market.
21          THE COURT:  But they aren't all
22  antitrust issues.
23          MR. FABRICANT:  Then I think it's
24  prejudicial to the defendants to not be able to at the

Page 92

1  same time trial to be able to tell the complete story to
2  this jury.  I think it's prejudicial.  It's better,
3  obviously, than not having those claims at all because we
4  believe they are viable claims; we believe the evidence
5  is serious.  We would prefer, and we think it's
6  prejudicial not to allow the jury to consider those
7  factors with the others.
8          THE COURT:  Mr. Drucker, may have a note
9  for you, and then you will be done.
10          MR. DRUCKER:  Just quickly to address
11  Ms. Ondrick's arguments.  Basically, they are looking at
12  the pleading requirement just to say if you say that the
13  other side had knowledge of the patents, that's all you
14  need to do.  Those are the magic words.  You utter those
15  words, and you are fine.
16          We say there is an additional obligation
17  as to Rule 11 that still is not being addressed here.
18  There has to be some basis of saying that there was
19  knowledge of patents at the time the complaint was filed.
20  If they are only looking at conduct that came afterward,
21  if they are only look at things they learned about during
22  the course of discovery, they are admitting that they had
23  no knowledge at the time that the complaint was filed or
24  when it was amended for the first time that our client

Page 93

1  had any knowledge of the patents.  You would expect to
2  see something.  There was no mention in the course of
3  dealings in 2002 when the parties were negotiating, when
4  they were exchanging information, there was no mention of
5  the patents then.  Their papers in opposition to the
6  motion are silent about that.
7          So if you allow them to just utter the
8  magic words, the defendants had knowledge of the patent
9  in suit and was selling the accused products, and that
10  satisfies their burden then it eviscerates Rule 11, if
11  they can just get around it by saying that and there is
12  nothing further to support it.
13          THE COURT:  Thank you for that.
14          MR. FABRICANT:  Your Honor, I don't know
15  what other questions you may have.  There is one other
16  issue unrelated to today's motion that at the appropriate
17  time we would like to bring to your attention.
18          THE COURT:  I don't have any other
19  questions on the motions we talked about.
20          MR. JACOBS:  Your Honor, if I could, I
21  just have 20 seconds.  I promise.
22          THE COURT:  With respect to these
23  motions?
24          MR. JACOBS:  With respect to these

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                    719b3435-759f-41f0-994c-79a533b967e9

Page 94

1  issues.
2          THE COURT:  Okay.
3          MR. JACOBS:  I just wanted to bring to
4  the Court's attention, this is paragraph 21 of the
5  McDonald declaration, and he says there:  "In addition,
6  to signing two of the promissory notes and the term sheet
7  on June 29th, I signed an assignment as part of the loan
8  transaction."
9          So McDonald ties together into the loan
10 transaction all of the documents, including the
11 assignment.  So I just wanted to -- I was stretching my
12 memory to figure out where we had that, and that's where
13 it was.
14         THE COURT:  Thank you.
15         MR. FABRICANT:  If I could comment on
16 that, Your Honor.
17         THE COURT:  I don't need any comment on
18 that.  I understand where that fits in, but your other
19 issue.
20         MR. FABRICANT:  Yes.  The other issue
21 is, and I don't know whether this is an issue which we
22 should properly bring to Your Honor's attention or if
23 Judge Robinson should resolve this.
24         Recently within the last week or ten

Page 95

1  days, after the time for identifying the asserted claims
2  passed, after the time for identifying the disputed claim
3  terms passed, and after the time when our initial expert
4  reports were exchanged, including our expert report on
5  invalidity, which identifies prior art, addressing the
6  claims being asserted, the plaintiff chose to assert
7  additional claims of the patents, not previously asserted
8  after this schedule went forward new claims, for which we
9  did not agree, or proposed disputed claim language nor
10 claims for which our expert was able to address or did
11 address prior art, because those were not claims being
12 asserted.
13         So we are now confronted with, in the
14 middle of our expert schedule, new claims being asserted,
15 our expert not having addressed it in his initial report,
16 creating a ramification of, perhaps, a schedule delay
17 because we now need -- if they are allowed to do this, we
18 need to go out there and search for prior art, have our
19 expert address the prior art, have them address the
20 noninfringement position, which we haven't previously
21 addressed.  And it is a serious change, at this late
22 date, on the patent side of the case, to change the
23 asserted claims at this state without asking us to do so,
24 without the Court's permission.

