# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MCKESSON AUTOMATION, INC. a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:06CV00028-SLR/LPS |
| v. | ) ) ) | |
| TRANSLOGIC CORPORATION a Delaware corporation, and | ) ) ) | |
| SWISSLOG ITALIA S.P.A. an Italian corporation, | ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFF MCKESSON AUTOMATION, INC.'S
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR BIFURCATION

Dale R. Dubé (#2863)
BLANK ROME LLP
1201 N. Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6400
dube@blankrome.com

Blair M. Jacobs
Robert A. Gutkin
Christina A. Ondrick
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 383-0100

Dated: August 15, 2008                    *Counsel for Plaintiff McKesson Automation, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

NATURE AND STAGE OF PROCEEDING .................................................1

SUMMARY OF ARGUMENT ........................................................................3

STATEMENT OF FACTS ..............................................................................3

ARGUMENT ....................................................................................................5

   I.    PATENT AND ANTITRUST ISSUES SHOULD BE TRIED
       SEPARATELY PURSUANT TO RULE 42(b) ...................................5

      A.   IT IS STANDARD PRACTICE IN PATENT CASES TO
          SEPARATE THE TRIALS FOR PATENT AND ANTITRUST ISSUES ...5

      B.   SEPARATING ANTITRUST ISSUES FROM PATENT ISSUES
          AND TRYING THE PATENT ISSUES FIRST WILL FURTHER
          THE GOALS SET FORTH IN RULE 42(b) AND WILL BENEFIT
          THE COURT, THE PARTIES, AND JURORS............................................8

          1.   Bifurcation will Simplify or Eliminate Issues For a
              Second Antitrust Trial............................................................8

          2.   Separating Trials on Patent and Antitrust Issues Will
              Promote Judicial Economy and Enhance the Convenience
              of the Parties .....................................................................12

          3.   Bifurcation Will Enhance Juror Comprehension of the
              Issues Presented at Trial........................................................14

          4.   Avoidance of Potential Prejudice..........................................15

      C.   CONDUCTING SEPARATE TRIALS ON PATENT AND
          ANTITRUST ISSUES WOULD NOT PREJUDICE DEFENDANTS.......16

   II.   THE TRIAL ON ANTITRUST ISSUES SHOULD BE STAYED
       PENDING FINAL RESOLUTION OF THE PATENT ISSUES,
       INCLUDING ALL APPEALS .......................................................16

CONCLUSION...............................................................................................17

# TABLE OF AUTHORITIES

## Cases

*Akzona Inc. v. E.I. Du Pont De Nemours & Co.,*
607 F. Supp. 227 (D. Del. 1984) ................................................................. 7, 8, 9, 16

*Allergan Inc. v. Pharmacia Corp.,*
2002 WL 1268047 (D. Del. May 17, 2002) ............................................................. 7

*Applied Biosystems, Inc. v. Cruachem, Inc.,*
1990 WL 495458 (D. Del. Aug. 3, 1990) ............................................................... 7

*Arthrocare Corp. v. Smith & Nephew, Inc.,*
2004 WL 896002 (D. Del. Mar. 10, 2004) ............................................................. 7

*ASM Am., Inc. v. Genus, Inc.,*
2002 WL 24444 (N.D. Cal. Jan. 9, 2002) ............................................................. 15

*Axis, S.P.A. v. Micafil, Inc.,*
870 F.2d 1105 (6th Cir. 1989) ........................................................................ 10, 11

*Barr Labs., Inc. v. Abbott Labs.,*
978 F.2d 98 (3d Cir. 1992) .................................................................................... 5

*Baxter Int'l, Inc. v. Cobe Lab., Inc.,*
1992 WL 77665 (N.D. Ill. Apr. 7, 1992) ............................................... 6, 12, 13, 15

*Brandt, Inc. v. Crane,*
97 F.R.D. 707 (N.D. Ill. 1983) ..................................................................... *passim*

*Briggs & Stratton Corp. v. Kohler Co.,*
2005 WL1711154 (W.D. Wisc. July 20, 2005) ....................................................... 6

*Callaway Golf Co. v. Acushnet Co.,*
2007 WL 4261696 (D. Del. Nov. 30, 2007) ........................................................... 7

*Ciena Corp. v. Corvis Corp.*,

    210 F.R.D. 519 (D. Del. 2002) ............................................................................... 14

*Components, Inc. v. Western Elec. Co.*,

    318 F. Supp. 959 (D. Me. 1970) ............................................................ 6, 12, 15, 16

*Container Co. v. Carpenter Container Co.*,

    9 F.R.D. 89, 92 (D. Del. 1949) ....................................................................... *passim*

*Dentsply Int'l, Inc. v. New Tech. Co.*,

    1996 WL 756766 (D. Del. Dec. 19, 1996) ..................................................... *passim*

*Donnelly Corp. v. Reitter & Schefenacher USA Ltd. P'ship*,

    2002 WL 31418042 (W.D. Mich. Aug. 13, 2002) ............................................... 15

*Ecrix Corp. v. Exabyte Corp.*,

    191 F.R.D. 611 (D. Co. 2000) ...................................................................... 6, 12

*Fischer & Porter Co. v. Sheffield Corp.*,

    31 F.R.D. 534 (D. Del. 1962) ....................................................................... *passim*

*In re Independent Service Orgs. Antitrust Litigation*,

    203 F.3d 1322 (Fed. Cir. 2000) ......................................................................... 10

*In re Innotron Diagnostics*,

    800 F.2d 1077 (Fed. Cir. 1986) .................................................................... *passim*

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,

    508 U.S. 49 (1993) ............................................................................................. 10

**Statutes**

Sherman Act §2 ........................................................................................................ 10, 11

**Other Authorities**

Claudia Wilken & Robert M. Bloom, Manual for Complex Litigation, Section 33.62 (1995) ...... 6

Howard T. Markey, *On Simplifying Patent Trials*, 116 F.R.D. 369 (1987) .................................... 6

Steven Gensler, *Bifurcation Unbound*, 75 Wash. L. Rev. 705 (2000) ........................................... 6

Thomas Creel & Robert Taylor, *Bifurcation, Trifurcation, Opinions of Counsel*, 424 PLI/Pat 823, 826 (1995)...................................................................................................................... 6

**Rules**

Fed. R. Civ. P. 42(b) ............................................................................................. *passim*

## INTRODUCTION

On October 11, 2007, over 20 months after the initial complaint was filed in this action, Defendants sought to amend their pleadings to include an entirely new set of antitrust counterclaims, some of which are wholly unrelated to the parties' original claims and counterclaims. [D.I. 172] On June 5, 2008, Magistrate Judge Stark granted Defendants' motion and allowed Defendants to introduce Antitrust Counterclaims Four through Nine. [D.I. 315 and 322 & 323, ¶¶ 71-129]. McKesson now seeks to have those counterclaims bifurcated from the remainder of the patent issues presented in this case and stayed pending final resolution of the patent issues.

Bifurcating antitrust issues from patent issues and trying the patent issues first pursuant to Rule 42(b) of the Federal Rules of Civil Procedure is "standard practice" in federal district courts, including in the Federal Circuit and the District Court here in Delaware. Separating Defendants' Antitrust Counterclaims from the patent issues presented in this case and trying the patent issues first will benefit the Court, the parties and jurors because it will (1) simplify and/or eliminate issues for a second antitrust trial, (2) promote judicial economy and enhance the convenience of the parties, (3) enhance juror comprehension of the issues present in the case, and (4) avoid potential prejudice. Moreover, Defendants will not be prejudiced by the requested bifurcation and stay of their Antitrust Counterclaims.

Accordingly, McKesson respectfully requests that the Court grant its Motion for Bifurcation with respect to Defendants' Fourth through Ninth Counterclaims and stay those counterclaims pending final resolution of the patent issues.

## NATURE AND STAGE OF PROCEEDING

On January 13, 2006, McKesson Automation, Inc. filed a Complaint, alleging infringement of U.S. Patent Nos. 5,468,110 ("the '110 patent") and 5,593,267 ("the '267

patent"). The matter, which was originally assigned to the Honorable Kent Jordan, was reassigned to the Honorable Sue Robinson on February 1, 2008. Magistrate Judge Leonard Stark was also assigned to the matter.

On October 11, 2007, Defendants filed a Revised Motion to Amend the Pleadings to include antitrust counterclaims. [D.I. 172]. A hearing on the Motion to Amend the Pleadings and a pending Motion to Dismiss was held before Magistrate Judge Stark on May 20, 2008. On June 5, 2008 Judge Stark granted Defendants' Motion for Leave to Amend the Pleadings and extended the case schedule. [D.I. 315].

The parties served opening expert reports on March 31, 2008 and the last amended or rebuttal expert reports were served on July 14, 2008. According to Judge Stark's July 31, 2008 Order, read in conjunction with the Seventh Amended Scheduling Order [D.I. 289] and August 14, 2008 Scheduling Letter to Judge Stark [D.I. 346], the following dates are applicable:

- Antitrust fact and expert discovery closes on September 12, 2008;

- Opening summary judgment motions are to be filed on September 24, 2008;

- Opposition briefs on October 10, 2008 and reply briefs on October 20, 2008;

- Opening claim construction briefs due on August 15, 2008 and response briefs due August 31, 2008;

- The hearing for claim construction and summary judgment is scheduled for October 31, 2008 at 9:00 A.M.; and

- Trial is currently scheduled to begin on March 16, 2009.

McKesson now files this Motion under Rule 42(b) to separate trials on patent and antitrust issues and to stay the trial on the antitrust issues pending final resolution of the patent issues.

## SUMMARY OF ARGUMENT

1.      Defendants' Antitrust Counterclaims (Counterclaims Nos. 4 - 9) should be bifurcated under Rule 42(b),  for purposes of trial, from the patent issues and stayed pending final resolution of the patent issues, which could include appeal(s).

2.      Bifurcating and staying the Antitrust Counterclaims from patent issues and trying the patent issues first is "standard practice" in federal district courts.

3.      Separating the Antitrust Counterclaims from the patent issues and trying the patent issues first will benefit the Court, the parties and jurors.

4.      Bifurcation of the patent and antitrust issues is appropriate because it will (1) simplify and/or eliminate issues for a second antitrust trial, (2) promote judicial economy and enhance the convenience of the parties, (3) enhance juror comprehension of the issues present in the case, and (4) avoid potential prejudice.

5.      Defendants will not be prejudiced by the requested bifurcation and stay of their Antitrust Counterclaims as bifurcation and stay would result in convenience to the parties, efficiency and economy, avoidance of prejudice and avoidance of jury confusion.

6.      The bifurcated Antitrust Counterclaims should be stayed pending final resolution of the patent issues, including all appeals, to promote convenience, avoid prejudice and prevent confusion.

## STATEMENT OF FACTS

On January 13, 2006, McKesson filed a Complaint alleging infringement of the '110 patent and the '267 patent.  [D.I. 1].  Translogic Corporation filed an Answer on March 15, 2006 alleging the following four counterclaims:  First Counterclaim - Declaratory Judgment of Invalidity; Second Counterclaim - Declaratory Judgment of Non-Infringement; Third Counterclaim - Unfair Competition; and Fourth Counterclaim - Violation of the Antitrust Laws.

124402.00601/40176125v.1

[D.I. 24]. The Third and Fourth Counterclaims in Translogic's were based on allegations that McKesson was asserting infringement of patents it should have known to be invalid and not infringed. [*Id.* at ¶¶ 42-61].

On July 3, 2006 McKesson amended its initial Complaint to make corrections to the actual parties to the suit. [D.I. 47]. Translogic filed its Answer to the Amended Complaint on July 5, 2006 alleging the same counterclaims as those identified in its original Answer. [D.I. 48]. Swisslog Italia, S.p.A. ("Swisslog") also filed an answer and counterclaims on July 5, 2006 alleging only First Counterclaim (Declaratory Judgment of Invalidity); and Second Counterclaim (Declaratory Judgment of Non-Infringement). [D.I. 49, ¶¶ 34-39].

On October 11, 2007, Translogic and Swisslog (collectively "Defendants") filed a revised motion for leave to amend its Answer and Counterclaims. [D.I. 172]. In its motion, Defendants sought to amend their Answers and Counterclaims to include allegations of antitrust violations under Unfair Competition provisions of Delaware law, Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and 6 Del. C. § 2103. [D.I. 172]. McKesson opposed the motion arguing undue delay, bad faith, undue prejudice to McKesson and futility. [D.I. 187].

On June 5, 2008, Judge Stark granted Defendants' revised motion for leave to amend their Answers and Counterclaims. [D.I. 315]. Defendants each filed an Amended Answer and Counterclaims on June 13, 2008 alleging the following antitrust counterclaims: Fourth Counterclaim - Unfair Competition Under Delaware Law; Fifth Counterclaim - Sherman Act § 2, 15 U.S.C. § 2 (Sham Litigation); Sixth Counterclaim - Sherman Act § 2, 15 U.S.C. § 2 (Illegal Monopoly in Hospital Pharmacy Automation Market); Seventh Counterclaim - Sherman Act § 1, 15 U.S.C. § 1 (Illegal Anti-Competitive Contract in Hospital Pharmacy Automation Market); Eighth Counterclaim - Clayton Act § 3, 15 U.S. C. § 14 (Illegal Anti-Competitive Contract in

4

Hospital Pharmacy Automation Market); and Ninth Counterclaim - 6 Del. C. § 2103 (Illegal

Anti-Competitive Contract in Hospital Pharmacy Automation Market) (hereafter collectively

"Antitrust Counterclaims"). [D.I. 322 & 323, ¶¶ 71 - 129].[1]

McKesson now seeks to bifurcate the Defendants' Antitrust Counterclaims and have

them stayed pending final resolution of the patent issues.

## ARGUMENT

### I.    PATENT AND ANTITRUST ISSUES SHOULD BE TRIED SEPARATELY PURSUANT TO RULE 42(B)

#### A.    IT IS STANDARD PRACTICE IN PATENT CASES TO SEPARATE THE TRIALS FOR PATENT AND ANTITRUST ISSUES

Under Federal Rule of Civil Procedure 42(b), a court may order separate trial of claims,

counterclaims or issues "[f]or convenience, to avoid prejudice, or to expedite and economize."[2]

The decision to conduct separate trials is committed to the sound discretion of the trial court. *See*

*Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 115 (3d Cir. 1992).

The Court of Appeals for the Federal Circuit has recognized that separating trials on

patent and antitrust issues and trying the patent issues first is "now-standard practice." *See In re*

*Innotron Diagnostics*, 800 F.2d 1077, 1084-85 (Fed. Cir. 1986) (affirming district court's order

to separate, and try first, patent infringement claim from antitrust claims). In fact, examples of

---

[1] Both Defendants filed Amended Answers and Counterclaims on June 13, 2008. Both Amended Answers are identical for purposes of this motion. That is, both answers include identical Fourth through Ninth Counterclaims, at ¶¶ 71 – 129, reciting identical allegations therein. For purposes of this motion, McKesson will make reference to Swisslog's Amended Answer, but this should be understood to apply to both Defendants' Amended Answers and the Antitrust Counterclaims contained therein.

[2] Separating trials under Rule 42(b) is often referred to as "bifurcating." McKesson uses the terms bifurcating and separating trials interchangeably herein.

federal district courts adopting this practice are legion.[3] *See, e.g., Briggs & Stratton Corp. v. Kohler Co.*, 2005 WL1711154, at *3-4 (W.D. Wis. July 20, 2005) ("separating trials of patent and antitrust claims is typical"); *Ecrix Corp. v. Exabyte Corp.*, 191 F.R.D. 611, 614 (D. Co. 2000) ("The majority of courts, when faced with a case involving claims of patent infringement by the patent holder and counterclaims of antitrust and unfair competition by the alleged infringer, bifurcate the case to hear the issues separately."); *Baxter Int'l, Inc. v. Cobe Lab., Inc.*, 1992 WL 77665, at *5 (N.D. Ill. Apr. 7, 1992) (separating and staying trial of antitrust counterclaim in light of lack of common issues, and due to prejudice, probable jury confusion and possibility that issues relating to antitrust counterclaim could be rendered moot by patent issues); *Brandt, Inc. v. Crane*, 97 F.R.D. 707, 708 (N.D. Ill. 1983) ("As a general rule, separate trials of patent and antitrust claims further the interests of convenience, expediency and economy."); *Components, Inc. v. Western Elec. Co.*, 318 F. Supp. 959, 966 (D. Me. 1970) ("courts have frequently found it to be in the interest of economy and convenience, both to the court and to the parties, and in furtherance of the most expeditious disposition of complex litigation of this kind, to sever the antitrust and misuse issues from the issues of validity and infringement.") (citations omitted).

The Delaware District Court likewise has a long history of bifurcating patent and antitrust issues to better serve judicial economy, further the convenience of the parties, avoid jury

---

[3] The common practice of bifurcation in this context has been well documented by legal scholars. *See, e.g.,* Steven S. Gensler, *Bifurcation Unbound*, 75 Wash. L. Rev. 705, 725 (2000); Thomas L. Creel & Robert P. Taylor, *Bifurcation, Trifurcation, Opinions of Counsel*, 424 PLI/Pat 823, 826 (1995); Claudia Wilken & Robert M. Bloom, Manual for Complex Litigation, § 33.62 (1995); Howard T. Markey, On Simplifying Patent Trials, 116 F.R.D. 369, 377 (1987).

confusion and eliminate potential prejudice.[4] *See, e.g., Dentsply Int'l, Inc. v. New Tech. Co.*,

1996 WL 756766, at *1-5 (D. Del. Dec. 19, 1996) (separating patent and antitrust trials because

it served judicial economy, avoided jury confusion, expedited trial, and eliminated prejudice);

*Applied Biosystems, Inc. v. Cruachem, Inc.*, 1990 WL 495458, at *2-3 (D. Del. Aug. 3, 1990)

(granting bifurcation of patent and antitrust trials where trials would be extended and would

involve complex issues); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 232-

36 (D. Del. 1984) (separating antitrust issues from patent issues and limiting discovery to the

first trial on patent issues); *Fischer & Porter Co. v. Sheffield Corp.*, 31 F.R.D. 534, 539-40 (D.

Del. 1962) (granting bifurcation of trials and scheduling patent trial first).

     Indeed, the Attorney General's Office, recognizing the need to separate trials on complex

issues to "to serve the ends of justice," has reported:

> in any patent infringement suit in which antitrust violation is the basis of defense,
> or counterclaims, the court, pursuant to Rule 42(b) ... , should order separate
> trials of the antitrust issues and the patent issues.  Such separation may be
> essential not only 'in furtherance of convenience and to avoid prejudice,' but also
> 'to serve the ends of justice.'

The Report of Attorney General's National Committee to Study the Antitrust Laws at p.

249 (emphasis added).

---

[4] This Court has also used Rule 42(b) to order separate trials of other issues in the context of
patents as well. *See, e.g., Callaway Golf Co. v. Acushnet Co.*, 2007 WL 4261696, *1 (D. Del.
Nov. 30, 2007) (separating willfulness and damages from patent liability); *Arthrocare Corp. v.
Smith & Nephew, Inc.*, 2004 WL 896002, *1 (D. Del. Mar. 10, 2004) (referencing Court's prior
bifurcation of willfulness and damages from patent infringement and validity issues); *Allergan
Inc. v. Pharmacia Corp.*, 2002 WL 1268047, *2 (D. Del. May 17, 2002) (bifurcating willfulness
from infringement and validity).

In this case, the now-standard practice of bifurcating antitrust issues from patent issues and trying the patent issues first is appropriate for the reasons set forth in Rule 42(b) and adhered to by the Federal Circuit, the Delaware District Court, and countless other federal district courts.

**B.    SEPARATING ANTITRUST ISSUES FROM PATENT ISSUES AND TRYING THE PATENT ISSUES FIRST WILL FURTHER THE GOALS SET FORTH IN RULE 42(B) AND WILL BENEFIT THE COURT, THE PARTIES, AND JURORS**

Courts, when exercising their broad discretion to bifurcate issues for trial under Rule 42(b) , should consider whether bifurcation will avoid prejudice, promote convenience, efficiency and economy, and enhance juror comprehension of the issues presented in the case. *See Dentsply*, 1996 WL 756766, at *1-6; *Akzona*, 607 F. Supp. at 232-33. In this case, bifurcation of the patent and antitrust issues is appropriate because it will (1) simplify and/or eliminate issues for a second antitrust trial, (2) promote judicial economy and enhance the convenience of the parties, (3) enhance juror comprehension of the issues present in the case, and (4) avoid potential prejudice. Each of these factors is discussed in turn.

