UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MCKESSON AUTOMATION, INC. a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| TRANSLOGIC CORPORATION a Delaware corporation, and | ) ) ) ) |
| SWISSLOG ITALIA S.P.A. an Italian corporation, | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 1:06CV00028-SLR/LPS

## PLAINTIFF MCKESSON AUTOMATION, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

Dale R. Dubé (#2863)
BLANK ROME LLP
1201 N. Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6400
dube@blankrome.com

Blair M. Jacobs
Robert A. Gutkin
Christina A. Ondrick
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 383-0100

Dated: August 15, 2008

*Counsel for Plaintiff McKesson Automation, Inc.*

124402.00601/40176131v.1

## TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................1

II.    LEGAL STANDARDS .......................................................................................2

    A.     General Principles .................................................................................2

    B.     Means-Plus-Function Terms..................................................................5

III.   SUMMARY OF THE INVENTIONS .................................................................6

IV.    THE '110 PATENT ............................................................................................9

    A.     Prosecution History ...............................................................................9

    B.     Claim Terms To Be Construed .............................................................13

        1.     "X, Y Coordinate"/"X, Y Coordinate Location" ............................13

            a.     The Claims and Specification Support McKesson's Proposed Construction ...........................................14

            b.     The Prosecution History Supports McKesson's Proposed Construction ...........................................16

            c.     Extrinsic Evidence Supports McKesson's Proposed Construction.........................................................17

        2.     "Picking Means/Automated Picking Means" .................................18

            a.     The Claims and Specification Support McKesson's Proposed Construction .......................................18

        3.     "Package Reader Associated With The Picking Means"...............21

            a.     Claims and Specification ...................................21

            b.     Prosecution History............................................23

            c.     Extrinsic Evidence ............................................26

V.     THE '267 PATENT ...........................................................................................27

    A.     Prosecution History...............................................................................27

    B.     Terms To Be Construed ........................................................................30

        1.     "X, Y Coordinate Location" and "X And Y Coordinate" ............30

2.      "Means For Picking Medicine Packages From The
        Support Rods"/ "Picking Means"/"Means For
        Picking Packages"..................................................................................31

3.      "Means For Obtaining A Medicine Package"/
        "Obtaining Means" ...............................................................................33

4.      "Picking Means For Picking Packages From The
        Support Rods In Accordance With Instructions
        Received From A Computer" .................................................................34

VI.     CONCLUSION.....................................................................................................36

124402.00601/40176131v.1

# TABLE OF AUTHORITIES

**Cases**

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
   216 F.3d 1042 (Fed. Cir. 2000) ................................................................................. 3

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ............................................................................. 2, 5

*Electro Med. Sys. v. Cooper Life Sciences*,
   34 F.3d 1048 (Fed. Cir. 1994) .................................................................................. 4

*Envirco Corp. v. Clestra Cleanroom, Inc.*,
   209 F.3d 1360 (Fed. Cir. 2000) ........................................................................... 6, 35

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
   93 F.3d 1572 (Fed. Cir. 1996) .................................................................................. 4

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
   234 F.3d 558 (Fed. Cir. 2000) ........................................................................... 3, 4, 5

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
   535 U.S. 722 (2002) ................................................................................................. 4

*Forest Labs. v. Abbott Labs.*,
   239 F.3d 1305 (Fed. Cir. 2001) ................................................................................ 3

*GoLight, Inc. v. Wal-Mart Stores, Inc.*,
   355 F.3d 1327 (Fed. Cir. 2004) ................................................................................ 5

*In re Priest*,
   199 U.S.P.Q. 11 (C.C.P.A 1978) ....................................................................... 12, 25

*In re Self*,
   213 U.S.P.Q. 1 (C.C.P.A. 1982) ........................................................................ 12, 25

*Interactive Gift Express Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ................................................................................ 4

*JVW Enters. Inc. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir.2005) ................................................................................. 6

124402.00601/40176131v.1

*Laitram Corp. v. Rexnord, Inc.*,
  939 F.2d 1533 (Fed. Cir. 1991) .......................................................................... 5

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ............................................................................. 5

*Markman v. Westview Instruments*,
  517 U.S. 370 (1996) ............................................................................................ 2

*Markman v. Westview Instruments*,
  52 F.3d 967 (Fed. Cir. 1995) .............................................................................. 3

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005) .......................................................................... 3

*Micro Chemical, Inc. v. Great Plains Chemical Co.*,
  194 F.3d 1250 (Fed. Cir.1999) ..................................................................... 6, 21

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) ........................................................................ 27

*Personalized Media Comm. v. U.S.I.T.C.*,
  161 F.3d 696 (Fed. Cir. 1998) ............................................................................ 6

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................. *passim*

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) .................................................................... 3, 31

*Teleflex, Inc. v. Ficosa North America Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) .......................................................................... 2

*Texas Digital Sys. v. Telegenix, Inc.*,
  308 F.3d 1193 (Fed. Cir. 2002) .......................................................................... 4

*Toro Co. v. White Consolidated Indus.*,
  199 F.3d 1295 (Fed. Cir. 1999) .......................................................................... 2

*Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*,
  520 U.S. 17 (1997) ...................................................................................... 3, 4, 5

*York Prods. v. Central Tractor*,
  99 F.3d 1568 (Fed. Cir. 1996) ............................................................................ 5

124402.00601/40176131v.1

**Statutes**

35 U.S.C. § 112.............................................................................................................*passim*

## I.     INTRODUCTION

On January 13, 2006, McKesson Automation, Inc. ("McKesson") brought suit against Defendants Swisslog Italia S.p.A. and Translogic Corporation (collectively "Swisslog"), alleging infringement of U.S. Patent No. 5,468,110 ("the '110 patent") and U.S. Patent No. 5,593,267 ("the '267 patent") (collectively "the McKesson patents"). The technology involved in this case relates, at a high level, to automated systems for selecting and delivering packages to fill orders. Both McKesson and Swisslog are in the business of manufacturing and selling automated pharmaceutical retrieval and distribution systems to hospitals. This Court is asked to construe terms from the following claims: 1-8, 10-11, 13-17, 21 and 22 of the '110 patent; and claims 1-5 and 7-9 of the '267 patent.[1]

While the claims present many claim terms that relate to the patented invention, the claim construction issues presented are relatively straightforward. The patents are well written and generally relate to the same technical matter. The claims use terms that have clearly understood meaning in the art, and the patent specifications provide ample definitional guidance. The inventors did not serve as their own lexicographers and there is no indication of an intent to limit the scope of the claimed invention to the preferred embodiment or other embodiments disclosed in the specification.

It is a bedrock principle of patent law that claim terms should generally be given the meaning those terms would have to a person of ordinary skill in the art, unless the specification and prosecution history clearly indicate that the patentee intended otherwise. That is precisely the meaning that McKesson's proposed constructions provide here. As such, McKesson

---

[1]     Copies of the '110 patent and the '267 patent are attached hereto as Exhs. A and B, respectively.

respectfully requests that the Court construe each of the identified claim terms in the manner set forth by McKesson in this brief.[2]

Section II. briefly outlines the legal standards to be followed by the Court when construing terms. Section III. summarizes the inventions disclosed in the McKesson patents. Sections IV. and V. set forth McKesson's arguments concerning the construction of claim terms for the '110 patent and the '267 patent, respectively.

## II.     LEGAL STANDARDS

### A.     General Principles

Claim construction is a question of law, which is the province of the Court. *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996). Claim construction begins with the words of the claim. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). As a first step, the Court should determine if the patentee has specifically defined a term used in the claims. If so, that definition controls. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). Next, the Court should determine if the terms and phrases used in the claims have an ordinary and customary meaning within the patent's field of invention. *Toro Co. v. White Consolidated Indus.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999) ("[W]ords in patent claims are given their ordinary and customary meaning in the usage of the field of invention, unless the text of the patent makes clear a word was used with a special meaning."). Generally speaking, there is a heavy presumption that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). The ordinary and customary meaning should be determined from the viewpoint of one of ordinary skill in the art at the time

---

[2]     A copy of the parties' joint claim construction statement, in which each party's construction of the agreed-upon and disputed terms is listed, is attached hereto as Exh. C.

of the invention. *Phillips*, 415 F.3d at 1312-13. The ordinary meaning of a term cannot, however, be construed in a vacuum; rather, a court must "must look at the ordinary meaning in the context of the written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

It is presumed that the patentee uses words and phrases consistently – that is, that a word or phrase means the same thing whenever it is used in the claims. *Id.* at 1314; *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Similarly, it is presumed that different words and phrases within a claim, and among different claims in the same patent, have a different meaning. *Forest Labs. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001). Where multiple patents issue from a common ancestor application, identical claim terms shared by the patents should be read consistently as well. *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1044 (Fed. Cir. 2000).

