IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-028 (SLR/LPS) |
| | ) | |
| SWISSLOG ITALIA, S.P.A. and | ) | **PUBLIC VERSION** |
| TRANSLOGIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS SWISSLOG ITALIA S.P.A.'S AND TRANSLOGIC
CORPORATION'S OPENING BRIEF ON CLAIM CONSTRUCTION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jheaney@mnat.com
  *Attorneys for Defendants Swisslog Italia,*
  *S.p.A. and Translogic Corporation*

OF COUNSEL:

Alfred R. Fabricant
Lawrence C. Drucker
Richard LaCava
Bryan N. DeMatteo
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 277-6500

Confidential Version Filed: August 15, 2008

Public Version Filed: August 22, 2008

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

I.    INTRODUCTION .................................................................................................1

II.   THE PATENTS-IN-SUIT ....................................................................................3

III.  THE LAW ON CLAIM CONSTRUCTION .......................................................7

IV.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS ............................10

      A.    Person Of Ordinary Skill In The Art....................................................10

      B.    "X,Y Coordinate," "X,Y Coordinate Location," "X And Y
            Coordinate"...........................................................................................11

      C.    "Package Reader Associated With The Picking Means".......................18

      D.    "Picking Means/Automated Picking Means/Means For Picking
            Medicine Packages From The Support Rods/Picking Means For
            Picking Packages From The Support Rods In Accordance With
            Instructions Received From A Computer" And "Means For
            Obtaining A Medicine Package/Obtaining Means".................................23

V.    CONCLUSION....................................................................................................25

TABLE OF AUTHORITIES

Page(s)

CASES

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.,*
    2006 U.S. App. LEXIS 13213 (Fed. Cir. May 26, 2006) ........................................................14

*Allen Eng'g Corp. v. Bartell Indus., Inc.,*
    299 F.3d 1336 (Fed. Cir. 2002).........................................................................................10

*Autogiro Co. of Am. U. United States*
    384 F.2d 391, 399 (Ct. Cl. 1967) .......................................................................................8

*B. Braun Med., Inc. v. Abbott Labs.,*
    124 F.3d 1419 ...............................................................................................................10

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) .............................................................................7

*Ekchian v. The Home Depot, Inc.,*
    104 F.3d 1299 (Fed. Cir. 1997)...........................................................................................9

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.,*
    508 F.3d 1366 (Fed. Cir. 2007)...........................................................................................9

*Laitram Corp. v. Cambridge Wire Cloth Co.,*
    863 F.2d 855 (Fed.Cir.1988)..............................................................................................8

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ...................................................7-8

*Med. Instrumentation & Diagnostic Corp. v. Elekta AB,*
    344 F.3d 1205 (Fed. Cir. 2003)..........................................................................................10

*Personalized Media Commc'ns v. Int'l Trade Comm'n,*
    161 F.3d 696 (Fed. Cir. 1998)...........................................................................................10

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .....................................................................7-10

*Southwall Techs., Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995)............................................................................................9

*SRI Int'l v. Matsushita Elec. Corp.,*
    775 F.2d 1107 (Fed. Cir. 1985)...........................................................................................8

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985)........................................................................8-9

*Symantec Corp. v. Computer Assoc. Int'l, Inc.*,
    522 F.3d 1279 (Fed. Cir. 2008)........................................................................8

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)........................................................................9

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).................................................................7-8, 10

*Watts v. XL Sys., Inc.*,
    232 F.3d 877 (Fed. Cir. 2000)........................................................................10

### RULES AND STATUTES

35 U.S.C. § 103................................................................................................20, 22

35 U.S.C. § 112................................................................................................24-25

## I.    INTRODUCTION

Defendants Translogic Corporation ("Translogic") and Swisslog Italia S.p.A ("Swisslog") (together, "Defendants") submit this opening brief in support of Defendants' proposed constructions of disputed terms in the asserted claims of U.S. Patent No. 5,468,110 ("the '110 patent") and U.S. Patent No. 5,593,267 ("the '267 patent") (collectively "the patents-in-suit"). A Declaration of Bryan N. DeMatteo (DeMatteo Decl.) and accompanying Exhibits are submitted herewith.

The patents-in-suit are directed to automated systems for selecting and delivering packages from a storage area and, in particular, for selecting and delivering medicine packages from a hospital pharmacy to fill patients' prescriptions. In accordance with the Eighth Amended Scheduling Order, the parties have exchanged proposed constructions of the disputed terms and have submitted a Joint Claim Construction Statement on June 16, 2008 (D.I. 324) and a First Revised Joint Claim Construction Statement on July 31, 2008 (D.I. 345). DeMatteo Decl. Exh. D. The parties have agreed on the construction of the terms "package holding means," "means for moving the automated picking means to selected locations," "means for moving the picking means over the track," "means for moving the column with respect to the row," "means for storing a plurality of medicine packages/means for storing package," "identifying means," "means for producing a suction" and "means for sensing when a package is properly positioned," as these terms are recited in the asserted claims of the patents-in-suit. *Id.*

The parties, however, dispute the proper construction of "x,y coordinate/x,y coordinate location/x and y coordinate" ('110 patent – claims 1 and 8; '267 patent claims 1 and

