IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| McKesson Automation, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 06-28-SLR-LPS |
| | : | |
| Swisslog Holding AG, et al., | : | |
| | : | |
| Defendants. | : | |

### ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION AND REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO DISMISS AND RELATED MOTIONS

This patent infringement case is before me for a second time. On the first occasion I recommended that the case be dismissed because it appeared that Plaintiff lacked standing. Based on the record the parties had put before me in connection with Defendants' Motion to Dismiss, I found that Plaintiff had failed to meet its burden to establish that it owned 100% of the rights to U.S. Patent Nos. 5,468,110 ("the '110 Patent") and 5,593,267 ("the '267 Patent") (collectively, "the patents-in-suit").

Just four days after I issued my R&R, Plaintiff filed a Motion for Reconsideration, providing the Court with documents that it had previously withheld. None of the newly-produced evidence was newly-discovered. Rather, Plaintiff's counsel had calculated that it was unnecessary to share it with the Court because counsel believed the limited evidence it chose to put in the record already satisfied Plaintiff's burden. As reflected in my earlier R&R, I disagreed.

I do agree, however, that the more extensive evidence now before me demonstrates that Plaintiff does own 100% of the rights to the patents-in-suit. My earlier R&R, while reaching a

correct conclusion based on the limited record then before me, contains a clear error of fact: the expanded record establishes that what I referred to as the Heilman Note was repaid by Plaintiff's predecessor. To allow my earlier recommendation of dismissal to stand would result in a manifest injustice. Therefore, I will grant Plaintiff's Motion for Reconsideration.

This conclusion requires me to reach issues that were not pertinent before. I find that the underlying financial transactions were intended by the parties to create a short-term "bridge financing" security interest in the patents-in-suit and not an outright assignment of those patents. This security interest was extinguished by operation of law upon the repayment of the debts they secured; no physical reassignment was necessary. Consequently, Plaintiff holds 100% of the interests in the patents-in-suit, and I recommend denial of the Motion to Dismiss.

Other matters must be addressed as well. I grant Plaintiff's Motion for Leave to File a Reply Brief in support of its Motion for Reconsideration. I also explain why I have granted Defendants' Motion for Leave to Amend Their Answers and Counterclaims, and why I am recommending denial of Defendants' Motion to Dismiss Plaintiff's Allegations of Willful Infringement and Plaintiff's Motion for Leave to Amend Its Allegations of Willful Infringement.

## BACKGROUND[1]

Plaintiff is McKesson Automation, Inc. ("McKesson"). McKesson's predecessor, Automated Healthcare, Inc. ("AHI"), was founded in 1987 by Sean McDonald and Philip Keys. McDonald is the former president of AHI and the named inventor of the patents-in-suit. In need of funds for product development, AHI's founders sought out investors and entered into a series

---

[1]All of the statements contained in this Background section are undisputed.

2

of agreements with the Pittsburgh Seed Fund ("PSF"), a venture capital group, and private

investor Dr. Stephen Heilman ("Heilman" and, collectively with PSF, the "Investors") to provide

capital.

On June 29, 1990, AHI and PSF signed a term sheet dated June 27, 1990 (the "Term

Sheet"). The Term Sheet provided, in pertinent part:

> Upon achieving agreement to this term sheet, [PSF] and perhaps other investors
> are willing to provide bridge financing of $150,000 on demand note basis.
> Compensation on this demand note will include simple annual interest of 12%
> plus warrants to purchase shares of common stock [of AHI]. . . . The note will be
> secured by the technology rights associated with the patent application.

(D.I. 223 Ex. A at M0475803) AHI and Heilman did not execute a term sheet.

In June and November 1990, PSF and Heilman provided AHI with loans totaling

$200,000.00 in exchange for three promissory notes (collectively the "Notes"). Specifically, on

June 29, 1990, AHI executed a note for a $42,857.14 loan from Heilman (the "Heilman Note").

(D.I. 314 Ex. 2 at M0475285-86) On this same date, AHI executed a separate note for a

$107,142.86 loan from PSF ("PSF June Note"). (*Id*. at M0475283-84) On November 14, 1990,

AHI executed a third note for an additional $50,000.00 loan from PSF ("PSF November Note").

(*Id*. at M0475282)

> Each of the three Notes provided that:
>
> (i) it "will be secured by an Assignment of Application for Patent for the
> technology rights associated with the patent application of January 24, 1990
> entitled 'A System for Filling Orders,' with serial number 07/469,217" ("the '217
> Application," i.e., the parent application to the two patents-in-suit); and
>
> (ii) "[a]ssignment [of the '217 Application] will be made back to the Company
> [AHI] upon full satisfaction of the obligations under this note."

(*Id.* at M0475282-86)

3

Also on June 29, 1990, the same date PSF and AHI executed the Term Sheet and the

Investors and AHI executed the Heilman Note and the PSF June Note, AHI executed an

Assignment of Invention ("Assignment"). By the Assignment, in exchange for consideration of

$1.00, AHI "hereby sells, assigns and transfers" to

> [Heilman a 26.8%] interest . . . including all rights to claim priority, in and to any
> and all improvements which are disclosed in the invention [the '217 Application]

and "hereby assigns and transfers" to

> [PSF the remaining 71.4%] interest . . . including all rights to claim priority, in
> and to any and all improvements which are disclosed in the invention . . .
> including the right to claim priority and, in and to, all Letters Patent to be obtained
> for said invention . . . or any continuation, division, renewal, or substitute thereof,
> and as to letters patent any reissue or reexamination thereof.

(*Id.* at M0475287-88) Although executed on the same date as the other documents already

referenced, and by the same parties, the Assignment itself does not refer to the Notes or the Term

Sheet.

The next relevant document is a December 27, 1990 Stock Purchase Agreement ("SPA"),

by which, among other things, the Investors agreed to purchase shares of AHI preferred stock.

