IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-28 (SLR/LPS) |
| | ) | |
| SWISSLOG ITALIA S.P.A. and | ) | |
| TRANSLOGIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS SWISSLOG ITALIA S.P.A'S AND
TRANSLOGIC CORPORATION'S BRIEF IN OPPOSITION TO
MCKESSON AUTOMATION, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Julia Heaney (#3052)
120 1 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jheaney@mnat.com
   *Attorneys for Defendants Swisslog Italia, S.p.A.
   and Translogic Corporation*

OF COUNSEL:

Alfred R. Fabricant
Lawrence C. Drucker
Richard LaCava
Bryan N. DeMatteo
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 277-6500

September 5, 2008

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.  MCKESSON'S PROPOSED CONSTRUCTION OF "X,Y COORDINATE," "X,Y COORDINATE LOCATION" AND "X AND Y COORDINATE" SHOULD BE REJECTED ........................................................ 3

    A.  McKesson's Construction Of "X,Y Coordinate," "X,Y Coordinate Location" And "X and Y Coordinate" Improperly Limits These Terms By Their Use And Should Be Rejected .......................................... 6

    B.  McKesson's Construction Of "X,Y Coordinate," "X,Y Coordinate Location" And "X and Y Coordinate" Improperly Reads Limitations Into The Asserted Claims And Should Be Rejected .............. 9

    C.  McKesson's Construction Of "X,Y Coordinate," "X,Y Coordinate Location" And "X and Y Coordinate" Improperly Reads Limitations Out Of The Asserted Claims And Should Be Rejected ....... 12

    D.  McKesson's Construction Of "X,Y Coordinate," "X,Y Coordinate Location" And "X and Y Coordinate" Improperly Renders Superfluous Other Limitations Of The Asserted Claims And Should Be Rejected .............................................................................. 14

II.  MCKESSON'S PROPOSED CONSTRUCTION OF "A PACKAGE READER ASSOCIATED WITH THE PICKING MEANS" SHOULD BE REJECTED ..................................................................................... 16

III.  MCKESSON'S PROPOSED CONSTRUCTION OF "PICKING MEANS/MEANS FOR PICKING/AUTOMATED PICKING MEANS" AND "OBTAINING MEANS/MEANS FOR OBTAINING" SHOULD BE REJECTED ................................................................................................. 22

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*ADE Corp. v. KLA-Tencor Corp.*,
    252 F. Supp. 2d 40 (D. Del. 2003) ................................................................................. 17

*Asyst Tech., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001) .................................................................................... 22

*Bicon v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) ...................................................................................... 13

*Ciba Specialty Chems. Corp. v. Hercules, Inc.*,
    436 F. Supp. 2d 670 (D. Del. 2006) ............................................................................. 17

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000) .................................................................................... 13

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*,
    93 F.3d 766 (Fed. Cir. 1996) ........................................................................................ 13

*Generation II Orthotics Inc. v. Med. Tech. Inc.*,
    263 F.3d 1356 (Fed. Cir. 2001) .................................................................................... 13

*Hyperion Solutions Corp. v. Hyperroll, Inc.*,
    2006 U.S. Dist. LEXIS 64081, at *25 (N.D. Cal. 2006) .............................................. 14

*Janssen Pharma. V. Eon Labs Mfg.*,
    2005 U.S. App. LEXIS 11038........................................................................................ 13

*Laitram Corp. v. Morehouse Indus., Inc.*,
    143 F.3d 1456 (Fed. Cir. 1998) .................................................................................... 16

*Lifestream Diag., Inc. v. Polymer Tech. Sys., Inc.*,
    2004 WL 1946490 ........................................................................................................ 17

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
    248 F.3d 1303 (Fed. Cir. 2001) .................................................................................... 22

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
    287 F.3d 1062 (Fed. Cir. 2002) ...................................................................................... 5

*Philips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)...................................................................................... 8

*Safari Water Filtration Systems, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ...................................................................................... 8

*Seachange Int'l, Inc. v. C-Cor Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) .................................................................. 16

*Springs Window Fashions LP v. Novo Indus., L.P.*,
    323 F.3d. 989 (Fed. Cir. 2003) .............................................................17, 21

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ................................................................... 8

*Takeda Pharm. Co. Ltd. v. Teva Pharms. USA Inc.*,
    542 F. Supp. 2d 342 (D. Del. 2008) ......................................................... 14

*Texas Instruments Inc. v. United States Int'l Trade Comm'n*,
    988 F.2d 1165 (Fed. Cir. 1993) ............................................................... 11

**RULES AND STATUTES**

35 U.S.C. § 112 ...........................................................................................18, 24

INTRODUCTION

Defendants Translogic Corporation ("Translogic") and Swisslog Italia S.p.A ("Swisslog") (together, "Defendants") submit this brief in opposition to McKesson Automation, Inc.'s ("McKesson's) opening brief on claim construction of disputed terms in the asserted claims of U.S. Patent No. 5,468,110 ("the '110 patent") and U.S. Patent No. 5,593,267 ("the '267 patent") (collectively "the patents-in-suit").[1]  A Rebuttal Declaration of Bryan N. DeMatteo (DeMatteo Rebut. Decl.) and accompanying Exhibits are submitted herewith.

McKesson's construction of "X,Y coordinate" – *i.e.*, "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages" – rewrites plain and unambiguous language of the asserted claims to read on the accused device in this case.[2]  An "X,Y coordinate" is simply a location identifier for identifying locations with respect to X and Y axes of a coordinate system.   This customary definition, which has existed for almost four centuries, is applied routinely in the scientific arts.   By proposing a construction so far beyond the ordinary and customary meaning of "X,Y coordinate," McKesson turns reason on its head and violates virtually every basic tenet of claim construction. McKesson's proposed construction of "X,Y coordinate" (i) is inconsistent with the use of this term in the asserted claims; (ii) reads limitations into the claims from preferred embodiments

---

[1]     The specifications of the '110 and '267 patents are identical.   References to the specifications of the patents-in-suit are made herein with respect to the '110 patent.

