## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

McKesson Automation, Inc.,                    :
                                              :
                    Plaintiff,                :
                                              :
        v.                                    :    Civ. No. 06-28-SLR-LPS
                                              :
Swisslog Holding AG, et al.,                  :
                                              :
                    Defendants.               :

## REPORT AND RECOMMENDATION REGARDING
## MOTION TO DISMISS, CLAIM CONSTRUCTION,
## AND SUMMARY JUDGMENT, AND
## ORDER ON EVIDENTIARY MOTIONS

In this patent infringement case, plaintiff McKesson Automation, Inc. ("Plaintiff" or

"McKesson") asserts that the PillPick System of defendants Swisslog Italia S.p.A. and Translogic

Corporation (collectively, the "Defendants" or "Swisslog") infringes the patents-in-suit, namely

McKesson's U.S. Patent Nos. 5,468,110 ("the '110 patent") and 5,593,267 ("the '267 patent").

(D.I. 1, 47)  Below I provide my recommendations with respect to Swisslog's motion to dismiss

as well as both parties' claim construction contentions and motions for summary judgment.  I also

rule on the parties' *in limine* motions.

## A.   Background[1]

### 1.   The Technology at Issue

The technology involved in this case relates to automated systems for selecting and

_____

[1]All of the statements contained in this Background section are undisputed.  Additional
background is set forth in my previous Reports and Recommendations issued in this matter.
(D.I. 310, 357)

1

delivering packages to fill orders, such as patient prescriptions. (D.I. 351 at 1) McKesson and Swisslog are in the business of manufacturing and selling automated pharmaceutical retrieval and distribution systems to hospitals. (*Id*.) The accused device in this case, the PillPick System, is a patented system for dispensing medications in hospitals. (D.I. 384 at 1)

## 2. The Patents

The '110 and '267 patents disclose a system for filling prescriptions and restocking medicines in a pharmacy. (D.I. 351, Ex. A (hereinafter "'110 patent") at col. 1 lines 13-16; D.I. 351 Ex. B (hereinafter "'267 patent") at col. 1 lines 15-18) Independent claim 1 of the '110 patent, and independent claims 1 and 7 of the '267 patent, are representative of the invention. (D.I. 442 at 4;'110 patent, col. 12 line 66 to col. 13 line 39; '267 patent, col. 13 lines 2-32 & col. 14 lines 17-38) The specifications of the '110 patent and '267 patent are identical except for the claims. (D.I. 351 at 6; D.I. 361 at 1 n.1; D.I. 384 at 1 n.1; D.I. 442 at 4 n.1)

### a. The '110 Patent

The '110 patent (entitled "Automated System for Selecting Packages from a Storage Area") was issued to Sean C. McDonald, Ellen J. Hertz, James A. Smith, and Gregory Toto (collectively, the "Applicants") on November 21, 1995, and assigned to Automated Healthcare, Inc. (McKesson's predecessor-in-interest and, hereinafter, "AHI"). Generally, the '110 patent discloses an automated drug management system comprising a storage area, automated picking means, means for moving the automated picking means, a computer for directing the automated picking means, and a package reader associated with the automated picking means. There are 22 claims, of which claim 1 is independent.

The full prosecution history of the '110 patent is attached to Plaintiff's claim construction

2

briefing. (*See* D.I. 360 Ex. E; *see also* D.I. 351 at 9-13.) The '110 patent stems from an application related to several other patent applications. On January 24, 1990, the Applicants filed the first in the chain of applications that eventually resulted in the '110 patent: U.S. Patent Application No. 07/469,217 ("the '217 application"). (D.I. 351 at 10; *see also* D.I. 360 Ex. E.) Prior to abandonment of the '217 application, the Applicants filed a continuation-in-part application, U.S. Application No. 07/871,832 ("the '832 application"), on April 21, 1992; the '217 application was subsequently abandoned on April 23, 1992. (*Id.*) Prior to the abandonment of the '832 application, on August 25, 1994, the Applicants filed U.S. Application No. 08/295,495 ("the '495 application") as a continuation of the '832 application. (D.I. 351 at 12; *see also* D.I. 360 Ex. E.) The '495 application ultimately issued as the '110 patent: the Examiner issued a notice of allowability on March 7, 1995 and the patent was issued on November 21, 1995. (D.I. 351 at 9, 13; *see also* D.I. 360 Ex. E.)

## b. The '267 Patent

The '267 patent (entitled "Automated System for Selecting and Delivering Packages from a Storage Area"), which was issued to the Applicants on January 14, 1997 and assigned to AHI, is a divisional of the '832 application,[2] which eventually resulted in the '110 patent (D.I. 351 at 27). Generally, the '267 patent discloses a system for filling orders, comprising a device for holding packages in which the same type of contents are held at predetermined locations in the device, a device for picking packages from the holding device, and a device for supplying packages to the holding device. There are 11 claims, of which claims 1 and 7 are independent. The full

---

[2]The '267 patent issued from U.S. Application No. 09/452,646 ("the '646 application"), a divisional application of the '495 application (which was a continuation application of the '832 application), which was the application that resulted in the '110 patent. (D.I. 374 at 6)

prosecution history of the '267 patent, which was prosecuted after the '110 patent issued, is attached to Plaintiff's claim construction briefing. (D.I. 360 Ex. I; *see also* D.I. 351 at 27-30.) The Examiner issued a notice of allowability with respect to the '267 patent on June 6, 1996, and the patent was issued on January 14, 1997. (D.I. 351 at 27, 30; *see also* D.I. 360 Ex. I.)

### 3. Procedural History

McKesson filed the instant patent infringement lawsuit against Defendants on January 13, 2006. (D.I. 1) McKesson filed a first amended complaint (the "Complaint") on July 3, 2006. (D.I. 47) This case was originally assigned to the Honorable Kent A. Jordan. Upon Judge Jordan's elevation to the Third Circuit Court of Appeals in December 2006, it was reassigned to the "judicial vacancy" and referred for pretrial management to Magistrate Judge Mary Pat Thynge. (D.I. 69) On February 1, 2008, the case was reassigned to Judge Sue L. Robinson and then, on February 11, 2008, referred to me. (D.I. 238; D.I. 250) Pursuant to the Court's revised referral order dated March 20, 2009 (D.I. 520), as well as 28 U.S.C. § 636, my authority with respect to the case-dispositive motions for dismissal and summary judgment is limited to issuing a Report and Recommendation ("R&R"). Because my claim construction recommendations are subject to *de novo* review, *see Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451, 1454-56 (Fed. Cir. 1998), the portion of this opinion dealing with claim construction is an R&R as well. My rulings with respect to the nondispositive evidentiary motions, by contrast, are orders of the Court. *See Fuller v. Summit Treestands, LLC*, 2009 WL 483188, at *1 n.1 (W.D.N.Y. Feb. 25, 2009) ("Although defendant's motion for summary judgment is dispositive, its motion to preclude expert evidence is non-dispositive."); *Pigott v. Sanibel Development, LLC*, 2008 WL 2937804, at *3 (S.D. Ala. July 23, 2008) ("[A] magistrate judge's ruling excluding plaintiff's expert from

4

testifying is nondispositive.").

## B.   **Swisslog's Motion to Dismiss Due to Lack of Entire Patent Ownership**

Swisslog moves to dismiss based on its contention that McKesson has failed to establish

that it holds all rights, title, and interest in the '110 and '267 patents. *See* Defendants' Rule

12(b)(1) Motion to Dismiss for Lack of Standing, to Limit Damages, and for Sanctions (D.I. 526)

(hereinafter, "Motion to Dismiss"). Swisslog's Motion to Dismiss essentially asks me to

reconsider my conclusion that, under Pennsylvania law, a 1990 transaction between AHI

(McKesson's predecessor-in-interest) and several Investors did not involve an assignment of

patent rights to the Investors but, instead, only gave the Investors a security interest in AHI's

patent rights. I fully addressed this issue in my August 29, 2008 R&R (hereinafter "2008 R&R"),

which recommended denial of Swisslog's earlier motion to dismiss that was based on these same

grounds. (D.I. 357)

Swisslog objected to the 2008 R&R. In reviewing those objections, Judge Robinson

declined to adopt the recommendation to deny Swisslog's earlier motion to dismiss on the merits.

(D.I. 503 at 3) Instead, Judge Robinson denied Swisslog's motion to dismiss without prejudice to

renew, writing:

> 2. Legal standard. Plaintiff bears the burden of establishing that it
> has standing to bring an action for patent infringement. *Sicom Sys.,
> Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 976 (Fed. Cir. 2005).
> "Only a patent owner or an exclusive licensee can have
> constitutional standing to bring an infringement suit[.]" *Mars, Inc.
> v. Coin Acceptors, Inc.,* 527 F.3d 1359, 1367 (Fed. Cir. 2008)
> (citing *Sicom,* 427 F.3d at 976); *see also Propat lnt'l Corp. v. Rpost,
> Inc.,* 473 F.3d 1187, 1189 (Fed. Cir. 2007); *Mentor H/S, Inc. v.
> Med. Device Alliance, Inc.,* 240 F.3d 1016, 1017 (Fed. Cir. 2001)
> (only patentee or successor in title is a proper plaintiff in a patent
> infringement case).

5

> 3. To substantiate a claim of patent ownership, a putative patentee "must produce a written instrument documenting the transfer of [ownership]." *Speed play, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1259 (Fed. Cir. 2000). Where more than one party owns rights in a patent, "a co-owner acting alone will lack standing." *Israel Bio-Engineering Project v. Amgen, Inc.,* 475 F.3d 1256, 1265 (Fed. Cir. 2007). This requirement aims to ensure that accused infringers are not "subjected to multiple suits and duplicate liability" from other parties who might also assert rights in the same patent. *IpVenture, Inc. v. ProStar Computer, Inc.,* 503 F.3d 1324, 1325 (Fed. Cir. 2007).
>
> 4. Analysis. Although plaintiff has produced evidence of ownership, there is sufficient competing evidence to give me pause. This record presents a very different situation from the typical jurisdictional dispute in patent cases, where the court is required to determine whether a licensee has sufficient rights to bring suit on its own (based on a review of the license) or where the determination of ownership apparently does not affect the rights of others who may have a competing ownership interest.[3] In short, I am not satisfied that, in the interests of fairness and judicial economy, this litigation should go forward without plaintiffs resolving the question of ownership, either through agreement or in a court having proper jurisdiction over the non-party investors.
>
> . . . .
>
> FN 3. Where, for example, the absent parties have either disavowed rights in the patents-in-suit or indicated a willingness not to enforce these rights. *See, e.g., IpVenture, Inc.,* 503 F.3d at 1327.

(D.I. 503 at 2-3)

Judge Robinson did not reach the issue of whether the underlying transaction between AHI and the Investors was an outright assignment of the patent rights to the Investors or, instead, gave the Investors only a security interest in the patent rights. This is the issue upon which resolution of Swisslog's pending Motion to Dismiss now turns. Under Pennsylvania law, if AHI assigned the patent rights to the Investors, only a physical reassignment of those rights by the Investors

6

would return the rights to AHI (permitting AHI to re-assign those rights to McKesson). By

contrast, a security interest would have expired by operation of law upon AHI's repayment of the

loans from the Investors, without need of a physical reassignment. (D.I. 357 at 2, 17 & 29)

Nothing has occurred that has changed my view that AHI gave the Investors a security interest in

AHI's patent rights. The transaction between AHI and the Investors did not involve an outright

assignment of patent rights to the Investors.

In her ruling on Swisslog's objections, Judge Robinson stayed this case for six months "or

until [McKesson] has resolved the issue of ownership of the patents-in-suit, whichever comes

first." (D.I. 503 at 3) Within the ensuing six months, on March 5, 2009, each of the Investors

executed a Disavowal. In the Disavowals, each of the Investors made the following

representations:

> . . . I, [Investor], do hereby affirm that as of December 27,
> 1990 AHI was the sole owner of the Patents holding all rights,
> interests, and title to the Patents. I affirm that AHI fully satisfied
> the obligations under the Promissory Note[s]. I affirm my
> understanding that any legal or equitable rights I may have held in
> the Patents terminated as of December 27, 1990, by operation of
> law when AHI repaid the Promissory Note[s].
>
> . . . .
>
> I further affirm that as of December 27, 1990 I did not have
> any legal or equitable rights to any of the Patents.
>
> . . . .
>
> I affirm that, at least as of December 27, 1990, I have never
> asserted any rights to the Patents and agree to forbear from asserting
> such rights at any time in the future. I also affirm that I will never
> assert any claim that Swisslog Italia S.p.A., Translogic Corporation,
> or any affiliates, successors, assigns, or transferees, or their
> customers infringe the Patents.

(D.I. 535 Exs. 1, 41)

The Investors received a total of $337,500 in connection with their execution of the Disavowals. (D.I. 528 Ex. B at ¶13) The Disavowals were executed only after the Investors, through their attorney, strongly suggested the Investors believed they had ownership interests in the patents. (D.I. 528 Ex. A) Furthermore, while McKesson did not obtain an assignment from any of the Investors, paragraph 7 of a March 5, 2009 Agreement executed in conjunction with the Disavowals expressly binds the Investors to "execute any additional documents required to provide AHI, now McKesson, with full legal and equitable title to the Patents, including a reassignment with an effective date of December 27, 1990 should a Court deem one necessary in the patent litigation pending in the U.S. District Court for the District of Delaware." (D.I. 528 Ex. B at ¶7) According to Swisslog, these facts destroy the credibility of the Disavowals and leave McKesson short of satisfying its burden to establish its ownership of all rights in the '110 and '267 patents. (D.I. 527 at 2-3)

I disagree. Nothing about the Disavowals or the March 5, 2009 Agreement alters the record with respect to the material issue: in 1990 was there an outright assignment or the creation of a security interest? All of the reasons on which I relied to find in my 2008 R&R that a security interest was created, and that this security interest was automatically extinguished when AHI repaid the loans, are unaffected by the subsequent history now in the record.[3] I continue to conclude that the security interests the Investors once held expired upon AHI's repayment of the

_____

[3] If anything, my conclusions are bolstered by the Disavowals, as in the Disavowals the Investors state that they do not have any ownership interests in the patents-in-suit and they will not sue Defendants for patent infringement, or otherwise assert any rights to the patents. (D.I. 535 Exs. 1, 41)

8

loans, so AHI had all right, title, and interest in the patent rights it eventually transferred (in full)
to McKesson.

Accordingly, I recommend that Swisslog's Motion to Dismiss be denied.[4]

## C.    Claim Construction

### 1.    Pertinent Procedural History

On June 16, 2008, McKesson and Swisslog filed a Joint Claim Construction Statement
and Chart ("Joint Statement") identifying the claim terms the parties contend require construction.
(D.I. 324)  The parties revised their Joint Statement on July 31, 2008 (D.I. 345) and again on
September 2, 2008 (D.I. 359).  The parties briefed their respective positions on claim construction
and, on June 3, 2009, filed a joint motion to renew those briefs.  (D.I. 529)  On July 13, 2009, I
conducted a Markman hearing.  *See* July 13, 2009 Hearing Transcript (D.I. 547) ("Tr.").  Post-
hearing supplemental briefing by the parties was submitted as late as August 2009.  (D.I. 548; D.I.
549; D.I. 550)  The Court is asked to construe terms from the following claims: 1-8, 10-11, 13-17,
and 21-22 of the '110 patent and 1-5 and 7-9 of the '267 patent.  (D.I. 351 at 1)

### 2.    Legal Standards

"It is a bedrock principle of patent law that the claims of a patent define the invention to
which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

---

[4]As alternative relief, Swisslog asks that McKesson's damages be limited to infringement
(if any) that occurred subsequent to execution of the March 5, 2009 Disavowals.  (D.I. 527 at 17-
18)  However, given my conclusion that the loans were repaid and the Investors' security
interests thereby extinguished by operation of law in 1990, McKesson has been the owner of all
right, title, and interest in the '110 and '267 patents at all relevant times, including continuously
since the inception of the instant lawsuit in 2006.  It follows that the ownership issue does not
provide a basis for limiting the damages to which McKesson will be entitled if it proves
infringement.

9

(Fed. Cir. 2005) (internal quotation marks omitted).  Construing the claims of a patent is a question of law.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996).  "[T]here is no magic formula or catechism for conducting claim construction."  *Phillips*, 415 F.3d at 1324.  Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law."  *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1312-13 (internal citations and quotation marks omitted).  "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Id.* at 1321 (internal quotation marks omitted).  The patent specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered.  *Phillips*, 415 F.3d at 1314.  Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ."  *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . .  For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Id.* at 1314-

10

15 (internal citation omitted).  This "presumption is especially strong when the limitation in

dispute is the only meaningful difference between an independent and dependent claim, and one

party is urging that the limitation in the dependent claim should be read into the independent

claim." *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim

term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the

inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.  It bears emphasis that "[e]ven

when the specification describes only a single embodiment, the claims of the patent will not be

read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope

using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v.

Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481

F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution

history, if it is in evidence." *Markman*, 52 F.3d at 980.  The prosecution history, which is

"intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent

and Trademark Office] and includes the prior art cited during the examination of the patent."

*Phillips*, 415 F.3d at 1317.  "[T]he prosecution history can often inform the meaning of the claim

language by demonstrating how the inventor understood the invention and whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower than it would

otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to

the patent and prosecution history, including expert and inventor testimony, dictionaries, and

learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks omitted). Thus, if possible, claims should be construed to uphold validity. *See In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

## 3. Construction of the Disputed Terms

The parties agree that all claim terms not identified in their Second Revised Joint Claim Construction Statement, or not otherwise addressed by the parties, are not in dispute and,

12

therefore, do not require construction. (D.I. 359; D.I. 536)  I agree.  Also, I recommend that the

Court adopt each of the proposed constructions on which the parties agree (D.I. 359), and have

incorporated this into my recommendations at the end of this opinion.  My recommendations for

the disputed claim terms are discussed below.

> **a.**     **"x,y coordinate/ x,y coordinate location/ x and y coordinate"**

The parties disagree as to the proper construction of the terms "x,y coordinate" and "x,y

coordinate location" in claims 1 and 8 of the '110 patent and the terms "x, y coordinate location"

and "x and y coordinate" in claims 1 and 7 of the '267 patent.  The parties do agree, however, that

whatever construction the Court adopts for any one of these terms should also be adopted for all

of these "x, y terms." (*See* D.I. 351 at 30; D.I. 359; D.I. 384 at 16-17.)  I agree.  Therefore, the

following analysis applies to all of the disputed "x, y" terms.

Claim 1 of the '267 patent shows how the claims use the terms "x, y coordinate location"

and "x and y coordinate":

> 1.     A system for selecting and delivering medicine package
>        from a holding means to fill orders comprising:
>
>> a) holding means comprised of a frame
>> having a plurality of support rods each
>> support rod sized for holding a plurality of
>> medicine packages, each rod associated with
>> a given medicine and holding medicine
>> packages with only the same medicine each
>> support rod having a distinct *x, y coordinate
>> location*; . . .
>>
>> . . . .
>>
>> c) a computer having a database containing
>> an *x, y coordinate location* for all packages
>> in the holding means, the computer able to

13

> receive orders for packages and able to direct
> the means for picking packages; and
>
> d) a supply structure having a plurality of
> supply support rods which extend from said
> structure to form an x, y coordinate system,
> with each supply support rod and medicine
> package thereon having a unique *x and y
> coordinate*, said picking means disposed to
> have access to said structure such that a given
> medicine package on an associated supply
> support rod can be picked by the picking
> means to fill a patient's prescription, or a
> given medicine package in the supply
> structure can be picked by the picking means
> to restock an associated rod from the holding
> means.

'267 patent, col. 13 lines 1-9, 16-32 (emphasis added).

McKesson proposes that the "x, y" terms be construed as "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages." Swisslog, by contrast, proposes that these terms be given their plain and ordinary meaning and construed as "a location identifier 'X,Y,' in which X designates a position of the location along an X-Axis and Y designates a position of the location along a Y-Axis."

While the parties have devoted many pages to briefing this issue, their dispute essentially comes down to a single question: does the x, y plane being referred to in the claims exist only where the picking means can access packages, or may it also exist in places where the picking means cannot access packages? McKesson advocates the former position and Swisslog the latter.[5]

---

[5]As McKesson puts it, "[b]oth parties . . . agree that these claim terms should be given ordinary and customary meaning. . . . The parties disagree, however, regarding the identification of the area, or place in space, that defines the boundaries in which the 'x, y coordinate location' may exist." (D.I. 364 at 2)

14

After careful review of the claim language, the specification, and the prosecution history, I conclude that the claims require that the x, y plane exist in an area where the picking means can access a package. Therefore, I recommend that the Court adopt McKesson's proposed construction of the x, y terms.

Looking first at the claim language, it is clear that the claims require a relationship between the "x, y" plane and the locations where packages are accessible to (i.e., may be picked by) the picking means. As McKesson states, "the claims consistently refer to x, y coordinates in relation to packages held in a storage area location that are accessible to the picking means." (D.I. 364 at 4; *see also id.* at 3-8.) For instance, element d) of claim 1 of the '267 patent recites "a supply structure having a plurality of support rods which extend from such structure to form an x, y coordinate system, with each supply support rod and medicine package thereon having a unique x and y coordinate, said picking means disposed to have access to said structure such that a given medicine package on an associated supply support rod can be picked by the picking means." '267 patent, col. 13 lines 22-29 (emphasis added). Similarly, element a) of claim 1 of the '110 patent recites "a storage area comprised of a plurality of storage area locations each location having a package: . . . the packages being held in a manner so that each package can be placed into and removed from the storage area locations and . . . each location having a distinct x, y coordinate." '110 patent, col. 12 line 66 to col. 13 line 11 (emphasis added).

Consistent with the claims, the specification also demonstrates a relationship between known "x, y" coordinates in a plane and the automated picking means. As McKesson notes, the Applicants made this relationship evident by referencing the picking means as part of the specification's explanation of the x, y coordinate system. (D.I. 351 at 15-16) The specification

15

discloses:

> The frame 28 with rod supports 32 form an X, Y coordinate system with
> each rod 30 and medicine packages 14 therein having a unique x, y
> coordinate.  Packages are placed in the storage rack so that each product is
> located at a known X, Y coordinate.  Since every product is a known X, Y
> location, it is possible to direct an automated picking means to any product
> location to select a desired item . . . .
>
> . . .
>
> The racks of FIGS. 3, 4, and 5 have two important features.  First,
> the packages are held in areas having known X, Y coordinates.
> Those coordinates could be single X, Y values as may correspond to
> the position of the package holes 15 or a group of X, Y values
> defining an entire package.  Second, there is sufficient clearance
> between packages to allow automated picking means to select, grab
> and replace individual packages.

'267 patent, col. 5 lines 18-51 (emphasis added).  Additionally, while describing the actual

operation of the automated system, the Applicants described the "x, y coordinate" with reference

to selection of packages from the storage rack:

> The system is now ready to pick the drugs 188.  First, the
> column-type vehicle 44 goes to the rack where the drug to be
> selected is stored and stops at the X coordinate of that drug package.
> The picking means 38 then moves along the column 44 to the Y
> coordinate of the medicine package to be picked.  It is also turned to
> the proper storage rack 12 which has the desired package 14.  These
> actions may be performed simultaneously by the system 189.

'267 patent, col. 9 line 64 to col. 10 line 4 (emphasis added).  As a result, one of ordinary skill in

the art would comprehend that the x, y coordinate is determined relative to both the storage area

locations and the action of the picking means – which acts to grab, select, and place packages.

(D.I. 351 at 16)[6]

Swisslog insists that "the inventors used the terms 'X, Y coordinate,' 'X, Y coordinate location,' and 'X and Y coordinate' in accordance with their notoriously well-known, plain, and ordinary meanings as location identifiers for designating the position of various locations within the automated system of the patents-in-suit." (D.I. 349 at 18)  Swisslog adds: "This customary definition, which has existed for almost four centuries, is applied routinely in the scientific arts." (D.I. 361 at 1)  I do not disagree.  However, as McKesson explains, Swisslog's proposal to construe the x, y terms as a sterile, dictionary definition fails to account for the context in which the terms appear in the claims of the patents-in-suit and would, if adopted, result in an incorrect elucidation of the patentees' rights.  In the context of the patent claims at issue in this lawsuit, the "well-known, plain, and ordinary" x, y plane exists at locations where the picking means can pick packages.  It does not, within the context of the patent claims asserted here, exist elsewhere.  That is the extent of the patent right claimed by the Applicants and granted by the PTO.  It will assist the jury to have this fact made clear, and McKesson's proposed construction does so.

Another Swisslog criticism of McKesson's proposed construction is that it is limited to the location of packages.  (D.I. 361 at 11-12)  The claim language uses the x, y terms also to refer to the location of storage area locations and support rods.  '110 patent, col. 13 lines 10-11 ("each [storage area] location [has] a distinct x, y coordinate"); '267 patent, col. 13 lines 7-9 ("each support rod having a distinct X, Y coordinate location"); *id.* col. 14 lines 19-21 (same).  While

---

[6]While McKesson purports to find support for its construction in the prosecution history, *see* D.I. 351 at 16-17 (citing D.I. 360 Ex. E at MA000194, MA000209-10), I do not find the prosecution history to be either supportive or detrimental to either side's proposed construction of the x, y terms.

17

McKesson is correct that all points in the x, y plane claimed in the patent claims are locations accessible to the picking means, it is also true that this plane is identified in some portions of the claims by reference to the location of the storage rods or the storage area locations. For the reasons already given (as well as those given below with respect to the construction of "storage area location"), I agree with McKesson that the claims' references to "support rods" and "storage area locations" must also relate to locations that render the packages accessible to the picking means. Hence, Swisslog's argument does not detract from my conclusion that the x, y terms define a plane in which the packages are accessible to the picking means. Whether it is necessary to further refine the construction of the x, y terms (e.g., to sometimes refer to storage rods and not always just to packages) is a matter on which I will confer with the parties at a later date.

Thus, I recommend that the Court construe the x, y terms to mean "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages."

### b.    "Storage area location"

I recommend that the term "storage area location" as used in claim 1 of the '110 patent be construed as McKesson proposes, to mean "a place in the storage area accessible to the picking means where packages are held." This conclusion follows from my recommendation that the Court adopt McKesson's proposed construction of the x, y terms.

The parties acknowledge the relationship between the x, y terms and "storage area location." (D.I. 361 at 10)[7]   In fact, the heart of the parties' dispute with respect to "storage area

─────────────

[7]Indeed, the parties did not identify "storage area location" as a disputed term requiring judicial construction until after they exchanged opening claim construction briefs and saw each others' analyses of the x, y terms. (*See generally* D.I. 391; D.I. 421; D.I. 536.)

18

locations" is the same as the dispute over the x, y terms: whether "storage area locations" are only those areas where packages are stored and accessible to the picking means (McKesson's position) or whether they also include areas where packages are stored but are not accessible to the picking means (Swisslog's position). (D.I. 391 at 8) For the same reasons I agreed with McKesson in connection with the x, y terms, I also agree with McKesson on the "storage area location" term.

Swisslog proposes that "storage area location" be construed as "a location within the storage area where packages are held for storage." (D.I. 421) Swisslog's construction would result in portions of the "storage area location" being inaccessible to the picking means. Such a result is inconsistent with the claim language and is not in any way supported by either the specification or the prosecution history.

As McKesson observes, all five parts of claim 1 of the '110 patent refer to the "storage area location," and all of these parts provide guidance as to what the storage area location is and where it exists within the claimed system. (D.I. 391 at 2) Specifically, claim 1 provides:

> a) a storage area comprised of a plurality of <u>storage area locations</u> each location having package holding means sized and configured to hold a plurality of individual packages each individual package . . . , the <u>packages being held in a manner so that each package can be placed into and removed from the storage area locations</u> . . . , each location having a distinct x, y coordinate;
>
> b) automated picking means . . . to <u>select packages from the storage area locations and place packages in the storage area locations</u> in accordance with computer controlled instructions . . . ;
>
> c) means for moving the automated picking means <u>to selected storage locations</u>;
>
> d) a computer . . . <u>for directing the picking means to chosen storage area locations</u> and a database containing at least one x, y coordinate location in the storage area for each package held within the storage

19

area . . . ; and

e) . . . wherein only one type of package is stored in each x, y coordinate location.

'110 patent, col. 13 lines 1-38 (emphasis added).

It is evident from this claim language that the term "storage area location" refers to the part of the storage area where the picking means travels to select or place packages – not the entire storage area. Element a) provides that the packages in the storage area locations are "held in a manner so that each package can be placed into and removed from the storage area locations." (D.I. 391 at 3; '110 patent, col. 13 lines 6-8) Element b) requires that the picking means select packages from the storage area locations and place packages in the storage area locations. (D.I. 391 at 3; '110 patent, col. 13 lines 13-15) Elements c) and d) likewise demonstrate that the picking means must be able to move to and be directed to the selected storage area locations. (D.I. 391 at 3; '110 patent, col. 13 lines 24-28) As McKesson asserts, "[t]he linkage between the storage area locations and the picking means is thus undeniable. As a result, one of ordinary skill would understand that a 'storage area location,' in the context of the claimed invention, must be a place accessible to the picking means." (D.I. 391 at 3)

Although McKesson purports to find support for its construction in the specification and prosecution history, it does not identify any discussion in either place which is helpful to construing the term "storage area location." On the other hand, neither have I found anything in the specification or prosecution history that conflicts with the strong support found for McKesson's construction in the claim language itself. I agree, therefore, with McKesson's conclusion that "the specification does not provide any suggestion that a storage area location can

be a place holding packages but that the picking means cannot access." (D.I. 391 at 5)  Given the weight of the claim language, this is a sufficient basis for me to recommend that the Court adopt McKesson's proposed construction of the term "storage area location."

Swisslog argues against McKesson's construction primarily by reviving the same arguments it makes in connection with the x, y terms.  I am no more persuaded by these arguments in connection with "storage area location" than I was in connection with the x, y terms. Swisslog's primary additional contention is that McKesson confuses the definition of the term "storage area location" with a description of relationships among structures.  (D.I. 421 at 2-7)  In Swisslog's view, "[r]elationships between elements do not define the elements themselves."  (*Id.* at 6 n.3)  That is, Swisslog agrees with McKesson that claim 1 of the '110 patent "requires the picking means to access 'storage area locations,'" but Swisslog insists "this requirement does not come from the definition of 'storage area location.'  It comes from other limitations in the claim that define relationships between the picking means and storage area locations."  (*Id.* at 1)  To Swisslog, then, it would be improper to include these relationships in the construction of "storage area location," because to do so "would render these [relational] limitations superfluous."  (*Id.*)

I am not persuaded that Swisslog has identified a flaw in McKesson's proposed construction.  The claim requires that the storage area location be accessible to the picking means. Whether this is viewed as a "relational" or "definitional" fact, adopting McKesson's construction does not eliminate this requirement – to the contrary, it retains the requirement.  There is no principle of claim construction of which I am aware that prohibits a term from being construed in a manner incorporating some relational content.

21

### c.    "Package Reader associated with the picking means"

The parties next dispute the proper construction of "package reader associated with the

picking means," as that term is used in claim 1 of the '110 patent. McKesson proposes that this

term be construed as "a device that provides the identity of a package to the computer directing

the picking means." Swisslog counters that the proper construction is "a package reader attached

to the picking means." I recommend that the Court adopt McKesson's proposed construction.

The disputed term appears in element e) of claim 1 of the '110 patent, which reads:

> 1. A system for selecting and delivering packages to fill orders
> comprising: . . .
>
> e) a *package reader associated with the picking means* and being
> positioned for reading the machine readable labels on packages
> located within the storage area, wherein only one type of package is
> stored in each x, y coordinate location.

'110 patent, col. 13 lines 34-38 (emphasis added).

The claim language does not include the word "attachment" or "attached" or contain any

suggestion that the package reader must be physically affixed to the picking means.[8]  Importantly,

other claims do use the word "attached." '110 patent, col. 13 lines 41-42 (claiming "sensor

attached to the picking means"); '267 patent, col. 13 lines 48-52 (claiming "A system as described

---

[8]The parties appear to be in agreement that a plain and ordinary dictionary definition of
"associated" would be broader than such a definition of "attached," in that the former does not
require a physical connection between the package reader and the picking means. (*See, e.g.,* D.I.
351 at 26-27 (citing dictionary definitions); Tr. at 119 (McKesson stating that "extrinsic
evidence" with respect to "attached" as that term is used "requires some type of fastening or
physical connection, but associated with is united in action or purpose. It's a broader
interpretation. It denotes a broader connection between elements that attach."); Tr. at 120
(Swisslog responding that "because of the specific arguments and statements which the inventors
made to the Patent Office during the prosecution, they gave  up the broader scope of the claim
that otherwise might have been applicable with respect to the difference between the word
association and attached.").)

