IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MCKESSON AUTOMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-028-SLR |
| | ) | |
| SWISSLOG ITALIA S.P.A. and | ) | |
| TRANSLOGIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

Neal C. Belgam, Esquire of Proctor Heyman LLP, Wilmington, Delaware; Christine S. Azar, Esquire of Blank Rome LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Blair M. Jacobs, Esquire, Charles J. Hawkins, Esquire, Christina A. Ondrick, Esquire, and Christopher L. May, Esquire of McDermott Will & Emery, Washington, D.C.

Julia Heaney, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Alfred R. Fabricant, Esquire, Lawrence C. Drucker, Esquire, Richard LaCava, Esquire, and Bryan N. DeMatteo, Esquire of Dickstein Shapiro LLP, New York, New York.

**MEMORANDUM OPINION**

Dated: May 18, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff McKesson Automation, Inc. ("McKesson") is the owner of U.S. Patent

Nos. 5,468,110 ("the '110 patent") and 5,593,267 ("the '267 patent") (collectively, "the

patents-in-suit").  The patents-in-suit claim automated systems for selecting and

delivering packages to fill orders, such as patient prescriptions.  ('267 patent, col. 3:7-

10; '110 patent, col. 3:7-10)  In its complaint for patent infringement,[1] McKesson asserts

that defendants Swisslog Italia S.p.A. ("Swisslog Italia") and Translogic Corporation

("Translogic") (collectively, "Swisslog") infringe the patents-in-suit through the

manufacture and sale of the PillPick Automated Drug Management System ("the

PillPick System").  (*Id.* at ¶ 13)

The court referred this action to Magistrate Judge Leonard P. Stark for a Report

and Recommendation ("R&R") on claim construction and the parties' motions for

summary judgment, as well as the disposition of certain evidentiary disputes.  (D.I. 238;

D.I. 250)  On October 30, 2009, Judge Stark issued the R&R, recommending that the

court:  (1) deny Swisslog's motion to dismiss for lack of standing (D.I. 526); (2) adopt

the parties' agreed-upon constructions for the undisputed claim terms of the patents-in-

suit; (3) adopt certain constructions for the disputed claim terms of the patents-in-suit;

(4) grant McKesson's motion for summary judgment on Swisslog's lack of standing

defense (D.I. 379); (5) deny Swisslog's motion for summary judgment of

noninfringement (D.I. 383); (6) grant McKesson's motion for summary judgment of no

inequitable conduct (D.I. 373); (7) grant McKesson's motion for summary judgment of

---

[1]McKesson filed this action on January 13, 2006.  (D.I. 1)

validity under 35 U.S.C. § 112 (D.I. 404); (8) deny Swisslog's motion for summary judgment of invalidity (D.I. 408); (9) deny, without prejudice to renew, Swisslog's motion for summary judgment of no willfulness (D.I. 385); (10) deny, without prejudice to renew, McKesson's motion for summary judgment of no patent misuse (D.I. 376); (11) grant McKesson's motion for summary judgment of no unclean hands, waiver, laches and equitable estoppel (*id.*); (12) deny Swisslog's motion for summary judgment of laches and estoppel (D.I. 381); and (13) grant in part Swisslog's motion for summary judgment of failure to mark (*id.*).  (D.I. 551 at 79-83)  Judge Stark further denied the parties' respective motions to exclude certain expert testimony (D.I. 428; D.I. 435).  (D.I. 551 at 83)

The parties have filed multiple objections, and responses thereto, in connection with the R&R.  (D.I. 553; D.I. 554; D.I. 559; D.I. 561)  Swisslog also seeks reconsideration of Judge Stark's decision not to exclude the expert testimony of Dr. Wayne J. Book ("Dr. Book").  The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a).  For the reasons that follow, the court will adopt in part and overrule in part the recommendations made by Judge Stark and deny Swisslog's motion for reconsideration.

## II. BACKGROUND

### A. The Parties

McKesson is a Pennsylvania corporation with its principal place of business in Cranberry Township, Pennsylvania.  (D.I. 1 at ¶ 1)  McKesson designs, manufactures, markets and sells, inter alia, automated inpatient medication and supply management

2

systems. (Id.)

Swisslog Italia is an entity formed under the laws of the nation of Italy, having its principal place of business in Maranello, Italy. (D.I. 47 at ¶ 2) Translogic, a Swisslog Italia subsidiary, is a Delaware corporation with its principal place of business in Denver, Colorado. (D.I. 48 at ¶ 32) Swisslog engages in, inter alia, the manufacture, sale, distribution and installation of automated storage systems for medications.

## B. The Technology At Issue

### 1. The patents-in-suit

The patents-in-suit claim an automated system for retrieving packages containing medication to fill prescription orders in a pharmacy. ('110 patent, col. 1:13-16; '267 patent, col. 1:15-18) The patents-in-suit share identical specifications, differing only by the claimed subject matter. Independent claim 1 of the '110 patent, and independent claims 1 and 7 of the '267 patent, are representative of the invention.

The '110 patent, entitled "Automated System for Selecting Packages from a Storage Area," issued from a chain of continuation applications[2] on November 21, 1995 and lists Automated Healthcare, Inc. ("AHI") as the assignee.[3] Claim 1 is the sole independent claim and provides for:

A system for selecting and delivering packages to fill orders comprising:

a) a storage area comprised of a plurality of storage area locations each location having package holding means sized and configured to hold a plurality of individual packages each individual package having a machine

[2]Through this chain of applications, the '110 patent claims priority to U.S. Application No. 07/469,217, which was filed on January 24, 1990.

[3]McKesson subsequently acquired AHI.

3

readable label which identifies a type of package, the packages being held in a manner so that each package can be placed into and removed from the storage area locations and so that the machine readable label on at least one package in a storage location can be read without removing the package from the storage location, each location having a distinct x, y coordinate;

b) automated picking means sized and configured to be able to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions, the picking means having a gripper for grasping and moving the packages and having a picking means storage location sized and configured to hold a plurality of packages in a face to face relationship after the plurality of packages have been retrieved from the storage area and prior to delivery of the plurality of packages to a desired destination separate from the picking means;

c) means for moving the automated picking means to selected storage locations;

d) a computer having at least one memory which contains a program for directing the picking means to chosen storage area locations and a database containing at least one x, y coordinate location in the storage area for each package held within the storage area the computer being connected to the automated picking means and the means for moving the automated picking means; and

e) a package reader associated with the picking means and being positioned for reading the machine readable labels on packages located within the storage area, wherein only one type of package is stored in each x, y coordinate location.