Page 96

1          THE COURT:  If I am not mistaken, I
2  think the reference to me carves out claim construction
3  and Judge Robinson has claim construction -- help me out.
4          MR. JACOBS:  That's correct.
5          MR. FABRICANT:  That's correct.  But it
6  doesn't exactly deal -- I guess it begins being a
7  procedural issue because, putting aside the fact if they
8  are allowed to add the claim, obviously we have to
9  propose claim construction and we will get to the point
10 of the expert.  But it does involve procedure, because
11 does our expert now have to consider these claims?  Does
12 our expert now have to proffer prior art?  Should we
13 consider in our expert report, which is due in another
14 week on noninfringement.
15         So we are left really objecting to but
16 not knowing exactly what to do.
17         THE COURT:  Let me hear what Mr. Jacob's
18 view on how I should handle that, if in fact, I should
19 handle it.
20         MR. JACOBS:  Your Honor, if the Court is
21 inclined to handle it, we have agreed to grant additional
22 time to the extent additional time is necessary.  This
23 came about as a result of some information that was
24 provided in one of their initial expert reports.  So

Page 97

1  until we had that information, we were not prepared to
2  assert these additional claims.  They are dependent
3  claims.  So they depend upon independent claims that were
4  already asserted.  To the extent that it does require
5  additional time or an amendment of expert reports, we are
6  certainly willing to work with the defendants, as we have
7  done all along, to make sure that everybody can get done
8  what they need to get done in an appropriate time period
9  here.
10         And at the same time, they have
11 supplemented one of their expert reports and added some
12 additional claims after their initial first round of
13 expert reports came in and we agreed to allow them to do
14 that, even though it obligated us to do some additional
15 stuff with our expert as well.  My view, is this
16 something that, given the time period we have, we can
17 work out and we certainly can bring it in.  It's three
18 dependent claims, certainly something that shouldn't take
19 a lot of time, but we will work with them to the extent
20 it causes any undue problems for them.
21         THE COURT:  Here is what we are going to
22 do.  I am going to tentatively view this as a
23 discovery-type issue that would be referred to me and
24 would be governed by my standard procedure is that we

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                                    719b3435-759f-41f0-994c-79a533b967e9

Page 98

1  would schedule a telephone conference. And a couple of
2  days before I would get a three-page letter from the
3  party that is complaining, and the next day a three-page
4  letter from the other side. And so I can set a schedule
5  now for letters, but let me just, before I buy that
6  litigation for myself, did I understand from Mr. Jacobs
7  that maybe if I had left you all on your own for a few
8  more days maybe you could work this out without me having
9  to get involved? Do you think you have an issue and are
10 at an impasse that's just not going to get resolved
11 without some judicial involvement?
12        MR. FABRICANT: Your Honor, I would
13 prefer if Your Honor set the schedule. It is a relevant
14 change. Although it involves only three new claims, it's
15 a significant addition at this point.
16        I would also ask for some direction on,
17 I don't know whether Your Honor would have an opportunity
18 to resolve this, but the only immediate impact that is
19 that both sides have expert rebuttal reports due on, I
20 believe, the 28th of May, and it would be very difficult,
21 in light of this latest development, for our expert to
22 address those three additional claims in the report due
23 in a short time.
24        THE COURT: Scheduling, I'm almost

Page 99

1  certain, is in front of Judge Robinson. I think you
2  folks met with her.
3        MR. JACOBS: We will work with her.
4        THE COURT: This is what we will do.
5  That I will look for a three-page letter from Swisslog by
6  the end of day tomorrow on this issue, a three-page
7  letter from McKesson by the end of the day Thursday on
8  this matter. And we will, I will go back and look at my
9  calendar, but sometime Friday we will try to put this on
10 for a call. However, be on notice that if after
11 reviewing your letters I determine or Judge Robinson
12 determines it's not an issue for me, then we will let the
13 parties know that you are not having a call with me on
14 Friday, and there will be some other mechanism for
15 resolving the issue.
16        MR. JACOBS: And in the meantime, Your
17 Honor, we will try to reach out and negotiate and maybe
18 we can obviate the need for the letters.
19        THE COURT: If you can resolve it,
20 that's great. Don't leave the courtroom. I will send my
21 deputy back in with a tentative time for a Friday
22 telephone conference. But if I don't get letters
23 tomorrow and Thursday, there won't be a teleconference
24 and even if I get letters and it's not my issue, we will