**1.    Bifurcation will Simplify or Eliminate Issues For a Second Antitrust Trial**

Bifurcation under Rule 42(b) is appropriate where, as is the case here, separating the two issues and trying the patent issues first might simplify or eliminate some or all of the antitrust issues. *See Innotron*, 800 F.2d at 1085 (reasoning that a decision on patent issues could resolve or simplify later tried antitrust issues); *Dentsply*, 1996 WL 756766, at *2-4 ("Separate trials may be warranted so long as some of the issues in a second trial would be simplified"); *Akzona*, 607 F. Supp. at 234 ("if [the patentee] prevails on the issue of patent validity, [plaintiff's] antitrust claim based on fraud on the United States Patent Office would have to be dismissed."). It is appropriate to separate and stay <u>all</u> the antitrust claims even if some of them will not be

8

simplified or eliminated by the resolution of the patent issues. *See Dentsply*, 1996 WL at *3-4; *Akzona*, 607 F. Supp. at 232.

In *Innotron*, certain "patent type antitrust" claims at-issue required a determination of threshold patent issues, while other "pure Sherman Act" antitrust claims did not. *Innotron*, 800 F.2d at 1085. The Federal Circuit concluded that economy would be served by separating <u>all</u> antitrust issues from patent issues and trying the patent issues first because infringement and validity determinations first could decide issues in some of the antitrust claims. *Id.* The court reasoned that either the patents are valid and infringed, in which case the patent type antitrust claims could be dismissed, or the patents are invalid, unenforceable and/or not infringed, in which case elements of the antitrust claims would have already been proven. *Id.*

The same rationale has been adopted by this Court on several occasions. *See Dentsply*, 1996 WL 756766, at *2; *Akzona*, 607 F. Supp. at 235. In *Dentsply*, the Court recognized that staying all antitrust counterclaims – regardless of whether they would all be simplified by an initial patent trial – was commensurate with the purpose and goal of bifurcation under Rule 42(b). *Dentsply*, 1996 WL 756766, at *4 (bifurcating two non-patent type antitrust claims along with one antitrust claim that included threshold patent questions)

In this case, at least Defendants' Fourth and Fifth antitrust counterclaims would be mooted if McKesson successfully proves validity, enforceability and infringement of the '110 and '267 patents. Defendants' Fourth Counterclaim, which claims unfair competition under Delaware law, alleges that "McKesson has unlawfully and oppressively brought this action against Swisslog Italia, alleging infringement of ... Patents by Swisslog Italia with the knowledge and belief that these <u>Patents are invalid, unenforceable and/or not infringed</u> ...." [D.I. 323, ¶72] (emphasis added). Further, Defendants' Fifth Counterclaim alleges sham

9

litigation under Sherman Act §2 which likewise requires a showing of patent invalidity and non-infringement by Defendants. *Id.* at ¶¶82-85.

If McKesson proves at an initial trial that the '110 and '267 patents are valid, enforceable and infringed by Defendants, Defendants' allegations of unfair competition and sham litigation in its Fourth and Fifth Counterclaims, respectively, will be mooted. *See Dentsply*, 1996 WL 756766, at *2 (citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)).

In fact, a finding of validity, enforceability, and infringement of McKesson's patents may moot <u>all</u> of Defendants' Antitrust Counterclaims, including Defendants' Sixth through Ninth Counterclaims which are pure antitrust claims that are not rooted in the patent context. *See Dentsply*, 1996 WL 756766, at *3 ("There is a possibility that all aspects of the antitrust counterclaim – including the two non-'sham' allegations – could be resolved by a first trial on patent infringement."). The Federal Circuit has stated that, in the absence of any illegal tying, fraud on the Patent Office or sham litigation, a patent holder may enforce its statutory patent rights free from liability under the antitrust laws. *See In re Independent Service Orgs. Antitrust Litigation*, 203 F.3d 1322, 1327(Fed. Cir. 2000); *see also Axis, S.P.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989), *cert. denied*, 493 U.S. 823 (1989). Accordingly, if validity and infringement are sustained by a jury, allegations about other anticompetitive conduct become irrelevant, particularly when, as here, the only two competitors in an industry are the two parties to the litigation. *See Dentsply*, 1996 WL 756766, *3 (citing *Axis*, 870 F.2d at 1107).

In *Axis*, an Italian plaintiff sued a Swiss competitor alleging that the Swiss competitor's recent purchase of two U.S. companies improperly consolidated the American marketplace which prevented plaintiff's entry into the market. *Axis*, 870 F.2d at 1106-07. The district court

10

dismissed the action finding that the Italian plaintiff failed to show a causal connection between the alleged anticompetitive behavior and plaintiff's inability to enter the U.S. market, where valid U.S. patents were the actual reason preventing entry into the market. *Id.* at 1107.

The Sixth Circuit affirmed the District Court and held that the alleged anticompetitive behavior was not the cause of plaintiff's alleged antitrust injury: instead, it was valid U.S. patents that prevented it from competing in the market. *Id.* at 1111. The Sixth Circuit concluded that the Italian plaintiff would have been equally unable to enter the relevant market in the absence of the alleged anticompetitive conduct because of the valid U.S. patents, and thus, plaintiff failed to prove that the anticompetitive behavior was causally connected to any antitrust injury, as required by law. *Id.*

In this case, Defendants' Sixth through Ninth Counterclaims each require a showing of antitrust injury and causation. By way of example, Defendants' Sixth Counterclaim, alleging Illegal Monopoly in Hospital Pharmacy Automation Market under Sherman Act § 2, alleges:

> 96.    The foregoing acts and practices have directly and proximately caused injury to the relevant market as a whole by harming consumers and reducing competition in the relevant market. Among other things, McKesson's acts constitute a significant barrier to entry for all entrants into this market, including Defendants. These acts have reduced – if not eliminated – competing products ...

> 97.    The foregoing acts and practices have also directly and proximately caused Swisslog Italia harm in the marketplace. Swisslog Italia's injury is of the type the antitrust laws are intended to prevent and thus constitute antitrust injury.

[D.I. 322].

Similar allegations are repeated in Defendants' Seventh, Eighth and Ninth Counterclaims. [D.I. 322]. All of the allegations require a showing that McKesson's acts and practices have caused antitrust harm to the market and to Defendants.

Defendants cannot support these allegations if the '110 and '267 patents are found to be valid, enforceable and infringed. If such a finding occurs, the existence of McKesson's patents,

governmentally conferred rights to exclude others from making, using and selling products within the scope of the patent claims, will be the reason that Defendants are precluded from the market, not because of the allegedly anticompetitive conduct about which Defendants complain. The relevant market here has only has two players – McKesson and Defendants – and therefore there can be no other harm to the marketplace as a result of McKesson's conduct.

Bifurcation is therefore appropriate because resolution of the patent claims could potentially obviate the need for trial on some, if not all, of Defendants' antitrust counterclaims.

### 2. Separating Trials on Patent and Antitrust Issues Will Promote Judicial Economy and Enhance the Convenience of the Parties

Bifurcating trials on the antitrust and patent issues and trying the patent issues first promotes judicial economy and enhances the convenience of the parties and the Court – two of the express goals of separate trials under Rule 42(b). *See Innotron*, 800 F.2d at 1085; *Brandt*, 97 F.R.D. at 708; *Fischer & Porter Co.*, 31 F.R.D. at 535. Having one comprehensive trial on complex patent <u>and</u> antitrust issues would require the parties to introduce multiple legal concepts and would significantly increase the number of facts, evidence and witnesses. *See Dentsply*, 1996 WL 765766 at *5.

Moreover, where many of the antitrust issues are completely distinct from the patent issues, bifurcation is particularly appropriate. *See Components*, 318 F. Supp. at 966; *Ecrix Corp. v. Exabyte Corp.*, 191 F.R.D. 611, 614 (D. Col. 2000); *Baxter Int'l v. Cobe Lab*, 1992 WL 77665, at *2 (N.D. Ill. Apr. 7, 1992) (finding that bifurcation made sense where the majority of the antitrust issues were not directly related to the patent issues); *Container Co. v. Carpenter Container Co.*, 9 F.R.D. 89, 92 (D. Del. 1949) ("Rule 42(b) justifies separation to further convenience or avoid prejudice. Since it appears from the record that the issues, proof and witnesses will be substantially different for each claim, the convenience of both the parties and

12

the court will be served by separation."). Even where some overlap of issues exists, bifurcation is appropriate for all of the antitrust counterclaims where issues resolved in the initial patent trial can become law of the case and can be used in a subsequent antitrust trial. *See Innotron*, 800 F.2d at 1085; *Fischer & Porter*, 31 F.R.D. at 539; *Container*, 9 F.R.D. at 91-92.

Here, aside from Defendants' Fourth and Fifth Counterclaims, Defendants' Antitrust Counterclaims are wholly unrelated to the patent issues presented in this case. Adjudication of the patent claims at issue will require a comprehensive discussion of the underlying technology, and will require the jury to decide issues of infringement, validity, enforceability and damages. In making those decisions jurors must consider concepts such as claim construction, prior art, persons skilled in the art, anticipation, obviousness and inequitable conduct, to name a few.

Defendants' Sixth through Ninth Counterclaims allege antitrust violations wholly unrelated to McKesson's patent claims. Counterclaims Six through Nine involve issues such as illegal monopolization and the existence of anti-competitive contracts. [D.I. 322 & 323, ¶¶ 71-129]. To fully adjudicate those claims, a jury must consider factual allegations relating to predatory pricing, sole source agreements, false statements and refusal to interface, among others. In addition, determining Defendants' antitrust counterclaims will require an analysis of the relevant product market, geographic market, existence of market power, antitrust injury and a causal connection between the allegedly anticompetitive conduct and the injury. *See Brandt*, 97 F.R.D. at 708; *Baxter*, 1992 WL 77665, at *2. This will require a completely different group of fact and expert witnesses.

Moreover, if the patent and antitrust issues are tried together, the parties will surely need more than the currently scheduled two weeks for trial. The two week trial duration was originally scheduled in the May 16, 2006 Scheduling Order, long before Defendants sought to

13

introduce their new antitrust allegations reflected in the Sixth through Ninth Counterclaims on October 11, 2007 and which were first officially pled on June 13, 2008. If the parties are required to try the patent and antitrust issues together in a single trial, McKesson submits that the parties would need an additional week, if not two weeks, to accommodate the additional facts, evidence and witnesses.

Separation of the patent and antitrust issues is therefore appropriate here because it will promote judicial economy and it will make trial more convenient for the parties and the Court.

### 3.    Bifurcation Will Enhance Juror Comprehension of the Issues Presented at Trial

Bifurcating trials on the antitrust and patent issues will also avoid the potential for jury confusion when trying to understand two separate complex bodies of law. *See Innotron*, 800 F.2d at 1085 (recognizing that separate trials effectively reduces the risk for jury confusion); *Brandt*, 97 F.R.D. at 708 ("Separation of trials will result in little, if any, duplication of proof while significantly reducing the likelihood of prejudice and confusion."); *Fischer & Porter*, 31 F.R.D. at 539-40; *Container*, 9 F.R.D. at 92. Bifurcation makes complex patent and antitrust cases easier for juries to understand by limiting the number of issues the jurors must consider during each phase of the litigation. *See Ciena Corp. v. Corvis Corp.*, 210 F.R.D. 519, 521 (D. Del. 2002). A combined trial would be burdensome on the parties and the Court and could result in a disjointed and inefficient trial where jurors are "left numb and bewildered." *See Dentsply*, 1996 WL 756766, at *5.

In this case, a trial on both patent and antitrust issues would require a jury to consider two complex and broad-ranging bodies of law – patent and antitrust – and weigh voluminous facts, evidence and testimony. Resolving McKesson's patent claims and Defendants' patent defenses will require, in addition to an understanding of patent law, detailed analyses of highly technical

14

issues to understand the patented inventions (pharmacy automation storage robots), determine the scope of the patent claims and consider the state of the prior art at the time of the invention, among other issues.

If the issues were tried together, jurors would also be required to learn broad-ranging economic principles that underlie antitrust law and would be required to follow complex expert analysis on antitrust liability and damages. It would be difficult for any jury to manage both aspects of the allegations at-issue here. This is yet another reason why the patent and antitrust issues should be bifurcated. *See Donnelly Corp. v. Reitter & Schefenacher USA Ltd. P'ship*, No. 1:00-cv-751, 2002 WL 31418042, at *6 (W.D. Mich. Aug. 13, 2002); *Baxter*, 1992 WL 77665, at *2, 5 (bifurcating due to burden on jury).

### 4.    Avoidance of Potential Prejudice

As with any aggrieved patent owner, McKesson desires, and believes it is entitled, to have its patent allegations adjudicated swiftly and correctly. Separating the patent issues from the antitrust issues and trying the patent issues first is the only way to ensure that those goals are satisfied and that the ends of justice are served. *See Innotron*, 800 F.2d at 1085; *Brandt*, 97 F.R.D. at 708; *ASM Am., Inc. v. Genus, Inc.*, 2002 WL 24444, at *5 (N.D. Cal. Jan. 9, 2002) (noting interest in preventing delay of trial of patent claims); *Components*, 318 F. Supp. at 966-67 (severing and staying antitrust counterclaims from patent claims to avoid delay); *Fischer & Porter*, 31 F.R.D. at 539-40; *Container*, 9 F.R.D. at 92.

In addition, Defendants' antitrust allegations are littered with unsupportable allegations relating to McKesson's business activities that have no bearing on the merits of the validity and enforceability of McKesson's patents. There is little doubt, however, that a jury could easily be confused by Defendants' allegations of anticompetitive conduct. McKesson's patents should be evaluated by jurors independent from antitrust claims so that determinations of infringement,

15

validity and enforceability are made free from any confusion or cloud of uncertainty that might be cast upon them through Defendants' allegations of anticompetitive conduct.

### C. CONDUCTING SEPARATE TRIALS ON PATENT AND ANTITRUST ISSUES WOULD NOT PREJUDICE DEFENDANTS

Finally, Defendants will not be prejudiced by bifurcation of the patent and antitrust claims. Bifurcation will not require Defendants to conduct duplicative discovery and any evidence obtained through discovery on the patent issues will, if necessary, be available for the later trial on antitrust issues. *See Innotron*, 800 F.2d at 1085-86; *Components*, 318 F. Supp. at 967; *Fischer & Porter*, 31 F.R.D. at 539; *Container*, 9 F.R.D. at 92.

In addition, as discussed above, Defendants may benefit from bifurcation because the resolution of the patent issues may obviate the need for trial on the Antitrust Counterclaims, in which case Defendants will have been spared the needless expense of preparing for trial and trying issues on which they cannot prevail. To the extent any of Defendants' Antitrust Counterclaims survive the wake of the patent trial, Defendants will have a full and fair opportunity to try those claims. Accordingly, bifurcating here will benefit, and not prejudice, Defendants.

Moreover, Defendants only recently raised the new antitrust allegations in October, 2007. Separating the antitrust issues from the patent issues and trying the patent issues first will not prejudice Defendants.

### II. THE TRIAL ON ANTITRUST ISSUES SHOULD BE STAYED PENDING FINAL RESOLUTION OF THE PATENT ISSUES, INCLUDING ALL APPEALS

It is implicit in Rule 42(b) that a trial court judge who grants bifurcation of patent and antitrust issues has the power to stay the antitrust trial pending the final resolution of the disputed patent issues. *See Akzona*, 607 F. Supp. at 232-36 (staying all discovery not relevant to the patent trial). Staying the antitrust trial until all of the patent issues have been finally resolved is

16

common practice. *See Innotron*, 800 F.2d at 1085 ("Avoidance of prejudice and confusion is served in trying first the patent issues, without injecting the different counterclaim issues which require different proof and different witnesses). Moreover, it will benefit the parties and the Court, and as discussed above, Defendants will not be prejudiced by staying all proceedings relevant to the Antitrust Counterclaims until final resolution of all the patent issues presented in the case.

## CONCLUSION

For the foregoing reasons, McKesson respectfully requests that the Court grant McKesson's Motion for Separate Trials on Patent and Antitrust Issues, separate Defendants' Fourth – Ninth Counterclaims and stay the trial on the Antitrust Counterclaims pending final resolution of the patent issues.

Dated: August 15, 2008

BLANK ROME LLP

_Dale R. Dubé_
Dale R. Dubé (#2863)
1201 N. Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6400
dube@blankrome.com

Blair M. Jacobs
Robert A. Gutkin
Christina A. Ondrick
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 383-0100

*Counsel for Plaintiff McKesson Automation, Inc.*

17

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2008, I served **PLAINTIFF MCKESSON AUTOMATION, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR BIFURCATION** to the following, in the manner indicated:

### FIRST-CLASS MAIL AND EMAIL

Alfred R. Fabricant
Lawrence C. Drucker
Richard LaCava
Bryan DeMatteo
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 277-6500
Fax.: (212) 277-6501

### HAND DELIVERY AND EMAIL

Julie Heaney (#3052)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

_Dale R. Dubé_

Dale R. Dubé
(I.D. No. 2863)

# EXHIBIT – UNREPORTED CASE 1

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 24444 (N.D.Cal.), 2002-1 Trade Cases P 73,573

CASM America, Inc. v. Genus, Inc.
N.D.Cal.,2002.

United States District Court, N.D. California.
ASM AMERICA, INC., Plaintiff,
v.
GENUS, INC., Defendant.
GENUS, INC., Counterclaimant,
v.
ASM AMERICA, INC., and ASM International,
N.V., Counterdefendants.
**No. 01-2190 EDL.**

Jan. 9, 2002.

ORDER REGARDING MOTIONS TO STRIKE,
STAY, DISMISS AND AMEND

LAPORTE, Magistrate J.
*1 Before the Court is Plaintiff-Counterdefendant ASM America's ("ASM") Motion to Strike Inequitable Conduct Defenses, to Sever and Stay Antitrust Claim and Related Discovery, and to Dismiss Pursuant to Rule 12(b)(6) [15], Defendant-Counterclaimant Genus' ("Genus") Cross-Motion for Leave to Amend Its Answer and Counterclaims [20], and ASM's Motion for Leave to File Amended Complaint and to Supplement the Case Management Order [18]. The first two motions were heard on December 11, 2001; the latter motion was heard on December 18, 2001. As explained in more detail below, the Court grants in part and denies in part ASM's Motion to Strike, Sever and Stay, and to Dismiss; grants Genus' Cross-Motion for Leave to Amend; and grants ASM's Motion for Leave to File Amended Complaint and Supplement the Case Management Order.

I. Introduction

The parties in this case sell manufacturing equipment that is used to make semiconductor chips via atomic layer deposition or chemical vapor deposition. ASM America is the Arizona-based subsidiary of ASM International N.V., a Dutch company (collectively, "ASM"). Genus, Inc. ("Genus") is based in Santa Clara, California.

ASM America initially sued Genus for infringement of U.S. Patent No. 6,015,590 ("the '590 patent") and No. 5,916,365 ("the '365 patent"). Genus counterclaimed for infringement of U.S. Patent No. 5,294,568 ("the '568 patent"). ASM now seeks leave to amend the complaint to include allegations of infringement of U.S. Patent No. 4,798,165 ("the '165 patent") and to add Dr. Arthur Sherman, the inventor of the '365 patent, as a plaintiff.

The '590 and '365 patents assigned to or controlled by ASM concern methods for atomic layer deposition ("ALD"),[FN1] a process used in manufacturing semiconductor wafers. The '568 patent assigned to Genus claims a method for selective etching of native oxides deposited during the manufacturing process.The '165 patent that ASM proposes to add to this case concerns a "showerhead" device used to regulate the flow of gases into the reaction chambers used for ALD and other types of manufacturing processes. Each of the motions before the Court will be discussed in turn.

> FN1. This process is also referred to by ASMA under its trademark, Atomic Layer Chemical Vapor Deposition or Atomic Layer CVD ™. Atomic layer epitaxy ("ALE") is another generic name for this process.

II. ASM's Motion to Strike Inequitable Conduct Defenses

ASM moves to strike Genus' Fifth Affirmative Defense (paragraphs 18-19 of the Answer and Counterclaim), which asserts the defense of inequitable conduct before the Patent and Trademark Office ("PTO"). This defense is raised as to both the '365 and '590 patents.

Motions to strike are governed by Federal Rule of Civil Procedure 12(f), which permits the Court to order stricken from any pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."Fed.R.Civ.P. 12(f). Motions to strike an affirmative defense are disfavored, but are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 24444 (N.D.Cal.), 2002-1 Trade Cases P 73,573

proper when the defense is insufficient as a matter of law. *See, e.g., Chiron Corp. v. Abbott Labs., 156 F.R.D. 219, 220 (N.D.Cal.1994)* (Patel, J.) (citation omitted).