Claims must be read in view of the specification of which they are a part. *Markman v. Westview Instruments*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The claims, along with the specification and the prosecution history, constitute the intrinsic evidence, and are the primary source of understanding for the claim term. *Phillips*, 415 F.3d at 1313-17.

Like the specification, the prosecution history provides evidence as to the meaning of the claims. *Phillips*, 415 F.3d at 1317. Arguments made during the prosecution of a patent by the applicant may, under certain circumstances, limit the scope of a claim term under the doctrine of prosecution history estoppel. *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 30 (1997). In order for prosecution history estoppel to be triggered, the patentee must make either an amendment to the claims or an argument in support of the claims for reasons of patentability and the Examiner must have relied on the argument or amendment in granting the patent. *Festo*

3

*Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558, 566-68 (Fed. Cir. 2000) (en

banc), *vacated on other grounds*, 535 U.S. 722 (2002). Under such conditions, there is a

rebuttable presumption of estoppel with respect to that claim amendment.  *Festo Corp. v.*

*Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 739-40 (2002). The presumption

may be rebutted, however, by a showing that the amendment was made for a reason unrelated to

patentability, the amendment was not narrowing, or the argument was not relied upon by the

PTO in allowing the patent.  *Warner-Jenkinson*, 520 U.S. at 33; *Ethicon Endo-Surgery, Inc. v.*

*U.S. Surgical Corp.*, 93 F.3d 1572, 1582 n.7 (Fed. Cir. 1996).

     Finally, courts may also look to extrinsic evidence such as encyclopedias, dictionaries,

treatises and expert testimony to help determine the meaning of a claim term.  *Phillips*, 415 F.3d

at 1317; *Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002). Extrinsic

evidence, however, is considered less significant than intrinsic evidence in interpreting the claim

language. Moreover, the Court need not consider extrinsic evidence if the words of a claim are

clear on their face.  *Interactive Gift Express Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed.

Cir. 2001). Together, these rules of construction provide the public with notice of the scope of

the claimed invention.  *See Phillips*, 415 F.3d at 1327. The public notice aspect of patents is

important, and this explains why claim terms must be construed in the context of the claimed

invention rather than in a vacuum.

     As the Federal Circuit has repeatedly made clear, limitations from the specification are

not to be read into the claims unless it is clear that the patentee specifically intended to limit

himself to such subject matter.  *Phillips*, 415 F.3d at 1323; *Electro Med. Sys. v. Cooper Life*

*Sciences*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("Although the specification may well indicate

that certain embodiments are preferred, particular embodiments appearing in a specification will

4

not be read into the claims when the claim language is broader than such embodiments"). Similarly, it is error to limit a claim to the preferred embodiment(s) or to specific examples in the specification. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004); *CCS*, 288 F.3d at 1368 ("our case law makes clear that a patentee need not describe in the specification every conceivable and possible future embodiment of his invention"). Even if only a single embodiment is disclosed, the claims are entitled to the full breadth of their plain meaning, without limiting them to the disclosed embodiment. *Phillips*, 415 F.3d at 1323; *GoLight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1330-32 (Fed. Cir. 2004) (term "horizontal drive means for rotating said lamp unit in a horizontal direction" was not construed to require 360° rotation, notwithstanding the fact that only lamp disclosed in the specification rotated 360°).

### B.    Means-Plus-Function Terms

35 U.S.C. § 112, ¶ 6 provides that:

> An element in a claim may be expressed as a means or step for
> performing a specified function without the recitation of structure,
> materials, or acts in support thereof, and such claim shall be
> construed to cover the corresponding structure, material, or acts
> described in the specification and equivalents thereof.

Claims involving 35 U.S.C. § 112, ¶ 6 are referred to as "means-plus-function" or "step-plus-function" claims. Thus, an applicant may "describe an element of his invention by the result accomplished, or the function served, rather than identifying the element to be used...." *Warner-Jenkinson*, 520 U.S. at 27 (1997). A claim element in means-plus-function format literally encompasses the corresponding structure, materials or acts described in the specification, and equivalents thereof. *Festo*, 234 F.3d at 589 (*citing Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533 (Fed. Cir. 1991)).

The use of the word "means" in a claim creates a rebuttable presumption that the patentee has invoked §112, ¶ 6. *York Prods. v. Central Tractor*, 99 F.3d 1568, 1574 (Fed. Cir. 1996).

Similarly, the lack of the word "means" in a claim creates a presumption that § 112, ¶ 6 does not

apply. *Phillips*, 415 F.3d at 1311 (*citing Personalized Media Comm. v. U.S.I.T.C.*, 161 F.3d 696

(Fed. Cir. 1998)). The means-plus-function presumption can be rebutted upon a showing that

either (1) the claim element, despite use of the word "means," recites no function, or (2) the

patentee has disclosed sufficient structure in the claim itself to perform the cited function.

*Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364-65 (Fed. Cir. 2000).

The first step in construing a means-plus-function limitation is identification of the

claimed function. *JVW Enters. Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir.

2005). The second step is identification of the corresponding structure in the written description

of the patent, i.e., the claim language and specification, necessary to perform the claimed

function. *Id.* "When multiple embodiments in the specification correspond to the claimed

function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of

those embodiments." *Micro Chemical, Inc. v. Great Plains Chemical Co.,* 194 F.3d 1250, 1258

(Fed. Cir.1999).

## III.    SUMMARY OF THE INVENTIONS

The '110 and '267 patents disclose systems for filling orders by selecting one or more

packages from a device for holding the packages (e.g., a holding means). Critically, the system

also contains a device for supplying packages to the holding means, picking a package from the

holding means, and restocking the holding means – i.e., a picking means. The '110 and '267

patents have identical specifications. Figures 3 and 6 show one preferred embodiment of the

inventions:



Figure 3

**FIGURE 3**



**FIGURE 6**

In the preferred embodiment, a holding means contains a plurality of packages. These packages are hung from support rods or brackets in the holding means, and may contain a bar code for identification of the package contents. '110 patent, col. 4, lns. 40-46. The packages are placed into and selected from the holding means through the use of the picking means. Col. 5, lns. 63-64, col. 7, lns. 28-44. The picking means places packages in the holding means, and selects packages from the holding means, according to instructions received from a computer. Col. 6, lns. 2-9. These selected packages are stored on the picking means until their delivery to a desired location. Col. 7, ln. 57 - col. 8, ln. 21.

The patents also disclose placing packages in the holding means through the use of a supply rack. The supply rack holds individual packages in a manner similar to the holding means. The supply rack is made accessible to the picking means, and the picking means then selects the packages from the supply rack and places the packages in a predetermined position in the holding means, based on the contents of the package as relayed by the computer. Col. 7, 17-44. The supply rack may be either a separate structure or a designated portion of the holding means. Col. 3, lns. 12-14.

The components of the invention primarily operate through, and are described relative to, the action of the picking means. Thus, the storage rack of Figure 3 is described as having two important features: that the packages are held in locations having known x, y coordinates, and that there is sufficient clearance between packages to allow the automated picking means to grab, select and replace individual packages. Col. 5, lns. 41-48. Similarly, the function of the computer is described, in part, as "guid[ing] the picking means based on information contained in the database such that the picking means picks a package according to the order to be filled." Col. 6, lns. 7-9; *see also* col. 5, ln. 64 – col. 6, ln. 2 (describing vehicle with respect to the

8

picking means), col. 7, lns. 17-24 (describing supply rack with respect to the picking means).

Thus, each claim term, in order to be construed with fidelity to the specification, must be

understood in the context of its relationship to, and interaction with, the picking means.