7);[1] "package reader associated with the picking means" ('110 patent – claim 1); "picking means/automated picking means/means for picking medicine packages from the support rods/picking means for picking packages from the support rods in accordance with instructions received from a computer" ('110 patent – claim 1; '267 patent – claims 1 and 7); and "means for obtaining a medicine package/obtaining means" ('267 patent – claim 4). Defendants' proposed constructions for these disputed terms are as follows:

| Term | Patent/Asserted Claim(s) | Defendants' Construction |
|---|---|---|
| x,y coordinate/x,y coordinate location/x and y coordinate | '110 patent – claims 1 and 8<br>'267 patent – claims 1 and 7 | plain and ordinary meaning – i.e., a location identifier, in which X designates a position of the location along an X-Axis and Y designates a position of the location along a Y-Axis. |
| package reader associated with the picking means | '110 patent – claim 1 | a package reader attached to the picking means |
| picking means/automated picking means/means for picking medicine packages from the support rods/picking means for picking packages from the support rods in accordance with instructions received from a computer | '110 patent – claim 1<br>'267 patent – claims 1 and 7 | **Function**: "picking medicine packages from the support rods in accordance with instructions received from a computer"<br><br>**Corresponding Structure**: Picking means 38 |
| means for obtaining a medicine package/obtaining means | '267 patent – claim 4 | **Function**: "obtaining a medicine package"<br><br>**Corresponding Structure**: obtaining means 50 |

---

[1]     The First Revised Joint Claim Construction Statement identified as requiring construction only the first instance of "x,y coordinate" appearing in claim 1 of the '110 patent. DeMatteo Decl. Exh. D. Defendants had identified in its exchange of terms requiring construction the term "x,y coordinate" in claim 8 as well, but the parties inadvertently left this instance of "x,y coordinate" out of the First Revised Joint Claim Construction Statement. It is Defendants' position that the construction of "x,y coordinate," as this term is used in claim 8 of the '110 patent, is identical to the construction of "x,y coordinate," as used in claim 1 of the same patent.

Defendants' proposed constructions of the disputed terms are based on the meaning of these terms to a person having ordinary skill in the art at the time the patents-in-suit were filed, in light of the Specification, prosecution history and relevant extrinsic evidence. They are consistent with the Specification in all respects and, unlike Plaintiff's constructions, do not seek to recapture claim scope given up during prosecution to obtain allowance of the claims.

## II.    THE PATENTS-IN-SUIT

The patents-in-suit are directed to automated systems for selecting and delivering packages from a storage area and, in particular, for filling prescriptions and restocking medications in a hospital pharmacy ("automated dispensing systems").  DeMatteo Decl. Exh. A at col. 1, lns. 11-16.[2]

The automated dispensing system of one embodiment is used in a hospital pharmacy and comprises a 2-dimensional storage rack 12 having storage area locations for storing medicine packages 14 and a picking means 38 to retrieve packages 14 from these locations for dispensing to patients.  *Id*. at col. 4, lns. 24-39; Figs. 3, 6.  In the embodiment illustrated in Figs. 3 and 6, each storage area location of rack 12 includes a rod 30 for storing packages 14.   *Id*. at col. 5, lns. 22-24; Figs. 3, 6.  In other embodiments, rods 30 are replaced with brackets 25 or shelves 29 to store packages 14. *Id*. at col. 5, lns. 35-39.

Each medicine package 14 includes, e.g., a single dose of medication and preferably has a bar code 16 and a written description 17 identifying the medication contained in the package.  *Id*. at col. 4, ln. 44 to col. 5, ln. 3. Bar code 16 and the written description may

---

[2]     The '267 patent (DeMatteo Decl. Exh. B) is a divisional of the '110 patent and, as such, shares the same specification.  References to the specifications of the patents-in-suit are made herein with respect to the '110 patent.

include, for example, the name of the product/drug, quantity, weight, instructions for use and expiration date. *Id.* at col. 4, lns. 48-51.

Each storage area location within rack 12 contains packages 14 having the same or similar contents (e.g., the same medication) and each location has a unique or distinct X,Y coordinate (or group of unique or distinct X,Y coordinates), where X denotes the horizontal position of the storage area location and Y denotes the vertical position of the storage area location. *Id.* at col. 5, lns. 15-18, 41-49, 57-60. With respect to one embodiment, each storage area location is described as containing a rod 30 having a unique or distinct X,Y coordinate defining the horizontal "X" and vertical "Y" positions of that rod 30 within storage rack 12. *Id.* at col. 5, lns. 42-46.

Picking means 38 is controlled by a computer to be moved to selected storage area locations within rack 12 for removing packages and delivering those packages to a desired site for dispensing. *Id.* at col. 5, lns. 60-62; col. 6, lns. 13-15; Figs. 1, 3, 6. For this purpose, picking means 38 is mounted on a column shaped vehicle 44. The vehicle 44 is movable along the horizontal or X direction of rack 12 by means of track 42. *Id.* at col. 5, lns. 49-60; Fig. 6. Picking means 38 is movable vertically in the Y direction along the column shaped vehicle 44. In this manner, picking means 38, in conjunction with vehicle 44, can reach a desired storage area location within storage rack 12. *Id.* at col. 5, ln. 64 to col. 6, ln. 2; Fig 6.