(D.I. 314 Ex. 2 at M0475185) The SPA stated that AHI would use the proceeds from the sale of

the preferred stock to repay the Investors for AHI's indebtedness under the Notes. The SPA

further granted the Investors warrants to purchase additional shares of AHI common stock. (*Id.*

at M0475186)

Specifically, the SPA provided:

> 3.     (d)     The Company [AHI] covenants that it shall use the proceeds from
>                the sale of Preferred Stock under Paragraph 3(a) primarily for the
>                following purposes:

4

     (i)  The Company shall repay in full its outstanding indebtedness under the Promissory Notes of the Company dated June 29, 1990 in favor of the Investors (the "Notes"), and the Company shall contemporaneously therewith issue to Heilman a Warrant exercisable to purchase . . . (1,406) shares of Common Stock and to PSF a Warrant exercisable to purchase . . . (3,516) shares of Common Stock all at an exercise price of . . . ($.01) per share (collectively, the "Warrants"), as provided for in the Notes.

     (ii)  The Company shall repay in full the Promissory Note dated November 14, 1990 to the Pittsburgh Seed Fund.

(*Id.*) Exhibit I to the SPA identified the Notes as the notes AHI intended to satisfy with the proceeds of the preferred stock sale. (*Id.* at M0475193, M0475279, M0475282-86) Finally, the SPA set out that at closing AHI would deliver to the Investors the warrants for purchase of AHI common stock and "[t]he Investors will simultaneously deliver to the Company the Notes upon receipt of said Warrants and will reassign the ['217 Application]." (*Id.* at M0475189, M0475194)

  Plaintiff, McKesson, acquired AHI in 1996. With the acquisition, McKesson obtained whatever rights AHI then had in the '217 Application and any patents relating to it.

  McKesson filed the instant patent infringement lawsuit against Translogic Corporation and Swisslog Italia S.P.A. ("Swisslog" or "Defendants") on January 13, 2006. (D.I. 1) McKesson filed a first amended complaint (the "Complaint") on July 3, 2006. (D.I. 47) On October 3, 2007, Swisslog filed its Motion to Dismiss the Complaint, arguing that McKesson lacks standing to sue for patent infringement because it failed to meet its burden to show that it owns 100% of the rights in the patents-in-suit, due to uncertainties surrounding the Notes (the

"Standing Motion").[2]  (D.I. 165, 166 & 167)

On October 11, 2007, Swisslog filed a Revised Motion for Leave to Amend Answers and Counterclaims (the "Motion for Leave to Amend Answers and Counterclaims").  (D.I. 172, 173 & 174)

On January 25, 2008, Swisslog filed a Motion to Dismiss McKesson's Willfulness Allegations (the "Motion to Dismiss Allegations of Willful Infringement").  (D.I. 224, 225 & 226)  In response, on April 15, 2008, Plaintiff filed a Motion for Leave to File a Second Amended Complaint, to permit McKesson to add to its allegations of willful infringement (the "Motion for Leave to Amend Allegations of Willful Infringement").  (D.I. 272, 273 & 274)

I held oral argument on all pending motions on May 20, 2008.  (D.I. 308)  On May 30, 2008, based on the record then before me, I issued a Report and Recommendation Regarding Swisslog's Rule 12(b)(1) Motion to Dismiss (the "R&R").  (D.I. 310)  I recommended that Swisslog's Standing Motion be granted given the failure of proof on whether the Heilman Note had been repaid, which raised a substantial issue as to whether McKesson owned 100% of the rights in the patents-in-suit.

Within two business days, on June 3, 2008, Plaintiff filed a Motion for Reconsideration of the R&R (the "Reconsideration Motion").  (D.I. 312, 313 & 314)  At that time, McKesson supplemented the record with more than 70 pages of documents it had previously withheld from the Court.  All of these documents had been produced in discovery; none were newly-discovered.

_____

[2]This case was originally assigned to the Honorable Kent A. Jordan.  Upon Judge Jordan's elevation to the Third Circuit Court of Appeals in December 2006, it was reassigned to the "judicial vacancy" and referred for pretrial management to Magistrate Judge Mary Pat Thynge.  (D.I. 69)  On February 1, 2008, the case was reassigned to Judge Sue L. Robinson and then, on February 11, 2008, referred to me.  (D.I. 238, 250)

I held a teleconference with counsel on June 4, 2008 and ordered Swisslog to respond to

the Reconsideration Motion by June 20, 2008. (D.I. 352)  Swisslog did so. (D.I. 325)  On June

24, 2008, McKesson filed a Motion for Leave to File a Reply Brief in Support of Plaintiff's

Motion for Reconsideration (the "Motion for Leave to File a Reply Brief"). (D.I. 328)


## LEGAL STANDARDS

A.     Motion for Reconsideration

The Federal Rules of Civil Procedure do not mention motions for reconsideration or for

reargument. *See Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.

Va. 1983).  Courts often treat such motions as motions to alter or amend a judgment, under Fed.

R. Civ. P. 59(e). *See Silva Rivera v. State Ins. Fund Corp.*, 488 F. Supp. 2d 72, 77 (D.P.R.

2007).  Regardless of their title, motions for reconsideration or reargument are to be granted only

sparingly. *See Pirelli Cable Corp. v. Ciena Corp.*, 988 F. Supp. 424, 445 (D. Del. 1998); *Karr v.

Castle,* 768 F. Supp. 1087, 1090 (D. Del. 1991), *aff'd* 22 F.3d 303 (3d Cir. Mar. 8, 1994) (table).

They are not to be used simply to rehash arguments which have been previously briefed by the

parties and considered and decided by the Court. *See Corning Inc. v. SRU Biosystems,* 2006 WL

155255, at *3 (D. Del. Jan. 20, 2006); *Schering Corp. v. Amgen, Inc.*, 25 F. Supp. 2d 293, 295

(D. Del. 1998).

Accordingly, a motion for reconsideration or reargument will only be granted where one

or more of the following conditions are satisfied: (i) the Court has patently misunderstood a

party; (ii) the Court has made a decision outside of the adversarial issues presented to it by the

parties; (iii) the Court has made an error not of reasoning but of apprehension; (iv) there has been

a change in the controlling law; (v) there is newly available evidence; or (vi) there is a need to correct a clear error of law or fact to prevent manifest injustice. *See Donald M. Durkin Contracting, Inc. v. City of Newark*, 2006 WL 2724882, at \*3 (D. Del. Sept. 22, 2006); *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990). Even where one or more of these conditions is satisfied, the Court may deny the motion where it would not alter the outcome. *See Becton Dickinson & Co. v. Tyco Healthcare Group LP*, 2006 WL 890995, at \*2 (D. Del. Mar. 31, 2006); *Brambles*, 735 F. Supp. at 1240.