[2]     The parties identified as requiring construction the terms "X,Y coordinate," "X,Y coordinate location" and "X and Y coordinate" (collectively referred to herein as "X,Y coordinate"), and agree that these terms, as used in all asserted claims of both patents, should be construed together and consistently.   On September 2, 2008, the parties filed a Second Revised Joint Construction Statement to correct for a minor error of form. Defendants' construction of "X,Y coordinate" now reads "plain and ordinary meaning – *i.e.*, a location identifier 'X,Y,' in which X designates the position of the location along an X-Axis and Y designates a position of the location along a Y-Axis." DeMatteo Rebut. Decl. Exh. M.

having nothing to do with the definition of this term; (iii) uses the term "X,Y coordinate" as a conduit to redefine "storage area location" – a different claim term having a different meaning; (iv) renders superfluous and meaningless other limitations recited expressly in the claims; and (v) reads out of the asserted claims the very limitation that the accused device in this case fails to meet – *i.e.,* that the storage area locations and support rods have "distinct" X,Y coordinates. McKesson's construction of "X,Y coordinate" is baseless and should be rejected.

McKesson's construction of the term "a package reader associated with the picking means" is equally unavailing. McKesson argues that the numerous statements made by the inventors limiting this term to "a reader attached to the picking means" should be ignored because the Examiner purportedly did not rely on these statements when allowing the patent. Even if that were true, and there is no basis in the record to support McKesson's assertion, reliance by the Examiner is not necessary for inventors' statements made during prosecution to have a limiting effect on claim terms. The public notice function of a patent requires an inventor to be bound by statements that a competitor may reasonably rely upon in business, regardless of Examiner reliance. This is especially true where, as here, the inventors did not retract their statements or acquiesce to the Examiner's rejections. Indeed, despite the Examiner's initial disagreement, the inventors of the patents-in-suit maintained their position and proffered the same limiting statements in subsequent communications with the Patent Office.

In any event, there is substantial evidence suggesting that the Examiner did, in fact, rely on the inventors' limiting statements when allowing the claims. In response to the inventors' statements limiting claim 1 of the '110 patent to an attached reader, the Examiner issued a "double inclusion" rejection because, according to the Examiner, claim 1 included all limitations of a dependant claim that already recited "a reader attached to the picking means."

The Examiner's reasons for allowance also make clear that his decision to allow the claims was based, in part, on the package reader element of claim 1, which was characterized repeatedly by the inventors throughout prosecution as requiring an attached reader for performing pre-pick verification of packages. There is no indication, in the reasons for allowance or otherwise, that the Examiner based allowance of the claims solely on the "face-to-face relationship" limitation, as suggested by McKesson. McKesson's construction of "a package reader associated with the picking means" – *i.e.*, "a device that provides the identity of a package to the computer directing the picking means" – ignores the inventor's limiting statements and is contradictory to the inventors' characterization of their own claims. McKesson's construction of this term should be rejected.

McKesson's constructions of "picking means," "automated picking means," "means for picking medicine packages from support rods," and "means for obtaining a medicine package/obtaining means" are also flawed. The corresponding structures for these limitations are picking means 38 and obtaining means 50. McKesson's constructions identify structure that merely enables picking means 38 and obtaining means 50 to perform the stated functions. McKesson's constructions of these terms should, therefore, be rejected.

<u>ARGUMENT</u>

I.     MCKESSON'S PROPOSED CONSTRUCTION OF "X,Y COORDINATE," "X,Y COORDINATE LOCATION" AND "X AND Y COORDINATE" SHOULD BE REJECTED

McKesson's proposed construction of "X,Y coordinate" – "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages" – is so far removed from the ordinary and customary meaning of this term that it should be rejected outright. McKesson's construction reads numerous limitations into and out of the claims, renders other claim limitations meaningless and effectively reads out the express

requirement of the claims that the storage area locations and support rods have "distinct X,Y coordinates." There is nothing in the patents-in-suit or their prosecution histories that justifies McKesson's construction, nor is there anything to suggest that the inventors used the term "X,Y coordinate" in any way other than in its customary meaning as a location identifier.

McKesson apparently seeks such a tortured construction of "X,Y coordinate" to avoid the very limitations not met by the accused device in this case. The pertinent portions of asserted independent claims relating to the "X,Y coordinate" limitations are as follows:

| Claim 1 of the '110 Patent | Claims 1 and 7 of the '267 Patent |
|---|---|
| a storage area comprised of a plurality of storage area locations each location having package holding means sized and configured to hold a plurality of individual packages . . . ***each location having a distinct x, y coordinate*** . . . . | holding means comprised of a frame having a plurality of support rods each support rod sized for holding a plurality of medicine packages, . . . ***each support rod having a distinct X, Y coordinate location*** . . . . |

DeMatteo Decl. Exh. A at col. 13, lns. 1-17; Exh. B at col. 13, lns. 4-15; col. 14, lns. 18-27 (emphasis added).

The accused device in this case, the "Pillpick system," employs a novel 3-dimensional storage area (as opposed to the 2-dimensional racks taught by the patents-in-suit) having a matrix of rotatable pin conveyors. DeMatteo Decl. Exh. F at 11-18. The pin conveyors include rows of storage area locations, each of which has a storing rod for storing medicine packages. *Id.* To select a given medicine package, the picking robot of the Pillpick system (called the "SinglePill Robot") is moved to the pin conveyor containing the desired medication. *Id.* The pin conveyor is then rotated until the storage area location/support rod containing the desired medication is facing the SinglePill Robot. The SinglePill Robot then removes the medication from the rod for dispensing to a patient. This process is shown below in three illustrations depicting different views of the Pillpick system. *Id.*





The Pillpick system avoids infringement in part through use of the 3-dimensional storage area. Because all storage area locations on a pin conveyor of the Pillpick system extend 3-dimensionally along the Z-Axis at the same X,Y coordinate, every storage area location/support rod shares an X,Y coordinate with at least one other storage area location/support rod. Each storage area location/support rod, therefore, does not[have a "distinct" X,Y coordinate, as required by all asserted claims of both patents-in-suit.