22

in claim 3 wherein the picking means is comprised of: a housing; means for storing a plurality of

medicine packages attached to the housing . . . ."); id. col. 14 line 29 (claiming "means for storing

packages attached to the housing"). Where, by contrast, the Applicants used "associated," as in

claim 1 of the '110 patent, I believe they meant something broader than "attached." *See* '267

patent, col. 13 lines 33-38 ("A system as described in claim 1 including a conveyor in

communication with the picking means; and patent prescription boxes which are moved by the

conveyor to the picking means such that the picking means provides the medicine packages it has

picked to fill a given prescription to an *associated* box.") (emphasis added).

Likewise, in the specification, the patentees continued this distinction between things that

are physically "attached" to one another and things that may merely be "associated" with one

another. *Compare* '110 patent, col. 3 lines 21-24 ("The gripper assembly preferably has a

movable rod or other carrier for holding selected items, at least one vacuum head and associated

controls for gripping and moving selected items."); *id.* col. 3 lines 30-31 ("We provide a

processing unit with associated memory and data entry peripherals."); *id.* col. 8 lines 4-7 ("The

obtaining means 50 also preferably includes an extension rod 52 in fluidic communication with a

pneumatic in/out cylinder 53 and associated valve 59, as shown in FIGS. 8 and 11.") *with id.* col.

5 lines 29-30 ("Attached to the back 23 are sets of brackets 25 position to hold packages 27."); *id.*

col. 7 lines 49-50 ("A third actuator 43 is attached to bracket 41."); *id.* col. 7 lines 60-61 ("The

obtaining means 50 is slidingly attached to the housing 49 . . . ."); *id.* col. 8 lines 7-9 ("The

extension rod 52 is slidingly attached with respect to the Y and Z directions to the housing 49.");

*id.* col. 8 lines 24-28 ("The holding rod 48 is also attached to a cylinder 48B which allows the

storage rod to retract and extend in reference to the obtaining means.  The pusher plate 57B is also

23

attached to a cylinder 57A . . . ."). Thus, I conclude that the Applicants used the terms
"associated" and "attached" differently and, therefore, claim 1's use of "associated" should not be
narrowed to "attached."

Swisslog emphasizes that the specification discloses a package reader that is physically
attached to the picking means, and McKesson does not disagree. When the package reader is
physically attached to the picking means in a specific manner as shown in Figures 7-11, the
specification notes an additional capability of reading the package label prior to picking to
confirm picking of the proper packages. *See* '110 patent, col. 10 lines 2-6 ("When the end of
gripper assembly 38 is properly positioned, the bar code reader 26 reads 190 the identity 16 on the
medicine package 14 in order to confirm that it is the proper medicine package to be picked with
respect to the patient's prescription.").[9] This is a preferred embodiment. '110 patent, col. 6 lines
9-12 ("The picking means 38 <u>can</u> also include means, such as a bar code reader 26 as shown in
FIG. 7, for determining the identity 16 of a package 14 . . . and providing its identity 16 to the
computer 24.") (emphasis added); *id.* col. 7 lines 64-67 ("Identifying means, <u>for example</u>, the bar
code reader 26 shown in FIG. 8, is mounted on housing 49 such that it can identify a package 14
to be picked by the obtaining means 50.") (emphasis added). Nothing in the claim language limits
the claimed invention to this preferred embodiment. Nor may the Court import a preferred
embodiment into a claim limitation. *See Phillips*, 415 F.3d at 1323.

Swisslog additionally argues that during prosecution the Applicants disavowed any claim
they might otherwise have had to package readers that are not physically attached to the picking

---

[9]McKesson does not appear to dispute Swisslog's contention (D.I. 349 at 19) that to
perform such "pre-pick verification" it is necessary for the package reader to be attached to the
picking means.

24

means. (D.I. 349 at 18-23; D.I. 361 at 16-22; Tr. at 119-29) That is, Swisslog finds in the

prosecution history an express disclaimer by the Applicants of the full scope of package readers

that are "associated" with the picking means, narrowing the claim to just those package readers

that are "attached" to the picking means. Such a disclaimer "must be clear and unambiguous."

*Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1373 (Fed. Cir. 2005). "Consequently, for

prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing

actions or statements made during prosecution be both clear and unmistakable." *Omega Eng'g,*

*Inc. v. Raytek Corp.,* 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). Moreover, the disavowal must

directly address the disputed term. *See Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305

F.3d 1318, 1324 (Fed. Cir. 2002). "If the locus of the argument does not center on the disputed

term, a court will face an ambiguity as to whether the statement or disclaimer affects the

inventor's belief in the scope of the disputed term." *Sky Techs., LLC v. Ariba, Inc.,* 491 F. Supp.

2d 154, 158 (D. Mass. 2007). Having reviewed the extensive prosecution history in the record

here (*see* D.I. 349 at 18-23; D.I. 360 Ex. E; D.I. 361 at 16-22), I find that the statements on which

Swisslog relies do not constitute a clear, unambiguous, unmistakable, and particularized

disavowal.[10]

---

[10]The statement most helpful to Swisslog appears in the Applicants' February 15, 1994
"Remarks" accompanying proposed amendments, in which they attempted to distinguish a prior
art reference (Morello) the PTO had cited in rejecting claims as obvious. The Applicants stated:
"When the picker assembly [of the Morello reference] arrives at that [storage] location it cannot
read the article identification while the article remains in the storage location. This teaching is
quite different from the system of amended claim 1." (D.I. 387 Ex. 4 at T056471-72) (emphasis
added) When read within the full context of the complex prosecution history here, even these
two sentences do not rise to the level of clarity and particularity required to constitute a
disclaimer. *See generally Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1141 (Fed. Cir.
2003) ("Every statement made by a patentee during prosecution to distinguish a prior art
reference does not create a separate estoppel. Arguments must be viewed in context.").

Accordingly, again, I recommend that the Court adopt McKesson's proposed construction

of "package reader associated with the picking means."

### d.   Means-plus-function terms

The parties dispute the construction of several other terms, specifically: "picking

means/automated picking means," "means for picking medicine packages from the support rods,"

"means for obtaining a medicine package/obtaining means," and "picking means for picking

packages from the support rods in accordance with instructions received from a computer."

All of these terms recite the word "means" and, as such, are presumptively governed by

---

These two sentences appear in the middle of a long paragraph that runs to three pages. The two sentences appear at the point in this long paragraph in which the Applicants move from describing multiple features of the Morello patent to describing multiple features of their own invention. Hence, the second of the two sentences – "This teaching is quite different from the system of amended claim 1" – is not referring just to the sentence immediately preceding it – about how Morello's "picker assembly . . . cannot read the article identification while the article remains in the storage location" – but, rather, refers generally to the many features of the Morello patent described to that point in the paragraph. Moreover, in the paragraph just before the long paragraph in which the two sentences appear, the Applicants explained that they "have amended the pending claims to distinguish over" prior art references including Morello, by adding three new requirements, only one of which deals with the package reader. *See id.* at T056470. That new package reader requirement is that "a package reader be associated with the picking means which reader is positioned for reading the machine readable labels on packages located within the storage area;" the requirement is not, therefore, that the package reader be "attached" to the picking means. *Id.* (emphasis added); *compare id.* at T056472 (distinguishing Morello reference as not including element of Applicants' system of "a sensor attached to the picking means"). To be sure, there are also suggestions in this long paragraph that the package reader may be attached to the picking means. *See id.* (explaining that in patentees' invention "[a]rticles are removed from storage locations after the reader confirms that the desired article has been found"); *id.* (explaining that, even if an associated computer knowing the locations of packages crashes, "applicants' system can still operate using the package reader to locate desired packages"). However, there is nowhere the clear, unambiguous, unmistakable, and particularized disclaimer that would be required to narrow the "associated" claim language to "attached." Given this ambiguity, there is also nothing in the prosecution history on which the public or a competitor of the Applicants could have reasonably relied in concluding that the Applicants disclaimed package readers that are not physically attached to picking means.

26

the provisions of Section 112, paragraph 6 of Title 35, which provides that:

> An element in a claim for a combination may be expressed as a
> means or step for performing a specified function without the recital
> of structure, material, or acts in support thereof, and such claim
> shall be construed to cover the corresponding structure, material, or
> acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

Claims involving this provision are referred to as "means-plus-function." Under the
means-plus-function clause of § 112, a patent applicant may "describe an element of his invention
by the result accomplished or the function served, rather than describing the item or claim to be
used (*e.g.*, 'a means of connecting Part A to Part B,' rather than 'a two-penny nail')."
*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28 (1997). "The court must
construe the function of a means-plus-function limitation to include the limitations contained in
the claim language, and only those limitations. It is improper to narrow the scope of the function
beyond the claim language. It is equally improper to broaden the scope of the claimed function by
ignoring clear limitations in the claim language." *Cardiac Pacemakers, Inc. v. St. Jude Medical,
Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). A claim limitation using a means-plus-function
format covers "only the corresponding step or structure disclosed in the written description, as
well as that step or structure's equivalents." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d
1359, 1369 (Fed. Cir. 2000).

In construing a means-plus-function claim, courts look to such factors as the language of
the claim, the patent specification, and the prosecution history. *See United States v. Telectronics,
Inc.*, 857 F.2d 778, 782 (Fed. Cir. 1988). In so doing, a court must identify both the claimed
function and the corresponding structure in the written description for performing that function.

27

*See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003). A claim governed by the means-plus-function clause does not encompass every structure, material, or act that can possibly perform the specified function. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). Instead, the claim covers only the structure, material, or acts necessary to perform the function. *See Omega Eng'g*, 334 F.3d at 1322.

While use of the term "means" in a claim limitation creates a presumption that § 112, ¶ 6 has been invoked, the means-plus-function presumption can be rebutted upon a showing that (1) the claim element, despite use of the word "means," recites no corresponding function, or (2) the patentee has disclosed sufficient structure in the claim itself to perform the cited function. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997).

i.     **"picking means/automated picking means"**

The parties agree that the terms "picking means/automated picking means" as used in claim 1 of the '110 patent are written in means-plus-function format. They disagree, however, as to the identity of the function disclosed and the structure for performing that function.

McKesson proposes that the function is "to hold packages and to select and place packages in the storage area locations." According to McKesson, the structure corresponding to this function is "a device that includes a housing, a gripper, an extension rod and a storing rod as disclosed at col. 7, lines 57-64 and Fig. 7." Swisslog proposes, instead, that the function is "to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions." It identifies the structure that performs this function as "picking means 38" from the specification. I agree with Swisslog.

28

Considering first the function, there is little difference between the parties' competing proposals. However, whereas McKesson's proposal largely tracks the claim language – making only a minor grammatical change, replacing the claim's "to select packages from the storage area locations and place packages in the storage area locations" with McKesson's proposed "to select and place packages in the storage area locations" – Swisslog's proposal is identical to the claim language, which identifies an "automated picking means sized and configured to be able to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions." Thus, I believe Swisslog has accurately identified the function served by the automated picking means.

The corresponding structure for performing this function is "picking means 38," depicted in Figure 7. The claim language supports Swisslog in identifying this as the structure, in that the claim states only that "the picking means ha[s] a gripper for grasping and moving the packages." '110 patent, col. 13 lines 16-17. McKesson argues that the picking means in claim 1 "is disclosed to contain at least a gripper" and, by implication, more (D.I. 351 at 20) (emphasis added), but the claim does not disclose any structure other than the gripper in connection with the automated picking means.[11]

The specification also supports Swisslog's position. In a portion of the specification excerpted in McKesson's brief, the specification consistently and repeatedly (eight times)

---

[11]McKesson contends that the claim's reference to "a picking means storage location sized and configured to hold a plurality of packages in a face-to-face relationship" discloses further structure that is part of the automated picking means. (D.I. 351 at 20) I disagree. I find that this language is describing the storage location, not the picking means.

describes "picking means 38."[12] (D.I. 351 at 19-20 (citing '110 patent, col. 5 line 63 to col. 6 line 9; *id.* col. 7 line 45 to col. 8 line 13); *see also* '110 patent, col. 5 lines 63-64 ("Packages are selected by a picking means 38, preferably of the type illustrated in FIGS. 7 though 10. . . ."), *id.* col. 7 lines 51-53 ("A picking means 38, which preferably is the gripper assembly of FIGS. 7 through 10 . . . .").) One of ordinary skill in the art would read all of this to mean that the automated picking means/picking means is structure 38.

### ii. "means for picking medicine packages from the support rods"

As used in claim 1 of the '267 patent, McKesson proposes that the term "means for picking medicine packages from the support rods" relates to the function of picking medicine from the support rods. McKesson identifies the corresponding structure as "a device that includes a housing, a gripper, an extension rod, and a storing rod as disclosed at col. 7, lines 57-64 and Fig. 7." Swisslog counters that the function is "picking medicine packages from the support rods in accordance with instructions received from a computer" and the corresponding structure is "picking means 38."

The parties' dispute with respect to this term is the same as their dispute with respect to the preceding term ("picking means/automated picking means"), the only difference being that the preceding term appears in claim 1 of the '110 patent instead of claim 1 of the '267 patent. For the same reasons I gave above, I recommend that the Court adopt Swisslog's proposed construction of "means for picking medicine packages from the support rods."

---

[12]While the specification of the '110 patent does also make reference to "Assembly 38," such reference does not overcome the persuasive impact of the numerous references to "picking means 38."

30

### iii.    "means for obtaining a
### medicine package/obtaining means"

Claim 4 of the '267 patent contains the disputed term "means for obtaining a medicine

package/obtaining means."  With respect to this term, both parties agree that the disclosed

function is "obtaining a medicine package."  They disagree, however, as to the corresponding

structure for performing this function.  McKesson identifies the corresponding structure as "a

device including a suction head, vacuum generator and an extension rod as disclosed at col. 7, line

60 - col. 8, line 33 and FIGS. 7 and 11."  Swisslog identifies the corresponding structure as

"obtaining means 50."

Here, again, the parties' arguments largely repeat the arguments I considered in connection

with the "picking means/automated picking means terms."  (*See, e.g.*, D.I. 351 at 32, 34

(McKesson using same block quote from specification to argue its construction of "picking

means" and "obtaining means" terms); D.I. 349 at 23-25 (Swisslog combining its arguments for

"picking means" and for "obtaining means" terms).)  Accordingly, for the same reasons given

above, I recommend that the Court adopt Swisslog's construction of this term.

### iv.    "picking means for picking packages
### from the support rods in accordance with
### instructions received from a computer"

The final disputed term appears in claim 7 of the '267 patent.  It is: "picking means for

picking packages from the support rods in accordance with instructions received from a

computer."  McKesson contends that this is not a means-plus-function term and should be

construed according to its plain and ordinary meaning.  Swisslog, on the other hand, argues that it

is a means-plus-function term, that the disclosed function is "picking packages from the support

31

rods in accordance with instructions received from a computer," and that the corresponding

structure is "picking means 38." I agree that McKesson has offered the proper construction of this

term.

Because the term includes the word "means," there is a presumption that it is a means-

plus-function term. However, this presumption is overcome if the claim recites sufficient

structure to accomplish the function. *See Sage Prods., Inc.*, 126 F.3d at 1427-28. Here, claim 7

does recite sufficient structure to overcome the presumption.

In pertinent part, claim 7 claims:

> b)    picking means for picking packages from the support
> rods in accordance with instructions received from a
> computer, the picking means being able to access the
> holding means and having
>
> > a housing;
> >
> > means for storing packages attached
> > to the housing;
> >
> > means for producing a suction;
> >
> > a suction rod in fluid connection with
> > the suction producing means, said
> > suction rod slidingly attached with
> > respect to the y and z directions to the
> > housing and maintaining a suction
> > therethrough when the suction
> > producing means is activated by
> > which a medicine package is picked
> > through suction; and
> >
> > means for sensing when a package is
> > properly positioned such that the
> > package rod is then moved to the
> > storing means and deposits the
> > package thereon.

'267 patent, col. 14 lines 24-39. This is not a means-plus-function claim term. It should be construed according to the plain meaning of the structure identified, namely as "a device having a housing, means for storing packages, means for producing a suction, a suction rod, and a means for sensing." Accordingly, I recommend that the Court adopt McKesson's construction of this term.