The '267 patent, entitled "Automated System for Selecting and Delivering Packages from a Storage Area," issued to AHI on January 14, 1997.[4]  The '267 patent has 11 claims; only claims 1 and 7 are independent.  Exemplary claim 1 discloses:

A system for selecting and delivering medicine packages from a holding means to fill orders comprising:

---

[4]The '267 patent, issuing from essentially the same chain of applications as the '110 patent, also lists the January 24, 1990 priority date.

a) holding means comprised of a frame having a plurality of support rods each support rod sized for holding a plurality of medicine packages, each rod associated with a given medicine and holding medicine packages with only the same medicine each support rod having a distinct X, Y coordinate location;

b) means for picking medicine packages from the support rods in accordance with instructions received from a computer, said picking means being able to access the holding means; the picking means capable of holding a plurality of medicine packages which have been picked from the holding means;

c) a computer having a database containing an X, Y coordinate location for all packages in the holding means, the computer able to receive orders for packages and able to direct the means for picking packages; and

d) a supply structure having a plurality of supply support rods which extend from said structure to form an X, Y coordinate system, with each supply support rod and medicine package thereon having a unique X and Y coordinate, said picking means disposed to have access to said structure such that a given medicine package on an associated supply support rod can be picked by the picking means to fill a patient's prescription, or a given medicine package in the supply structure can be picked by the picking means to restock an associated rod in the holding means.

Claim 7 discloses an embodiment employing a suction rod as the picking means:

A system for selecting and delivering packages from a holding means to fill orders comprising:

a) holding means comprised of a frame having a plurality of support rods for holding packages each support rod having a distinct X, Y coordinate location and holding a plurality of packages, all of those packages on each support rod having similar contents;

b) picking means for picking packages from the support rods in accordance with instructions received from a computer, the picking means being able to access the holding means and having

a housing;

means for storing packages attached to the housing;

means for producing a suction;

5

a suction rod in fluid connection with the suction producing means, said suction rod slidingly attached with respect to the Y and Z directions to the housing and maintaining a suction therethrough when the suction producing means is activated by which a medicine package is picked with suction; and

means for sensing when a package is properly positioned such that the package rod is then moved to the storing means and deposits the package thereon.

## 2. The accused PillPick System

Swisslog's PillPick System is an automated system that, in response to the manual entry of prescription information via computer interface, automatically retrieves and dispenses unit-dose medications from a hospital pharmacy to fill patient prescriptions. (D.I. 387, ex. 30 at 10673) At its most basic level, the PillPick System includes three pieces of equipment: (1) a device that automatically creates unit-dose packages of medications from bulk medication canisters ("the PillPicker"); (2) an area for storing, retrieving and restocking the unit-dose packages ("the DrugNest"); and (3) optional dispensing machines for organizing unit-dose packages retrieved from the DrugNest into parcels for distribution to patients (either "the PickRing assembly" or "the FillBox assembly"). (D.I. 443, ex. 3 at 57755-58)

Once the PillPicker creates a unit-dose package pursuant to the desired specifications, a robot positioned at the loading ends of the DrugNest ("the SinglePill Robot") retrieves packages from the PillPicker and places the packages in the DrugNest for storage.[5] The DrugNest includes a storage area having a matrix of up to 20 rotatable pin conveyors. (D.I. 387, ex. 32 at 10820) Each pin is capable of holding

---

[5]Swisslog's noninfringement arguments (and thus the court's factual inquiries) primarily emphasize the configuration of the DrugNest.

6

up to three rows of 74 storage area locations, each storage area location having a support rod to hold unit-dose packages (created by the PillPicker) of the same medication. (*Id.*) The rods can be rotated, through movement of the rotatable conveyor, to bring the rod designated for a particular type of medication towards the front or back ("the loading ends") of the DrugNest. (*Id.*, ex. 38 at 44459-60, 489-90) The SinglePill Robot subsequently travels horizontally and/or vertically within the plane of the loading ends to the designated rod and loads the package onto the rod. (*Id.*)

The SinglePill Robot also acts to retrieve unit-dose packages from the DrugNest to fill a patient's prescription. A command prompt entered via computer interface causes the rotatable conveyor to move the rod carrying the desired medication to the loading ends of the DrugNest. (*Id.*, ex. 33 at 12468) The SinglePill Robot travels within the plane of the loading ends to the designated rod and retrieves the specified unit-dose package. (*Id.*) This process repeats until each medication that comprises the patient's prescription is retrieved. (*Id.*, ex. 34 at 22933) Once the SinglePill Robot has retrieved all of the requested medications, it rotates 180 degrees, orienting so that the collected unit-dose packages face away from the DrugNest. (D.I. 443, ex. 6 at 46265) The unit-dose packages are then either dispensed directly by the SinglePill Robot, or packaged into parcels by the PickRing and/or the FillBox.

If the PillPick System employs the PickRing assembly, the SinglePill Robot releases the unit-dose packages onto the rod of a robot manipulator ("the RingRobot") positioned adjacent to the DrugNest. (D.I. 387, ex. 34 at 22934) The RingRobot subsequently rotates 180 degrees, and the unit-dose packages are individually

7

removed and scanned by a barcode scanner located within the PickRing assembly and separate from the DrugNest. (*Id.*)  The scanner verifies that the medications selected by the SinglePill Robot match the prescription information.  After verification, a binding machine in the PickRing assembly threads a plastic cord through a perforation in the unit-dose packages and welds the ends together to form a ring of medications that can be delivered to the patient.[6]  (*Id.*)

Alternatively, the SinglePill Robot transfers the unit-dose packages to the FillBox assembly. (*Id.*, ex. 37 at 85697)  After the FillBox assembly receives the unit-dose packages from the SinglePill Robot, a barcode scanner[7] verifies that the unit-dose packages selected by the SinglePill Robot match the patient's prescription information. (*Id.*)  The unit-dose packages are then transported by a conveyor and placed into boxes assigned to the patient.  (*Id.*)