Page 100

1  let you know.
2        MR. FABRICANT: Your Honor, if it is
3  your issue, I would just let you know that we have a
4  conflict from about noon until three o'clock on Friday.
5        THE COURT: We will go and take a look
6  at it whether we have time in the morning. Okay.
7        Anything further?
8        MR. JACOBS: No, Your Honor.
9        MR. FABRICANT: No, Your Honor.
10       (The hearing adjourned at 1:10 p.m.)

Page 101



1            C E R T I F I C A T E
2
3  STATE OF DELAWARE:
4  NEW CASTLE COUNTY:
5        I, Ellen Corbett Hannum, a Notary Public within and
6  for the County and State aforesaid, do hereby certify
7  that the foregoing oral argument was taken before me,
8  pursuant to notice, at the time and place indicated; that
9  the statements of participants was correctly recorded in
10 machine shorthand by me and thereafter transcribed under
11 my supervision with computer-aided transcription; that
12 the transcript is a true record of the statements given
13 by the participants; and that I am neither of counsel nor
14 kin to any party in said action, nor interested in the
15 outcome thereof.
16       WITNESS my hand and official seal this 27th day of
17 May A.D. 2008.
18
19       Ellen Corbett Hannum, RMR, CMRS
         Notary Public - Reporter
20       Delaware Certified Shorthand Reporter
         Certification No. 118-RPR, Expires 1/31/11
21
22
23
24

26 (Pages 98 to 101)

Electronically signed by Ellen Corbett Hannum (601-396-460-1954)                                    719b3435-759f-41f0-994c-79a533b967e9

# EXHIBIT M

BLANK █ ROME LLP

COUNSELORS AT LAW

Phone:      (302) 425-6438
Fax:        (302) 428-5134
Email:      Azar@BlankRome.com

May 22, 2008

**VIA ELECTRONIC FILING & HAND DELIVERY**

The Honorable Leonard P. Stark
United States Magistrate Judge
United States District Court
844 King Street
Wilmington, DE 19801

    Re: *McKesson Automation, Inc. v. Swisslog Italia S.p.A,. et al.,*
      *C.A. No. 06-28 (SLR/LPS)*

Dear Judge Stark:

  Plaintiff respectfully requests that the Court accept this letter in order to briefly clarify an issue raised at the hearing two days ago. During the hearing on the standing issue, Your Honor asked how one could look beyond the four corners of the Assignment document if that document, standing alone, was deemed unambiguous. Under Pennsylvania black letter law, "where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." *Huegel v. Mifflin Construction Company, Inc.*, 796 A.2d 350, 354-355 (Pa. Super. Ct. 2002). The four corners of all writings constituting the transaction must be read as a whole to determine the true intent of the parties. *Von Lange v. Morrison-Knudsen Co.*, 460 F. Supp. 643, 647-48 (M.D. Pa. 1978).

  Here, the Assignment and Promissory Notes were executed the same day and concern a single transaction. They must thus be read together. The four corners of these documents collectively demonstrate that the parties intended a security interest, because the Notes indicate that they ***will be secured*** by an assignment of the patent application. Furthermore, to the extent reading these documents together results in any ambiguity because, for example, one requires a written reassignment and the other does not, extrinsic evidence should be considered to determine the intent of the parties. *Ney v. Open Solutions, Inc.*, Civ. No. 06-CV-4354, 2007 WL



May 22, 2008
Page 2


3377239, *7 – 8 (E.D. Pa. November 8, 2007).  As discussed at the hearing, the parol evidence available further confirms that the parties here intended a security interest.

                                        Respectfully submitted,

                                        Christine S. Azar
                                        I.D. No. 4170

cc:     Dale R. Dubé, Esq.
        Alfred R. Fabricant, Esq.
        Richard LaCava, Esq.
        Larry Drucker, Esq.
        Brian DeMatteo, Esq.
        Blair Jacobs, Esq.
        Christina Ondrick, Esq.
        Christopher May, Esq.
        Kate Lahnstein-Bertocci, Esq.

# EXHIBIT N

## FULLY REDACTED