**\*2** The doctrine of inequitable conduct (also sometimes referred to as "fraud on the PTO") renders a patent unenforceable if the patent applicant acted inequitably before the PTO in prosecuting the patent. *See, e.g., Chiron, 156 F.R.D. at 220* (citations omitted); *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 41 U.S.P.Q.2d 1770, 1996 WL 467273 at \*5 (N.D.Cal.1996)* (Jensen, J.). Inequitable conduct includes "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive."*Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd., 204 F.3d 1368, 1373 (Fed.Cir.2000), cert. denied,531 U.S. 1190 (Feb. 26, 2001)* (hereafter *"SEL"* ) (quoting *Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir.1995)*).

Allegations of inequitable conduct involve fraud and are subject to the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b).See, e.g., Advanced Cardiovascular Sys., 1996 WL 467273 at \*5; Raychem Corp. v. PSI Telecomms., Inc., 1995 WL 108193 at \*2 (N.D.Cal.1995)* (Aguilar, J.); *Chiron, 156 F.R .D. at 220.* Materiality and intent to deceive must be specifically pleaded. *See SEL, 204 F.3d at 1373* (discussing elements of inequitable conduct claim); *see also Xilinx, Inc. v. Altera Corp., 33 U.S.P.Q.2d 1149, 1994 WL 782236 at \*2-3 (N.D.Cal.1994)* (Whyte, J.) (discussing pleading requirements). Further, the time, place and content of any alleged misrepresentations made to the PTO as well as the identities of the parties to the misrepresentation must be specified. *Sun Microsystems, Inc. v. Dataram Corp., 1997 WL 50272 at \*4 (N.D.Cal.1997)* (Williams, J.).

The patent regulations require each individual associated with the filing of a patent application "to disclose to the Office all information known to that individual to be material to patentability ."*37 C.F.R. § 1.56 (2001).* Information disclosure statements provided to the PTO must include a legible copy of "each publication or that portion which caused it to be listed."*37 C.F.R. § 1.98(a)(2)(ii) (2001).* Genus contends that ASM engaged in inequitable conduct

by failing to disclose relevant prior art to the PTO in connection with both the '590 patent and the '365 patent.

### *A. The '590 patent*

Genus alleges that the inventors of the '590 patent, Tuomo Suntola and Sven Lindfors, and the attorneys involved in the prosecution of the patent, Sterne, Kessler, Goldstein & Fox P.L.L.C.,

were aware of aspects of Tuomo Suntola's prior art work, publications, and patents in Atomic Layer Deposition, Molecular Beam Epitaxy, and Atomic Layer Epitaxy, including but not limited to the publication *Atomic Layer Epitaxy* (T. Suntola & M. Simpson eds.1990), that were material to the patentability of the claims in the '590 patent, but withheld this prior art from the U.S. Patent and Trademark Office, materially misrepresenting the state of the art, with an intent to deceive that Office. (Answer and Counterclaim at ¶ 18.)

**\*3** ASM attacks these allegations, particularly the failure to disclose unidentified "aspects" of Dr. Suntola's prior work, as lacking the specificity required by *Rule 9(b).* ASM also asks this Court to strike this defense on the innovative ground that it is "implausible." (ASM's Motion to Strike at 8:10.) ASM points out that the face of the '590 patent identifies nineteen *other* patents among the references cited (some of which Dr. Suntola holds) and lists a subsequent article by Dr. Suntola, also entitled "Atomic Layer Epitaxy," that postdates the omitted work by two years. ASM cites *Fiskars, Inc. v. Hunt Mfg. Co., 221 F.3d 1318, 1327 (Fed.Cir.2000), cert. denied,121 S.Ct. 1603 (Apr. 16, 2001)*, which states, "An applicant cannot be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner."

Genus disputes the lack of specificity but requests leave to amend its Answer and Counterclaims to this patent to refer only to the failure to disclose *Atomic Layer Epitaxy* to the PTO and to delete the reference to aspects of Dr. Suntola's prior work. Genus contends that this amendment addresses ASM's concerns about specificity.[FN2]

     **FN2.** The parties are cautioned that cross-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                     Page 3
Not Reported in F.Supp.2d, 2002 WL 24444 (N.D.Cal.), 2002-1 Trade Cases P 73,573

motions on the same schedule as the original motion are no longer proper under the Civil Local Rules of this Court. Because Genus' cross-motion does not expand the issues in the original motion at all, however, the Court will nonetheless consider it.

The Court finds that Genus adequately pleaded that the 1990 work *Atomic Layer Epitaxy* was withheld from the PTO, but did not plead the requisite level of specificity as to Dr. Suntola's unspecified other prior art work. The Court therefore grants ASM's motion to strike as to the '590 patent with leave to amend. The Court grants Genus' request to file its proposed amendment previously lodged with the Court, which cures this lack of specificity.

*B. The '365 patent*

Genus alleges with respect to the '365 patent that:

[T]he named inventor of the '365 patent, Arthur Sherman, the attorneys involved in the prosecution of the '590 [*sic* ] patent including, without limitation, Robert Moll and his colleagues at Wilson Sonsini Goodrich & Rosati, and/or other persons substantively involved in the preparation or prosecution of the applications for the '365 patent, were aware of prior art that was material to the patentability of claims in the '365 patent, including without limitation, an article entitled "Atomic layer epitaxy of Si using atomic H," authored by S. Imai, T. Iizuka, O. Sugiura, and M. Matsumura, published in the journal *Thin Solid Films,* 225 (1993) 168-172, but withheld this prior art from the U.S. Patent and Trademark Office, materially misrepresenting the state of the art, with an intent to deceive that Office. (Answer and Counterclaim at ¶ 19.)

ASM contends that Genus' affirmative defense must be stricken because the referenced article (by S. Imai et al.) was contained in the *Proceedings of the Second International Atomic Layer Epitaxy Symposium,* in *Thin Solid Films,* vol. 225(1-2), (1993), which was disclosed to the PTO even though it was not specifically cited to the patent examiner as an independent article. ASM also argues that Genus fails to specify what specific aspect of the Imai article was not covered cumulatively in the other references supplied to the patent examiner, or to identify who in particular made the misrepresentation.

*4 Genus responds that ASM did not provide copies of the documents to the examiner and placed the burden on the examiner to obtain them. Genus asks the Court to equate ASM's failure to disclose readily-available and lengthy documents in English to the rather more nefarious conduct in *SEL* involving a misleading partial translation of a twenty-nine-page document in Japanese.

On a motion to strike, the Court is limited to considering the material appearing on the face of the pleadings. The Court cannot consider extrinsic evidence such as Moll's letter to the examiner (albeit cited by Genus in opposition to the motion) explaining why copies of the *Proceedings* were not provided. While this defense falls short of alleging misconduct like that in *SEL* and may well fail on summary judgment, the Court declines to foreclose it at this early pleading stage. As pled, however, it lacks specificity (e.g., "including, without limitation"). Accordingly, ASM's motion to strike Genus' inequitable conduct defense as to the '365 patent is granted with leave to amend. Genus shall amend its inequitable conduct affirmative defense to provide greater specificity about ASM's failure to comply with the requirements of applicable sections of the patent regulations and ASM's intent to mislead the PTO thereby, as discussed at the December 11, 2001 hearing.

III. Motions for Leave to Amend

The parties moved for leave to amend their pleadings under Federal Rule of Civil Procedure 15(a). Genus' opposition to ASM's motion to strike, sever, and stay contains a cross-motion for leave to amend its antitrust counterclaims, as addressed above. ASM separately moves for leave to file an amended complaint naming Arthur Sherman, the inventor of the '365 patent, as a plaintiff and adding claims of infringement of the '165 patent.

*A. Legal Standard*

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."Fed.R.Civ.P. 15(a); *see, e.g., Bowles v. Reade,* 198 F.3d 752, 757 (9th Cir.1999) ("strong policy permitting amendment"); *Yakima Indian Nation v. Washington Dep't of Revenue,* 176 F.3d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1241, 1246 (9th Cir.1999) (same); *Beery v. Hitachi Home Elecs. (Am.), Inc.,* 157 F.R.D. 481, 483, 485 (C.D.Cal.1994) (applying "extremely liberal" policy to permit amendment of patent infringement complaint). Leave to amend should be granted "unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay."*Yakima Indian Nation,* 176 F.3d at 1246 (citation and internal quotation marks omitted); *Bowles,* 198 F.3d at 757. Undue delay alone is insufficient to justify denying a motion to amend. *Bowles,* 198 F .3d at 757.

*B. Genus' Motion for Leave to Amend*

Genus seeks to amend its counterclaims to allege that the relevant geographic scope of the ALD market is worldwide, that the worldwide ALD market is "an area of effective competition where buyers can find alternative sources of supply," and that "no other goods and services are reasonably interchangeable with the particular and distinct semiconductor manufacturing equipment and processes" that make up the ALD market. (Opp. Brief at 17:13-15, 18:13-18; *see also* Answer and Counterclaim at ¶¶ 39-46 and Proposed Amended Answer and Counterclaim at ¶¶ 39-46.) Genus further seeks leave to amend its predatory pricing claim to state that "[t]here is a dangerous probability that ASMI and ASM America will recoup their investment in below-costs [*sic* ] sales of the Polygon ™ tool and the Pulsar ™ chamber by virtue of, without limitation, their control of over 50% of the ALD market," and to specify the alleged barriers to entry in the ALD market. (Opp. Brief at 20:17-21:2; Proposed Amended Answer and Counterclaim at ¶ 39.) Applying the liberal policy of Rule 15(a), the Court grants Genus' motion for leave to amend its Answer and Counterclaim.

*C. ASM's Motion for Leave to File Amended Complaint and Supplement Case Management Schedule*

*1. Dr. Sherman*

**\*5** As noted above, ASM seeks leave to amend its complaint to name Dr. Arthur Sherman, inventor of the '365 patent, as a plaintiff. Genus does not oppose the addition of Dr. Sherman as a plaintiff, provided that his inclusion does not delay the scheduling established in this case, and provided that Dr.

Sherman is counted as part of the "ASM side" for purposes of discovery limits. The Court grants ASM's motion to amend its complaint to add Dr. Sherman as a party. Dr. Sherman will be considered part of the "ASM side" for purposes of the discovery limits.

*2. The '165 patent*

ASM also seeks leave to amend its complaint to add allegations that Genus infringed its '165 patent. The device that is the subject of this patent is a "showerhead" that regulates the flow of gases into the reaction chambers used for the ALD processes claimed in the '590 and '365 patents. Genus opposes the addition of the '165 patent to this case on the ground that its inclusion will cause delays at least equal to those that would be caused by Genus's antitrust counterclaims, absent the stay ordered by the Court today.

The Court is not persuaded. While the addition of a fourth patent to the three patents already at issue will complicate the case somewhat, the "showerhead" device in the '165 patent is interwoven with the existing patents and will not add an undue amount of new material to the case. Moreover, counsel for Genus has previously litigated aspects of the '165 patent within this very district in an unrelated case. Further, Genus agrees that if the '165 patent were the subject of a separate action, it would be related to this case. At this early stage of the litigation, in light of the liberal policy favoring amendment of the pleadings, the Court grants ASM's motion for leave to amend its complaint to add the '165 patent infringement claim.

The real issue is timing. ASM chose not to include this older patent in its original complaint, but now urges that discovery and claims construction occur on an accelerated basis to "catch up" with the original patents in suit. ASM does not provide any particularly persuasive reason for this new haste. At the same time, Genus cannot seriously contend that discovery will be greatly complicated because its counsel previously conducted considerable discovery on this patent and stipulated to the use of that discovery in this case. Genus correctly points out, however, that it is premature for the Court to decide now whether trial of the '165 patent should be bifurcated from that of the other patents. The Court concludes that the previously-set claims construction

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 24444 (N.D.Cal.), 2002-1 Trade Cases P 73,573

hearings for the other patents should proceed first, as scheduled. The tutorial on the '165 patent will follow on September 19, 2002 at 9:00 a.m., with the claims construction hearing on September 26, 2002 at 9:00 a.m.

## IV. ASM's Motion to Sever and Stay Antitrust Claims and Related Discovery

Pursuant to Rule 42(b), ASM moves to sever and stay Genus' four antitrust claims and related discovery until after a determination of whether or not ASM's patents are invalid. Rule 42(b) provides that the Court may order a separate trial of claims, counterclaims, or issues "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy."Fed. R. Civ. Proc. 42(b); see also Ellingson Timber Co. v. Great N. Ry. Co., 424 F.2d 497, 499 (9th Cir.1970) ("One of the purposes of Rule 42(b) is to permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of potentially dispositive preliminary issues.")

*6 Genus asserts counterclaims for antitrust violations based on four theories: (1) predatory pricing; (2) attempted monopolization based on a patent accumulation theory; (3) attempted monopolization based on a *Walker Process*[FN3] theory (i.e., acquisition of fraudulently-procured patents); and (4) attempted monopolization based on a *Handgards* theory (i.e., sham litigation as an act in restraint of competition).[FN4]

> FN3.*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 176-77 (1965).

> FN4. Monopolization and attempted monopolization are prohibited by the Sherman Antitrust Act. 15 U.S.C. § 2. To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must allege that: (1) the defendant possesses monopoly power in the relevant market; (2) the defendant willfully acquired or maintained that power; (3) and the defendant's conduct caused antitrust injury. *See, e.g., Cost Mgmt. Servs. v. Washington Natural Gas Co.*, 99 F .3d 937, 949 (9th Cir.1996). To state a claim for attempted monopolization, a plaintiff must allege: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) a dangerous probability of success; and (4) causal antitrust injury. *Id.* at 949-50.

ASM argues that a stay will simplify the case, avoid confusion, and reduce the burden and costs imposed on the Court, the attorneys, and the parties by deferring the burdensome and expensive discovery that would necessarily arise from litigation of the antitrust claims, and possibly avoiding it altogether. The Court agrees that a stay would promote an efficient resolution of the patent invalidity issues and substantially narrow or eliminate the antitrust claims as a result. As Genus itself recognizes, its sham litigation and fraudulent procurement theories fail if the patents are not invalidated. Conversely, the *Kobe* patent accumulation theory fails if the pooled patents are declared invalid.

Genus nonetheless argues that a stay of the antitrust claims will irreparably harm both Genus and competition in the ALD market, and that this prejudice outweighs any benefits of severance. Its allegation of irreparable harm rings somewhat hollow, however, in light of its failure to bring its antitrust claims against ASM independently. Genus also contends that a stay would not be beneficial because the antitrust claims will require separate discovery in any event.

It is a common practice in federal court to stay antitrust counterclaims until after the trial of the invalidity issue. *See, e.g., In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed.Cir.1986) (discussing the "now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim"); *Hewlett-Packard Co. v. Genrad, Inc.*, 882 F.Supp. 1141, 1157-58 (D.Mass.1995) (staying counterclaim based on inequitable conduct; "[C]ourts often separate patent issues from antitrust counterclaim issues ... Antitrust issues are complex and, particularly with respect to damages, raise different issues and proof."); *Baxter Int'l, Inc. v. Cobe Lab., Inc.*, 1992 WL 77665 at *2, 4 (N.D.Ill.1992) (severing and staying discovery and trial of antitrust counterclaim in light of lack of common issues other than fraudulent procurement, prejudice to plaintiff in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 24444 (N.D.Cal.), 2002-1 Trade Cases P 73,573

defending patent claim and *Handgards* claim simultaneously, burden on jury, and possibility that issues relating to antitrust counterclaim could be rendered moot); *Carlisle Corp. v. Hayes,* 635 F.Supp. 962, 967-68 (S.D.Cal.1986) (severing and staying counterclaim alleging that defendant attempted to monopolize market by seeking to enforce a patent obtained by fraud on the PTO); *Pharmacia, AB v. Hybritech, Inc.,* 224 U.S.P.Q. 975, 976, 1984 WL 1479 (S.D.Cal.1984) (severing and staying antitrust and patent misuse counterclaims based on fraudulent procurement, predatory pricing, and tying); *Components, Inc. v. Western Elec. Co., Inc.,* 318 F.Supp. 959, 966-67 (D.Me.1970) (severing and staying antitrust counterclaims from patent claims for convenience of parties and court and to avoid delay in resolving patent issues). The reasoning in all of these cases supports the severance and stay in this case of the discovery and trial of Genus' antitrust counterclaims until after a trial on the patents.

*7 Here, the benefits derived from a stay of the antitrust counterclaims outweigh any prejudice. Indeed, proceeding on the antitrust claims simultaneously with the patent claims may well delay resolution of the case by increasing its complexity exponentially, whereas many issues will likely be mooted by addressing the patent claims first. Resolution of the invalidity issue may dispose of some of the antitrust counterclaims altogether, and may potentially narrow the damages inquiry on any remaining claims to particular products or product lines. Given the multiple patents already at issue in this case, and the wide swath of non-overlapping discovery on the antitrust claims that will be required in addition to any discovery germane to both patent and antitrust claims, the Court concludes that a stay of the antitrust claims will promote judicial economy significantly.

Moreover, although Genus submitted a declaration regarding the window of opportunity in the emerging market for ALD manufacturing equipment, as noted above a stay at this time will not necessarily delay the ultimate determination of the antitrust claims significantly longer than no stay at all, because of the added complexity of proceeding on a variety of fronts simultaneously. Thus, Genus has failed to demonstrate prejudice resulting from a stay that would outweigh the judicial economy certain to result from a stay.

Therefore, discovery and trial of Genus' antitrust counterclaims are stayed until after trial on the patents at issue. The stay shall take effect upon the filing of Genus' Amended Answer and Counterclaims. This order staying the antitrust counterclaims is without prejudice to a motion by either party of lift the stay based on equitable harm, provided that such a motion is based on changed circumstances. The Court is mindful of Genus' concerns and will proceed expeditiously to resolve the entire matter as quickly and efficiently as possible.

## V. ASM's Motion to Dismiss Antitrust Claims

As an alternative to its motion to sever and stay, ASM moves for dismissal of the antitrust counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. In light of the Court's decision to allow amendment and then grant a stay, ASM's motion to dismiss is denied as moot.

## VI. Conclusion

For the foregoing reasons, the Court orders as follows:

1. ASM's motion to strike Genus' inequitable conduct defense as to the '590 patent is granted with leave to amend.

2. ASM's motion to strike Genus' inequitable conduct defense as to the '365 patent is granted with leave to amend.

3. Genus' cross-motion for leave to amend its Answer and Counterclaims is granted.

4. ASM's motion to sever and stay discovery and trial of Genus' antitrust counterclaims until after the trial on the invalidity claim is granted without prejudice. The stay shall take effect upon the filing of Genus' Answer and Counterclaims.

5. ASM's alternative motion to dismiss the antitrust counterclaims is denied as moot in light of the amendments and stay.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 24444 (N.D.Cal.), 2002-1 Trade Cases P 73,573

**\*8** 6. A second tutorial on the '568 patent shall be held starting at 1:30 p.m. on June 18, 2002, in Courtroom E of this Court, 450 Golden Gate Avenue, 15th Floor, San Francisco, California. A third tutorial on the '165 patent shall be held starting at 9:00 a.m. on September 19, 2002. The claims construction hearing for the '165 patent shall be held at 9:00 a.m. on September 26, 2002. The parties shall meet and confer on a briefing and disclosure schedule for the '165 patent based on the dates provided for the claims construction hearing and the tutorial, and shall jointly submit a proposed schedule to the Court no later than January 25, 2002.

N.D.Cal.,2002.
ASM America, Inc. v. Genus, Inc.
Not Reported in F.Supp.2d, 2002 WL 24444 (N.D.Cal.), 2002-1 Trade Cases P 73,573

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT – UNREPORTED CASE 2**

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)

▷Allergan Inc. v. Pharmacia Corp.
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ALLERGAN INC. and Allergan Sales, Inc.,
Plaintiffs,
v.
PHARMACIA CORPORATION, Pharmacia AB,
Pharmacia Enterprises S.A. and Pharmacia & Upjohn
Company, Defendants,
andTHE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,
Additional Defendant on Counterclaim in Reply.
**No. Civ.A.01-141-SLR.**

May 17, 2002.