## IV.    THE '110 PATENT

### A.    Prosecution History

The '110 patent was issued to Sean C. McDonald, Ellen J. Hertz, James A. Smith and

Gregory Toto (collectively "Applicants") on November 21, 1995, and assigned to Automated

Healthcare, Inc. (McKesson's predecessor-in-interest). Generally, the '110 patent discloses an

automated drug management system comprising a storage area, automated picking means, means

for moving the automated picking means, a computer for directing the automated picking means,

and a package reader associated with the automated picking means.

There are 22 claims, of which claim 1 is independent.[3] Claim 1 is reproduced below:

1. A system for selecting and delivering packages to fill orders comprising:

> a) a storage area comprised of a plurality of storage area locations each location
> having a package holding means sized and configured to hold a plurality of individual
> packages each individual package having a machine readable label which identifies a
> type of package, the packages being held in a manner so that each package can be placed
> into and removed from the storage area locations and so that the machine readable label
> on at least one package in a storage location can be read without removing the package
> from the storage location, each location having a distinct x, y coordinate;

> b) automated picking means sized and configured to be able to hold packages, to
> select packages from the storage area locations and place packages in the storage area
> locations in accordance with computer-controlled instructions, the picking means having
> a gripper for grasping and moving the packages and having a picking means storage
> location sized and configured to hold a plurality of packages in a face to face relationship
> after the plurality of packages have been retrieved from the storage area and prior to
> delivery of the plurality of the packages to a desired destination separate from the picking
> means;

---

[3]    A copy of the claims from the '110 patent at issue in this case, with the terms to be
construed highlighted in bold and italics, is attached hereto at Exh. D.

c) means for moving the automated picking means to selected storage locations;

d) a computer having at least one memory which contains a program for directing the picking means to chosen storage area locations and a database containing at least one x, y coordinate location in the storage area for each package held within the storage area the computer being connected to the automated picking means and the means for moving the automated picking means;

e) a package reader associated with the picking means and being positioned for reading the machine readable labels on packages located within the storage area, wherein only one type of package is stored in each x, y coordinate location.

On January 24, 1990, the Applicants filed the first in the chain of applications that eventually resulted in the '110 patent, U.S. Patent Application No. 07/469,217.[4] A continuation-in-part, U.S. Application No. 07/871,832 ("the '832 application"), was filed on April 21, 1992, and the '217 application was abandoned on April 23, 1992. On October 15, 1993, in a first Office Action, the Examiner of the '832 application required that the Applicants elect to prosecute either claims 1-23 and 36, or claims 24-35. The Examiner also rejected, among others, claim 1 of the '832 application as obvious over a patent issued to Morello et al., stating in part:

Morello et al. discloses storage areas 40, automated picking means 20, 62 etc. on tracks 98 (99) and computer means 16 to assign the package to X-Y coordinates (column 11, lines 11-17) and to control the picking means. It would have been obvious to operate the system in the claimed manner.

Exh. E, MA000193. In response, the Applicants amended claim 1 to better describe the interaction between certain components of the invention and the picking means. Among other amendments, the Applicants added the terms "means for moving the picking means to selected storage locations" and "a package reader associated with the picking means:"

1. (Amended) A system for selecting and delivering packages from a [stored] storage area to fill orders comprising:

---

[4]      The full prosecution history of the '110 patent is attached hereto as Exh. E.

a) a storage area comprised of a plurality of storage area locations each location [being] having package holding means sized and configured to hold [at least one package] a plurality of individual packages each individual package having a machine readable label which identifies a type of package, the packages being held in a manner so that [the] each package can be placed into and removed from the storage area locations [by automated picking means], each location having a distinct x, y coordinate;

b) automated picking means sized and configured to be able to hold packages, to select packages from the storage area locations and place packages in storage area locations in accordance with computer controlled instructions [received from a computer], the picking means having a gripper for grasping and moving individual packages;

c) means for moving the picking means to selected storage locations;

[c] d) a computer having at least one memory which contains a program for directing the picking means to chosen storage area locations and a database containing at least one x, y coordinate location in the storage area the computer being connected to the automated picking means and the means for moving the automated picking means[,]; and

e) a package reader associated with the picking means and being positioned for reading the machine-readable labels on packages located within the storage area, wherein only one type of package is stored in each x, y coordinate location.

Exh. E, MA000201-02. In the Response, the Applicants compared the Morello et al. reference to

the claims, stating in part:

> The teaching of Morello et al. is that the transfer assembly be sent to a specific location to select the desired article. The article is removed from the location into the picker assembly. There the identification code of the article is read. The picker assembly then delivers the article to a pick-up position. The picker assembly can also receive individual articles which have been placed at the gate mechanism 22. As disclosed, the picker assembly and the gate mechanism can handle only a single article at any given point in time. Similarly each storage location can accommodate a single article at any given point in time....this teaching is quite different from the system of amended claim 1. The claimed storage locations accommodate a plurality of packages and a package reader is positioned to read the package label while the package is in the storage location.

Exh. E, MA000207-08. The Applicants argued that these amendments placed the claims in

condition for allowance, because the prior art "does not teach or suggest a system in which a

plurality of individually retrievable packages are stored in a single location" or "have machines

11

for reading machine readable labels on a package while that package is in a storage location."
Exh. E, MA000212.

The Examiner, however, maintained his rejection of claim 1, using the exact same description of Morello as used in the original rejection, and adding two additional prior art references, Chutca et al. and Boucher et al., which the Examiner stated disclosed a gripper and reading an article's bar code prior to transfer from the storage area. Exh. E, MA000217. Of significant importance, the Examiner explicitly rejected the Applicants' attempt to distinguish the Morello reference by adding the "package reader associated with the picking means" limitation as element 1 e). The Examiner concluded that the package reader claimed in the '110 patent could not be limited to a reader that can read packages before they are removed from storage locations (as shown in the preferred embodiment), as follows:

> Applicant's arguments filed February 17, 1994 have been fully considered but they are not deemed to be persuasive.
>
> Re applicant's "Remarks" on the top of page 8, [i.e., the reference to Morello cited above] the same are not well-taken since the claimed subject matter, not the specification, is the measure of invention. *Limitations in the specification cannot be read into the claims for the purpose of avoiding the prior art.* In re Self, 213 U.S.P.Q. 1, 5 (C.C.P.A. 1982); In re Priest, 199 U.S.P.Q. 11, 15 (C.C.P.A 1978).

Exh. E, MA000219 (emphasis added).

In response to the Examiner's rejection, a telephone interview was held on July 20, 1994 regarding claims 1, 4 and 18 of the application. During the interview, the Examiner suggested that the claims would be allowed if the picking means element was amended to include the phrase "more than one package suspended in a face-to-face relationship from the picking means after retrieval from the holding means and prior to delivery of the packages." Exh. E, MA000221. On August 25, 1994, the Applicants filed U.S. Application No. 08/295,495 ("the '495 application") as a continuation of the '832 application, containing claim language identical

12

to that in the February 17, 1994 Response to Office Action (i.e., not including the "face to face relationship" limitation discussed on July 20).[5] After receiving the continuation application, the Examiner maintained the earlier rejection of the claims and repeated that limitations from the specification could not be read into the package reader limitation.[6] Exh. E, MA000234.

In the ensuing response, the Applicants amended the picking means element of claim 1 to add the "face to face relationship" phrase suggested in the July 20, 1994 Examiner's Interview, and argued that this placed the application in condition for allowance. Exh. E, MA000243-44. The Examiner issued a notice of allowability on March 7, 1995 consistent with his prior representation on patentability. Exh. E, MA000247-48.

## B.    Claim Terms To Be Construed

McKesson and Swisslog disagree on the construction of three terms in the '110 patent: "x, y coordinate"/ "x, y coordinate location," "picking means"/ "automated picking means," and "package reader associated with the picking means."

### 1.    "X, Y Coordinate"/"X, Y Coordinate Location"

**McKesson's Proposed Construction: "one or more points that designates the position of a package where the picking means grabs, selects and places packages."**

McKesson submits that the terms "x, y coordinate" and "x, y coordinate location" should be construed to mean "one or more points that designates the position of a package where the picking means grabs, selects and places packages." Swisslog advocates that this term should be

---

[5]    The prior application was abandoned in favor of the continuation application on October 26, 1994.