To use the automated dispensing system, a doctor first accesses a Hospital Information System ("HIS") to create a "patient medication profile" that lists all medications to be dispensed to the patient on a particular day. *Id.* at col. 8, ln. 65 to col. 9, ln. 18. The patient medication profile is then communicated to the hospital pharmacy via a communication link, where it is used by the automated dispensing system to position picking means 38 at the storage

- 4 -

area location within rack 12 that contains the first medication (i.e., single dose medicine package 14) in the profile. *Id.* at col. 9, lns. 55-60. This is accomplished by first moving column shaped vehicle 44 horizontally along track 42 to the "X" position of the storage area location and then moving picking means 38 vertically along column shaped vehicle 44 to the "Y" position of the storage area location, thereby positioning picking means 38 adjacent to a medicine package 14 containing the first medication in the patient medication profile. *Id.* at col. 9, lns. 61-67; Fig. 6.

Before removing medicine package 14 from storage rack 12, picking means 38 reads bar code 16 of the package using an attached bar code reader 26. *Id.* at col. 7, lns. 64-66; Fig. 7. Attaching the bar code reader to the picking means 38, according to the '110 patent, permits the automated system to perform a pre-pick verification function by "[confirming] that [the package] is the proper medicine package to be picked with respect to the patient's prescription" before removing the package 14 from the storage rack. *Id.* at col. 10, lns. 2-19. The '110 patent discloses no other way of achieving the pre-pick verification function other than by attaching a reader to the picking means 38 in this manner.

After bar code reader 26 verifies the contents of package 14, a gripper assembly on picking means 38 removes medicine package 14 from the storage area location of storage rack 12 and places the package on a storing rod 48 attached to and movable with picking means 38. *Id.* at col. 7, lns. 45-56; col. 10, lns. 6-19. Picking means 38 is then moved to the storage area location containing the next medication in the patient's medication profile, and the retrieval process described above is repeated until all medications in the patient's profile have been removed from storage rack 12 and placed on storing rod 48 of picking means 38. *Id.* at col. 10, lns. 45-48.

In one embodiment, the gripper assembly of picking means 38 includes an obtaining means 50 operable to remove medicine packages 14 via suction.  For this purpose, obtaining means 50 includes a suction head 56, an extension rod 52 for holding suction head 56, up/down and in/out pneumatic cylinders 51, 53, for moving extension rod 52 with respect to the Y and Z directions, respectively, a vacuum generator 58 to produce a suction force at suction head 56, and a vacuum sensor 58a for sensing the presence of a package 14 at suction head 56. *Id*. at col. 8, lns. 1-30; Figs. 9-11.  To remove a package 14, in/out cylinder 53 moves extension rod 52 and attached suction head 56, which is positioned initially in front of storing rod 48, along the Z direction toward a medicine package 14 within storage rack 12 to be picked.  *Id*. at col. 10, lns. 6-9.  Suction produced by vacuum generator 58 causes medicine package 14 to adhere to suction head 56, thereby causing vacuum sensor 58a to detect the presence of package 14.  *Id*. at col. 10, lns. 9-13.  In/out cylinder 53 then retracts extension rod 52 and suction head 56 toward picking means 38 to deposit the medicine package 14 on storing rod 48.  *Id*. at col. 10, lns. 14-19. Up/down cylinder 51 and in/out cylinder 53 then act together to move the extension rod 52 and attached suction head 56 upward along the Y direction, forward along the Z direction, and downward along the Y direction to reposition suction head 56 in front of storing rod 48 for the next pick.  *Id*. at col. 10, lns. 21-37.

Once all medicine packages in the medication profile for a particular patient have been retrieved, picking means 38 is moved to a conveyor 34, where the medicine packages 14 on storing rod 48 are transferred to a waiting patient box 36 assigned to the patient.  *Id*. at col. 6, lns. 13-17; col. 10, lns. 48-49; Fig. 1.  Patient box 36 is then checked, removed from conveyor 34 and manually transported to a nurse's station assigned to the patient. *Id*. at col. 6, lns. 17-21.  The

medications in patient box 36 are then administered to the patient at appropriate times throughout the day.

If patients fail to take all medications that were prescribed, unused medicine packages 14 are returned to the storage rack 12 of the automated dispensing system. *Id*. at col. 6, lns. 48-50. For this purpose, the unused medicine packages 14 are first placed randomly into supply area locations within a supply rack 20, which is similar in structure to and positioned alongside storage rack 12. *Id*. at col. 7, lns. 17-30; Fig. 1. Picking means 38 is then moved to a supply area location within supply rack 20 containing a returned medicine package 14. *Id*. at col. 7, lns. 33-34. Bar code reader 26 attached to picking means 38 scans returned package 14 to determine its contents. Picking means 38 then removes returned package 14 from supply rack 20, in a manner similar to that described above, and transfers returned medicine package 14 to the appropriate storage area location within storage rack 12 assigned to that medication. *Id*. at col. 7, lns. 34-44. This process is repeated until all returned medications in supply rack 20 are transferred to the proper storage area locations with storage rack 12.