The District of Delaware Local Rules require leave of the Court before a reply brief may be filed in connection with a motion for reconsideration or reargument. *See* D. Del. LR 7.1.5 ("The Court will determine from the motion and answer whether reargument will be granted.").

B.      Motion to Dismiss – Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, including where the plaintiff lacks standing to bring its claim. *See Samsung Elecs. Co. , Ltd. v. ON Semiconductor Corp.*, 2008 WL 900979, at \*3 (D. Del. Apr. 3, 2008). Motions brought under Rule 12(b)(1) may present either facial or factual challenges to a court's subject matter jurisdiction.

> In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the Court must accept all factual allegations in the Complaint as true, and the Court may only consider the complaint and documents referenced in or attached to the complaint. Gould Electronics, Inc. v. U.S., 220 F.3d 169, 176 (3d Cir. 2000). [In contrast, however,] [i]n reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the complaint. Mortensen v. First Fed. Sav. & Loan, 549 F.2d 884, 891 (3d Cir. 1997). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176,

179 (3d Cir. 1997).

*Id.*

Here, because the Standing Motion attacks the factual basis for jurisdiction, the Court is not required to accept Plaintiff's averments of standing as true, but is instead "free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case." *UD Tech. Corp. v. Phenomenex, Inc.*, 2007 WL 28295, at \*2 (D. Del. Jan. 4, 2007). In fact, "[f]ederal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines. Standing is a threshold question in every federal case, determining the power of the court to entertain the suit." *Pfizer, Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1356 (D. Del. 1993) (internal quotation marks and citations omitted).

"Once the Court's jurisdiction is challenged, the plaintiff bears the burden of proving that jurisdiction exists." *Samsung*, 2008 WL 900979, at \*3. In assessing whether a plaintiff has met its burden, the Court must be mindful that "standing cannot be inferred argumentatively from averments in the pleadings . . . but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation marks and citations omitted), *overruled on other grounds by City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004).

With respect to standing in a patent infringement case, "[o]nly the entity or entities that own or control all substantial rights in a patent can enforce rights controlled by that patent, lest an accused infringer be subjected to multiple suits and duplicate liability." *IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1325 (Fed. Cir. 2007). "Thus all entities with an independent right to enforce the patent are indispensable or necessary parties to an infringement

9

suit," as courts must be assured that "all interested parties are before the court and that their

interests are considered." *Id.* The party bringing the action bears the burden of establishing that

it has standing and has had standing at all times since commencement of the case. *See Sicom*

*Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005); *see also Paradise*

*Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) ("[I]n order to assert

standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to

the patent at the inception of the lawsuit.") (emphasis omitted).

If the plaintiff lacks standing to sue, the case must be dismissed under 28 U.S.C. §1338(a)

for lack of subject matter jurisdiction. *See Fieldturf, Inc. v. Southwest Rec. Indus., Inc.*, 357 F.3d

1266, 1268 (Fed. Cir. 2004); *see also Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d

1198, 1203 (Fed. Cir. 2005) ("In the area of patent infringement . . . if the original plaintiff

lacked . . . initial standing, the suit must be dismissed, and the jurisdictional defect cannot be

cured by the addition of a party with standing."). Ordinarily, dismissal for lack of standing is

without prejudice. *See H.R. Techs., Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1385 (Fed. Cir.

2002).

C.     Motion to Dismiss – Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action

for "failure to state a claim upon which relief can be granted." A motion to dismiss requires a

court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d

218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether

the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory*

*Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citation omitted).

Thus, a court may grant a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007) (internal citations omitted)). While heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged. *Bell Atlantic,* 127 S. Ct. at 1974. At bottom, the complaint must state "enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315, 321-22 (3d Cir. 2008) (internal quotation marks omitted). Nor is the Court obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

D.    Motion for Leave to Amend – Federal Rule of Civil Procedure 15(a)(2)

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, the Court "should freely give" leave to amend "when justice so requires." The Court has discretion, however, to deny a proposed amendment "if it is apparent from the record that (1) the moving party has

11

demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005). "Futility of amendment occurs when the complaint, as amended, does not state a claim upon which relief can be granted. If the proposed amendment is frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend." *Koken v. GPC Int'l, Inc.*, 443 F. Supp. 2d 631, 634 (D. Del. 2006) (internal citations and quotation marks omitted).

## MOTION FOR RECONSIDERATION

The expanded record now before me establishes the foundational fact that all three Notes were repaid. Even on the prior truncated record, there was little doubt that the PSF June and November Notes had been repaid. A January 3, 1991 letter from David I. Cohen, attorney for PSF, to AHI, which I quoted in my earlier Report and Recommendation, states as much:

> Enclosed please find the original [June and November] Promissory Notes payable to the Pittsburgh Seed Fund. . . .
>
> These Notes were satisfied at the closing of the financing held last Thursday and you are authorized to mark the Notes cancelled and paid in full.

(D.I. 240 Ex. N at M0474908; *see also* D.I. 308 at 47, 59-60, 63, 69)

The more substantial issue is whether the Heilman Note was repaid. In my earlier R&R, I considered the evidence of repayment McKesson had placed before me and found it did not satisfy McKesson's burden of proof on this point. McKesson then presented the Court with more than 70 additional pages of documents. Based on this newly-enlarged record, I find that, in fact, the Heilman Note was repaid.