McKesson's construction of "X,Y coordinate," together with faulty constructions of other terms, such as "storage area location," effectively read out of the claims the very

5

limitation not met by the Pillpick system – *i.e.*, that each storage area location and support rod "[have] a distinct x,y coordinate." McKesson's attempt to construe the claims looking to the accused device is baseless, unsupportable and contrary to established principles of claim construction. *See, e.g., NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device.") Accordingly, McKesson's proposed construction of "X,Y coordinate" should be rejected in its entirety.

> A.   McKesson's Construction Of "X,Y Coordinate," "X,Y Coordinate Location" And "X and Y Coordinate" Improperly Limits These Terms By Their Use And Should Be Rejected

McKesson argues basically that, because the term "X,Y coordinate" was used in the patents-in-suit to identify storage area locations where the picking means selects and places packages, the ordinary meaning of "X,Y coordinate" is somehow changed by this use. McKesson Br. at 13-18. McKesson's arguments defy common sense and should be rejected.

An "X,Y coordinate" is a location identifier for identifying areas with respect to X and Y axes of a coordinate system.[3] This definition, which has remained unchanged for the past four centuries and is applied routinely in the mathematical and engineering arts, is constant *irrespective of what the "X,Y coordinate" is used to identify* – locations, rods, stakes, positions, etc. This can be seen in the following illustration of a hypothetical coordinate system.

---

[3]   More specifically, an "X,Y coordinate" is a location identifier "X,Y," in which X designates the position of the location along an X-Axis and Y designates a position of the location along a Y-Axis.



In the coordinate system above, the "X,Y coordinate" of the marked location is [3,2], where "3" designates the position of the location along the X-Axis and "2" designates the position of the location along the Y-Axis. If the marked location identifies a "storage area location," the X,Y coordinate of that location is [3,2]. If the marked location identifies a metal screw, the X,Y coordinate of the screw is [3,2]. It simply does not matter what location or object the X,Y coordinate [3,2] is used to identify, the definition of "X,Y coordinate" remains the same and the X,Y coordinate of that location is always [3,2] – plain and simple.

Thus, whether the inventors used the term "X,Y coordinate" to identify storage area locations is irrelevant and does not affect in any way the definition of the term "X,Y coordinate" itself. Even with respect to only storage area locations accessible by the picking means, as suggested by McKesson, the inventors used "X,Y coordinate" in its ordinary and customary way as a location identifier, in which "X" designates the position of the storage area location with respect to an X-Axis and "Y" designates the position of the location with respect to the Y-Axis. DeMatteo Decl. Exh. A at Fig. 3. There is nothing in the patents-in-suit or their prosecution histories to suggest that this term was used in any other way, and certainly nothing that justifies redefining this term in the manner suggested by McKesson.

McKesson applies the same faulty logic throughout its opening brief:

- McKesson cites col. 9, ln. 61 to col. 10, ln. 1 of the '110 patent for the proposition that "while describing the actual operation of the automated system, the Applicants *defined* x,y coordinate in terms of the 'proper storage rack [] which has the desired package.'" McKesson Br. at 16 (emphasis added). The passage cited by McKesson contains no definitional language whatsoever and reveals only that the Applicants *used* "X,Y coordinates" to identify packages in the storage rack. The use of X,Y coordinates to identify packages does not change what an "X,Y coordinate" is and, thus, does not affect the definition of the term "X,Y coordinate."

- McKesson argues that the movement of the picking means in relation to an x-y-z coordinate system limits the definition of "X,Y coordinate" with respect to this movement. McKesson Br. at 17. McKesson's argument is nonsensical. A coordinate system is static and not affected by objects that move within it, nor does such movement transform the coordinate conventions of that system.

- McKesson argues that the specification and prosecution history instruct that Applicants "intended the picking means and the coordinate system of the invention to be understood in relation to each other." McKesson Br. at 17. Again, McKesson misses the mark. A coordinate system, once defined, has no relationship to anything; it merely provides a context for identifying locations through use of coordinates. Positional relationships, such as relationships between the storage area locations and the picking means, arise through the *use* of the coordinate system to define those relationships.

- McKesson argues that the specification and prosecution history indicate that the inventors "specifically incorporated the movement and selection process of the picking means into the description of 'x,y coordinate.'" McKesson Br. at 17. This is entirely false. Nowhere in the patents-in-suit or in the prosecution histories do the inventors specifically define or incorporate anything into the term "X,Y coordinate," nor is there anything to suggest that this term should be construed contrary to its plain and ordinary meaning as a location identifier.

The flaws in McKesson's arguments do not end there. McKesson also cites an extrinsic definition of "coordinates" as "linear or angular quantities which designate the position that a point occupies in a given frame or reference system," and then argues incorrectly that the reference system referred to in the definition is determined with respect to the storage area locations. McKesson Br. at 17. The "reference system" in this definition refers simply to the *coordinate reference system*, not to a device employing the coordinates. If the "coordinates" are

8

"X,Y" coordinates, for example, the reference system is a Cartesian X-Y coordinate system employing perpendicular X and Y axes.  If the "coordinates" are polar coordinates ($\theta$, r), the reference system is a polar coordinate reference system defined by a single polar axis. DeMatteo Rebut. Decl. Exh. L.[4]  Here, the inventors of the patents-in-suit chose a standard Cartesian reference system, which is referred to throughout the patents-in-suit, illustrated in Figure 3, and not limited in any way by the storage area locations or by the picking means.