## D.   **Motions for Summary Judgment**

The parties have filed various motions for summary judgment, all of which were renewed on June 3, 2009.  (D.I. 529)  The summary judgment motions, and the order in which I will address them, are as follows: (1) Swisslog's Motion for Summary Judgment of Non-Infringement of the Patents-In-Suit ("Non-Infringement Motion") (D.I. 383); (2) McKesson's Motion for Summary Judgment of No Inequitable Conduct ("Inequitable Conduct Motion") (D.I. 373); (3) Swisslog's Motion for Summary Judgment of Invalidity of the Patents-In-Suit ("Invalidity Motion") (D.I. 408); (4) McKesson's Motion for Partial Summary Judgment of Validity Under 35 U.S.C. § 112 ("Validity Motion") (D.I. 404); (5) Swisslog's Motion for Summary Judgment Dismissing McKesson's Claim of Willful Infringement and Related Relief (D.I. 385) ("Willfulness Motion"); (6) McKesson's Motion for Summary Judgment of Patent Misuse, Unclean Hands, Waiver, Laches and Estoppel ("McKesson's Equitable Motion") (D.I. 376); and (7) Swisslog's Motion for Summary Judgment on Defenses of Laches, Equitable Estoppel and Failure to Mark ("Swisslog's Equitable Motion") (D.I. 381).[13]

---

[13]For reasons provided earlier in connection with my recommendation to deny Swisslog's Motion to Dismiss, I further recommend that McKesson's Motion for Summary Judgment on Defendants' Lack of Standing Defense (D.I. 379) be granted.

## 1.    **Legal Standards**

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).   Moreover, "[i]t is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (internal quotation marks omitted).

### 2.    Swisslog's Non-Infringement Motion

Swisslog asserts in its Non-Infringement Motion that it is entitled to judgment as a matter of law that its PillPick System, the accused device, does not infringe any claim of either the '110 or '267 patents.  I disagree and, therefore, recommend that Swisslog's Non-Infringement Motion be denied.

"Determining whether a patent claim has been infringed involves two steps: (1) claim construction to determine the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure." *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  The first step, claim construction, is a matter of law for the Court. In the following discussion, I will apply the constructions of the disputed claim terms that I have recommended be adopted by the Court.  The second step of the infringement analysis – determining, element-by-element, whether each limitation of a claim is infringed, either literally or by application of the doctrine of equivalents – is a question of fact.  *See id.*

To prove literal infringement, a party must show that the accused device possesses each and every element of the patent at issue.  *See Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996).  Infringement is examined on an element-by-element basis; if an element of the claim is not present in the accused device, then the device does not literally infringe the claims. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).  In order to establish infringement under the doctrine of equivalents, there must be an insubstantial difference between the accused system and the corresponding element of the patent-in-suit.  *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1260 (Fed. Cir. 1989)

(patentee must prove accused device "does substantially the same thing in substantially the same way to get substantially the same result") (internal quotation marks omitted).  As with literal infringement, infringement under the doctrine of equivalents is analyzed on an element-by-element basis.  *See Warner-Jenkinson,* 520 U.S. at 29.

The doctrine of equivalents is not available to a patentee who made narrowing amendments during prosecution in order to obtain allowance of the claims.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733-34 (2002); *see also Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1573 (Fed. Cir. 1997) ("When a claim has been narrowed by amendment for a substantial reason related to patentability, such as to avoid a prior art rejection, the patentee may not assert that the surrendered subject matter is within the range of equivalents.") (internal quotation marks omitted).  In such circumstances, the presumption of prosecution history estoppel may be rebutted if the patentee can show that the amendment at issue was not made for a reason of patentability, that it bore no more than a tangential relationship to the equivalent in question, or the equivalent sought was unforeseeable at the time the amendment was made.  *See Festo*, 535 U.S. at 736, 740-41.

When an accused infringer moves for summary judgment of non-infringement, such relief may only be granted if one or more limitations of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents.  *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also Techsearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of non-infringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial.").  Thus,

summary judgment of non-infringement can only be granted if, after viewing the facts in the light

most favorable to Plaintiff, there is no genuine issue whether the accused product is covered by

the claims. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

If the accused product includes all of the elements of a claim, or if the accused product is an

equivalent under the doctrine of equivalents, the patent remains infringed despite any

improvements or additional features in the accused product. *See Atlas Powder Co. v. E. I. du*

*Pont de Nemours & Co.*, 750 F.2d 1569, 1580-81 (Fed. Cir. 1984); *Northern Telecom, Inc. v.*

*Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990).

Turning to Swisslog's arguments, it is first important to note that the parties agree that a

single, central issue largely determines whether the accused device, Swisslog's PillPick System,

infringes McKesson's patents. According to Swisslog:

> Unlike the patents-in-suit, which teach 2-dimensional planes of static storage
> locations, the PillPick system employs a novel 3-dimensional area of movable
> storage locations for holding medicines. . . . The PillPick system . . . uses X-Y-Z
> location identifiers that permit storage locations at multiple levels in 3-dimensional
> space to be identified using *non-distinct* X,Y coordinates. This is vastly different
> than *distinct* X,Y identifiers for identifying locations in 2-dimensional planes – a
> requirement of *all* asserted claims of both patents-in-suit.

(D.I. 384 at 1) In other words, to Swisslog, "[t]he dispute regarding these [x,y] limitations hinges

on a single question – Whether the storage area locations and rods . . . behind the picking plane of

the PillPick system should be considered in an infringement analysis." (D.I. 473 at 3)

Likewise, McKesson states: "The crux of [Swisslog's] argument is that the use of a three

dimensional system having rotating storage/support rods in the DrugNest [component of the

PillPick System] avoids infringement because the claims are limited to a two-dimensional system

of static storage/support rods. . . . [E]ach of [Swisslog's] noninfringement arguments is premised

37

on the faulty assumption that the additional feature of rotating rods somehow avoids

infringement." (D.I. 442 at 14-15) Therefore, McKesson continues: "The dispute is whether

[Swisslog's] purported improvement of rotating different rods holding medicine packages at a

particular x, y coordinate can avoid infringement." (D.I. 442 at 1-2)

I agree that the essential issue for the infringement analysis is whether the three-

dimensional rotating approach of the PillPick system is within the scope of the properly construed

claims. I further agree with McKesson that this is a factual issue that must be left for the jury to

decide. A reasonable factfinder could find by a preponderance of the evidence in the record that

the PillPick System contains all of the limitations of the asserted claims, either literally or by

equivalents.

It bears emphasis that most of the force of Swisslog's arguments for non-infringement is

tied to Swisslog's proposed constructions of the disputed claim terms, and particularly the

constructions I have recommended be rejected. Swisslog made this point repeatedly in its briefing

on the Non-Infringement Motion and also in its claim construction briefing, arguing that adoption

of McKesson's construction of the x, y terms, for instance, would "read[] out of the asserted

claims the very limitation that the accused device in this case fails to meet – *i.e.*, that the storage

area locations and support rods have 'distinct' X, Y coordinates." (D.I. 361 at 2 (emphasis

added); *see also id.* at 5-6 ("McKesson's construction of 'X, Y coordinate,' together with faulty

constructions of other terms, such as 'storage area location,' effectively read out of the claims the

very limitation not met by the Pillpick system – *i.e.*, that each storage area location and support

rod '[have] a distinct x, y coordinate.'"); D.I. 384 at 2 ("McKesson's allegations of infringement .

. . are based on faulty claim constructions . . . .")).

Swisslog does contend that it is entitled to summary judgment of non-infringement even if the Court accepts my recommendation to adopt McKesson's construction of the x, y terms, "storage area location," and "package reader." Swisslog's contentions are based on constructions of terms that neither party identified as requiring construction,[14] or assertions that McKesson's infringement expert's report is conclusory and deficient.[15] I am unpersuaded that either of these provide a basis for granting Swisslog summary judgment of non-infringement.

One final argument of Swisslog's requires consideration. That is Swisslog's insistence that McKesson is estopped from proving infringement by the doctrine of equivalents. Again, I do

---

[14]Neither party identified "distinct" or "unique" as terms requiring construction. Nonetheless, Swisslog argues that under McKesson's construction of the x, y terms there is no literal infringement because each storage area location and support rod of the PillPick System lacks a "distinct" or "unique" x, y coordinate. (D.I. 384 at 19-20; 26-27) Swisslog's argument is dependent upon construing "distinct" and "unique" in a manner that excludes the possibility of more than one storage area location (or more than one storage rod) having the same x, y coordinate. But this is neither the only nor the most reasonable way to construe "distinct" and "unique" as those terms are used in the claims. Instead, as McKesson explains (*see* Tr. at 166-67), each storage rod (for example) has a "distinct" and "unique" x, y coordinate in that the x, y coordinate for each storage rod does not change from time to time – yet the same x, y coordinate may be shared among multiple storage rods (*e.g.*, in the PillPick System, all rods on the same belt share the same "x, y coordinate," though only one rod at a time is in the position to be accessible to the picking means). At bottom, the jury could conclude that the claims as I have recommended they be construed are infringed by the PillPick System.

[15]"[I]t is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact." *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000). Swisslog contends that McKesson's infringement expert, Dr. Book, submitted an expert report that is merely conclusory. Yet Swisslog eventually concedes that Dr. Book's report contains some analysis, not merely conclusions. (*See* D.I. 384 at 24 ("Dr. Book's conclusion that the PillPick system contains equivalents of the 'distinct X,Y coordinate' limitations is supported by virtually no analysis whatsoever.") (emphasis added).) Having reviewed Dr. Book's report, I find that it recites sufficient factual basis and adequate analysis to permit a reasonable factfinder to find infringement. *See also infra* Part E.2 (denying Swisslog's motion to preclude Dr. Book's testimony).

not agree. As McKesson explains, portions of the prosecution history on which Swisslog relies

pertain to amendments that the patentees proposed after claims had already been allowed by the

Examiner, *see* D.I. 442 at 22; D.I. 443 Ex. 16 at M0125378, or were merely tangentially related to

the issue on which Swisslog would now have the amendment relate directly to, *see* D.I. 442 at 26

("[T]he scope of protection surrendered to obtain patentability did not cover the 'support rod[s]

and medicine packages thereon having a unique x, y coordinate.'"); *see also* D.I. 443 Ex. 17 at

M000416; M000418-19.

    For the foregoing reasons, I recommend that the Court deny Swisslog's Non-Infringement

Motion.

### 3.    McKesson's Inequitable Conduct Motion

    McKesson moves for summary judgment on Swisslog's defense that the '110 and '267

patents are unenforceable due to McKesson's inequitable conduct in prosecuting these patents

before the PTO. I recommend that the Court grant McKesson's Inequitable Conduct Motion.

    To prove inequitable conduct, an accused infringer must present clear and convincing

evidence of both materiality and intent. *See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,*

537 F.3d 1357, 1365 (Fed. Cir. 2008). That is, the party asserting an inequitable conduct defense

must show that the patentee: "(1) made an affirmative misrepresentation of material fact, failed to

disclose material information, or submitted false material information, and (2) intended to deceive

the [PTO]." *Id.* If an accused infringer makes the necessary clear and convincing showing of

materiality and intent to deceive, the Court proceeds to a second stage of the analysis by

"balanc[ing] the equities to determine whether the applicant's conduct before the PTO was

egregious enough to warrant holding the entire patent unenforceable." *Id.* The issue at this point

is whether, in the Court's discretion, the patentee's misconduct warrants a finding of unenforceability. *See id.* at 1365-66. "[C]ourts must ensure that an accused infringer asserting inequitable conduct has met his burden on materiality and deceptive intent with clear and convincing evidence before exercising their discretion on whether to render a patent unenforceable." *Id.* at 1366.

In order "to survive [a plaintiff's] summary judgment [motion], [the defendant is] required to introduce evidence from which a trier of fact could find materiality and intent by clear and convincing evidence." *Abbott Labs. v. TorPharm, Inc.,* 300 F.3d 1367, 1379 (Fed. Cir. 2002). Due to the severity of the penalty for inequitable conduct – the loss of the entire patent even where the claims meet the rigorous standards of patentability – it is imperative the elevated burden of proof in the inequitable conduct context be strictly enforced. *See Star Scientific,* 537 F.3d at 1366.

Here, McKesson challenges the adequacy of Swisslog's showing with respect to both materiality and intent to deceive. The material prior art references Swisslog contends should have been disclosed to the PTO are three business plans created by AHI between 1987 and 1989 (prior to the critical date of January 24, 1989), as well as demonstrations of a prototype and offers for sale. Swisslog asserts that all of this "would have been of utmost importance, and thus material, to the Examiner's decision of whether to issue the patents-in-suit." (D.I. 433 at 4) Swisslog contends that AHI's prototype, which is described throughout the Business Plans, "exhibited 'substantially all of the functionality' of the first commercial [automated pharmacy station ("APS")] offered by AHI, as well as many of the purportedly novel features described in the patents-in-suit." (*Id.* at 7-8; *see also id.* at 8-10.) Moreover, according to Swisslog, "AHI offered

41

the APS at reduced prices to 'alpha' site hospitals before the January 9, 1989 Business Plan was drafted and, thus, before the January 24, 1989 critical date." (*Id.* at 10; *see also id.* at 11-15.)

McKesson responds that the documentation Swisslog relies upon does not qualify as prior art, as that term is defined in 35 U.S.C. § 102(b), because it was not generally available to the relevant public without restriction. Instead, the business plans were distributed only subject to confidentiality agreements, as evidenced by the unrebutted testimony of the deposed AHI representatives with knowledge of the distribution of the business plans. (D.I. 374 at 1, 3-4, 7-8, 19-21; D.I. 478 at 2-4) McKesson further argues that the public demonstrations made by AHI prior to the critical date were "exhibitions of a crude prototype device that was significantly different from the patented system," as evidenced by the unrebutted testimony of inventor-applicant Sean Donald. (D.I. 374 at 1-2; *see also id.* at 4, 9, 21-23.) McKesson further explains that, according to McDonald, AHI "sold nothing and offered to sell nothing" from 1989 to 1991 – and there is no evidence that sales or offers for sale of the patented invention took place prior to the critical date. (D.I. 374 at 9; *see also id.* at 4, 9-10, 23-24.)

I need not decide whether Swisslog has met its burden with respect to materiality because, even assuming that it has, I find that Swisslog has failed to meet its burden with respect to intent to deceive. The only "evidence" that Swisslog can point to with respect to intent to deceive is that the purportedly highly material prior art was not disclosed to the PTO. (D.I. 433 at 17) The Federal Circuit has held that deceptive intent may be inferred when: "(1) highly material information is withheld; (2) the applicant knew of the information [and] . . . knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313-14 (Fed. Cir.

2008) (internal quotation marks omitted).

Here, even assuming that the materials Swisslog has identified were highly material, the record does not contain sufficient evidence from which a reasonable factfinder could conclude that the patentees knew or should have known of that materiality and that they failed to provide a credible explanation for the withholding.  Only one of the patentees, Sean McDonald, was deposed, and he testified that he understood his obligation to submit material references to the PTO, that he followed advice of counsel with respect to these matters, and that he was unaware of whether anything was withheld from the PTO.  (D.I. 374 at 3, 15-18; D.I. 478 at 7-8; D.I. 375 Ex. 9 at 227-28)  McKesson further explains that the Applicants "withheld" the identified materials because the Applicants believed they were not prior art and, therefore, were not material to the PTO.  (D.I. 374 at 19-21)

"Intent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent."  *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,* 439 F.3d 1335, 1340 (Fed. Cir. 2006) (internal quotation marks omitted).  Furthermore:

> because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence.  But such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement. . . .  Further, the inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard.

*Star Scientific,* 537 F.3d at 1366 (internal citations omitted; emphasis added).  Here, the record simply does not contain sufficient evidence to establish that deceptive intent is "the single most reasonable inference able to be drawn from the evidence."  Therefore, I recommend that

McKesson's Inequitable Conduct Motion be granted.

### 4.    Swisslog's Invalidity Motion and McKesson's Validity Motion

Swisslog contends that the '110 and '267 patents are invalid as a matter of law, for reasons including obviousness, lack of adequate written description, and indefiniteness. McKesson opposes Swisslog's Invalidity Motion and, further, seeks partial summary judgment of validity with respect to the claim terms Swisslog contends are invalid due to their written description or indefiniteness. Having reviewed the parties' extensive submissions regarding validity, I find that there are genuine issues of material fact relating to obviousness and, therefore, recommend denying Swisslog's Invalidity Motion. However, as to the issues of written description and definiteness, I recommend that the Court grant McKesson's Validity Motion.