An automated feature facilitates the sorting and subsequent return of unused medications to the DrugNest.  These medications are manually loaded onto a conveyor configured to transfer the medications back to the DrugNest ("the Return Conveyor"). The medications, generally arranged randomly on the Return Conveyor, rotate towards the SinglePill Robot. (*Id.*, ex. 35 at 29473)  Prior to reaching the SinglePill Robot, each

---

[6]If the scan is interrupted, or results in a determination that the SinglePill Robot did not correctly fill the prescription, the PickRing assembly creates the medication ring and then discards it.  The computer will then direct the SinglePill Robot to begin the selection process anew. (*Id.*)

[7]The barcode scanner is located within the FillBox assembly, which is separate from the DrugNest. (*Id.*)  A scan identifying an error will likewise result in the rejection of the entire order.

unit-dose package is scanned by a stationary barcode reader[8] oriented on the wall of the DrugNest. (*Id.*, ex. 6 at 209-11)  The information obtained by the scan provides the SinglePill Robot with the coordinates required to transport the unit-dose package to the rod associated with that specific medication.  This operation continues until the SinglePill Robot has reintegrated each unit-dose package into the DrugNest.



---

[8] The DrugNest contains three such scanners, one for each of the three rows on the Return Conveyor.

## III. STANDARD OF REVIEW

### A. Referral of Proceedings to Magistrate Judge

The court engages in *de novo* review for each objection to the decision of a magistrate judge on a dispositive matter. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(3). A motion for summary judgment is considered a dispositive matter and, therefore, objections to the findings or conclusions of the magistrate judge in connection with such a motion necessitate *de novo* review. *Id.* Irrespective of whether the parties have lodged an objection, the court may accept, reject, or modify the recommendations of the magistrate judge. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

By contrast, evidentiary decisions made by the magistrate judge go to non-dispositive matters. *See Fuller v. Summit Treestands, LLC*, 2009 WL 483188, at *1 n.1 (W.D.N.Y. Feb. 25, 2009) ("Although defendant's motion for summary judgment is dispositive, its motion to preclude expert evidence is non-dispositive."). These decisions become orders of the court. *See U.S.W. v. New Jersey Zinc Co.*, 828 F.2d 1001, 1005 (3d Cir. 1987) (holding that, pursuant to 28 U.S.C. § 636(b)(1)(A), the order of a magistrate judge is dispositive unless district court takes action to overrule it). The court must reconsider such decisions to the extent that "it has been shown that the magistrate's order is clearly erroneous or contrary to the law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

### B. Summary Judgment

10

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

The 83-page R&R reflects Judge Stark's careful and exhaustive consideration of each of the referred issues. In general, the recommendations are well supported by the record in view of the relevant authority.[9] Having considered the parties' objections, the court engages in *de novo* review of the recommendations. The court also briefly pauses to consider whether the Magistrate Judge's decision not to exclude expert testimony resulted in a clear error of law.

### A. Swisslog's Motion to Dismiss for Lack of Standing

Swisslog objects to Judge Stark's recommendation to deny its motion to dismiss based on its contentions that McKesson has failed to establish that it holds all rights, title, and interest in the patents-in-suit.[10] (D.I. 553 at 4) McKesson bears the burden of establishing that it has standing to bring an action for patent infringement. *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). It is axiomatic that "[o]nly a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit[.]" *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008) (citing *Sicom*, 427 F.3d at 976); *see also Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001) (only patentee or successor in title is a proper plaintiff

---

[9]As will become apparent, the court's *de novo* review has uncovered only two instances, both matters of claim construction, that require a modification of the Magistrate Judge's recommendations.

[10]This *de novo* review marks the fourth time that this specific issue has come before the court.

in a patent infringement case).

To substantiate a claim of patent ownership, a putative patentee "must produce a written instrument documenting the transfer of [ownership]." *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1259 (Fed. Cir. 2000). Where more than one party owns rights in a patent, "a co-owner acting alone will lack standing." *Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007). This requirement aims to ensure that accused infringers are not "subjected to multiple suits and duplicate liability" from other parties who might also assert rights in the same patent. *IpVenture, Inc. v. ProStar Computer, Inc.*, 503 F.3d 1324, 1325 (Fed. Cir. 2007).

In the R&R, Judge Stark reaffirms his prior opinion that a 1990 loan between AHI and several investors did not involve an assignment of patent rights to inventors, but instead gave the investors a mere security interest in AHI's patent rights which expired upon repayment of the loan. (D.I. 551 at 5) This reaffirmation was made in view of a ruling in which the court declined to adopt the Magistrate Judge's previous recommendation to outright deny the motion and, instead, denied the motion without prejudice to renew. Specifically, the court evinced skepticism that, in view of the competing evidence, McKesson had met its burden to substantiate its claim of patent ownership. (D.I. 503 at 2-3) Accordingly, the court stayed this action and directed McKesson to resolve the question of ownership "either through agreement or in a court having proper jurisdiction over the non-party investors." (*Id.*)

During the six month interim in which this case was stayed, McKesson obtained a disavowal from each investor. The disavowal states, in relevant part:

13

> . . . I, [investor], do hereby affirm that as of December 27, 1990 AHI was the sole owner of [the patents-in-suit] holding all rights, interests, and title to the [patents-in-suit].  I affirm that AHI fully satisfied the obligations under the Promissory Note[s].  I affirm my understanding that any legal or equitable rights I may have held in [the patents-in-suit] terminated as of December 27, 1990, by operation of law when AHI repaid the Promissory Note[s].

> . . . .

> I further affirm that as of December 27, 1990 I did not have any legal or equitable rights to any of [the patents-in-suit].

> . . . .

> I affirm that, at least as of December 27, 1990, I have never asserted any rights to [the patents-in-suit] and agree to forbear from asserting such rights at any time in the future.  I also affirm that I will never assert any claim that [Swisslog] or any affiliates, successors, assigns, or transferees, or their customers infringe [the patents-in-suit].