MEMORANDUM ORDER

ROBINSON, J.
*1 At Wilmington this 17th day of May, 2002,
having reviewed the various pending discovery
motions and the papers submitted in connection
therewith;

IT IS ORDERED that:

1. Columbia's motion for a protective order
precluding plaintiffs from deposing and obtaining
documents from John P. White, Esquire (D .I. 77) is
granted.

a. Plaintiffs have subpoenaed Columbia's lead trial
counsel, Mr. White, to appear for a deposition on the
issue of inventorship of U.S. Patent No. 4,599,353
("the '353 patent"). More specifically, plaintiffs
contend "that the inventor of the '353 patent, with
Columbia's full knowledge and participation through
its attorneys, failed to credit one or more co-inventors
who collaborated in and contributed to the conception
and reduction to practice of the '353 invention." (D.I.
87 at 4) Plaintiffs argue that Mr. White has relevant
information based on an amendment filed by Mr.
White wherein he declares that "[a]pplicant is the
sole inventor of the invention described and claimed
in the subject application." (Id., Ex. 2 at 4) The
amendment reflects facts as averred by the inventor

in his declaration. (Id., Ex. 3)

b. As a general principle, depositions of trial counsel
are limited to those circumstances where "the party
seeking to take the deposition has shown that (1) no
other means exist to obtain the information than to
depose opposing counsel; (2) the information sought
is relevant and nonprivileged; and (3) the information
is crucial to the preparation of the case."Shelton v.
Am. Motors Corp., 805 F.2d 1323, 1327 (8th
Cir.1987) (internal citation omitted).Cf.,Environ
Prods., Inc. v. Total Containment, Inc., 41
U.S.P.Q.2d 1302, 1306 (E.D.Pa.1996) ("Impressions
protected by the work-product doctrine may be
discovered when directly relevant to the litigation and
when the need for production is compelling."); Bio-
Rad Labs., Inc. v. Pharmacia, Inc., 130 F . R.D. 116,
122 (N.D.Cal.1990) ("[A]n attorney's opinion work
product is discoverable where such information is
directly at issue and the need for production is
compelling."). Moreover, absent a primafacie
showing of fraud, an allegation of inequitable
conduct, in and of itself, does not vitiate the attorney-
client privilege or the protections of the attorney
work product doctrine. SeeIn re Spalding Sports
Worldwide, Inc., 203 F.3d 800, 806-07
(Fed.Cir.2000).

c. The court concludes that plaintiffs have not met
their burden to demonstrate a compelling need for the
requested discovery. Plaintiffs apparently contend, in
support of their inequitable conduct contentions, that
Mr. White knew or should have known that one or
more co-inventors collaborated in and contributed to
the conception and reduction to practice of the
patented invention and was obligated to so inform the
PTO. The court suggests that until such time as
plaintiffs have demonstrated the truth of the matters
asserted (i.e., there were co-inventors), Mr. White's
knowledge is irrelevant. Because the issue of
inequitable conduct is a matter for the court to
determine, and because the factual predicate to the
issue of inventorship can be pursued independent of
Mr. White's testimony (through the depositions of the
inventor and alleged co-inventors and through access
to the documents that reflect the inventive process),
the court declines to permit the deposition of Mr.
White at this time.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)

**\*2** 2. Defendants' motion to compel the production of documents (D.I.82) is granted to the extent explained below.

a. Defendants have moved to compel plaintiffs to produce "all documents relating to the subject matter of three opinion letters provided by their counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP ("Finnegan, Henderson"), and to permit questioning of Allergan witnesses regarding the subject matter of those opinion letters."(*Id.* at 1) By way of background, plaintiffs have chosen to rely upon the opinions written by Finnegan, Henderson in defense of the claim of willful infringement. Plaintiffs have produced the three opinion letters and drafts thereof, and "all communications between Allergan and Finnegan regarding those letters as well as all of the materials that Allergan considered in connection with its reliance on the letters."Defendants seek, in addition to the above, "documents relating to [Allergan's] other infringement and validity analyses of the patents."(*Id.* at 3)

b. From the court's perspective, the question posed by this discovery dispute is whether the scope of a party's voluntary waiver is defined by the course of conduct between the party and its opinion counsel, or whether it is defined by the subject matter discussed in the opinion letters. The court concludes that it is the latter.

c. It is undisputed that,

[w]hen an alleged infringer decides to respond to a claim of willful infringement by offering evidence that he or she reasonably and in good faith relied on advice of counsel in making, using or selling the allegedly infringing device, then the advice becomes relevant and admissible. Documents and testimony relating to that advice are relevant in that they are probative of the alleged infringer's intent. They are admissible because the alleged infringer has waived the privilege as to the subject matter of the advice.

*Thorn EMI North Am., Inc. v. Micron Tech., Inc.,* 837 F.Supp. 616, 621 (D.Del.1993). In order to determine whether the alleged willful infringer "reasonably and in good faith relied on" the advice rendered by opinion counsel, it is appropriate to test the

knowledge of the alleged willful infringer concerning the subject matter of the opinion. *Cf.id.*(the patentee should be entitled to discover facts relating to what the alleged willful infringer "knew and had concluded about the credibility, value and reasonableness of the opinions.").

d. Consistent with the above reasoning, the court concludes that the only equitable way for a patentee to test the knowledge of an alleged willful infringer (so as to test the reasonableness of its evaluation of counsel's opinions) is for the alleged willful infringer to disclose all of the information it possessed prior to or at the time it obtained opinions of counsel as to the subject matters discussed in such opinions.[FN1]

> FN1. The court recognizes that the scope of discovery allowed at bar is relatively broad and potentially prejudicial to plaintiffs. Therefore, rather than requiring disclosure consistent with this order at this time, the court will bifurcate the issue of willfulness, stay discovery relating to willfulness, and conduct a separate trial with a new jury in the event plaintiffs are found to infringe valid patents. See*Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.,* No. 00-800-JJF, 2002 WL 576088, at *3 n. 2 (D.Del. Mar. 28, 2002).

3. Plaintiffs' motion to compel the production of documents withheld under the common legal interest doctrine (D.I.99) is denied as untimely. The parties agreed to exchange their privilege logs on January 23, 2002. By stipulation filed on March 11, 2002, the discovery cutoff date was extended to March 15, 2002. Plaintiffs filed the instant motion on April 8, 2002. Motions that relate to fact discovery must be filed during fact discovery, especially where, as here, the underlying facts relating to the motion were known to plaintiffs in January 2002. Therefore, the court declines to address the motion on its merits.

**\*3** 4. Plaintiffs' motion for leave to file a sur-reply brief (D.I.96) is denied as moot.

D.Del.,2002.
Allergan Inc. v. Pharmacia Corp.
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1268047 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT – UNREPORTED CASE 3

Not Reported in F.Supp.                                                                                           Page 1
Not Reported in F.Supp., 1990 WL 495458 (D.Del.)

**C**Applied Biosystems, Inc. v. Cruachem, Inc.
D.Del.,1990.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
APPLIED BIOSYSTEMS, INC., Plaintiff,
v.
CRUACHEM, INC., Defendant.
**Civ.A. No. 89-579-JRR.**

Aug. 3, 1990.

Jeffrey M. Weiner, Wilmington, DE (Arthur M.
Lieberman, David A. Kalow and Henry Pitman, of
Lieberman, Rudolph & Nowak, New York City, of
counsel).
Donald F. Parsons, Jr., of Morris, Nichols, Arsht &
Tunnell, Wilmington, DE (Robert J. Koch and David
M. Foster, of Fulbright & Jawroski, Washington, DC,
of counsel).

MEMORANDUM OPINION

ROTH, District Judge.
**\*1** Plaintiff Applied Biosystems ("ABIO")
commenced this action for patent infringement on
October 20, 1989, against defendant Cruachem, Inc.
("Cruachem"). ABIO alleges that Cruachem has
infringed U.S. Patent Nos. 4,415,732 and 4,458,066,
of which ABIO is the exclusive licensee. The patents-
in-suit involve methods and chemistries for
constructing DNA fragments in the field of
biotechnology and genetic engineering. Cruachem
denies infringement and asserts that the patents-in-
suit are invalid. Cruachem also counterclaims under
section 2 of the Sherman Act, 15 U.S.C. § 2, the
Virginia Antitrust Act, Va.Code Ann. § 59.1-9.6, and
asserts patent misuse by ABIO. ABIO has moved to
sever the patent issues in this case from the antitrust
issues and to stay discovery of the antitrust issues.
ABIO's motion is presently before the Court.

Also before the Court is Cruachem's motion to
compel discovery. Both parties filed motions to
compel discovery in December, 1989. The Court
denied these motions in open court on January 26,
1990, and strongly encouraged the parties to resolve
their discovery disputes on their own. Later, on May

8, 1990, the Court entered a stipulated scheduling
order which provided that production in response to
first requests for documents be completed by May 17,
1990. Cruachem moved to compel when ABIO failed
to comply with this order. We will deal with each
motion in turn.

I. *Cruachem's Motion to Compel*

Discovery in this case is governed by the stipulated
scheduling order of May 8, 1990. (D.I. 35) Paragraph
1(a) of that order provides:

Production in response to first requests for documents
under Fed.R.Civ.P. 34. This discovery, including
identification of documents being withheld from
production on grounds of attorney-client privilege or
work-product immunity, shall be completed in
accordance with the Federal Rules of Civil Procedure
by May 17, 1990.

Despite this order, on May 17 ABIO withheld
production of documents that it deems related to the
antitrust claims, served no objections under
Fed.R.Civ.P 34, submitted a "draft" list of privileged
documents, and did not produce a "final" list of
privileged documents until June 14. ABIO does not
interpret the order to require it to conduct discovery
on the antitrust issues in this case because of its
pending motion to sever the antitrust issues from the
patent issues. This amounts to a unilateral stay of
discovery on antitrust issues by ABIO.

This Court dealt with a similar situation in *Willemijn
Houdstermaatschaapij BV v. Apollo Computer, Inc.,
707 F.Supp. 1429 (D.Del.1989)*. In that case the
defendant moved for a separate trial on damages and
to stay discovery on damages. The defendant then
refused to respond to discovery on damages pending
a hearing on its motion to sever. This Court ruled that
"unless and until it is granted a stay, defendant
should be required to conduct discovery as if no
motion had been filed at all." *Willemijn,* 707 F.Supp.
at 1441.

**\*2** So here, the fact that ABIO has pending a motion
to sever antitrust issues from patent issues does not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                     Page 2
Not Reported in F.Supp., 1990 WL 495458 (D.Del.)

impact upon its duty under the Federal Rules of Civil Procedure and under the stipulated order to conduct discovery on all issues in this case. In fact, ABIO's motion to sever was not filed until the day after the May 17 discovery deadline. ABIO's motion has no effect on its duty to provide discovery, and, even if it did, the deadline had come and gone before it was filed. ABIO will be ordered to respond fully to Cruachem's first request for production of documents within two weeks of this memorandum opinion.

ABIO may assert the attorney-client privilege for those documents listed on ABIO's "draft" privileged document list on May 17. The attorney-client privilege is waived as to all documents not listed as of May 17. *See, e.g., Krewson v. City of Quincy,* 120 F.R.D. 6, 7 (D.Mass.1988) (defendant waived objections to document request by failing to serve timely response); *Perry v. Golub,* 74 F.R.D. 360, 363 (N.D.Ala.1976) (objection on the grounds of privilege waived by failure to file timely objection); *United States v. 58.16 Acres of Land,* 66 F.R.D. 570, 572 (E.D.Ill.1975) ("an objection that the information sought is privileged, is waived by a failure to make it within the proper time limits"). ABIO, as the party asserting the attorney-client privilege, bears the burden of showing it is entitled to the privilege. *Willemijn,* 707 F.Supp. at 1443; *International Paper Co. v. Fiberboard Corp.,* 63 F.R.D. 88, 93 (D.Del.1974). ABIO's service of a "final" list of privileged documents on June 14 does not cure its failure to comply with the May 17 deadline or its failure to assert privilege as to documents left off its "draft" list. ABIO may, however, augment its description of those documents listed as privileged as of May 17 if it deems added description to be necessary. We permit this unorthodox procedure only because ABIO apparently believed in good faith that it was not required to do more than list its privileged documents by the May 17 discovery deadline. We note, however, that the settled law in this District is to the contrary. *See Willemijn,* 707 F.Supp. at 1443 (denying party opportunity to augment its description of privileged documents in its brief).[FN1]

## II. *ABIO's Motion to Sever Trial and to Stay Antitrust Discovery*

Turning to ABIO's motion to sever the antitrust issues from the patent issues, we note that Cruachem does not seriously oppose ABIO's request to sever

these issues for trial. Separate trials in this case would be "in furtherance of convenience [and] conducive to expedition and economy." Fed.R.Civ.P. 42(b). Both the patent and antitrust aspects of this case will require extended trials involving complex issues. Accordingly we will sever this case for trial on the merits. *See In re Innotron Diagnostics,* 800 F.2d 1077, 1084 (Fed.Cir.1986).

For the following reasons, however, we will not stay antitrust discovery. It is within this Court's discretion to decide whether to limit discovery on issues that have been separated for trial. This is so even in patent cases where antitrust and patent issues are to be tried separately. *Innotron,* 800 F.2d at 1078; *Alarm Device Mfg. Co. v. Alarm Prod. Int'l, Inc.,* 60 F.R.D. 199 (E.D.N.Y.1973); *Standard Pressed Steel Co. v. Astoria Plating Corp.,* 162 U.S.P.Q. 441, 442 (N.D.Ohio 1969).

**\*3** A stay of discovery at this stage of the proceedings is inappropriate in light of the extensive antitrust discovery that has already taken place. Cruachem has responded fully to ABIO's first set of interrogatories and first request for the production of documents (totalling nearly 50,000 pages of documents). This discovery included substantial material relevant to Cruachem's antitrust and patent misuse counterclaims. ABIO has yet to respond in kind to Cruachem's requests for antitrust discovery. Therefore there has been roughly nine months of unilateral discovery on antitrust issues by ABIO.

ABIO will not be burdened by going forward with antitrust discovery. It has stated that it is ready, willing and able to produce the antitrust documents it has thus far withheld. Moreover, much of the "antitrust" discovery objected to by ABIO is potentially relevant to patent issues. These include the issues of damages, and secondary indicia of nonobviousness, such as commercial success.

Severance of discovery at this stage of the proceedings would not necessarily save time or expense. It appears that Cruachem will seek trial on the merits of its antitrust counterclaims whether or not ABIO prevails on the merits of the infringement issues. Cruachem's counterclaim allegations include overbroad licensing practices by ABIO and tying the sale of patented products to the sale of unpatented products. Discovery and trial on these issues may

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 495458 (D.Del.)

have to proceed even if ABIO prevails on its patent claims.

Nor has ABIO shown that the number of depositions will be materially reduced by staying discovery related to the antitrust and patent misuse issues. The vast majority of deposition witnesses will give testimony relevant to both patent and antitrust issues. These witnesses include ABIO, University Patents, Inc., and University of Colorado personnel, as well as ABIO's customers. A stay of antitrust discovery may necessitate multiple depositions of these witnesses.

The Court also notes that discovery in this case has been characterized by the parties' mutual inability to agree on anything. If past experience is a harbinger of things to come, a stay of antitrust discovery will merely serve to multiply discovery disputes inordinately. For example, the parties already disagree over what is "antitrust-related" discovery. Such bickering will serve only to waste the Court's and the parties' time. This factor militates against a stay of antitrust discovery. *Willemijn,* 707 F.Supp. at 1435.

Finally, it was not made clear to the Court at the scheduling conference on May 8 that any of the discovery due on May 17 was in the antitrust category. It is unfair for ABIO to have stipulated to a discovery production date without making it perfectly clear that it intended to withhold discovery on "antitrust" issues.

## CONCLUSION

Cruachem's motion to compel will be granted. ABIO's motion to sever will be granted as to trial. The patent issues in this case will be tried separately from the antitrust and patent misuse issues. Discovery of antitrust issues will not be stayed pending trial on the patent issues. An appropriate order will issue.

FN1. We also deny ABIO's motion for leave to file a rebuttal to Cruachem's reply brief (D.I. 52), and ABIO's request for oral argument on the discovery issue. (D.I. 53)

D.Del.,1990.
Applied Biosystems, Inc. v. Cruachem, Inc.
Not Reported in F.Supp., 1990 WL 495458 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT – UNREPORTED CASE 4

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 896002 (D.Del.)

**H**Arthrocare Corp. v. Smith & Nephew, Inc.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ARTHROCARE CORPORATION, Plaintiff,
v.
SMITH & NEPHEW, INC., Defendant.
**No. Civ. 01-504-SLR.**

March 10, 2004.

Jack B. Blumenfeld, Karen Jacobs Louden, and James W. Parrett, Jr. , of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Plaintiff, Matthew D. Powers, Jared Bobrow, and Perry Clark, of Weil, Gotshal & Manges LLP, Redwood Shores, California, of counsel.

William J. Marsden, Jr., and Keith A. Walter, Jr., of Fish & Richardson P.C., Wilmington, Delaware, for Defendant, Mark J. Hebert, and Kurtis D. MacFerrin, of Fish & Richardson P.C., Boston, Massachusetts, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On July 25, 2001, plaintiff Arthrocare Corporation ("Arthrocare") filed this action against defendant Smith & Nephew, Inc. ("Smith & Nephew") alleging willful infringement of certain claims of U.S. Patent Nos. 5,697,536 (the " '536 patent"), 5,697,882 (the " '882 patent") and 6,224,592 (the " '592 patent) directed to electrosurgery devices and methods. (D.I.1) Smith & Nephew answered the complaint on September 13, 2001 denying the infringement allegations and asserting five affirmative defenses including noninfringement, invalidity, misuse, unenforceability based upon inequitable conduct, and unclean hands. (D.I.10) Smith & Nephew also asserted counterclaims for declaratory judgment that the patents in suit are invalid and not infringed by any act of Smith & Nephew and that the '592 patent is unenforceable due to inequitable conduct. (D.I.10) On September 26, 2001, Arthrocare denied Smith &

Nephew's counterclaims. (D.I.20) With the court's permission, Smith & Nephew amended their answer on November 27, 2002 to add counterclaims for antitrust violations under 15 U.S.C. § 1 of the Sherman Act. (D.I.219) Specifically, Smith & Nephew alleges that Arthrocare and Ethicon, Inc. violated antitrust law by bringing and maintaining the instant action to restrain trade "knowing the '536, '882, and/or '592 patents are invalid, unenforceable, and/or not infringed by any act of Smith & Nephew." (D.I. 219 at ¶ 27-37)

ArthroCare is organized under the laws of the State of Delaware with its principal place of business in California. (D.I. 1 at ¶ 2) Smith & Nephew is also organized under the laws of State of Delaware with its principal place of business in Massachusetts. (D.I. 1 at ¶ 3) Smith & Nephew manufactures and sells the following three allegedly infringing products: the Saphyre bipolar ablation probe ("Saphyre"), the Dyonics Control RF System ("Control RF"), and the ElectroBlade Resector ("ElectroBlade"). The court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338(a) and 2201(a).

The court separated the issues raised by the parties into two phases pursuant to Smith & Nephew's motion to bifurcate the issues of willfulness and damages until a jury verdict on infringement and validity of the patents in suit. (See D.I. 206) The first phase, in turn, included the issues of infringement, validity, and inequitable conduct ("the patent litigation"). The parties tried these issues before a jury from April 30, 2003 through May 9, 2003. On May 12, 2003, the jury returned a verdict in favor of Arthrocare on all issues. (See D.I. 405) That is, the jury found that Smith & Nephew directly infringed, induced infringement, and contributed to the infringement of the following claims of the three patents in suit with its Saphyre, ElectroBlade, and Control RF products: claims 46, 47, and 56 of the '536 patent, claims 13, 17, and 54 of the '882 patent, and claims 1, 3, 4, 11, 21, 23, 26, 27, 32, and 42 of the '592 patent. (See id.)The jury also found that none of the patents were invalid on anticipation or lack of enablement grounds. (See id.)

*2 The second phase is presently pending before the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 896002 (D.Del.)

court and includes the issues of willfulness, damages, and Smith & Nephew's antitrust counterclaims. Currently before the court is Arthrocare's motion to dismiss Smith & Nephew's antitrust counterclaims.[FN1](D.I.429) For the reasons that follow, the court grants said motion.

> FN1. Arthrocare filed this motion to dismiss on May 27, 2003. Smith & Nephew has not responded, despite mentioning its antitrust counterclaims in its answering brief opposing Arthrocare's motion for a permanent injunction in the patent litigation filed with the court on June 4, 2003. (*See* D.I. 436) The court, therefore, presumes that Smith & Nephew does not oppose the motion.