[6]    This Office Action also notes that a "pre-amendment" was made on August 25, 1994. MA000232. McKesson believes this is an error. As noted above, the continuation application was filed on August 25, 1994. The file history has no record of a pre-amendment on that date, and the claims prior to amendment in the January 8, 1995 Response to Office Action are identical to those rejected in the May 16, 1994 Office Action.

given its "plain and ordinary meaning – i.e., a location identifier, in which X designates a position of the location along an X-axis and Y designates a position of the location along a Y-axis."

### a.    The Claims and Specification Support McKesson's Proposed Construction

McKesson's proposed construction more closely follows the definition of this claim phrase <u>as it is used in the context of the claimed invention</u>. Beginning with the claim, "**the context in which a term is used can be highly instructive**." *Phillips*, 415 F.3d at 1314. (emphasis added).

The claim phrase first appears in element a) of claim 1:

> 1. A system for selecting and delivering packages to fill orders comprising:
>
>    a) a storage area comprised of a plurality of **storage area locations** each location having a package holding means sized and configured to hold a plurality of individual packages each individual package having a machine readable label which identifies a type of package, the **packages being held in a manner so that each package can be placed into and removed from the storage area locations** and so that the machine readable label on at least one package in a storage location can be read without removing the package from the storage location, *each location having a distinct x, y coordinate*;...

Col. 12, lns. 66 – col. 13, ln. 11 (emphasis added). The context in which "x, y coordinate" is used here reveals that the use of the term "location" preceding "distinct x, y coordinate" means that storage area locations, which are part of a storage area, have distinct x, y coordinates. Col. 13, lns. 1-2.

Thus, it is apparent that when the patentee used the term "x, y coordinate" in the claims, he was specifically referring to a <u>specific portion of the storage area</u> (the "storage area location"), as opposed to the entirety of the storage area, as apparently advocated by Swisslog. This conclusion is reinforced by element b) of claim 1, which similarly requires the picking means to

14

be able "to select packages **from the storage area locations** and place packages in the storage area locations." Col. 13, lns. 13-15 (emphasis added).

As a result, the claim language (through elements 1 a) and b)) unambiguously discloses that the "picking means" does not select packages from every part of the storage area, but only from storage area locations – i.e., places where the picking means can "select from and place packages." Accordingly, one of ordinary skill would understand that the "x, y coordinate", in the proper context of the disclosed invention, must be determined relative to the storage area locations accessed by the picking means. This understanding would be reinforced by elements d) and e) of claim 1, both of which describe the x, y coordinate in relation to the storage area locations and required actions of the picking means.

The specification language provides yet further confirmation to the necessary relationship between the storage area locations and the x, y coordinate through the action of the picking means. In other words, the x, y coordinate system defines the storage area locations, i.e., the places in which the picking means is able to access and select the next package to be picked or placed in storage. The Applicants made this clear by, first, specifically referencing the picking means as part of the initial explanation of the x, y coordinate system in the specification:

> The frame 28 with rod supports 32 form an X, Y coordinate system with each rod 30 and medicine packages 14 therein having a unique x, y coordinate. Packages are placed in the storage rack so that each product is located at a known X, Y coordinate. *Since every product is a known X, Y location, it is possible to direct an automated picking means to any product location to select a desired item….*

*   *   *

> *The racks of FIGS. 3, 4, and 5 have two important features. First, the packages are held in areas having known X, Y coordinates. Those coordinates could be <u>single X, Y values</u> as may correspond to the position of the package holes 15 <u>or a group of X, Y values</u> defining an entire package. Second, there is sufficient clearance between packages to allow automated <u>picking means to select, grab and replace individual packages.</u>*

15

Col. 5, lns. 15-22, 40-47 (emphasis added).

Second, while describing the actual operation of the automated system, the Applicants

defined the x, y coordinate in terms of the "proper storage rack [] which has the desired

package":

> *The system is now ready to pick the drugs 188. First, the column-type vehicle*
> *44 goes to the rack where the drug to be selected is stored and stops at the X*
> *coordinate of that drug package. The picking means 38 then moves along the*
> *column 44 to the Y coordinate of the medicine package to be picked.* It is also
> turned to the proper storage rack 12 which has the desired package 14. These
> actions may be performed simultaneously by the system 189.

Col. 9, ln. 61 – col. 10, ln. 1 (emphasis added). As a result, one of ordinary skill in the art would

understand that the x, y coordinate is determined relative to both the storage area locations and

the action of the picking means, which is to grab, select and place packages.

Swisslog's proposed construction of this term is devoid of any description of what

constitutes the X-axis and Y-axis. Without such information, it is impossible to define an "x, y

coordinate system" as described in column 5, lines 15-22 of the specification. Indeed, under

Swisslog's proposed construction, claim 1 would likely be rendered indefinite, as one of ordinary

skill in the art would be unable to determine which coordinate system the storage location must

have a "distinct x, y coordinate" as required by claim 1. In contrast, McKesson's definition

clearly defines the frame of reference for the claimed x, y coordinate.

### b.    The Prosecution History Supports McKesson's Proposed Construction

The file history also supports the definition proposed by McKesson. During prosecution

of the '110 patent, the Examiner rejected claims 4-6 of the '832 application in part over a patent

issued to O'Neil et al. Exh. E, MA000194. Claims 4-6 were primarily directed to additional

limitations to the machine readable labels. However, in responding to this rejection, the

Applicants again described the x, y coordinate system of the application to the Examiner with reference to the action of the picking means:

> Moreover, the bar and post arrangement used by O'Neil is significantly different from applicants' track and column system. Whereas the O'Neil picking means can only travel in a single plane, ***applicants' device can move in any x-y-z direction limited only by the track layout which can be any shape.***

Exh. E, MA000209-10 (emphasis added).

Thus, the specification, combined with the prosecution history, instructs that the Applicants 1) intended the picking means and the coordinate system of the invention to be understood in relation to each other; 2) specifically incorporated the movement and selection processes of the picking means into the description of the "x, y coordinate"; and 3) in response to a rejection by the Examiner, argued that the track (upon which the picking means travels to the package access sites) could be "any shape" and move in "any x-y-z direction." The logical understanding of these three passages, read together, is that the picking means selection process defines the "x, y coordinate(s)" of the claims.

### c. Extrinsic Evidence Supports McKesson's Proposed Construction

While McKesson does not believe that extrinsic evidence is necessary here, such also supports McKesson's proposed construction. For example, "coordinates" is defined as "linear or angular quantities which designate ***the position that a point occupies in a given frame or reference system***…a set of numbers that locate a point in space." Exh. F, p. 432 (emphasis added). This is key because the "given frame or reference system" with respect to the invention disclosed in the '110 patent is clearly the one defined by the storage area locations relative to the travel of the picking means. *See, e.g.,* Col. 5, lns. 15-22, 40-47; col. 9, ln. 61 – col. 10, ln. 1. Within this frame of reference, each group of items has a coordinate position.

124402.00601/40176131v.1

For all of the above reasons, McKesson respectfully requests that the Court construe the term "x, y coordinate" as "one or more points that designates the position of a package where the picking means grabs, selects and places packages."

### 2.    "Picking Means/Automated Picking Means"

**McKesson's Proposed Construction: The disclosed function is "to hold packages and to select and place packages in the storage area locations." The corresponding structure is a device that includes a housing, a gripper, an extension rod and a storing rod as disclosed at col. 7, lines 57-64 and in FIG. 7 of the '110 patent.**

The parties agree that this term as used in claim 1 of the '110 patent is written in means-plus-function format as specified in 35 U.S.C. § 112, ¶ 6. McKesson contends that the function disclosed by these terms is "to hold packages and to select and place packages in the storage area locations." The corresponding structure associated with these terms is a device that includes a housing, a gripper, an extension rod and a storing rod as disclosed at col. 7, lns. 57-64 and in FIG. 7 of the '110 patent. Swisslog contends that the disclosed function is "to hold packages, to select packages from the storage area locations, and place packages in the storage area locations in accordance with computer controlled instructions" with the corresponding structure being a "picking means 38."