## III.    THE LAW ON CLAIM CONSTRUCTION

Claim construction is a question of law exclusively for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*). Claim terms are to be construed principally in light of the intrinsic record, such as the specification and prosecution history, although extrinsic evidence such as dictionaries and expert testimony may also be consulted. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (*en banc*); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The claim construction process begins with the language used in each claim itself, including the unasserted claims. *Vitronics,* 90 F.3d at 1582; *see also Phillips*, 415 F.3d at 1312. The central inquiry is the meaning that a particular claim term would have to a person having ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312-13. A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but also in the context of the entire patent, including the specification. *Markman*, 52 F.3d at 979 (citing *Autogiro Co. of Am. U. United States*, 384 F.2d 391, 399 (Ct. Cl. 1967)). "The specification is . . . the primary basis for construing the claims," informed, as needed, by the prosecution history. *Phillips*, 415 F.3d at 1315 (citing *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)).

That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims. *Id*. at 1323; *see also SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). If the specification lacks clear statements of scope limiting the term at issue, then the court is constrained to follow the language of the claims, rather than that of the written description. *See SRI*, 775 F.2d at 1121. That a limitation is used in a preferred embodiment is not sufficient justification for it to be imported into the claim. *Symantec Corp. v. Computer Assoc. Int'l, Inc.*, 522 F.3d 1279, 1290 (Fed. Cir. 2008); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed.Cir.1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations.").

In addition to consulting the specification of a patent to shed light on the meaning of claim terms, the court must also consider the prosecution history, which is of "primary significance in understanding the claims." *Markman*, 52 F.3d at 980; s*ee also Vitronics*, 90 F.3d

at 1582; *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Arguments and amendments made during the prosecution history as well as the specification and other claims, must be examined to determine the meaning of the terms in the claims."). A court should consider a patent's prosecution history because it, like the specification, is "evidence of how the PTO and inventor understood the patent" and "was created by the patentee in attempting to explain and obtain the patent." *Phillips*, 415 F.3d at 1317. The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be. *Id*. "By distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover" *Ekchian v. The Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002). Indeed, according to the Federal Circuit:

> The terms in a claim . . . are not given their ordinary meaning to one of skill in the art when it appears from the patent and file history that the terms were used differently by the applicant. . . . A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'

*Southwall Techs., Inc.*, 54 F.3d at 1578. Thus, "the prosecution history (or the file wrapper) limits the interpretation of claims so as to exclude any interpretation that was disclaimed or disavowed during prosecution in order to obtain claim allowance." *Teleflex*, 299 F.3d at 1326 (quoting *Standard Oil*, 774 F.2d at 452); *see also Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007).

With respect to means-plus-function limitations, "[t]he use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandate for means-plus-function clauses." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002); *Personalized Media Commc'ns v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998). This presumption may be rebutted only by evidence that the claim element does not recite sufficiently definite structure or material to perform the claimed function. *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880-81 (Fed. Cir. 2000).

Construction of means-plus-function limitations generally involves two steps, (i) identification of the recited function, and (ii) identification of the corresponding structure disclosed in the specification that performs that function. *Med. Instrumentation & Diagnostic Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). Once the function is identified, the court determines the corresponding structure by examining the specification and prosecution history to identify all the structures disclosed in the specification that are clearly linked to the claimed function. *Id*. at 1211; *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424-25.

If, after reviewing all the intrinsic evidence, genuine ambiguity remains with respect to the claims, the court may turn to extrinsic evidence as an additional tool to construe the claim language. *Vitronics*, 90 F.3d at 1584-85. Expert and inventor testimony, dictionaries, and other learned treatises fall into the category of extrinsic evidence. *Phillips*, 415 F.3d at 1317.

## IV.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS

### A.   Person Of Ordinary Skill In The Art

Claim terms are to be construed with respect to a person having ordinary skill in the art. It is Defendants' position that such a person would have at least a Bachelors degree in Engineering with education in control theory and machine design, or equivalent, and a year or

two of industry experience involving robotic system design.  DeMatteo Decl. Exh. E at ¶ 25.

Plaintiff contends that such a person would hold a Bachelor's degree in Mechanical or Electrical

Engineering with computer science know-how and have three to five years of experience in

automation.    DeMatteo Decl. Exh. J at ¶ 38.    Defendants contend that their proposed

constructions are consistent with either of these definitions of the level of ordinary skill in the

art.

      **B.**      **"X,Y Coordinate," "X,Y Coordinate Location," "X And Y Coordinate"**

        The parties agree that the terms "X,Y coordinate," "X,Y coordinate location" and

"X and Y coordinate," as these terms are recited in asserted claims 1 and 8 of the '110 patent and

claims 1 and 7 of the '267 patent, should be construed together, but dispute the proper

construction of these terms.  Since the parties did not identify these terms as means-plus-function

elements, these terms should be construed in accordance with their plain and ordinary meanings

to a person having ordinary skill in the art in view of the specifications of the patents-in-suit and

their corresponding prosecution histories.   When read in light of the asserted patents and

corresponding prosecution histories, the proper construction of "X,Y coordinate," "X,Y

coordinate location" and "X and Y coordinate" is "a location identifier, in which X designates a

position of the location along an X-Axis and Y designates a position of the location along a Y-

Axis."   This construction is entirely consistent with the plain and ordinary meaning of these

terms, as well as the inventors' use of these terms throughout the specifications and prosecution

histories of the patents-in-suit.