12

The record now shows that on December 27, 1990, the date of the closing on the SPA,

Heilman paid $161,309.53 to AHI by check. (D.I. 314 Ex. 5 at SH000079-80; D.I. 314 Ex. 6 at

M0474782)[3]  In exchange, Heilman received 223,304 shares of AHI preferred stock. (D.I. 314

Ex. 7 at SH000120)[4]  Heilman had agreed to purchase 223,304 shares of preferred stock pursuant

to the SPA. (D.I. 314 Ex. 2 at M0475185)[5]  The agreed-upon purchase price for this number of

shares was $204,166.67. *Id.*  Heilman paid this total amount at the December closing through the

combination of his $161,309.53 check and by forgiving the previous debt on the Heilman Note of

$42,857.14. Consistent with this manner of Heilman's making payment, the SPA provided that

the parties intended the Heilman Note to be repaid in full by AHI at the closing. (D.I. 314 Ex. 2

at M0475186) Exhibit I to the SPA identified and attached a copy of the Heilman Note as one of

the Notes AHI intended to satisfy by the preferred stock sale. (*Id.* at M0475186, M0475193,

M0475279, M0475285-86)

The record also now contains a December 21, 1990 letter from Attorney Cohen to Mark I.

Baseman, an attorney for AHI. (D.I. 314 Ex. 3)[6]  Intending to finalize the details of the

forthcoming closing, Cohen explained that "[a]t the closing we would expect the following

monetary transactions: . . . [a check] in the amount of $161,309.53 from S. Heilman [to AHI] . . .

. [Also] a check to S. Heilman [from AHI] in the amount of $2,550.29 representing bridge loan

---

[3]Neither Heilman's December 28, 1990 check nor AHI's General Ledger (showing receipt of Heilman's check) were in the record originally before me.

[4]The stock certificate for these shares of AHI preferred stock purchased by Heilman in December 1990 was not in the record originally before me.

[5]The SPA was in the record originally before me.

[6]Cohen's letter was not in the record originally before me.

interest [on the Heilman Note] . . . ." (*Id.* at M0474933)  A schedule of closing transactions similarly shows that Heilman would pay only $161,309.53 for his $204,166.77 worth of preferred shares, due to the offsetting credit by AHI of the full value of the $42,857.14 Heilman Note (referred to in the schedule as "Bridge Loan Principal").  (D.I. 314 Ex. 4 at M0475059)[7]

Other documents in the expanded record confirm that the December 27, 1990 closing occurred as planned.  A December 28, 1990 letter from Cohen to Heilman states:

> Enclosed please find the following documentation in connection with your investment in [AHI]:  1. A check payable to you from [AHI] in the amount of $2,550.29 [the bridge loan interest]; 2. The original Warrant evidencing your right to purchase 1,406 additional shares of Series A Preferred Stock; 3. Stock Certificate No. 2 representing 223,304 shares of Preferred Stock; and 4. Finally, a copy of your check No. 1211 payable to [AHI] in the amount of $161,309.53.

(D.I. 314 Ex. 5 at SH000079)[8]  The record shows that Heilman received these documents, as copies were found in Heilman's files.  (D.I. 314 Exs. 5, 7 & 8)

In addition, December 31, 1990 AHI General Ledger entries show the receipt of two separate amounts from Heilman on December 27, 1990: $161,309.53 (the check) and $42,857.14 (repayment of the Heilman Note by converting the debt to an equity investment).  (D.I. 314 Ex. 6 at M0474782)[9]

As McKesson observes, "Swisslog do[es] not seriously dispute that the evidence before the Court establishes repayment to Dr. Heilman."  (D.I. 328 Ex. A at 2)  Rather, Swisslog attempts to persuade the Court to avoid reaching the issue of ownership.  Swisslog asserts "this is

---

[7]The schedule of closing transactions was not in the record originally before me.

[8]Cohen's December 28, 1990 letter to Heilman was not in the record originally before me.

[9]As mentioned *supra*, AHI's General Ledger was not in the record originally before me.

14

not the proper forum to resolve the ownership question because the Investors, who are not parties

to this action and not subject to this Court's jurisdiction, are necessary and indispensable to

resolution of this very question." (D.I. 325 at 5)  Yet here, as I have found, the documents

convincingly show the Investors have no ownership interest.  I cannot ignore this reality.  The

Investors' presence is not necessary in order to determine who owns the rights to the patents-in-

suit because the record now makes plain that the Investors have no rights in those patents.  For

reasons explained in the next section, the security interest the Investors previously had in the

'217 Application became extinguished by operation of law upon such repayment.  Where, as

here, it is clear that 100% of the rights in the patents-in-suit are before the Court, it is not

necessary to bring before the Court all other theoretical claimants to any of those rights.  *See,*

*e.g.*, *Kahn v. General Motors*, 77 F.3d 457, 459 (Fed. Cir. 1996) (determining that patent

ownership for standing purposes is a question of law that may require resolution of factual

disputes by the court and finding, there, that inventor had legal title to all patent rights);

*Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292, 296-97 (D. Del. 2006) (determining

plaintiff held legal title to patents and had standing, without joining as parties other potential

claimants to patent rights); *see also Provident Tradesmens Bank & Trust Co. v. Patterson*, 390

U.S. 102, 119 (1968) ("To say that a court 'must' dismiss in the absence of an indispensable

party and that it 'cannot proceed' without him puts the matter the wrong way around: a court

does not know whether a particular person is 'indispensable' until it ha[s] examined the situation

to determine whether it can proceed without him.").

Swisslog also insists that "a motion for reconsideration cannot be based on information

that was readily available at the time the underlying motion was heard." (D.I. 325 at 1)  It is

undisputed that all of the documents in the expanded record were readily available since at least

October 2007, when McKesson produced them to Swisslog in discovery. (D.I. 352 at 13, 20)

Although it is extremely unlikely for a clear error of fact and a manifest injustice to occur in the

absence of newly-discovered evidence, it is not impossible, as this case demonstrates.[10] Here,

McKesson has met the stringent standards for reconsideration. While my original R&R – based,

as it had to be, on the record then before me – was not an incorrect judicial ruling, the expanded

record demonstrates that it contained a clearly erroneous factual finding that the Heilman Note

may not have been repaid. The record now demonstrates that the Heilman Note was repaid.

Because McKesson has standing to press its claim of patent infringement, it would be a manifest

injustice to deprive McKesson of the opportunity to do so based on a clear factual error.