　　　　McKesson's attempt to limit the definition of "X,Y coordinate" based on what the coordinate is used to identify is baseless and should be rejected.

　　　B.　　McKesson's Construction Of "X,Y Coordinate," "X,Y
　　　　　　Coordinate Location" And "X and Y Coordinate"
　　　　　　Improperly Reads Limitations Into The Asserted Claims
　　　　　　And Should Be Rejected

　　　　McKesson's construction of "X,Y coordinate" not only improperly reads limitations into the claims, but it also reads in limitations regarding entirely different claim terms unrelated to the term "X,Y coordinate."  McKesson's proposed construction violates basic rules of claim construction and should be rejected.

　　　　It is a fundamental tenet of claim construction that limitations may not be read into a claim from the specification.  *See, e.g., Philips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005); *see also SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875, (Fed. Cir. 2004) ("[I]t is important not to import into a claim limitations that are not a part of the claim.").  It is also a fundamental principle of claim construction that different terms within a claim have different meanings unrelated to one another. *See, e.g., Safari Water Filtration*

---

[4]　　　In a polar coordinate reference system, $\theta$ and r coordinates designate locations on a 2-dimensional surface. $\theta$ designates the angle of the location with respect to the polar axis and r designates the radial distance of the location from the polar axis.  DeMatteo Rebut. Decl. Exh. L.

*Systems, Inc.*, 381 F.3d 1111, 1119-20 (Fed. Cir. 2004) ("when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.").

       McKesson's construction of "X,Y coordinate" improperly reads in limitations relating to the term "storage area location," which is recited in claim 1 of the '110 patent as a separate term having a separate meaning. DeMatteo Decl. Exh. A at col. 12, ln. 65 to col. 13, ln. 39. Indeed, McKesson's proposed construction of "X,Y coordinate" is:

> one or more points that designates the position of a package ***where the picking means grabs, selects and places packages***.

McKesson Br. at 13 (emphasis added). The emphasized portion of McKesson's construction of "X,Y coordinate" above is nothing more than McKesson's construction of the term "storage area location," which, according to McKesson, is a "place where the picking means can 'select from and place packages.'" *Id.* at 15. In essence, McKesson uses the term "X,Y coordinate" as a conduit to limit the term "storage area locations" – a completely different claim term – to only those storage locations accessible by the picking means. Such limitations are wholly unrelated to the definition of "X,Y coordinate" and are, thus, improperly included within McKesson's construction of this term. There is even less justification for using "X,Y coordinate" to read these limitations into claims 1 and 7 of the '267 patent, which do not even recite "storage area locations." McKesson's construction of "X,Y coordinate" is without merit and should be rejected.

       Assuming, *arguendo*, that it would be appropriate to use the term "X,Y coordinate" to read in a construction of "storage area location" – which it is not – McKesson's construction of "storage area location" is wrong. The ordinary and customary meaning of "storage area location . . . configured to hold a plurality of individual packages" is simply "a

location within a storage area where packages are held for storage."[5]    The requirement of element (b) of claim 1 of the '110 patent that the picking means be "configured . . . to select packages from the storage area locations and place packages in the storage area locations" does not define what a storage area location is, as McKesson contends.    McKesson Br. at 15.    It simply defines a *relationship* between the picking means and the storage area locations that must be present in an accused device to infringe.    DeMatteo Decl. Exh. A at col. 13, lns. 12-16.[6] Whether the picking means can access storage area locations does not affect the nature of those locations as places where packages are stored and, thus, does not affect their nature as "storage area locations."    That the picking means of the preferred embodiments are disadvantageously required to access the storage area locations is irrelevant and provides no justification for redefining a "storage area location."[7]    McKesson's attempt to limit this term to only those storage area locations that are directly accessible by the picking means is contrary to the ordinary and customary meaning of this term, as well as the use of this term throughout the patents-in-suit.

McKesson's construction of "X,Y coordinate" also improperly reads into the claims other limitations.    For example, McKesson construes "X,Y coordinate" to identify only "a

---

[5]    The term "storage area location" was not identified by the parties as requiring construction and, thus, should be construed in accordance with its ordinary and customary meaning.  DeMatteo Rebut. Decl. Exh. M.

[6]    If the picking means of an accused device cannot access the storage area locations "to select packages . . . and place packages," there can be no infringement of claim 1 of the '110 patent.  If the picking means can access the storage area locations "to select packages . . . and place packages," there may be infringement if the remaining elements of that claim are met.

[7]    The picking means of the patents-in-suit access all storage area locations because the patents teach only the use of non-flexible 2-dimensional storage racks with static storage area locations, rather than more flexible storage area solutions, such as the 3-dimensional storage area and movable pin conveyors of the Pillpick system.

point or group of points that designates the position of a **package** . . . ." McKesson Br. at 13 (emphasis added). Yet, numerous areas of the asserted claims use the term "X,Y coordinate" to identify locations other than packages, such as locations of support rods and storage area locations. Element (a) of claim 1 of the '110 patent, for example, recites that "each [storage area] location [has] a distinct x,y coordinate." DeMatteo Decl. Exh. A at col. 13, lns. 10-11. Likewise, element (a) of claims 1 and 7 of the '267 patent recite that "each support rod [has] a distinct X,Y coordinate location." DeMatteo Decl. Exh. B at col. 13, lns. 7-9; col. 14, lns. 19-21. By forcing the term "X,Y coordinate" to identify only package locations, McKesson's construction effectively rewrites the claims by changing what "X,Y coordinate" was recited expressly in the claims to identify. McKesson's construction is improper.