### a.    Legal Standards Concerning Invalidity

When a party challenges a patent's validity, the Court's analysis begins with the statutory presumption of validity. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid."). Consequently, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* Because patents are presumed to be valid, an alleged infringer seeking to invalidate a patent must establish invalidity by facts supported by clear and convincing evidence. *See Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006). Accordingly, in order to obtain summary judgment of invalidity, the record must reveal: (i) the absence of any genuine issue of material fact; (ii) sufficient evidence from which a reasonable jury could find clear and convincing evidence of invalidity, taking all facts and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff; and (iii) that the accused infringer is entitled to judgment as a matter of law. *See generally Celotex Corp. v. Catrett*, 477 U.S. 317,

325 (1986) (stating party is entitled to summary judgment if it shows that nonmoving party has

failed "to make a sufficient showing on an essential element of her case with respect to which she

has the burden of proof").

Swisslog posits several bases for invalidating some or all of the claims in the '110 and

'267 patents. Many of Swisslog's contentions may be addressed together.

### i.      Obviousness in light of prior art

Swisslog first asserts that all of the claims of the '110 and '267 patents are invalid under

35 U.S.C. § 103 because these claims are obvious in view of the prior art. Swisslog argues:

> Because all of the requisite components required for automation were known in the
> art, one skilled in the art would have successfully arrived at the "invention" of the
> asserted claims of the '110 and '267 patents by implementing the teachings in U.S.
> Patent No. 3,490,616 to Castaldi ("the '616 Reference"), U.S. Patent No.
> 5,025,140 to Varley ("the '140 Reference") and/or U.S. Patent No. 4,678,390 to
> Bonneton et al. ("the '390 Reference"). . . . In particular, the '616 Reference
> specifically teaches that the system therein can be adapted for use with packaged
> drugs.

(D.I. 409 at 2)

McKesson responds that Swisslog cannot establish even a *prima facie* case of obviousness

because the references cited by Swisslog fail to disclose key elements of the claims of the patents-

in-suit. McKesson contends that the prior art, instead, discloses inventions that function very

differently than the claimed inventions, making it extremely unlikely that one of ordinary skill in

the art would have combined the disclosed references in the manner described in the patents-in-

suit. (D.I. 452 at 1-2, 11-19) McKesson also argues that Swisslog has failed to compare the

claims of the patents-in-suit with the prior art on an element-by-element basis, as it must do to

sustain its burden. (*Id.* at 1-2, 8)

45

Section 101 of Title 35 of the United States Code provides that: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." Section 103(a) of Title 35 adds, however: "A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."

Determining whether, given the prior art, a patent is invalid due to obviousness presents a question of law, but one whose resolution depends on multiple factual inquiries. As the Supreme Court explained in *KSR Int'l Co. v. Teleflex Inc.*:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

550 U.S. 398, 407 (2007) (internal quotation marks omitted). If a genuine factual dispute exists with respect to any of these issues, summary judgment is not appropriate. *See Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 880-81 (Fed. Cir. 1998).

I have reviewed the three prior art references on which Swisslog relies and find that there are genuine issues of material fact as to whether a person having ordinary skill in the art would find the patents-in-suit to be obvious in light of this prior art.[16] I agree with McKesson that "the

---

[16]Swisslog offers that one having ordinary skill in the art would be an individual having "at least a Bachelor's degree in Engineering with education in control theory and machine design, or equivalent," and 1-2 years of "industry experience involving robotic system design." (D.I. 409

references cited by Defendants fail to disclose key elements of the claims of the patents-in-suit."

(D.I. 452 at 1)[17]  For example, McKesson emphasizes that none of the prior art references on

which Swisslog relies "contain a picking means that can hold, select and place packages, as

required by element 1(b) of the '110 patent and 1(d) of the '267 patent." (D.I. 452 at 12 (citing

D.I. 453 Ex. 8 (Jameson expert report) at ¶¶ 60-65))  Another problem for Swisslog is that "a

patent composed of several elements is not proved obvious merely by demonstrating that each of

its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 401; *see also*

*Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1343 (Fed. Cir. 2000)

("Virtually all [inventions] are combinations of old elements.").  I agree with McKesson that

"substantial questions of material fact exist as to what the prior art discloses and how a person of

ordinary skill would interpret it." (D.I. 452 at 2)

Another reason Swisslog is not entitled to summary judgment is the state of the record

with respect to secondary considerations of nonobviousness.  The Supreme Court has stated that

---

at 14 n.3) McKesson, contends, by contrast that a person having ordinary skill in the art would hold "a Bachelor's degree in Mechanical or Electrical Engineering with computer science know-how and have three to five years of experience in automation." (D.I. 409 at 14-15 n.3)  I do not find a material difference between these positions.  My recommendation to deny the Invalidity Motion does not depend on which of these views the Court adopts.  It should be further noted that neither party argues that the invalidity analysis is impacted in this case by how the Court construes the disputed claim terms. (D.I. 409 at 14 n.2; D.I. 486 at 10)

[17]At least one of the prior art references on which Swisslog relies – the '390 patent, *see* D.I. 452 at 14; D.I. 453 Exs. 5-6 – was considered by the PTO, making it even more difficult for Swisslog to meet its burden. *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (stating "burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application"); *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990) (same).  Another patent that was before the PTO, the '580, references and incorporates the '616 patent, a second prior art reference on which Swisslog relies. (*See* D.I. 452 at 14; D.I. 453 Ex. 11 at col. 1 lines 5-11 and col. 4 lines 56-69.)

"[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of

others, etc., might be utilized to give light to the circumstances surrounding the origin of the

subject matter sought to be patented. As indicia of obviousness or nonobviousness, these

inquiries may have relevancy." *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). McKesson

has produced evidence of such secondary considerations from which a reasonable juror could find

that Swisslog's *prima facie* case of obviousness is rebutted. McKesson has shown that its

products practicing the patents have enjoyed significant commercial success. Twenty-seven

systems were sold and installed in hospitals in the first two years after AHI introduced the system;

the current version, Robot-Rx, is installed in more than 300 hospitals. (D.I. 452 at 20; D.I. 453

Ex. 18 at M0170893; D.I. 453 Ex. 21 at 63; D.I. 456 at ¶¶ 21-22.) This success may have been

surprising to one having ordinary skill in the art at the time of the invention, since McKesson's

predecessor, AHI, had encountered initial skepticism that its invention would work. (D.I. 452 at

21; D.I. 453 Ex. 12 at M0188753) Also, at least seven other companies have attempted to enter

the market of automated pharmacy systems but have proven unsuccessful. (D.I. 452 at 21; D.I.

456 at ¶ 23)

Swisslog has not rebutted this evidence of nonobviousness, nor has it produced an expert

opinion analyzing McKesson's evidence of nonobviousness. I recognize, as Swisslog

emphasizes, that McKesson, and not Swisslog, "bears the burden of proving secondary

considerations to *rebut* obviousness." (D.I. 486 at 1) This does not detract from the fact that

secondary considerations are relevant to the obviousness analysis, including on summary

judgment. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000). Just as a patentee

may at trial rely on secondary considerations to rebut obviousness, so may a patentee do so in

order to defeat a motion for summary judgment and get to trial.[18] Swisslog has not addressed

McKesson's evidence of secondary considerations of non-obviousness in a manner that even

comes close to showing there are no genuine disputes of material fact with respect to this aspect

of the invalidity analysis.[19]

Hence, I recommend that the Court deny Swisslog's request for summary judgment of

invalidity due to obviousness over the three prior art references.

### ii.    Obviousness due to automating a manual activity

Swisslog next contends that the '110 and '267 patents are invalid as obvious based on the

"Background of the Invention," which describes the manual process prior art which the inventions

automate. According to Swisslog, "[t]he asserted claims of the patents-in-suit are invalid under

35 U.S.C. § 103 because they are the mere substitution of known components with known

operable properties yielding predictable results." (D.I. 409 at 1) In a similar argument, Swisslog

contends that the patents are invalid under § 101 because they do not disclose an "invention"

within the meaning of the statute, given that they merely automate a manual process. Swisslog

asserts: "The claimed inventions of the patents-in-suit are not patentable subject matter under 35

U.S.C. §101 because providing a mechanical or automatic means to replace manual activity which

---

[18]In each of the cases Swisslog cites in which courts determined a patent to be invalid due
to obviousness, the court evaluated secondary considerations of nonobviousness before reaching
its conclusion. *See, e.g., Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed.
Cir. 2007); *see also* D.I. 452 at 22-23 (McKesson distinguishing Swisslog's cases).

[19]Actually, to the contrary, Swisslog's assertions that McKesson's secondary
considerations evidence is insufficient because it "fails to link these alleged considerations to
features of the claimed invention," and that McKesson's commercial success "was not the result
of the patents, but rather of AHI's and McKesson's monopoly in the pharmacy automation
market" (D.I. 486 at 4, 6), illustrate the types of factual disputes that preclude summary judgment
here.

accomplished the same result is not an 'invention' afforded protection under the patent statute."
(*Id*. at 1-2)  Yet another way Swisslog states essentially the same position is: "The asserted claims
of the patents-in-suit are invalid under 35 U.S.C. §103 because it would have been 'obvious to
try' to automate a manual process such as a hospital pharmacy. . . ." (*Id*. at 1)  In any formulation,
Swisslog's contention is essentially that "[t]he inventors of the patents-in-suit simply did not
discover anything new in the combination of components that they assembled to arrive at the
claimed 'invention.'" (*Id.* at 3)  I do not agree that Swisslog is entitled to judgment as a matter of
law on any of these grounds.

Swisslog cites *KSR* in support of its proposition that "[p]roviding an automatic or
mechanical means to replace a manual activity that accomplishes the same result is also obvious
and not sufficient to distinguish over the prior art." (D.I. 409 at 4 (citing *KSR*, 550 U.S. at 398))
Swisslog finds additional support in *Leapfrog*, 485 F.3d at 1157, and *In re Venner*, 262 F.2d 91
(CCPA 1958).  McKesson responds that Swisslog is relying on far too narrow a view of what
constitutes an "invention" under § 101. (D.I. 452 at 6-7)  McKesson distinguishes *Leapfrog* and
*Venner* as "stand[ing] for the principle that where mechanical means do nothing more than replace
exactly the same steps, in exactly the same manner as a human would perform the operation, then
a claim is obvious." (*Id.* at 25-26 (citing *Ex parte Wollenhaupt*, 2008 WL 685165, at *3 (Bd. Pat.
App. & Interf. Mar. 13, 2008); *Ex parte Brouillet*, 2008 WL 1339914, at *2 (Bd. Pat. App. &
Interf. Apr. 12, 2001); *Decca Ltd. v. U.S.*, 160 U.S.P.Q. 739, 750 (Cl. Ct. 1969)))  Having
reviewed the relevant authorities, I agree with McKesson that the "patents-in-suit are not the
'automation of a known manual process' because each individual step of the invention described
by the patents-in-suit was neither performed manually nor known in the prior art prior to the

disclosure of the invention." (D.I. 452 at 3)

Swisslog finds support for its position that the McKesson patents do not contain an "invention" in the patents' specifications as well as the supposed "admissions" of McKesson's expert and one of the Applicants. (D.I. 409 at 17)  Swisslog is correct that the specification recites that among the reasons to automate hospital pharmacies was to "improve[] accuracy . . . recognize significant labor savings . . . and track inventory and expired medications." '110 patent, col. 2 lines 63-67.  Also, McKesson's expert, Dr. Jameson, described the benefits of automating the dispensing of medications in hospitals. (D.I. 409 at 20-21 (citing D.I. 410 Ex. K at 110-12)) One of the Applicants, McDonald, explained that when he conceived of the invention that became the patents-in-suit he knew that the hospital pharmacy market "was ripe for automation . . . it became obvious that there was a need for this type of technology and a receptiveness to this type of technology, so that concept of the product came from discussions with people in the market." (D.I. 409 at 22-23 (citing D.I. 410 Ex. L at 27-28))  This evidence, however, does not support the conclusion Swisslog seeks to draw from it.  That automating the delivery of medications in a hospital pharmacy yielded the benefits of efficiency and accuracy that are always among the goals of automation does not mean that figuring out how to accomplish such automation is not an "invention" within the meaning of § 101 or § 103.

Therefore, again, I recommend that the Court deny Swisslog's Invalidity Motion with respect to the various manifestations of Swisslog's obviousness arguments.

### iii.   Flaws in written description

#### (a)   Lack of written description

A patent may be invalid under 35 U.S.C. § 112, ¶1 if it fails to meet the requirement that

"the specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." To satisfy the written description requirement, the patent must convey to one of ordinary skill in the art that, as of the date of filing, the patentee was in possession of the invention claimed. *See Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). The defense of lack of written description must be proven by clear and convincing evidence. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072-73 (Fed. Cir. 2005).

By its Invalidity Motion, Swisslog seeks summary judgment that claim 9 of the '267 patent is invalid because it "lacks a written description of the claimed 'support head.'" (D.I. 409 at 4-5) "The specification of the '110 and '267 patents does not mention a 'support head' or where in the described invention such a 'support head' is located. This phrase is entirely absent from the specification," nor is it described in the prosecution history. (D.I. 409 at 29; *see also* D.I. 486 at 17.)

In response, McKesson observes that Swisslog's expert, Dr. McCarthy, did not opine that one of ordinary skill in the art could not understand the term "support head." (D.I. 452 at 28) By contrast, McKesson's expert, Dr. Jameson, explained in detail how one of ordinary skill in the art would understand the term. (D.I. 453 Ex. 8 at ¶¶ 130-31; D.I. 456 at ¶ 26)

Furthermore, in filing its own Validity Motion, McKesson moves for partial summary judgment of validity with respect to all of the terms Swisslog has asserted are invalid for lack of a written description (as well as those Swisslog has asserted are invalid for indefiniteness). In

addition to claim 9 of the '267 patent and its term "support head," Swisslog – in its May 30, 2008

final preliminary invalidity contentions – contended that the terms "package reader associated

with the picking means" and "plurality of packages in a face to face relationship" in claim 1 of the

'110 patent render each of the '110 patent's claims invalid based on lack of written description

under 35 U.S.C. § 112, ¶1.  (D.I. 405 at 2; D.I. 406 Ex. E)  In seeking summary judgment that the

written description is adequate for each of these claim terms, McKesson points out there is no

opinion from Swisslog's expert, Dr. McCarthy, that one of ordinary skill in the art would be

unable to understand the terms "package reader associated with the picking means" or a "plurality

of packages in a face to face relationship."  (D.I. 405 at 5-6; D.I. 406 Ex. F)  Moreover, Dr.

McCarthy "was able to conduct analysis on the precise terms that Defendants claim lack written

description or are indefinite, and was able to interpret them for the purposes of stating that the

patents-in-suit were either not infringed or invalid."  (D.I. 452 at 3)

     As McKesson observes: "While lack of written description is a factual issue for the jury,

there must be some evidence on which the jury can base its decision."  (D.I. 405 at 6)  Here, the

record does not contain evidence from which a reasonable finder of fact could find, by the

requisite clear and convincing standard, that one having ordinary skill in the art would conclude

the patentee was not in possession of the invention claimed in claim 9 of the '267 patent or claim

1 of the '110 patent.  Accordingly, I recommend that with respect to Swisslog's lack of written

description defense, Swisslog's Invalidity Motion be denied and McKesson's Validity Motion be

granted.  *See Celotex*, 477 U.S. at 325 (stating party is entitled to summary judgment if it shows

that nonmoving party has failed "to make a sufficient showing on an essential element of her case

with respect to which she has the burden of proof"); *Lucent Techs. Inc. v. Gateway, Inc.*, 2007

WL 1449804, at *3 (S.D. Cal. May 15, 2007) (granting summary judgment of no invalidity due to written description where defense assertion without expert testimony did not meet burden of clear and convincing evidence).

### (b)   Indefiniteness

Pursuant to 35 U.S.C. § 112, ¶2, a patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  In order for a claim term to be found indefinite, the accused infringer must show by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification and prosecution history, would be unable to understand the bounds of the claim - i.e., the claim must be "insolubly ambiguous" after all reasonable attempts at construction. *See Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  A claim is not indefinite if it is amenable to construction, even if "the task may be formidable and the conclusion may be one over which reasonable persons will disagree . . . ." *Aero Prods., Int'l, Inc., v. Intex Recreation Corp.*, 466 F.3d 1000, 1016 (Fed. Cir. 2006) (internal quotation marks omitted).  "A claim is not indefinite merely because its scope is not ascertainable from the face of the claims." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003). If one having ordinary skill in the art is able to understand the claim after reading the claims and specification, the claim is valid.  *See Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).

Concerning indefiniteness, by its Invalidity Motion Swisslog has moved for summary

judgment of invalidity with respect to four claim terms.[20]  McKesson, through its Validity Motion,

has moved for summary judgment on all ten claim terms with respect to which Swisslog has

asserted an indefiniteness defense,[21] including the four claim terms involved in Swisslog's

Invalidity Motion.