(D.I. 535, exs. 1, 41)  Moreover, while lacking an explicit assignment from the investors, the disavowals obligate the investors to "execute any additional documents required to provide AHI, now McKesson, with full legal and equitable title to [the patents-in-suit], including a reassignment with an effective date of December 27, 1990 should a Court deem one necessary in the patent litigation pending in the U.S. District Court for the District of Delaware." (D.I. 528, ex. B at ¶7)  The disavowals were obtained in view of the investors' expressed opinion that they possessed rights to the patents-in-suit. (*Id.*, ex. A)  The investors received a total of $337,500 in consideration of their execution of the disavowals. (*Id.*, ex. B at ¶ 13)

Swisslog argues that these facts expose a defect in ownership, emphasized by McKesson's failure to obtain an assignment, that precludes McKesson alone from asserting the patents-in-suit.  According to Swisslog, the absence of an express assignment in the disavowals is, in reality, a gamble on McKesson's part in "choosing to

14

keep the ownership question alive . . . ." (D.I. 553 at 5)  The court disagrees.  While re-assignment by the investors of any remaining rights would have provided greater clarity with respect to the question of ownership, another equally sufficient method of resolving the issue in a manner that would allow the litigation to progress, as explained by the court's previous order, was to demonstrate that the investors have "either disavowed rights in the patents-in-suit or indicated a willingness not to enforce those rights."  (D.I. 503 at 3 n.3)  The disavowals contain representations that satisfy both criteria. Accordingly, the court concludes that McKesson "resolv[ed] the issue of ownership . . . through agreement [with] . . . the non-party investors" and has standing to bring this suit.  (*Id.* at 3)

## B. Swisslog's Equitable Motion to Limit Damages

Generally, a patentee is "entitled to damages from the time when it either began marking its products in compliance with 35 U.S.C. § 287(a) or when it actually notified [the infringer] of its infringement, whichever was earlier."  *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993).  Section 287(a) of Title 35 of the United States Code provides, in relevant part, that

> [p]atentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice.  In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice.

15

The Federal Circuit has interpreted this provision to require the marking of each tangible product capable of being so marked with the patent number prior to allowing the patentee to claim constructive notice of infringement. *See American Medical Systems*, 6 F.3d at 1538-39.

Judge Stark recommends that, insofar as McKesson failed to properly mark its Robot-Rx system, the court circumscribe McKesson's potential damages to those accruing after December 16, 2005, when Swisslog received a cease and desist letter. Consistent with this recommendation, the record demonstrates both that the Robot-Rx system is an embodiment of the patents-in-suit and that McKesson never marked the physical system or any of its packaging with the numbers of the patents-in-suit. (D.I. 387, ex. 46 at 18) McKesson's objection, notwithstanding these facts, argues primarily that the Connect-Rx software associated with the Robot-Rx system displays the patents-in-suit on the log-in screen of the user interface each time a user accesses the Robot-Rx system. (D.I. 554 at 6)

The Connect-Rx software is neither an embodiment of the patents-in-suit, nor exclusive to the Robot-Rx system.[11] Moreover, it is inapposite to the marking inquiry that, according to McKesson, "[i]f a user accesses the Robot-Rx system ten times a day, the user sees the patent marking ten times." (D.I. 554 at 7) Mere frequency of exposure to a given patent marking does nothing to put the user on constructive notice of infringement if it is uncertain which product the patent is purported to cover. *See*

---

[11]The Conect-Rx software is configured to control, and is included with, a variety of McKesson's products, including: (1) Horizon Meds Manager™; (2) Horizon MedComm-Rx™; (3) AcuDocse-Rx ®; (4) Connect-Rn™; (5) MedCarousel ®; (6) IntellShelf-Rx™; (7) PACMED™; and (8) NarStation™. (D.I. 387, ex. 48)

16

*Nike Inc. v. Wal-Mart Stores*, 138 F.3d 1437, 1443 (Fed. Cir. 1998) (identifying as among the policies of the marking statute "aiding the public to identify whether an article is patented . . . ."). As Judge Stark and Swisslog correctly note, a user has no way of knowing which patents listed on the log-in screen cover which of the multiple products controlled by the Connect-Rx software, or whether the patents cover the Connect-Rx software itself. The court concludes that the marking displayed by the Connect-Rx software does not sufficiently apprise the public that the Robot-Rx is covered by the patents-in-suit. Accordingly, McKesson may seek damages accruing after December 16, 2005, when Swisslog was placed on notice of its potential infringement through receipt of the cease and desist letter.

### C. Swisslog's Motion to Exclude Expert Testimony

Judge Stark denied the motions of both parties to exclude expert testimony. Swisslog argues that the denial of its motion to exclude the testimony of Dr. Book insofar as it pertains to an equivalency analysis of the PillPick System has resulted in a clear error of law under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court disagrees. A review of the record demonstrates that Dr. Book compared the function, way and result of the PillPick System with the relevant claim limitations for each element where such an equivalency analysis was applicable. (D.I. 443, ex. 13) Nothing in the expert report of Dr. Book leads the court to question the Magistrate Judge's determination that McKesson has met its burden of demonstrating qualifications, reliability and fit. To the extent that Swisslog's concerns go to the substance of Dr. Book's opinions, these may be addressed through cross-examination at trial.

17

## D. Claim Construction

The court construes the words of a claim according to "their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). A claim term's "ordinary and customary meaning" "is the meaning that the term would have to a person of ordinary skill in the art in the question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Where "the meaning of a claim term as understood by persons of skill in the art is . . . not immediately apparent," the court turns to publicly-available sources to ascertain the meaning, including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quotation marks omitted).

In the R&R, Judge Stark recommends: (1) adoption of the parties' agreed-to constructions of undisputed claim limitations; and (2) constructions for the disputed claim limitations. The court adopts these recommendations in part, overruling two proposed constructions of the disputed limitations.

### 1. "[X],y coordinate"[12]

_____

[12]This disputed limitation appears in a variety of forms; however, the parties and the court agree that one construction should apply to all instances. Claims 1 and 7 of the '267 patent describes this limitation as "x, y coordinate location" and "x and y coordinate." Claims 1 and 8 of the '110 patent refer to "x,y coordinate" and "x,y coordinate location." The court refers to each of these instances through the use of "x,y coordinate."

18

Judge Stark construed "x,y coordinate," to mean "one or more points that designates the position of a package where the picking means selects, grabs and replaces packages." In recommending this construction of "x,y coordinate," Judge Stark agreed with McKesson's position that the x,y plane referred to in the claims must exist only where the picking means can access packages. Swisslog objects to this construction and argues that the court should construe "x,y coordinate" in accordance with its ubiquitous mathematical meaning, to wit, "a location identifier 'X,Y,' in which X designates a position of the location along an X-Axis and Y designates a position of the location along a Y-Axis."