## II. BACKGROUND

Arthrocare filed suit against Ethicon, Inc., Mitek Surgical Products, Inc., and Gynecare, Inc. in the Northern District of California on February 13, 1998, alleging infringement of eight claims in four patents. (*Arthrocare Corp. v. Ethicon, Inc.,* No. C-98-0609 WHO (N.D.Cal. Dec. 1, 1998); D.I. 321, ex. A at 1) The claims at issue included: (1) claims 40 and 44 of United States Patent No. 5,697,909 ("the '909 patent); (2) claim 45 of the '536 patent; (3) claim 101 of United States Patent No. 5,697, 281 ("the '281 patent); and (4) claims 1, 26, 28, and 32 of the '882 patent. (*Id.* at 2) On March 10, 1998, Arthrocare moved for a preliminary injunction against Ethicon and Mitek to enjoin the two from making, using, importing, selling, or offering for sale an electrosurgery system marketed and sold under the VAPR System name.(*Id.*) Senior Judge William H. Orrick issued a memorandum decision on December 1, 1998 denying Arthrocare's preliminary injunction motion. (*Id.* at 33) Judge Orrick found that the defendants raised substantial questions as to (1) whether claims 40 and 44 of the '909 patent and claims 26 and 28 of the '882 patent are invalid for obviousness; (2) whether claim 45 of the '536 patent and claim 101 of the '281 patent are invalid for anticipation and obviousness; and (3) whether claims 1 and 32 of the '882 patent are invalid for lack of enablement. (*Id.*) The parties settled the litigation in June 1999 prior to trial.

## III. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.*Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). In analyzing a motion to dismiss under this rule, the court, therefore, must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *SeeTrump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). The court, however, is not required to credit "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997)."A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."*Id.* The defendant has the burden of persuasion to show that no claim has been stated. *SeeKehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

## IV. DISCUSSION

*3 Smith & Nephew's antitrust counterclaims are premised on the idea that Arthrocare and Ethicon filed "sham" litigation against Smith & Nephew to prevent or to restrain it from entering the arthroscopic surgery market.[FN2] Smith & Nephew appears to base this allegation on Judge Orrick's ruling that there were substantial questions concerning the validity of the '882 and '536 patents. In fact, Smith & Nephew particularly asserts that the "patent infringement action is objectively baseless in that no reasonable litigant could realistically expect success on the merits."(D.I. 219 at ¶ 36) Arthrocare argues in rebuttal that the jury's verdict in its favor on infringement and invalidity proves that the patent litigation was not a "sham."

> FN2. Arthrocare and Ethicon have a combined seventy-five percent share of the market in the United States for arthroscopic surgical devices. (D.I. 219 at ¶ 35)

A party who petitions the government for redress generally is immune from antitrust liability. *Eastern*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 896002 (D.Del.)

Page 3

*R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington,* 381 U.S. 657 (1965). Commonly referred to as the *Noerr-Pennington* doctrine, this immunity extends to persons who petition all types of government entities, including legislatures, administrative agencies, and courts. *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). Although originally developed in the antitrust context, courts have applied this doctrine universally to business torts. *See Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 128-29 (3d Cir.1999) (applying the doctrine to common law claims of malicious prosecution, tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition); *see also IGEN Int'l, Inc. v. Roche Diagnostics GmbH,* 335 F.3d 303, 310 (4th Cir.2003). Noerr-Pennington immunity, however, is subject to an exception for "sham" litigation. The Supreme Court has held that *Noerr-Pennington* immunity does not apply to petitions that are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144. In this regard, the Supreme Court outlined a two-part definition for the term "sham litigation." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Ind.,* 508 U.S. 49 (1993). As an objective first part, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, then the suit does not qualify as sham litigation and is immunized under the *Noerr-Pennington* doctrine. *Id.* In other words, the antitrust claim premised on the sham exception must fail. The subjective second part of the definition arises only if the challenged litigation is objectively meritless. In such case, the court must decide whether the "baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor." ' *Id.* at 60-1.

**\*4** The court disagrees with Smith & Nephew and finds that Arthrocare instituted the patent litigation in a legitimate attempt to protect its patented inventions. The court rejects the notion that Judge Orrick's decision undermined Arthrocare's belief that its patents were valid, enforceable, and infringed by Smith & Nephew's Saphyre, ElectroBlade, and Control RF probes. Judge Orrick's opinion was based upon a partially developed record and was issued in response to Arthrocare's motion for a preliminary injunction. Under 35 U.S.C. § 282, a patent is presumed valid, and invalidity may be established only by clear and convincing evidence. *See* 35 U.S.C. § 282 (2003). Such is not the standard employed in a preliminary injunction proceeding.

Additionally, the court notes that in *Applera Corp. V. Micromass UK Ltd.,* 204 F.Supp.2d 724, 782 (D.Del.2002), antitrust counterclaims like those at bar were dismissed after a jury verdict of infringement and validity, based upon the reasoning that a jury verdict in plaintiff's favor proved the litigation had merit. Applying this reasoning to the instant case, the court likewise concludes that the objective threshold for "sham" litigation is not satisfied and that the *Noerr-Pennington* doctrine shields Arthrocare from liability for Smith & Nephew's antitrust counterclaims. Accordingly, the court grants Arthrocare's motion to dismiss Smith & Nephew's counterclaims.

## V. CONCLUSION

For the reasons stated, the court grants Arthrocare's motions to dismiss Smith & Nephew's antitrust counterclaims. An order shall issue.

### ORDER

At Wilmington, this 10th day of March, 2004, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that Arthrocare's motion to dismiss Smith & Nephew's antitrust counterclaims is granted. (D.I.429)

D.Del.,2004.
Arthrocare Corp. v. Smith & Nephew, Inc.
Not Reported in F.Supp.2d, 2004 WL 896002 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT – UNREPORTED CASE 5

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 77665 (N.D.Ill.)

**H**Baxter Intern., Inc. v. Cobe Lab, Inc.
N.D.Ill.,1992.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
BAXTER INTERNATIONAL INC., and, Baxter
Healthcare Corp., Plaintiffs,
v.
COBE LAB., INC., Defendant.
No. 89 C 9460.

April 7, 1992.

MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

*1 Currently before the court is the motion of the plaintiffs, Baxter International Incorporated and Baxter Healthcare Corporation ("Baxter"), to sever and stay the discovery and trial of the counterclaim filed by the defendant Cobe Laboratories Incorporated ("Cobe") as its "Second Claim for Relief" from Baxter's alleged attempted monopolization under Section 2 of the Sherman Antitrust Act. For the reasons that follow, the court grants Baxter's motion.

I.

Baxter filed this action over two years ago on December 22, 1989, charging Cobe with the infringement of four of Baxter's patents.[FN1] The patents all concern aspects of the use of centrifuges for the processing of blood and blood components. Cobe answered Baxter's Complaint on June 28, 1990, asserting in an Answer and Counterclaim that each of the four patents was invalid, unenforceable, and had not been infringed. Additionally, Cobe sought declaratory judgment to the effect that another Baxter patent, U.S. patent No. 4,934,995, was invalid, unenforceable and had not been infringed. In May of 1991, Cobe filed a motion seeking partial summary judgment of invalidity of Baxter's patent 4,734,089 (" '089 patent"), and another motion seeking leave to add an antitrust counterclaim which it referred to as its "Second Claim for Relief." On November 22, 1991, the court denied Cobe's motion for partial

summary judgment of invalidity of the '089 patent.[FN2]

The court, however, granted Cobe's motion for leave to file its antitrust counterclaim.

Extensive discovery has continued on these matters since the onset of the case. Baxter in its briefs represents that "hundreds of thousands of pages of material have been produced for inspection and copying by both parties" and that "tens of thousands of copies have been made and over thirty days of deposition testimony have been taken." The parties both represented to this court some time ago that their discovery on the patent issues should be completed within a period of several months.

II.

Under Rule 42(b) of the Federal Rules of Civil Procedure,[FN3] a trial court has broad discretion in ordering separate trials. *See Ventrex Laboratories, Inc. v. AB Fortia,* 223 U.S.P.Q. 897, 898 (D.Me.1983). Various federal district courts throughout the country have almost consistently found it to be in the best interest of the economy and convenience of the court and as well as of the parties to sever antitrust and similar issues from the issues of patent validity and infringement, and to stay discovery and trial of antitrust issues until the patent issues have been determined by trial. *See Ventrex, supra; Components, Inc. v. Western Elec. Co., Inc.,* 318 F.Supp. 959, 965-68 (D.Me.1970).

Serious concerns for economy and fairness have led this court to conclude that the antitrust claim raised by Cobe should be severed from the patent issue and that independent discovery on the antitrust issues should be stayed pending the outcome of the patent case. First in the court's mind is the fact that Cobe's antitrust counterclaim raises new issues that could be rendered moot by the decisions on the patent issues. Cobe's antitrust counterclaim charges that Baxter violated Section 2 of the Sherman Act by attempting to monopolize the alleged market in what are referred to as "five-day platelet disposables".[FN4] To demonstrate a violation of Section 2 of the Sherman Act based on a fraudulently procured patent, Cobe has to prove not only that the '089 patent was obtained by an intentional fraud involving affirmative

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                        Page 2
Not Reported in F.Supp., 1992 WL 77665 (N.D.Ill.)

dishonesty, but also must show the presence of the essential elements of a monopolization charge, i.e. (1) that a relevant market exists; (2) that the fraudulently procured patent allowed the patentee to obtain economic dominance in the relevant market; and (3) that as a result the complaining party suffered injury. *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.,* 812 F.2d 1381, 1384 (Fed.Cir.1987); *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.,* 382 U.S. 172, 177 (1965); *Ekco Products, Inc. v. Dare Plastics, Inc.,* 173 U.S.Q.P. 664, 665-66 (S.D.Ohio 1972).

**\*2** At the request of the parties the court has bifurcated the patent liability and damages, and has stayed proceedings concerning issues relating solely to damages until after a determination has been made of liability. Thus, as it its today, the case is proceeding through discovery and trial on the patent liability issues alone. Other than the issue of fraudulent patent procurement, none of the proposed antitrust issues are directly related to the patent liability issues of infringement and validity. A determination of patent infringement requires interpretation of the patent claims and evaluation of the accused products sold by Cobe to determine whether the accused Cobe products embody or use the claimed subject matter of the patents-in-suit, i.e., whether the claims "read on" the accused Cobe products. The patent issues, do not therefore, involve any substantial proof in common with the antitrust issues, i.e. relevant market, damage to Cobe, economic dominance of the patent in the relevant market, predatory pricing activity, Baxter's cost of manufacturing or selling price, or Baxter's subjective intent in bringing this action.

This court finds persuasive on this issue the statement made by the trial court in *Foster Wheeler v. Babcock,* 440 F.Supp. 897, 902 (S.D.N.Y.1977), where the judge there stated that the antitrust counterclaims before it "interject[ed] a host of entirely new issues, such as the scope of the relevant market, the impact of the patents ... and so on, requiring extensive additional proofs." *See also Components, Inc. v. Western Elec. Co., Inc.,* 318 F.Supp. 959, 965-68 (D.Me.1970). The only issue which is common between the patent and antitrust issues in our case here is whether the '089 patent was fraudulently procured. Cobe's antitrust counterclaim is devoted almost entirely to this as the basis for its allegation of

antitrust violation. Trial of the patent issue will be dispositive of the issue of enforceability. If, after trial of the patent issues, the court concludes that the '089 patent is enforceable, then most of Cobe's antitrust counterclaim will be rendered moot. If Cobe, however, proves by clear and convincing evidence that the '089 patent is unenforceable, then that decision will be binding in any subsequent litigation, and no repetition or duplication of proof will be necessary. In a similar setting the trial judge in the *Ventrex* case stated:

[R]esolution of the issue of patent validity and enforceability of the '760 patent, which will include resolution of the issue of fraud on the Patent Office, would as a practical matter make it unnecessary to litigate the remaining antitrust issues set forth in Ventrex's complaint. It is true that resolution of the patent issue will not necessarily dispose of all of the Ventrex claims of anti-competitive conduct. It appears very probable that decision concerning the validity, [sic] enforceability of the '760 patent will resolve many of the questions presented by the antitrust complaint.

**\*3** *Ventrex, supra,* at 899. That reasoning is equally applicable to the situation that exists before this court.

### III.

Cobe recently submitted a supplemental brief in opposition to Baxter's motion to sever and stay the discovery and trial of Cobe's antitrust counterclaim. This supplemental brief focuses on alleged new evidence that Cove claims presents an overwhelming showing of fraud committed on the patent office by Baxter in procuring the '089 patent. This court believes that this supplemental brief of Cobe is unnecessary and that the alleged evidence of fraud contained within that brief does not serve to support a denial of Baxter's motion to sever and stay the antitrust issues.

On February 21, 1992, Cobe received from Baxter's counsel a copy of a cassette tape produced by Houshang Lolachi, a former Baxter employee who was a central figure in Baxter's development of its sealless centrifuge. The tape purportedly contains a recording made by Lolachi of a telephone conversation that occurred on February 2, 1977,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1992 WL 77665 (N.D.Ill.)

between Lolachi and a Donald Finn, who was the president of Aminco, the subsidiary of Baxter responsible for the development of its sealless centrifuge.

The Lolachi tape provides what Cobe characterizes as "new and dramatic evidence of Baxter's knowing and willful fraud committed upon the U.S. Patent Office in the prosecution of the main patent-in-suit, the '089." At the time of that telephone conversation Baxter had two patent applications pending which contained patent claims for a sealless centrifuge and sealless disposable set, Ser. Nos. 657,186 and 657,187, both of which identified Lolachi as the inventor. At that same time a competing patent application was filed by the U.S. Government in the name of Yoichiro Ito, Ser. No. 661,114, which also contained patent claims on a sealless centrifuge. Cobe says in its briefs and in paragraph 39 of its Amended Counterclaim, that Baxter's designation of Lolachi as the sole inventor presented a serious problem in Baxter's prosecution, since there was this pending Ito patent. Cobe alleges that Baxter knew that Ito had made a complete drawing of a sealless centrifuge back in October, 1973, whereas Lolachi supposedly did not start working at AMINCO on Baxter's centrifuge until January of 1974. Thus, Cobe asserts Baxter, in realizing that it could not possibly establish priority over the Ito application if Lolachi were designated as the sole inventor of the Lolachi applications, decided that it needed to "fix" the problem by adding the names of some other inventors to the patent. Cobe goes on to assert that this proffered telephone conversation demonstrates Baxter's attempt at fixing the problem. In that recorded conversation, Finn reportedly telephoned Lolachi in an effort to persuade Lolachi to consent to the addition of a Herbert Cullis and a Herbert Goldsmith as co-inventors on the Lolachi patent applications. In this conversation, Lolachi is supposed to have refused to do so.

*4 Cobe strongly asserts that this telephone conversation discredits and "exposes as utterly false" the explanation that Baxter gave to the Patent Office after the alleged conversation when Baxter cancelled the patent claims for the sealless centrifuge and the sealless disposable set from the Lolachi patent application and added them to a patent application that was being filed in the name of Cullis, the application which matured into the '089 patent. Cobe

contends that Baxter's representations to the patent office that the patent claims had been included in Lolachi's patent applications through "inadvertent error" were totally at odds with Baxter's attempt to persuade Lolachi to consent to the addition of Cullis and Goldsmith as co-inventors on Lolachi's patent applications.

The court is not convinced that the discovery of this fifteen year old tape serves to add any more credence to Cobe's opposition to Baxter's motion to stay and sever Cobe's antitrust counterclaim. Cobe has already argued at length that the '089 Cullis patent was procured by fraud in the Patent and Trademark Office and that there is an overlap of proof between that argument and the antitrust issues. To the extent that there is overlap it should be resolved in the trial of the patent liability issues. As already stated, Cobe's argument that the '089 Cullis patent was procured by fraud will be tried with the patent liability issues even though a stay of the antitrust issues is granted.

The evidentiary impact of the Lolachi tape may not be as severe as Cobe portrays it. The most that could be ascertained from the Lolachi tape is that Lolachi presumably had a discussion with a Baxter representative regarding inventorship, after evidence had been uncovered that Cullis was the inventor of the broad subject matter set forth in the Lolachi applications. This may not necessarily be proof of fraud. Rather the statement could be seen as being fully consistent with the statements made to the Patent Office some eight months later that Baxter had determined that Cullis was the inventor of the broad claims to a sealless blood processing centrifuge.

IV.

The Lolachi tape does not diminish the prejudice that Baxter would suffer if no stay of the antitrust issue were granted. If Cobe's antitrust counterclaim were not stayed, Baxter would be put in the position of having to choose between giving up a viable defense, on the one hand, and waiving the attorney-client privilege on the other hand. Either choice would result in prejudiced to Baxter. This prejudice is substantially lessened by the staying of Cobe's antitrust counterclaim.

Cobe's antitrust counterclaim is founded in part on the allegation that the present action was commenced

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1992 WL 77665 (N.D.Ill.)

in bad faith, with knowledge that the patents-in-suit were invalid or not infringed. For this proposition, Cobe has relied upon *Handgards Inc. v. Ethicon Inc., 601 F.2d 986, 202 U.S.P.Q. 342 (9th Cir.1979)*. Under *Handgards,* Cobe must prove, *inter alia,* that the present action was brought in bad faith. *Handgards, supra,* 601 F.2d at 996, 202 U.S.P.Q. at 351. To rebut that claim, Baxter would have to present proof that the present litigation was brought in good faith. The most direct source of evidence of Baxter's good faith would be testimony of Baxter's attorney, who has represented Baxter since the outset of this case over two years ago. Baxter would be unable to call its counsel as a witness unless it first released him from further representation of Baxter in this matter. *American Hospital Supply Corp. v. Roy Lapidus, Inc.,* 493 F.Supp. 1076, 1078 (D.Mass.1980). Thus, if Cobe's antitrust were not stayed, Baxter would be required to forego one of its relevant sources of evidence or to obtain new counsel. Obtaining new counsel for this complex case would be expensive and would necessarily result in substantial delay.

**\*5** Even if Baxter were to rely upon the testimony of its own in-house counsel, instead of trial counsel, it would risk the waiver of attorney-client privilege regarding pre-litigation investigations.

The court, therefore, must do what it can to reduce probable prejudice to one side, without causing prejudice to the other. This can be done by staying the antitrust counterclaim proceedings until after a resolution of the patent issues.

## V.

One of the considerations repeatedly relied upon by the courts in dealing with this problem is the overwhelming burden that is placed on the jury of simultaneously trying both a patent case and an antitrust case. *Components, Inc. v. Western Electric Co., 318 F.Supp. 959, 967, 167 U.S.P.Q. 583, 590 (D.Me.1970)*; *Ventrex, supra,* 223 U.S.P.Q. 897, 899 (D.Me.1983). In the instant case, even without the antitrust issues, the situation is a complex and difficult one for the trier of fact. There are five separate patents involved, each directed to a unique technical subject matter. Cobe has alleged that each of the patents is invalid and unenforceable. Accordingly, the trier of fact will be faced with

evaluating the complex proofs regarding patent claim interpretation, infringement, the scope and content of the prior art, the level of ordinary skill in the art, and the objective evidence of non-obviousness for each of the five patents.

As the judge said in the *Components* case, "The consideration of all these issues at one trial would impose a heavier burden than is sensible on a single judge." *Components, supra,* 318 F.Supp. at 967, 167 U.S.P.Q. at 590. Similarly, in *Ventrex Laboratories, supra,* 223 U.S.P.Q. at 899, the court stayed the antitrust issues in part because such issues would present to a single jury too many complex and difficult issues. The court said that, "it's almost inconceivable that a jury could arrive at an intelligent verdict." Again, the rationale of the *Ventrex* is applicable to the complex scenario that exists in the case here before this court.

## VI.

### CONCLUSION

The antitrust counterclaim asserted by Cobe must be severed from the rest of the litigation and discovery on all antitrust issues should be stayed pending the outcome of the patent infringement claims that are presently asserted by Baxter. Without a stay of the antitrust issues, Baxter would be unfairly prejudiced because it would be forced to either abandon a "good faith" defense or rely upon the testimony of counsel to show good faith and thereby disqualify counsel and waive the attorney client privilege. By proceeding first with the patent liability issues and staying proceedings on the antitrust issues this prejudice will be avoided. Additionally, the antitrust issues may be rendered moot by the determinations to be made during the patent liability trial. Accordingly, Baxter's motion to sever and stay the antitrust issues is granted.

### ENTER:

Cobe's "Second Claim for Relief" is severed from the patent liability issues, and all proceedings are hereby stayed until after the trial of the issues of patent validity, infringement, and unenforceability. Accordingly, Baxter's motion to sever and stay the antitrust issues is granted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 77665 (N.D.Ill.)

Page 5

FN1. Baxter alleged that Cobe infringed Baxter's U.S. Letters Patents Nos. 4,734,089, 4,526,515, 4,283,004, and 4,151,844.

FN2. Cobe's motion for reconsideration or, in the alternative, for leave to proceed with an interlocutory appeal of the court's order denying the summary judgment motion is currently pending.

FN3. Rule 42(b) provides in pertinent part:

(b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any ... counterclaim ... always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a Statute of the United States.