### a.    The Claims and Specification Support McKesson's Proposed Construction

This term first appears in element b) of claim 1:

1.  A system for selecting and delivering packages to fill orders comprising:...

b) *automated picking means* sized and configured to be able to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer-controlled instructions, the picking means having a gripper for grasping and moving the packages and having a picking means storage location sized and configured to hold a plurality of packages in a face to face relationship after the plurality of packages have been retrieved from the storage area and prior to delivery of the plurality of the packages to a desired destination separate from the picking means;

18

Col. 12, ln. 66 – col. 13, ln. 23 (emphasis added).

McKesson's proposed function of "to hold packages and to select and place packages in the storage area locations" comes directly from the claim language. The corresponding structure recited in the written description for performing the claimed function must next be identified. The claim identifies a gripper the structure for the recited functions. This structure alone is insufficient to perform the recited functions, so examination of the specification is necessary.

With respect to the functioning of the picking means, the claim is clear that it picks items (i.e., packages) from, and places items into, storage. The picking means is moved from position to position by the column-shaped vehicle:

> We also provide means for picking items from and placing items in the storage rack and the supply station. The picking means is preferably comprised of a gripper assembly mounted on a transport vehicle which moves along a rack or other controlled route. The gripper assembly preferably has a movable rod or other carrier for holding selected items, at least one vacuum head and associated controls for gripping and moving selected items.

Col. 3, lns. 17-24. Additional language in the specification provides further support for the operation and structure of the picking means. Within this language, the housing, extension rod, gripper and storing rod are expressly included as part of the picking means:

> Packages are selected by a picking means 38, preferably of the type illustrated in FIGS. 7 though 10. The picking means is mounted on column-shaped vehicle 44 in a manner to allow controlled vertical movement along that column. In this manner, the picking means 38 can be positioned at locations along column 44 which correspond to the Y coordinates of packages to be selected. The picking means 38 is controlled by a computer 24, or local area network of computers, having a database. The database has the order to be filled and a record of the predetermined locations 18 of each different product in the storage rack 12. The computer 24 guides the picking means 38 based on information contained in the database, such that the picking means 38 picks a package 14 according to the order to be filled.

> *       *       *

> The picking means 38 includes at least one gripper assembly illustrated in FIGS. 7 through 12. As shown in FIG. 12, we prefer to provide a support bracket 41

19

extending from column 44. This bracket can move along column 44 in a vertical direction. A third actuator 43 is attached to bracket 41. Mounting 39 permits movement along rod 41 and movement at bar 43 in a direction normal to rod 41. A picking means 38, which preferably is the gripper assembly of FIGS. 7 through 10, is mounted to actuator 43 through actuator 45, which permits a 180-degree rotation of the gripper assembly. Actuator 43 permits horizontal movement of picking means 38 in the Z direction.

The gripper assembly is preferably comprised of a housing 49, as shown in FIG. 7 having means for storing medicine packages 14, such as a storing rod 48. Assembly 38 also contains means 50 for obtaining a package 14. The obtaining means 50 is slidingly attached to the housing 49 such that it can move in a Z direction, which is perpendicular to the X, Y directions, to pick a package 14 from a support rod 30 in the storage rack 12 or supply rack 20…. The obtaining means also preferably includes an extension rod 52 … slidingly attached with respect to the Y and Z directions to housing 49. The obtaining means 50 can also include a suction head 56 connected to extension rod 52 through which a package is picked with suction.

Col. 5, ln. 63 – col. 6, ln. 9; col. 7, lns. 45 – col. 8, ln. 13; *see also, e.g.*, col. 8, lns. 45-46 ("The packages are held by the storing rod 48"); col. 8, lns. 23-24 ("holding rod 48" used interchangeably with storing rod 48); col. 12, ln. 17 (suction cup "grasps" a package).

Accordingly, the specification specifically references a "picking means", and discloses that its elements include, among other things, a gripper assembly comprising a housing, a gripper, an extension rod and a storing rod for accomplishing the recited functions. This is consistent with the picking means as described in claim 1; there, the picking means is disclosed to contain at least "a gripper for grasping and moving the packages" and "a picking means storage location sized and configured to hold a plurality of packages in a face-to-face relationship." Col. 13, lns. 16-19. Thus, McKesson submits that the term "picking means" should be construed to cover a device including a housing, a gripper, an extension rod and a storing rod for picking a package from a location and their equivalents. Inclusion of other structures described in the specification as being part of the picking means is unnecessary

20

because this would import additional structures for accomplishing unrelated functions. *Micro Chemical, Inc.*, 194 F.3d at 1258.

### 3. "Package Reader Associated With The Picking Means"

**McKesson's Proposed Construction: "a device that provides the identity of a package to the computer directing the picking means."**

McKesson submits that the claim phrase "package reader associated with the picking means" should be construed to mean "a device that provides the identity of a package to the computer directing the picking means." Swisslog advocates that this phrase be construed to mean "a package reader attached to the picking means."

### a. Claims and Specification

The claims and specification support McKesson's proposed construction. First, turning to the claim language, the phrase appears in element e) of claim 1:

> 1. A system for selecting and delivering packages to fill orders comprising:...
>
> e) *a package reader associated with the picking means* and being positioned for reading the machine readable labels on packages located within the storage area, wherein only one type of package is stored in each x, y coordinate location.

Col. 13, lns. 34-38. (emphasis added).

The phrase "package reader associated with the picking means" is not used in the specification. The specification does disclose a bar code reader and identifies the purpose of this device as determining and providing the identity of the package identity to the computer, and confirming that the package is the proper medicine package with respect to the patient's prescription. Col. 3, lns. 24-25; col. 6, lns. 9-13; col. 10, lns. 2-6. Notably, these functions do not require the bar code reader to be in any specific position within the invention, only that the bar code reader be able to interact with the picking means (via the computer) to accept or reject a package based on its identity. Accordingly, the specification instructs one of ordinary skill in the

21

art that the package reader provides the identity of a package to the computer directing the picking means, precisely the construction that McKesson now proposes.

Regarding the location of the device, the preferred embodiment describes the bar code reader at times as attached to the picking means (*see* col. 7, lns. 64-67), but also describes the reader in a nonspecific location, in terms of the functions it performs in concert with the picking means. *See* Col. 10, lns. 2-3 ("the bar code reader 26 reads 190 the identity 16 on medicine package 14"), col. 6, lns. 9-12 ("The picking means 38 can also include means, such as a bar code reader 26 as shown in Fig. 7, for determining the identity 16 of a package 14...and providing its identity 16 to computer 24."). When the device is physically attached in a specific manner as shown in the preferred embodiment of FIGS. 7-11, the specification notes an additional capability of reading the package label prior to picking to confirm picking of the proper packages. Col. 10, lns. 3-6.

Swisslog's proposed construction, wherein the package reader is <u>attached</u> to the picking means, appears to be an attempt to limit the claim scope to the preferred embodiment. Not only is this contrary to established legal precedent, but the claim language of the '110 and '267 patents do not support Swisslog's proposed definition. Indeed, the term "attached" was used by the Applicants in another claim of the '110 patent, claim 3, to describe the relationship of the sensor to the picking means. *Compare* Col. 13, ln. 34 ("package reader associated with the picking means") with col. 13, lns. 41-42 ("sensor attached to the picking means"). Thus, the Applicants knew how to "attach" something to the picking means, but intentionally chose not do so with regard to the package reader.

This is confirmed by the Applicants' use of the term "attached" in the '267 patent, again to describe an element's physical attachment to the picking means. Claim 4 of the '267 patent

claims, in part, "A system as described in claim 3 wherein the picking means is comprised of: a

housing; means for storing a plurality of medicine packages attached to the housing...." '267

patent, col. 13, lns. 48-52. Claim 7 uses nearly identical language: "means for storing packages

attached to the housing." Col. 14, ln. 29.

In contrast, the '267 patent also uses the term "associated" in claim 2 in a manner clearly

not meaning "attached":

> 2. A system as described in claim 1 including a conveyor in
> communication with the picking means; and patent prescription
> boxes which are moved by the conveyor to the picking means such
> that the picking means provides the medicine packages it has
> picked to fill a given prescription to an **associated** box."