        The plain and ordinary meaning of "X,Y coordinate," "X,Y coordinate location"

and "X and Y coordinate" is notoriously well known in the art as a location identifier(s) used in a

coordinate system employing at least two perpendicular axes (also known as a Cartesian

coordinate system), in which "X" designates the position of the location as measured along an X-Axis (or abscissa) and "Y" designates the position of the location as measured along a Y-Axis (or ordinate). DeMatteo Decl. Exh. G.[3] Thus, in the coordinate system illustrated below having horizontal X and vertical Y axes perpendicular to one another, for example, the X,Y coordinate of the marked location (or X,Y coordinate location) is the location identifier [**3,2**], where "3" designates the position of the location along the horizontal X-Axis and "2" designates the position of the location along the vertical Y-Axis.



The specifications of the patents-in-suit make clear that the terms "X,Y coordinate," "X,Y coordinate location," and "X and Y coordinate" were indeed used by the inventors of the patents-in-suit in their plain and ordinary contexts as simple location identifiers to identify locations of various objects and sites (e.g., packages and storage area locations)

---

[3]     Defendants cite Wikipedia.com and Webster.com for the plain and ordinary meaning of "X,Y coordinate," "X,Y coordinate location" and "X and Y coordinate." Although these websites came into existence after the filing of the patents-in-suit, the concepts discussed therein, including the discussion of Cartesian coordinate systems and X,Y axes, were developed by the French mathematician René Descartes and Pierre de Fermat in 1637 and have not changed since that time. DeMatteo Decl. Exh. G.

within the automated dispensing system of the patents-in-suit.  For example, the inventors used the term "X,Y coordinate" as an identifier for the location of packages 14 in storage rack 12. As stated in the patents-in-suit:

> A storage rack 12 . . . is shown in FIG. 3. . . .  Packages are placed in the storage rack so that each product is **located** at a known X, Y coordinate.

DeMatteo Decl. Exh. A at col. 5, lns. 10-19; Fig. 3. (emphasis added).  The inventors also used the term "X,Y coordinate" and "X and Y coordinates" to refer to locations within storage rack 12 and supply rack 20 where packages are kept (i.e., storage area locations).  According to the patents-in-suit:

> . . . packages are held in **locations** [of storage rack 12] having known X,Y coordinates.
>
> *         *         *
>
> . . . the X and Y coordinates at which packages may have been placed [i.e., their **locations**] in return racks 20 are known to the computer 24.

*Id*. at col. 5, lns. 41-42; col. 7, lns. 29-33 (emphasis added).  Nowhere in the patents-in-suit are the terms "X,Y coordinate," "X,Y coordinate location" or "X and Y coordinate" used by the inventors in any way other than as identifiers of package locations or locations within storage and supply areas (e.g., rods 30).

The prosecution history of the '110 patent also supports the inventors' use of "X,Y coordinate," "X,Y coordinate location" and "X and Y coordinate" as simple location identifiers.  Indeed, when traversing claim rejections based on U.S. Patent No. 5,129,777 to Pohjonen et al. ("the Pohjonen reference") and a European patent, the inventors stated:

> There is no teachming [in the Pohjonen reference] of the use of storage **locations** having x,y coordinates. . . . The cited European

- 13 -

> patent . . . does not rely upon a set of storage **locations** having
> distinct x,y coordinates.

DeMatteo Decl. Exh. C at T056474-476 (emphasis added).  Since the '267 patent is a divisional

of the '110 patent, the statements made in the '110 prosecution history concerning the meaning

of "X,Y coordinate" apply with equal force to similar terms used in the asserted claims of the

'267 patent. *See, e.g., Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 2006 U.S.

App. LEXIS 13213, at *8 (Fed. Cir. May 26, 2006) ("When multiple patents derive from the

same initial application, the prosecution history regarding a claim limitation in any patent that

has issued applies with equal force to subsequently issued patents that contain the same

limitation.").

The "X,Y coordinate" location identifiers were also used by the inventors in their

conventional manner to identify locations using perpendicular X and Y axes; namely, a

horizontal X-Axis and a vertical Y-Axis, in which "X" designates the position of the location as

measured along the X-Axis and "Y" designates the position of the location as measured along

the Y-Axis.[4]   Figure 3 of the patents-in-suit, for example, includes an overlay of three

perpendicular coordinate axes (X, Y, Z) in the lower left hand corner of storage rack 12

illustrated therein.[5]  DeMatteo Decl. Exh. A at Fig. 3.  As is shown, the "X" and "Y" directions

---

[4]                                                           REDACTED

[5]    The '110 patent states that "like reference numerals refer to similar or identical parts
throughout the several views" of the patent.  DeMatteo Decl. Exh. A at col. 4, lns. 25-27.
Figure 3 illustrates a storage rack 12, which is employed in virtually every embodiment
disclosed in the patents-in-suit.  There is nothing in the patents-in-suit to suggest that the
X,Y,Z coordinate axes illustrated in Figure 3 are limited only to the storage rack
illustrated therein.

illustrated in Figure 3 extend along the horizontal and vertical directions, respectively, of storage rack 12, whereas the "Z" direction extends in a direction away from storage rack 12. Thus, for example, in the copy of Figure 3 reproduced below, with overlay added by Defendants, the X,Y coordinate of the lower storage area location in the first column (as well as the group of packages at this location) is the location identifier $[\mathbf{X_1, Y_1}]$, where "$X_1$" designates the position of the storage area location along the horizontal X-Axis and "$Y_1$" designates the position of the storage area location along the vertical Y-Axis.