Plaintiff's counsel's initial failure to make an adequate record merits criticism, and I have

considered imposing sanctions. (*See* D.I. 352 at 8-9; D.I. 325 at 6 (defense asking for

reimbursement for costs of preparing brief in opposition to Reconsideration Motion.)) I have

decided not to impose sanctions because counsel's mistakes were made in good faith and

prejudiced counsel's own client's interests, not those of counsel's opponent. Moreover, Swisslog

bears a portion of responsibility for this unusual situation because it stated in its reply brief in

support of its Standing Motion that whether the Notes were repaid was "irrelevant." (D.I. 239 at

11-12) While the Court's time was, regrettably, squandered in making a decision on an

incomplete record – a decision that had to be re-analyzed in light of the expanded record – there

---

[10]By contrast, neither of the cases cited by Swisslog involved a clear error of fact or a manifest injustice. *See* D.I. 325 at 7 (citing *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990); *Kloth v. Christian Univ.*, 2007 U.S. Dist. LEXIS 76916, at *5-6 (D. Del. Oct. 17, 2007)).

16

was no undue prejudice to Swisslog. It is unfortunate it took so long, and the issuance of an

R&R recommending dismissal of the case, to motivate McKesson to provide a fuller record.

Although counsel seriously miscalculated, I am convinced that, at all times, counsel was acting in

good faith and simply erred.[11]

## MOTION TO DISMISS FOR LACK OF STANDING

Having granted McKesson's Reconsideration Motion, and having found all the Notes

were repaid, I must next address whether the Assignment nonetheless deprives McKesson of

standing. Swisslog observes that, notwithstanding repayment of the Notes, there is no evidence

the Investors ever reassigned their interests in the '217 Application to AHI. Without a physical

reassignment back to AHI, Swisslog continues, AHI did not own 100% of the rights to the

patents-in-suit after 1990 and, therefore, could not have transferred 100% of those rights to

McKesson in 1996. McKesson counters that, looked at as a whole, as applicable Pennsylvania

law requires, the 1990 transactions gave the Investors merely a security interest in the '217

Application. Under Pennsylvania law, such a security interest is automatically extinguished upon

repayment of the debt it is securing. Because there was no outright assignment, no physical

reassignment was required. For the reasons explained below, I agree with McKesson.

State law governs patent ownership. *See Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d

1354, 1357 (Fed. Cir. 2008). Moreover, "[c]onstruction of patent assignment agreements is a

---

[11]I grant McKesson's Motion for Leave to File a Reply Brief in support of its Reconsideration Motion. (D.I. 328) I grant this motion as, in the unusual circumstances of this case, I have benefitted from review of McKesson's Reply Brief. McKesson's brief is succinct (less than four pages) and provided its position on Swisslog's sanctions request – which, by its nature, was not an issue that McKesson could have addressed in its Reconsideration Motion.

matter of state contract law." *Mars, Inc. v. Coin Acceptors, Inc.*, 2008 WL 2229783, at \*9 (Fed. Cir. June 2, 2008); *see also Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1117 (Fed. Cir. 1996) ("Determining whether the right to sue for prior infringement has been transferred turns on the proper construction of the assignment agreements, which is a matter of state contract law."); *Affymetrix,* 446 F. Supp. 2d at 296 ("The proper construction of assignment agreements is a matter of state contract law."). Thus, in examining ownership of the patents-in-suit, Pennsylvania law, which is the choice of law provided for in the documents, will govern my analysis.[12]

Under Pennsylvania law, when a single transaction is comprised of multiple writings, these individual writings should be construed together as a whole, even if they were executed at different times by different signatories. *See Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir. 1999); *see also Von Lange v. Morrison-Knudsen Co., Inc.*, 460 F. Supp. 643, 647-48 (M.D. Pa. 1978) ("It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter that they should be construed together and interpreted as a whole. There is not 'any requirement that a contract be evidenced by a single instrument' and '(i)f contracting parties choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the

---

[12]At times Swisslog has suggested that the Court should apply federal law to interpret the Assignment and/or the assignment clause in the Notes. (*See* D.I. 249 at 3 (citing *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284 (Fed. Cir. 2008)); D.I. 325 at 10 n.6 (same).) Elsewhere, however, Swisslog appeared to agree with McKesson that state law applies. (D.I. 308 at 26-28, 48-49, 88-89) As noted above, I find that the dispute between the parties must be resolved according to Pennsylvania law.

true intent of the parties."); *Huegel v. Mifflin Const. Co., Inc.*, 796 A.2d 350, 355-56 (Pa. Super. 2002) (looking at various documents because they formed one transaction).

> Furthermore, under Pennsylvania law,

> [t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties.  In cases of a written contract, the intent of the parties is the writing itself. . . .  When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.  When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.  A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.

*Panetta v. SAP Am., Inc.*, 2007 WL 1001889, at *3 (E.D. Pa. Mar. 30, 2007) (internal citations omitted).

"[I]t may not [always] be apparent whether a contract is ambiguous without an examination of the context in which the contract was made;" that is, in determining whether an agreement is ambiguous, a court "is not confined to its four corners . . . and may read the contract in the context in which it was made." *Sanford*, 198 F.3d at 421 (internal citation omitted). "Therefore, to determine the parties' intentions, the court may consider, among other things, the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Id.* (internal quotation marks and citations omitted).

Additionally, "the Third Circuit plainly requires the admission of extrinsic evidence where 'the written contract is not fully integrated.'" *Ritti v. U-Haul Int'l, Inc.*, 2006 WL 1117878, at *14 (E.D. Pa. Apr. 26, 2006) (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1010 n.9 (3d Cir. 1980)).  A fully integrated writing is one that represents

19

the entire agreement between the parties. *See Yocca v. Pittsburgh Steelers Sports, Inc.,* 854 A.2d 425, 436 (Pa. 2004).

Therefore, to properly understand a transaction, the Court is free to look at the parties' conduct and the manner in which they themselves interpreted the contract, and is not necessarily constrained by a document's label or terminology. *See, e.g., S. F. Bowser & Co., Inc. v. Franklin Mortgage & Inv. Co.*, 158 A. 170, 171 (Pa. 1931) ("it is immaterial what the parties call it; the law pays little heed to the label" and instead "look[s] through the screen of paper titles to ascertain what was the real situation"); *see also Tompkins v. Harrisburg Auction House*, 63 F.2d 485, 486 (3d Cir. 1933) ("[I]n deciding whether a writing is one or the other, courts should not be controlled by technical terms and especially they should not be influenced by the name given a contract. . . .").