McKesson's construction of the term "X,Y coordinate" improperly reads into the claims numerous limitations relating to other claim elements that have nothing whatsoever to do with the definition of this term. McKesson's construction of "X,Y coordinate" should, therefore, be rejected.

> C.    McKesson's Construction Of "X,Y Coordinate," "X,Y Coordinate Location" And "X and Y Coordinate" Improperly Reads Limitations Out Of The Asserted Claims And Should Be Rejected

McKesson's construction of "X,Y coordinate" also improperly reads numerous limitations out of the asserted claims and, thus, should be rejected.

Similar to the rule against reading limitations into a claim, it is improper to construe a term to read limitations out of a claim. *See, e.g., Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[T]o construe the claims in the manner suggested [by the patentee] would read an express limitation out of the claims. This

we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something different [from] what he has set forth.'").

McKesson's proposed construction of "X,Y coordinate" effectively reads out of the claims the requirement that the storage area locations and support rods have "distinct" X,Y coordinates. DeMatteo Decl. Exh. A at col. 13, lns. 10-11; Exh. B at col. 13, lns. 7-9; col. 14, lns. 19-21. McKesson's proposed construction of "X,Y coordinate" is

> one or more points that designates the position of a package where the picking means grabs, selects and places packages.

McKesson Br. at 13. The "one or more points" in space where the picking means grabs, selects and places packages (*i.e.*, McKesson's construction of "storage area locations") are always distinguishable or separate from one another. They are, therefore, always distinct under McKesson's constructions. The claims' requirement that each storage area location or support rod have a "distinct" X,Y coordinate is, thus, rendered meaningless and effectively read out of the claims.

McKesson's proposed construction of "X,Y coordinate" also reads out the express requirement of "X,Y" values, which are recited numerous times throughout the asserted claims. DeMatteo Decl. Exh. A at col. 13, lns. 10-11, 28-31, 38-39; Exh. B at col. 13, lns. 8-9, 16-17, 22-25; col. 14, lns. 20-21. The patents-in-suit state that "X,Y" in "X,Y coordinate" represents the "value" of the coordinate – *i.e.*, the [X,Y] value of the "X,Y coordinate." According to the patents-in-suit, "the coordinates could be a single X,Y *value* . . . or a group of X,Y *values* . . . ." DeMatteo Decl. Exh. A at col. 5, lns. 41-46 (emphasis added). McKesson's construction replaces "X,Y" with "point or groups of points." A point, however, is not an "X,Y" value; it is merely a location identified by an "X,Y" value. In the 2-dimensional coordinate system illustrated in section (II)(A) supra, for example, the "point" is the marked location, and the

"X,Y" value of this point is [3,2]. McKesson's construction improperly reads the express requirement of "X" and "Y" out of the claims and is, therefore, improper.[8]

McKesson's construction of "X,Y coordinate" reads numerous limitations out of the claims. McKesson's construction of "X,Y coordinate" should, therefore, be rejected.

> D.    McKesson's Construction Of "X,Y Coordinate," "X,Y Coordinate Location" And "X and Y Coordinate" Improperly Renders Superfluous Other Limitations Of The Asserted Claims And Should Be Rejected

McKesson's construction of "X,Y coordinate" also improperly renders other claim limitations superfluous and, as such, should be rejected.

A claim term should be interpreted so as to give effect to all terms in the claim, so that none are rendered superfluous or meaningless. *Bicon v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim."); *Janssen Pharma. V. Eon Labs Mfg.*, 2005 U.S. App. LEXIS 11038, at **5 (Fed. Cir. 2005) ("we generally interpret claims so that no term is superfluous."); *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting the district court's claim construction because it rendered superfluous an express requirement of the claims.).

---

[8]    McKesson's contention that the use of "X" and "Y" in Defendants' construction renders the claim indefinite is puzzling. McKesson Br. at 16. If the use of "X" and "Y" to refer to axes is indefinite, as McKesson contends, the claims' numerous recitations of "X" and "Y" to refer to coordinates must also be indefinite. McKesson cannot avoid indefiniteness issues by simply proposing a construction that reads out ambiguities and ignores the explicit language of the claims. *See, e.g., Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001) ("[C]laims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims."); *see also Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1309 (Fed. Cir. 2000) (". . . we cannot construe the claim differently from its plain meaning in order to preserve its validity"). Regardless, in the context of the patents-in-suit, one of ordinary skill in the art would understand "X" and "Y" to refer to the coordinate reference system (including X and Y axes) defined by the inventors and referred to throughout the patents-in-suit. Defendants' construction of "X,Y coordinate," therefore, is unambiguous when read in view of the specifications of the patents-in-suit.

Following this principle, this Court in *Takeda Pharm. Co. Ltd. v. Teva Pharms. USA Inc.*, rejected a litigant's attempt to use a relationship already recited in the claim to limit the definition of a claim term. 542 F. Supp. 2d 342, 349 (D. Del. 2008). In *Takeda Pharm.*, the litigant proposed a construction of a claim term that required salt and benzimidazole – chemicals recited in the claim term – to be in "contact" with one another. *Id.* The Court rejected the litigant's arguments reasoning:

> [The claim term] refers to . . . salt and benzimidazole in the pharmaceutical compound, without, respect to whether these ingredients are in even contact. Claim 1 separately requires that the salt and benzimidazole are in contact evenly; importing this requirement here would render that limitation superfluous.

*Id.*

The Northern District of California in *Hyperion Solutions Corp. v. Hyperroll, Inc.* rejected as superfluous a similar attempt by a litigant to limit a claim term by relationships already recited in the claim. 2006 U.S. Dist. LEXIS 64081, at *25-26 (N.D. Cal. 2006). According to the *Hyperion Solutions* Court:

> [The litigant's] definition . . . unnecessarily imports functional limitations . . . . The claim language already describes the functional relationship . . . . Hence, it would be superfluous to interpret [the claim term] as containing these functional limitations.