McKesson's technical expert on infringement, Dr. Wayne Book, analyzed each of the ten

disputed terms and, as one having ordinary skill in the art, concluded that he could understand

each of the terms.  (D.I. 453 Ex. 25; D.I. 406 Ex. I)  Dr. Book was then able to explain how, in his

opinion, the Swisslog PillPick System infringes each of the claims containing each of these terms.

(D.I. 453 Ex. 25; D.I. 406 Ex. I)

---

[20]Swisslog argues that claim 16 of the '110 patent is invalid because "the term 'the labels'
is vague and unclear;" claim 3 of the '267 patent is invalid "because it is unclear how there can
be 'at least one column supporting the column,' while at same time allowing the column to move
along the row;" claim 8 of the '267 patent is invalid "because the term 'suction head' lacks
antecedent basis;" and claim 9 of the '267 patent is indefinite "based on its dependence from
claim 8 and also because the term 'the tooling' lacks antecedent basis."  (D.I. 409 at 5, 29-31)

[21]In its Validity Motion, McKesson identifies the terms in dispute as follows:

Defendants alleged that the terms "means for moving the automated picking
means to selected storage locations," "program for directing the picking means to
chosen storage area locations," and "package reader associated with the picking
means" in claim 1 of the '110 patent; "the labels" in claim 16 of the '110 patent;
"a given medicine package in the supply structure can be picked by the picking
means to restock an associated rod in the holding means" in claim 1 of the '267
patent; "or restock a given medicine package on a corresponding support rod" in
claim 3 of the '267 patent; "holding means comprised of a frame having a
plurality of support rods for holding packages each support rod having a distinct
X,Y coordinate location and holding a plurality of packages, all of those packages
on each support rod having similar contents" and "packages" in claim 7 of the
'267 patent; "suction head" in claim 8 of the '267 patent; and "tooling" in claim 9
of the '267 patent rendered the claims of the '110 and '267 patents indefinite
under 35 U.S.C. § 112, ¶2.

(D.I. 405 at 2)

Swisslog's expert, Dr. McCarthy, offered no opinion on indefiniteness as to any of these ten terms. (D.I. 405 at 7)  Swisslog's position is that "[t]he evidence required to determine whether patent claims are invalid under 35 U.S.C. § 112 can be ascertained from the intrinsic record of the patents themselves," which here establish genuine issues of material fact with respect to each of the terms at issue in McKesson's motion. (D.I. 455 at 1)

Here, the record with respect to indefiniteness consists not just of the patents themselves, but also McKesson's expert's opinion that one having ordinary skill in the art would understand the claim terms at issue, and the analyses of Swisslog's experts regarding infringement and invalidity – analyses that implicitly required these experts, as individuals having ordinary skill in the art, to formulate an understanding of the claims containing the terms Swisslog challenges as indefinite. No reasonable factfinder could conclude, based on this record, that Swisslog has adduced clear and convincing evidence of invalidity based on indefiniteness. Therefore, summary judgment for McKesson is appropriate and I recommend that it be granted.[22]

### 5.    Swisslog's Willfulness Motion

With its Willfulness Motion, Swisslog seeks summary judgment on McKesson's claim that Swisslog willfully infringed the '110 and '267 patents. In the alternative, Swisslog asks that the Court bifurcate the issues of infringement and willful infringement and defer consideration of willfulness until after infringement is found, if it is. In either case, Swisslog asks that it be

---

[22]Swisslog attempts to distinguish McKesson's indefiniteness cases by pointing out that in each of those cases the court was asked to construe the indefinite claim terms, while here "this Court has not been asked to construe the indefinite terms." (D.I. 486 at 18)  I fail to see the pertinence of this observation. The legal test for indefiniteness is whether one having ordinary skill in the art is able to understand the claim; if one of ordinary skill is not so able, because the claim is "insolubly ambiguous," then the claim is invalid. The issue, then, is whether the Court could construe the claim, not whether the Court has actually been asked to do so.

permitted to withdraw its election to rely on advice of counsel as a defense to willful infringement and that McKesson be precluded from using the attorney opinions Swisslog produced in discovery.

Paragraph 2(a) of Judge Robinson's standard "Scheduling Order for Patent Cases" provides: "The issues of willfulness and damages shall be bifurcated for purposes of discovery and trial, unless good cause is shown otherwise." *Available at* www.ded.uscourts.gov/SLRmain.htm; *see also Dutch Brand of Streamserve Development AB v. Exstream Software, LLC*, 2009 WL 2705932, at *1 (D. Del. Aug. 26, 2009) ("I have determined that bifurcation [of damages and willfulness] is appropriate, if not necessary, in all but exceptional patent cases."). This case will be tried before Judge Robinson. I find nothing exceptional to cause this case to be treated differently than other patent cases Judge Robinson has bifurcated. Therefore, I recommend that Swisslog's Willfulness Motion be denied without prejudice to renew after liability is determined.

It follows from this recommendation that the question of whether Swisslog may withdraw its election to assert reliance on advice-of-counsel as a defense to willful infringement may be deferred until the merits of the willful infringement claim are addressed later in the case. That leaves the issue of whether McKesson may make any use at the infringement trial of the legal opinions on which Swisslog relied as part of its "advice-of-counsel" defense. Swisslog's request to preclude McKesson's use of these opinions is essentially a motion *in limine*. Evidentiary issues such as this may be raised in connection with the proposed pretrial order and the pretrial conference.

### 6.    McKesson's Equitable Motion

McKesson moves for summary judgment on a series of equitable defenses Swisslog has

asserted against patent infringement.  These defenses are patent misuse, unclean hands, laches,

estoppel, and waiver.  My recommendations as to each of the components of McKesson's

Equitable Motion are given below.

### a.    Patent misuse

McKesson moves for summary judgment that its infringement claims are not barred by

patent misuse.  *See C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1372 (Fed. Cir. 1998)

(explaining that patent misuse "renders the patent unenforceable until the misuse is purged").

Swisslog has asserted that McKesson cannot enforce the '110 and '267 patents because

McKesson has "engaged in an illegal sales and marketing campaign to extend its patent

monopoly, including blatant predatory pricing."  (D.I. 432 at 7-8)

The "key inquiry" in assessing a patent misuse defense is "whether, by imposing

conditions that derive their force from the patent, the patentee has impermissibly broadened the

scope of the patent grant with anticompetitive effect."  *C.R. Bard,* 157 F.3d at 1372.  Plainly, then,

the issue of patent misuse is closely related to allegations of antitrust violations.  *See Ethyl Corp.*

*v. Hercules Powder Co.*, 232 F. Supp. 453, 458 (D. Del. 1963) ("There is a legal distinction

between misuse and antitrust violation, but the misuse decisions are deeply suffused with the

antitrust philosophy . . . .") (internal quotation marks and citation omitted).

Here, Swisslog has filed counterclaims asserting that McKesson has committed antitrust

violations.  (D.I. 48, 49)  These antitrust counterclaims have been bifurcated from the issue of

patent infringement.  (D.I. 369)  Given the heavy overlap between the factual and legal issues

implicated by Swisslog's patent misuse defense and Swisslog's antitrust claims, the consideration

of the merits of the patent misuse defense should be bifurcated and deferred until the antitrust

claims are taken up.  Accordingly, I recommend that McKesson's Equitable Motion with respect

to the patent misuse defense be denied without prejudice to renew at the time issues of

anticompetitive conduct are addressed.

### b.      Unclean hands

McKesson seeks summary judgment with respect to Swisslog's defense that the patents-

in-suit are unenforceable due to the patentees' unclean hands.  *See Precision Instrument Mfg. Co.*

*v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come

with clean hands.").  As Swisslog notes, the facts supporting its unclean hands defense are the

same as those supporting its claim that the patentees' inequitable conduct renders the patents-in-

suit invalid.  (D.I. 432 at 1 ("[T]here is substantial evidence of material prior art business plans,

demonstrations, and offers for sale of the inventions of the patents in suit that were not disclosed

to the PTO.  That evidence of inequitable conduct is the basis of defendants' unclean hands

defense.")) For the same reasons I recommended that McKesson's Inequitable Conduct Motion

be granted, I further recommend that McKesson's Equitable Motion be granted with respect to

Swisslog's unclean hands defense.

### c.      Laches

Both parties have moved for summary judgment with respect to Swisslog's equitable

defense of laches.  (D.I. 376; D.I. 381)[23]  I find that there are no genuine issues of material fact

---

[23]Swisslog asserted laches as a defense with respect to the entirety of McKesson's suit
(i.e., infringement and damages).  (D.I. 48, 49)  While Swisslog seeks summary judgment
regarding laches only as it relates to damages, McKesson moves for summary judgment with

and that McKesson is entitled to judgment as a matter of law with respect to laches. Therefore, I

recommend that McKesson's Equitable Motion be granted and Swisslog's Equitable Motion be

denied to the extent these motions relate to laches.

Laches is "neglect or delay in bringing suit to remedy an alleged wrong, which taken

together with lapse of time and other circumstances, causes prejudice to the adverse party and

operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020,

1028-29 (Fed. Cir. 1992) (en banc). To establish the defense of laches, a defendant must prove,

by a preponderance of the evidence, that: (1) the plaintiff delayed in filing suit for an unreasonable

and inexcusable length of time after the plaintiff knew or reasonably should have known of its

claim against the defendant; and (2) the defendant suffered material prejudice or injury as a result

of the plaintiff's delay. *See id.* at 1028; *see also Intuitive Surgical, Inc. v. Computer Motion, Inc.*,

2002 WL 31833867, at *5 n.4 (D. Del. Dec. 10, 2002). Even where both undue delay and

prejudice are demonstrated, "application of the defense of laches is committed to the sound

discretion of the district court," requiring a court to consider all factors that are equitable to

consider in the totality of circumstances before granting relief on the basis of laches. *A.C.

Aukerman*, 960 F.2d at 1032.

With regard to the first requirement, unreasonable delay, "[t]he length of time which may

be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." *Id.*

In the context of patent infringement, the period does not begin until the patent issues. "The

patentee need not know unequivocally that a device actually infringes before the laches clock

---

respect to all aspects of the laches defense. My recommendation to grant McKesson the relief it
seeks with respect to laches necessarily leads me also to recommend denial of Swisslog's motion
with respect to laches.

begins to run. . . . Rather, he is charged with making the inquiry that a diligent and reasonably

prudent patentee would make to determine whether another device infringes his patent." *Odetics,*

*Inc. v. Storage Tech. Corp.,* 919 F. Supp. 911, 917 (E.D. Va. 1996), *vacated on other grounds by*

116 F.3d 1497 (Fed. Cir. 1997); *see also Wanlass v. General Elec. Co.,* 148 F.3d 1334, 1338 (Fed.

Cir. 1998) (stating patentees have "duty to police their rights"). The commercial release of the

allegedly infringing product, coupled with the patentee's examination of that product, has been

held to trigger the patentee's duty of inquiry. *See Odetics*, 919 F. Supp. at 917. On the other

hand, the court must consider and weigh any excuses offered by the plaintiff for its delay,

including, but not limited to: (1) other litigation; (2) negotiations with the accused infringer;

(3) possible poverty or illness under limited circumstances; (4) wartime conditions; (5) the extent

of the alleged infringement; and (6) disputes over the ownership of the asserted patent. *See*

*Auckerman*, 960 F.2d at 1033.[24]

Turning to the record here, it is essentially undisputed that the earliest date on which

McKesson knew or should have known of the existence of Swisslog's PillPick System is May

2002.[25] At the hearing, Swisslog's counsel described the evidence of McKesson's knowledge of

---

[24]A presumption of unreasonable delay arises if a patentee delayed filing suit for six years after it had actual or constructive knowledge of the defendant's acts of alleged infringement. *See A.C. Aukerman*, 960 F.2d at 1037. Swisslog is not entitled to a presumption of laches. There is no evidence that McKesson was aware or should have been aware of Swisslog's PillPicker until May 2002 at the earliest. (D.I. 382 at 14; D.I. 387 Ex. 56; D.I. 441 Exs. 29, 30, 32 & 33) McKesson filed suit against Swisslog less than six years later, in January 2006.

[25]McKesson seeks to hold Swisslog to its interrogatory responses, which took the position that McKesson only first "became aware of the features of the PillPick System in [October] 2002, when representatives of McKesson, Swisslog Italia and Translogic met in Pittsburgh in 2002 and discussed the PillPick System." (D.I. 441 Exs. 29 & 30) McKesson asserts that it would violate Fed. R. Civ. Proc. 37(c) to permit Swisslog to deviate from its repeated interrogatory responses identifying October 2002 as the date of McKesson's first knowledge of the accused device and

61

the accused device as follows:

> [T]he parties were not strangers to each other. They met in the
> spring of 2002 at trade shows. There was mutual interest in trying
> to do some sort of a venture together, to see if McKesson was
> interested in selling the PillPick, and they actually exchanged
> information. In fact, [Swisslog's] Mr. Devolio has testified that he
> gave a video of the PillPick in operation and technical documents to
> McKesson, and McKesson has admitted that they received those.
> The parties finally met in October of 2002. They discussed going
> forward. The meeting was at McKesson's headquarters in
> Pittsburgh, and as a result of that, there was no deal going forward.
> But the point is that the parties had met each other, Swisslog had
> presented the technical details of its invention to McKesson, and not
> a word about infringement, not a word about the patents.[26] What
> happen[s] next? In 2003, having no other sales channel, Swisslog
> decides to sell on its own. They go forward. They sell openly.
> They are at trade shows, 2003, 2004, 2005. Not a word from
> McKesson about infringement. The first time McKesson . . . says
> anything to Swisslog about potential infringement issues was in
> December of 2005. Three weeks after the initial letter accusing -- it

---

allow Swisslog now to assert that McKesson had actual or constructive knowledge five months
earlier, by May 2002. (D.I. 440 at 15) I need not resolve this dispute because I find that, even if
McKesson's "delay" in filing suit is measured from May 2002, there was no unreasonable delay
and, hence, McKesson's suit is not barred by laches.

[26]Swisslog has elsewhere described this meeting as having taken place:

> on October 2, 2002 at 700 Waterfront Drive in Pittsburgh. Charlie
> Kegley, Maurizio Davolio, Jim Patrician and Philippe Op de Beeck
> attended on behalf of Defendants, and Richard Lunak and another
> individual believed to be Plaintiff's head of engineering attended
> on behalf of Plaintiff. The purpose of the meeting was to explore
> whether McKesson would partner with Defendants to sell the
> PillPick System in North America. At the meeting, Defendants
> presented a PowerPoint presentation which gave detailed
> information regarding the PillPick System. Although no copies of
> that presentation are believed to exist, a copy of a virtually
> identical PowerPoint presentation made to AmerisourceBergen will
> be produced to Plaintiff by Swisslog Italia.

(D.I. 441 Exs. 32 & 33)

was not specified which product, but accusing Swisslog of potential infringement, the suit, the instant suit, was commenced.

(Tr. at 216-17)[27]

Taking this evidence in the light most favorable to Swisslog as the non-movant, and drawing all reasonable inferences in Swisslog's favor, I conclude that McKesson did not act with unreasonable delay in waiting until January 2006 to file the instant patent infringement lawsuit. As an initial matter, Swisslog cannot prove with any precision what it told McKesson about its product in 2002. There is no evidence as to what information McKesson's representatives may

---

[27]McKesson's account of these earliest contacts is not materially different:

> The first contact between the parties was at a trade show in Paris, France in or around May 2002. Michael Morneault and Philip Spano attended the trade show for McKesson to understand the European healthcare market, a market in which McKesson does not compete. . . . Morneault and Spano visited numerous booths at the show, including Defendants. . . . [I]n June of 2002, persons from Defendants and McKesson crossed paths at a trade show in Baltimore, Maryland. . . . [Ultimately], the parties agreed to meet at McKesson's facility in Pittsburgh, Pennsylvania in September of 2002. . . . The record does not reflect the details of the meeting [but] indicates that Defendants provided general information about their PillPick System, but no attendees recall what was disclosed about the PillPick System or the level of specificity. The parties also discussed potential business opportunities. No attendees have any recollection of the specific details of such discussion. The record indicates that some at McKesson believed that Defendant had an interesting packaging solution – the PillPicker . . . . It further appears that Defendants believed McKesson might be interested in the packager. The record contains no documents from the meeting or notes of this meeting, so it is difficult to ascertain exactly what transpired. In any event, the meeting ended without any commitment from either party. McKesson never contacted Defendants to continue such discussions and Defendants similarly did not contact McKesson.