While construing "x,y coordinate" in terms of where the picking means can access packages has intuitive appeal based on the claim language and the specification (which demonstrate a relationship between x,y coordinates and the automated picking means), Judge Stark's proposed construction goes one step further and associates the "x,y coordinate" with the location of the packages themselves. The court declines to adopt this construction for several reasons. First, the claims themselves are replete with language requiring the accessibility of packages to the picking means. ('267 patent at col.13:10-14, col. 13:26-32, col. 14:23-29; '110 patent at col. 13:5-11, col. 13:12-23) Therefore, the construction of the "x,y coordinate" limitation need not contain a duplicate requirement. Second, and most importantly, designating a nonpermanent, movable object (i.e., package) as a location identifier runs the inherent risk of defining a transient coordinate system which varies according to the position of a given package. Neither does Swisslog's proposed construction comport with the claims or specifications of either of the patents-in-suit. Construing "x,y coordinate" according

19

to its ubiquitous meaning fully divorces this claim limitation from the context of the patents-in-suit, which makes clear that the x, y plane exists in certain locations and not others.

In light of the above, the court concludes that the patents-in-suit contemplate a coordinate system anchored by the various means for holding the packages. With respect to the '110 patent, designating the "package holding means"[13] as the anchor of the coordinate system resolves the permanency issues associated with the recommended construction, while simultaneously preserving the context of the invention. This understanding of "x,y coordinate" comports with the claims and specifications. Limitation a) of claim 1 of the '110 patent recites "a storage area comprised of a plurality of storage area locations each location having a **package holding means** . . . each location having a distinct x, y coordinate." Dependent claim 8 of the '110 patent further requires a "supply station . . . having a plurality of locations each location having **package holding means** . . . each location having a distinct x, y coordinate." (Emphasis added)  In both claims, the package holding means are "sized and configured" to hold one or more medicine packages. The '267 patent uses slightly different terminology, claiming a "holding means" and a "supply structure." Consequently, the "holding means" and "supply structure" anchor the coordinate system of the '267 patent.

In sum, the package holding means of the '110 patent, as well as the holding

_____

[13]Judge Stark has construed "package holding means" in accordance with 35 U.S.C. § 112, ¶6 to have the function of holding packages and corresponding structure of the "rods, brackets, shelves and dividers as disclosed at positions 30, 25, 29 and 31 of, e.g., FIG. 3-6, and col. 5, lines 10-19 and 25-40.

means and supply structure of the '267 patent, relate to discrete and permanent

locations that render the packages accessible to the picking means. Accordingly, with

respect to the '110 patent, the court construes "x,y coordinate" to mean "one or more

points that designates a position in the package holding means." With respect to the

'267 patent, the court construes "x,y coordinate" to mean "one or more points that

designates a position in the holding means or supply structure."

### 2. "[P]ackage reader associated with the picking means"

The Magistrate Judge has recommended that the court construe "package

reader associated with the picking means" as used in claim 1 of the '110 patent to

mean "a device that provides the identity of a package to the computer directing the

picking means." Swisslog objects[14] to the recommended construction, arguing that a

"package reader associated with the picking means" is properly construed to mean a

"package reader attached to the picking means."

In support of its proposed construction, Swisslog alleges that the applicants

made statements during prosecution of the '110 patent that resulted in a disavowal of

claim scope,[15] requiring a package reader that is physically attached to the picking

means. Swisslog primarily relies upon a selective quotation from the prosecution

history in which the applicants sought to traverse a rejection made pursuant to 35

U.S.C. § 103 in view of, inter alia, U.S. Patent No. 4,896,024 to Morello ("the Morello

---

[14]Swisslog's objection is found nestled within its objection to the Magistrate Judge's recommended denial of its motion for noninfringement. (D.I. 553 at 10-11)

[15]The parties agree that "associated with" contemplates a broader connotation than "attached to," at least to the extent that "associated with" does not require a physical connection. (See, e.g., D.I. 351 at 26-27)

21

patent"):

> [T]he picker assembly [of the Morello patent] . . . cannot read the article identification while the article remains in the storage location. **This teaching is quite different from the system of the amended claim 1**.

(D.I. 350, ex. C at 56471-72) (emphasis added)  Looking at these two sentences in isolation lends credence to Swisslog's position regarding the physical relationship between the picking means and the package reader.  However, the clarity of any specific disavowal is belied by the bulk of the applicants' remarks, contained in a sizeable two-page paragraph terminating in the aforementioned sentences, which distinguish the invention of the '110 patent from the Morello patent on various grounds. (*Id.* at 56470-72)  The emphasized sentence characterizes the combination of elements taught by the Morello patent, and not solely the manner in which the picking means identifies an article.  The court agrees with Judge Stark's conclusion that these remarks do not amount to a clear, unambiguous and unmistakable disavowal.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-1326 (Fed. Cir. 2003) (holding that "for prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.").  Accordingly, the court declines to limit this claim limitation in the manner proposed by Swisslog, and adopts the Magistrate Judge's recommended construction.

### 3. "[S]torage area location"[16]

The parties have no objection to Judge Stark's construction of "storage area

---

[16]'110 patent, claim 1 (and dependent claims).

location" as used in claim 1 of the '110 patent to mean "a place in the storage area accessible to the picking means where packages are held." However, the explicit detail provided by claim 1 defines the precise nature of a "storage area location," and belies any need for further construction. Accordingly, the court concludes that no construction is required and overrules this recommendation.

### 4. "[P]icking means," "automated picking means,"[17] and "means for picking medicine from the support rods"[18]

Judge Stark recommends that the court construe these means-plus-function limitations to have the following function: "to hold packages, to select packages from the storage area locations and place packages in the storage area locations in accordance with computer controlled instructions." The recommended structure corresponding to this function is "picking means 38." McKesson objects only to the recommended structure and argues that the Magistrate Judge, through this allegedly narrow and "circular" definition, has essentially failed to identify a corresponding structure. (D.I. 554 at 2) In an attempt to alleviate this perceived structural deficiency, McKesson proposes that the court find the corresponding structure for these limitations to be "a device that includes a housing, a gripper, an extension rod, and a storing rod as disclosed in col. 7, lines 57-64 and Fig. 7."[19] However, the components proposed by

---

[17]Id.