FN4. Cobe alleges specifically that Baxter in its attempt to monopolize:

(1) engaged in a "knowing and willful fraud and/or inequitable conduct ... upon the U.S. Patent Office, and because Baxter had actual knowledge that its '089 patent was invalid and/or unenforceable prior to commencing this suit;"

(2) engaged in predatory pricing by selling its patented CS3000 apheresis device at below cost to commit as many customers as possible to purchasing only Baxter's five-day platelet disposables.

(3) is wrongfully asserting three other patents which are not infringed.

N.D.Ill.,1992.
Baxter Intern., Inc. v. Cobe Lab, Inc.
Not Reported in F.Supp., 1992 WL 77665 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT – UNREPORTED CASE 6

Westlaw.

Not Reported in F.Supp.2d                                                            Page 1
Not Reported in F.Supp.2d, 2005 WL 1711154 (W.D.Wis.)

**H**Briggs & Stratton Corp. v. Kohler Co.
W.D.Wis.,2005.
Only the Westlaw citation is currently available.
United States District Court,W.D. Wisconsin.
BRIGGS & STRATTON CORP., Plaintiff,
v.
KOHLER CO., Defendant.
**No. 05C0025C.**

July 20, 2005.

OPINION AND ORDER

CRABB, J.
**\*1** In this patent infringement suit, plaintiff Briggs & Stratton Corp. accuses defendant Kohler Co. of manufacturing and selling a single-cylinder internal combustion engine that infringes plaintiff's U.S. Patents Nos. 6,382,166 and 6,460,502. In response to the lawsuit, defendant has filed six counterclaims, alleging noninfringement, patent invalidity, violations of 15 U.S.C. §§ 1 and 2 of the Sherman Act, Wisconsin antitrust laws, Wis. Stat. §§ 133.03, 133.04, 133.04, 133.14 and 133.18, and Wisconsin common law of unfair competition. Now before the court is plaintiff's motion to dismiss defendant's antitrust and unfair competition counterclaims. Jurisdiction is present. 28 U.S.C. §§ 1331 and 1338.

The crux of plaintiff's motion is whether defendant's counterclaims meet the liberal pleading standards under Fed.R.Civ.P. 8(a). Plaintiff argues that because defendant has alleged no injury to the competitive process and because it fails to plead the elements of any recognized federal or state antitrust claim, this court should grant plaintiff's motion to dismiss defendant's antitrust and unfair competition counterclaims under Fed.R.Civ.P. 12(b)(6). In the alternative, plaintiff asks the court to sever the patent claims from the antitrust claims pursuant to Rule 21. In response, defendant contends that its counterclaims meet the notice pleading requirements of Rule 8(a) and that the court can meet plaintiff's concerns about delay, increased complexity of trial and juror confusion by bifurcating the patent and antitrust cases under Rule 42(b), rather than severing them under Rule 21. Because defendant's counterclaims meet the minimal pleading

requirements of Rule 8(a), I will deny plaintiff's motion to dismiss. In addition, because both parties agree to bifurcation of the patent and antitrust cases, I will deny plaintiff's motion to sever the antitrust claims under Rule 21 and bifurcate the cases pursuant to Rule 42(b).

For the sole purpose of deciding the motion to dismiss, I find that the well-pleaded allegations of plaintiff's complaint and defendant's answer fairly allege the following.

ALLEGATIONS OF FACT

A. *Factual Allegations of Complaint*

Plaintiff Briggs & Stratton Corporation and defendant Kohler Co. are competitors in the market for the manufacture and sale in the United States of engines used in consumer lawn tractors.

On May 7, 2002, the U.S. Patent and Trademark Office issued U.S. Pat. No. 6,382,166 (the '166 patent) to Daniel L. Klika and John H. Thiermann for an invention entitled "Balancing System Using Reciprocating Counterbalance Weight." On October 8, 2002, the United States Patent and Trademark Office issued U.S. Pat. No. 6,460,502 (the '502 patent) to Gary J. Gracyalny for an invention entitled "Engine Cylinder Head Assembly." By virtue of assignment, plaintiff acquired and continues to maintain all rights, title and interest in the '166 and '502 patents.

Without the permission of plaintiff, defendant manufactures, sells and offers for sale deliberately and willfully in the United States a single-cylinder internal combustion engine that infringes the claims of the '166 patent. In addition, defendant manufactures, sells and offers for sale deliberately and willfully in the United States a single-cylinder internal combustion engine that infringes the claims of the '502 patent.

B. *Factual Allegations of Answer and Counterclaim*

**\*2** According to defendant, the '166 and '502 patents

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1711154 (W.D.Wis.)

are invalid and void for failing to meet one or more of the conditions for patentability specified in 35 U.S.C. §§ 102, 103 and 112. In addition, plaintiff has monopoly power in the consumer lawn tractor market, as demonstrated by plaintiff's market share as well as by significant barriers to entry, including the investment, technology and business reputation necessary to manufacture and market the products in the consumer lawn tractor market. Plaintiff has willfully maintained its monopoly power in the consumer lawn tractor market by illegal anticompetitive and exclusionary acts and by engaging in unreasonable agreements in restraint of trade affecting a substantial volume of commerce, including, but not limited to the following: 1) bundling rebates that defendant pays to both its direct purchasers (original equipment manufacturers that incorporate engines into a consumer lawn tractor) and to retailers that sell completed consumer lawn tractors directly to consumers; and 2) entering into exclusionary contracts that expressly or effectively require direct purchasers or retailers to deal exclusively with plaintiff and not with its competitors, including defendant. Plaintiff has acted for the purpose and with the effect of obtaining and maintaining monopoly power in the market for engines for consumer lawn tractors and it has excluded competition from that market in violation of the Sherman Act §§ 1 & 2, Wis. Stat. §§ 133.03, 133.04, 133.05, 133.14 and 133.18 and Wisconsin unfair competition laws. Plaintiff's monopoly power has not resulted from superior products or business acumen or competition on the merits, but rather from unlawful anticompetitive conduct.

As a result of plaintiff's conduct, consumers have been harmed by having to pay higher prices for products in the consumer lawn tractor market and by being denied choice. In addition, plaintiff's conduct has harmed defendant in its business or property through lost sales and profits. Defendant had a reasonable probability of deriving economic benefit from ongoing and prospective business relationships with third parties involving the sale of products to those parties. Plaintiff interfered with defendant's relationships with its customers and prospective customers knowingly and without justification or excuse, causing harm to those relationships and economic loss to defendant.

DISCUSSION

A. *Motion to Dismiss*

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) will be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" of the complaint. *Cook v. Winfrey,* 141 F.3d 322, 327 (7th Cir.1998) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, (1984)); *Gossmeyer v. McDonald,* 128 F.3d 481, 489 (7th Cir.1997)). In deciding a Rule 12(b)(6) motion to dismiss, the court takes as true all well-pleaded facts, drawing all inferences and resolving all ambiguities in favor of the non-moving party. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992).

*3 The Federal Rules of Civil Procedure provide for a system of notice pleading pursuant to Rule 8, which requires only that the plaintiff set out a "short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2)."The primary purpose of [Rule 8] is rooted in fair notice: under Rule 8, a complaint must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is."*Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 775 (7th Cir.1994) (citations omitted). In light of this liberal standard, a party can resist a 12(b)(6) motion to dismiss by setting out facts sufficient to outline the basis of its claim.*Panaras v. Liquid Carbonic Indus. Corp.,* 74 F.3d 786, 792 (7th Cir.1996).

Plaintiff raises two related arguments: 1) defendant lacks standing to bring antitrust claims because it failed to allege injury to the competitive process and instead alleged that it lost business, which is not an antitrust injury; and 2) even if defendant had standing, it failed to allege any facts that amount to a violation of antitrust law. Specifically, according to plaintiff, defendant failed to allege what market share plaintiff has, what shares its competitors have or what barriers it has erected to expansion by existing firms such as defendant. Defendant points out correctly that Rule 8(a) requires notice pleading only and therefore, its allegations are sufficient. Defendant's counterclaims identify the laws under which it is suing and the anticompetitive actions in which plaintiff is engaged, namely 1) bundling rebates that defendant pays to both its direct purchasers and to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                              Page 3
Not Reported in F.Supp.2d, 2005 WL 1711154 (W.D.Wis.)

retailers that sell completed consumer lawn tractors directly to consumers; and 2) entering into exclusionary contracts that expressly or effectively require direct purchasers or retailers to deal exclusively with plaintiff and not with its competitors, including defendant. These allegations are sufficient to put plaintiff on notice of the counterclaims and allow it to file an answer. *See, e .g., Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 863 (7th Cir.2002) (federal pleading rules require that complaint only give notice of plaintiff's claim and not that it spell out facts underlying claim) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir.1999)) ("The courts keep reminding plaintiffs that they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories.") (citing *Johnson v. Hondo, Inc.*, 125 F.3d 408, 417 (7th Cir.1997)). Whether defendant will be able to prove facts consistent with its allegations that reveal a violation of antitrust law is a matter for summary judgment.

### B. Motion to Sever

As an alternative to its motion to dismiss, plaintiff asks the court to sever the antitrust claims from the patent claims pursuant to Rule 21 because the antitrust claims raise different issues and will require different proof. Rule 21 allows a court to sever any claim against a party. According to plaintiff, without severance, the jury may become confused regarding damages incurred from the patent infringement claims and the antitrust claims. Furthermore, plaintiff contends, without severance and upon appeal, the Court of Appeals for the Federal Circuit will have to apply the antitrust laws of the Court of Appeals for the Seventh Circuit; severance would allow the Seventh Circuit to hear any appeals regarding the antitrust claims.

**\*4** Defendant points out that plaintiff's concerns can be addressed by separating the patent and antitrust trials pursuant to Rule 42(b), which allows a court to conduct separate trials on claims in furtherance of convenience or to avoid prejudice and which defendant would be willing to accept. Defendant is correct when it contends that the Federal Circuit's jurisdiction does not change upon severance of claims; the court's jurisdiction is based on the

allegations in the complaint. *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1343 (Fed.Cir.2003). Because the complaint in this case alleges patent infringement claims, the Federal Circuit has jurisdiction. *Id.* (Federal Circuit has appellate jurisdiction if district court's original jurisdiction was based in part on 28 U.S.C. § 1338, as determined by plaintiff's well-pleaded complaint). In addition, separating trials of patent and antitrust claims pursuant to Rule 42(b) is typical. *See, e.g., Brandt, Inc. v. Crane*, 97 F . R.D. 707, 708 (N.D.Ill.1983) ("As a general rule, separate trials of patent and antitrust claims further the interests of convenience, expediency and economy.") In its reply brief, plaintiff appears to concede that it would be satisfied with a separate trial and separate discovery and pre-trial schedules for the antitrust claims. Plt.'s Reply Br., dkt. # 31, at 3. Therefore, I will order the clerk of court to set a scheduling conference to arrange a separate trial date and discovery schedule for defendant's antitrust and unfair competition claims and deny plaintiff's motion to sever those claims from the patent claims as unnecessary.

### ORDER

IT IS ORDERED that

1. Plaintiff Briggs & Stratton Corporation's motion to dismiss plaintiff Kohler Co.'s antitrust and unfair competition counterclaims pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED;

2. Plaintiff's motion to sever defendant's antitrust counterclaims from the patent claims pursuant to Fed.R.Civ.P. 21 is DENIED as unnecessary;

3. The clerk of court is directed to set a scheduling conference before the magistrate judge to address bifurcation of the antitrust claims from the patent claims.

W.D.Wis.,2005.
Briggs & Stratton Corp. v. Kohler Co.
Not Reported in F.Supp.2d, 2005 WL 1711154 (W.D.Wis.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT – UNREPORTED CASE 7

**Westlaw.**

Slip Copy                                                                                   Page 1
Slip Copy, 2007 WL 4261696 (D.Del.)

**H**Callaway Golf Co. v. Acushnet Co.
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
CALLAWAY GOLF COMPANY, Plaintiff,
v.
ACUSHNET COMPANY, Defendant.
**Civ. No. 06-91-SLR.**

Nov. 30, 2007.

Thomas Lee Halkowski, Fish & Richardson, P.C., Wilmington, DE, Craig R. Compton, Pro Hac Vice, John V. Picone, III, Pro Hac Vice, Roger A. Denning, Pro Hac Vice, for Plaintiff.
David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE, Alan M. Grimaldi, Pro Hac Vice, Brian Rosenthal, Pro Hac Vice, Clinton H. Brannon, Pro Hac Vice, John E. Dubiansky, Pro Hac Vice, Joseph P. Lavelle, Pro Hac Vice, Kenneth W. Donnelly, Pro Hac Vice, for Defendant.

### MEMORANDUM ORDER

SUE L. ROBINSON, District Judge.
*1 At Wilmington this 30th day of November, 2007, having reviewed all the papers submitted in connection with the evidentiary issues raised at the pretrial hearing;

IT IS ORDERED that:

**1. Test golf balls.**[FN1]Evidence relating to Acushnet's test golf balls may be admitted, but only under the following specific circumstances: Dr. Statz may testify consistent with his expert report vis-a-vis the prior art and motivation to combine. He may not testify about the test golf balls. Only if Callaway, through its cross examination, raises an issue of fact that implicates the test golf balls [FN2] may such balls become the subject of testimony. More specifically, with permission and following Dr. Statz's testimony, Acushnet may present its fact witnesses to testify about the testing procedures. If a proper foundation is laid in this regard, Dr. Statz may retake the stand to relate how and why he relied on these results for his opinion of invalidity.

FN1. These balls may **not** be referred to as "prior art" balls or "hybrid" balls.

FN2. At the conclusion of Dr. Statz's testimony, Acushnet may make its proffer as to the relevance of the test golf balls.

**2. Professional golfers.**I conclude that Callaway timely identified both Greg Norman and Phil Mickelson as witnesses. I also conclude, however, that the kind of testimony I had envisioned [FN3] their giving is more appropriately the subject of expert testimony. Therefore, none of the identified professional golfers may testify generally as to the characteristics of the patented golf balls (as discerned through personal play) or the golf ball market. Nevertheless, I understand that Mr. Mickelson has some personal experiences with Acushnet that may, or may not, be relevant [FN4] to the issues at bar. Therefore, I will entertain a proffer at the end of Acushnet's case in chief as to Mr. Mickelson's expected rebuttal testimony to determine, at that point, whether he is an appropriate fact witness (i.e., he has personal knowledge of relevant facts).

FN3.See e.g., D.I. 217, ex. 18.

FN4.See, e.g., D.I. 355.

**3. Willfulness.**Upon further reflection, I have concluded that the issue of willfulness shall be bifurcated, to be tried with the issue of damages.

**4. Injunctive relief.**The entry of injunctive relief, if implicated by the verdict, shall be resolved through the course of post-trial briefing.

D.Del.,2007.
Callaway Golf Co. v. Acushnet Co.
Slip Copy, 2007 WL 4261696 (D.Del.)

**END OF DOCUMENT**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT – UNREPORTED CASE 8

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

**C**Dentsply Intern., Inc. v. New Technology Co.
D.Del.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
DENTSPLY INTERNATIONAL, INC., and Tulsa
Dental Products, Inc., Plaintiffs,
v.
NEW TECHNOLOGY COMPANY (aka NT
Company), Tycom Corporation, and Tycom Dental
Corporation, Defendants.
**Civ.A. No. 96-272 MMS.**

Dec. 19, 1996.

Edward B. Maxwell, 2nd, and Josy W. Ingersoll,
Young Conaway Stargatt & Taylor, Wilmington, DE
(Dale M. Heist, Albert J. Marcellino, and Lynn A.
Malinoski, Woodcock Washburn Kurtz Mackiewicz
& Norris, Philadelphia, PA, of counsel), for
plaintiffs.
Jack B. Blumenfeld, and Julia Heaney, Morris,
Nichols, Arsht & Tunnell, Wilmington, DE (Don W.
Martens, Craig S. Summers, and Stephen M. Lobbin,
Knobbe, Martens, Olson & Bear, Newport Beach,
CA, George L. Graff, and Davis S. Benyacar, Paul,
Hastings, Janofsky & Walker LLP, New York (City,
of counsel), for defendants.

*MEMORANDUM OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

I. INTRODUCTION

**\*1** Plaintiff corporations Dentsply International, Inc.
("Dentsply") and Tulsa Dental Products, Inc.
("Tulsa") (collectively, "plaintiffs"), have brought
three claims against defendant corporations New
Technology Co. ("New Technology"), NT
Acquisition Corp. ("NT Acquisition"), and Tycom
Dental Corp. ("Tycom Dental") (collectively,
"defendants"). Docket Item Number ("D.I.") 7. The
claims arise from the alleged infringement of two
Dentsply patents--U.S. Patent Number ("No.")
4,934,934 entitled "Dental File/Reamer Instrument"
and U.S. Patent No. 5,464,362 entitled "Endodontic
Instrument." D.I. 7 at Exhibits ("Exh.") 1, 2. In Count
I of the Amended Complaint, plaintiffs allege patent
infringement. D.I. 7 at 3. In Count II, plaintiffs allege
trade secret misappropriation, D.I. 7 at 4, and in
Count III, plaintiffs allege breach of contract, D.I. 7
at 8. Plaintiffs invoke this Court's jurisdiction under
28 U.S.C. §§ 1338 and 1367.

Defendants answered and brought a four-count
counterclaim. D.I. 12. Their first count seeks a
declaration of noninfringement and invalidity of
Dentsply's two patents. D.I. 12 at 6. Their second
count alleges violations of the Sherman Antitrust Act,
15U.S.C. § 2. D.I. 12 at 7. Counts III and IV allege
violations of Delaware law; specifically, Count III
alleges tortious interference with business relations,
and Count IV asserts plaintiffs engaged in unfair
competition. D.I. 12 at 8, 9. After oral argument,
defendants dropped Counts III and IV of their
counterclaim. D.I. 67.

Plaintiffs have moved to: (1) bifurcate the antitrust
counterclaim pursuant to Rule 42(b) of the Federal
Rules of Civil Procedure; and (2) stay all discovery
on the antitrust counterclaim until trial on the patent
infringement issues has concluded. D.I. 23.[FN1]For the
reasons below, the Court will grant the motion to
bifurcate, but the motion to stay will be denied.

> FN1. Plaintiffs also moved to dismiss the
> state law counterclaims for an alleged failure
> to plead sufficient information to outline the
> elements of the claims and an alleged failure
> to plead with specificity pursuant to Rule
> 9(b) of the Federal Rules of Civil Procedure.
> D.I. 23. This aspect of plaintiffs' motion was
> mooted when defendants agreed to the
> voluntary dismissal of the state law
> counterclaims without prejudice. D.I. 67.

II. DISCUSSION

A. Motion to Bifurcate

Rule 42(b) of the Federal Rules of Civil Procedure
provides that a district court, "in furtherance of
convenience or to avoid prejudice, or when separate
trials will be conducive to expedition and economy,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

may order a separate trial of any claim [or] ... counterclaim."The decision on whether to order separate trials under Rule 42(b) is a matter of "informed discretion" by the district court. *Lis v. Robert Packer Hosp.*, 579 F.2d 819, 824 (3d Cir.) (citations omitted), *cert. denied,*439 U.S. 955 (1978).[FN2]

> FN2. Defendants argue that the Court should only grant the motion to bifurcate upon a showing of substantial prejudice by the plaintiffs. D.I. 33 at 11 (quoting 5 MOORE'S FEDERAL PRACTICE ¶42.03, at 43-46). This request is belied by the plain text of the bifurcation Rule itself. The Rule clearly provides bifurcation may be ordered "in furtherance of convenience *or* to avoid prejudice, *or* when separate trials will be conducive to expedition and economy ...."FED. R. CIV. P. 43(b) (emphasis added).

Plaintiffs offer four justifications as to why bifurcation is warranted in this case. First, they assert that bifurcation will remove patent and trade secret issues from the counterclaim, thus simplifying or even eliminating the antitrust count of the counterclaim. Second, they contend there will be little or no overlap in evidence on the patent and antitrust claims. Third, they state that bifurcation, given the complex nature of this case, will reduce confusion of the jury. Finally, they submit, an order of separate trials will streamline the resolution of the entire controversy. According to plaintiffs, these four factors--all subserving the ideal of thorough and efficient justice--militate toward an order of bifurcation under Rule 42(b).*See In re Innotron Diagnostics,* 800 F.2d 1077, 1085 (Fed. Cir. 1986) (considering substantially similar factors).

**\*2** Defendants, on the other hand, weigh these four factors much differently. They argue that the Court, after deliberating on all of the factors in this case, should refrain from ordering separate trials. The Court turns now to the contentions of each side.