Col. 13, lns. 37-38 (emphasis added). These portions of the claims clearly demonstrate that the

Applicants knew how to describe an element of the invention as "attached" to the picking means

or to elements of the picking means, and did so when that was required. For the package reader,

however, the Applicants chose to describe its relationship with the picking means in a broader

manner.

**b.      Prosecution History**

The prosecution history of the '110 patent demonstrates that the Applicants and the

Examiner understood that Figures 7-11 of the '110 patent represented only one embodiment of

the Applicants' invention, and that the claims were not limited to this single embodiment. The

table below shows key events for understanding the prosecution history of claim 1 of the '110

patent with respect to the phrase "package reader associated with the picking means":

| '110 Patent Prosecution History | Date |
|---|---|
| Examiner rejects claim 1 of '832 application over Morello et al. Exh. E, MA000190, MA000193-95 | October 15, 1993 |
| Applicants adds elements c) ("means for moving") and e) ("package reader associated with picking means") added to claim 1. Exh. E, MA000202 | February 17, 1994 |

23

| | |
|---|---|
| Examiner rejects all claims and states that Applicants may not limit claims based on specification showing an attached bar code reader. Exh. E, MA000217-19 | May 16, 1994 |
| Examiner interview; Examiner suggests adding term "plurality of packages in a face to face relationship" to claim 1 in order for claim to be patentable. Exh. E, MA000221 | July 20, 1994 |
| Continuation application filed with claims identical to those of February 17 Response to Office Action. Exh. E, MA000225-29 | August 25, 1994 |
| Examiner rejects continuation application over Morello et al. and Chutca repeats argument that claims are not limited to specification regarding the bar code reader. Exh. E, MA000234-36 | November 4, 1994 |
| Applicants add "picking means storage location sized and configured to hold a plurality of packages in a face to face relationship" to element b) of claim 1. Exh. E, MA000239 | January 8, 1995 |
| Claim 1 allowed. Exh. E, MA000248 | March 7, 1995 |

In the October 15, 1994 Office Action, the Examiner rejected proposed claim 1 (the future claim 1 of the '110 patent) over the Morello patent, which, as cited by the Examiner, "disclose[d] storage areas 40, automated picking means 20, 62, etc. on tracks 98 (99) and computer means 16 to assign the package to X-Y coordinate[s] (column 11, lines 11-17) and to control the picking means." Exh. E, MA000193. In a February 17, 1994 Response, the Applicants amended claim 1 to distinguish over, among others, the Morello reference. Specifically, claim 1 was amended to specify that, among other things, the storage area held "a plurality of individual packages each individual package having a machine readable label which identifies a type of package," add a "means for moving the automated picking means to selected storage locations," specify a connection between the computer, the automated picking means and the means for moving, and add "a package reader associated with the picking means and being positioned for reading the machine readable labels on packages located within the storage area." Exh. E, MA000202-MA000206.

24

Notably, the Applicants, rather than adding the package reader limitation by amending element b), which already contained elements that were physically attached to the picking means assembly, created two entirely new elements, c) and e), to describe portions of the invention that were <u>not</u> physically part of the picking means.

With respect to the Morello rejection, the Applicants explained the reasons for the amendments as follows:

> The teaching of Morello et al. is that the transfer assembly be sent to a specific location to select the desired article. The article is removed from the location into the picker assembly. There the identification code of the article is read. The picker assembly then delivers the article to a pick-up position. The picker assembly can also receive individual articles which have been placed at the gate mechanism 22. As disclosed, the picker assembly and the gate mechanism can handle only a single article at any given point in time. Similarly each storage location can accommodate a single article at any given point in time....This teaching is quite different from the system of amended claim 1. The claimed storage locations accommodate a plurality of packages and a package reader is positioned to read the package label while the package is in the storage location.

Exh. E, MA000207-08.

Thus, the Applicants argued that their invention was distinguishable over Morello because the package reader was positioned to read the package label while at the storage location. *Id.* The Examiner, however, rejected this attempt to distinguish claim 1 from the Morello reference. Exh. E, MA000219. Indeed, the Examiner specifically stated that the Applicants could <u>not</u> use the preferred embodiment to limit the claim to an attached reader that was capable of reading packages before removal from the storage locations, in the exact manner that Swisslog would now have the Court limit claim 1:

> Re: Applicant's "Remarks" on the top of page 8 [i.e., applicant's statement that "a package reader is positioned to read the package label while the package is in the storage location"], the same are not well taken since the ***claimed subject matter, not the specification, is the measure of the invention. Limitations in the specification cannot be read into the claims for the purpose of avoiding the prior art.*** <u>In re Self</u>, 213 USPQ 1, 5 (CCPA 1982); <u>In re Priest</u>, 199 USPQ 11, 15 (CCPA 1978).

25

Exh. E, MA000219 (emphasis added). Thus, the Examiner explicitly and rightfully rejected the idea that claim 1 was limited to the embodiment in the specification in which the bar code reader was attached to the picking means.

Faced with the Examiner's rejection of claim 1, the Applicants, after an interview with the Examiner, filed a continuation application and amended element b) of claim 1 at the Examiner's request to require the picking means to have a "picking means storage location sized and configured to hold a plurality of packages in a face-to-face relationship." The Applicants then distinguished their invention from the prior art based on the face-to-face relationship limitation. Exh. E, MA000245. Only after distinguishing the prior art based on this added limitation was the claim granted.[7]

### c.     Extrinsic Evidence

Similar to the "x, y coordinate" phrase, McKesson believes that extrinsic evidence is not required to construe the phrase "package reader associated with the picking means." Nevertheless, the extrinsic evidence also supports McKesson's construction. It is clear from dictionary definitions that while "associated" and "attached" share certain similarities, "associated" is used to describe a much looser relationship with an item than "attached." For example, a dictionary from the relevant time period defines "attached" as "3. [t]acked on, fastened by a material union to; 4. [j]oined functionally" (Exh. G, p. 759), while the definition of "associated" is "1. ... united in action or purpose ... 3. combined locally, circumstantially, or in

---

[7]     It should be noted that the argument made in the February 17, 1994 Response to Office Action is repeated almost verbatim in the February 6, 1995 Response to Office Action that further distinguished the invention based on the face to face relationship. However, it is clear that this argument has no relevance to the "face to face relationship" portion of the claim that was at issue in the rejection. Thus, the Morello et al. argument in the January 8, 1995 Office Action is not related to the patentability of the claim.

classification (with); occurring in combination" (Exh. G, p. 718.) A scientific dictionary, while not providing a definition of "associated" from an engineering perspective, defines the term as a more intangible connection: "associated: [PSYCH] An item that is linked to another in the mind of an individual." (Exh. F, p. 134). These definitions are consistent with the claims, and the way in which a person of ordinary skill in the art would have understood the term, as describing a relationship between the package reader and the picking means that, while including a direct connection,[8] also encompasses other, indirect connections as well.

## V.    THE '267 PATENT

### A.    Prosecution History

The '267 patent was issued to Sean C. McDonald, Ellen Hertz, James A. Smith and Gregory Toto on January 14, 1997, and is a divisional of the '832 application, which eventually resulted in the '110 patent. Generally, the '267 patent discloses a system for filling orders, comprising a device for holding packages in which the same type of contents are held at predetermined locations in the device, a device for picking packages from the holding device, and a device for supplying packages to the holding device. There are 11 claims, of which 1 and 7 are independent:[9] Claims 1 and 7 are reproduced below:

> 1. A system for selecting and delivering medicine package from a holding means to fill orders comprising:

---

[8]    There is nothing in the specification that would limit the ordinary meaning of "associated with" to require a physical attachment between the picking means and the package reader. Although the preferred embodiment utilizes a picking means that has a package reader physically attached, this is not a case where the specification consistently refers to the invention as requiring an attachment. *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313 (Fed. Cir. 2007).