Figure 6 of the '110 patent also supports the inventors' use of horizontal X and vertical Y axes to designate the position of a location. *Id.* at Fig. 6. Figure 6 shows picking means 38 mounted on a column shaped vehicle 44. The vehicle 44 is movable along the horizontal direction of rack 12 by means of track 42. *Id.* at col. 5, lns. 49-60; Fig. 6. Picking means 38 is movable vertically along the column shaped vehicle 44 to reach a desired storage area location. *Id.* at col. 5, ln. 64 to col. 6, ln. 2; Fig 6. According to the patents-in-suit:

> [The] drive system . . . used should be capable of moving the vehicle [44] to positions along the track [42] *which correspond to the X coordinates of the packages within the rack*. . . . The picking means is mounted on column-shaped vehicle 44 in a manner to allow controlled vertical movement along that column. In this manner, the picking means 38 can be positioned at locations along column 44 *which correspond to the Y coordinates of packages to be selected.*

*Id.* at col. 5, ln. 56 to col. 6, ln. 2 (emphasis added). Since track 42 is horizontal with respect to rack 12 and positions along track 42 correspond to "X" coordinates, the X-Axis chosen by the inventors is a horizontal axis. Likewise, since column-shaped vehicle 44 permits vertical movement of picking means 38 to locations corresponding to "Y" coordinates, the Y-Axis chosen by the inventors is a vertical axis. The inventors clearly used the terms "X,Y coordinate," "X,Y coordinate location," and "X and Y coordinate" in their plain and ordinary context as simple location identifiers to identify locations.

The plain and ordinary meanings of "X,Y coordinate," "X,Y coordinate location," and "X and Y coordinate" are also consistent with the claims of the patents-in-suit. For example, claim 20 of the '110 patent, which is not asserted by McKesson in this case, requires that storage locations be "positioned opposite and facing one another." DeMatteo Decl. Exh. A at col. 14, lns. 40-52. REDACTED

REDACTED

- 16 -

REDACTED

Regardless, there is nothing in the specification of the '110 patent or its prosecution history that requires the storage area locations of different storage areas to align perfectly when placed opposite one another. The '110 patent claims' requirement that each storage area location have a "distinct x,y coordinate" appears to preclude such a possibility at least with respect to the claimed embodiments. *Id*. at 220; DeMatteo Decl. Exh. A at col.13, lns. 1-11; Exh. F at ¶¶ 40-42.

The same is true for the support rods of unasserted claim 6 of the '267 patent. Claim 6 of the '267 patent, which depends from claim 1, recites that "the support rods extend from back rod supports within the frame in sets of two, with a first rod and a second rod on each set pointing essentially in a Z direction which is perpendicular to the X and Y directions, but approximately 180 degrees apart from each other." DeMatteo Decl. Exh. B at col. 14, lns. 11-16. There is nothing in the '267 patent claims, the specification or its file history that requires the rods on either side of the rack to use the same X,Y coordinate axes, nor is there anything that requires the rods in each set of two to line up perfectly with one another.     REDACTED

- 17 -

REDACTED

The specifications and prosecution histories of the patents-in-suit make clear that the inventors used the terms "X,Y coordinate," "X,Y coordinate location," and "X and Y coordinate" in accordance with their notoriously well-known, plain, and ordinary meanings as location identifiers for designating the position of various locations within the automated system of the patents-in-suit. There is nothing in the patents-in-suit or their prosecution histories to suggest that these terms were used by the inventors in any other way. The terms "X,Y coordinate," "X,Y coordinate location," and "X and Y coordinate" should, therefore, be construed to mean "a location identifier, in which X designates a position of the location along an X-Axis and Y designates a position of the location along a Y-Axis."

### C.    "Package Reader Associated With The Picking Means"

The parties dispute the meaning of the term "package reader associated with the picking means," as this term is recited in claim 1 of the '110 patent. Since the parties did not identify this term as a mean-plus-function element, this term should be construed in accordance with its meaning to a person having ordinary skill in the art in view of the specification of the '110 patent and its corresponding prosecution history. When read in light of the '110 patent and its corresponding prosecution history, the term "package reader associated with the picking means" should be construed to mean "a package reader attached to the picking means."

The '110 patent discloses that the picking means is not only capable of moving to a desired storage location where a desired package is located, but is also capable of scanning the package to verify its contents immediately *before* the picking means removes the package from the storage area ("pre-pick verification"). According to the '110 patent:

- 18 -

> When the end of gripper assembly 38 [or picking means 38] is properly positioned, the bar code reader 26 reads the identity 16 on the medicine package 14 in order to confirm that it is the proper medicine package to be picked with respect to the patient's prescription.