Article 9 of the Pennsylvania Uniform Commercial Code defines a "security agreement" as one "which creates or provides for a security interest." 13 Pa. C.S.A. § 9102(a). A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." *Id.* § 1201. "The determination of whether a security interest exists initially depends upon the intent of the parties to the transaction." *Bonczek v. Pascoe Equipment Co.*, 450 A.2d 75, 79 (Pa. Super. 1982). The formal requirements for the creation of a security interest enforceable against the debtor and third parties are: (1) that value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) that one of four enumerated conditions is met, such as the debtor having an authenticated security agreement describing the collateral. *Id.* § 9203(b). "So long as the exchange includes the provision of credit and the release of an interest in property as security for the debt, Article 9

generally applies." *Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F. Supp. 2d

230, 236-37 (M.D. Pa. 2004) (internal citations omitted).  A debtor may show by parol evidence

that a transfer purporting to be absolute was in fact for security.  *See Biddle v. Biddle*, 70 A.2d

281 (Pa. 1950) (holding that parol evidence is admissible to establish that an assignment,

absolute on its face, was intended to operate only as security for a debt); *see* also 29 Am. Jur. 2d

Evidence, §1122 (2008) ("Parol evidence is admissible to show that a conveyance or assignment

that is absolute on its face was intended merely as security for the payment of a debt.").

Crucially, Pennsylvania law dictates that "[a] security interest is effective only to the

extent that the underlying debt obligation remains outstanding." *Interbusiness Bank,* 318 F.

Supp. 2d at 248; *accord Carpenter v. Longan*, 83 U.S. 271, 275 (1872) (same).  Satisfaction of

an underlying debt obligation automatically extinguishes a security interest.  *See Major's*

*Furniture Mart, Inc. v. Castle Credit Corp.*, 449 F. Supp. 538, 544 (E.D. Pa. 1978), *aff'd* 602

F.2d 538 (3d Cir. 1979); *see also Interbusiness Bank*, 318 F. Supp. 2d at 245 ("Assignment or

satisfaction of the underlying debt obligation extinguishes the party's security interest.").

Applying these concepts to this case, it follows that I must examine and construe together

all of the documents relating to the 1990 transactions between AHI and the Investors.  These

documents include the three Notes, the Assignment, the Term Sheet, and the SPA.  All of these

documents were executed between June and December 1990, by some or all of the same parties,

and all are linked to the provision of short-term bridge financing by the Investors to AHI.  None

of these documents are fully integrated; none by itself represents the entire agreement among the

parties.  Thus, I must also analyze the extrinsic evidence in order to understand the parties'

intentions with respect to ownership of the rights to the patents-in-suit.  When taking all of this

into account, it becomes clear that the '217 Application was used by AHI simply as security for short-term loans and that this security interest became extinguished upon repayment of those loans.

I begin with the language of the documents themselves. All three of the Notes contain language referring both to an assignment and to a security interest. Each states that it "will be secured by an Assignment [of the '217 Application]." (D.I. 314 Ex. 2 at M0475283, M0475285) (emphasis added) One could read the language of the Notes to contemplate either a security interest or an assignment. This language is, thus, ambiguous.

The Notes also provide that "assignment [of the '217 Application] will be made back to the Company upon full satisfaction of the obligations under this note." *Id.* (emphasis added). This, again, is ambiguous. Does it mean that assignment back to AHI will occur automatically upon repayment of the note, or does it mean instead that the Investors are contractually obligated to execute a physical reassignment at the time of repayment? Both interpretations are reasonable.

The Term Sheet, which is referenced in the PSF June Note as well as the Heilman Note, supports McKesson's position that the parties created a security interest, and not an outright Assignment. The Term Sheet provides: "Upon achieving agreement to this term sheet, the Pittsburgh Seed Fund and perhaps other investors are willing to provide bridge financing of $150,000 on demand note basis . . . The note will be secured by the technology rights associated with the patent application." (D.I. 223 Ex. A at M0475803 (emphasis added)) While not definitive, the reference to "secured" is indicative of a security interest. Likewise, the reference to "bridge financing" implies a short-term, temporary loan transaction, not a permanent transfer of property interests.

Next, the SPA sets out the following "[p]rocedures" for the December 1990 closing: "the Company will deliver to the Investors the Warrants exercisable to purchase . . . Common Stock . . . . The Investors will simultaneously deliver to the Company the Notes upon receipt of said Warrants and will reassign the ['217 Application]." (D.I. 223 Ex. F at M0143195) (emphasis added) At closing AHI did deliver the Warrants, and the Investors then delivered the Notes back to AHI. There is no requirement of "delivery" of the '217 Application or the Assignment; instead, the Investors were obligated to "reassign" the '217 Application. One (but not the only) reasonable interpretation of the Investors' contractual obligation to "reassign" would include a requirement of physical delivery. In any event, there was no physical reassignment of the '217 Application at closing or any time thereafter. Reassignment either occurred as a matter of law upon repayment of the Notes or it did not occur.

The SPA also contains the following representation on behalf of AHI and the "Principal Shareholders," a group including Heilman and Frank Demmler, a PSF partner: AHI "has all right, title and interest in and to all intangible property and technology, including . . . all patents." (*Id.* at M0143200)

In contrast to the other documents, the Assignment unambiguously contemplates an outright assignment. There is no reference in the Assignment to the Notes, the Term Sheet, the SPA, or any other document relating to the transaction. There is no reference to a security interest or bridge financing.

Overall, then, the documents do not resolve whether AHI and the Investors intended to create a security interest or an outright assignment. Pursuant to Pennsylvania law, it is necessary to consider the extrinsic evidence. This evidence establishes that the parties intended to create a

security interest.