*Id.*

Similar to the litigants in *Takeda Pharm.* and *Hyperion Solutions Corp.*, McKesson seeks to limit the construction of "storage area location," which it improperly reads into its construction of "X,Y coordinate," by relationships already recited in the claim. Element (b) of claim 1 of the '110 patent requires the picking means to be "configured . . . to select packages from the storage area locations and place packages in the storage area locations . . . ." DeMatteo Decl. Exh. A at col. 13, lns. 12-16. If the "storage area locations" and "X,Y

15

coordinates" are already defined with respect to "places where the picking means can 'select from and place packages,'" as suggested by McKesson, the requirement in element (b) that the picking means have access to the storage area locations for selecting and placing packages would be wholly redundant and, thus, superfluous. To give effect to all terms in the claim requires that "storage area locations," as well as "X,Y coordinate" be given their ordinary and customary meanings and not be limited to only those locations directly accessible by the picking means.

McKesson's construction of "X,Y coordinate" also renders superfluous elements in the asserted claims relating to "packages." Claim 1 of the '110 patent recites "a database containing at least one x,y coordinate location . . . for each package," and claim 1 of the '267 patent recites "a database containing an X,Y coordinate location for all packages." DeMatteo Decl. Exh. A at col. 13, lns. 28-31; Exh. B at col. 13, lns. 16-18. If the definition of "X,Y coordinate" already identifies "a point . . . that designates the position of a package," as suggested by McKesson, the claims' requirement that the database contain "X,Y coordinates" for "packages" would be superfluous.

McKesson's construction of "X,Y coordinate" renders superfluous and meaningless numerous limitations recited expressly in the asserted claims. McKesson's construction should, therefore, be rejected.

II.     MCKESSON'S PROPOSED CONSTRUCTION OF "A PACKAGE READER ASSOCIATED WITH THE PICKING MEANS" SHOULD BE REJECTED

McKesson apparently agrees that the inventors distinguished claim 1 of the '110 patent during prosecution on the basis that the prior art did not disclose a reader attached to the picking means for performing pre-pick verification.[9] McKesson, however, contends that these

---

[9]     McKesson admits that attaching a reader to the picking means is precisely what enables the system of the patents-in-suit to verify package contents prior to picking ("pre-pick

16

statements should be ignored because the Examiner purportedly did not rely on them in allowing the patent. McKesson Br. at 23-26. McKesson's arguments are fatally flawed. Not only is Examiner reliance unnecessary to limit construction of a claim term, there is substantial evidence to suggest that the Examiner did in fact rely on the inventors' statements when allowing the claims. The inventors' statements make clear that the term "a package reader associated with the picking means" was intended by the inventors – and limited by the inventors during prosecution – to require a reader attached to (*i.e.*, movable with) the picking means. McKesson's construction of "a package reader associated with the picking means" – *i.e.*, "a device that provides the identity of a package to the computer directing the picking means" – does not account for these limiting statements and should, therefore, be rejected.

       "The fact that an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that the statement is inconsequential for purposes of claim construction." *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998). "An applicant's argument . . . may lead to a disavowal of claim scope even if the Examiner did not rely on the argument." *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1374 (Fed. Cir. 2005). The public notice function of patents, for example, requires a patentee to be bound by limiting statements that a competitor may reasonably rely upon in business, regardless of Examiner reliance. According to the Federal Circuit:

---

verification"). Indeed, McKesson states "[w]hen the [barcode reader] device is physically ***attached*** in a specific manner as shown in . . . FIGS. 7-11 [*i.e.*, attached to the picking means], the specification notes an additional capability of reading the package label ***prior to picking*** [*i.e.*, while the packages are at the storage area locations] to confirm picking of proper packages." McKesson Br. at 22 (emphasis added). McKesson goes on to admit that Applicants distinguished the asserted art on the basis of the pre-pick verification function enabled by the attached reader. According to McKesson, "Applicants argued that their invention was distinguishable over [the prior art] because the package reader was positioned to read the package label while at the storage location . . . ." *Id.* at 25. McKesson also characterized the Examiner's disagreement with the inventors' limiting statements requiring "an attached bar code reader." *Id.* at 24.

> The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent. A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement. . . . Were we to accept [the patentee's] position [that the Examiner did not agree with or rely upon the patentee's statements distinguishing the prior art], we would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies.

*Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d. 989, 995 (Fed. Cir. 2003); *see also Ciba Specialty Chems. Corp. v. Hercules, Inc.*, 436 F. Supp. 2d 670, 679 (D. Del. 2006) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.") (citations omitted); *ADE Corp. v. KLA-Tencor Corp.*, 252 F. Supp. 2d 40, 58 (D. Del. 2003) ("a patentee is held to what was said during patent prosecution when distinguishing prior art . . . because competitors must be able to look to the intrinsic record and rely upon it."). Even if the Examiner expresses disagreement with the applicant's statements, "the examiner's remarks do not negate the effect of the applicant's disclaimer." *Springs Window Fashions*, 323 F.3d at 995. This is particularly true where a patentee does not "[retract] any of his statements nor explicitly [acquiesces] to the Patent Office's rejection . . . ." *Lifestream Diag., Inc. v. Polymer Tech. Sys., Inc.*, 2004 WL 1946490, at **3 (Fed. Cir. Aug. 25, 2004).

Regardless of Examiner reliance, statements made by the inventors during prosecution of the patents-in-suit limit the construction of "a package reader associated with the picking means" to "a reader attached to the picking means." As explained in Defendants' Opening Brief on Claim Construction, the inventors made numerous statements throughout prosecution distinguishing their invention from the prior art on the basis of an attached reader for performing pre-pick verification – a fact that McKesson apparently does not contest.