(D.I. 440 at 4-6 (internal docket references omitted))

have seen at the trade shows in May and June 2002. With respect to the October 2002 meeting

between the parties, Swisslog contends that it gave a "detailed presentation" on the PillPick

system, but no copy of the presentation has been located or produced. (D.I. 377 at 10; D.I. 440 at

16) Swisslog's witnesses – Maurizio Davolio, Swisslog's General Manager, and Charles Kegley,

Translogic's President and CEO – testified, respectively, only that Swisslog "presented some

information relating to the product" and provided "general" information to McKesson "to present

our product, explain it, how it worked, and why we hoped they would be interested." (D.I. 387

Ex. 6 at 431; D.I. 440 at 16; D.I. 387 Ex. 16 at 129-30)

In addition, it is undisputed that Swisslog's PillPick System remained in the design phase

through at least the end of 2002, making it even more difficult (if not impossible) for McKesson

to have been in a position at that time to have evaluated that system for potential infringement

issues. (D.I. 440 at 7, 17; D.I. 441 Ex. 17 at 54-55, 80, 83, 87, 167, 392) The record also contains

a 2002 e-mail communication from Swisslog's Davolio to McKesson's Morneault, stating:

> Today we have not PillPick systems in U.S.A. and I have not intention to have a
> competition against your important company. I really think that we have a lot of
> products that could be very interesting for your company. The packaging machine
> could be connected with your Robot Rx[.] Our robot is very different for price,
> philosophy and performances in comparison with yours so could be important ·
> complements of your systems. [W]e are very interested into a collaboration with
> your company, but before to go on with documents and prices ecc.ecc I want to
> understand your interest and intentions.

(D.I. 387 Ex. 16 at T016124; *see also* D.I. 387 Ex. 6 at 430 (Davolio testifying regarding same);

D.I. 387 Ex. 16; D.I. 440 at 16.) Even assuming there is a factual dispute as to Swisslog's actual

intentions in 2002, there is no genuine dispute as to the reasonableness of McKesson's belief in

that time frame that Swisslog's intentions were not to compete directly with McKesson in the

United States market. (*See, e.g.*, D.I. 387 Ex. 14 at 180-81 (McKesson's Spano testifying that McKesson believed Swisslog's intentions were friendly).)[28]

The sales history of the PillPick System further demonstrates that McKesson did not unreasonably delay litigating. Swisslog sold and placed its first PillPick System in the United States in the summer of 2003. (D.I. 472 at 6; D.I. 440 at 19; D.I. 382 at 20)[29]  There were no additional sales in the remainder of 2003 or all of 2004; the next sales were in September 2005 (two sales) and December 2005 (one sale). (D.I. 440 at 19; D.I. 382 at 20)  Thus, McKesson filed suit just <u>four months</u> after the <u>beginning</u> of the period in which Swisslog completed 75% of its total U.S. sales. This is simply not an unreasonable delay.

In considering the second prong of the laches inquiry, material prejudice, a defendant may attempt to demonstrate evidentiary or economic prejudice. *See Aukerman*, 960 F.2d at 1033. Evidentiary prejudice arises where the plaintiff's delay has curtailed the defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories. *See id.*  Economic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the plaintiff

---

[28]The evidence suggests that McKesson first suspected potential infringement on or about September 1, 2005, a few months prior to commencing this suit. (*See* D.I. 440 at 6, 18; D.I. 441 Ex. 20 at M004672 (letter from Jim Longo, McKesson's Products Marketing Manager, to others at McKesson commenting, "I was thinking about the Swisslog situation and was wondering if we ever thought to step back and consider whether they might be violating our patents on ROBOT-Rx. Could we be overlooking the obvious?"); D.I. 441 Ex. 21 (Longo testifying regarding same).) After investigation, on December 16, 2005, McKesson sent a cease-and-desist letter to Defendants. (D.I. 440 at 6; D.I. 441 Ex. 4 at 260-62, 275-76; D.I. 441 Ex. 21 at 296-98; D.I. 441 Ex. 22 at S076682)  McKesson then filed suit on January 13, 2006. (D.I. 1)

[29]The evidence shows that McKesson first became aware of Swisslog's attempts to sell in the U.S. in June 2003. (D.I. 382 at 15; D.I. 387 Ex. 54; D.I. 440 at 18)

had filed suit earlier. *See id.* Because I find that Swisslog has failed to meet the first prong of the laches defense, it is not necessary to address Swisslog's efforts to show that it has demonstrated economic and evidentiary prejudice.

Accordingly, I recommend that McKesson be granted summary judgment, and Swisslog be denied summary judgment, with respect to Swisslog's laches defense.

### d.    Equitable estoppel

Swisslog seeks to bar the entirety of McKesson's infringement action under the doctrine of equitable estoppel. (D.I. 382 at 18)  In order to establish equitable estoppel, Swisslog must show by a preponderance of the evidence that: (1) McKesson, through misleading words, conduct, or silence, led Swisslog reasonably to infer that McKesson did not intend to enforce its patent rights against Swisslog; (2) Swisslog relied on McKesson's conduct; and (3) due to its reliance, Swisslog will be materially prejudiced if McKesson is allowed to proceed with its claim. *See Auckerman*, 960 F.2d at 1041, 1046.  In support of this defense, Swisslog relies largely on the same evidence on which it relies for its laches defense. (*See, e.g.,* D.I. 472 at 10 n.4 (Defendants noting that "[m]any of the facts and arguments supporting equitable estoppel (particularly prejudice) are the same as those supporting defendants' laches defense").)

Having reviewed the record, I find that Swisslog has failed to produce evidence from which a reasonable factfinder could find, by a preponderance of evidence, that McKesson did (or failed to do) anything to lead Swisslog reasonably to infer that McKesson did not intend to enforce the '110 and '267 patents against Swisslog.  Swisslog's evidence is inadequate with respect to all three elements of equitable estoppel.

First, as to McKesson's conduct, Swisslog's estoppel evidence amounts to nothing more

than a failure by McKesson to warn Swisslog that McKesson might assert that the PillPick System infringed the patents-in-suit. (D.I. 382 at 21 ("Defendants relied on McKesson's inaction and silence as confirmation that the PillPick system did not infringe McKesson's patents and continued to develop, promote and market the PillPick system, committing increased effort and resources to the PillPick system with each successive year.")) For instance, Swisslog complains that "[a]t no time during [the] discussions" between the parties at and around the time of their October 2002 meeting "did McKesson ever assert or suggest that the PillPick system might infringe the patents-in-suit." (D.I. 382 at 20)[30] "Courts have generally held that in order for a patentee's silence to be considered misleading, the patentee must first 'threaten [] prompt and vigorous enforcement of the patent.'" *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 119 (D. Mass. 1993). This is because, for estoppel to apply, the patentee's conduct must "support[ ] an inference that the patentee [does] not intend to press an infringement claim against the alleged infringer." *Auckerman*, 960 F.2d at 1042. Here, there is no record of McKesson threatening to enforce its patent rights and then waiting a lengthy time to do so.

Second, the record lacks evidence from which a reasonable factfinder could conclude that Swisslog relied on McKesson's silence regarding enforcement of its patent rights. "Unlike laches, which requires an examination of whether a patentee's conduct was reasonable or excusable, estoppel focuses on the effect of the patentee's conduct on the alleged infringer, not on the reasons

---

[30]As with the laches prong of unreasonable delay, McKesson seeks to limit Swisslog's showing with respect to the delay element of equitable estoppel to those matters that occurred during and subsequent to the parties' October 2002 meeting, given Swisslog's responses to discovery requests. (D.I. 440 at 26) Again, I need not resolve this dispute, given that Swisslog's showing with respect to equitable estoppel is inadequate even if all events in 2002 are considered.

for the patentee's conduct." *Wafer Shave*, 857 F. Supp. at 119.  Hence, Swisslog "must show that, in fact, it substantially relied on the misleading conduct of [McKesson] in connection with taking some action." *Aukerman*, 960 F.2d at 1042-43.  This Swisslog has failed to do.

The record shows that Swisslog decided to sell the PillPick System in the U.S. *prior* to meeting with McKesson in October 2002.  (*See* D.I. 441 Ex. 16 at 131, 475-76 & Ex. 17 at 134-35.)  Swisslog's documents show that market potential – not anything McKesson did or failed to do – was the reason Swisslog entered the U.S. market.  (*See* D.I. 441 Ex. 24 & Ex. 25 at T016704.)  Moreover, it is undisputed that Swisslog was aware at all material times of the existence of the patents-in-suit.  Indeed, Swisslog obtained legal opinions in February and November 2002 to the effect that the PillPick System would not infringe the '110 or '267 patents. (D.I. 441 Ex. 27 & Ex. 28)  At least one of these opinions factored into Swisslog's decision to enter the U.S. market.  (D.I. 441 Ex. 17 at 83-84)  Swisslog's Davolio and Kegley testified that Swisslog entered the U.S. market firmly believing it did not infringe McKesson's patents.  (*See* D.I. 441 Ex. 17 at 83-84; D.I. 387 Ex. 7 at 275-77.)  From this record, no reasonable juror could find that Swisslog relied on McKesson's silence – as opposed to its own conclusions of non-infringement, or the attractions of competing in the U.S. market, or other business motivations – in deciding to develop and market the PillPick System in the U.S.  *See generally Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1558 (Fed. Cir. 1996) (reversing grant of summary judgment sustaining estoppel defense because defendant "may have acted due to its belief that the patent was invalid rather than due to any belief that [the patentee] would not sue under the patent").

Nor do I find that there is sufficient evidence from which a reasonable juror could conclude that Swisslog would suffer economic or evidentiary prejudice attributable to

McKesson's conduct if this case is permitted to proceed. Swisslog relies on declarations provided by Robert Rasmussen, Chief Financial Officer of Defendant Translogic Corporation and Controller of Swisslog Healthcare Solutions Division. (D.I. 387 Ex. 56 at ¶ 1; D.I. 475 Ex. J) Rasmussen estimates that Translogic expended millions of dollars between 2003 and 2005 in connection with marketing, selling, and servicing the PillPick System in the United States. (D.I. 475 Ex. J at ¶¶ 2, 4) Rasmussen then states: "Had Translogic and/or Swisslog been informed by McKesson in 2002 that McKesson believed the PillPick system infringed its patents, Defendants may never have invested these significant sums in the PillPick system and may have pursued selling a non-infringing alternative product or explored a re-design to avoid potential conflict with McKesson." (D.I. 387 Ex. 56 at ¶ 5) (emphasis added; internal footnote omitted) This is insufficient to show economic prejudice. *See State Contracting & Eng'g Corp. v. Condotte America, Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003) (upholding judgment as matter of law of no laches where accused infringer failed to provide evidence that a lawsuit, if filed earlier, would have caused it to adopt non-infringing alternative or otherwise change course). Nor has Swisslog identified any evidence of which it has been deprived that it would have been able to produce or discover had this case begun in 2002 instead of early 2006. Most of the evidence Swisslog complains of being unavailable – such as evidence relating to the transactions involving the patent rights in 1990 – was already "old" by 2002 and may well have been unavailable at that time as well. *See Meyers v. Asics Corp.*, 974 F.2d 1304, 1307-08 (Fed. Cir. 1992).

For all of these reasons, I recommend that summary judgment be granted to McKesson

and denied to Swisslog with respect to the equitable estoppel defense.[31]

### 7.    **Swisslog's Equitable Motion**

I have already dealt with (and recommended denial of) the portions of Swisslog's

Equitable Motion (D.I. 381) that seek summary judgment limiting the damages McKesson may

recover due to laches and equitable estoppel.  Swisslog further seeks summary judgment limiting

damages to those accruing after January 13, 2006 – the date McKesson filed suit against Swisslog

– due to McKesson's failure to mark its Robot-Rx product and Connect Rx Software as required

by 35 U.S.C. § 287.  Alternatively, Swisslog requests that damages be limited to those accruing

after December 16, 2005, the day McKesson wrote to Swisslog with its accusation that the

PillPick System infringes the '110 and '267 patents.  I recommend that the Court enter summary

judgment limiting McKesson's damages to those accruing after December 16, 2005.[32]

> Section 287(a) provides:
>
> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. *In the event of failure so to mark, no damages shall*

---

[31] As McKesson states: "An affirmative defense of waiver 'require[s] proof of the same or similar elements required by the estoppel defense.'"  (D.I. 377 at 7 (quoting *McKesson Info. Solutions LLC* v. *Trizetto Group, Inc.,* 426 F. Supp. 2d 203, 211 n.10 (D. Del. 2006)))  Accordingly, I recommend that summary judgment be granted to McKesson with respect to Swisslog's waiver defense.

[32] McKesson opposes Swisslog's request to limit damages due to a failure to mark, but there is some ambiguity as to the date from which McKesson believes damages should accrue.  Swisslog believes that "McKesson seeks lost profits damages dating back to Defendants' first sale in 2003."  (D.I. 382 at 1)  However, McKesson states that it only "seeks damages from September 13, 2005, the date of first marking."  (D.I. 440 at 4)

> *be recovered by the patentee in any action for infringement, except on proof that*
> *the infringer was notified of the infringement and continued to infringe thereafter,*
> *in which event damages may be recovered only for infringement occurring after*
> *such notice.  Filing of an action for infringement shall constitute such notice.*

35 U.S.C. § 287(a) (emphasis added).

The Federal Circuit has held that notice of infringement for purposes of satisfying § 287 "must be an affirmative act on the part of the patentee which informs the defendant of infringement." *Lans v. Digital Equip. Corp.,* 252 F.3d 1320, 1327 (Fed. Cir. 2001) (internal quotation marks omitted).  The focus is on "the action of the patentee, not on the knowledge or understanding of the infringer." *Amsted Indus., Inc. v. Buckeye Steel Casting Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994).  Indeed, "[i]t is irrelevant . . . whether the defendant knew of the patent or knew of his own infringement." *Id.*  "[T]he clear meaning of this section is that a patentee cannot recover damages absent marking or notice to the particular defendants by informing them of his patent and of their infringement of it." *Id.* at 186-87 (internal quotation marks and footnote omitted); *see also Mosel Vitelic Corp. v. Micron Tech., Inc.*, 2000 WL 1728351, at *2 (D. Del. Feb. 20, 2000) (limiting plaintiff's damages for failure to comply with § 287(a))

Compliance with the marking statute is a question of fact.  *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).  The issue is amenable to resolution on summary judgment only if no reasonable juror could find that the patentee has (or has not) provided notice to the accused infringer.  *See Sentry Protection Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005).

McKesson admits that its Robot-Rx is an embodiment of the patents-in-suit and that it never marked this product itself or any packaging in which the Robot-Rx is contained with the

numbers of the patents-in-suit. (D.I. 440 at 2-3; D.I. 382 at 1, 3-4, 8, 10; D.I. 387 Ex. 46 at 18,

Ex. 47 at 10 & Ex. 54 at 6-8) Yet McKesson opposes Swisslog's motion on the grounds that

computer software that is used in conjunction with Robot-Rx – software called Connect-Rx –

does prominently display the number of the patents-in-suit every time a user of the Robot-Rx

system logs in using (as she must) an associated computer running the Connect-Rx program. (D.I.

440 at 10-11) McKesson asserts: "In May 2005, McKesson wrote the software code that marked

the Robot-Rx with the patents-in-suit. In September 2005, McKesson retroactively marked two

Robot-Rx systems at different hospitals. On October 20, 2005, McKesson sold the first Robot-Rx

marked with the patents-in-suit." (D.I. 440 at 3; *see also* D.I. 441 Ex. 5.)[33]

Marking the Connect-Rx software is not sufficient to satisfy § 287's marking requirement

for the Robot-Rx hardware. It is undisputed that the Connect-Rx software is not an embodiment

of any claim of the '110 or '267 patents. McKesson's Connect-Rx software is described on its

website as being used with a wide array of products offered by McKesson for use in hospitals.

(D.I. 382 at 4; D.I. 387 Ex. 48) Connect-Rx and Robot-Rx are listed on the McKesson website as

separate products. Nothing about the log-in screen on the Connect-Rx sufficiently notifies the

user that the Robot-Rx machine is protected by a patent. To the contrary, one would reasonably

read the log-in screen, which prominently says "Connect-Rx" and does not mention the "Robot-

---

[33]Swisslog asks the Court not to consider the Declaration of Lori Jashinski (D.I. 441 Ex. 5) that McKesson submitted in connection with its briefing and, instead, to limit the analysis to the evidence McKesson produced during discovery. (D.I. 472 at 1-2) As with McKesson's similar request to limit Swisslog's evidence relating to the unreasonable delay prong of laches, *see supra*, there is no need for me to resolve Swisslog's contention that the new Declaration should be stricken pursuant to Fed. R. Civ. Proc. 37(c)(1). Even taking into consideration the Jashinski Declaration, I agree with Swisslog that McKesson's failure to mark limits McKesson's damages to the period after December 16, 2005.