[18]'267 patent, claim 1 (and dependent claims).

[19]This portion of the specification provides that the picking means 38 includes at least one gripper assembly illustrated in FIGS. 7 through 12. . . . The gripper assembly is preferably comprised of a housing 49, as shown in FIG. 7 having means for storing medicine packages 14, such as a storing rod 48.

23

McKesson to act as corresponding structure do not perform the stated function; rather, they merely enable the picking means 38 to do so. *See Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001) (holding that "[t]he corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended . . . .").

The court disagrees that identifying picking means 38 as the corresponding structure "provides insufficiently specific structure." (D.I. 554 at 4) McKesson relies upon *Toro Co. v. Textron, Inc.*, 502 F. Supp. 2d 904 (D. Minn. 2007), for its objection in this regard. In *Toro*, the claim terms at issue were "means . . . to allow such wheel to overrun the hydraulic motor" and "overrunning clutch means." While the *Toro* court rejected the proposal that "mechanical overrunning clutch means 50" serve as corresponding structure, it did not, as McKesson suggests, find "a unidirectional clutch [that] comprises at least one roller clutch with a splined inner diameter" fulfilled this role. *Id.* at 913. Rather, citing to *Asyst*, 268 F.3d at 1364 and *Micro Chemical, Inc. v. Great Plains Chemical Co.*, 194 F.3d 1250 (Fed. Cir. 1999), it found that this level of detail did not comport with "Federal Circuit law on interpreting means-plus-function claims." *Id.* Viewing the specification in light of the Federal Circuit's guidance, the *Toro* court adopted a broader corresponding structure, which it identified as a "mechanical overrunning clutch."

Consistent with the findings of Judge Stark, the specification repeatedly

---

Assembly 38 also contains means 50 for obtaining a package 14. The obtaining means 50 is slidingly attached to the housing 49 such that it can move in a Z direction, which is perpendicular to the X, Y directions, to pick a package 14 from a support rod 30 in the storage rack 12 or supply rack 20.

describes and refers to "picking means 38" in connection with the identified function. ('110 patent, col. 5:63-6:9, col. 7:45-col. 8:13, col. 5:63-64, col. 7:51-53) Accordingly, the court concludes that one of ordinary skill would understand the corresponding structure of the aforementioned means limitations to be "picking means 38."

### 5. "[M]eans for obtaining a medicine package" and "obtaining means"[20]

The recommended disclosed function for these means-plus-function limitations is "obtaining a medicine package." The structure corresponding to this function is "obtaining means 50." McKesson objects again to the recommended corresponding structure, reiterating the same structural deficiency arguments it proffered regarding the picking means limitations. For the reasons given *supra*, the court disagrees that the recommended corresponding structure is "circular" and fails to evoke a readily identifiable structure. Consequently, the court adopts the recommended disclosed function and corresponding structure.

### E. Swisslog's Motion for Summary Judgement of Noninfringement

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A two-step analysis is employed in making an infringement determination. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, the court must construe the asserted claims to ascertain their meaning and scope. *Id.* Construction of the claims is a question of law subject to *de novo* review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). The

---

[20]'267 patent, claim 4.

trier of fact must then compare the properly construed claims with the accused infringing product. *Markman*, 52 F.3d at 976. This second step is a question of fact. See *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Direct infringement requires a party to perform each and every step or element of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. See *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). A product that does not literally infringe a patent claim may still infringe under the doctrine of equivalents if the differences between an individual element of the claimed invention and an element of the accused product are insubstantial. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (U.S. 1997).

Prosecution history estoppel may preclude the patentee from relying upon a theory of equivalence during an infringement proceeding. "[E]stoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (U.S. 2002). However, the Supreme Court has rejected a per se approach in which a finding of estoppel would bar a patentee from later asserting a claim under the doctrine of equivalents regarding the narrowed element. Indeed, such a practice is "inconsistent with the purpose of applying the estoppel in the first place -- to hold the inventor to the

26

representations made during the application process and to the inferences that may reasonably be drawn from the amendment." *Id.* at 737. In *Festo*, the Supreme Court provided guidance as to when narrowing amendments should not eliminate access to the doctrine of equivalents:

> There is no reason why a narrowing amendment should be deemed to relinquish equivalents unforeseeable at the time of the amendment and beyond a fair interpretation of what was surrendered. Nor is there any call to foreclose claims of equivalence for aspects of the invention that have only a peripheral relation to the reason the amendment was submitted.

*Id.* at 738. Accordingly, the flexible rule announced in *Festo* requires the court to "consider[] what equivalents were surrendered during the prosecution of the patent." *Id.*

The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

Swisslog alleges that the Magistrate Judge, in recommending that the court deny its motion for summary judgment of noninfringement of the '110 patent, failed to consider several arguments that could, individually, result in a contrary conclusion. The court has disposed of one such argument, *supra*, in overruling Swisslog's objection to the recommended construction of a "package reader associated with the picking means." The court now turns to Swisslog's remaining arguments, most of which center upon limitations it alleges define the operation of the package reader.[21]

---

[21]These limitations, each added to claim 1 during prosecution, include: (i) a "package reader associated with the picking means" ("the First Reader Limitation"); (ii) the "package reader . . . positioned for reading . . . packages located within the storage area" ("the Second Reader Limitation"); and (iii) "at least one package in a storage area location can be read [by a package reader] without removing the package from the storage location" ("the Third Reader Limitation") (collectively, "the Package Reader

27

Highlighting a series of amendments made during the prosecution of the '110 patent, Swisslog argues that the *Festo* presumption precludes McKesson from relying upon the doctrine of equivalence with respect to the Package Reader Limitations. *Festo*, 535 U.S. at 736.  Despite the multiple prior art rejections of claim 1, the record sufficiently demonstrates that it was not the addition of the Package Reader Limitations that ultimately swayed the examiner to allow the '110 patent.  Indeed, the examiner twice explained that the prior art references taught a package reader that scanned an article prior to the article's removal from the storage area.  (D.I. 443, ex. 15 at 217, 234) Instead, claim 1 of the '110 patent was allowed after the applicants made a subsequent amendment, proposed by the examiner at an interview, that "the picking means storage location [be] sized and configured to hold a plurality of packages in a face to face relationship." (*Id.* at 248)  Consequently, the court cannot say that the Package Reader Limitations bear more than a tangential relationship to the patentability of the '110 patent. *See Festo*, 535 U.S. at 736, 740-41.  The court concludes that McKesson has rebutted the *Festo* presumption and may rely upon a theory of equivalence with respect to the Package Reader Limitations.