### 1. Will Bifurcation Simplify or Eliminate the Antitrust Counterclaim?

In their antitrust counterclaim, defendants allege plaintiffs acted in three ways to monopolize the market for endodontic files[FN3] in violation of the

antitrust laws; by:

> FN3. Endodontic files are flexible dental instruments, used in dental surgery, including root canal surgery. The files at issue in this lawsuit are configured to follow a curved tooth root canal. D.I. 7 at Exh. 1.

(a) Instituting this litigation in bad faith and without good grounds to believe, founded upon reasonable inquiry that defendants have infringed one or more of the patents-in-suit, have misappropriated any valid trade secrets or breached any contract, for the express purpose of hindering and preventing defendants from engaging in lawful competition.

(b) Acquiring competitors and potential competitors with the purpose and effect of eliminating lawful competition.

(c) Using their monopoly power in an effort to compel customers to enter into long-term supply contracts in order to foreclose entry into the market of lawful competition.

D.I. 12 at 7, ¶15.

In the first count of its counterclaim, defendants allege plaintiffs violated the antitrust laws by engaging in "sham" litigation--using spurious claims as a thug tactic of intimidation and harassment. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49 (1993), the Supreme Court established a two-part test to identify such "sham" litigation. First, a lawsuit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and second, the litigant's "subjective motivation" must have been "to interfere *directly* with the business relationships of a competitor."508 U.S. at 60-61 (quoting *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144 (1961)). Further, "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."*Id.*

Thus, plaintiffs are correct in their assertion that if they can convince a jury that defendants have infringed their patent, an important aspect of the defendants' antitrust counterclaim--their allegations

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

of "sham" litigation-- will be mooted. A winning lawsuit cannot be considered a "sham," despite a subjective, anti-competitive motive by the litigant. *Professional Real Estate Investors, 508 U.S. at 60 n.5* ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 597 (Fed. Cir.)* ("The charge that Philips' patent infringement suit in Florida sham can not be deemed to have substance, for Philips prevailed in Florida on that issue."), *cert. denied,*116 S. Ct. 567 (1995); *Columbia Pictures Indus., Inc. v. Redd Horne, Inc., 749 F.2d 154, 161 (3d Cir. 1984)* (holding that success on the merits of an infringement action demonstrates clearly that it would be impossible to prove bad faith necessary for antitrust claim of "sham" litigation); *Levine v. Mciesky, 881 F. Supp. 1030, 1042 (E.D. Va. 1995)*. Further, although defendants contend plaintiffs must prevail in a first trial on both the patent and trade secret counts of their claim for an accusation of "sham" to be dismissed, they have not supported this contention with law. In fact, courts have indicated that litigation will not be considered a "sham" so long as at least one claim in the lawsuit has objective merit. *See Professional Real Estate Investors, 508 U.S. at 60* (specifying "*lawsuit* must be objectively baseless") (emphasis added); *Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556, 565 (4th Cir. 1990)* (holding since plaintiff succeeded on one of four claims, suit was "hardly a sham."), *cert. denied,*499 U.S. 947 (1991). Therefore, if plaintiffs prevail on one of their counts, the sham aspect of the antitrust counterclaim must fail.

*3 But as defendants point out, the "sham" allegation is just one aspect of their antitrust counterclaim. Defendants also allege two other instances of unlawful behavior by plaintiffs: the unlawful acquisition of competitors and the use of monopoly power to coerce customers into long-term supply contracts. See D.I. 12 at 7, ¶15. Even if plaintiffs prevail in a first trial, defendants argue, these two bases for an antitrust claim would still be viable and ripe for determination.

Defendants' vision of the antitrust claims surviving an adverse patent ruling is somewhat clouded. There is a possibility that all aspects of the antitrust counterclaim--including the two non-"sham" allegations--could be resolved by a first trial on

patent infringement. A patent gives a patent owner the right to exclude others from the marketplace for a statutory number of years. Accordingly, a patent confers upon its owner the ability to bring monopolistic characteristics to the marketplace--the very antithesis of a prime purpose of antitrust legislation. "[W]here a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."*SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981), cert. denied,*455 U.S. 1016 (1982); *Crucible, Inc. v. Stora Kopparbergs Bergslags AB, 701 F. Supp. 1157, 1160 (W.D. Pa. 1988)* (quoting *Xerox*). Thus, if the validity of the patents at issue is sustained, and a jury determines defendants have produced infringing products, defendants' allegations about illegal acquisition of competitors may be irrelevant. *See Axis, S.P.A. v. Micafil, Inc., 870 F.2d 1105, 1107 (6th Cir.)* (dismissing antitrust allegation of illegal acquisition of competitors because patents were "impenetrable barrier" to plaintiff company's entry into market), *cert. denied,*493 U.S. 823 (1989); *Valley Products, Inc. v. Landmark, 877 F. Supp. 1087, 1091-93 (W.D. Tenn. 1994)* (following reasoning of *Axis*, above); *United States v. L.D. Caulk Co., 126 F. Supp. 693, 705 (D. Del. 1954)* (reasoning that "a holder of a valid patent monopoly and without any unlawful combination or conspiracy with others is not limited to any percentage of control of that article which is covered by the patent. Such I think is the very purpose of the patent laws ...."). Further, plaintiffs have asserted they have not entered into long-term contracts that extend beyond the applicable terms of its patents; a portion of the antitrust counterclaim alleges such long-term contracts exist. Like the allegations of illegal acquisition of competitors, this could be the subject of a summary judgment motion in a later proceeding.[FN4]

> FN4. There is also a distinct possibility defendants lack standing to press the counterclaims based on illegal acquisition of competitors and long-term contracts. At oral argument, counsel for defendants fleshed out its antitrust argument; by acting in violation of the antitrust laws, plaintiffs had kept the price for endodontic instruments artificially high, thereby allowing defendants to adopt a favorable pricing structure. Accordingly, there is reason to question whether defendants have suffered an antitrust injury,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                      Page 4
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

a prerequisite to a justiciable antitrust claim. See *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986) ("[R]espondents [cannot] recover damages for any conspiracy by petitioners to charge higher than competitive prices in the ... market. Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price.") (internal citations omitted).

Defendants also warn the merits of the patent, trade secret and contract claims brought by plaintiffs will have to be completely relitigated to a second antitrust jury. The Federal Circuit Court of Appeals does not share this concern. In *In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986), the court ordered a separation of patent and antitrust trials and explained why such concerns are misplaced. "Economy is served," the court wrote, "because in the trial of the patent issues the validity of the patent ... will be determined and become law of the case and thus removed from trial on the original antitrust issues."*Id.* at 1085.Thus, if defendants' prevail at a first trial and demonstrate the invalidity of plaintiffs' patents, they need not again prove the same issues at a second trial. *Id.*

**\*4** Defendants stress these situations are mere possibilities and all of the antitrust issues may not be resolved in a first trial. This argument, however, misapprehends the goal of bifurcation. Separate trials may be warranted so long as some of the issues in a second trial would be simplified, *Akzona, Inc. v. E.I. Du Pont de Nemours & Co.*, 607 F. Supp. 227, 232 (D. Del 1984); all of the issues in a second trial need not be implicated in the first. See *Baxter Travenol Lab. v. LeMay*, 536 F. Supp. 247, 252 (S.D. Ohio 1982) (explaining "while Defendant's antitrust counterclaim is not based entirely on the allegedly 'sham' litigation, the Court deems it appropriate ... to permit Plaintiffs' complaint to go to trial first, in order to aid in the determination of whether said complaint is baseless.").

### 2. Is There An Overlap of Proofs?

Plaintiffs argue that bifurcation is further warranted because there is no overlap in proofs between the allegations in the complaint and the antitrust counterclaim. To prove the allegations in the complaint, plaintiffs anticipate introducing evidence regarding the patents, defendants' products, and the manner in which the defendants' products were developed and made. By contrast, plaintiffs assert evidence of a very different sort will be needed for the antitrust claim; proofs will focus on plaintiffs' actions in initiating this lawsuit, on the companies acquired by plaintiffs, on plaintiffs' business practices with its own customers, and proofs that endodontic instruments comprise a relevant product market in which plaintiffs exercised a monopoly. Thus, plaintiffs forcefully argue, the minuscule overlap in proof does not warrant a single trial.

Defendants concede there is not much overlap in proofs when the elements of the antitrust claims are compared with the elements of plaintiffs' claims. Defendants do expect a significant overlap of proofs, however, if and when the plaintiffs try to establish damages. According to defendants, plaintiffs will try to establish damages by calculating their loss in profits caused by the alleged infringement of their patents. But these profits should be reduced, defendants posit, because plaintiffs have "augment[ed] their profitability by virtue of their unlawfully acquired market power[.]" D.I. 33 at 9. Defendants attach an affirmation by an economist to demonstrate that the determination of damages in claims such as plaintiffs' generally depends upon what proportion of the alleged infringer's sales would have been recouped by plaintiff. See D.I. 33 at Exh. A. Thus, defendants argue, they are entitled to present evidence that plaintiffs engaged in anticompetitive activities as a defense to plaintiffs' damage claims; even if bifurcation is ordered, the parties would have to present the same issues twice, to two juries.

Plaintiffs respond by pointing out that no damage theories have been determined, and no damage proofs have been collected. But even if lost profits are pursued, plaintiffs argue, defendants have not pled any affirmative defenses based on antitrust or patent misuse allegations.[FN5]Finally, plaintiffs state they are willing to sever and stay any damage proceedings so that damages could be adjudicated either in a separate trial, or in conjunction with any antitrust claims that may remain viable for a second trial. See *Smith v. Alyeska Pipeline Serv. Co.*, 538 F. Supp. 977, 982-86

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

(D. Del. 1982) (ordering separate trials for liability and damages in patent case because issue of damages was complex), *aff'd mem.,*758 F.2d 668 (Fed. Cir. 1984), *cert. denied,*471 U.S. 1066 (1985).

> FN5. Patent misuse is "an affirmative defense that must be pleaded and proved."*Bio-Rad Lab., Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 617 (Fed. Cir.), *cert. denied,*469 U.S. 1038 (1984). Further, plaintiffs have cited authority which indicates if such an affirmative defense were proved, it would be a complete bar to the enforceability of a patent; there would not be any damages. *United States Gypsum Co. v. National Gypsum Co.,* 352 U.S. 457, 465 (1957) (holding "courts will not aid a patent owner who has misused his patents to recover *any* of their emoluments accruing during a period of misuse or thereafter until the effects of such misuse have been dissipated ...") (emphasis added).

### 3. Will Bifurcation Avoid Jury Confusion and Expedite Trial?

**\*5** This is the primary end to which any order of separate trials under Rule 42(b) is directed. All of the arguments advanced by both parties so far address, directly or indirectly, the issues of judicial economy and jury comprehension. In plaintiffs' view, if all of the diverse and complex evidence is presented in a single trial, the jury will be left numb and bewildered; application of Rule 42(b) will permit the jury to adroitly separate the antitrust chaff from the central patent and trade secret claims. Plaintiffs point out that, if both the complaint and counterclaims were presented in a single trial, a jury would not only have to determine whether the plaintiffs' patents were valid and infringed, but also whether its trade secrets were misappropriated--rigorous chores in and of themselves. If the antitrust counterclaims were tried at the same time, the jury would also have to consider, at a minimum, intricate factual and economic analyses regarding (1) the relevant market before and after plaintiffs' allegedly acquired competitors, (2) actual and potential shares in that market, (3) barriers to defendants' entry into the market, (4) long-term contracts plaintiffs' may or may not have had with customers, and whether those contracts violated the antitrust laws, (5) the issue of

whether the claims of the complaint were, viewed both objectively and subjectively, baseless, (6) antitrust damages, and (7) all the remaining concomitant antitrust considerations.

Defendants have countered by arguing a jury cannot eliminate antitrust considerations from its deliberations on plaintiffs' claims without severely prejudicing its defense. But this ignores the fact that courts have been bifurcating antitrust claims and patent infringement claims on a frequent and long-standing basis. Indeed, the Federal Circuit has endorsed the "now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim."*Innotron,* 800 F.2d at 1084. *See also Fischer & Porter Co. v. Sheffield Corp.,* 31 F.R.D. 534, 540 (D. Del. 1962) (quoting recommendation from Report of the Attorney General's National Committee To Study the Antitrust Laws that antitrust and patent issues should be considered in separate trials); *but see Genentech Inc. v. The Wellcome Found. Ltd.,* 14 U.S.P.Q.2d 1363, 1373 (D. Del. 1990) (denying bifurcation because proof that plaintiffs knew of prior art but intentionally withheld information from patent office bears on both defense to patent infringement and antitrust counterclaim). In this case, the only real and significant overlap of evidence defendants can delineate pertains to damages. This is not enough. Separate trials are warranted, and will be granted, pursuant to Rule 42(b).

### B. Motion to Stay Discovery on Antitrust Counterclaim

Although separate trials have been ordered, there remains a distinct and important issue: whether the Court should order a stay in discovery on the antitrust counterclaims. Replicating much of its argument in favor of bifurcation, plaintiffs argue that antitrust discovery should await a disposition of a first trial, since the first trial may remove some of antitrust claims. Plaintiffs also express their dread at engaging separate antitrust counsel for antitrust discovery; a stay in discovery would, no doubt, spare them considerable expense.

**\*6** The Court is skeptical about plaintiffs' concern about expense; after all, they brought the suit and are asking for discovery in their own right. Moreover, they should have expected an antitrust counterclaim,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

now commonplace in patent litigation. More importantly, a stay of discovery on antitrust issues would most likely devolve into a series of time-consuming and expensive discovery disputes as to whether particular discovery is directed at the patent or antitrust claims. Efficiency dictates that discovery on all claims, including the antitrust counterclaims, continue apace.

An order will be entered granting plaintiffs' motion to bifurcate the patent and trade secret trial from the antitrust trial. Plaintiffs' motion to stay antitrust discovery, however, will be denied.

D.Del.,1996.
Dentsply Intern. Inc. v. New Technology Co.
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT – UNREPORTED CASE 9

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 1
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

C Donnelly Corp. v. Reitter & Schefenacker USA
Ltd. Partnership
W.D.Mich.,2002.

United States District Court,W.D. Michigan,
Southern Division.
DONNELLY CORP., Plaintiff
v.
REITTER & SCHEFENACKER USA LTD.
PARTNERSHIP and Reitter & Schefenacker GmbH
& Co. KG, Defendants.
No. 1:00-CV-751.

Aug. 13, 2002.

Thomas R. Behm of Gruel, Mills, Nims & Pylman,
Grand Rapids, Mich.. , John Augustine O'Brien of
Fitzpatrick, Cella, Harper & Scinto, Nicholas Philip
Groombridge, Weil, Gotshal & Manges, New York,
N.Y., James R. Redford of Plunkett & Cooney,
Grand Rapids, Mich., Timothy J. O'Hearn of Jones,
Day, Reavis & Pogue, Cleveland, Ohio, Howard P.
Walthall, Jr., Burr & Forman, Birmingham, Ala. for
parties.

[OPINION]

ENSLEN, J.
*1 This matter is before the Court on Plaintiff
Donnelly Corporation's Motion to Dismiss
Defendants' Michigan Common Law Unfair
Competition Counterclaim Pursuant to Rule 12(b)(6)
and for Separate Trials and Stay of Certain Discovery
Pursuant to Fed.R.Civ.P. 42(b). The Court will deny
Plaintiff's Motion to Dismiss Defendant Reitter &
Schefenacker USA Limited Partnership's [FN1] ("R & S
USA LP") Michigan common law unfair competition
counterclaim. The Court will grant Plaintiff's request
to bifurcate the trial of R & S USA LP's antitrust and
unfair competition counterclaims and the patent
misuse defense from the current patent infringement
case. The Court will not, however, stay any discovery
in this matter.

FN1. The Amended Answer and
Counterclaims were filed on February 1,
2002 by Defendant R & S USA LP only and

were not joined by Defendant Reitter &
Schefenacker GmbH & Co. KG ("R & S
GmbH"). (See Amended Answer and
Counterclaims, Dkt. No. 147.)

I. Standard of Review

A. Motions to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a
court may dismiss a claim only if it is clear that no
relief could be granted under any set of facts that
could be proved consistent with the allegations.
Hishon v. King & Spalding, 467 U.S. 69, 73, 81
L.Ed.2d 59, 104 S.Ct. 2229 (1984); Conley v. Gibson,
355 U.S. 41, 45-46, 2 L.Ed.2d 80, 78 S.Ct. 99 (1957).
The allegations must be construed in the light most
favorable to the plaintiff. Gregory v. Shelby County,
Tenn., 220 F.3d 433, 446 (6th Cir.2000) (citations
omitted). The rules generally require only a "short
and plain statement of the claim" and not detailed
allegations. Leatherman v. Tarrant County Narcotics
Intelligence & Coordination Unit, 507 U.S. 163, 168,
122 L.Ed.2d 517, 113 S.Ct. 1160 (1993). The
complaint, however, "must contain either direct or
inferential allegations respecting all the material
elements to sustain a recovery under some viable
legal theory."Scheid v. Fanny Farmer Candy Shops,
Inc., 859 F.2d 434, 436 (6th Cir.1988) (quotations
omitted) (emphasis in original).

B. Motions For Separate Trials

The Court may order a separate trial for any number
of claims to promote convenience, expediency,
economy, or to prevent prejudice. Fed.R.Civ.P. 42(b).
In order for a court to grant bifurcation, the party
seeking bifurcation has the burden of demonstrating
that judicial economy would be served and that no
party would be prejudiced by separate trials, based on
the circumstances of the individual case. Real v.
Bunn-O-Matic Corp., 195 F.R.D. 618, 620
(N.D.Ill.2000); Novopharm Ltd. v. Torpharm, Inc.,
181 F.R.D. 308, 310 (E.D.N.C.1998).

II. Facts

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

On October 5, 2000, Plaintiff Donnelly Corporation ("Donnelly") filed its Complaint for patent infringement against R & S GmbH and R & S USA LP ("Defendants" collectively), alleging that Defendants' manufacture, use, sale, and offering for sale to customers of lighted interior rearview mirrors infringed three Donnelly patents.[FN2] In their original Answer submitted on January 8, 2001, Defendants denied the infringement claim.

> FN2. These patents are U.S. Patent Nos. 4, 733, 336 ("the '336 patent"); 5, 671, 996 ("the '996 patent"); and 5, 938, 321 ("the '321 patent").

On February 1, 2002, R & S USA LP filed an Amended Answer and Counterclaims, alleging that Donnelly is: (1) guilty of patent misuse;[FN3] (2) in violation of the Sherman Act § 2 due to Walker Process fraud;[FN4] (3) in violation of the Sherman Act § 2 due to Donnelly's alleged filing of "sham litigation";[FN5] and (4) in violation of Michigan's unfair competition common law. First, Donnelly requests dismissal of R & S USA LP's Michigan common law unfair competition counterclaim for failure to state a claim. Second, Donnelly asks for bifurcation of the trial of the Sherman Act antitrust counterclaims, the unfair competition counterclaim in the event that the Court denies the motion to dismiss it, and the patent misuse defense. Finally, Donnelly requests a stay of any litigation concerning these issues pending the resolution of the on-going patent infringement case that Donnelly originally brought against Defendants.

> FN3. When a patent infringement suit is used for the purpose of stifling competition with the patent holder's sale of an *unpatented* product, the defendants in the patent infringement suit are entitled to the *patent misuse* defense. *Kolene Corp. v. Motor City Metal Treating, Inc.* 440 F.2d 77, 84 (6th Cir.1971). This defense has been subsequently limited by other case law. *See, e.g., Virginia Panel Corp. v. MAC Panel Co.* 133 F.3d 860, 868-871 (Fed.Cir.1997).

> FN4. *Walker Process* fraud is the enforcement of a patent procured by fraud on the patent office and may constitute a violation of the Sherman Act § 2, provided

the other elements necessary to a Sherman Act case are present. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.* 382 U.S. 172, 174, 15 L.Ed.2d 247, 86 S.Ct. 347 (1965).

> FN5. R & S USA LP's "sham litigation" claim made under § 2 of the Sherman Act seeks to demonstrate Donnelly undertook litigation against Defendants for the sole purpose of hindering and disrupting R & S USA LP's business operations. *See Re/Max Int'l, Inc. v. Realty One, Inc.* 173 F.3d 995, 1005 (6th Cir.1999).

## III. Analysis

### A. Unfair Competition Under Michigan Common Law

*2 In its Michigan common law unfair competition counterclaim, R & S USA LP alleges Donnelly: (1) obtained patents by fraud and inequitable conduct; (2) filed and maintained the current, allegedly baseless patent infringement action; (3) publicized the pending action to R & S USA LP's actual and potential customers; and (4) advised R & S USA LP's actual and potential customers that R & S USA LP "will be unable to supply lighted interior automotive rearview mirrors because such mirrors infringe the patents in suit."(R & S USA LP's Amended Answer and Counterclaim at P 56.) Donnelly asserts that none of this conduct, even if true, gives rise to a claim under Michigan's unfair competition common law. However, the Court will deny Plaintiff's Motion to Dismiss this counterclaim.