[9]    A copy of the claims from the '267 patent at issue in this case, with the terms to be construed highlighted in bold and italics, is attached as Exh. H. The full prosecution history of the '267 patent is attached hereto as Exh. I.

a) holding means comprised of a frame having a plurality of support rods each support rod sized for holding a plurality of medicine packages, each rod associated with a given medicine and holding medicine packages with only the same medicine each support rod having a distinct X, Y coordinate location;

b) means for picking medicine packages from the support rods in accordance with instructions received from a computer, said picking means being able to access the holding means; the picking means capable of holding a plurality of medicine packages which have been picked from the holding means;

c) a computer having a database containing an X, Y coordinate location for all packages in the holding means, the computer able to receive orders for packages and able to direct the means for picking packages; and

d) a supply structure having a plurality of supply support rods which extend from said structure to form an X, Y coordinate system, with each supply support rod and medicine package thereon having a unique X and Y coordinate, said picking means disposed to have access to said structure such that a given medicine package on an associated supply support rod can be picked by the picking means to fill a patient's prescription, or a given medicine package in the supply structure can be picked by the picking means to restock an associated rod in the holding means.

7. A system for selecting and delivering medicine package; from a holding means to fill orders comprising:

a) holding means comprised of a frame having a plurality of support rods for holding packages each support rod having a distinct X, Y coordinate location and holding a plurality of packages, all of those packages on each support rod having similar contents;

b) picking means for picking packages from the support rods in accordance with instructions received from a computer, the picking means being able to access the holding means and having

a housing;

means for storing packages attached to the housing;

means for producing a suction;

a suction rod in fluid connection with the suction producing means, said suction rod slidingly attached with respect to the Y and Z directions to the housing and maintaining a suction therethrough when the suction producing means is activated by which a medicine package is picked with suction; and

means for sensing when a package is properly positioned such that the package rod is then moved to the storing means and deposits the package thereon.

124402.00601/40176131v.1

During the prosecution of the '267 patent, the Examiner initially rejected claims 24, 25 and 35 over a combination of the Morello patent and a European patent 304. The Examiner also rejected claims 26 through 29 by adding Butarazzi to the prior art combination. Exh. I, MA000398-99. In response, the Applicants amended claim 24 of the application (the future claim 1 of the '267 patent) to add several terms, including the term "each support rod having a distinct x, y coordinate location":

> 24. (Amended) A system for selecting and delivering <u>medicine</u> packages from a holding <u>means</u> to fill orders comprising:
>
> a) A holding means comprised of a frame having a plurality of support rods <u>each support rod sized</u> for holding <u>a plurality of</u> medicine packages, each rod associated with a given medicine and holding medicine packages with only the same medicine <u>each support rod having a distinct X, Y coordinate location;</u>
>
> b) [means for supplying medicine packages to the support rods;
>
> c)] means for picking medicine packages from the support rods in accordance with instructions received from a computer, said picking means being able to access the holding means [and the supply means]; <u>the picking means capable of holding a plurality of medicine packages which have been picked from the holding means; and</u>
>
> <u>c</u> [d]) a computer having a database containing <u>an X, Y coordinate location</u> [the locations of] <u>for</u> all packages in the holding means, <u>the computer</u> able to receive orders for packages and able to direct the means for picking packages.

Exh. I, MA000404-05. The Applicants explained the amendment as follows:

> Morello et al. discloses an apparatus for dispensing and accepting the return of reusable articles such as videotapes. The apparatus has a housing containing a plurality of stationary locations each location being capable of holding a single reusable article therein and having its own location code. A transfer assembly is utilized to remove individual articles from selected locations and return articles to selected locations....The teaching of Morello et al. is that the transfer assembly be sent to a specific location to select one directed article stored in that location.... As disclosed, the picker assembly and the gate mechanism can handle only a single article at any given point in time. Similarly, each location can accommodate a single article at any given point in time. Storage of many articles at a single location as well as selecting multiple packages before delivery is not taught or suggested by Morello.

Exh. I, MA000409. After, Applicants incorporated a supply structure limitation, the Examiner issued a notice of allowance on June 6, 1996. Exh. I, MA000416, MA000421.

**B.      Terms To Be Construed**

    **1.      "X, Y Coordinate Location" and "X And Y Coordinate"**

**McKesson's Proposed Construction: "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages."**

Both McKesson and Swisslog submit that the terms "x, y coordinate location" and "x and y coordinate" in the '267 patent should be construed identically to the term "x, y coordinate" in the '110 patent. These terms first appear in claim 1 of the '267 patent:

1. A system for selecting and delivering medicine package from a holding means to fill orders comprising:

    a) holding means comprised of a frame having a plurality of support rods each support rod sized for holding a plurality of medicine packages, each rod associated with a given medicine and holding medicine packages with only the same medicine *each support rod having a distinct x, y coordinate location*;...

    c) *a computer having a database containing an x, y coordinate location* for all packages in the holding means, the computer able to receive orders for packages and able to direct the means for picking packages; and

    d) a supply structure having a *plurality of supply support rods which extend from said structure to form an x, y coordinate system, with each supply support rod and medicine package thereon having a unique x and y coordinate*, said picking means disposed to have access to said structure such that a given medicine package on an associated supply support rod can be picked by the picking means to fill a patient's prescription, or a given medicine package in the supply structure can be picked by the picking means to restock an associated rod from the holding means.

The term also appears in claim 7, the other independent claim in the '267 patent:

7. A system for selecting and delivering packages from a holding means to fill orders comprising:

    a) holding means comprised of a frame having a plurality of support rods for holding packages *each support rod having a distinct x, y coordinate location*....

McKesson's analysis of these terms in the '267 patent is identical to its analysis for these terms in the '110 patent, and McKesson refers the Court to its discussion of the construction of this term at Section IV.B.1. above. *Phillips*, 415 F.3d at 1314; *Rexnord Corp.*, 274 F.3d at 1342. These claims, like those of the '110 patent, define the x, y coordinate relative to the place which the picking means accesses.

### 2.    "Means For Picking Medicine Packages From The Support Rods"/ "Picking Means"/"Means For Picking Packages"

**McKesson's Proposed Construction: "The disclosed function is the picking of medicine packages from the support rods. The corresponding structure is a device that includes a housing, a gripper, an extension rod, and a storing rod as disclosed at col. 7, lines 57-64 and Fig. 7."**

The terms "means for picking the medicine packages from the support rods," "picking means," and "means for picking packages" are in the means-plus-function format as specified in 35 U.S.C. § 112, ¶ 6. The latter two terms are shorthand references to the first, longer means plus function recitation. Because these terms are used interchangeably they should be construed identically. The function disclosed by these terms in the claims is the picking of medicine packages from the support rods. The corresponding structure required to perform the claimed function is a device that includes a housing, a gripper, an extension rod, and a storing rod as disclosed at col. 7, lns. 57-64 and FIG. 7 of the '267 patent.

Swisslog also advocates that this term is in means-plus-function format, with the disclosed function being "picking medicine packages from the support rods in accordance with instructions received from a computer" and the corresponding structure being a "picking means 38."

These terms first appears in claim 1 of the '267 patent:

1. A system for selecting and delivering medicine package from a holding means to fill orders comprising:...

- 31 -

> b) *means for picking medicine packages from the support rods* in accordance with instructions received from a computer, said picking means being able to access the holding means; the *picking means* capable of holding a plurality of medicine packages which have been picked from the holding means;
>
> c) a computer … able to direct the *means for picking packages;*….

'267 patent, col. 13, lns. 2-19. With respect to the functioning of the system, the Applicants, in describing its operation, specify that the picking means picks items (i.e., packages) from, and places items into, storage:

> We also provide means for picking items from and placing items in the storage rack and the supply station. The picking means is preferably comprised of a gripper assembly mounted on a transport vehicle which moves along a rack or other controlled route. The gripper assembly preferably has a movable rod or other carrier for holding selected items … at least one vacuum head and associated controls for gripping and moving selected items.