DeMatteo Decl. Exh. A at col. 10, lns. 2-6; Figs. 7-10.  To achieve this pre-pick verification function, the package reader 26 of the '110 patent has two critical features: (i) it is attached to or movable with the picking means to selected storage locations and (ii) positioned for reading machine readable labels on packages located in the storage area.  Both of these features are critical for reader 26 of the '110 patent to perform the pre-pick verification function, and the '110 patent discloses no other way of performing the pre-pick verification function other than by attaching a package reader to the picking means.[6]                        REDACTED

REDACTED


REDACTED

The prosecution history of the '110 patent makes clear that the inventors intended for the "package reader associated with the picking means" limitation to require a bar code reader movable with (i.e., attached to) the picking means to perform the pre-pick verification function described in the '110 patent.  The limitation "a package reader associated with the

---

[6]     If the reader were attached to the picking means but not "positioned for reading machine readable labels on packages located in the storage area," the system could not read a package in the storage area before picking it and, as such, could not perform the pre-pick verification function.  Likewise, if the reader were "positioned for reading machine . . . packages located in the storage area" but not movable with the picking means (i.e., attached to the picking means) to different storage locations where the packages are kept, the reader could not be positioned to read different selected packages in the storage area locations and, for similar reasons, could not perform the pre-pick verification function.

picking means" does not appear in the '110 patent specification and did not appear in claim 1 as originally filed. This limitation was added in response to an Office Action dated October 15, 1993, in which the Examiner rejected, *inter alia*, claim 1 of the '110 patent under 35 U.S.C. § 103(a) as obvious over U.S. Patent No. 4,896,024 to Morello et al. ("the Morello reference"). DeMatteo Decl. Exh. C at T056457. According to the Examiner, the Morello reference disclosed a system containing the limitations of the claimed invention and that it would have been obvious to use the system of the Morello reference in the claimed manner. *Id*.

The inventors distinguished the Morello reference by making various amendments to claim 1, including an amendment adding the "package reader associated with the picking means" limitation for reading labels on packages in the storage area. *Id*. at T056466. The inventors amended claim 1 to recite explicitly:

> a package reader associated with the picking means and being positioned for reading the machine readable labels on packages located within the storage area.

("the package reader amendment"). *Id*. This package reader amendment placed two distinct requirements on the package reader: (i) that it be associated with the picking means; and (ii) that it be positioned for reading labels on packages located in the storage area. According to the inventors, the package reader amendment (with its two requirements) permitted the system of claim 1 to perform the same pre-pick verification function achieved by the reader attached to the picking means disclosed in the '110 patent – i.e., to remove articles from the storage locations only "after the reader confirms that the desired article has been found," thereby resulting in fewer "wrong selections" and "false picks" *Id*. at T056472.[7] Since attachment of the barcode reader to

---

[7] The inventors later reinforced this requirement of claim 1 by further amending the claim to require that "the machine readable label on at least one package in a storage location (Continued . . .)

- 20 -

the picking means is *precisely* what permits the system of the '110 patent to perform the pre-pick verification function, the inventors clearly intended the term "package reader associated with the picking means" to require the package reader to be attached to (i.e., movable with) the picking means.

Without attaching the barcode reader to the picking means, the pre-pick verification function, which was used by the inventors explicitly to distinguish the art asserted by the Examiner, could simply not be realized by any embodiment disclosed in the '110 patent. Indeed, the only way the system of claim 1 can "[remove articles] from storage locations after the reader confirms that the desired article has been found" by the picking means, as suggested by the inventors, is if the package reader is both positioned for reading labels on packages located in the storage area – i.e., the second requirement of the package reader amendment – and ***movable*** to the location within the storage area where the desired article is stored. The first requirement of the package reader amendment – i.e., that the reader be "associated with the picking means" – was, thus, clearly intended by the inventors to require the reader to be movable with (i.e., attached to) the picking means to selected storage area locations.       REDACTED

REDACTED

---

(. . . continued)
    can be read without removing the package from the storage location." DeMatteo Decl. Exh. C at T056500-01.

Other statements made by the inventors during prosecution provide further support for this construction. The inventors, for example, explicitly characterized the package reader amendment during prosecution as requiring a picking means capable of reading articles (i.e., having an attached reader) and distinguished the prior art on this basis. For example, with respect to the Morello reference, the inventors stated:

> When the picker assembly [of the Morello reference] arrives at that [storage location] it cannot read the article identification while the article remains in the storage location. This teaching is quite different from the system of amended claim 1.

DeMatteo Decl. Exh. C at T056471-72. The only way a picker assembly or picking means can "read an article," much less do so "while the article remains in the storage location," is if the picking means includes a reader.

The inventors of the '110 patent also criticized other prior art asserted by the Examiner for not including a picking means with an attached bar code reader. For example, with respect to a rejection of claims 2 and 3 under 35 U.S.C. § 103(a) based on the Morello reference in combination with U.S. Patent No. 4,789,295 to Boucher et al. ("the Boucher reference"), the inventors distinguished and criticized the picking means of the Boucher reference for "not [including] any type of package reader . . . ." *Id*. at T056474.[8] In a subsequent amendment filed with the United States Patent and Trademark Office ("USPTO") on February 6, 1995, the inventors again distinguished claims 1-3 of the '110 patent from the Morello and Boucher references which, according to the inventors, failed to disclose picking means having a reader

---

[8]     The inventors' statements regarding the reader of the Boucher reference were made with respect to the package reader amendments of claim 1, which are necessarily incorporated within dependant claims 2 and 3.

capable of reading packages before they are removed from storage area locations.  *Id*. at T056504, 506.