First, the testimony of the parties to the transaction supports the conclusion that they intended a security interest. Sean McDonald, the inventor of the patents-in-suit and the former president of AHI, testified that his understanding was that the Notes and Assignment simply provided the Investors with collateral in the event the loans to AHI were not repaid. (D.I. 222 ¶¶ 22-23) McDonald further testified that because AHI was a start-up company, and its most valuable asset was its intellectual property rights, it would have made no sense for AHI to have provided the Investors a permanent assignment of rights to this property. Instead, obtaining a short-term bridge loan in exchange for a security interest in the intellectual property was entirely sensible. (D.I. 222 ¶¶ 22-23, 25) The Investors who have testified had no recollection about the character of the transaction, so they do not contradict McDonald's testimony. (D.I. 223 Ex. H at 55-56; D.I. 240 Ex. J at 106-07)

More persuasive is the parties' conduct. Everyone's conduct is consistent with an intent and understanding that the patent rights automatically reverted back to AHI in December 1990 due to the extinguishment of the security interest; there is no action consistent with the contrary view that the patent rights remained with the investors absent execution of a physical reassignment back to AHI. As McKesson states, "The Investors had more than seventeen years to assert patent rights to the Patent Application, yet they did not take one step during that period to evidence a belief that they possessed such rights . . . ." (D.I. 221 at 1-2, 6; *see also* D.I. 223 Ex. H at 68 & Ex. I at 78 (testimony of Heilman and Demmler agreeing they did not state that, or act as if, they had patent rights))

For instance, in November 1990, when AHI and PSF executed the November PSF Note,

24

AHI pledged – and PSF accepted – its rights in the '217 Application as collateral, just as it had done in connection with the June Notes. AHI could not have done this, and PSF likely would not have accepted it, if all of AHI's interest in the '217 Application had already been assigned outright in June. (D.I. 221 at 11) But because the June transaction had only created a security interest, which would be extinguished upon repayment of the June debt, AHI could pledge, and PSF could accept, AHI's contingent interest in the '217 Application that would automatically be revived upon repayment of the June debt (and would continue to secure the November debt as long as it remained outstanding).

Significantly, Heilman and Demmler served on AHI's Board of Directors from approximately 1990 to 1996. (D.I. 223 Ex. H at 9 & Ex. I at 11-12; D.I. 308 at 62) Throughout this time they allowed AHI to use its ownership of the '217 Application as collateral for loans from third parties and further permitted AHI to make representations that AHI had full ownership of the rights in the '217 Application. In 1994, AHI used the '217 Application as collateral for a loan it received from Partech, Inc. (D.I. 223 Ex. J) AHI could not have done so if AHI had in 1990 assigned all its ownership rights to the technology to the Investors and had never had those rights reassigned to AHI. Nor could AHI have warranted to Partech that AHI "is the owner of the Collateral [the '217 Application] free from any prior lien, security interest or encumbrance." (D.I. 223 Ex. J at M0144875). Likewise, if AHI did not own the patent rights, it would not have made the representations it did in 1996 in order to effectuate the McKesson merger. (D.I. 222 ¶ 30)

Additionally, at all times AHI maintained complete responsibility over the '217 Application and its progeny. There is no evidence that the Investors ever attempted to gain

control of this intellectual property, voiced concern over AHI's use of it, or reported the intellectual property to any government entity. (D.I. 221 at 16; D.I. 222 ¶¶ 26-28)

Swisslog's strongest argument against finding a security interest is that I need look no further than the Assignment because the Assignment itself does not reference other documents or transactions, nor does it mention any security interest, debt, or note, and is unambiguous on its face. If I found the Assignment lying on the street by itself, I would read it as just that: an Assignment, and not an instrument creating a security interest. It follows, according to Swisslog, that the unambiguous Assignment must be "interpreted solely in accordance with the natural meaning of its terms." (D.I. 325 at 10 (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 96 (3d Cir. 2001)). Even McKesson concedes that the Assignment, if construed in a vacuum, appears to create a standard assignment. (D.I. 308 at 51-52)

I have rejected Swisslog's argument, however, because it is inconsistent with Pennsylvania law. Under Pennsylvania law, as already noted, the Court must examine all of the related documents and extrinsic evidence to comprehend the essence of the subject transaction. Labels such as "Assignment" are not dispositive. *See S. F. Bowser*, 150 A. at 171. The documents, including the Assignment, are not fully integrated, and the loan transaction consisted of a number of writings, all of which must be considered as a whole. "Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." *Neville v. Scott*, 127 A.2d 755, 757 (Pa. Super. 1957). It is therefore proper and necessary for me to examine all of the documents relating to the creation of the Investors' interests in the patent rights, and consider all of the evidence that

26

comprises "the entire agreement of the parties."

In other words, I did not find the Assignment lying on the street by itself. Instead, as both parties recognize, the record shows that the Assignment was executed as part of a series of transactions that also included the Notes, Term Sheet, and SPA. When I look at all these materials, as well as the testimony of the participants in the transactions and their subsequent conduct, I conclude that the intent was to create a short-term security interest, not an outright assignment.[13]

Swisslog also points out that the SPA provision that at closing the Investors "will reassign" the '217 Application to AHI would not have been necessary if the documents as a whole had created an automatically-extinguishing security interest. (D.I. 239 at 3)  Swisslog is correct that the language was not needed to effectuate the reassignment; the reassignment happened by operation of law upon repayment of the Notes. *See generally Akazawa,* 520 F.3d at 1356 (observing that written assignment is unnecessary to transfer interest in patent rights where such transfer occurs by operation of law). The inclusion of unnecessary language, however, does not alter the operation of law. In any case, the language appears in the context of the SPA's discussion of "[p]rocedures" at closing. (D.I. 223 Ex. F at M0143195)  It is describing one of the

---

[13]My finding is consistent with that of several courts facing similar situations. *See MidSouth Rail Corp. v. Citizens Bank & Trust Co., Inc.*, 697 So.2d 451, 455-57 (Miss. 1997) (finding, based on parties' conduct, that "assignment" document conveying "all . . . rights, title, and interest" in property, and also stating "[t]his Assignment is made solely as to security for the repayment of the Note," was intended to, and did, create security interest and not outright assignment); *In re Tyson Metal Products, Inc.*, 117 B.R. 181, 184 (Bankr. W.D. Pa. 1990) (finding contract itself ambiguous as to whether transaction was security interest or assignment, court applied Pennsylvania law and examined "the business activities, the objectives, and the relationship of the parties to ascertain . . . intent" and concluded parties' intended to create security interest).