18

Defendants' Br. at 18-23.  Competitors are entitled to rely on these limiting statements in formulating their business decisions and strategies, regardless of whether the Examiner expressed disagreement.  This is especially true here because the inventors remained steadfast in their position throughout prosecution, never retracting any of their limiting statements or acquiescing to the Patent Office's arguments.  Indeed, after the Office Action disagreeing with the inventors' limiting statements, the inventors maintained their position and, until allowance of the claims, continued to make the same limiting statements in subsequent communications with the Patent Office.  DeMatteo Decl. Exh. C at T056503-508.  McKesson should not be permitted a construction of a claim term that contradicts directly the inventors' understanding and characterization of their own claims.

Regardless, there is substantial evidence to suggest that the Examiner relied on limiting statements of the inventors distinguishing claim 1 of the '110 patent from the prior art. In a November 4, 1994 Office Action, the Examiner – in direct response to the inventors' limiting statements – rejected claim 4 under 35 U.S.C. § 112, ¶ 2 based on "double inclusion" because, according to the Examiner, "claim 4 [repeated] *all* the structure in base claim 1."  *Id*. at T056495 (emphasis added).  Claim 4 at the time recited:

> 4. The system of claim 1 wherein at least one package has a machine readable label identifying contents of the package *and also comprising a package reader attached to the picking means for reading the label*.

*Id*. at T056409 (emphasis added).  The Examiner was, therefore, clearly persuaded by the inventors' repeated arguments limiting claim 1 to "a package reader attached to the picking means" for performing pre-pick verification of packages.  The inventors agreed with the Examiner and, in the Amendment Paper dated January 8, 1995 in which the inventors added the

"face to face relationship" limitation, they canceled claim 4 to overcome the "double inclusion" rejection. *Id.* at T056502.

>        In that same Amendment Paper, the inventors also added a separate amendment to claim 1 of the '110 patent requiring that

>> the machine readable label on at least one package in a storage area location can be read without removing the package from the storage location.

*Id.* at T056500-501.[10]  This amendment was apparently made, in part, to remove any doubt that the package reader was intended by the inventors to perform the pre-pick verification function described in the patents-in-suit (*i.e.,* the ability to read the barcode of a package for confirming package contents before being removed by the picking means), and admitted by McKesson, as being enabled only by a reader attached to the picking means.

>        Indeed, in the "Remarks" section of the January 8, 1995 Amendment Paper, the inventors made the same limiting statements regarding element (e) of claim 1 requiring "a package reader associated with the picking means and being positioned for reading the machine readable labels on packages located within the storage area" ("the Package Reader Element").  The inventors, for example, characterized the Package Reader Element as enabling the system to remove packages only "after the reader confirms that the desired article has been found."  *Id.* at T056504.  The inventors also again relied upon the Package Reader Element to distinguish U.S. Patent No. 4,896,024 to Morello et al. ("the Morello reference") arguing that:

---

[10]        Interestingly, McKesson's chronology of events during prosecution, as depicted on pages 23-24 of its opening brief, fails to identify this critically important amendment. McKesson Br. at 23-24.  McKesson also incorrectly states that the Examiner indicated during the July 20, 1994 telephone interview that the "face-to-face relationship" amendments would result in allowance of the claims. McKesson Br. at 12. The interview summary indicates only that the Examiner suggested the amendments.  DeMatteo Decl. Exh. C at T056485.  The summary does not indicate whether such amendments would overcome the asserted rejections or whether they would withstand further search of the prior art.  *Id.*

> [w]hen the picker assembly [of the Morello reference] arrives at that [storage location] it cannot read the article identification while the article remains in the storage location. This teaching is quite different from the system of amended claim 1.

*Id*.  They also again criticized U.S. Patent No. 4,789,295 to Boucher et al. ("the Boucher reference") for "not [including] any type of package reader," and again characterized the reader as capable of "locating" packages – a feature that is enabled only by a reader attached to and movable with the picking means. *Id*. at T056504, 506.[11]

The inventors' efforts to change the mind of the Examiner apparently worked.  In response to the January 8, 1995 Amendment Paper, the Examiner allowed the claims without any criticism of the inventors' limiting statements.  In the Notice of Allowability issued on March 7, 1995, the Examiner stated:

> The claims are allowed because the prior art does not disclose or teach the modification thereof to arrive at the claimed combination of a storage area with packages (as claimed), automated picking means (as claimed), a computer (as claimed) **and a reader (as claimed) operating in the claimed manner**.

*Id*. at T056510 (emphasis added).  There is no indication that the Examiner based his decision to allow the claims solely on the "face-to-face relationship" amendment, as suggested by McKesson.  McKesson Br. at 26.  To the contrary, the reasons for allowance do not even refer to the amendment and state expressly that allowance of the claims was based, in part, on the package reader limitations, which were repeatedly characterized by the inventors throughout prosecution as requiring an attached reader for performing pre-pick verification.  Even if it were unclear whether the Examiner changed his mind regarding the limiting statements – which it is

---

[11]     McKesson's contention that the patents-in-suit describe the reader in "a nonspecific location, in terms of the functions it performs . . . ." is wrong.  McKesson Br. at 22.  The sections of the patents-in-suit cited by McKesson, *i.e.*, col. 10, lns. 2-3, refer specifically to a reader identified by reference numeral "26."  *Id*.  Bar code reader "26" is referred to in all embodiments and illustrated in the drawings as a reader attached to the picking means.  DeMatteo Decl. Exh. A at col. 6, lns. 9-13; col. 10, lns. 2-3, Figs. 7-10.

not – such lack of clarity would require giving the inventors' statements limiting effect. *See, e.g., Springs Window Fashions,* 323 F.3d. at 994-95 (Fed. Cir. 2003) ("[I]t is not clear . . . why the examiner allowed the claims. While the examiner expressed doubt in the second office action that the [amendment] was sufficient to distinguish [the prior art], it is not clear that the examiner adhered to that position at the time of allowance."). The term "a package reader associated with the picking means" should be construed consistent with the inventors' statements during prosecution to mean "a package reader attached to the picking means."