Rx" by name, as identifying patents that protect the Connect-Rx software, not the Robot-Rx hardware. (*See* D.I. 440 at 10; D.I. 441 Ex. 5 at ¶ 11.)

In short, I agree with Swisslog: "Marking the patent numbers on software associated with a wide variety of products, that do not use the patents, in no way satisfies McKesson's obligation to specifically inform the public that the Robot-Rx system *is* covered by the patents." (D.I. 472 at 5; *see also IMX, Inc. v. LendingTree, LLC*, 2005 WL 3465555, at *2-4 (D. Del. Dec. 14, 2005) (requiring sufficiently clear nexus for marking to be adequate).) The Robot-Rx is a tangible product capable of being marked, but it was not. Thus, pursuant to § 287, McKesson is not entitled to damages based on marking.

It is undisputed that McKesson sent Swisslog a cease-and-desist letter on December 16, 2005. (D.I. 382 at 1-2) This letter provided Swisslog actual knowledge of infringement. Therefore, McKesson is entitled to damages from December 16, 2005 going forward.[34]

## E.   **Evidentiary Motions**

Both parties have filed motions to preclude certain testimony of their opponent's expert(s). Specifically, Swisslog has filed a Motion to Preclude Plaintiff's Experts from Introducing Testimony Regarding Infringement by Equivalents and Materiality of Art ("Swisslog's Motion to Preclude") (D.I. 428). McKesson has filed a Motion to Exclude the Expert Testimony of John Michael McCarthy Relating to Obviousness ("McKesson's Motion to Exclude") (D.I. 435). I will deny both motions.

---

[34]While it appears that Swisslog did not sell any PillPick Systems between December 16, 2005 and January 13, 2006, and the amount of damages recoverable may not be different as between these two dates, McKesson is entitled under the law to damages from the date it provided actual knowledge of infringement, which is December 16, 2005.

## 1.     **Legal Standards**

Motions to exclude evidence are committed to the Court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994). The admissibility of expert testimony is a question of law governed by Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Pursuant to Rule 702, in order to be admissible, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." The Supreme Court has assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597. Thus, expert testimony shall be admitted at trial only if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The Third Circuit has described these requirements as "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

Rule 702 embodies a liberal policy of admissibility. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Nonetheless, the burden is placed on the party offering expert testimony to show that it meets all of the standards for admissibility. *See Daubert,* 509 U.S. at 592 n.10; *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999). Once that burden is met, a Court must consider additional factors before precluding expert testimony:

> (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial

74

of the case or other cases in the court; and (4) bad faith or wilfulness in failing to comply with a court order or discovery obligation.

*Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir. 1997) (internal quotation marks omitted). The exclusion of important evidence is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *In re Paoli,* 35 F.3d at 791-92 (internal quotation marks omitted).

### 2.     Swisslog's Motion to Preclude Testimony Regarding Infringement and Materiality

By its Motion to Preclude, Swisslog seek to preclude McKesson's experts, Wayne J. Book, Ph.D., and John W. Jameson, Ph.D., from providing testimony regarding infringement by equivalents or the materiality of prior art, respectively. (D.I. 428; D.I. 430 Exs. C & E) I will deny Swisslog's Motion to Preclude.

McKesson's technical expert on infringement, Dr. Book, prepared an amended expert report setting forth his opinions as to how Swisslog's PillPick System infringes the asserted claims of the patents-in-suit, either literally or under the doctrine of equivalents. (D.I. 429 at 1; D.I. 430 Ex. C at ¶¶ 11-15) Swisslog asserts that Dr. Book's doctrine of equivalents analysis is inadequate under Federal Rule of Civil Procedure 26(a)[35] and Federal Rule of Evidence 702 in that it provides no equivalency analysis for claims 2-7, 10-11, 13, 15-17, and 21-22 of the '110 patent or claim 8 of the '267 patent. (D.I. 429 at 1-2, 6) With respect to the remaining asserted claims, Swisslog complains that Dr. Book's analysis contains only recitations of the legal test for infringement by equivalents and conclusory statements of infringement. (*Id.* at 2, 4-5)

---

[35]Fed. R. Civ. P. 26(a)(2)(B) requires that a testifying expert submit a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them."

McKesson counters that Dr. Book's analysis follows established legal principles. McKesson states that "for every claim limitation for which Dr. Book concludes that doctrine of equivalents is applicable he describes the function, way and result of the Defendants' accused system for purposes of comparison to the relevant claim limitation." (D.I. 464 at 1; *see also id.* at 2-5.) McKesson insists that Swisslog's complaints "improperly focus[] on the weight of the evidence provided by Dr. Book's analysis rather than the relevant inquiries under Fed. R. Evid. 702, *Daubert* and Fed. R. Civ. P. 26(a)(2)(B), which focus instead on notice, reliability and utility." (*Id.* at 1; *see also id.* at 13-14.)

McKesson's other expert, Dr. Jameson, prepared an amended expert report with respect to prior art, concluding that business plans, prior art demonstrations, and pre-critical date sales – all of which Swisslog relies on in its Inequitable Conduct Motion – were not material to patentability and, thus, did not have to be disclosed to the PTO. (D.I. 430 Ex. E at ¶ 30 & n.4; *id.* at ¶¶ 191-93) Swisslog argues that Dr. Jameson's conclusions on materiality are not legally sound, as they rely solely on Rule 56 of the PTO's Procedures and not on the PTO's broader "Reasonable Examiner" standard. (D.I. 429 at 9-10) To Swisslog, Dr. Jameson's testimony will not assist the trier of fact and should be excluded. Swisslog also challenges the adequacy of Dr. Jameson's expert reports under Rule 26(a)(2)(B). (D.I. 496 at 8-9)

In response, McKesson insists that Dr. Jameson's analysis is proper. Dr. Jameson analyzed materiality pursuant to the PTO's current rule governing a patent applicant's duty of disclosure. According to the Federal Circuit, this rule is "essentially the same" as the old rule that was in place at the time the '110 and '267 patents were being prosecuted. (D.I. 464 at 2, 6-7, 14-15, 17) (citing *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1314-16 (Fed. Cir.

76

2006) and 37 C.F.R. § 1.56) McKesson also observes that exclusion of expert testimony is a severe sanction, one not warranted under the circumstances here, where Swisslog has not demonstrated McKesson acted in bad faith or that Dr. Jameson's testimony would cause Swisslog incurable prejudice. (D.I. 464 at 5, 16-17)

After reviewing the experts' reports and the parties' contentions regarding them, I find that the experience and methodology of Drs. Book and Jameson are sufficient under *Daubert*. McKesson has met its burden of showing qualifications, reliability, and fit with respect to the opinions of both Dr. Book and Dr. Jameson. I further find that Swisslog's contentions largely relate to the weight McKesson's experts' testimony may be given by the factfinder, rather than the admissibility of those experts' testimony. In conducting the required analysis under Rule 702 and *Daubert*, it is not proper to attempt to assess the correctness of the expert's opinion. *See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006); *In re Paoli,* 35 F.3d at 744 ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). Each of the criticisms raised by Swisslog may be adequately explored during cross-examination of the experts at trial. Finally, I agree with McKesson that there has been no showing of bad faith or incurable prejudice. Therefore, I will deny Swisslog's Motion to Preclude.

### 3. McKesson's Motion to Exclude the Expert Testimony Regarding Obviousness

McKesson seeks to exclude portions of the report and testimony of Swisslog's expert, Dr. John Michael McCarthy, relating to obviousness of the asserted claims of the '110 and '267 patents. (D.I. 435; D.I. 437 Ex. 3) I will deny McKesson's Motion to Exclude.

Dr. McCarthy prepared a June 30, 2008 amended report in support of Swisslog's

contention that the patents-in-suit are invalid. (D.I. 436 at 1; D.I. 437 Ex. 3) In his amended report, Dr. McCarthy opined that the '110 and '267 patents are invalid based on obviousness, pursuant to 35 U.S.C. § 103. Dr. McCarthy provided testimony with respect to this opinion during his 2008 deposition. (D.I. 436 at 1)

McKesson seeks to exclude Dr. McCarthy's testimony regarding obviousness on the grounds that he failed to provide a factual basis for his conclusion that persons of ordinary skill in the art would have known to combine and/or would have been motivated to combine the alleged prior art references; in McKesson's view, Dr. McCarthy relies on nothing other than his personal belief that persons skilled in the art would have known to do this. (*Id.* at 2, 5-9) McKesson contends that exclusion is further warranted because Dr. McCarthy did not evaluate the secondary considerations of non-obviousness, rendering his opinions insufficient and incomplete. (*Id.* at 2-3, 9-11)

Swisslog responds that Dr. McCarthy's obviousness analysis fully complies with Fed. R. Evid. 702 and Fed. R. Civ. P. 26. (D.I. 465 at 4) According to Swisslog, Dr. McCarthy's report and testimony establish a motivation to combine based on the prior art references themselves and the claim language, as well as the common knowledge and ordinary creativity of a person of ordinary skill in the art. (*Id.* at 4-5) Furthermore, Dr. McCarthy was under no obligation to analyze secondary considerations of obviousness, as such secondary considerations are a means for a patentee to rebut a *prima facie* showing of obviousness by an accused infringer, not something that the accused infringer must necessarily address. (*Id.* at 11-12)

I find that Dr. McCarthy's experience and methodology are adequate under Rule 702 and *Daubert*. Swisslog has met its burden of showing qualifications, reliability, and fit with respect to

the opinions of Dr. McCarthy. Consequently, Dr. McCarthy is qualified to opine as to

obviousness; his opinion in this regard is not so conclusory as to require exclusion. McKesson's

contentions go to the weight a factfinder will accord to Dr. McCarthy's opinion, not the

admissibility of that opinion. Each of McKesson's criticisms can be sufficiently addressed on

cross-examination, allowing the jury to evaluate the weight to be given to the expert's testimony.

There has been no showing by McKesson of bad faith or incurable prejudice. I see no reason to

impose the "extreme sanction" of excluding the proffered evidence. Thus, I will deny

McKesson's Motion to Exclude.

## **RECOMMENDED DISPOSITION AND ORDER**

For the reasons set forth above:

1.      I recommend that Swisslog's Motion to Dismiss (D.I. 526) be DENIED.

2.      I recommend adoption of the parties' agreed-upon construction of various claim

terms in the '110 and '267 patents, as identified in their Second Revised Joint Claim Construction

Chart (D.I. 359), as follows:

a.      "package holding means" as that term is used in claims 1 and 8 of the '110

patent means: "The disclosed function is the holding of packages. The corresponding structures

are the rods, brackets, shelves and dividers as disclosed at positions 30, 25, 29 and 31 of, e.g.,

FIG. 3-6, and col. 5, lines 10-19 and 25-40."

b.      "means for moving the automated picking means to selected storage

locations" as that term is used in claim 1 of the '110 patent means: "The disclosed function is

moving the automated picking means to the selected storage locations. The corresponding

structure is a vehicle that travels over a track, and is driven by a drive system including a motor,

79

as disclosed at col. 5, line 49 – col. 6, line 2 and Fig. 6."

      c.      "means for moving the picking means over the track" as that term is used in claim 22 of the '110 patent means: "The disclosed function is moving the picking means over the track. The corresponding structure is the drive system including a motor disclosed at col. 5, line 52-55 and FIG. 6."

      d.      "means for moving the column with respect to the row" as that term is used in claim 3 of the '267 patent means: "The disclosed function is the moving of the column with respect to the row. The corresponding structure is the drive system including a motor, as disclosed at col. 5, line 52 – col. 6, line 5 and FIG. 6."

      e.      "means for storing a plurality of medicine packages/means for storing packages" as those terms are used in claims 4 and 7 of the '267 patent mean: "The disclosed function is the storing of a plurality of medicine packages. The corresponding structure is a storage rod as disclosed at col. 8, lines 18-23 and Figs. 7-11."

      f.      "identifying means" as that term is used in claim 4 of the '267 patent means: "The disclosed function is the identification of a package. The corresponding structure is the bar code reader as disclosed at col. 5, line 66 – col. 6, line 18."

      g.      "means for producing a suction" as that term is used in claim 7 of the '267 patent means: "The disclosed function is the production of a suction. The corresponding structure is the vacuum generator as disclosed at col. 7, line 48 – col. 8, line 7 and FIG. 11."

      h.      "means for sensing when a package is properly positioned" as that term is used in claim 7 of the '267 patent means: "The disclosed function is the sensing of a package. The corresponding structure is the vacuum sensor as disclosed at col. 7, line 48 – col. 8, line 18

and FIG. 11."

    3.    I recommend that the Court construe the disputed terms of the '110 patent as follows:

    a.    "x,y coordinate/ x,y coordinate location" as those terms are used in claims 1 and 8 of the '110 patent mean: "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages."

    b.    "storage area location" as used in claim 1 of the '110 patent be construed to mean: "a place in the storage area accessible to the picking means where packages are held."

    c.    "package reader associated with the picking means" as that term is used in claim 1 of the '110 patent means: "a device that provides the identity of a package to the computer directing the picking means."

    d.    "picking means/automated picking means" as those terms are used in claim 1 of the '110 patent mean: the function of the claim is "to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions." The structure corresponding to this function is "picking means 38."

    4.    I recommend that the Court construe the disputed terms of the '267 patent as follows:

    a.    "x, y coordinate location/ x and y coordinate" as those terms are used in claims 1 and 7 of the '267 patent mean: "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages."

    b.    "means for picking medicine packages from the support rods" as that term

81

is used in claim 1 of the '267 patent means: the function of the claim is "picking medicine packages from the support rods in accordance with instructions received from a computer." The structure corresponding to this function is "picking means 38."

c. "means for obtaining a medicine package/obtaining means" as those terms are used in claim 4 of the '267 patent mean: the function of the claim is "obtaining a medicine package." The structure corresponding to this function is "obtaining means 50."

d. "picking means for picking packages from the support rods in accordance with instructions received from a computer" as that term is used in claim 7 of the '267 patent means: "a device having a housing, means for storing packages, means for producing a suction, a suction rod, and a means for sensing."

5. I recommend that McKesson's Motion for Summary Judgment on Lack of Standing Defense (D.I. 379) be GRANTED.

6. I recommend that Swisslog's Non-Infringement Motion (D.I. 383) be DENIED.

7. I recommend that McKesson's Inequitable Conduct Motion (D.I. 373) be GRANTED.

8. I recommend that Swisslog's Invalidity Motion (D.I. 408) be DENIED.

9. I recommend that McKesson's Validity Motion (D.I. 404) be GRANTED.

10. I recommend that Swisslog's Willfulness Motion (D.I. 385) be DENIED without prejudice to renew after the issue of liability has been determined at trial.

11. I recommend that McKesson's Equitable Motion (D.I. 376), as it relates to the defense of patent misuse, be DENIED without prejudice to renew as part of the bifurcated antitrust trial; and, as it relates to the defenses of unclean hands, waiver, laches, and equitable

estoppel be GRANTED.

12.     I recommend that Swisslog's Equitable Motion (D.I. 381) be DENIED as it relates

to the defenses of laches and estoppel, and with respect to failure to mark be GRANTED, with

any damages being limited to those accruing after December 16, 2005.

13.     Swisslog's Motion to Preclude (D.I. 428) is hereby DENIED.

14.     McKesson's Motion to Exclude (D.I. 435) is hereby DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

**of no longer than ten (10) pages within ten (10) days after being served with a copy of this**

**Report and Recommendation**.  Fed. R. Civ. P. 72(b).  The failure of a party to object to legal

conclusions may result in the loss of the right to de novo review in the district court. *See*

*Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed.

Appx. 924, 925 n.1 (3d Cir. 2006).  **A party responding to objections may do so within ten**

**(10) days after being served with a copy of objections; such response shall not exceed ten**

**(10) pages.  No further briefing shall be permitted with respect to objections without leave**

**of the Court.**

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For

Objections Filed Under Fed. R. Civ. P. 72, dated April 7, 2008, a copy of which is available on

the Court's website, www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated:  October 30, 2009
Wilmington, Delaware

The Honorable Leonard P.  Stark
UNITED STATES MAGISTRATE JUDGE