The conclusion that the Package Reader Limitations are entitled to a range of equivalents erodes much of the force of Swisslog's noninfringement arguments directed to these limitations.[22]  In this regard, Swisslog first argues that the PillPick System does

Limitations").

[22]Aside from its position that the court should preclude McKesson from relying upon a theory of equivalence with respect to the Package Reader Limitations, Swisslog does not alternatively argue that the PillPick System does not infringe under the doctrine of equivalents.

28

not scan packages "within the storage area" and, thus, fails to meet the Second Reader Limitation. (D.I. 553 at 8) A reasonable jury could conclude that the Return Conveyor and the attached bar code scanners, contained within the larger DrugNest structure, exist "within the storage area" of the PillPick System. Even assuming, as Swisslog alleges, that the Return Conveyor scanning occurs within a "supply rack," the '110 patent alludes to the interchangeability of the storage rack and the supply rack. ('110 patent at 3:12-16, 5:10-11 ("A storage rack 12, which may also be used as a supply station, is shown in FIG. 3.")) Indeed, in several embodiments, the storage rack and supply rack exist within the same continuous structure, all of which is accessible to the picking means. (*Id.* at Figs. 1, 15) Consequently, a second issue of material fact exists with respect to whether a supply rack is properly part of the storage area.

Swisslog also argues that the PillPick System does meet the Third Reader Limitation because it does not scan a package "without removing the package from the storage location." While this argument depends, at least partially, upon Swisslog's characterization of the Return Conveyor - determined, *supra*, to be one that a reasonable jury could disagree with - as excluded from the storage area, the court finds that this claim must fail for an independent reason. The full context of the Third Reader Limitation reveals that this limitation only concerns the orientation of packages held within the storage area. Limitation a) of claim 1 requires that

> **the packages** be[] held in a manner so that each package can be placed into and removed from the storage area locations and **so that the machine-readable label on at least one package in a storage area location can be read without removing the package from the storage area location** . . . .

(emphasis added) By contrast, limitation e) provides a relational context between the

29

package reader and the labels on the stored packages, stating that the package reader is "positioned for reading the machine readable labels on packages located within the storage area . . . ." A reasonable jury could conclude, in view of the foregoing, that the three bar code readers of the PillPick system scan packages within the storage area as required by limitation e).

Finally, Swisslog contends that the SinglePill Robot, which the parties seem to agree functions as the picking means, does not hold packages "after the . . . packages have been retrieved from the storage area," as required by limitation b) of claim 1. In support of this position, Swisslog cites to the deposition testimony of McKesson's expert, Dr. Book, in which he explained that the SinglePill Robot remains within the storage area at all times. (D.I. 387, ex. 43 at 266-68) The probative value of this alleged admission is questionable in view of Dr. Book's opinion that the SinglePill Robot is separate and distinct from the DrugNest (which Dr. Book characterized as the storage area of the PillPick System). (D.I. 443, ex. 21 at 237-40, 241-42) At a minimum, an issue of material fact exists with respect to whether this limitation, too, is met by the PillPick System.

The court next briefly pauses to consider how, if at all, the court's construction of "x,y coordinate" in a manner different from that proposed by either of the Magistrate Judge or the parties affects the noninfringement analysis. To the extent that the adopted construction has merely altered the point of reference from the package (the Magistrate Judge's proposed construction) to the package holding means, the court concludes that this change does not warrant the grant of Swisslog's motion for summary judgment of noninfringement of the '110 patent. Specifically, a question of

30

fact persists as to whether the requirement of a "distinct" x,y coordinate for each storage area location is met by the rotating conveyor approach of the PillPick System, which Swisslog asserts is absent to the extent that each pin conveyor has multiple storage area locations with the same x,y coordinate. (D.I. 384 at 2) Neither party requested that the court construe "distinct," and Swisslog's position does not account for all reasonably possible interpretations of this limitation.[23] Even Swisslog's conclusion that, under its proposed definition of "distinct," the pin conveyors of the PillPick System do not have "distinct" x,y coordinates is subject to reasonable disagreement. While the x,y coordinates may be the same for all the unit-dose packages contained on a single pin conveyor of the PillPick System (differing only by the z coordinate), the jury could conclude that "storage area locations" exist only on the x,y plane accessible to the SinglePill Robot, to wit, those areas exposed at the loading ends of the DrugNest. Pursuant to this alternative reasonable characterization, the PillPick System may contain "storage area locations" that have "distinct" x,y coordinates according to Swisslog's understanding of the term.

In conclusion, multiple issues of material fact warrant the denial of Swisslog's motion for summary judgment of noninfringement; the court adopts the Magistrate Judge's recommendation in this regard.

## F. McKesson's Motion for Summary Judgement of No Inequitable Conduct

---

[23]Indeed, it is not unreasonable to conclude that the PillPick System has storage area locations, each location containing a "x,y coordinate" that is "distinct" to the extent that the x,y coordinate for each storage rod does not change from time to time - even though the same x,y coordinate may be shared among multiple storage rods on the same pin conveyor.

31

Applicants for patents and their legal representatives have a duty of candor, good faith, and honesty in their dealings with the United State Patent and Trademark Office ("PTO"). *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995); 37 C.F.R. § 1.56(a) (2003). The duty of candor, good faith, and honesty includes the duty to submit truthful information and the duty to disclose to the PTO information known to the patent applicants or their attorneys which is material to the examination of the patent application. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 30 (Fed. Cir. 1999). A breach of this duty constititues inquitable conduct. *Mollins*, 48 F.3d at 1178. If it is established that a patent applicant engaged in inequitable conduct, then the patent application is rendered unenforceable. *Kingsdown Med. Consultants v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988).

In order to establish unenforceability based on inequitable conduct, a defendant must establish, by clear and convincing evidence, that: (1) the omitted or false information was material to patentability of the invention; or (2) the applicant had knowledge of the existence and materiality of the information; and (3) the applicant intended to deceive the PTO. *Mollins*, 48 F.3d at 1178. A determination of inequitable conduct, therefore, entails a two step analysis. First, the court must determine whether the withheld information meets a threshold level of materiality. A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995) (citations omitted). A reference, however, does not have to render the claimed

32

invention unpatentable or invalid to be material. *See Merck v. Danbury Pharmacal*, 873 F.2d 1418 (Fed. Cir. 1989).