In 1933, the Michigan Supreme Court described a principle of unfair competition law as follows:

Unfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor. The rule is generally recognized that no one shall by imitation or unfair device induce the public to believe that the goods he offers for sale are the goods of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                                            Page 3
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

another, and thereby appropriate to himself the value of the reputation which the other has acquired for his own product or merchandise.

*Schwannecke v. Genesee Coal & Ice Co.*, 262 Mich. 624, 247 N.W. 761, 762 (Mich.1933). This description is oft-quoted. *See, e.g., Love v. New York Times Co.*, 691 F.2d 261, 265 (6th Cir.1982); *Pennwalt Corp. v. Zenith Labs., Inc.* 472 F.Supp. 413, 418 (6th Cir.1979); *Cawley v. Swearer*, 936 F.2d 572, 1991 U.S.App. LEXIS 19971, 1991 WL 108725, at *2-3 (6th Cir.1991); *Marion Labs., Inc. v. Michigan Pharmacal Corp.*, 338 F.Supp. 762, 767 (E.D.Mich.1972), *aff'd without op.*, 473 F.2d 910 (6th Cir.1973); *Moon Bros. v. Moon*, 300 Mich. 150, 1 N.W.2d 488, 493 (Mich.1942). As a result, Donnelly asserts Michigan's common law unfair competition claim encompasses only trademark violations described in the passage in *Schwannecke*, particularly those violations known as "palming off," where one attempts to disguise his or her goods as those of another in order to trade on the other's business goodwill.[FN6] In essence, Donnelly asserts that Michigan's common law of unfair competition does not include claims for bad faith assertion of patent actions.

> FN6. Another federal court in this District has held that Michigan's unfair competition claim is mostly limited to "palming off," although recognizing unauthorized duplication and deception of the public are also theories under which unfair competition claims have been sustained. *See Action Publ'ns, Inc. v. Panax Corp.* 1984 U.S. Dist. LEXIS 24846, 1984 WL 2268, at *11 (W.D.Mich. Nov. 30, 1984) (Miles, J.) (citing *Schwannecke*, 247 N.W. at 762 (main source of "palming off" theory); *A & M Records, Inc. v. M.V.C. Distributing Corp.*, 574 F.2d 312 (6th Cir.1978) (unauthorized duplication theory); *Clairol, Inc. v. Boston Discount Center of Berkley*, 608 F.2d 1114, 1119-20 (6th Cir.1979) (deception of public theory)).

Donnelly also bases its argument that R & S USA LP's allegations are insufficient to state a claim on *Letica Corp. v. Sweetheart Cup Co., Inc.*, 790 F.Supp. 702 (E.D.Mich.1992). In *Letica*, another federal court held that an allegation that a company

was threatening to assert its right to a product's trade dress, and therefore bar the plaintiff from entry into the market in that product, was not enough to state a claim for unfair competition under Michigan law. *See id.* at 706.After so holding, the *Letica* Court noted that "few, if any, cases exist wherein a claim of unfair competition involved something other than the protection of names of corporations, buildings and other businesses."*Id.* In addition, the *Letica* Court noted there was no allegation of any improper business activity, like prosecuting baseless litigation for the purpose of harassing a competitor. *See id.* at 706-07.Unlike in *Letica*, however, R & S USA LP alleges that Donnelly has prosecuted the current patent litigation in bad faith to steal its customers.

*3 Moreover, R & S USA LP counters that other Michigan cases have considered similar conduct to constitute unfair competition and that none of the cases cited by Donnelly conclude that Michigan's common law absolutely excludes a claim based on R & S USA LP's allegations. For example, the Michigan Supreme Court has said,

There are many ways, other than by interference with contract, of harassing, interfering with, and obstructing a competitor in such a manner as to amount to unfair competition, in the broadest sense of the term. The business of another may be unlawfully obtained by harassing his customers and salesmen, just as effectively as by passing off his goods as those of another.... There may be also interference by bringing a multiplicity of suits. The bringing of a multiplicity of suits, started not in good faith, but for the purpose of deterring the public from purchasing from a rival and ruining his trade was enjoined in Wisconsin.... There is no question that it is lawful and proper for the owner of a patent to give a notice of infringement of his patent to any infringer thereof, or to any user of an infringing article. It is also his legal right to bring and prosecute a suit for recovery of damages against an infringer or user. Such suit, however, must be honestly brought and prosecuted in good faith, and not commenced and prosecuted to harass, annoy, intimidate, financially embarrass, and drive out of business a competitor, for such acts and conduct would amount to unlawful and unfair competition.

*Attorney Gen. ex rel. James v. Nat'l Cash Register Co.*, 182 Mich. 99, 148 N.W. 420, 428 (Mich.1914).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

These statements would appear to recognize a cause of action in Michigan for common law unfair competition to have been stated with the allegations made by R & S USA LP.

Donnelly counters that the above discussion concerned only whether the defendants in that case violated Michigan's anti-monopoly statute and did not relate to Michigan's common law of unfair competition. (*See* Donnelly's Reply to Motion to Dismiss, at 5 n. 3 (citing *Nat'l Cash Register,* 148 N.W. at 422).) It is true that the only apparent claim at issue was a claim that defendants violated the anti-monopoly statute, probably owing to the fact that the case was brought by the State of Michigan on the relation of a private individual, instead of directly by the private individual. However, the *National Cash Register* Court's discussion of why defendants' conduct constituted unfair competition is still relevant to the issue of what may constitute a properly stated unfair competition claim in Michigan. Certainly, it can be inferred from *National Cash Register* that had there been a claim against defendants for unfair competition, the Michigan Supreme Court may very well have found such a claim to have been properly stated. 148 N.W. 420, 428.

In another case, the Michigan Supreme Court affirmed a trial court decree enjoining the defendants from continuing to engage in practices found to constitute "unfair and immoral competition." *See Schwanbeck Bros. v. A. Backus, Jr., & Sons,* 148 Mich. 508, 111 N.W. 1046, 1047 (Mich.1907). There, the defendants wrote letters to the plaintiff's customers who purchased plaintiff's allegedly infringing product, threatening them with suit for infringement of defendants' patent. 111 N.W. 1046, 1046-47. In addition, the defendants refused to litigate the matter of the patent infringement after the plaintiff invited them to do so, and engaged in other activities apparently leading the *Schwanbeck* Court to conclude that "unfair and immoral competition" was present. *See id.*

*4 Donnelly responds that *Schwanbeck* "more closely approximates a tortious interference with business relations claim," not an unfair competition claim, and cites another federal district court who dismissed unfair competition claims because of a lack of evidence in the plaintiff's favor. *See Nagle Indus.,*

*Inc. v. Ford Motor Co.,* 173 F.R.D. 448, 456-57 (E.D.Mich.1997). However, the *Nagle* Court asserted that the plaintiff's reliance on *Schwanbeck* was "misplaced" because Nagle had no evidence Ford interfered with its business relationships by threatening its customers with a patent infringement action, whereas "the *Schwanbeck* Court upheld an unfair competition claim against defendant because plaintiff had presented the court with evidence that defendant had interfered with its business relationships by threatening its customers with a patent infringement action if they purchased plaintiff's products...."*Id.* at 457.Thus, the *Nagle* Court did *not* hold that these allegations could only constitute a tortious interference claim and not an unfair competition claim under Michigan law. *Cf. id.* at 457.

In addition, Michigan follows general principles of unfair competition.*Marion Labs.,* 338 F.Supp. at 767 (citing *Clipper Belt Lacer Co. v. Detroit Belt Lacer Co.,* 223 Mich. 399, 194 N.W. 125, 128 (Mich.1923)); *see also Clairol, Inc.,* 608 F.2d at 1120 ("measuring [the facts of the case] against principles of law which obtain in Michigan as throughout the United States"). Regarding the scope of unfair competition law, the *Clipper Belt* Court said,

There is no hard and fast rule by which it can be determined when the court will interfere by injunction to prevent what is practically a fraud upon a person engaged in business by unfair methods of business. Each case must depend upon its own facts, but where it is clearly established that an attempt is being made by one person to get the business of another by any means that involves fraud or deceit, a court of equity will protect an honest trader and restrain a dishonest one from carrying out his scheme.

*Clipper Belt,* 194 N.W. at 128.[FN7] This statement leads this Court to believe that R & S USA LP's allegations state a cognizable claim under Michigan unfair competition law. If R & S USA LP proves its allegations, it would be established that Donnelly attempted to take R & S USA LP's business by means involving fraud or deceit, both unfair methods of conducting business. *See id.*

FN7.*Clipper Belt* cites from 2 Nims on Unfair Competition § 4, at 12-16 (1917),

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

which is apparently from where the statement quoted *supra* was reported. *See Clipper Belt,* 194 N.W. at 128. Also, *Clipper Belt* takes note of the statement which was later quoted and made famous in Michigan law by *Schwannecke* in 1933. *see supra,* which came from a different treatise or source identified as 26 R.C.L. 8.26*et seq. See id.*The *Clipper Belt* Court uses both statements in a manner suggesting they both constitute Michigan common law of unfair competition. *See id.*

Finally, this interpretation of Michigan law is consistent with the common law of other states. *See, e.g., Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1355 (Fed.Cir.1999) (referring to the claim both as a state law [FN8] unfair competition claim and a tortious interference claim); *Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470, 1472, 1478-79 (Fed.Cir.1998) (same). In *Zenith,* the Federal Circuit had occasion to hold that state law unfair competition claims are not preempted by federal patent or antitrust law so long as bad faith is an element of the state law claim. *Zenith,* 182 F.3d at 1355. "This is because the protection otherwise afforded by the patent laws to a patentee's conduct in enforcing its patent may be lost if the patentee acts in bad faith."182 F.3d 1340, 1343.

FN8. This Court presumes that Illinois state law was at issue in *Zenith,* although the Federal Circuit did not specify. *Cf. Zenith,* 182 F.3d at 1342 (referring to "the state's unfair competition laws," where the case originated in the Northern District of Illinois).

*5 Donnelly can present no case or other source stating that Michigan common law unfair competition claims *absolutely* cannot be sustained on the allegations at issue in this case. Moreover, other Michigan cases have recognized similar unfair competition claims under Michigan common law, and federal law apparently does not preempt such a claim. Therefore, Donnelly's Motion to Dismiss the unfair competition counterclaim will be denied.

B. Bifurcation

Donnelly further moves that the trial of all antitrust counterclaims, the patent misuse defense, and the

unfair competition counterclaim be bifurcated from the current patent case to promote convenience, expediency, and economy for all participants in these matters. Donnelly further argues that conducting one trial on all issues poses the risk of unfairly prejudicing Donnelly's patent infringement claims by adding many new issues, documents, and witnesses, as well as a great deal more time and complexity to the patent proceedings.

A court may order separate trials of claims or issues "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy."Fed.R.Civ.P. 42(b). In deciding whether to bifurcate, the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation. *In re Innotron Diagnostics* 800 F.2d 1077, 1084 (Fed.Cir.1986). In the interests of justice, the Court will order two separate trials in this matter-the first trying issues pertaining to the patent infringement claim, and the second trying issues pertaining to the antitrust and unfair competition counterclaims and the patent misuse defense.

1. Antitrust and Unfair Competition Counterclaims

In cases where there is a patent claim and an antitrust defense or counterclaim, it is "acceptable procedure to sever the antitrust claims from the patent claims and to provide for separate trials of each."*Standard Pressed Steel Co. v. Astoria Plating Corp.,* 1969 U.S. Dist. LEXIS 10541, 162 U.S.P.Q. 441, 442 (E.D.Ohio 1969). This practice is common because both issues require voluminous and complex proof and because the proof is non-duplicative.*Id.*

R & S USA LP's antitrust counterclaims are specifically dependant on a finding that Donnelly's patents in question are invalid and unenforceable since "antitrust laws do not negate a patentee's right to exclude others from patent property."*In re Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1325 (Fed.Cir.2000). Furthermore, R & S USA LP's counterclaims require the examination of many issues outside the scope of the current patent case. In order to prove an antitrust violation, in addition to demonstrating the core assertion of patent invalidity, R & S USA LP must first establish the relevant market and then demonstrate the indicia of monopoly power, including (but not limited to) the existence of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

barriers of entrance into the relevant market, the power to exclude others, the power to raise prices, the lack of product substitutability, predatory intent, market dominance, and guilty knowledge on the part of Donnelly. See *Innotron Diagnostics,* 800 F.2d at 1085.

**\*6** R & S USA LP argues that because the evidence and proofs needed in the current patent infringement claim and the evidence and proofs needed in the antitrust counterclaim overlap considerably and have largely the same patent "invalidity and unenforceability" basis, bifurcation would result in an excess of redundant litigation. However, if a determination is made that Donnelly's patents are invalid and unenforceable, neither party in this case need again prove the same issues at the antitrust hearing, but need only establish other issues not previously determined, such as the relevant market or predatory intent. Furthermore, although the antitrust counterclaim depends heavily on a determination that Donnelly's patents in question are invalid, the amount of evidence, testimony, and presentation that R & S USA LP must show in addition to the basic determination of patent invalidity in order to successfully claim antitrust violations is considerable.

If the Court or a jury finds that Donnelly's patents in question were valid and enforceable, R & S USA LP's counterclaims will be weakened if not obviated altogether. See *Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d at 1325. Although the possibility that antitrust and patent misuse counterclaims may be obviated does not alone warrant bifurcation, it does offer substantial support for it.

Moreover, because patent infringement and antitrust matters involve two completely different and highly complex bodies of law, a single trial for both the patent infringement claim and the antitrust counterclaims will likely cause some degree of jury confusion. A trial requiring the determination of patent validity, infringement, and antitrust violations places a heavy burden on any jury. *Henan Oil Tools, Inc. v. Eng'g Enters., Inc.,* 262 F.Supp. 629, 631 (S.D.Tex.1966). For all these reasons, the Court will bifurcate the possible trial of R & S USA LP's antitrust counterclaims from the current patent infringement proceedings.

The same reasoning applies to the unfair competition

counterclaim here, since most of the conduct alleged underlying the unfair competition counterclaim is quite similar to that underlying the antitrust counterclaims. Therefore, trial of the unfair competition counterclaim will also be bifurcated from the patent infringement proceedings and tried together with the antitrust counterclaims.

2. Patent Misuse Defense

Finally, bifurcation of the patent misuse defense is also appropriate under Rule 42(b). The patent misuse defense has been explained as follows:

Where the patent is used as a means of restraining competition with the patentee's sale of an *unpatented* product, the successful prosecution of an infringement suit even against one who is not a competitor in such sale is a powerful aid to the maintenance of the attempted monopoly of the *unpatented* article, and is thus a contributing factor in thwarting the public policy underlying the grant of the patent.

**\*7** *Kolene Corp. v. Motor City Metal Treating, Inc.* 440 F.2d 77, 84 (6th Cir.1971) (emphasis added). Patent misuse is an equitable doctrine which prevents a patentee from enforcing its rights through wrongful action. *Hunter Douglas, Inc. v. Comfortex Corp.* 44 F.Supp.2d 145, 156 (N.D.N.Y.1999). The patentee may not claim the protection of the patent's grant of exclusivity given for reasons of public policy where the patentee uses the grant to subvert the public policy underlying patents. *Id.* (quoting *Morton Salt Co. v. G.S. Suppiger Co.* 314 U.S. 488, 492-95, 86 L.Ed. 363, 62 S.Ct. 402, 1942 Dec. Comm'r Pat. 733 (1942)).[FN9]

> FN9. Further discussion of the limits of this defense may be found in *Virginia Panel Corp.,* 133 F.3d at 868-871.

R & S USA LP, to successfully assert its misuse defense, must prove Donnelly "has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect." *Hunter Douglas, Inc.,* 44 F.Supp.2d at 156. While one who misuses a patent does not also necessarily violate antitrust laws, one who violates antitrust laws by using a patent *is* necessarily guilty of patent misuse. *Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

This Court adopts the reasoning of the *Hunter Douglas* Court in its conclusion that the patent misuse defense should be bifurcated and tried with antitrust counterclaims. *See Hunter Douglas, Inc., 44 F.Supp.2d at 156.* Simply stated, this is primarily because the patent misuse defense and the antitrust claims involve the same essential operative facts. *See id.*

In more significant detail, the *Hunter Douglas* Court explained the benefits of trying the patent misuse defense separately from the question of infringement, all of which apply to the matter before this Court:

In the abstract, the ultimate issue in determining the merit of a patent misuse defense is whether the patentee has sought to wrongfully extend the rights granted under the patent statute; not whether the patentee has violated the antitrust laws per se. Read in that light, it would in all cases make perfect sense as a matter of law to group the patent misuse defense with patent rather than antitrust issues. Practically speaking, however, a party claiming patent misuse predicated on alleged antitrust violations will present its most forceful case which will entail showing the patentee to be a violator of the antitrust laws. Thus, one missing the primary target of establishing antitrust liability may nonetheless meet the lesser burden of showing misuse. Antitrust and patent misuse, therefore, are connected as a matter of fact.

Juries are fact-finders and as such are called upon to apply the relevant law to the facts presented. In cases involving complex issues, legal or otherwise, the interest of promoting the most orderly presentation of facts takes on added significance.... Given the foregoing, the patent misuse defense is better grouped with ... antitrust counterclaims.

Further, patent misuse is more logically connected to antitrust and state tort issues rather than issues of patent liability. As presently constructed, the first phase of the trial will involve presentation of infringement, validity, and enforceability matters. Each of these pertains to (1) the formalities of the ... patents [in suit] as they existed on their respective dates of issuance and (2) the actions of [the patent holder] during the prosecution of the ... patents.... Antitrust claims as well as the misuse defense, on the other hand, relate to [the patent holder's] conduct in practicing the patents.

*8 Moreover, placing the misuse defense with the antitrust counterclaims maintains the economies derived from separating the patent liability issues from ... counterclaims. That is, grouping the misuse defense with the patent liability issues would inject antitrust issues into the patent liability phase when it has already been found that the interests of judicial economy, convenience, and minimizing prejudice are better served when the patent and antitrust issues remain separate.

*Hunter Douglas, Inc., 44 F.Supp.2d at 156.* Accordingly, the Court will bifurcate R & S USA LP's patent misuse defense from the current patent infringement proceedings. The patent misuse defense will be tried with the antitrust counterclaims.

C. Stay on Discovery

The Court will not issue a stay on discovery of any issues which may solely relate to the antitrust or unfair competition counterclaims or the patent misuse defense. All discovery will continue so that it will completed prior to the two separate trials.

The Court believes that such a course is best in this matter for several reasons. For one, it will eliminate disagreement between the parties about what is and is not related to which claims and thus what discovery is permitted now and what discovery has been stayed. This will permit the focus to be on the collection of discovery information instead of bickering.

Second, full discovery now, thus permitting the parties to have the complete picture of all available evidence, facilitates settlement of this matter more than a stay would. A more likely chance of settlement serves the interests of justice, convenience, expediency, and conservation of resources of all involved.

Third, full discovery now eliminates the possibility of unfair prejudice to the parties inuring from interpretation of a stay on discovery. For instance, the Court could deny a discovery request on the basis that it did not appear to be calculated to lead to pertinent information in the patent infringement phase. If, in actuality, the request would have led to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

relevant information in the infringement phase, it would be unfair to the requesting party but there would likely be no way to correct the unfairness.

Fourth, full discovery now will permit quicker resolution of this dispute. Conducting two separate rounds of discovery would undoubtedly delay resolution of the entire dispute assuming the second, antitrust trial is necessary after the patent trial. If the second, antitrust trial is not necessary after the patent trial, the length of the entire proceeding will likely be only slightly longer, if longer at all, than it would have been under a stay of antitrust and unfair competition discovery. Such a course of action will also permit the two separate trials to be conducted in swifter succession, allowing the issues to be fresher in all minds involved and increasing the likelihood of a fully fair resolution of this complex dispute.

### III. Conclusion

*9 For the reasons stated, the Court will deny Donnelly's Motion to Dismiss R & S USA LP's Michigan common law unfair competition counterclaim. The Court will grant Donnelly's request for a separate trial of R & S USA LP's antitrust and unfair competition counterclaims and patent misuse defense. However, the Court will not grant Donnelly's request for a stay of discovery. An Order consistent with this Opinion will be entered.

W.D.Mich.,2002.
Donnelly Corp. v. Reitter & Schefenacher USA Ltd. Partnership
Not Reported in F.Supp.2d, 2002 WL 31418042 (W.D.Mich.), 2002-2 Trade Cases P 73,817

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.