Col. 3, lns. 21-25. Additional language in the specification provides further support for the operation and structure of the picking means. Within this language, the gripper is expressly included as part of the picking means, and picks packages from the support rods:

> The picking means 38 includes at least one gripper assembly illustrated in FIGS. 7-12. As shown in FIG. 12, we prefer to provide a support bracket 41 extending from column 44. This bracket can move along column 44 in a vertical direction. A third actuator 43 is attached to bracket 41. Mounting 39 permits movement along rod 41 and movement at bar 43 in a direction normal to rod 41. A picking means 38, which preferably is the gripper assembly of FIGS. 7-10, is mounted to actuator 43 through actuator 45, which permits a 180-degree rotation of the gripper assembly. Actuator 43 permits horizontal movement of picking means 38 in the Z direction.
>
> The gripper assembly is preferably comprised of a housing 49, as shown in FIG. 7 having means for storing medicine packages 14, such as a storing rod 48. Assembly 38 also contains means 50 for obtaining a package 14. The obtaining means 50 is slidingly attached to the housing 49 such that it can move in a Z direction, which is perpendicular to the X, Y directions, to pick a package 14 from a support rod 30 in the storage rack 12 or supply rack 20…. The obtaining means also preferably includes an extension rod 52 … slidingly attached with respect to the Y and Z directions to the housing 49. The obtaining means 50 can also include a suction head 56 connected to extension rod 52 through which a package is picked with suction.

32

Col. 7, lns. 48 – col. 8, ln. 16; *see also, e.g.,* col. 5, lns. 45-47; col. 8, lns. 45-46 ("The packages are held by the storing rod 48"); col. 8, lns. 23-24 ("holding rod 48" used interchangeably with storing rod 48); col. 12, ln. 17 (suction cup "grasps" a package).

Thus, the specification specifically references a "picking means" 38 that picks packages from the support rods, and discloses that its elements include, among others, a gripper assembly comprising a housing, a gripper, an extension rod and a storing rod. This disclosure is consistent with the picking means recited in claim 1 of the '267 patent, as well as, the picking means recited in claim 1 of the '110 patent. Thus, McKesson requests that the term "means for picking medicine packages from the support rods," "picking means," and "means for picking packages" be construed to cover a device including a housing, a gripper, an extension rod and a storing rod for picking a package from a location and their equivalents.

3.     **"Means For Obtaining A Medicine Package"/"Obtaining Means"**

> **McKesson's Proposed Construction: "The disclosed function is the obtaining of a medicine package. The corresponding structure is a device including a suction head, vacuum generator and an extension rod as disclosed at col. 7, line 60 – col. 8, line 33 and FIGS. 7 and 11."**

The terms "means for obtaining a medicine package" and "obtaining means" are in the means-plus-function format as specified in 35 U.S.C. § 112, ¶ 6. These terms should be construed identically. The function disclosed in the claims for these terms is the obtaining a medicine package. The corresponding structure required to perform the claimed function is a device including a suction head, vacuum generator and an extension rod as disclosed at col. 7, ln. 60 – col. 8, ln. 33 and FIGS. 7 and 11 of the '267 patent. Swisslog also advocates that this term is in the means-plus-function format, with the disclosed function being "obtaining a medicine package" and the corresponding structure being an "obtaining means 50." These claim terms appear in claim 4:

33

4.  A system as described in claim 3 wherein the picking means is comprised of:…

*means for obtaining a medicine package, said obtaining means* slidingly attached to the housing such that it can move in a Z direction, which is perpendicular to the X and Y directions, to pick a medicine package from a support rod when the housing is adjacent to and aligned with a support rod, and can move in the Z direction to place a picked package on the storing means;….

The specification explicitly describes a structure which comprises a "means [] for obtaining a package," and its function in the gripper assembly:

The gripper assembly is preferably comprised of a housing 49, as shown in FIG. 7 having means for storing medicine packages 14, such as a storing rod 48. Assembly 38 also contains means 50 for obtaining a package 14. The obtaining means 50 is slidingly attached to the housing 49 such that it can move in a Z direction, which is perpendicular to the X, Y directions, to pick a package 14 from a support rod 30 in the storage rack 12 or supply rack 20…. The obtaining means 50 preferably includes means for producing a suction, such as a vacuum generator 58 controlled by a vacuum sensor 58a which draws a vacuum through vacuum line 55 and vacuum valve 54. The obtaining means 50 also preferably includes an extension rod 52 in fluidic communication with a pneumatic in/out cylinder 53 and associated valve 59, as shown in FIGS. 8 and 11. The extension rod 52 is slidingly attached with respect to the Y and Z directions to the housing 49. A suction is maintained through the vacuum lines 55 when the vacuum valve 54 is activated to supply air to vacuum generator 48. The obtaining means 50 also can include a suction head 56 connected to the extension rod 52 through which a package is picked with suction.

Col. 7, ln. 60 – col. 8, ln. 16. Thus, McKesson requests that the Court construe the term "means for obtaining a medicine package" to include those structures necessary to perform the recited function, which McKesson submits include a suction head, vacuum generator and an extension rod as disclosed at col. 7, ln. 60 – col. 8, ln. 33 and FIGS. 7 and 11 of the '267 patent.

    **4.**    **"Picking Means For Picking Packages From The Support Rods In Accordance With Instructions Received From A Computer"**

**McKesson's Proposed Construction: "a device having a housing, means for storing packages, means for producing a suction, a suction rod, and a means for sensing."**

McKesson submits that the term "picking means for picking packages from the support rods in accordance with instructions received from a computer" should be construed by the Court to mean "a device having a housing, means for storing packages, means for producing a suction, a suction rod, and a means for sensing." Despite the use of the word "means," 35 U.S.C. § 112, ¶ 6 is not necessary here because the claim cites sufficient structure to overcome the presumption that means-plus-function rules are being invoked. *Envirco Corp.* 209 F.3d at 1364-65. Swisslog advocates that term is in the means-plus-function format, with the disclosed function being "picking packages from the medicine rods in accordance with instructions received from a computer" and the corresponding structure being a "picking means 38."

The term at issue appears in claim 7 of the '267 patent. While the Applicants have used the term "means" to describe the device at issue, the patentee also provided sufficient structure within the claim itself that resort to means-plus-function analysis is not necessary. This can be seen from the language immediately following the claim term:

> 7.    b) *picking means for picking packages from the support rods in accordance with instructions received from a computer, the picking means* being able to access the holding means and *having*
>
> > a housing;
> >
> > means for storing packages attached to the housing;
> >
> > means for producing a suction;
> >
> > a suction rod in fluid connection with the suction producing means, said suction rod slidingly attached with respect to the y and z directions to the housing and maintaining a suction therethrough when the suction producing means is activated by which a medicine package is picked through suction; and
> >
> > means for sensing when a package is properly positioned such that the package rod is then moved to the storing means and deposits the package thereon.

Col. 14, lns. 24-39. (emphasis added). The parties have agreed upon constructions for the means for storing packages attached to the housing, means for producing a suction, and means for sensing when a package is properly positioned. Beyond that, the claim itself defines the "picking means for picking packages from the support rods in accordance with instructions received from a computer" as containing five components: a housing, a means for storing packages attached to the housing, a means for producing a suction, a suction rod in fluid connection with the suction producing means, and a means for sensing when a package is properly positioned. These components fully describe to one of ordinary skill in the art the structure of the "picking means" and, as such, resort to § 112 is not necessary.

## VI.   CONCLUSION

For the foregoing reasons, McKesson respectfully requests that the Court issue a Claim Construction Order consistent with McKesson's proposed constructions.

August 15, 2008                        Respectfully submitted,

*Dale R. Dubé*

Dale R. Dubé (#2863)
1201 N. Market Street
Suite 800
Wilmington, DE 19801
(302) 425-6400
dube@blankrome.com
Blair M. Jacobs
Robert A. Gutkin
Christina A. Ondrick
Christopher L. May
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 383-0100

*Counsel for Plaintiff McKesson Automation, Inc.*

36

124402.00601/40176131v.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2008, I served **PLAINTIFF**

**MCKESSON AUTOMATION, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** to

the following, in the manner indicated:

### FIRST-CLASS MAIL AND EMAIL

Alfred R. Fabricant
Lawrence C. Drucker
Richard LaCava
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 277-6500
Fax.: (212) 277-6501

### HAND-DELIVERY AND EMAIL

Julie Heaney (#3052)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

Dale R. Dubé
(I.D. No. 2863)