The inventors also stated during prosecution that the package reader amendment requiring the package reader to be "associated with the picking means" permitted the system of claim 1 to "still operate using the package reader to *locate* a desired package" if there were an error in memory or a system crash that caused the stored information correlating package identification to individual locations to be lost.  *Id*. at T056472 (emphasis added).  The only way disclosed in the '110 patent for the package reader to "locate" desired packages is by being moved to storage locations within the storage rack to verify package contents, and the only way described in the '110 patent for moving the reader to storage locations is by being moved with the picking means to these locations.  It is clear that the inventors intended the term "a package reader associated with the picking means" to require the package reader to be moveable with (i.e., attached to) the picking means.

For the reasons discussed above, the term "a package reader associated with the picking means," as this term is used in claim 1 of the '110 patent, should be construed to mean "a package reader attached to the picking means."

### D. "Picking Means/Automated Picking Means/Means For Picking Medicine Packages From The Support Rods/Picking Means For Picking Packages From The Support Rods In Accordance With Instructions Received From A Computer" And "Means For Obtaining A Medicine Package/Obtaining Means"

The parties dispute the construction of the terms "picking means," "automated picking means," "means for picking medicine packages from the support rods," "picking means for picking packages from the support rods in accordance with instructions received from a computer" and "means for obtaining a medicine package/obtaining means."

All of these terms recite the word "means" and, as such, are presumptively governed by the provisions of 35 U.S.C. § 112, ¶ 6. These terms should, therefore, be construed to mean the corresponding structures recited in the specification for performing the stated functions of these terms and equivalent structures thereof.

The parties agree that the terms "picking means" and "automated picking means" recited in claim 1 of the '110 patent should be construed similarly, but dispute the proper construction of these terms. DeMatteo Decl. Exh. A at col. 13, lns. 1-39. The stated function of "picking means" and "automated picking means" in claim 1 of the '110 patent is recited in the claim as "to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions." *Id.* at col. 13, lns. 12-16. The structure disclosed in the '110 patent for performing this function is clearly picking means 38, which includes a storing rod 48 for holding packages and a gripper assembly (including an obtaining means 50) for selecting and placing packages in storage area locations. *Id.* at col. 7, lns. 45-56; col. 10, lns. 6-19; col. 8, lns. 1-30; col. 10, lns. 6-37; Figs. 9-11. The picking means 38 is also the structure disclosed in the '267 patent for performing the stated functions of the "means for picking" and "picking means" limitations of claims 1 and 7 of the '267 patent, both of which recite only the "picking" function – i.e., "picking medicine packages from the support rods in accordance with instructions received from a computer." DeMatteo Decl. Exh. B at col. 13, lns. 10-13; col. 14, lns. 23-26.

The parties agree that the terms "means for obtaining a medicine package" and "obtaining means" recited in claim 4 of the '267 patent should be construed similarly, but dispute the proper construction of these terms. The stated function of "means for obtaining a medicine package" and "obtaining means" is recited in claim 4 as "picking medicine packages from the

support rods in accordance with instructions received from a computer." *Id.* at col. 13, ln. 49 to col. 14, ln. 7. The structure disclosed in the '267 patent for performing this function is obtaining means 50, which, as described above, includes all the structure required for performing the "picking" function.

For the foregoing reasons, the terms "picking means/automated picking means/means for picking medicine packages from the support rods/picking means for picking packages from the support rods in accordance with instructions received from a computer" should be construed under 35 U.S.C. § 112, ¶ 6 to mean picking means 38 and the terms "means for obtaining a medicine package/obtaining means" should be construed under 35 U.S.C. § 112, ¶ 6 to mean obtaining means 50.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court enter an order adopting Defendants' proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney*

_____
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jheaney@mnat.com
   *Attorneys for Defendants Swisslog Italia,*
   *S.p.A. and Translogic Corporation*

OF COUNSEL:

Alfred R. Fabricant
Lawrence C. Drucker
Richard LaCava
Bryan N. DeMatteo
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 277-6500

August 15, 2008
2449786

- 25 -

<u>CERTIFICATE OF SERVICE</u>

        I, the undersigned, hereby certify that on August 22, 2008 I electronically filed the

foregoing with the Clerk of the Court using CM/ECF which will send notification of such filing

to the following:

                Dale R. Dubé, Esquire
                Blank Rome LLP

        Additionally, I hereby certify that true and correct copies of the foregoing were

caused to be served on August 22, 2008 upon the following individuals in the manner indicated

**<u>BY E-MAIL</u>**

| | |
|---|---|
| Dale R. Dubé, Esquire | Blair M. Jacobs, Esquire |
| Blank Rome LLP | Sutherland Asbill & Brennan LLP |
| Chase Manhattan Centre | 1275 Pennsylvania Avenue, NW |
| 1201 Market Street, Suite 800 | Washington, DC  20004 |
| Wilmington, DE  19801 | |

*/s/ Julia Heaney*

_____

Julia Heaney (#3052)
jheaney@mnat.com