27

many events that were to occur at closing, not imposing an obligation that any additional action needed to be taken.

Swisslog also argues that if one looks at drafts of several of the operative documents, one can see an intent to execute an assignment as opposed to a security interest. I am not persuaded. Swisslog asserts that unexecuted draft term sheets and notes "suggest that the [I]nvestors first considered a security interest but rejected the idea, insisting on an assignment instead." (D.I. 239 at 3) These drafts, dated two days before execution of the June 1990 documents, do not mention "assignment," unlike the eventual executed versions. (D.I. 239 at 10-11) In the full context already described, however, these drafts are not sufficient to persuade me that between June 27 and June 29, 1990 AHI and the Investors decided not to create a security interest and instead to execute an outright assignment that would survive repayment of the Notes.[14]

It is also true, as Swisslog emphasizes, that in the context of this litigation the Investors have refused to disavow their potential rights to the patents-in-suit. (D.I. 239 at 5-6) There appear to be two reasons for this. First, with the passage of more than 17 years since the underlying transactions, Heilman and Demmler naturally do not recall with clarity every detail of the 1990 transactions. Second, Heilman and Demmler likely understand that millions of dollars are at stake in this litigation and may have seen an opportunity to make some money from McKesson. Any suggestion in 2007 or 2008 by Heilman and Demmler that they may have rights

---

[14]It may be, as McKesson claims, that the word "assignment" was added late in the transaction to clarify some perceived ambiguity in identifying the property being pledged as collateral. (D.I. 221 at 3 n.1) Neither Heilman nor Demmler had any recollection of the reasons for the change in language. (D.I. 223 Ex. H at 55-56 & Ex. I at 106-07)

to the patents-in-suit would be entirely inconsistent with their conduct prior to being contacted in connection with this litigation (as described above). In any event, I have found, based on all the evidence, that the documents created a security interest which was extinguished upon repayment of the Notes. Whether Heilman and Demmler now agree with that reality is largely immaterial.

In sum, I find that AHI and the Investors intended to, and did, provide the Investors with a security interest in AHI's '217 Application. This security interest was extinguished automatically upon repayment of the Notes, which occurred in December 1990. Neither the law nor the agreements among the parties required a physical reassignment of the '217 Application back to AHI. Therefore, after December 1990, AHI held all right, title, and interest in the '217 Application and the patents-in-suit that arose from it. AHI could, and did, transfer all of these rights to its successor, McKesson. Accordingly, McKesson has standing to maintain this lawsuit. For these reasons, I recommend that Swisslog's Standing Motion be denied.

## OTHER MOTIONS

A.    Swisslog's Motion for Leave to Amend Answers and Counterclaims

By its Motion for Leave to Amend Answers and Counterclaims, Swisslog sought leave to amend its answer and counterclaims to add: counterclaims alleging antitrust violations under the Sherman Act, the Clayton Act, and Delaware law (6 Del. C. § 2103); an affirmative defense and counterclaim of unenforceability of the patents-in-suit; and an affirmative defense of lack of standing. (D.I. 172) In an earlier order, I granted Swisslog's motion but did not explain my reasoning. (D.I. 315)

At the same time I granted Swisslog's amendment motion I also granted McKesson's

29

then-pending request to add five additional claims of patent infringement. *Id.* Both sides argued

that their additions to the case were justified by what they had learned in discovery; both also

insisted that their actions would not require substantial additional discovery (though in both

instances these contentions were disputed by the other side). I granted both efforts to add claims

to the case because they appeared to be justified by the discovery to date, discovery would not be

significantly broadened by the new claims, and there was no undue prejudice to either side from

permitting both sides to add to the case as they sought to do.

B.   Willful Infringement Motions

Swisslog has moved pursuant to Rule 12(b)(6) to dismiss McKesson's allegations of

willful patent infringement. (D.I. 224) Swisslog argues that McKesson did not have a reasonable

basis for alleging willful infringement at the time it filed its original complaint in January 2006.

Swisslog suggests that McKesson cannot meet the standard for willful infringement recently

announced by the Federal Circuit in *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007),

*cert. denied* 128 S. Ct. 1445 (2008), which requires clear and convincing evidence that a

defendant acted despite an objectively high likelihood of infringement.

McKesson responds that it has adequately pled willful infringement. While *Seagate*

heightened the burden of proof for showing willful infringement, it did not heighten the pleading

standards. In the alternative, if the Court were to grant Swisslog's motion, McKesson seeks

leave to amend its complaint to add allegations of willful infringement based on what it has

learned in discovery.

I recommend that Swisslog's Motion to Dismiss Allegations of Willful Infringement be

denied. McKesson's complaint adequately alleges willful infringement. McKesson alleges that

30

Swisslog had "full knowledge" of McKesson's patents when it committed its infringing acts, which are identified to be "making, using, importing, offering to sell, or selling automated storage systems, including the systems Swisslog refers to as the Swisslog PillPick Automated Drug Management System." (D.I. 47 ¶¶ 11, 15, 20)  Moreover, McKesson is correct that *Seagate* did nothing to alter the standards for pleading willful infringement. *See F5 Networks, Inc. v. A10 Networks, Inc.*, 2008 WL 687114, at *1 (W.D. Wash. Mar. 10, 2008).

Therefore, I recommend denying Swisslog's Motion to Dismiss Allegations of Willful Infringement and denying McKesson's Motion for Leave to Amend Allegations of Willful Infringement as moot.

## CONCLUSION

For the reasons set forth above:

1.     I GRANT McKesson's Reconsideration Motion.

2.     I GRANT McKesson's Motion for Leave to File a Reply Brief.

3.     I recommend that Swisslog's Standing Motion be DENIED.

4.     I recommend that Swisslog's Motion to Dismiss Allegations of Willful

Infringement be DENIED.

5.     I recommend that McKesson's Motion for Leave to Amend Allegations of Willful

Infringement be DENIED AS MOOT.

Dated: August 29, 2008
Wilmington, Delaware

The Honorable Leonard P.  Stark
UNITED STATES MAGISTRATE JUDGE

31