McKesson's construction of "a package reader associated with the picking means" does not account for limiting statements made by the inventors during prosecution. McKesson's construction of this term should, therefore, be rejected.

III.   MCKESSON'S PROPOSED CONSTRUCTION OF "PICKING MEANS/MEANS FOR PICKING/AUTOMATED PICKING MEANS" AND "OBTAINING MEANS/MEANS FOR OBTAINING" SHOULD BE REJECTED

The parties agree that the terms "picking means," "automated picking means" and "means for picking medicine packages from support rods," as these terms are recited in claim 1 of the '110 and '267 patents ("the 'picking means' limitations"), and "means for obtaining a medicine package/obtaining means" of claim 4 of the '267 patent ("the 'obtaining means' limitations") should be construed similarly as means-plus-function terms. The parties also agree substantially on the recited functions of these terms. The parties differ, however, on the appropriate corresponding structure. McKesson contends that the corresponding structure for the "picking means" limitations is "a device that includes a housing, a gripper, an extension rod and a storing rod as disclosed at col. 7, lines 57-64 and Fig. 7" and that the corresponding structure for the "obtaining means" limitations is "a device including a suction head, vacuum generator and an extension rod as disclosed at col. 7, line 60 – col. 8, line 33 and FIGS. 7 and 11."

DeMatteo Rebut. Decl. Exh. M.   McKesson's constructions identify structure that merely *enables* picking means 38 and obtaining means 50 – the appropriate corresponding structures – to perform the stated functions.  McKesson's constructions should, therefore, be rejected.

To be corresponding structure, a disclosed structure must be "clearly linked or associated" in the specification with the stated function.  *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).  A disclosed structure is not corresponding structure if it merely enables other structure to carry out the function.  *See, e.g., Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001) ("The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended.").

The "housing" identified by McKesson performs *none* of the functions of (i) holding packages, (ii) picking packages from the storage area locations, and (iii) placing packages in the storage area locations, and the "gripper, . . . extension rod and a storing rod" of McKesson's construction merely enable picking means 38 to perform the stated functions of the "picking means" limitations.  Indeed, picking means 38 matches identically with the "picking means" terms to be construed and is clearly linked and associated by the patents-in-suit to all three stated functions. The patents-in-suit, for example, link picking means 38 to the stated function of "picking packages" by making clear that "[p]ackages are selected [*i.e.*, picked] by the picking means 38." DeMatteo Decl. Exh. A at col. 5, lns. 63-64. The patents-in-suit also clearly link and associate picking means 38 to the functions of holding packages and placing packages in storage area locations.  According to the patents-in-suit,

> when the picking means [38] is then moved to storage racks 12 the computer knows the identity of the respective medicine package 14 *on [i.e., held on]* the picking means 38, which is about to be *placed* back onto the storage racks 12.

23

*Id*. at col. 7, lns. 40-44 (emphasis added). McKesson's construction of the "picking means" limitations recites only enabling structure and should, therefore, be rejected.

Likewise, the structure identified by McKesson as corresponding to the "obtaining means" limitations – *i.e.*, "a device including a suction head, vacuum generator and an extension rod . . . ." – is merely structure that enables obtaining means 50 to perform the recited function. The patents-in-suit clearly link and associate obtaining means 50 to the function of "obtaining a medicine package." Indeed, the patents-in-suit recite that "[a]ssembly 38 also contains means 50 for obtaining a package 14." *Id*. at col. 7, lns. 59-60. McKesson's construction of the "obtaining means" limitations ignores this express association and should be rejected.

Not only does McKesson's construction of the "picking means" and "obtaining means" limitations recite structure that merely enables picking means 38 and obtaining means 50 to perform the stated functions, it cherry picks only certain enabling structure. For example, McKesson's construction of the "picking means" limitations does not recite the obtaining means 50, vacuum generator 58, vacuum sensor 58a, pneumatic in/out cylinder 53, suction head 56, or up/down cylinder 51 – all of which are also required to enable picking means 38 to pick and place packages. *Id*. at col. 7, ln. 56 to col. 8, ln. 51. McKesson's construction of the "obtaining means" limitation, likewise, fails to include vacuum sensor 58a, pneumatic in/out cylinder 53, and up/down cylinder 51, which are additional structure required to obtain a medicine package. McKesson's construction for the "picking means" and "obtaining means" limitations should be rejected.

With respect to claim 7 of the '267 patent, the term identified by the parties as requiring construction – "picking means for picking packages from the support rods in

accordance with instructions received from a computer" – includes the word "means" and, as such, is presumed to be governed by 35 U.S.C. § 112, ¶ 6. This term does not include the recitation of structure relied on by McKesson as rebutting this presumption. McKesson Br. at 35-36. McKesson's construction of "picking means for picking packages from the support rods in accordance with instructions received from a computer" should be rejected.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court enter an order adopting Defendants' proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney (#3052)*
_____

Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jheaney@mnat.com
   *Attorneys for Defendants Swisslog Italia, S.p.A.*
   *and Translogic Corporation*

OF COUNSEL:

Alfred R. Fabricant
Lawrence C. Drucker
Richard LaCava
Bryan N. DeMatteo
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 277-6500

September 5, 2008
2476541

25

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on September 5, 2008 I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Dale R. Dubé, Esquire
Blank Rome LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on September 5, 2008 upon the following individuals in the manner indicated

**BY HAND DELIVERY**
**AND E-MAIL**

Dale R. Dubé, Esquire
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE  19801

**BY E-MAIL**

Blair M. Jacobs, Esquire
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington, DC  20004

*/s/ Julia Heaney (#3052)*

Julia Heaney (#3052)
jheaney@mnat.com