After determining that the applicant withheld material information, the court must then decide whether the applicant acted with the requisite level of intent to mislead the PTO. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009); *Baxter Int'l, Inc. V. McGaw Inc.*, 149 F.3d 1321, 1327 (Fed. Cir. 1998). "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for finding a deceptive intent." *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996). That is, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown*, 863 F.2d at 876 (Fed. Cir. 1988). Evidence of specific intent must "be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). A "smoking gun," however, is not required in order to establish an intent to deceive. *See Merck*, 873 F.2d at 1422.

Once materiality and intent to deceive have been established, the trial court must weigh them to determine whether the balance tips in favor of a conclusion of inequitable conduct. *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1153 (Fed. Cir. 1988). The showing of intent can be proportionally less when balanced against high materiality. *Id.* In contrast, the showing of intent must be proportionally greater when balanced against low materiality. *Id.*

33

McKesson's motion for summary judgment of no inequitable conduct challenges the adequacy of Swisslog's proffered evidence regarding materiality and intent to deceive. To support its theory of inequitable conduct, Swisslog identifies several alleged material prior art references which it contends should have been disclosed to the PTO. The alleged material references include: 1) three business plans created by AHI prior to the critical date of January 24, 1989; 2) the demonstration of a prototype; and 3) multiple offers for sale (collectively, "the references"). (D.I. 322 at ¶¶ 65-67) Swisslog alleges that the prototype, described in the business plans, "exhibited 'substantially all of the functionality' of the first commercial [automated pharmacy station ("APS")] offered by AHI, as well as many of the purportedly novel features described in the patents-in-suit." (D.I. 433 at 7-8) Additionally, AHI allegedly entered into agreements, prior to the critical date, to install the APS at certain hospitals, offering a reduced price in consideration for the hospitals' agreements to allow potential buyers to witness demonstrations of the functionality of the APS.

Judge Stark, accepting for the sake of argument the materiality[24] of the references, recommended that the court grant McKesson's motion due to Swisslog's failure to produce any evidence of intent to deceive. Swisslog objects to this recommendation, urging that the patentees' intent to deceive is made apparent by the

---

[24]McKesson disputes that the references are prior art within the meaning of 35 U.S.C. § 102(b). According to the undisputed testimony of AHI representatives, each business plan was distributed pursuant to a confidentiality agreement. (D.I. 374 at 1, 3-4, 7-8, 19-21) With respect to the prototype demonstrations, McKesson argues that the demonstrations made prior to the critical date were "exhibitions of a crude prototype device that was significantly different from the patented system." (*Id.* at 1-2) Finally, McKesson contends that no sales took place prior to the critical date. (*Id.* at 9)

34

knowledge of the references held by Mr. Sean McDonald ("McDonald"), the founder and former president of AHI and named inventor of the patents-in-suit. (D.I. 553 at 19) In addition to this knowledge, Swisslog contends that McDonald's deposition testimony demonstrates the absence of any credible explanation on his part as to why he withheld the references from the PTO. (D.I. 434, ex. C at 222-26)

As a threshold matter, the court declines to characterize McDonald's deposition testimony in the manner suggested by Swisslog. McDonald's testimony merely establishes that, while he authored the business plans, he was not aware of whether the references were withheld from the PTO. (Id. at 227-28) A fortiori, if McDonald did not know whether the references were disclosed during the prosecution of the patents-in-suit, Swisslog cannot show on the basis of this testimony alone, by clear and convincing evidence, that McDonald made a deliberate decision to withhold them. Swisslog did not address this evidentiary gap by deposing any of the other inventors or attorneys involved in the prosecution of the patents-in-suit on this topic.

Perhaps recognizing the infirmity of using McDonald as a source of direct evidence for this theory, Swisslog argues that an intent to deceive can be inferred in view of the high level of materiality of the information withheld. (D.I. 553 at 20) However, the Federal Circuit has made clear that, to warrant such an inference, the record must demonstrate more than a simple failure to disclose a material reference. See Herbert, 99 F.3d at 1116. With respect to any inferences that could be drawn from this record, Swisslog bears the additional burden of demonstrating that an inference of intent to deceive is "the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." Star Scientific, 537 F.3d at 1366

(internal citations omitted). This record demonstrates neither and, accordingly, Swisslog has failed to adduce an inference that the applicants intended to deceive the PTO. The court adopts the recommendation of the Magistrate Judge to grant McKesson's motion for summary judgment of no inequitable conduct, concluding that Swisslog has failed to demonstrate either that the patentees knew or should have known of the materiality of the references, or that they intended to deceive the PTO.

## V. CONCLUSION

For the foregoing reasons, the court adopts Judge Stark's recommendation: (1) to deny Swisslog's motion to dismiss for lack of standing (D.I. 526); (2) to adopt the parties' agreed-upon constructions for the undisputed claim terms of the patents-in-suit; (3) to grant McKesson's motion for summary judgment on Swisslog's lack of standing defense (D.I. 379); (4) to deny Swisslog's motion for summary judgment of noninfringement (D.I. 383); (5) to grant McKesson's motion for summary judgment of no inequitable conduct (D.I. 373); (6) to grant McKesson's motion for summary judgment of validity under 35 U.S.C. § 112 (D.I. 404); (7) to deny Swisslog's motion for summary judgment of invalidity (D.I. 408); (8) to deny, without prejudice to renew, Swisslog's motion for summary judgment of no willfulness (D.I. 385); (9) to deny, without prejudice to renew, McKesson's motion for summary judgment of no patent misuse (D.I. 376); (10) to grant McKesson's motion for summary judgment of no unclean hands, waiver, laches and equitable estoppel (id.); (11) to deny Swisslog's motion for summary judgment of laches and estoppel (D.I. 381); (12) to grant in part Swisslog's motion for summary judgment of failure to mark (id.) The court also adopts in part and overrules in part the recommended constructions for the disputed claim terms of the patents-in-

suit, and denies Swisslog's motion to reconsider the Magistrate Judge's denial of its motion to exclude the expert testimony of Dr. Book (D.I. 428).  An appropriate order shall issue.